☐ **ORIGINAL**

**16 MAG 2978**

Approved: _____
BRIAN BLAIS/AIMEE HECTOR/REBECCA MERMELSTEIN
Assistant United States Attorneys

Before: HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

U.S. DISTRICT COURT
FILED
MAY 09 2016
S.D. OF N.Y.

**DOC #_____**

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :       **SEALED COMPLAINT**
                                :
        - v. -                  :       Violations of
                                :       15 U.S.C. §§ 78j(b), 78ff,
                                :       80b-6 and 80b-17; 17
JASON GALANIS,                  :       C.F.R. §§ 240.10b-5; 18
GARY HIRST,                     :       U.S.C. §§ 2 and 371
JOHN GALANIS,                   :
  a/k/a "Yanni,"                :       COUNTY OF OFFENSES:
HUGH DUNKERLEY,                 :       New York
MICHELLE MORTON,                :
DEVON ARCHER, and               :
BEVAN COONEY,                   :
                                :
                                :
        Defendants.             :
                                :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    SHANNON BIENIEK, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

**COUNT ONE**
**(Conspiracy To Commit Securities Fraud)**

    1.    From at least in or about March 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

2.    It was a part and object of the conspiracy that JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

Overt Acts

3.    In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In approximately March 2014, JOHN GALANIS, a/k/a "Yanni," the defendant, met with employees of and advisers to a Native American tribal entity at a Native America economic development conference in Las Vegas, Nevada.

b.    On or about August 8, 2014, HUGH DUNKERLEY, the defendant, signed an agreement pursuant to which he bound the broker-dealer at which he was employed to serve as the placement agent for an issuance of certain bonds by a Native American tribal entity.

c.    On or about August 22, 2014, GARY HIRST, the defendant sent an email containing trade tickets signed by him authorizing the purchase of certain bonds issued by a Native American tribal entity on behalf of certain clients of an asset management firm located in Alexandria, Virginia.

d.    On or about October 1, 2014, DEVON ARCHER, the defendant, caused the transfer of $15,000,000 from a brokerage account located in New York, New York for the purchase of

$15,000,000 of bonds issued by a Native American tribal entity, which bonds were also held, for a period of time, in the brokerage account located in New York, New York.

       e.   On or about October 9, 2014, BEVAN COONEY, the defendant, caused the transfer of $5,000,000 from an account in his name for purchase of $5,000,000 of bonds issued by a Native American tribal entity.

       f.   On or about September 16, 2015, JASON GALANIS and MICHELLE MORTON, the defendants, met in New York, New York to discuss, among other things, efforts to find buyers for certain bonds issued by a Native American tribal entity that had, at the direction of JASON GALANIS and MORTON, been placed in the accounts of clients of asset management firms run by MORTON.

       g.   On or about September 17, 2015, JASON GALANIS and MICHELLE MORTON, the defendants, met in New York, New York to discuss, among other things, efforts to find buyers for certain bonds issued by a Native American tribal entity that had, at the direction of JASON GALANIS and MORTON, been placed in the accounts of clients of asset management firms run by MORTON.

      (Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

    4.   From at least in or about March 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, the defendants engaged in a scheme to misappropriate the

proceeds of several bond issuances by a Native American tribal entity and also caused investor funds to be used to purchase the bonds, for which there was no secondary market through which such bonds could be redeemed, without disclosure to those investors of material facts, including the existence of multiple conflicts of interest and which, in some cases, were outside the investment parameters of the accounts in which they were placed.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

<u>COUNT THREE</u>
(Conspiracy To Commit Investment Adviser Fraud)

5.    From at least in or about May 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, investment adviser fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

6.    It was a part and object of the conspiracy that JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, and others known and unknown, willfully and knowingly would and did use the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

<u>Overt Acts</u>

7.    In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about August 22, 2014, GARY HIRST, the defendant sent an email containing trade tickets signed by him authorizing the purchase of certain bonds issued by a Native

American tribal entity on behalf of certain clients of an asset management firm located in Alexandria, Virginia.

b.   On or about September 16, 2015, JASON GALANIS and MICHELLE MORTON, the defendants, met in New York, New York to discuss, among other things, efforts to find buyers for certain bonds issued by a Native American tribal entity that had, at the direction of JASON GALANIS and MORTON, been placed in the accounts of clients of asset management firms run by MORTON.

c.   On or about September 17, 2015, JASON GALANIS and MICHELLE MORTON, the defendants, met in New York, New York to discuss, among other things, efforts to find buyers for certain bonds issued by a Native American tribal entity that had, at the direction of JASON GALANIS and MORTON, been placed in the accounts of clients of asset management firms run by MORTON.

(Title 18, United States Code, Section 371.)

COUNT FOUR
(Investment Adviser Fraud)

8.   From at least in or about May 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, willfully and knowingly used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, HIRST and MORTON, who were employees of a registered investment adviser and thus had fiduciary duties to their investment advisory clients, with the knowledge and approval of JASON GALANIS, intentionally withheld material information from their clients regarding purchases of bonds issued by a Native American tribal entity, including the existence of multiple conflicts of interest and the fact that the purchases were outside the investment parameters set forth in the investment advisory agreements of certain clients, for the purpose of profiting from the placement of such bonds.

(Title 15, United States Code, Sections 80b-6 and 80b-17;
and Title 18, United States Code, Section 2.)

5

The bases for my knowledge and for the foregoing charges are, in part, as follows:

9.    I have been a Special Agent with the FBI for approximately 5 years. I am currently assigned to a squad that investigates white collar crimes, including complex financial frauds and conduct within the regulatory jurisdiction of the U.S. Securities and Exchange Commission ("SEC"). I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

10.    The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to: (a) business records and other documents, such as trading records, bank records, telephone records, and records of electronic communications, including text messages; (b) publicly available documents; (c) conversations with, and reports of interviews with, non-law-enforcement witnesses; (d) conversations with, and reports prepared by, other agents, including agents of the United States Postal Inspection Service ("USPIS"); and (e) conversations with representatives from the SEC. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions and statements of and conversations with others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Relevant Entities – The Bond Issuer and the Bond Issuances

11.    At all times relevant to this Complaint, the Wakpamni Lake Community Corporation (the "WLCC") was a tribally-chartered economic development corporation, wholly-owned by the Wakpamni Lake Community, a subdivision of the Wakpamni Lake District, which are each subordinate units of the Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota. Based on my review of documents produced by, among others, the WLCC, I have learned the following:

a.    On or about August 27, 2014, the WLCC issued special limited taxable revenue bonds with a face amount of $27,077,436 (the "First Tribal Bond Issuance"), pursuant to a trust indenture (the "First Indenture") and a supplemental trust

indenture entered into by the WLCC and a bank acting as trustee (the "Trustee").

b.    On or about October 1, 2014, the WLCC issued special limited taxable revenue bonds with a face amount of $15,000,000 (the "Second Tribal Bond Issuance"), pursuant to a trust indenture (the "Second Indenture") entered into by the WLCC and the Trustee.

c.    On or about October 9, 2014, the WLCC issued special limited taxable revenue bonds with a face amount of $5,000,000 (the "Third Tribal Bond Issuance"), pursuant to a supplemental trust indenture entered into by the WLCC and the Trustee.

d.    On or about April 16, 2015, the WLCC issued special limited taxable revenue bonds with a face amount of $16,200,000 (the "Fourth Tribal Bond Issuance" and together with the First, Second and Third Tribal Bond Issuances, the "Tribal Bond Issuances," the components of which are the "Tribal Bonds"), pursuant to a trust indenture (the "Third Indenture" and, together with the First and Second Indentures, the "Indentures") entered into by the WLCC and the Trustee.

12.    At all times relevant to this Complaint, Burnham Securities, Inc. ("Burnham") was a broker-dealer registered with the SEC, with headquarters in New York, New York.  Burnham acted as the Placement Agent for each of the Tribal Bond Issuances, pursuant to placement agency agreements entered into by the WLCC and Burnham.  At certain times relevant to this Complaint, Burnham and its sister entity, Burnham Asset Management, were subsidiaries of Burnham Financial Group.  Beginning in approximately 2013 and at all times relevant to this Complaint, an entity called COR Fund Advisors LLC ("CORFA") had an ownership interest in Burnham.  DEVON ARCHER and BEVAN COONEY, the defendants, were investors in CORFA, either directly or through entities controlled by them and, as a result, owned a percentage of Burnham.

**Relevant Entities - The Investment of the Bond Proceeds**

13.    At all times relevant to this Complaint, Wealth-Assurance AG was a European life insurance company with headquarters in Liechtenstein.  At all times relevant to this Complaint, Wealth-Assurance AG was a subsidiary of the Valor Group Ltd. ("Valor"), which was a life insurance provider based in Bermuda.

14.  At certain times relevant to this Complaint, Wealth Assurance Private Client Corporation was a British Virgin Islands entity, established on or about August 22, 2014.  An entity with the same name – Wealth Assurance Private Client Corporation – was also incorporated in Florida as a Florida corporation on or about July 7, 2014.  The British Virgin Islands and Florida entities named "Wealth Assurance Private Client Corporation" are collectively referred to herein as "WAPCC."  HUGH DUNKERLEY, the defendant, was the sole officer and director of WAPCC listed in the British Virgin Islands incorporation documents.  These incorporation documents falsely represented that a predecessor entity to Valor was the parent company of WAPCC.  In addition, DUNKERLEY was the sole officer of WAPCC listed in the Florida incorporation documents.  The Florida incorporation documents for WAPCC contain a mailing address for WAPCC that is a post office box address in Lake Mary, Florida (the "Lake Mary PO Box").  On or about August 6, 2014, GARY HIRST, the defendant, opened a bank account for WAPCC in the United States, using the Lake Mary PO Box as the address for WAPCC (the "WAPCC Account").  HIRST was listed as the Assistant Secretary of WAPCC in the account opening documents.  HIRST and DUNKERLEY were authorized signatories of the WAPCC Account.

15.  At all times relevant to this Complaint, Thorsdale Fiduciary and Guaranty Company Ltd. ("Thorsdale") was a Nevada limited liability company.  Thorsdale was established on or about June 23, 2011 as a "family trust company" for "members of the Berger family and its family affiliates."  JASON GALANIS, the defendant, whose wife's maiden name is Berger, and two others had signature authority over a bank account associated with Thorsdale (the "Thorsdale Account").

16.  At all times relevant to this Complaint, Rosemary & Rue LLC ("Rosemary & Rue") was a Florida limited liability company, established on or about April 22, 2013.  The Rosemary & Rue incorporation documents list the Lake Mary PO Box as Rosemary & Rue's mailing address and list HUGH DUNKERLEY, the defendant, as Rosemary & Rue's Manager.  GARY HIRST, the defendant, signed the 2014 annual report of Rosemary & Rue as the Chairman, CEO, Sole Director, Sole Shareholder and Sole Member of Rosemary & Rue.

17.  At all times relevant to this Complaint, Rosemont Seneca Bohai, LLC ("Rosemont") was a Delaware limited liability company, established on February 13, 2014, with its principal

8

place of business in New York, New York.  On September 23, 2014, a law firm in Florida (the "Florida Law Firm"), acting as registered agent for Rosemont, filed with the Florida Secretary of State an application for authorization for Rosemont to transact business in Florida.  That application listed DEVON ARCHER, the defendant, as the manager of Rosemont.

18.  At certain times relevant to this Complaint, Sovereign Nations Development Corp. ("Sovereign Nations") was a Delaware limited liability company established on or about August 21, 2014.  A particular individual ("Individual-1") was the sole officer and director of Sovereign Nations.

### Relevant Entities – The Asset Management Entities

19.  At certain times relevant to this Complaint, BFG Socially Responsible Investing, Ltd. ("BFG") was a Nevada corporation.  BFG was formed on or about August 5, 2014.  HUGH DUNKERLEY, the defendant, was the Managing Member of BFG.  In or about August 2014, Wealth-Assurance AG acquired 100% of BFG.

20.  At all times relevant to this Complaint, GMT Duncan LLC ("GMT") was a Delaware limited liability corporation. GMT was formed in or about December 2013 by MICHELLE MORTON, the defendant, and others, with the stated business purpose of providing socially responsible fixed income investment management and advisory services as a minority business enterprise.  On or about July 31, 2014, GMT entered into an Amended and Restated Operating Agreement (the "Amended Agreement") with its members, pursuant to which, in exchange for an initial capital contribution of $2,660,618 by BFG, BFG became a Preferred Member of GMT.  Pursuant to the Amended Agreement, BFG was accorded certain privileges as the Preferred Member of GMT, including the right to approve the Chief Investment Officer for GMT and Hughes (defined in the next paragraph of this Complaint).  HUGH DUNKERLEY, the defendant, signed the Amended Agreement as the Managing Member of BFG.

21.  At certain times relevant to this Complaint, Hughes Capital Management, Inc. ("Hughes") was a registered investment adviser with its principal place of business in Alexandria, Virginia.  On August 4, 2014 GMT acquired Hughes and Hughes became a subsidiary of GMT.  Following the acquisition, MICHELLE MORTON, the defendant, became the Chief Executive Officer of Hughes.  At certain times relevant to the Complaint, GARY HIRST, the defendant, was the Chief Investment Officer of Hughes.

22.   At all times relevant to this Complaint, Atlantic Asset Management, LLC ("Atlantic") was a registered investment adviser with its principal place of business in Stamford, Connecticut.  On or about April 2, 2015, BFG gave GMT a capital contribution of $6,120,398 in order to enable GMT to purchase Atlantic.  GMT's purchase of Atlantic also included an agreement to make a deferred payment of $4,854,420 to Atlantic.  This deferred payment was guaranteed by Valor, and the guaranty was signed by HUGH DUNKERLEY, the defendant, as Valor's President. On or about April 2, 2015, GMT entered an Amended and Restated Limited Liability Company Agreement with its members, pursuant to which GMT would be renamed Atlantic Capital Holdings LLC and Atlantic would become its wholly owned subsidiary.  As part of this transaction, Hughes was merged into Atlantic.  Following the acquisition of Atlantic, MICHELLE MORTON, the defendant, became the Chief Executive Officer of Atlantic.

## The Defendants

23.   At all times relevant to this Complaint, JASON GALANIS, the defendant, was a purported adviser to or investor in various publicly-traded and privately held companies, including BFG, Hughes and Atlantic.  JASON GALANIS had signature authority over the Thorsdale Account.

24.   At certain times relevant to the Complaint, GARY HIRST, the defendant, was the Chief Investment Officer of Hughes.  At certain times relevant to this Complaint, HIRST was the Assistant Secretary of WAPCC and had signature authority over the WAPCC Account.  At all times relevant to the Complaint, HIRST was the Chairman, CEO, Sole Director, Sole Shareholder and Sole Member of Rosemary & Rue.

25.   At all times relevant to this Complaint, JOHN GALANIS, a/k/a "Yanni," the defendant, was an adviser to the WLCC regarding the structuring and placement of the Tribal Bond Issuances.  JOHN GALANIS is the father to, among others, JASON GALANIS.

26.   At all times relevant to this Complaint, HUGH DUNKERLEY, the defendant, was a Managing Director at Burnham, the Placement Agent for the Tribal Bond Issuances. Additionally, he was the sole officer of WAPCC, the President of Valor, the Managing Member of BFG, the Manager of Rosemary & Rue and a member of Wealth-Assurance AG's Board of Directors. DUNKERLEY also had signature authority over the WAPCC Account.

27.   At all times relevant to this Complaint, MICHELLE MORTON, the defendant, was a member of GMT.  From on or about July 31, 2014 through on or about April 2, 2015, MORTON was the Chief Executive Officer of Hughes, and from on or about April 2, 2015, through on or about January 8, 2016, MORTON was the Chief Executive Officer of Atlantic.

28.   At all times relevant to this Complaint, DEVON ARCHER, the defendant, was the manager of Rosemont.  ARCHER was also the founder of Rosemont Capital LLC, a diversified investment platform, as well as a member of the Board of Directors of Valor.  At certain times relevant to this Complaint, ARCHER was a member of the Board of Directors of Burnham and entities of which ARCHER was the sole member owned a percentage of Burnham.

29.   At all times relevant to this Complaint, BEVAN COONEY, the defendant, was an investor in Los Angeles, California.  At certain times relevant to this Complaint, COONEY owned a percentage of Burnham.

## Summary of the Fraudulent Scheme

30.   As set forth below, there is probable cause to believe that JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, engaged in a fraudulent scheme to misappropriate the proceeds of the Tribal Bond Issuances and to use funds in the accounts of clients of asset management firms controlled by the defendants to purchase the Tribal Bonds, which the clients were then unable to redeem or sell because of the illiquidity of the Tribal Bonds and the lack of a ready secondary market for the same.  Specifically:

a.   According to the Indentures and other closing documents, the proceeds of the Tribal Bond Issuances were to be given to an investment manager to be invested on the WLCC's behalf in investments that would generate annuity payments sufficient to pay interest on the Tribal Bonds and provide funds to the WLCC to be used for tribal economic development purposes. In fact, none of the proceeds of the Tribal Bond Issuances were turned over to the investment manager specified in the closing documents in order to be invested and significant portions of the proceeds were misappropriated by the defendants for their personal use.  For example, JASON GALANIS, the defendant, misappropriated more than $8,500,000 of the proceeds of the Tribal Bond Issuances for his personal use, and JOHN GALANIS, a/k/a "Yanni," the defendant, misappropriated more than

11

$2,300,000 of the proceeds for his personal use.  In addition, a portion of the misappropriated proceeds were recycled and provided by JASON GALANIS, the defendant, to entities affiliated with DEVON ARCHER and BEVAN COONEY, the defendants, in order to enable ARCHER and COONEY to purchase subsequent Tribal Bonds issued by the WLCC.  These Tribal Bonds purchased with recycled funds were, in part, later used by Burnham and another brokerage firm ("Brokerage Firm-1") to meet their net capital requirements established by the SEC.

              b.    There was no ready secondary market for the Tribal Bonds.  Nonetheless, without prior notice to their clients, MICHELLE MORTON and GARY HIRST, the defendants, at the direction of JASON GALANIS, the defendant, used funds in Hughes client accounts to purchase Tribal Bonds, and MORTON, at the direction of JASON GALANIS, used funds in a pooled investment vehicle in which an Atlantic client was the sole investor to purchase Tribal Bonds, even though JASON GALANIS, HIRST and MORTON were well aware that material facts about the Tribal Bond Issuances had been withheld from clients in whose accounts they were placed, including the fact that the Tribal Bond purchases fell outside of the investment parameters set forth in the investment advisory contracts of certain Hughes clients and of the Atlantic pooled investment vehicle.  When Hughes and Atlantic clients learned about the purchase of the Tribal Bonds in their accounts, several of them demanded that the Tribal Bonds be sold.  However, because there was no ready secondary market for the Tribal Bonds, as of the date of this Complaint, no Tribal Bonds have been sold from any Hughes or Atlantic client accounts.

              c.    Substantial conflicts of interest with respect to the issuance and placement of the Tribal Bonds existed, but were not disclosed to Hughes clients by MICHELLE MORTON or GARY HIRST, the defendants, or to Atlantic clients by MORTON, before the Tribal Bonds were purchased on the Hughes and Atlantic clients' behalf.  For example, HUGH DUNKERLEY, the defendant, was a Managing Director at Burnham, the Placement Agent for the Tribal Bonds.  DUNKERLEY was also the Managing Member of BFG, an investor in both Hughes and Atlantic, in whose client accounts the Tribal Bonds were placed.  DUNKERLEY was also the sole officer of WAPCC, the entity to which the proceeds of the Tribal Bonds were given, purportedly for the purpose of investing the proceeds to generate annuity payments for the WLCC.  The conflicts of interest involving DUNKERLEY were not disclosed to Hughes clients by MORTON or HIRST or to Atlantic clients by

MORTON before the Tribal Bonds were purchased on these clients' behalf.

## The Placement Agent and Misrepresentations Regarding the Purported Annuity Provider

31.   Based on my conversations with a representative of the WLCC and my review of documents, I have learned the following:

a.   In approximately March 2014, employees of and advisers to the WLCC met JOHN GALANIS, a/k/a "Yanni," the defendant, at a Native American economic development conference in Las Vegas, Nevada.  Over time, JOHN GALANIS and the WLCC employees and advisers discussed various economic development opportunities and financing alternatives.

b.   JOHN GALANIS, a/k/a "Yanni," the defendant, discussed the concept of special limited taxable revenue bonds with representatives of the WLCC.  JOHN GALANIS also introduced the WLCC representatives to JASON GALANIS, the defendant, whom JOHN GALANIS introduced as a senior partner at Burnham who focused on special projects.

c.   The board of directors of WLCC approved the issuance of special limited taxable revenue bonds by the WLCC, using a structure described by JOHN GALANIS, a/k/a "Yanni," the defendant.  On or about April 4, 2014, JASON GALANIS, the defendant, sent an email to DEVON ARCHER and BEVAN COONEY, the defendants.  The subject line of the email was "Oglala Native Spirits Memo.docx."  The body of the email stated, "$20mm bond approved.  Proceeds are $15mm to us and 5mm to them for a winery investment they want to make."

d.   On or about July 6, 2014, JASON GALANIS, the defendant, sent an email to DEVON ARCHER and BEVAN COONEY, the defendants, in which JASON GALANIS stated that counsel for the WLCC had "met and approved the [First Tribal Bond Issuance]." JASON GALANIS further stated, "[S]hooting for end of month. lots to accomplish to finesse this over the line.  im [sic] not counting the money yet, but I'm encouraged by the quality fo [sic] the work and the professionalism from everyone im [sic] coordinating."  JASON GALANIS further wrote, "[M]y primary objective is to get us a source of discretionary liquidity. sick of begging."

e.   The WLCC had no agreement with JOHN GALANIS, a/k/a "Yanni," the defendant, to pay him any finder's fee or

13

other compensation in connection with his assistance in arranging the First Tribal Bond Issuance.

32. Based on my review of documents provided by the Trustee, I have learned the following:

a. On or about August 8, 2014, the WLCC entered into a Placement Agency Agreement (the "First Placement Agreement") with Burnham, pursuant to which Burnham agreed to act as Placement Agent for the First Tribal Bond Issuance.

b. Pursuant to the First Placement Agreement, Burnham was entitled to a fee of $250,000 from the proceeds of the First Tribal Bond Issuance for its service as Placement Agent.

c. The First Placement Agreement was signed by HUGH DUNKERLEY, the defendant, on behalf of Burnham.

d. Pursuant to the First Placement Agreement, any notice to be provided to Burnham was to be provided to JASON GALANIS, the defendant, (although the last name was spelled "Galanos"), purportedly on behalf of Burnham, at the Irvine, California office of Burnham.

33. Based on my review of documents, I have learned that on or about August 15, 2014, JASON GALANIS, the defendant sent an email to DEVON ARCHER and BEVAN COONEY, the defendants, indicating that representatives of the WLCC had executed the legal documentation necessary for the First Tribal Bond Issuance to occur. COONEY replied, "This is pure genius alla [sic] mikey Milken!! The Native American Bonds!!...Great work here Greek!!" Based on my review of documents, I know that "Greek" is a nickname sometimes used by JASON GALANIS, ARCHER and COONEY to refer to JASON GALANIS.

34. Based on my review of documents and my conversations with a representative of Burnham, I have learned the following:

a. JASON GALANIS, the defendant, was never formally employed at Burnham, Burnham Financial Group or Burnham Asset Management.

b. On or about October 1, 2014, DEVON ARCHER, the defendant, in his capacity as managing member of CORFA, an investor in Burnham, and as manager and member of the entity that owned Burnham Asset Management, sent a letter to the Board

14

of Trustees of the Burnham Investors Trust (the "BIT Board"),
which operated certain mutual funds that used the Burnham name.
In the letter, ARCHER falsely confirmed for the BIT Board that
JASON GALANIS, the defendant, "would not be involved with any of
the Burnham entities and their 'affiliated persons' (within the
meaning of Section 2(a)(19) of the Investment Company Act) as
well as their successors or assigns at Burnham Financial Group,
Burnham Asset Management, Burnham Securities or Burnham
Investors Trust."   In fact, JASON GALANIS had extensive
involvement in the Tribal Bond Issuances, for which Burnham
served as placement agent, including by, among other things,
being the party designated to receive notices on behalf of
Burnham pursuant to the First Placement Agreement and by
receiving substantial portions of the proceeds of the Tribal
Bond Issuances in the Thorsdale Account, which he controlled.
In his letter to the BIT Board, ARCHER further claimed that
JASON GALANIS "will have no interest of any kind, direct or
indirect, in any of the Burnham entities or their successors,
that he will not source deals to the Burnham entities and that
the Burnham entities will not invest with or in, directly or
indirectly, any business or enterprise in which [JASON GALANIS]
has any association, affiliation or investment, pecuniary or
otherwise, directly or indirectly."   As noted above, this
representation was also false.

        35.   Based on my review of documents provided by Burnham,
WAPCC and the Trustee, I have learned that JASON GALANIS, HUGH
DUNKERLEY, and GARY HIRST, the defendants, fraudulently
misrepresented that the proceeds of the Tribal Bond Issuances
would be used to purchase an annuity contract on the WLCC's
behalf, pursuant to which the bond proceeds would be managed by
an investment manager. Specifically, I have learned the
following:

        a.   On or about August 17, 2014, JASON GALANIS, the
defendant, sent an e-mail to MICHELLE MORTON, the defendant,
attaching a draft trust indenture between the WLCC and the
Trustee.   The draft trust indenture provided that the proceeds
of the First Tribal Bond Issuance would be invested in an
annuity that would be issued and managed by Wealth-Assurance AG,
a subsidiary of Valor.

        b.   At the closing of the First Tribal Bond Issuance,
on or about August 25, 2014, the WLCC entered into an annuity
contract (the "First Annuity Contract") with WAPCC, not Wealth-
Assurance AG, pursuant to which WAPCC was to provide the
proceeds of the First Tribal Bond Issuance to an investment

manager (the "Investment Manager") who would invest the bond proceeds on the WLCC's behalf to generate sufficient returns to pay interest on the First Tribal Bond Issuance and other payments to the WLCC to fund economic development projects. The First Annuity Contract was signed by HUGH DUNKERLEY, the defendant, on behalf of the WAPCC and was initialed on each page by DUNKERLEY and a particular individual ("Individual-2") on behalf of the Investment Manager. In connection with the First Annuity Contract, a separate investment management agreement was entered into by the WLCC and the Investment Manager. The investment management agreement was signed by a representative of the WLCC and by Individual-2, on behalf of the Investment Manager.

c.    The proceeds of the First Tribal Bond Issuance were sent by the Trustee to the WAPCC Account, a bank account associated with WAPCC. No money was ever wired from the WAPCC Account to the Investment Manager named in the First Annuity Contract, who was supposed to manage the proceeds of the First Tribal Bond Issuance on behalf of the WLCC.

36. Based on my review of documents, I know that JASON GALANIS, the defendant, considered the proceeds of the Tribal Bond Issuances to be available for his own use. Specifically, I have learned that on or about August 13, 2014, JASON GALANIS sent an email to DEVON ARCHER, the defendant, that forwarded information about a Paris-based private equity fund of funds manager which HUGH DUNKERLEY, the defendant, among others, had a letter of intent to acquire. In that email, JASON GALANIS wrote, "[First name] and Hugh have locked it up and came to me for the money, which i have agreed to arrange/provide (probably Indians)."

37. Based on my conversations with legal counsel for Valor, I have learned that WAPCC is not part of the Valor corporate structure, is not a subsidiary of Valor and is not part of the Wealth-Assurance group of companies.

### The Defendants Use A Captive Asset Management Firm to Place Illiquid Tribal Bonds in the Accounts of Unsuspecting Clients Without Disclosing Conflicts of Interest

38. Based on my review of documents provided by Atlantic and others, I have learned that Hughes was an investment adviser registered with the SEC. Pursuant to investment advisory agreements signed by Hughes's clients, the clients empowered Hughes and its principals to make investment decisions on their

behalf, with the understanding that Hughes and its principals
would make such decisions based on the best interests of the
clients.  I also know that many clients of Hughes had written
investment parameters or other guidelines that limited the kinds
or amounts of investments that Hughes could make on their
behalf.  I know that compensation arrangements in Hughes's
investment advisory agreements took different forms but
typically included a fee based on total assets under management
and additional performance-based returns.

     39.  Based on my review of documents provided by Atlantic
and others, and my conversations with witnesses, I have learned
that MICHELLE MORTON and GARY HIRST, the defendants, while
associated with Hughes, and at the direction of JASON GALANIS,
the defendant, used funds in the accounts of Hughes clients to
purchase the entirety of the First Tribal Bond Issuance, for
which there was no ready secondary market, without advising
these clients in advance of such purchases, some of which were
outside the investment parameters contained in the investment
advisory agreements between Hughes and these clients, and
without disclosure of conflicts of interest inherent in such
purchases.  Specifically, I have learned the following:

     a.  In mid-2014, an individual introduced JASON
GALANIS, the defendant, to MICHELLE MORTON, the defendant.  Soon
thereafter, JASON GALANIS began working with MORTON regarding
the financing of the acquisition of Hughes by GMT, a company
formed by MORTON and her business partner.

     b.  On or about May 9, 2014, JASON GALANIS, the
defendant, sent an email to DEVON ARCHER and BEVAN COONEY, the
defendants, among others.  The subject of the email was "Hughes
Asset Management."  In the email, JASON GALANIS wrote that a
particular individual had "brought us an RIA [registered
investment adviser] to acquire.  possibly useful."  Later in the
email, JASON GALANIS wrote, "can buy for 1.7x fee ($3.4 million)
with 70% down.  The deal referral comes from two competent
sounding marketing people (resumes attached)."  The email
attached biographical information regarding MICHELLE MORTON, the
defendant, and her business partner.

     c.  On or about June 3, 2014, JASON GALANIS, the
defendant, sent an email to MICHELLE MORTON, the defendant.  The
text of the message was "for [first name of the owner of Hughes
at the time] when appropriate to demonstrate who your financial
sponsors are."  Attached to the email was a document entitled
"Introduction to COR Capital" that described various entities

17

purportedly affiliated with COR Capital, a Los Angeles and New York-based private equity investor that invested in the financial services sector.  Among the affiliates described were Burnham, CORFA and Wealth-Assurance AG.

d.    On or about July 14, 2014, JASON GALANIS, the defendant, sent two text messages to MICHELLE MORTON, the defendant, which together read, "you will be happier than you know" "when you enable my plan."

e.    On or about July 16, 2014, JASON GALANIS, the defendant, sent an email to DEVON ARCHER and BEVAN COONEY, the defendants.  In the email, JASON GALANIS said, "greek is forging ahead for us.  see attached executed term sheet for the acquisition of 100% of Hughes Capital management.  Firm manages $900 million on a discretionary basis for 28 institutional clients (pensions and endowments)."  Later in the email, JASON GALANIS said, "We have agreed to give the firm an opportunity to participate in native american bond new issues.  I believe they will take $28 million of the Wakpamni/Ogala [sic] Sioux issue that Greenberg Traurig is working on."  ARCHER responded, "This is very encouraging!"  COONEY responded, "West Coast offense charging down the field!"

f.    On or about July 31, 2014, GMT entered into the Amended Agreement, pursuant to which, in exchange for an initial capital contribution of $2,660,618 by BFG, BFG became a Preferred Member of GMT.  Pursuant to the Amended Agreement, BFG retained the right to approve the Chief Investment Officer for GMT and Hughes.  BFG's capital contribution was used to finance GMT's purchase of Hughes, which occurred pursuant to a share purchase agreement dated August 4, 2014.

g.    On or about August 29, 2014, the Chief Compliance Officer of Hughes filed an amended Form ADV with the SEC, in which it disclosed that GMT was the owner of Hughes, and that MICHELLE MORTON, the defendant, was the Chairwoman and Chief Executive Officer of Hughes and a partner of GMT.  BFG's capital contribution to and indirect ownership interest in GMT were not disclosed, as was required on Form ADV.

h.    Even prior to the closing of the acquisition of Hughes by GMT, JASON GALANIS, the defendant, began coordinating with MICHELLE MORTON, the defendant, to use Hughes client funds to purchase Tribal Bonds that were part of the First Tribal Bond Issuance.  For example, on or about July 21, 2014, MORTON sent a text message to JASON GALANIS which said "Should know how$ [sic]

18

we can proceed with bonds soon getting information."  JASON
GALANIS responded, "i'm confident you will figure it out."

i.    MICHELLE MORTON and JASON GALANIS, the
defendants, discussed placing GARY HIRST, the defendant, in an
investment role at Hughes for the purpose of orchestrating the
investment of Hughes client funds in the First Tribal Bond
Issuance.  For example, on or about July 22, 2014, MORTON sent a
text message to JASON GALANIS which said, "Thanks any thoughts
on Gary or Gary equivalent? Not to put pressure on you but we
will hit this OUT of the damn park if we have that element when
we start! PleasePleasePlease can I have one?"  JASON GALANIS
responded with text messages that said, "At breakfast with Gary"
and "He's on board."  MORTON responded, "Thanks for protecting
my vulnerable flank!"

j.    On or about July 25, 2014, MICHELLE MORTON, the
defendant, sent JASON GALANIS, the defendant, a text message
which said that her business partner "is going to [do] a
surgical analysis this evening to identify the accounts for
bonds."  On or about July 26, 2014, MORTON sent a text message
to JASON GALANIS which said, "I have good news. I will send you
the details later, but we will begin talking with the PM's
[portfolio managers] about the bond placement as soon as we get
in."

k.    On or about August 1, 2014, the day after the
Amended Agreement was signed, pursuant to which BFG agreed to
make an investment in GMT, and three days before the share
purchase agreement pursuant to which GMT purchased Hughes was
finalized, JASON GALANIS, the defendant, sent MICHELLE MORTON,
the defendant, two text messages which said, "and will form BFG
Socially Responsible Investments LLC tomorrow" and "as sub of
Burnham Financial Group."

l.    On or about August 12, 2014, GARY HIRST, the
defendant, entered into an employment agreement with Hughes,
pursuant to which he would serve as Chief Investment Officer of
Hughes.  The employment agreement was signed by HIRST and
MICHELLE MORTON, the defendant, on behalf of GMT.  Any notices
required to be provided to HIRST under the employment agreement
were to be sent to the Lake Mary PO Box, which is also the
mailing address listed in the Florida incorporation documents of
WAPCC and Rosemary & Rue.

m.    As an employee of Hughes, HIRST executed various
employee onboarding paperwork, including health insurance

19

enrollment forms, paperwork to have his salary directly deposited into his bank account and acknowledgement of various Hughes policies and procedures. HIRST was only paid as an employee of Hughes from August 12, 2014 through August 15, 2014. Subsequent to this time, he was paid as a consultant. On or about August 25, 2014, HIRST was appointed Chairman of the Investment Committee at Hughes and another Hughes employee became the Chief Investment Officer of Hughes. On or about October 5, 2014, MICHELLE MORTON, the defendant, sent a text message to JASON GALANIS, the defendant, which said, "In regard to Hirst, he opted to be a consultant because as an employee he would have been required to make certain disclosures for our ADV. . . . If he wants to follow the contract which has him as CIO its [sic] no problem, we just have to change the title, but he has to make the disclosures per regulations." JASON GALANIS sent two text messages in response, which together read, "good point[.] forgot"

n. On or about August 12, 2014, at an initial meeting of Hughes staff following the acquisition of Hughes by GMT, MICHELLE MORTON, the defendant, introduced GARY HIRST, the defendant, as the Chief Investment Officer of Hughes. HUGH DUNKERLEY, the defendant, also attended this meeting. On the same day, MORTON sent a text message to JASON GALANIS, the defendant, which said "Gary was a wreck when the PM's said that they could only by [sic] high rated bonds." Later that day, MORTON sent a text message to JASON GALANIS, referring to JASON GALANIS's role in arranging BFG's investment in GMT, which said "You invested because of the bonds not me." JASON GALANIS responded in a text message which said "The bonds are only possible because of you my dear." On or about August 13, 2014, MORTON sent a text message to JASON GALANIS which said "And I found out I am nothing more than a bond mule." On or about August 14, 2014, MORTON sent a text message to JASON GALANIS which said "Gary has copies of all client portfolio holdings so he will determine what we will liquidate."

o. In or about August 2014, MORTON asked the Chief Compliance Officer of Hughes to conduct an analysis of whether the investment guidelines of seven of Hughes's clients allowed for the purchase of the Tribal Bonds. On August 14, 2014, the Chief Compliance Officer of Hughes emailed MORTON her analysis, which concluded that a purchase of Tribal Bonds was outside the investment parameters of most of the seven clients, and that, as a result, the investment could not be made without consulting with those clients first.

        p.    On or about August 17, 2014, MICHELLE MORTON, the defendant, sent an email to JASON GALANIS, the defendant.  In the email, MORTON said she had spent much of the previous day analyzing the Tribal Bonds "because of the multiple views I had to take."  MORTON further explained that she had "a fiduciary duty to Burnham, and a fiduciary duty to the clients."  In her email, MORTON also explained that GARY HIRST, the defendant, refused to speak to Hughes clients about the Tribal Bonds.

        q.    On or about August 17, 2014, MICHELLE MORTON, the defendant, sent JASON GALANIS, the defendant, a text message which said "If this was a situation wherein the purchase of Hughes was contingent on the placement of the bonds, it should have been presented to me unequivocally.  I began to think that this week again, based on things Gary said."  JASON GALANIS responded with several text messages, including "this represents a transformational opportunity for tribal finance," "i hope you aren't having second thoughts," and "it was always a fundamental part of my plan."  MORTON later sent a text message to JASON GALANIS that said "Let's be clear, if you want the bonds to go in, I have no say.  I am not sitting in the position of making a judgement. [sic]  If you invested in Hughes for this sole purpose than [sic] it is your call not mine."

        r.    On or about August 17, 2014, MICHELLE MORTON, the defendant, sent JASON GALANIS, the defendant, an email attaching a memo articulating her concerns about the Tribal Bonds.  MORTON's memo questioned the financial stability of the Oglala Sioux Tribe, of which the WLCC was a component, and whether Hughes's clients would fire Hughes if they were dissatisfied with an investment in the Tribal Bonds.  MORTON, referring to BFG's investment in GMT, continued in her email as follows: "The decision regarding what should be done is yours, not mine . . . .  To be fair to both of us, if you made the investment with this in mind, I do not have the moral right to stand in the way and everything is in place to move forward. . . ."

        s.    On or about August 17, 2014, JASON GALANIS, the defendant, sent MICHELLE MORTON, the defendant, a text message regarding the memorandum MORTON had distributed via email.  The text message sent by GALANIS said "this is NOT working together. this is you bagging me. you knew your [sic] were writing this memo with this conclusion."  MORTON responded with a text message to JASON GALANIS that said, "At the end of the day it is only my view it does not have an impact on placing the bonds."  Later that day JASON GALANIS sent several text messages to MORTON, including text messages that said, "you gave

assurances," "and millions were transferred," "totally sandbagged me," "then i get a memo with no discussion at all" "and you gave me comfort we were on the same page," "the worst I can do is go nuclear on you," "and rip the firm apart," and "you god [sic] me pre closing and post closing that the trade was going to be put on."  After further exchanges of text messages, including a text message from MORTON regarding GARY HIRST, the defendant, JASON GALANIS sent a text message to MORTON referring to HIRST which said "he's the CIO.  he bears 100% of the resoibsibility [sic]."  JASON GALANIS later sent a text message to MORTON that said "all I've asked to do is put 3% of the firm's assets in a yield enhancing position, and leave 97% in the underperforming mess they continue to be in."

          t.    On or about August 17, 2014, JASON GALANIS, the defendant, emailed MICHELLE MORTON, the defendant, a draft of the trust indenture for the First Tribal Bond Issuance.  In his email, GALANIS said, in reference to the First Tribal Bond Issuance, "We believe there are sufficient controls in place to ensure sound governance of the debt security . . . ."  GALANIS continued, "The proceeds are going to fund a long term Economic Development Program for the tribe.  Although there are no absolutes, our credit conclusion is that the bonds will perform within their terms, and the added yield to the Purchasers compensates for the risk."  Finally, GALANIS concluded, "As commentary, I'm afraid your bias against the tribe is precisely why they are where they are today.  They are discriminated against by people who form conclusions like that expressed in your memo; that is, that they are poor, thus not worthy of credit.  You've made yourself part of the problem and I'm disappointed in your preliminary conclusion."

          u.    On or about August 21, 2014, MICHELLE MORTON, the defendant, sent a text message to JASON GALANIS, the defendant, which said "im [sic] going to do the trade blotter tonight so Gary can look at it and when I get his ok I will give it to [Hughes employee first name] and boom effectively the buy is done so really I'm doing the buy."

          v.    Between on or about August 22 and on about August 26, 2014, GARY HIRST, the defendant, signed a series of trade tickets on behalf of Hughes clients, the result of which was the investment of $27,077,436 of funds from nine Hughes client accounts to purchase the entirety of the First Tribal Bond Issuance.  An employee of Hughes used the information on the trade tickets to execute the purchases of the First Tribal Bond Issuances in the Hughes client accounts.  On or about August 22,

2014, MICHELLE MORTON, the defendant, sent JASON GALANIS, the defendant, a text message regarding this Hughes employee. The text message said "I was not hard on [Hughes employee first name] because I did not want him to walk out because of fear." Later that day, MORTON sent JASON GALANIS another text message, referring to the Hughes employee who executed the trades, that said, "He looked awful but he got his shit done." The purchases of the Tribal Bonds in the First Tribal Bond Issuance on behalf of Hughes client settled by physical delivery. At least one Hughes client received physical delivery of the Tribal Bonds in New York, New York.

w. At the time of the bond purchase described above, numerous conflicts of interest existed. For example, GARY HIRST, the defendant, was the Chief Investment Officer, and later the Chairman of the Investment Committee, of Hughes and signed the trade tickets authorizing the purchase of the First Tribal Bond Issuance on behalf of Hughes clients. He also was the Assistant Secretary of, and a signatory on the bank account of, WAPCC, the entity which received the proceeds of the First Tribal Bond Issuance to purportedly invest in an annuity on behalf of the WLCC. In addition, HUGH DUNKERLEY, the defendant, was a Managing Director at Burnham, the Placement Agent for the First Tribal Bond Issuance. DUNKERLEY was also the Managing Member of BFG, an investor in Hughes, in whose client accounts the First Tribal Bond Issuance was placed. DUNKERLEY was also an officer of, and a signatory on the bank account of, WAPCC, thus placing him at every end of the deal. Neither MICHELLE MORTON, the defendant, nor HIRST disclosed these conflicts of interest to Hughes clients before the First Tribal Bond Issuance was purchased on their behalf.

x. The investment advisory contracts entered into by Hughes and the nine clients on whose behalf the First Tribal Bond Issuance was purchased contained investment guidelines that limited the types and concentration of investments that could be made with these clients' funds. For example, the investment guidelines for multiple Hughes clients prohibited investments in securities offered in private placements, which is how the First Tribal Bond Issuance was offered. Other clients' guidelines prohibited investments in debt securities not rated by commercial rating agencies. Neither MICHELLE MORTON nor GARY HIRST, the defendant, consulted with any Hughes client about the investment in the Tribal Bonds, nor disclosed to any client that the Tribal Bonds were outside the investment parameters established by the client, before purchasing the Tribal Bonds on these clients' behalf.

23

y.    On or about September 9, 2014, after the First
Tribal Bond Issuance was purchased for Hughes clients as
described above, Hughes notified its clients of the investment
by letter.  Soon thereafter, several of the Hughes clients on
whose behalf Tribal Bonds were purchased demanded that these
bonds be liquidated from their accounts.  MICHELLE MORTON, the
defendant, falsely represented to these clients that Burnham had
other clients interested in the bonds and was in the process of
arranging purchases.  In fact, no such purchases had been
arranged.  No ready secondary market existed for the Tribal
Bonds and through the date of this Complaint, no Hughes client
has been able to find a buyer for the Tribal Bonds purchased in
their accounts.

40.  Based on my conversations with a representative of COR
Capital, I have learned that, contrary to the representations
made in the June 3, 2014 email sent by JASON GALANIS, the
defendant, to MICHELLE MORTON, the defendant, (referenced in
paragraph 39c above), Burnham, CORFA and Wealth-Assurance AG
were not affiliates of COR Capital.

41.  Based on my review of documents, I have learned that
on June 3, 2014, JASON GALANIS, the defendant, sent an email to
BEVAN COONEY, the defendant, which forwarded the email JASON
GALANIS sent to MICHELLE MORTON, the defendant, earlier that
same day, attaching the description of COR Capital which
fraudulently asserted that certain entities were affiliates of
COR Capital.  In JASON GALANIS's email to COONEY, JASON GALANIS
wrote "whoring it out shamelessly[.]  thank you [first name of
COR Capital representative.]"

### Misappropriation of the Proceeds of the Tribal Bond Issuances

42.  Based on my conversations with Individual-1, I have
learned that JOHN GALANIS, a/k/a "Yanni," the defendant,
instructed him to incorporate Sovereign Nations and establish a
bank account in its name.  I also know that JOHN GALANIS
instructed Individual-1 to make wire transfers out of, and to
write checks drawn from, the bank account established by
Individual-1 for Sovereign Nations.  The payee information and
amounts of such transfers and checks were provided to
Individual-1 by JOHN GALANIS.

43.  Based on my review of various bank records, as well as
documents provided by Sovereign Nations and the WLCC, and my
review of a transcript of a prior criminal trial, *United States*

v. *James Tagliaferri*, 13 Cr. 115 (RA)(S.D.N.Y.), I have learned the following:

        a.    Despite the representations in the Indentures and the contracts with WAPCC that the proceeds of the Tribal Bond Issuances would be invested by the Investment Manager on behalf of the WLCC, significant portions of the bond proceeds were diverted to various entities and individuals who used the funds for personal purposes.

        b.    On or about August 27, 2014 and August 29, 2014, the amounts of $22,092,089 and $2,228,847, respectively, were transferred by the Trustee from an account associated with the WLCC to the WAPCC Account.  These amounts represented the proceeds of the First Tribal Bond Issuance, which as described above had been purchased on behalf of Hughes's clients, less fees to Burnham and other advisers and certain contractual payments to the WLCC.  Prior to this transfer, the starting balance in the WAPCC Account was $0.

        c.    On or about August 28, 2014, HUGH DUNKERLEY, the defendant, acting at the direction of JASON GALANIS, the defendant, transferred $2,350,000 of the proceeds of the First Tribal Bond Issuance from the WAPCC Account to a bank account associated with Sovereign Nations.  These funds were then used by Individual-1, acting at the direction of JOHN GALANIS, a/k/a "Yanni," the defendant, to, among other things, make check payments or wire transfers including, but not limited to, the following:

            i.  $355,000, cumulatively, to JOHN GALANIS, a/k/a "Yanni," the defendant, on multiple dates;

          ii.  $20,000 to JASON GALANIS, the defendant, on or about September 3, 2014;

        iii.  $30,000, cumulatively, to a different son ("Galanis Son-1") of JOHN GALANIS on or about September 3, 2014 and September 9, 2014;

         iv.  $22,000, cumulatively, to a different son ("Galanis Son-2") of JOHN GALANIS on or about September 3, 2014 and December 5, 2014;

          v.  $10,000 to a different son ("Galanis Son-3") of JOHN GALANIS on or about September 10, 2014;

      vi. $38,692.28 to a luxury car loan servicer on or about September 3, 2014;

     vii. $180,000, cumulatively, to a wholesale jeweler on or about September 3, 2014, September 25, 2014 and October 21, 2014;

    viii. $25,000 to a daughter-in-law of JOHN GALANIS on or about September 4, 2014; and

     ix. $5,000 to the wife of JOHN GALANIS on or about December 1, 2014.

d.    On or about August 28, 2014, HUGH DUNKERLEY, the defendant, transferred $3,006,250 of the proceeds of the First Tribal Bond Issuance from the WAPCC Account to the Thorsdale Account, which was controlled by JASON GALANIS, the defendant. Prior to this transfer, the starting balance in the Thorsdale Account was $775.95. The same day that the transfer of $3,006,250 was received in the Thorsdale Account, JASON GALANIS initiated transfers from the Thorsdale Account, including, among others, $356,250 to the Internal Revenue Service ("IRS"), $150,000 to a law firm currently representing JASON GALANIS in connection with a pending criminal indictment in this district and $215 to a maid service.

e.    On or about August 29, 2014, HUGH DUNKERLEY, the defendant, transferred $1,000,000 of the proceeds of the First Tribal Bond Issuance from the WAPCC Account to the Thorsdale account. That same day, JASON GALANIS, the defendant, initiated transfers from the Thorsdale Account, including, among others, $1,300,000 to Rosemary & Rue, an entity associated with HUGH DUNKERLEY and GARY HIRST, the defendants, $14,000 to JASON GALANIS's wife, and $5,000 to a limited liability company that pays the expenses associated with JASON GALANIS's home in Bel Air, California. The $1,300,000 transferred to Rosemary & Rue was later transferred to a bank account associated with a vacant parcel of land in Florida.

f.    On or about August 30, 2014, JASON GALANIS, the defendant, initiated transfers from the Thorsdale Account, including, among others, $30,000 to his mother, $25,000 to the law firm of his brother, Galanis Son-3, $10,000 to the limited liability company that pays expenses associated with his home in Bel Air, California, $1,845 to an online clothing retailer, $1,000 to his father-in-law, and $199.35 to a country club.

g.      Between August 27, 2014 and September 22, 2014 (the day before transfers associated with the Second Tribal Bond Issuance began), HUGH DUNKERLEY, the defendant, transferred $4,656,250 of the proceeds of the First Tribal Bond Issuance from the WAPCC Account to the Thorsdale Account.  During that time period, JASON GALANIS, the defendant, transferred all but $215,654.72 out of the Thorsdale Account.  These outbound transfers included, among others, approximately $1,300,000 to Rosemary & Rue; approximately $1,250,000 to an account associated with Valor, from which $350,000 was subsequently transferred, on or about September 8, 2014, to an account associated with Hughes; at least $350,000 to the IRS; at least $325,000 to various lawyers and accountants; at least $200,000 for car-related expenses; approximately $200,000 to BEVAN COONEY, the defendant; approximately $100,000 to a trust account associated with JASON GALANIS's wife; at least $85,000 for expenses associated with JASON GALANIS's personal residence; approximately $75,000 to Individual-2, who was the Managing Director of the Investment Manager, which was, pursuant to the First Annuity Contract, supposed to receive and invest the proceeds of the First Tribal Bond Issuance; at least $75,000 to various members of JASON GALANIS's family; at least $20,000 to HUGH DUNKERLEY, the defendant; at least $35,000 for purchases of clothing and jewelry; at least $20,000 to JASON GALANIS personally; at least $10,000 for travel expenses; and at least $4,000 for restaurants and other food expenses.  In addition, at least $1,500 was withdrawn via ATM from the Thorsdale Account.

h.      On or about September 8, 2014, the date on which $350,000 was transferred from an account associated with Valor to an account associated with Hughes, JASON GALANIS, the defendant, sent MICHELLE MORTON, the defendant, several text messages, including messages which said "Money is out" and "$350,000 american dollars."  MORTON responded with a text message that said "Are you a magician? It just arrived!"

i.      On or about October 15, 2015, HUGH DUNKERLEY, the defendant, in response to a request from representatives of the WLCC sent the WLCC, on behalf of WAPCC, a document purporting to be an "Annual Statement of Account" for "Institutional Single Premium Variable Annuity" for the WLCC, dated as of October 14, 2015 (the "First Annual Statement").  The First Annual Statement falsely stated that WAPCC had received $25,250,000 of the proceeds of the First Tribal Bond Issuance on August 26, 2014. In fact, the WAPCC Account received the amounts of $22,092,089 and $2,228,847, respectively, on August 27, 2014 and August 29, 2014.  These amounts total $24,320,936, not $25,250,000.  The

First Annual Statement also shows a payment from WAPCC of $25,250,000 on August 26, 2014 which is labeled as "Payment – Annuity Purchase." Because no annuity was in fact purchased for the WLCC on the date specified, the First Annual Statement is fraudulent on its face.

## Recycling of the Proceeds from the First Tribal Bond Issuance to Purchase the Second and Third Tribal Bond Issuances

44. Based on my review of bank records and documents provided by various entities, I have learned that $15 million of the proceeds of the First Tribal Bond Issuance, rather than being provided to the Investment Manager and invested on the WLCC's behalf, as required by the Indentures, were instead misappropriated and recycled by JASON GALANIS and DEVON ARCHER, the defendants, and used to purchase the Second Tribal Bond Issuance. As a result of this recycling, although the face amount of Tribal Bonds outstanding increased and the amount of interest payable by the WLCC increased, the actual bond proceeds available for investment on behalf of the WLCC did not increase.

45. Based on my discussions with a representative of the WLCC, I have learned that in the summer of 2014, JOHN GALANIS, a/k/a "Yanni," the defendant, approached representatives of the WLCC and said, in sum and substance, that the First Tribal Bond Issuance had been a success and that there was investor interest in purchasing additional Tribal Bond Issuances, even though the entirety of the First Tribal Bond Issuance had been placed with the clients of a single asset management firm, Hughes, and despite the fact that many of these Hughes clients were seeking to have the Tribal Bonds removed from their accounts. As a result of the representations made by JOHN GALANIS regarding the market's appetite for additional Tribal Bond Issuances, the WLCC agreed to sell as much as $20 million of additional Tribal Bonds.

46. Based on my review of documents produced by various entities, I have learned the following:

a. On or about September 12, 2014, the WLCC entered into a Placement Agency Agreement (the "Second Placement Agreement") with Burnham, pursuant to which Burnham agreed to act as Placement Agent for the Second and Third Tribal Bond Issuances.

b.    Pursuant to the Second Placement Agreement, Burnham was entitled to a fee of $125,000 from the proceeds of the Second and Third Tribal Bond Issuances.

c.    The Second Placement Agreement was signed by HUGH DUNKERLEY, the defendant, on behalf of Burnham.

d.    Pursuant to the Second Placement Agreement, any notice to be provided to Burnham was to be provided to JASON GALANIS, the defendant, (although the last name was spelled "Galanos"), purportedly on behalf of Burnham, at the Irvine, California office of Burnham.

e.    On or about September 26, 2014, the WLCC entered into a new annuity contract (the "Second Annuity Contract") with WAPCC in connection with the Second and Third Tribal Bond Issuances, pursuant to which WAPCC was to provide the proceeds of the Second and Third Tribal Bond Issuances to the Investment Manager, who would invest the bond proceeds on the WLCC's behalf to generate sufficient returns to pay interest on the Second and Third Tribal Bond Issuances and other payments to the WLCC to fund economic development projects.  The Second Annuity Contract was signed by HUGH DUNKERLEY, the defendant, on behalf of the WAPCC and was initialed on each page by DUNKERLEY.  In connection with the Second Annuity Contract, a separate investment management agreement was entered into by the WLCC and the Investment Manager.  The investment management agreement was signed by a representative of the WLCC and by Individual-2, on behalf of the Investment Manager.

f.    As described in further detail below, the proceeds of the Second and Third Tribal Bond Issuance were sent by the Trustee to the WAPCC Account, a bank account associated with WAPCC.  No money was ever wired from the WAPCC Account to the Investment Manager named in the Second Annuity Contract.

47.    Based on my review of bank records and documents produced by various entities, I have learned the following:

a.    On or about September 23, 2014, HUGH DUNKERLEY, the defendant, transferred $15,000,000 of the proceeds of the First Tribal Bond Issuance from the WAPCC Account to the Thorsdale Account.

b.    On or about September 24, 2014, JASON GALANIS, the defendant, transferred $15,000,000 from the Thorsdale

29

Account to an account associated with the Florida Law Firm, the registered agent for Rosemont in the State of Florida.

      c.    On or about September 24, 2014, the $15,000,000 in the Florida Law Firm account was transferred to a brokerage account associated with Rosemont (the "Rosemont Account") at a broker-dealer ("Brokerage Firm-2") located in New York, New York. The balance in the Rosemont Account as of August 31, 2014 was $2,176,238.22. The $15,000,000 transferred from the Thorsdale Account to the Rosemont Account was documented as a loan to Rosemont by Calvert Capital Partners G.P. ("Calvert"), an entity for which Thorsdale purportedly serves as managing partner. Pursuant to that loan agreement, the principal balance and all accrued interest were payable on the maturity of the loan, which was September 21, 2024, almost three years after the maturity of the Second Tribal Bond Issuance, which was October 1, 2021. Interest on the purported loan between Calvert and Rosemont accrued at an annual rate of 5.82%, which was below the 6.02% coupon on the Second Tribal Bond Issuance.

      d.    On or about October 1, 2014, Rosemont purchased the entirety of the Second Tribal Bond Issuance, the face amount of which was $15,000,000. In connection with that purchase, DEVON ARCHER, the defendant, signed a letter dated September 24, 2014, addressed to the WLCC, in which he represented, among other things, that Rosemont was purchasing the Second Tribal Bond Issuance for investment purposes and not with a view to selling such bonds in violation of the securities laws. On that same date, $15,000,000 was transferred from the Rosemont Account to the Trustee, and $14,780,000, representing the face amount of the bonds less fees, and contractual payments to the WLCC, was transferred from the Trustee to the WAPCC Account, the same account that had received the proceeds of the First Tribal Bond Issuance.

      e.    On or about October 14, 2014, DEVON ARCHER, the defendant, provided paperwork to Brokerage Firm-2 containing representations about his purchase of Tribal Bonds as part of the Second Tribal Bond Issuance, which ARCHER was seeking to deposit in the Rosemont Account. ARCHER falsely represented in that paperwork, which was signed by ARCHER, that "The funds used to purchase the [Tribal] bonds were from real estate sales through my business Rosemont Seneca Bohai LLC." In fact, as described above, the funds used by ARCHER to purchase the Second Tribal Bond Issuance were wired to him from the Thorsdale Account and were composed of misappropriated proceeds of the First Tribal Bond Issuance.

     f. On or about November 10, 2014, JASON GALANIS, the defendant, transferred $600,513 from the Thorsdale Account to an account associated with Rosemont.  On or about November 14, 2014, a law firm transferred $600,513 to the Thorsdale Account.  On or about March 24, 2015, $100,000 was transferred into the Thorsdale Account from an account at Brokerage Firm-2 associated with DEVON ARCHER, the defendant.  On or about April 24, 2015, JASON GALANIS transferred $100,000 from the Thorsdale Account to an account associated with Rosemont.

     g. On or about April 9, 2015, Rosemont transferred its $15,000,000 of Tribal Bonds to a brokerage account at Brokerage Firm-2 in the name of VL Assurance (Bermuda) Ltd. Rosemont did not receive anything of economic substance, such as an equity interest in VL Assurance (Bermuda) Ltd., in exchange for this transfer.

     h. On or about May 29, 2015, VL Assurance (Bermuda) Ltd. transferred $2,600,000 of Tribal Bonds to Burnham.   VL Assurance (Bermuda) Ltd. did not receive anything of economic value, such as an equity interest in Burnham, in exchange for this transfer.

     i. Burnham began using the $2,600,000 of Tribal Bonds transferred to it by Rosemont via VL Assurance (Bermuda) Ltd. as part of the net capital Burnham, as a registered broker-dealer, was required to maintain under applicable SEC regulations.

     j. On or about April 29, 2015, HUGH DUNKERLEY, the defendant, transferred $835,000 from the WAPCC Account to an entity with the name "VL Assurance LLC," which was established as a Florida limited liability company on or about October 16, 2014 by GARY HIRST, the defendant, using the Lake Mary PO Box as its mailing address.  In the incorporation documents, HIRST is listed as the manager of the entity.

  48. Based on my review of documents and conversations with witnesses, I have learned that on or about May 15, 2015, Burnham Financial Group entered into an agreement with Brokerage Firm-1, pursuant to which Burnham Financial Group agreed to acquire 49% of the equity interest of Brokerage Firm-1 in exchange for, among other things, the provision of $5,000,000 of "regulatory capital" to Brokerage Firm-1.

49.    Based on my review of bank records and documents provided by various entities, I have learned that $5 million of the proceeds of the First Tribal Bond Issuance, which came from the Hughes investors, rather than being provided to the Investment Manager and invested on the WLCC's behalf, as required by the Indentures, were instead misappropriated and recycled by JASON GALANIS and BEVAN COONEY, the defendants, and used to purchase the Third Tribal Bond Issuance, just as $15,000,000 was recycled to purchase the Second Tribal Bond Issuance.  Once again, as a result of this recycling, although the face amount of Tribal Bonds outstanding increased and the interest payable by the WLCC increased, the actual bond proceeds available for investment on behalf of the WLCC did not increase. Specifically, I have learned the following:

a.    On or about October 6, 2014, HUGH DUNKERLEY, the defendant, transferred $5,970,000 from the WAPCC Account to the Thorsdale Account.

b.    That same day, JASON GALANIS, the defendant, transferred $5,050,000 from the Thorsdale Account to an account associated with BEVAN COONEY, the defendant.  $5,000,000 of the amount transferred from the Thorsdale Account to Bevan Cooney was documented as a loan to the Bevan Cooney Family Trust by Calvert.  The loan agreement was signed by JASON GALANIS, as Managing Director of Thorsdale, and COONEY, on behalf of the Bevan Cooney Family Trust.  Pursuant to that loan agreement, the principal balance and all accrued interest were payable on the maturity of the loan, which was September 21, 2024, almost three years after the maturity of the Third Tribal Bond Issuance, which was October 1, 2021.  Interest on the purported loan between Calvert and the Bevan Cooney Family Trust accrued at an annual rate of 5.82%, which was below the 6.02% coupon on the Third Tribal Bond Issuance.

c.    On or about October 9, 2014, BEVAN COONEY, the defendant, purchased the entirety of the Third Tribal Bond Issuance, the face amount of which was $5,000,000.    In connection with that purchase, BEVAN COONEY, the defendant, signed a letter dated October 7, 2014, addressed to the WLCC, in which he represented, among other things, that he was purchasing the Third Tribal Bond Issuance for investment purposes and not with a view to selling such bonds in violation of the securities laws.  On that same date, $5,000,000 was transferred from the account associated with COONEY to the Trustee, and $4,966,500, representing the face amount of the bonds less fees, was transferred from the Trustee to the WAPCC Account.

d.    On May 29, 2015, BEVAN COONEY, the defendant, transferred the Tribal Bonds he had purchased to Brokerage Firm-1, as part of Burnham Financial Group's agreed-upon contribution of $5,000,000 of "regulatory capital" in connection with Burnham Financial Group's acquisition of 49% of the equity interests of Brokerage Firm-1.  COONEY did not receive anything of economic substance in return for his contribution of Tribal Bonds, such as an equity interest in Burnham Financial Group or Brokerage Firm-1.  Following the transfer, Brokerage Firm-1 began using the $5,000,000 of Tribal Bonds transferred to it as part of the net capital Brokerage Firm-1, as a registered broker-dealer, was required to maintain under applicable SEC regulations.

e.    On August 25, 2015, JASON GALANIS, the defendant, sent an email to the President of Burnham Financial Group and the Chief Executive Officer of Brokerage Firm-1.  In that email, JASON GALANIS said, "In May 2015, Burnham approached investors, including existing investors, to make an investment into Burnham as part of its plan to invest in a fixed income broker dealer ([Brokerage Firm-1]).  Burnham does not have a fixed income business.  Cooney is an existing investor in Burnham dating to 2013.  He agreed to make a follow-on investment in 2015 in support of Burnham's business plan to diversify.  Burnham used the muni bonds received from an existing shareholder, together with certain cash, to make its investment in [Brokerage Firm-1] in consideration for 49% equity of the firm."

f.    On several dates before and after the purchase of the Third Tribal Bond Issuance by BEVAN COONEY, the defendant, JASON GALANIS, the defendant, transferred funds from the Thorsdale Account to COONEY including $100,000 on September 8, 2014; $25,000 on November 6, 2014; $100,000 on November 10, 2014; $12,000 on December 15, 2014; $20,000 on January 13, 2015; $10,000 on February 4, 2015; $15,000 on March 25, 2015; $25,000 on April 21, 2015; $50,000 on May 22, 2015; and $50,000 on June 12, 2015, for a total of $407,000.

g.    BEVAN COONEY, the defendant, also received funds transferred directly from the WAPCC Account by HUGH DUNKERLEY, the defendant, including $3,895,000 on November 12, 2014 and $75,000 on April 24, 2015.

h.    On January 15, 2015, BEVAN COONEY, the defendant, sent an email to several individuals associated with an accounting firm.  That email said, "Please send me the wire info

33

on the 3.9mm that came into my account and went out to Camden escrow for the down payment for the 1920 bel air purchase."

50.   I know from reviewing testimony in a prior criminal trial, *United States* v. *James Tagliaferri*, 13 Cr. 115 (RA)(S.D.N.Y.), that JASON GALANIS, the defendant, resides at 1920 Bel Air Road, Bel Air, California.

51.   Based on my review of bank records, I have learned that between September 23, 2014 and April 15, 2015 (the day before the Fourth Tribal Bond Issuance), HUGH DUNKERLEY, the defendant, transferred $32,040,000 from the WAPCC Account to the Thorsdale Account.  During the same time period, the Thorsdale Account also received inflows of approximately $2,300,000 from other sources.  During that time period, JASON GALANIS, the defendant, transferred over $34,000,000 out of the Thorsdale Account, leaving a negative balance of $189.88 on April 15, 2016.  Among the transfers out of the Thorsdale Account during this time period were the $15,000,000 and $5,000,000 transfers to the Florida Law Firm and BEVAN COONEY, the defendant, respectively, which were ultimately used to fund the purchases of the Second and Third Tribal Bond Issuance.  In addition, during that same time period, other outbound transfers initiated by JASON GALANIS, the defendant, from the Thorsdale Account included, among others, at least $7,300,000 to Valor, which appears to have been used by Valor to purchase a life insurance entity from an insurance company in Switzerland; at least $350,000 to various law firms; at least $1,000,000 to a brokerage account associated with Thorsdale; and at least $4,400,000 for personal expenses, including at least $3,800,000 for expenses associated with JASON GALANIS's home; at least $135,000 in payments to various members of JASON GALANIS's family; at least $165,000 for clothing and jewelry purchases; at least $55,000 to the IRS; at least $35,000 in travel expenses; at least $40,000 in ATM withdrawals from the Thorsdale Account; at least $27,000 in restaurant and other food-related expenses; at least $20,000 in payments to JASON GALANIS directly; at least $10,000 for car-related expenses; and at least $60,000 in miscellaneous personal expenses.

52.   Based on my review of documents provided by the WAPCC I know that, on or about October 15, 2015, HUGH DUNKERLEY, the defendant, on behalf of WAPCC and in response to a request from representatives of the WLCC, sent the WLCC a document purporting to be an "Annual Statement of Account" for "Institutional Single Premium Variable Annuity" for the WLCC, dated as of October 14, 2015 (the "Second Annual Statement").  The Second Annual

Statement falsely stated that WAPCC had received $19,750,000 of
the proceeds of the Second and Third Tribal Bond Issuances on
September 26, 2014.  In fact, the WAPCC Account received the
amounts of $14,780,000 and $4,966,500, respectively, on October
1, 2014 and October 9, 2014.  These amounts total $19,746,500,
not $19,750,000.  The Second Annual Statement shows a payment
from WAPCC of $19,750,000 on August 26, 2014 which is labeled as
"Payment - Annuity Purchase."  Because no funds were received by
WAPCC on August 26, 2014 and because no annuity was purchased on
the date specified, the Second Annual Statement is fraudulent on
its face.

        53.  Based on my review of bank records and other
documents, I have learned that $903,000 of interest was due on
the Second Tribal Bond Issuance and $294,311.11 of interest was
due on the Third Tribal Bond Issuance on or about September 30,
2015.  At that time, $2,600,000 of the Second Tribal Bond
Issuance was held by Burnham and the remainder was held by VL
Assurance (Bermuda) Ltd., and the entirety of the Third Tribal
Bond Issuance was held by Brokerage Firm-1.  The funds to pay
these interest amounts were generated as follows:

        a.   On or about September 30, 2015, $1,000,000 was
transferred from a brokerage account associated with VL
Assurance (Bermuda) Ltd. to Burnham Financial Group.

        b.   On or about September 30, 2015, HUGH DUNKERLEY,
the defendant, sent an email to the President of Burnham
Financial Group requesting authorization to wire $903,000 to the
Trustee "on behalf of [WAPCC] fbo our client WLCC."  Burnham
Financial Group sent two separate wires to the Trustee, one on
September 30, 2015, in the amount of $903,000 and, one on
October 1, 2015, in the amount of $294,311.11.

        c.   On or about October 1, 2015, the Trustee wired
$903,000 to Rosemont (even though Rosemont no longer held the
Second Tribal Bond Issuance) and $294,311.11 to an account
associated with Brokerage Firm-1.

        d.   On or about October 1, 2015, Rosemont sent three
wire transfers to Burnham Financial Group, in the amounts of
$750,000; $198,000; and $150,000.

        e.   On or about October 1, 2015, Burnham Financial
Group wired $746,480 to an account associated with VL Assurance
(Bermuda) Ltd., representing the interest owed on the $12.4
million of Tribal Bonds held by VL Assurance (Bermuda) Ltd.

Because VL Assurance (Bermuda) Ltd. sent the initial $1,000,000 wire that funded the interest payment, VL Assurance (Bermuda) Ltd. effectively paid interest on the Second Tribal Bond Issuance to itself.

        f.   On or about October 1, 2015, Burnham Financial Group wired $156,520 to Burnham, representing the interest owed on the $2.6 million of Tribal Bonds held by Burnham.

## The Defendants Use A Different Captive Asset Management Firm to Place the Fourth Tribal Bond Issuance in the Account of an Unsuspecting Client Without Disclosing Conflicts of Interest

    54.  Based on my discussions with a representative of the WLCC, I have learned that in approximately March 2015, JOHN GALANIS, a/k/a "Yanni," the defendant approached representatives of the WLCC and said, in sum and substance, the previous Tribal Bond Issuances had been successful and that there was investor interest in purchasing additional Tribal Bonds, even though the Second and Third Tribal Bond Issuances had each been purchased by a single investor using proceeds of the First Tribal Bond Issuance. As a result of the representations made by JOHN GALANIS regarding the market's appetite for additional Tribal Bond Issuances, the WLCC agreed to sell as much as $20 million of additional Tribal Bonds.

    55.  Based on my review of documents produced by various entities, I have learned the following:

        a.   On or about April 6, 2015, the WLCC entered into a Placement Agency Agreement (the "Third Placement Agreement") with Burnham, pursuant to which Burnham agreed to act as Placement Agent for the Fourth Tribal Bond Issuance.

        b.   Pursuant to the Third Placement Agreement, Burnham was entitled to a fee of $100,000 from the proceeds of the Fourth Tribal Bond Issuance.

        c.   In connection with the Fourth Tribal Bond Issuance, Burnham prepared a private placement memorandum that falsely stated that the "Wealth Assurance Private Client Corporation," the purported annuity provider for the Fourth Tribal Bond Issuance, was a "subsidiary of Valor Group, Ltd."

        d.   On or about April 16, 2015, the WLCC entered into a new annuity contract (the "Third Annuity Contract") with WAPCC in connection with the Fourth Tribal Bond Issuance, pursuant to

which WAPCC was to provide the proceeds of the Fourth Tribal
Bond Issuance to the Investment Manager, who would invest the
bond proceeds on the WLCC's behalf to generate sufficient
returns to pay interest on the Fourth Tribal Bond Issuance and
other payments to the WLCC to fund economic development
projects.  The Third Annuity Contract was signed by HUGH
DUNKERLEY, the defendant, on behalf of WAPCC and was initialed
on each page by DUNKERLEY and by Individual-2, on behalf of the
Investment Manager.

        e.   As described in further detail below, the
proceeds of the Fourth Tribal Bond Issuance were sent by the
Trustee to the WAPCC Account, a bank account associated with
WAPCC.  No money was ever wired from the WAPCC Account to the
Investment Manager named in the Third Annuity Contract.

     56.  Based on my review of documents provided by Atlantic
and my conversations with witnesses, including a representative
of a victim pension fund ("Pension Fund-1"), which was an
investment advisory client of Atlantic, I have learned that
MICHELLE MORTON, the defendant, while employed at Atlantic, and
at the direction of JASON GALANIS, the defendant, used funds in
a pooled investment vehicle in which Pension Fund-1 was an
investor to purchase the entirety of the Fourth Tribal Bond
Issuance, for which there was no ready secondary market, without
advising Pension Fund-1 in advance of such purchase and without
disclosure of conflicts of interest inherent in such purchase.
Specifically, I have learned the following:

        a.   On or about April 2, 2015, BFG gave GMT a capital
contribution of $6,120,398 in order to enable GMT to purchase
Atlantic.  GMT's purchase of Atlantic also included an agreement
to make a deferred payment of $4,854,420.  This deferred payment
was guaranteed by Valor, and the guaranty was signed by HUGH
DUNKERLEY, the defendant, as Valor's President.  On or about
April 2, 2015, GMT entered an Amended and Restated Limited
Liability Company Agreement with its members, pursuant to which
GMT would be renamed Atlantic Capital Holdings LLC and Atlantic
would become its wholly owned subsidiary.  Also pursuant to this
agreement, BFG obtained the right to designate two members of
Atlantic's four-member Board of Managers.  As part of this
transaction, Hughes was merged into Atlantic.  Following the
acquisition of Atlantic, MICHELLE MORTON, the defendant, became
the Chief Executive Officer of Atlantic.  On or about May 1,
2015, Atlantic filed an amended form ADV with the SEC.  The form
did not disclose BFG's indirect ownership of Atlantic, as was
required.

       b.    On or about April 10, 2015, JASON GALANIS, the defendant, sent an email to, among others, MICHELLE MORTON, the defendant.  In the email, JASON GALANIS asked MORTON and her business partner to "maintain their word" regarding the "Native American initiative."  JASON GALANIS continued, "Based on commitments from you and [Atlantic], we caused the tribe and the tribal council to make various commitments. . . .  We were continually assured that the investment was approved."  In the email, JASON GALANIS also said, "I am not a member of the board.  However, I was responsible for arranging the financing for the company and have been requested to continue to be the lead in liaising with the investors.  As you know, the investors have almost $15,000,000 in exposure."

       c.    On or about April 14, 2015, MICHELLE MORTON, the defendant, emailed JASON GALANIS, the defendant.  In the email, MORTON requested a $500,000 loan, explaining that Atlantic was suffering from financial difficulty and was struggling to pay its operating costs.  JASON GALANIS responded to MORTON's email with the response, "Let's talk.  I don't like e-mail."

       d.    On or about April 16, 2015, Atlantic used $16.2 million of funds in a pooled investment vehicle it operated called the Global Yield Opportunity Fund (the "GYOF") to purchase the entirety of the Fourth Tribal Bond Issuance.  The GYOF had only one investor, Pension Fund-1.  MICHELLE MORTON, the defendant, originally approached a trader at Atlantic (the "Atlantic Trader") on April 15, 2015 and asked the Atlantic Trader to execute the purchase of the Fourth Tribal Bond Issuance.  The Atlantic Trader refused to enter the trade because the Fourth Tribal Bond Issuance had not been approved by Atlantic's investment committee.  On April 16, 2015, MORTON again approached the Atlantic Trader and instructed her to send the wire to purchase the Fourth Tribal Bond Issuance.  After another Atlantic employee told the Atlantic Trader not to send the wire without speaking to Pension Fund-1 first, the Atlantic Trader became so upset that she began to cry.  The Atlantic Trader ultimately agreed to wire the funds used to purchase the Fourth Tribal Bond Issuance.

       e.    The governing documents for the GYOF provided, among other things, that "No single credit exposure is expected to exceed five percent (5%)" of the GYOF's assets.  At the time that the Fourth Tribal Bond Issuance was purchased in the GYOF, it represented more than 15% of the GYOF's assets.

f.    At the time of the bond purchase described above, certain conflicts of interest existed.  For example, HUGH DUNKERLEY, the defendant, was a Managing Director at Burnham, the Placement Agent for the Tribal Bonds.  DUNKERLEY was also the Managing Member of BFG, an investor in Atlantic, which operated the pooled investment vehicle in which the Tribal Bonds were placed, and was the President of Valor, which guaranteed a deferred payment to be made by GMT to the prior owners of Atlantic.  DUNKERLEY was also an officer of, and a signatory on the bank account of, WAPCC, the entity which received the proceeds of the Fourth Tribal Bond Issuance to purportedly invest in an annuity on behalf of the WLCC.  The conflicts of interest involving DUNKERLEY were not disclosed by MICHELLE MORTON, the defendant, or any Atlantic employee, to Pension Fund-1 before the Tribal Bonds were purchased in the GYOF, in which Pension Fund-1 was the sole investor.

g.    Neither MICHELLE MORTON, the defendant, nor any Atlantic employee discussed the purchase of the Fourth Tribal Bond Issuance with Pension Fund-1 or obtained consent from Pension Fund-1 prior to using funds in the GYOF to purchase the Fourth Tribal Bond Issuance.

h.    On April 23, 2015, less than ten days after MICHELLE MORTON, the defendant, requested a $500,000 loan from JASON GALANIS, the defendant, and one week after Atlantic purchased the Fourth Tribal Bond Issuance in the GYOF, $305,000 was transferred from the WAPCC Account to an account associated with Hughes.

i.    On April 23, 2015, MICHELLE MORTON, the defendant and others held a call with Pension Fund-1 in which they informed Pension Fund-1 about the purchase of the Fourth Tribal Bond Issuance and the fact that there was a potential conflict of interest.  The following day, Pension Fund-1 informed Atlantic of its strong disagreement with the purchase of the Fourth Tribal Bond Issuance and demanded that the bonds be sold out of the GYOF immediately.

j.    No ready secondary market existed for the Tribal Bonds, as MICHELLE MORTON, the defendant, well knew given her inability, and the inability of other Hughes employees, to find buyers for the Tribal Bonds placed with Hughes clients.  Through the date of this Complaint, no buyer has been located for the Tribal Bonds purchased by Atlantic in the GYOF.

k.    In or about October 2015, Atlantic's Chief
Compliance Officer asked HUGH DUNKERLEY, the defendant, to
provide a market price at which Burnham would be willing to
purchase the Tribal Bonds in the GYOF.  DUNKERELY's reply email
acknowledged the lack of a market for the bonds.  Specifically,
DUNKERLEY said, "You may want to refer to the risks section of
the [private placement memorandum] where it clearly says there
is 'no market for these and none is expected to develop in the
future.' . . . This situation is clearly true at the moment and
given the current investigation any price attributed to these
bonds may not be appropriate for accounting or even misleading
for any other purposes."  At the time DUNKERLEY sent this email
indicating that there was no ready market for the Tribal Bonds,
his employer, Burnham, was using $2,600,000 of the Tribal Bonds
as part of the net capital that Burnham, as a registered broker-
dealer, was required to maintain under applicable SEC
regulations and Brokerage Firm-1, in which Burnham had agreed to
purchase a 49% equity interest, was using $5,000,000 of the
Tribal Bonds to meet its net capital requirements.  The SEC
regulations governing broker-dealer net capital requirements
specifically disallow the use of securities for which there is
no ready market.

57.    Based on my review of documents provided by various
entities, I know that the Fourth Tribal Bond Issuance settled
through the book-entry system of the Depository Trust Company
("DTC") in New York, New York.

## The Proceeds from the Fourth Tribal Bond Issuance are Used to Purchase a Burnham-Sponsored Initial Public Offering

58.    Based on my review of bank records and documents
provided by various entities, I have learned that a portion of
the proceeds of the Fourth Tribal Bond Issuance, rather than
being provided to the Investment Manager and invested on the
WLCC's behalf, as required by the Indentures, was transferred to
two brokerage accounts set up at Burnham at the direction of
GARY HIRST, the defendant, so that these accounts could purchase
a significant percentage of the shares of a Burnham-sponsored
initial public stock offering.  Proceeds generated from a later
sale of these shares by the Burnham clients were used, in part,
to fund the interest payment on the First Tribal Issuance when
it became due.  Specifically, I have learned the following:

a.    Technology Company-1 is a Hawaii-based enterprise
software company.  Shares of Technology Company-1 were initially
offered to the public on May 19, 2015 and began trading on the

40

NASDAQ Stock Market LLC ("NASDAQ") that same day (the "IPO").
Burnham was the underwriter of the IPO.  HUGH DUNKERLEY, the
defendant, was listed as a Burnham contact in the Form S-1
registration statement filed with the SEC in connection with the
offering of Technology Company-1's shares.

        b.    On or about February 25, 2014, JASON GALANIS, the
defendant, emailed DEVON ARCHER and BEVAN COONEY, the
defendants, attaching a draft Form S-1 registration statement
for Technology Company-1's initial public stock offering.  In
the email, GALANIS said, "arch  we put the attached together in
about a week.  Lots of work, but just a week. . . .  will use
Burnham west coast for the IPO.  will be in NASDAQ by summer.
should be doing more of these using the machinery.  jason."

        c.    On or about April 16, 2015, $15,850,000 was
transferred by the Trustee from an account associated with the
WLCC to the WAPCC Account.  This amount represented the proceeds
of the Fourth Tribal Bond Issuance, which as described above had
been purchased in a pooled investment vehicle operated by
Atlantic, less fees paid to Burnham and certain contractual
payments to the WLCC.  Despite the representations in the
Indentures and the contracts with WAPCC that the proceeds of the
Tribal Bond Issuances would be provided to the Investment
Manager to be invested on the WLCC's behalf, significant
portions of the bond proceeds were diverted by JASON GALANIS and
HUGH DUNKERLEY, the defendant, to various entities and
individuals who used the funds for personal purposes.

        d.    From on or about April 29, 2015 through on or
about May 18, 2015, HUGH DUNKERLEY, the defendant, transferred
$4,336,000 from the WAPCC Account to two client accounts at
Burnham (the "Burnham Accounts").  Both accounts were opened by
Individual-2 at the direction of GARY HIRST, the defendant.
Over time, at least $175,000 had been transferred by JASON
GALANIS, the defendant, from the Thorsdale Account to
Individual-2, including transfers of $60,000 on September 2,
2014, $15,000 on September 5, 2014, $75,000 on October 28, 2014,
$20,000 on May 13, 2015, and $5,000 on May 20, 2015.

        e.    On or about May 19, 2015, the Burnham Accounts
purchased 867,000 shares of Technology Company-1's stock out of
the 1,000,983 shares offered in the IPO, or approximately 87% of
the shares offered, for a total purchase price of $4,335,000.
GARY HIRST and DEVON ARCHER, the defendants, were among the
purchasers of the remaining 13% of the shares offered in the
IPO.

f.   On or about May 21, 2015, Technology Company-1 transferred $1,766,000 to the Thorsdale Account.

g.   An interest payment of $1,546,417.13 with respect to the First Tribal Bond Issuance was due to the Trustee on or before September 1, 2015, and was funded largely through the sale of Technology Company-1 shares that had been purchased in the Burnham Accounts in connection with the IPO and by DEVON ARCHER, the defendant.

    i.  On or about September 1, 2015, the balance in the WAPCC Account, before the transfers described below, was less than $3,000.

    ii. On or about September 1, 2015, DEVON ARCHER, the defendant, transferred $250,000 to the WAPCC Account.

    iii. On or about September 2, 2015, a total of $1,212,000 was transferred from a bank that served as the clearing firm for Burnham client transactions to the WAPCC Account.  This amount represented the proceeds received by the Burnham Accounts from the sale of certain shares of Technology Company-1's stock that the Burnham Accounts purchased in the IPO.

    iv. On or about September 2, 2015, $126,908.70 was transferred from the WAPCC Account to the Trustee and on or about September 3, 2015, $1,419,508.43 was transferred from the WAPCC Account to the Trustee.  Together, these transfers totaled $1,546,417.13, which the Trustee used to make the interest payment with respect to the First Tribal Bond Issuance that was due on September 1, 2015.

59.   Based on my review of bank records, I know that between April 16, 2015 and October 30, 2015. HUGH DUNKERLEY, the defendant, transferred $1,340,000 of the proceeds of the Tribal Bond Issuances from the WAPCC Account to the Thorsdale Account. During the same time period, the Thorsdale Account also received inflows of approximately $2,900,000 from other sources, including $1,766,000 from Technology Company-1; approximately $475,000 from the Burnham Accounts; and $100,000 from BEVAN COONEY, the defendant.  During that time period, JASON GALANIS,

the defendant, transferred all but $9,640.39 from the Thorsdale Account.  Outbound transfers initiated by JASON GALANIS from the Thorsdale Account included, among others, at least $150,000 to Technology Company-1; at least $100,000 to Rosemont; at least $75,000 to BEVAN COONEY, the defendant; at least $400,000 to a brokerage account associated with Thorsdale; at least $875,000 to various law firms; and at least $2,000,000 for personal expenses, including at least $1,000,000 for expenses associated with JASON GALANIS's home; at least $500,000 in payments to various members of JASON GALANIS's family; at least $150,000 for clothing and jewelry purchases; at least $100,000 to the IRS; at least $40,000 in travel expenses; at least $10,000 in ATM withdrawals from the Thorsdale Account; at least $50,000 in restaurant and other food-related expenses; at least $35,000 for life insurance expenses; at least $7,500 for car-related expenses; and at least $30,000 in miscellaneous personal expenses.

60.  On or about November 5, 2015, HUGH DUNKERLEY, the defendant, on behalf of WAPCC and in response to a request from counsel for the WLCC, sent the WLCC a document purporting to be an "Annual Statement of Account" for "Institutional Single Premium Variable Annuity" for the WLCC, dated as of November 11, 2015 (the "Third Annual Statement").  The Third Annual Statement stated that WAPCC received $15,850,000 of the proceeds of the Fourth Tribal Bond Issuances on April 16, 2015.  The Third Annual Statement also falsely shows a payment from WAPCC of $15,850,000 on April 16, 2015 which is labeled as "Payment - Annuity Purchase."  Because no annuity was ever purchased for the WLCC on the date specified, the Third Annual Statement is fraudulent on its face.

61.  Based on my review of documents provided by various entities, I know that an interest payment of $1,013,166 was due on the Fourth Tribal Bond Issuance on or about May 1, 2016.  On or about April 4, 2016, HUGH DUNKERLEY, the defendant, sent a letter to representatives of the WLCC on letterhead of WAPCC. In the letter, DUNKERLEY advised the WLCC that WAPCC was seeking indemnification from the WLCC for the costs of the investigation conducted by "the US Securities and Exchange Commission and other agencies of the US government," pursuant to the terms of the annuity contracts entered into by the WLCC and WAPCC. DUNKERLEY advised the WLCC that WAPCC would withhold annuity distribution payments, including payments of interest owed on the Tribal Bonds, until the WLCC provided assurance that it could meet its indemnification obligations.

## Summary of JASON GALANIS's Expenditures from the Thorsdale Account

62.   Based on my review of bank records, I have learned that from on or about August 27, 2014 through on or about October 30, 2015, more than $43,000,000 was transferred into the Thorsdale Account, including more than $38,000,000 from the WAPCC Account, which represented proceeds of the Tribal Bond Issuances.  Of the more than $43,000,000 transferred into the Thorsdale Account, more than $8,750,000 was transferred out of the Thorsdale Account by JASON GALANIS, the defendant, for personal expenses, including at least $5,000,000 for expenses associated with JASON GALANIS's home; at least $1,250,000 to various law firms; at least $875,000 in payments to various members of the JASON GALANIS's family; at least $500,000 in payments to the IRS; at least $200,000 on automobile-related expenses; at least $75,000 for restaurants and other food-related expenses; at least $75,000 for travel expenses; at least $40,000 in payments to JASON GALANIS directly; at least $350,000 in clothing and jewelry purchases; at least $55,000 in ATM withdrawals; and at least $100,000 in miscellaneous personal expenses.

## JASON GALANIS Continues His Efforts to Deceive the WLCC About the Use of the Proceeds of the Tribal Bond Issuances

63.   Based on my review of documents provided by the WLCC, I have learned that on or about February 17, 2016, JASON GALANIS, the defendant, sent a letter to various individuals affiliated with the WLCC.  The letter, which was on Thorsdale letterhead and which claimed to have been written with "the authorization of [WAPCC]," attempted to assure the WLCC that the proceeds of the Tribal Bond Issuances had been invested as required by the Indentures.  In fact, the letter contained numerous false statements, including the following:

        a.   JASON GALANIS, the defendant, claimed in the letter that "WLCC bond interest of over $2.72 million was already paid by these [annuity] distributions precisely as contemplated in the Indenture and related agreements."  In fact, as described above, the interest payments made on the Tribal Bond Issuances did not derive from annuity distributions, but instead were generated from wire transfers made by multiple parties and from the sale of Technology Company-1 IPO stock.

        b.   In the letter sent to the WLCC, JASON GALANIS, the defendant, stated, "The SEC has declared the [Tribal] bonds

dubious in part because they have jumped to the conclusion, based on the most superficial incomplete information, that Thorsdale has diverted money for its own benefit." As shown above, JASON GALANIS in fact diverted at least $8,750,000 from the Thorsdale Account to pay a wide range of personal expenses.

c.    In the letter sent to the WLCC, JASON GALANIS, the defendant, stated, "The bottom line is that valuable securities were bought and remain the investment property of the annuity issuer – and therefore collateral, too." In fact, as of October 30, 2015, the WAPCC Account – the bank account associated with the purported annuity provider and which initially received the proceeds of the Tribal Bond Issuances from the Trustee for investment purposes – had a balance of $0. Moreover, the Thorsdale Account had a balance of less than $10,000 on October 30, 2015.

WHEREFORE, I respectfully request that arrest warrants be issued for JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

SHANNON BIENIEK
Special Agent
Federal Bureau of Investigation

Sworn to before me this
9th day of May 2016

HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK