**<u>EXHIBIT B</u>**

```
                                              ┌─────────────────────────────┐
                                              │ USDC SDNY                   │
UNITED STATES DISTRICT COURT                  │ DOCUMENT                    │
SOUTHERN DISTRICT OF NEW YORK                 │ ELECTRONICALLY FILED        │
- - - - - - - - - - - - - - - - - -  x        │ DOC #:_____│
                                     :        │ DATE FILED: NOV 0 2 2016    │
UNITED STATES OF AMERICA             :        └─────────────────────────────┘
                                     :
          - v. -                     :
                                     :
JASON GALANIS,                       :              SUPERSEDING
GARY HIRST,                          :              INDICTMENT
JOHN GALANIS,                        :              S1 16 Cr. 371 (RA)
     a/k/a "Yanni,"                  :
HUGH DUNKERLEY,                      :
MICHELLE MORTON,                     :
DEVON ARCHER, and                    :
BEVAN COONEY,                        :
                                     :
          Defendants.                :
                                     :
- - - - - - - - - - - - - - - - - -  x
```

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury Charges:

### Relevant Persons and Entities

1.     At all times relevant to this Indictment, the Wakpamni
Lake Community Corporation (the "WLCC") was a tribally-chartered
economic development corporation, wholly-owned by the Wakpamni
Lake Community, a subdivision of the Wakpamni Lake District,
which are each subordinate units of the Oglala Sioux Tribe of
the Pine Ridge Reservation, South Dakota.

2.     At certain times relevant to this Indictment, Hughes
Capital Management, Inc. ("Hughes") was an investment adviser
registered with the U.S. Securities and Exchange Commission
("SEC") with its principal place of business in Alexandria,

1

Virginia.  On August 4, 2014, a limited liability corporation of which MICHELLE MORTON, the defendant, was a fifty percent owner (the "Morton Corporation") acquired Hughes.  Following the acquisition, MORTON became the Chief Executive Officer of Hughes.  At certain times relevant to the Indictment, GARY HIRST, the defendant, was the Chief Investment Officer of Hughes.

3.     At all times relevant to this Indictment, Atlantic Asset Management, LLC ("Atlantic" and together with Hughes, the "Investment Advisers") was an investment adviser registered with the SEC with its principal place of business in Stamford, Connecticut.  In or about April 2015, the Morton Corporation purchased Atlantic and Hughes was merged into Atlantic. Following the acquisition of Atlantic, MICHELLE MORTON, the defendant, became the Chief Executive Officer of Atlantic. MORTON and GARY HIRST, the defendant, were legally obligated to the clients of the Investment Advisers to act in their best interests.

## Overview of the Conspiracy

4.     From at least in or about March 2014 through in or about April 2016, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, conspired to defraud the WLCC by (i) causing the WLCC to issue

2

more than $60 million in bonds based on false and misleading representations; (ii) failing to invest the bond proceeds on the WLCC's behalf in the manner agreed upon; and (iii) instead misappropriating the proceeds of the bonds for their own purposes.

5.    From at least in or about May 2014 through in or about April 2016, JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, and others known and unknown, conspired to defraud certain of the clients of the Investment Advisers by gaining ownership and control of the Investment Advisers and causing client funds to be invested in the WLCC's bonds, without disclosing material facts to these clients, including that the bonds did not fit within the investment parameters of certain clients' investment advisory contracts and that certain substantial conflicts of interest existed.

JASON AND JOHN GALANIS INDUCE THE WLCC TO ISSUE MORE THAN $60 MILLION OF BONDS THROUGH FALSE AND MISLEADING REPRESENTATIONS

6.    As a part of the scheme to defraud, JASON GALANIS and JOHN GALANIS, a/k/a "Yanni," the defendants, induced the WLCC, through false and misleading representations and omissions, to issue a total of approximately $60 million of bonds, over the course of four bond issuances (respectively, the "First Bond Issuance," the "Second Bond Issuance," the "Third Bond Issuance," and the "Fourth Bond Issuance" and, together, the

3

"Bond Issuances"). In furtherance of the scheme, JASON GALANIS apprised DEVON ARCHER and BEVAN COONEY, the defendants, of the status of the Bond Issuances and the likely proceeds to be obtained therefrom, and further discussed with them potential uses that could be made of the proceeds that were for the benefit of JASON GALANIS, ARCHER, COONEY and their co-conspirators.

7.     According to the trust indentures and other documents relating to the Bond Issuances (collectively, the "Bond Agreements") entered into by the WLCC, proceeds of the Bond Issuances were to be provided to an annuity provider (the "Annuity Provider") established in the British Virgin Islands by HUGH DUNKERLEY, the defendant, to be invested in an annuity for the benefit of the WLCC which would generate sufficient income to pay interest and eventually the principal to bond holders. On or about August 6, 2014, GARY HIRST, the defendant, opened a bank account in Florida in the name of the Annuity Provider and provided himself and DUNKERLEY with signatory authority on the account (the "Dunkerley Account").

8.     According to the Bond Agreements, a separate investment manager (the "Investment Manager") was to receive the bond proceeds from the Annuity Provider so that they could be invested on the WLCC's behalf.

4

9.    In connection with each of the Bond Issuances, the WLCC also entered into a placement agency agreement with a broker-dealer (the "Placement Agent") at which HUGH DUNKERLEY, the defendant, was employed, and in which DEVON ARCHER and BEVAN COONEY, the defendants, had an ownership interest.  Pursuant to the placement agency agreements – which in most cases were signed by DUNKERLEY – the Placement Agent would solicit investors for the WLCC bonds in exchange for a fee.  None of the eventual purchasers of the WLCC bonds, however, were solicited by the Placement Agent.

10.    At various times in furtherance of the scheme, JOHN GALANIS, a/k/a "Yanni," the defendant, falsely represented to the WLCC that JASON GALANIS, the defendant, was affiliated with the Placement Agent in order to create the false impression that JASON GALANIS'S role in the transaction was legitimate or authorized.  In addition, the placement agency agreements signed by HUGH DUNKERLEY, the defendant, stated that any notice that was to be provided to the Placement Agent should be sent to the attention of JASON GALANIS, thus ensuring that the conspirators were apprised of any developments concerning the Bond Issuances. Notwithstanding these representations, DEVON ARCHER, the defendant, who was affiliated with the Placement Agent, falsely represented to affiliates of the Placement Agent that, among other things, JASON GALANIS would not be involved with any

entities affiliated with the Placement Agent or source deals to the Placement Agent, despite ARCHER's knowledge of JASON GALANIS's role in procuring the Bond Issuances.

11.   JASON GALANIS, the defendant, apprised DEVON ARCHER and BEVAN COONEY, the defendants, among others, about the progress of the Bond Issuances via email, among other means. For example:

a.   On or about April 4, 2014, JASON GALANIS emailed ARCHER and COONEY, stating, "$20mm bond approved. Proceeds are $15mm to us and 5 mm to them."

b.   On or about July 6, 2014, JASON GALANIS emailed ARCHER and COONEY, noting that the WLCC had approved the first bond issuance and stating, "[M]y primary objective is to get us a source of discretionary liquidity. Sick of begging."

c.   On or about August 15, 2014, JASON GALANIS emailed ARCHER and COONEY, stating that the legal documents for the First Bond Issuance had been executed.  COONEY replied, "This is pure genius alla [sic] mikey Milken!! The Native American Bonds!!! . . . Great work here Greek!!"

### CONTROL OF ATLANTIC AND HUGHES

12.   In furtherance of the scheme to defraud, JASON GALANIS, the defendant, obtained control of the Investment Advisers, in order to use client funds for his own purposes. JASON GALANIS did so by arranging for an entity he, DEVON

6

ARCHER, HUGH DUNKERLEY, and BEVAN COONEY, the defendants, among others, controlled to provide financing for MICHELLE MORTON, the defendant, to purchase the Investment Advisers. ARCHER and COONEY were well aware of JASON GALANIS's efforts to locate and gain control of the Investment Advisers, and that client funds were to be used for the purchase of the Bond Issuances. To further facilitate the fraudulent scheme, MORTON installed GARY HIRST, the defendant, with JASON GALANIS's knowledge and approval, as the Chief Investment Officer and later as the Chairman of the Investment Committee of Hughes.

13. Having obtained control of the Investment Advisers, JASON GALANIS, MICHELLE MORTON, and GARY HIRST, the defendants, purchased a total of approximately $43.2 million of the Bond Issuances with client funds. In particular:

a. In or about August 2014, MORTON and HIRST, at the direction of JASON GALANIS, directed the use of Hughes client funds to purchase approximately $27 million of bonds, representing the entirety of the First Bond Issuance.

b. In or about April 2016, MORTON, at the direction of JASON GALANIS, directed the use of Atlantic client funds to purchase $16.2 million of bonds, representing the entirety of the Fourth Bond Issuance.

14. MICHELLE MORTON and GARY HIRST, the defendants, failed to disclose the contemplated bond purchases to, or to consult

7

with, any Hughes clients, and MORTON likewise failed to make any disclosures to any Atlantic client, prior to causing the clients' purchases of the bonds, notwithstanding that the bond purchases were outside the investment parameters of many of the clients.

15. MICHELLE MORTON and GARY HIRST, the defendants, also failed to disclose to the Investment Advisers' clients the numerous conflicts of interest that existed with regard to the Investment Advisers' role in the purchase of the bonds, despite their legal obligations to make such disclosures. For example:

a. HUGH DUNKERLEY, the defendant, was (i) a Managing Director at the Placement Agent; (ii) a managing member of an entity that invested in both Investment Advisers; (iii) an officer of the Annuity Provider; and (iv) a signatory on the Dunkerley Account. DUNKERLEY was thus affiliated with the entity purportedly soliciting investors for the WLCC bonds; the entities whose clients actually purchased the bonds; and the entity receiving the proceeds of the bond issuances and purportedly investing those proceeds on the WLCC's behalf.

b. HIRST was (i) the Chief Investment Officer, and later the Chairman of the Investment Committee, of Hughes and signed the trade tickets authorizing the purchase of the First Tribal Bond Issuance on behalf of Hughes clients; (ii) the Assistant Secretary of the Annuity Provider; and (iii) a

8

signatory on the Dunkerley Account. HIRST was thus affiliated both with the entities whose clients purchased the bonds and the entity receiving the proceeds of the bond issuances and purportedly investing those proceeds on the WLCC's behalf.

        c.   JASON GALANIS, the defendant, (i) held himself out as affiliated with the Placement Agent and was the notice party for certain of the agreements between the Placement Agent and the WLCC; (ii) orchestrated the purchase of Hughes and Atlantic; (iii) directed the purchase of the Bond Issuances using Atlantic and Hughes client funds; and (iv) exercised control over the Annuity Provider. JASON GALANIS was thus affiliated with the entity purportedly soliciting investors for the WLCC bonds; the entities whose clients actually purchased the bonds; and the entity receiving the proceeds of the bond issuances and purportedly investing those proceeds on the WLCC's behalf.

      16.   When clients of the Investment Advisers learned that certain of the Bond Issuances had been purchased in their accounts, several demanded that the bonds be liquidated. However, because there was no ready secondary market for the bonds, none were ever able to be sold or redeemed from the client accounts.

## MISSAPROPRIATION OF THE BOND PROCEEDS

17.   As a further part of the scheme to defraud, JASON GALANIS, the defendant, aided by HUGH DUNKERLEY, the defendant, misappropriated the bond proceeds for his own benefit and for the benefit of various co-defendants.   In particular, the entirety of the bond proceeds were deposited into the Dunkerley Account.   At no time were the funds deposited in the Dunkerley Account transferred to the Investment Manager as specified in the Bond Agreements.   Instead, at JASON GALANIS's direction, DUNKERLEY transferred more than $43 million of bond proceeds from the Dunkerley Account to accounts controlled by both JASON GALANIS (the "Jason Galanis Account") and JOHN GALANIS, a/k/a "Yanni," the defendant.   JASON GALANIS then transferred those proceeds, often through layers of intermediaries, (i) to accounts controlled by GARY HIRST, DEVON ARCHER, JOHN GALANIS, and BEVAN COONEY, the defendants, among others; (ii) to other business interests of JASON GALANIS and his co-defendants; and (iii) for use in connection with his own personal expenses.

18.   For example, HUGH DUNKERLEY, the defendant, acting at the direction of JASON GALANIS, the defendant, transferred approximately $2.3 million to a bank account associated with JOHN GALANIS, a/k/a "Yanni," the defendant, which JOHN GALANIS used for personal expenses.   In addition, between on or about · August 27, 2014 and on or about October 30, 2015, JASON GALANIS

10

used approximately $8,750,000 transferred by DUNKERLEY to the
Jason Galanis Account for his own personal expenses, including:
at least $5,000,000 for expenses associated with JASON GALANIS's
home; at least $1,250,000 to pay various law firms; at least
$875,000 in payments to various members of the JASON GALANIS's
family; at least $500,000 in payments to the IRS; at least
$200,000 on automobile-related expenses; at least $75,000 for
restaurants and other food-related expenses; at least $75,000
for travel expenses; at least $40,000 in payments to JASON
GALANIS directly; at least $350,000 in clothing and jewelry
purchases; at least $55,000 in ATM withdrawals; and at least
$100,000 in miscellaneous personal expenses.

　　　19.　JASON GALANIS, the defendant, and others, communicated
by email, among other means, about the use of the
misappropriated funds.　For example, on or about August 13,
2014, JASON GALANIS emailed DEVON ARCHER, the defendant, about a
business entity that HUGH DUNKERLEY, the defendant, was trying
to acquire, noting: "[first name] and Hugh [Dunkerley] have
locked it up and came to me for the money, which I have agreed
to arrange/provide (probably Indians)."

　　　20.　During the same period, JASON GALANIS, the defendant,
transferred significant amounts from the Jason Galanis Account
to various co-defendants, including at least $1.3 million to an

11

entity controlled by GARY HIRST and HUGH DUNKERLEY, the defendants.

## PROCEEDS OF THE FIRST BOND ISSUANCE ARE RECYCLED TO PURCHASE THE SECOND AND THIRD BOND ISSUANCES

21.  As a further part of the scheme to defraud, JASON GALANIS, HUGH DUNKERLEY, DEVON ARCHER, and BEVAN COONEY, the defendants, misappropriated $20 million from the proceeds of the First Bond Issuance and used the money to purchase the Second and Third Bond Issuances.  Specifically:

a.  In or about September 2014, JASON GALANIS, the defendant, transferred approximately $15 million from the proceeds of the First Bond Issuance via an intermediary to an entity controlled by DEVON ARCHER, the defendant.  ARCHER then used the funds to purchase the entirety of the Second Bond Issuance.  In or about October 2014, in connection with ARCHER's attempt to deposit the bonds into a brokerage firm account under his control, ARCHER falsely represented to the brokerage firm that the funds he had used to purchase the Second Bond Issuance came from real estate sales.

b.  In or about October 2014, JASON GALANIS, the defendant, transferred $5 million from the proceeds of the First Bond Issuance to BEVAN COONEY, the defendant.  COONEY then used the funds to purchase the entirety of the Third Bond Issuance.

12

22.  As a result of this recycling, although the face amount of WLCC bonds outstanding increased and the amount of interest payable by the WLCC increased, the actual bond proceeds available for investment on behalf of the WLCC did not increase.

23.  JASON GALANIS, BEVAN COONEY, and DEVON ARCHER, the defendants, then used the bonds purchased with the recycled proceeds of the First Bond Issuance to, among other things, support other business endeavors.  For example, ARCHER provided $2.6 million of bonds to the Placement Agent to meet its net capital requirements as a registered broker-dealer under applicable SEC regulations and COONEY transferred $5 million of bonds to another registered broker-dealer for the same purpose.

The Defendants Make Interest Payments to the WLCC

24.  Pursuant to the Bond Agreements, regular interest payments were due on each of the Bond Issuances and were to be derived from annuity distributions.  For example:

a.  The first interest payment of $1,546,417.13 was due on the First Bond Issuance on or before September 1, 2015.

b.  The first interest payment of $903,000 was due on the Second Bond Issuance on or about September 30, 2015.

c.  The first interest payment of $294,311.11 was due on the Third Bond Issuance on or about September 30, 2015.

d.  The first interest payment of $1,013,166 was due on the Fourth Bond Issuance on or about May 1, 2016.

13

25.   Interest payments on the Bond Issuances, however, did not derive from annuity distributions because the bond proceeds had not been invested as provided in the Bond Agreements. Instead, at the direction of JASON GALANIS, the defendant, the first interest payments on the First, Second and Third Bond Issuances were made using funds provided directly or through entities or accounts controlled by JASON GALANIS, HUGH DUNKERLEY, GARY HIRST, and DEVON ARCHER, the defendants.   No interest payment on the Fourth Bond Issuance was ever made.

## Statutory Allegations

26.   From at least in or about March 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

27.   It was a part and object of the conspiracy that JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, willfully and

14

knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Overt Acts

28. In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. In approximately March 2014, JOHN GALANIS, a/k/a "Yanni," the defendant, met with employees of and advisers to the WLCC at a Native American economic development conference in Las Vegas, Nevada.

15

b.   On or about July 21, 2014, MICHELLE MORTON, the
defendant, sent a text message to JASON GALANIS, the defendant,
stating, "Should know how$ [sic] we can proceed with bonds soon
getting information."   JASON GALANIS responded, "i'm confident
you will figure it out."

c.   On or about August 8, 2014, HUGH DUNKERLEY, the
defendant, signed an agreement pursuant to which he bound the
broker-dealer at which he was employed to serve as the placement
agent for an issuance of bonds by the WLCC.

d.   On or about August 22, 2014, GARY HIRST, the
defendant, sent an email containing trade tickets signed by him
authorizing the purchase of certain bonds issued by the WLCC on
behalf of certain clients of Hughes.

e.   On or about October 1, 2014, DEVON ARCHER, the
defendant, caused the transfer of $15,000,000 from a brokerage
account located in New York, New York for the purchase of
$15,000,000 of bonds issued by the WLCC, which bonds were also
held, for a period of time, in the brokerage account located in
New York, New York.

f.   On or about October 9, 2014, BEVAN COONEY, the
defendant, caused the transfer of $5,000,000 from an account in
his name for the purchase of $5,000,000 of bonds issued by the
WLCC.

(Title 18, United States Code, Section 371.)

16

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

29.  The allegations contained in Paragraphs 1 through 25 and 28 are repeated, realleged, and incorporated by reference as though fully set forth herein.

30.  From at least in or about March 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons,

to wit, the defendants engaged in a scheme to misappropriate the proceeds of several bond issuances by the WLCC and also caused investor funds to be used to purchase the bonds, for which there was no secondary market through which such bonds could be redeemed, without disclosure to those investors of material facts, including the existence of multiple conflicts of interest, and which investments, in some cases, were outside the investment parameters of the accounts in which they were placed.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy to Commit Investment Adviser Fraud)

The Grand Jury further charges:

31. The allegations contained in Paragraphs 1 through 25 and 28 are repeated, realleged, and incorporated by reference as though fully set forth herein.

32. From at least in or about May 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, investment adviser fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

18

33. It was a part and object of the conspiracy that JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, and others known and unknown, willfully and knowingly would and did use the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

## Overt Acts

34. In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about July 21, 2014, MICHELLE MORTON, the defendant, sent a text message to JASON GALANIS, the defendant, stating, "Should know how$ [sic] we can proceed with bonds soon getting information." JASON GALANIS responded, "i'm confident you will figure it out."

b. On or about August 22, 2014, GARY HIRST, the defendant, sent an email containing trade tickets signed by him

19

authorizing the purchase of certain bonds issued by the WLCC on behalf of certain clients of Hughes.

(Title 18, United States Code, Section 371.)

## COUNT FOUR
### (Investment Adviser Fraud)

The Grand Jury further charges:

35.  The allegations contained in Paragraphs 1 through 25, 28 and 34 are repeated, realleged, and incorporated by reference as though fully set forth herein.

36.  From at least in or about May 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, willfully and knowingly used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, HIRST and MORTON, who were employees of a registered investment adviser and thus had fiduciary duties to their investment advisory clients, with the knowledge and approval of JASON GALANIS, intentionally withheld material information from their clients

20

regarding purchases of bonds issued by the WLCC, including the existence of multiple conflicts of interest and the fact that the purchases were outside the investment parameters set forth in the investment advisory agreements of certain clients, for the purpose of profiting from the placement of such bonds.

(Title 15, United States Code, Sections 80b-6 and 80b-17; and Title 18, United States Code, Section 2.)

### **FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH FOUR**

37. As a result of committing one or more of the offenses alleged in Counts One through Four of this Indictment, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code Section 2461, any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Four of this Indictment.

### Substitute Assets Provision

38. If any of the above-described forfeitable property, as a result of any act or omission by any of the defendants:

a. cannot be located upon the exercise of due diligence;

21

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981(a)(1)(C);
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461.)

GRAND JURY FOREPERSON

PREET BHARARA
United States Attorney

22