**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      v.

JASON GALANIS,
GARY HIRST,
JOHN GALANIS, a/k/a "Yanni,"
HUGH DUNKERLEY,
MICHELLE MORTON,
DEVON ARCHER, and
BEVAN COONEY,

              Defendants.

No. 16 Cr. 371 (RA)

**DEVON ARCHER'S OPPOSITION TO THE GOVERNMENT'S MOTION TO ADMIT**
**EVIDENCE OF UNCHARGED CONDUCT**

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

*Attorneys for Devon Archer*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

LEGAL STANDARD ............................................................................................. 1

DISCUSSION ........................................................................................................ 4

    **A.**    **The Proffered Evidence Is Inadmissible** ............................................... 4

        1.   Code Rebel ............................................................................................. 4

        2.   The "Wisconsin" Bonds ........................................................................ 9

        3.   Alleged False Statements In Atlantic And Hughes's Form ADVs ............... 11

        4.   Mr. Archer's Alleged False Statement To The BIT Board; Jason Galanis And John Moran's SEC Bars; and the Gerova Arrests and Convictions ........................................ 14

        5.   The Alleged False Statements To Morgan Stanley And Deutsche Bank ...................... 26

    **B.**    **The Government's Rule 404(b) Notice Underscores The Need For Severance** ........ 27

    **C.**    **Any Extrinsic Acts Evidence Must Be Accompanied By A  Robust And Specific Limiting Instruction** ................................................................................. 30

**CONCLUSION** ............................................................................................... 31

Defendant Devon Archer respectfully submits this memorandum of law in opposition to the government's motion ("Motion," or "Mot.") to admit evidence of extrinsic acts pursuant to Federal Rule of Evidence 404(b) [ECF No. 339].

## PRELIMINARY STATEMENT

The government's evidence against Devon Archer is thin.  It consists of nothing more than a handful of ambiguous-at-best e-mails, Mr. Archer's shareholding in various entities, and a single transaction in which, even as alleged, Mr. Archer paid fair market value for certain bonds.

The government's Motion represents an attempt to mask this paucity of proof with irrelevant and extraordinarily prejudicial evidence about uncharged conduct:  the criminal convictions of three of Mr. Archer's alleged co-conspirators on conduct that did not involve him and about which he is not alleged to have had any knowledge; SEC bars against two individuals for conduct that was years, and in one case decades, old, and in which Mr. Archer played no role; a totally separate pump-and-dump scheme involving Mr. Archer's co-defendants; an attempted securities fraud; and two alleged irrelevant misstatements to third parties.

If this irrelevant evidence is admitted, it will overwhelm the (lack of) actual evidence concerning the charged crimes, hopelessly confuse the jury, significantly lengthen the trial, and cause Mr. Archer tremendous prejudice far out of proportion with any asserted probative value. The Court should exclude it.  In the alternative, the Court should sever Mr. Archer's trial so that evidence that may be admissible against Mr. Archer's co-defendants does not deprive him of a fair trial.

## LEGAL STANDARD

Rule 404(b) prohibits the introduction of evidence of prior bad acts to prove a defendant's character or propensity.  *See* Fed. R. Evid. 404(b) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular

occasion the person acted in accordance with the character."). The rule recognizes the danger that a fact finder will use prior act evidence to conclude that because someone acted wrongly in the past, they must have acted wrongly with respect to the charged conduct. *See, e.g., Old Chief v. United States*, 519 U.S. 172, 180 (1997).

In considering whether prior acts evidence is admissible, courts in the Second Circuit look to several fact-specific considerations:

> When reviewing the admission of evidence pursuant to Rule 404(b), we consider whether (1) the prior crimes evidence was "offered for a proper purpose;" (2) the evidence was relevant to a disputed issue; (3) the probative value of the evidence was substantially outweighed by its potential for unfair prejudice pursuant to Rule 403; and (4) the court administered an appropriate limiting instruction.

*United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009).

As the proponent of the evidence, the government bears the burden of proof as to admissibility, and the district court should not "presume that such evidence is relevant or admissible." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011); *accord United States v. Nachamie*, 101 F. Supp. 2d 134, 137 (S.D.N.Y. 2000) ("The government . . . must explain in detail the purposes for which the evidence is sought to be admitted." (citing *United States v. Levy*, 731 F.2d 997, 1002 (2d Cir. 1984))).

Where the government offers Rule 404(b) evidence on the issue of state of mind (as is the case here), it must demonstrate a high degree of similarity between the proffered evidence and the charged crimes.

> To satisfy the relevance inquiry, the evidence must be "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the [state of mind] inference advocated by the proponent of the evidence." The district court must consider all the evidence presented to the jury and determine whether a reasonable jury could find the advocated inference. The court abuses its discretion if the evidence is "not sufficiently similar" to the

> charged conduct or if "the chain of inferences necessary to connect [the] evidence with the ultimate fact to be proved [is] unduly long."

*Curley*, 639 F.3d at 57 (quoting *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987)).

Put differently, prior act evidence is not probative of a defendant's state of mind unless there is "a 'close parallel' between the crime charged and the acts shown." *United States v. Corey*, 566 F.2d 429, 431 (2d Cir. 1977); *see also United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002) ("The government may not invoke Rule 404(b) and proceed to offer, carte blanche, any prior act of the defendant in the same category of crime."); *United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) ("[E]vidence of another act should not be admitted as proof of the defendant's knowledge or intent unless the other act is 'sufficiently similar to the conduct at issue' . . . . [s]imilarity, being a matter of relevancy, is judged by the degree in which the prior act approaches near identity with the elements of the offense charge[d]." (citations omitted)); *id.* (in addition to approaching "near identity" to charged crimes, prior acts evidence must have "*substantial* relevanc[e]" (emphasis supplied)).

If the proffered Rule 404(b) evidence is relevant to the charged crimes under these standards, the Court must then consider, under Rule 403, whether the "potential for unfair prejudice" outweighs its probative value.

> If the evidence is relevant, the district court must determine if its potential for unfair prejudice substantially outweighs its probative value. *See* Fed. R. Evid. 403. The evidence's probative value "depends largely on whether or not there is a close parallel between the crime charged and the acts shown." Evidence is unfairly prejudicial when "it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." If the other acts tend to prove a fact not in issue or "to excite emotions against the defendant," they create a prejudicial effect. The district court abuses its discretion when it admits "other act" evidence with a high possibility of jury misuse but with only slightly more probative value than other evidence on the same issue.

*Curley*, 639 F.3d at 57 (citations omitted).

Even where evidence is otherwise admissible under Rule 404(b), the Court has "broad discretion" in refusing to admit evidence related to extrinsic acts. *Ismail v. Cohen*, 899 F.2d 183, 188 (2d Cir. 1990).

## DISCUSSION

### A.   The Proffered Evidence Is Inadmissible

As set forth below, the government's attempts to introduce various categories of extrinsic acts evidence should be rejected.

### 1.   Code Rebel

Evidence concerning Code Rebel should be excluded.  It is not part of the charged offense, and instead represents an entirely separate alleged securities fraud committed by Jason Galanis and others.  The government's evidence with respect to Code Rebel is voluminous, and substantial time at trial will be required to prove up the government's allegations about Code Rebel, and for the defendants to respond.  Moreover, as set forth in Mr. Archer's pre-trial motions, the introduction of evidence about Code Rebel will substantially prejudice the defendants and confuse the jury, and raise the very real possibility that the jury could mistakenly convict on the Code Rebel conduct alone.

According to the government, Jason Galanis and certain of the other defendants essentially engaged in a pump-and-dump scheme involving the shares of Code Rebel, a technology company.  The government claims that Galanis and others took control of virtually all of the shares of Code Rebel following its IPO in May 2015, and then somehow manipulated the stock to pump its share price by approximately 700%.  The government alleges that Galanis

"and his confederates" purchased the Code Rebel shares with the proceeds of the charged WLCC bond fraud.

There are numerous reasons why this evidence should not be admitted.

*First*, this evidence has nothing to do with the charged securities fraud. The government does not argue otherwise, but contends that Code Rebel is relevant to "how the defendants profited from the Wakpamni scheme." Mot. at 6. But that is not so. At best, Code Rebel is relevant to how certain defendants *spent* money that was allegedly the proceeds of the Wakpamni scheme. But where a thief steals $10, how she spends it – whether that money was spent on cab fare or luxury items or was put into savings – is not relevant to the charged offense, which was complete at the moment the defendant walked away with $10 that wasn't hers. *See United States v. Ewing*, 936 F.2d 903, 906 (7th Cir. 1991) ("That the defendant went to Las Vegas, or bought a new car tells us nothing about why he defrauded the insurance companies. Ewing might have spent the money the same way had the [allegedly fraudulent insurance] policies been legitimate"); *United States v. Hatfield*, 685 F. Supp. 2d 320, 326 (E.D.N.Y. 2010) ("it is irrelevant if Mr. Brooks spent his fortune on lavish parties, instead of donating it to starving Malawian orphans").

*Second*, even if it were appropriate for the jury to know how the defendants allegedly spent the alleged proceeds of the WLCC bonds, it would not be necessary or appropriate for the jury to hear about the separate alleged Code Rebel pump-and-dump scheme; it would be sufficient to tell the jury that certain of the defendants invested their allegedly ill-gotten gains in securities. The fact that the defendants allegedly spent the proceeds to perpetrate a second crime does not shed any light on whether they committed the first (charged) one. Again, an analogy proves the point. Suppose a defendant is charged with stealing $100 in an armed robbery, and

then uses that money to ante up in an illegal card room.  No one could plausibly argue that the illegal gambling conduct was probative of whether the defendant committed the robbery.

*Third,* the government's argument that the Code Rebel fraud is relevant to "the nature of the relationships between the defendants" fares no better, Mot. at 5, because it seeks to draw an unacceptable inference about the defendants' relationship based on their propensity to commit unrelated crimes together.  Take the same example.  If there were *two* robbers who later joined the same card illegal game with their stolen loot, the illegal gambling does not magically become relevant.  Yes, evidence that they sat together at an underground gambling parlor might in some sense be relevant to their "relationship," but only insofar as they had a relationship of committing unrelated crimes together.  That is to say, the government's "relationship" argument is just another way to say "propensity" – the precise purpose for which prior acts evidence is inadmissible.

*Fourth*, the government's disclosures with respect to Code Rebel are inadequate.  The government contends that certain defendants engaged in a pump-and-dump scheme, but nowhere does it explain how that scheme supposedly worked.  How did Galanis and "his confederates" pump Code Rebel's share price by 700%?  Did Galanis engage in matched trading?  Did Galanis cause other entities to engage in sham sales of Code Rebel?  Did Galanis cause investment advisers to tout Code Rebel stock to innocent investors to create false demand?  The government seeks permission to introduce evidence of an entirely separate securities fraud without providing basic disclosure of how the fraud supposedly worked.  The failure to make full disclosure, by itself, is grounds to deny the government's motion, *see* Fed. R. Evid. 404(b), advisory committee's note (1991) ("The court in its discretion may, under the facts, decide that the particular request or notice was not reasonable, either because of the lack of timeliness or completeness. Because the notice requirement serves as condition precedent to admissibility of

404(b) evidence, the offered evidence is inadmissible if the court decides that the notice requirement has not been met."), and could even constitute reversible error, *see United States v. Carrasco*, 381 F.3d 1237, 1241–43 (11th Cir. 2004) (per curiam) (failure to provide notice of Rule 404(b) incidents required reversal of conviction).

*Fifth*, evidence of the Code Rebel pump-and-dump will be a massive waste of time, create a trial-within-the-trial, and hopelessly confuse the jury. As described by the government, the Code Rebel scheme was incredibly complex and not at all "substantially similar" to the charged crimes. In many ways, the Code Rebel allegations much more closely resemble Jason Galanis's conduct in the Gerova case – a case that involved millions of pages of discovery and a weeks-long trial. As alleged, Galanis ingratiated himself to the management of Code Rebel, took effective control of the company, shepherded it through an IPO, and arranged for approximately 85% of the shares to be purchased by entities associated with a man named Francisco Martin known as "Thunder Valley Engineering" and "Seymour Capital" (which the government alleges Galanis controlled). Most of the remainder of the shares, according to the government, were purchased by "other fraudulent entities" and "pretend buyers" in order to satisfy the hyper-technical "round lot requirements [necessary] to get listed on the NASDAQ." (March 6, 2018 Hearing Transcript at 63-64; *see also* Mot. at 5-6). In order to prove this conduct, the government has (based on Mr. Archer's preliminary review of the government's trial exhibits) designated nearly 100 exhibits, comprising more than 2,500 pages, relevant to the Code Rebel scheme. Simply put, an enormous amount of time will need to be spent by the government to introduce the Code Rebel evidence. And the longer the government spends, the more the jury will be misled into believing that the alleged Code Rebel fraud actually is part of the securities fraud in this case, and thus the greater the prejudice to the defendants. *See United States v. Kahale*, 789 F. Supp. 2d 359, 385-86 (E.D.N.Y. 2009) (holding that defendant's "fear that

introduction of such evidence will lead to multiple 'mini-trials' within the trial is well-founded," and that defendant's "defen[se of] the legitimacy of these other V-1 Transactions will necessarily result in delay, confusion of the issues, and may mislead the jury to make a determination of guilt based on propensity").

The defendants of course will have to respond to this evidence, amplifying the trial time devoted to Code Rebel and confusing the jury.  For example, as the government well knows, any shares of Code Rebel acquired by Mr. Archer were *not* paid for using proceeds from the WLCC bonds, but were paid for out of his own pocket.  Mr. Archer was not involved in, or aware of, any "pump" of the shares – as explained above, the government hasn't even explained how the pump worked.  And Mr. Archer didn't "dump" any shares either.  Code Rebel's price may have jumped from $5 to $40, but Mr. Archer never sold any shares and in fact took a complete loss when trading in Code Rebel was ultimately suspended.  To the extent Code Rebel reveals anything about the "relationship" between Mr. Archer and Galanis, it represents yet another situation in which Mr. Archer was tricked and used.  If the government is permitted to introduce evidence of the Code Rebel fraud, Mr. Archer will have no choice but to introduce extensive evidence to put his interactions around the Code Rebel issuance into appropriate context.  The other defendants, presumably, will have to do the same.[1]

*Sixth*, evidence of the Code Rebel scheme is immensely prejudicial, and will confuse the jurors into thinking that the government's proof of securities fraud is stronger than it is.  That is

---

[1]	For example, the government argues that evidence about Code Rebel is necessary to confront Gary Hirst's argument that he was "really only around for a period of a few weeks in August of 2014."  (Mot. at 6).  Mr. Hirst will presumably present evidence that late 2014 was precisely when the Code Rebel IPO plans began.  But even if the government is justified in making limited reference to the Code Rebel IPO to confront Mr. Hirst's argument, that is no reason why it needs to delve into the details of what the government alleges is an entirely separate, uncharged securities fraud.

so in at least two different ways.  First, especially given the overwhelming amount of trial time that will be spent on Code Rebel, the jury may be confused into believing that the alleged Code Rebel pump-and-dump is part of the charged securities fraud, and that a defendant can be convicted on the basis of his or her involvement in that scheme even if he or she is innocent of the charged WLCC bond scheme.  *See Kahale*, 789 F. Supp. 2d at 386 (holding that introduction of such evidence "could 'undermine the fairness of the trial' with 'classic, and powerful, evidence of propensity'" (quoting *McCallum*, 584 F.3d at 477)).  Second, the jury may be confused about the strength of the government's case, where it presents evidence that many of the same individuals allegedly engaged in a separate but totally unrelated – and utterly dissimilar – securities fraud together.  It is a reality that in the minds of jurors, two plus two does not always equal four, and the introduction of a substantial amount of evidence about a totally unrelated scheme will artificially create the impression that the government's proof is stronger than it is.  *See United States v. Martoma*, No. 12 Cr. 973 (PGG), 2014 WL 31191, at *6 (S.D.N.Y. Jan. 6, 2014) ("Introduction of the non-bapi evidence also leads to a risk that jurors will presume that, if Martoma could obtain 'confidential' information from the doctors, he could also obtain material, non-public information from these same doctors, and trade on it. As discussed above, this would not be a fair inference.").

Simply put, if the government is allowed to introduce evidence of the entirely separate and dissimilar Code Rebel pump-and-dump, it will unfairly prejudice the defendants and confuse the jury, and will substantially prolong the length of trial.  The Court should not permit it.

### 2.    The "Wisconsin" Bonds

Evidence about the "Wisconsin" bonds should be excluded for much the same reasons. According to the government, this was an entirely separate *attempted* securities fraud, in which certain defendants were allegedly working to get a different Native American Tribe to issue

bonds, the proceeds of which would be misappropriated and used to repurchase the WLCC bonds. The government therefore argues that this attempted fraud was designed to cover up the charged WLCC securities fraud.

Here, too, evidence about extrinsic acts is not necessary to prove the government's point, and will only confuse the jury, prolong the trial, and prejudice the defendants. If the government has evidence that the defendants intended to buy back the WLCC bonds from disgruntled investors in order to conceal their alleged crimes, that evidence *may* be admissible.[2] But the *source* of funds for the buy-back is beside the point. *See United States v. Edwards*, 342 F.3d 168, 177 (2d Cir. 2003); *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992).

Again, an analogy proves the point: if a bank robber tries to conceal her crime by putting money back into the vault, that evidence may be probative of the fact that she committed the robbery in the first place. But it doesn't matter where the money came from. Proof that she robbed a second bank to replace the money in the first only tends to show her propensity to rob banks – an impermissible use of the evidence.

To the extent that the government claims evidence about the Wisconsin bonds is admissible under Rule 404(b) as proof of modus operandi, its argument should be rejected. First of all, there never was a Wisconsin bond issuance. Evidence of attempted extrinsic acts is of particularly limited value. *See United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 714 (S.D.N.Y. 2011) (commenting that evidence of alleged extrinsic act that was unsuccessful "appears to be of questionable relevance"); *see also Martoma*, 2014 WL 31191, at *5 ("The crime alleged is not a signature crime, and the non-bapi evidence concededly was not

---

[2]     But it may not. *See* Fed. R. Evid. 407 ("When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable conduct."). Depending on the nature of the government's proof, Mr. Archer reserves the right to object to this entire line of evidence.

used for purposes of insider trading."). To return to the bank robbery analogy one last time, that's like pointing to the fact that a person *went* to one bank as evidence that she previously *robbed* a different bank.

Moreover, the evidence will be tortured. Although Mr. Archer has not yet received the government's 3500 disclosures, we expect that the sole evidence of fraud or potential misappropriation in connection with the Wisconsin bonds will come from the government's cooperating witness, who will testify that *his* only conversations about misappropriating the proceeds of the Wisconsin bonds were with Jason Galanis. The only documentary evidence about the Wisconsin bonds will be that certain individuals took steps in furtherance of a potential issuance – not surprising or suspicious for a broker-dealer that handles bond issuances. But what the government cannot demonstrate with quality proof, it will try to demonstrate with quantity. Based on Mr. Archer's preliminary analysis of the government's trial exhibits, nearly 50 of them, comprising more than 1,250 pages, relate to the Wisconsin bonds. The result will be that the government will point to these documents as false corroboration of its cooperating witness, who will be allowed to accuse certain defendants of being recidivist criminals and preying upon Native American tribes without any actual evidence. This will inflame and confuse the jury, and cause overwhelming prejudice to the defendants.

### 3. Alleged False Statements In Atlantic And Hughes's Form ADVs

Evidence about purported false statements in Atlantic and Hughes's SEC filings should be excluded for a different reason: they were not false, but explaining why will be utterly confusing to the jury and will involve complicated issues concerning advice of counsel. The real explanation for the Form ADV evidence will also introduce sensitive and highly inflammatory racial dynamics that would make the introduction of the Form ADV evidence so prejudicial it could not be admitted against the person who prepared and allegedly falsified the form. But in

this case, Mr. Archer – whose control of Hughes and Atlantic was allegedly concealed on the form – had absolutely no role in filling out the form, and is not alleged to have even been *aware* of it.  It serves no relevant purpose as evidence against him.

### a.      Relevant Background

Under SEC regulations, certain investment advisors must register by filing a Form ADV, and must update certain portions of the ADV on an annual basis.  In this case, both Atlantic Asset Management and Hughes Capital Management were SEC registered investment advisers, and both filed Forms ADV.  During the relevant time period, each accurately reported that its direct majority shareholder was GMT Duncan (later called Atlantic Capital Holdings), and that its indirect controlling shareholders were Michelle Morton and Richard Deary.

This was entirely correct.  GMT Duncan (and its successor) had a two-tiered stock structure.  Morton and Deary owned the entirety of the Class A Units, while other entities and individuals held Class B Units.  Under the company's operating agreement, while Class B holders enjoyed certain economic benefits, only Class A Units were designated as "Voting Units."

This was critical, because as set forth in the company's operating agreement, the "purpose" of GMT Duncan was to "provid[e] socially responsible fixed income investment management and advisory services *as a minority business enterprise* ("MBE") and to derive revenue from public and corporate programs designed to provide investment management opportunity to groups that the U.S. Government has designated as *historically disadvantaged. . . .*"  GMT Duncan's two-tiered equity structure was designed – by lawyers – to ensure that the company met the requirements for being an MBE, which conferred certain tax and other benefits.

### b.      The Form ADV Evidence Should Be Excluded

No efforts were made to conceal anything on the Form ADVs.  Rather, the companies

accurately reported the direct and indirect voting shareholders for Hughes and Atlantic.  Proving

that, however, will require the defendants to walk the jury through an unnecessary and

labyrinthine web of entities and operating agreements, legal opinions, SEC and FINRA rules,

and the requirements for qualifying as an MBE.  This will hopelessly confuse any jury, and the

true (but very technical) answer will be lost in the clarity of the government's false accusation.

That is especially so because of the racial dynamics that hang over this case.  In a case

where five defendants – four white men and one African American woman who apparently

intends to point the finger at her co-defendants and claim that she was a whistleblower – are

already accused of victimizing a Native American tribe, the (false) accusation by the government

that some of the defendants fraudulently took advantage of the rules surrounding minority owned

businesses will be toxic.  *United States v. Bowman*, 302 F.3d 1228, 1239-40 (11th Cir. 2002)

(government "should have scrupulously avoided the possibility that the jury's verdict might be

clouded by racial issues" and trial court "should have prevented the injection of racial issues");

*United States v. Saccoccia*, 58 F.3d 754, 774 (1st Cir. 1995) ("[C]ourts must not tolerate

prosecutors' efforts gratuitously to inject issues like race and ethnicity into criminal trials.

Emphasizing a person's national origin not only may raise concerns of relevancy, undue

prejudice, and prosecutorial misconduct, but also may pose issues of constitutional dimension.");

*United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir. 1990) ("Racial fairness of the trial is an

indispensable ingredient of due process and racial equality a hallmark of justice.  Appeals to

racial passion can distort the search for truth and drastically affect a juror's impartiality."

(footnotes omitted)); *Smith v. Farley*, 59 F.3d 659, 663 (7th Cir. 1995) ("There is no place in a

criminal prosecution for gratuitous references to race.").

Evidence of alleged false statements in the Forms ADV is also of no probative value, because the people who were allegedly omitted from the ADV are (according to the government) Jason Galanis, Bevan Cooney, and Mr. Archer.  There is literally no evidence that Mr. Archer or Mr. Cooney ever saw or were even aware of the existence of Form ADV, let alone that they knew they were being omitted from it, let alone that they believed that to be wrongful.  Allowing the government to introduce evidence that *someone* failed to disclose them on forms that they had no knowledge of is not probative at all of their criminal intent.  The prejudicial value of this evidence therefore swamps its non-existent probative value, and it should be excluded.

### 4. Mr. Archer's Alleged False Statement To The BIT Board; Jason Galanis And John Moran's SEC Bars; and the Gerova Arrests and Convictions

The government's efforts to introduce evidence about alleged false statements to the BIT Board should also be rejected.  That evidence would entail mind-numbing complexity about matters that are entirely extrinsic to the charged offenses, the introduction of which would be substantially prejudicial to Mr. Archer.  Worse, however, is that the government uses these alleged false statements to attempt to justify the introduction *against Mr. Archer* of the prior criminal convictions of Jason Galanis, John Galanis, and Gary Hirst, and the prior SEC bars imposed on Jason Galanis and John Moran – all of which involved conduct that the government does not claim Mr. Archer had any involvement with.  Evidence of these convictions and bars – for the same statutory offense, imposed in the same courthouse where this case is being tried – will so prejudice Mr. Archer as to make a fair trial absolutely impossible.

#### a. Relevant Background

For appropriate context and the Court's convenience, we set out the relevant allegations more fully below.

Beginning in or about early 2014, Burnham Financial Group, Inc. ("BFG") entered into discussions to be acquired by an entity allegedly associated with Mr. Archer.  BFG was a multi-faceted financial services firm, with several operating subsidiaries, one of which was known as Burnham Asset Management Corporation ("BAM").  BAM was a legitimate and significant asset manager, with billions of dollars under management.  To be clear, BAM is not affiliated with Atlantic or Hughes, is not the investment adviser involved in the two investment adviser fraud counts in the Indictment, did not have any of its clients invested in the WLCC bonds, and in general was not involved in or used in furtherance of the alleged crimes in any way.

The so-called "BIT Board" is the board of independent trustees of the Burnham Investors Trust (the "Trust"), which was party to investment advisory agreements, on behalf of the Trust, with three BAM portfolios, known as the Burnham Fund, the Burnham Financial Services Fund, and the Burnham Financial Industries Fund (the "Funds").  In connection with the potential renewal of the Trust's investment advisory agreements with BAM, the BIT Board raised a number of questions, most amounting to ordinary due diligence, about the BFG transaction.

During that due diligence process, the BIT Board raised concerns about the potential involvement of various people with BFG, including Jason Galanis, John Moran, Hugh Dunkerley, Bevan Cooney, and others.  Galanis and Moran, but not the others, had previously been subject to SEC enforcement actions and industry bars, in two cases that were totally unrelated to one another.  Galanis, in a "no-admit, no-deny" settlement with the SEC reflected in an April 2007 consent Judgment signed by the Honorable Robert W. Sweet, agreed to a five-year bar to serving as an officer or director of a public company.  *See* Ex. A [GX 1040].  Moran, meanwhile, was barred in December 1994 from association with a broker-dealer or investment adviser, following his own "no-admit, no-deny" settlement and associated consent judgment signed by the Honorable Thomas P. Griesa.  *See* Ex. B [GX 1044].

In a heavily-lawyered and negotiated exchange of correspondence and meetings, the BIT Board received a series of representations and clarifications about the transaction, including some purportedly signed by Mr. Archer that the government now claims are false. In particular, the government claims that Mr. Archer made false statements to the BIT Board concerning "the involvement of Jason Galanis and John Moran in the potential acquisition of Burnham Securities." (Mot. at 2).

The government also says that, after Jason Galanis was arrested in the Gerova case in September 2015, Mr. Archer made additional inculpatory statements to the BIT Board.[3] As the Court is aware, in September 2015, Jason Galanis, John Galanis, and Gary Hirst, among others – but not Mr. Archer – was charged in this District with securities fraud. John and Jason Galanis pleaded guilty, and Hirst was convicted following trial before the Honorable P. Kevin Castel.

> ### b. The Court Should Exclude The Alleged False Statements To The BIT Board

The Court should exclude the alleged misstatements to the BIT Board.

First, this evidence is not part of the charged scheme, and in arguing otherwise the government conflates entirely distinct entities – a theme throughout its papers and arguments in this case. The S1 Indictment alleges that Mr. Archer, "who was affiliated with the Placement Agent, falsely represented to affiliates of the Placement Agent that, among other things, JASON GALANIS would not be involved with any entities affiliated with the Placement Agent or source deals to the Placement Agent." (Ind. ¶ 10.) In response to Mr. Archer's motion for a bill of

---

[3]     At the March 6 hearing, the government claimed that Mr. Archer also made false statements to the BIT Board after Galanis's arrest in the Gerova case in September 2015, reaffirming his prior allegedly false statements. Hearing Tr. at 46:10–18 (Mar. 6, 2018). But in its motion, the government claims that after Galanis's arrest, Mr. Archer "admitted that he had allowed Galanis to remain involved in Burnham notwithstanding Archer's representations to the contrary." (Mot. at 5). Mr. Archer is entitled to know which theory the government is pursuing.

particulars, the government clarified that the "Placement Agent" refers to Burnham Securities Inc. ("BSI"), and the "affiliates of the placement agent" refer to the BIT Board.  *See* Ex. C (January 25, 2018 e-mail from ASUA R. Mermelstein to defense counsel).

As set forth above, however, the BIT Board was *not* an affiliate of BSI.  The BIT Board is a board of the independent trustees over entities entirely independent of BAM, BSI, BFG, or any other entity involved in this case.  The BIT Board controlled investments by the Trust, which in turn had entered into investment advisory agreements with BAM.  That is, the BIT Board represented the Trust, one of BAM's clients.  The BIT Board was in no sense an *affiliate* of BAM, let alone of BSI (which merely shared a common corporate parent with BAM but was in an entirely different line of business).

Thus, on the government's own evidence, Mr. Archer made representations to investors in an entity wholly separate from BSI, the Placement Agent for the WLCC bonds, not to an "affiliate."  The government has never explained how this could be part of the charged scheme, nor could it.  Alleged misrepresentations to the members of BIT Board – even if they *were* "affiliates" of BSI, but especially because they weren't – cannot constitute statements or omissions in connection with "the purchase or sale of any security," 15 U.S.C. § 78j(b) – the securities here being the WLCC bonds, *see* Ind. ¶ 4, and acquired by the clients of Atlantic and Hughes, *see id.* ¶ 5.  According to the government, BSI contracted with the WLCC to solicit investors for the bonds.  *See id.* ¶ 9.  Any alleged misrepresentations by Mr. Archer, however, were to the BIT Board, who were neither the issuer nor purchasers of the bonds, nor the entity responsive for locating investors in the bonds.  The BIT Board, in fact, had nothing to do with the bonds at all, and the entity through which it invested the Trusts' assets into the Funds, BAM, *also* had nothing to do with the bonds.  Moreover, as the Indictment alleges, "[n]one of the eventual purchasers of the WLCC bonds . . . were solicited by the Placement Agent," BSI.  *Id.*

Thus, even if Mr. Archer had made some alleged misrepresentation to BSI itself, it would not have been "in connection with the purchase or sale of any security," and so not part of the charged offense and not necessary to understand the alleged scheme.  *See Martoma*, 2014 WL 31191, at *3 ("It is not necessary for the jury to know that the doctors provided the Defendant with confidential information about other drugs in order for the jury to understand the Government's theory that the Defendant obtained material, nonpublic information from the doctors about bapineuzumab, which the Defendant then traded on. . . . [T]emporal proximity alone is not sufficient to establish that charged and uncharged conduct is intertwined."); *United States v. Newton*, No.  01 Cr. 635 (CSH), 2002 WL 230964, at *3 (S.D.N.Y. Feb. 14, 2002) ("Nor can it be said that the uncharged and charged crimes arose out of the same transaction or series of transactions. While the activity was similar, these were separate visa referrals made with respect to different individuals at different times.").

To counter the government's ultimately irrelevant argument about the falsity of Mr. Archer's representations to the BIT Board, he will have to not only go into excruciating detail about the corporate structure above, he will also have to parse the extraordinarily technical and well-lawyered representations – an exercise that will devolve into a dispute about the meaning of the representations, rather than Mr. Archer's intent.  Indeed, the government's own witness – one of the members of the BIT Board – has said that "[t]he letter replies [to the BIT Board] were semantics done by a lawyer," and that the witness "did not feel ARCHER was being a bad guy or lying.  ARCHER was being semantic."  Ex. D at 6 (Government's Notes Regarding December 6, 2017 Interview of William Connell).

Whatever probative value Mr. Archer's representations to the BIT Board may have, it is swamped by the confusion that will be caused in the minds of the jurors by having to wade into BFG's complex corporate structure and the back-and-forth of corporate lawyers.  *See United*

*States v. Bonventre, et al.*, No. 10 Cr. 225 (LTS) (S.D.N.Y. Sept. 24, 2013) (ECF No. 445 at 6–7)

("Failing to include this type of income [*i.e.*, income derived from the charged fraud] on a

personal tax return one time does not clearly indicate a willingness to intentionally participate in

a scheme to defraud investors or to provide false records concerning the business of the

taxpayer's employer to the SEC. Furthermore, as noted above, the chain of inferences necessary

to make the Government's point – from failure to declare as taxable income a credit that was not

reported on any W2, to willful tax evasion, to willingness to defraud the regulatory authorities

and investors about the fundamental nature of the employer's business, to knowing and willful

participation in securities fraud and false reporting of the employer's finances and transactions –

is also unduly long. For all of these reasons, the tax evasion evidence falls outside the ambit of

Rule 404(b).").

<blockquote>

**c.      The Court Should Exclude The Prior SEC Bars and Criminal
Convictions**

</blockquote>

Even if the Court were inclined to permit the government to introduce Mr. Archer's

alleged false statements to the BIT Board, there is no good reason to admit evidence of Jason

Galanis and John Moran's SEC bars, or the Gerova defendants' convictions.

With respect to the SEC bars, the government does not even attempt to address them in

the substantive portion of its motion as a separately-admissible category of evidence.  Rather, the

government in a footnote says that evidence of Galanis and Moran's SEC bars is "inexorably

intertwined with Archer's lies to the BIT Board" because "absent evidence of those bars it would

be impossible for the jury to understand why the BIT Board demanded representations. . . .  Nor

would the jury understand the significance of Archer's decision to do business with Galanis."

Mot. at 5 n.1.  These arguments don't hold water.

First of all, evidence (the SEC bars) that the government says is "inexorably intertwined" with other evidence (the BIT Board representations) that the government claims is "inexorably intertwined" with the charged offenses is not admissible as a general matter. There is no transitive property of Rule 404(b) evidence; unless the government can demonstrate that the SEC bars are themselves an inextricable part of the charged crimes, they are not admissible unless they satisfy the test set out above, including that the evidence is "sufficiently similar to the charged crimes." *Curley*, 639 F.3d at 57 (holding that it is an abuse of discretion to admit evidence proffered under Rule 404(b) "if the evidence is not sufficiently similar to the charged conduct or if the chain of inferences necessary to connect [the] evidence with the ultimate fact to be proved [is] unduly long.").

That is not the case here. The evidence that the government intends to admit reflects, for example, that Moran was accused of engaging in sham trades and making false statements – all in the late 1980s – in an effort to inflate the net capital position of a broker-dealer of which he was the Chairman and CEO. Ex. B at 1. These allegations – which Moran did not admit and which no court found to be substantiated, but which is nonetheless part of the evidence the government seeks to admit – bear no resemblance to the charges here, which include undisclosed conflicts of interest and the misappropriation of bond proceeds.[4]

The government's argument that the SEC bar is admissible to show "the significance of Archer's decision to do business with Galanis" is meritless. What the government is saying is that the jury should convict Mr. Archer because he allegedly chose to do business with someone who previously entered into a civil settlement with the SEC. First of all, that is no more than

---

[4]     The government's evidence of the SEC bar against Galanis does not discuss the nature of the charges against him, other than that he was accused of securities fraud. But the caption of the case, *SEC v. Penthouse International*, does imply an additional layer of seediness.

character evidence, designed to inflame the jury by arguing that Mr. Archer is the sort of person who associates with criminals. *See Newton*, 2002 WL 230964, at *4 ("The fact that Newton was notified about a prior referral's identity problems does not make it more likely that he knew of the falsity, in a different respect, of his other referrals. Even if it does, the minimal probative value the evidence offers on that score is substantially outweighed by the prejudice that it would cause defendant by revealing his association with a shady character."). But in this case, Galanis and Moran were *not* criminals, nor were they found liable in their cases with the SEC. They both entered into no-admit, no-deny settlements, which by definition carry no evidentiary weight concerning the underlying allegations. But in this case, Galanis and Moran were *not* criminals, nor were they found liable in their cases with the SEC. They both entered into no-admit, no-deny settlements, which by definition carry no evidentiary weight concerning the underlying allegations. *See In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) (observing that an "SEC consent decree . . . was inadmissible under Fed. R. Evid. 410 and, thus, the private action plaintiff could not derive any evidentiary benefit from it." (citing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976))). The fact that the government wants to use those settlements against Mr. Archer, a third party who was not involved in the underlying conduct, is nonsensical.

The government's argument that the SEC bars are necessary context for the BIT Board representations is also wrong. As set forth above, the BIT Board expressed reservations about, and at various points asked for representations concerning, a number of people, most of whom had no prior regulatory enforcement history. If the Court is inclined to permit the BIT Board evidence, it is sufficient for the jury to be told that the BIT Board raised concerns about the suitability of certain people, including Galanis and Moran. *See, e.g., United States v. Lopez*, 112 F. Appx. 774, 777 (2d Cir. 2004) (approving of District Court's introduction of "heavily

redacted" prior bad acts evidence); *see generally United States v. Williams*, 585 F.3d 703, 708

(2d Cir. 2009) ("The Government's argument that the evidence was admissible under a Rule

404(b) analysis fails. . . . [W]hile the evidence that Jackson had ready and contemporaneous

access to an apartment in which firearms were recovered constituted a relevant piece of

circumstantial evidence tending to prove that he possessed the weapon at issue, the evidence

offered at trial went far beyond what was necessary for this purpose. Its admission ignored a

'common sense precaution which should clearly be taken . . . to limit the prosecutor's

presentation to such facts . . . as are reasonably necessary to prove the point for which the

evidence is admitted, and to exclude unsavory details which go beyond what is necessary to

make the point.'" (quoting David W. Louisell & Christopher B. Mueller, Federal Evidence

§ 140, at 209 (rev. ed. 1985)).  The jury does not need to know about the SEC bars, and in fact

introducing that evidence would tend to place undue weight on the BIT Board's concerns about

those two individuals.

     The same is true for the Gerova arrests.  If the Court is inclined to permit the BIT Board

evidence, there is still no need for the jury to hear about the Gerova arrests.  It would be

sufficient for them to know that, in September 2015, the BIT Board allegedly confronted Mr.

Archer about his prior representations.  Knowing that the BIT Board's confrontation was in the

wake of Galanis's arrest on totally unrelated charges adds nothing that is probative to Mr.

Archer's guilt or innocence – let alone that it was securities fraud, and that it involved two of Mr.

Archer's co-defendants, and that they were all convicted.  *See United States v. Bradwell*, 388

F.2d 619, 622 (2d Cir. 1968) (discussing the undue prejudice that can result when the "minute

peg of relevancy [is] entirely obscured by the dirty linen hung upon it" (citation omitted) (quoted

approvingly in *Williams*, 585 F.3d at 708)).

The government also argues that the Gerova arrests are relevant to the "pre-existing relationships" between Jason Galanis, John Galanis, and Gary Hirst.  (Mot. at 7).  That may be true, but its probative value is virtually non-existent in the context of this case.  The "pre-existing relationship" between John and Jason Galanis is self-evident:  they are father and son.  And Galanis's pre-existing relationship with Gary Hirst is demonstrated by the fact that, among other things, Galanis recruited Hirst's involvement with the entities involved in this case.  *See Curley*, 639 F.3d at 57 ("The district court abuses its discretion when it admits 'other act' evidence with a high possibility of jury misuse but with only slightly more probative value than other evidence on the same issue.").

The prejudicial value of the Gerova arrests, on the other hand, is overwhelming.  The fact that two of the five charged defendants, along with the undisputed mastermind of the alleged fraud, were previously charged and convicted together will overshadow everything else.  *See Krulewitch v. United States*, 336 U.S. 440, 454 (Jackson, *J.*, concurring) ("It is difficult for the individual to make his own case stand on its merits in the minds of jurors who are ready to believe that birds of a feather are flocked together").

Here, in an attempt to take full advantage of the unfairly prejudicial effect that introducing the Gerova convictions will have, the government doesn't even want to present evidence of what the underlying Gerova fraud involved, it simply wants the jury to know the bare fact that Jason Galanis, John Galanis, and Hirst were arrested and convicted of the same criminal offense before.  This is not evidence of *modus operandi* – other than the impermissible MO of committing securities fraud.  *See United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002) ("The government may not invoke Rule 404(b) and proceed to offer, carte blanche, any prior act of the defendant in the same category of crime.").  Nor does it shed any light on whether Hirst and John Galanis were "duped" by Jason Galanis.  (Mot. at 8).

To respond to this poisonous evidence, each of the defendants will have to present countervailing proof.  Mr. Archer, for his part, would need to show that he had no knowledge of the Gerova fraud until Galanis's September 2015 arrest, in order to overcome the government's implicit (and improper) argument that Mr. Archer knew about, and hid, Galanis's prior crime from the BIT Board and others.  This implication is of a totally different magnitude than the one created by the SEC bar.[5]  It's one thing for Galanis to have entered into a civil settlement years earlier in which he did not admit responsibility and paid a $60,000 fine. *See* Ex. A [GX 1040]. It's an entirely different thing if the jury is confused into believing that Mr. Archer knew that Galanis was engaged in a crime – at the very time that he was involved in the events of this case – for which he would ultimately be criminally convicted after a guilty plea, and sentenced in February 2017 to 135 months' imprisonment and forfeiture of more than $37 million.  *See* Ex. E [GX 1041] at 1, 3, 8.  There is a very real possibility that the jury could convict Mr. Archer for covering up the Gerova fraud, when (a) that is not the crime he was charged with, and (b) there is zero evidence that Mr. Archer was aware of the Gerova fraud.

Other defendants would have to confront the Gerova convictions in different ways.  Mr. Hirst, for example, was convicted after trial and his appeal is pending before the Second Circuit. He will presumably need to re-litigate large portions of the Gerova case if the government is permitted to introduce that evidence, creating a literal trial-within-a-trial.  *United States v. Bonventre*, No. 10 Cr. 228 (LTS) (S.D.N.Y. Sept. 24, 2013) (ECF No. 445 at 7–8) ("Here, if O'Hara and Perez's alleged tax evasion is admitted in the context of a trial in which other

---

[5]     Moreover, there is evidence that Mr. Archer was aware of the SEC bar at the time of his alleged representations to the BIT Board.  On the other hand, we believe there is no dispute that Mr. Archer was totally unaware of the Gerova fraud until he and the entire world learned about it in September 2015.

Defendants are charged with tax crimes, it could influence unfairly the jury's view of O'Hara and Perez's character and their capacity for truthfulness. A limiting instruction as to the tax issue for O'Hara and Perez and not the other Defendants is further likely to confuse the jury, and, as the willfulness of any failure to report will be contested by the defense, there is also the potential for a trial within a trial on this uncharged crimes issue, causing undue complication and delay in an already-lengthy trial.").[6]

Finally, the SEC bars and Gerova convictions are particularly prejudicial because they all arise from cases brought in the Southern District of New York.  Of the exhibits that the government intends to use to evidence the prior SEC bars and convictions, all but one bears the signature of a judge of this Court; the last one (Moran's SEC bar) refers to the Southern District case in its text.  *See* Exs. A, B, F & G [GX 1040, GX 1044, GX 1042 & GX 1043].  Evidence that many of the individuals involved in this case had previously been charged and/or convicted of the same offense in the same Court by the same prosecutor's office will imbue the U.S. Attorney's Office with credibility and suggest – in contravention of the defendants' basic constitutional rights, *see United States v. Young*, 470 U.S. 1, 29 (1985) (observing that something which "convey[s] the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant . . . can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury"); *Estelle v. Williams*, 425 U.S. 501, 503 (1976) ("The presumption of innocence . . . is a basic component of a fair trial under our system of criminal justice.") – that its decision to charge the defendants in this case was equally well-founded.

---

[6]     If Mr. Hirst's conviction in Gerova is reversed on appeal, it would also seriously undermine any potential guilty verdict in this case.

5.      **The Alleged False Statements To Morgan Stanley And Deutsche Bank**

Finally, the government seeks to introduce evidence of purported false statements by Mr. Archer to Morgan Stanley and Deutsche Bank.  Contrary to the government's argument, these statements are not part of the charged scheme, as neither bank engaged in a purchase or sale of securities on behalf of Mr. Archer.  Instead, the relevant statements were allegedly made in connection with custodying the WLCC bonds, which had already been acquired.  They are therefore, as alleged, extrinsic acts.

More fundamentally, the inference that the government seeks to draw from this evidence is faulty as a matter of law and logic.  The government intends to argue that Mr. Archer lied about the source of funds for the purchase of a tranche of the WLCC bonds, and so he therefore knew that the source of funds was stolen money recycled from prior WLCC bond issuances.  But that inference does not follow.  At best, if the government can prove any misstatements (it can't), the fair inference is that Mr. Archer knew that there was something improper or illicit about the source of funds – but it does not follow that he therefore understand *what* was improper about it. That argument is identical to the same one courts have rejected time after time in the money laundering context.  *See United States v. Messer*, 139 F.3d 895 at *2 (4th Cir. 1998) ("To sustain a conviction for money laundering . . ., the Government must prove beyond a reasonable doubt that [defendant] had actual knowledge that the transactions . . . involved proceeds from illegal activities. . . . [O]ne cannot be convicted based upon what one should have known." (citing *United States v. Campbell*, 977 F.2d 854, 857 (4th Cir. 1992))); *United States v. Gleave*, 786 F. Supp. 258, 267 (W.D.N.Y. 1992) ("[T]o establish [money laundering] liability in this case, the defendants must be proven to have known, not merely to have suspected . . . that they conducted or attempted to conduct a financial transaction with the proceeds of unlawful activity."), *rev'd in part on other grounds sub nom United States v. Knoll*, 16 F.3d 1313 (2d Cir. 1994).  It is also

26

analogous to a similarly-invalid argument prosecutors have been known to make in narcotics cases:  just because a defendant knows that *something* illegal is in a bag doesn't mean that she knows it's drugs.  *See United States v. Torres*, 604 F.3d 58, 72-73 (2d Cir. 2010) (overturning narcotics conviction where evidence "was insufficient to permit the jury to find beyond a reasonable doubt that [the defendant] knew that the Packages addressed to him contained narcotics"); *United States v. Roberts*, 363 F.3d 118, 123(2d Cir. 2004) (finding that drug offense "requires the Government to show that the defendants knew that they possessed a controlled substance, not that they 'might be involved in some sort of criminal activity.'" (quoting *United States v. Morales*, 577 F.2d 769, 773 (2d Cir. 1978))).  The same authority forecloses the government's arguments here.

**B.**     **The Government's Rule 404(b) Notice Underscores The Need For Severance**

The government's Motion also illustrates exactly why it is necessary to sever Mr. Archer's trial.  In his severance motion [ECF No. 290], Mr. Archer predicted that the government would attempt to introduce categories of evidence that are inadmissible against him, although potentially admissible against his co-defendants.  He specifically cited the examples of the Gerova fraud – in which two of Mr. Archer's trial co-defendants were convicted of committing a securities fraud with Jason Galanis prior to the events involved in this case – as well as the alleged Code Rebel pump-and-dump – in which Jason Galanis and certain trial co-defendants, but not Mr. Archer, received Code Rebel shares for no consideration and benefited from the post-IPO "pump" of the stock – and Jason Galanis's prior SEC bar.  [*Id.* at 23-30].

The government's Motion has confirmed that it intends to introduce all of these categories of evidence, as well as others that have nothing to do with Mr. Archer.  The Supreme Court has long recognized that among the legitimate reasons for courts to grant trial severances is when "evidence that the jury should not consider against a defendant and that would not be

admissible if a defendant were tried alone is admitted against a codefendant," and when "evidence of a codefendant's wrongdoing . . . could lead the jury to conclude that a defendant was guilty." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). *See also United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992) (noting that the "typical spillover claim is that evidence admissible against only one defendant is prejudicial to all defendants and that individual trials should have been held to avoid that prejudice" (citations omitted)); *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 173 (S.D.N.Y. 2006) ("The Second Circuit recognizes the potential 'spillover' prejudice that a co-defendant may incur in a joint trial where prior-act evidence is admitted against another co-defendant." (citing *United States v. Gelzer*, 50 F.3d 1133, 1140 (2d Cir. 1995))).

Here, the evidence proffered by the government is not admissible against Mr. Archer, even if some of it might be admissible against his co-defendants. In particular, evidence that Jason Galanis and Mr. Archer's co-defendants engaged in numerous other crimes together, including the Gerova fraud and the Code Rebel pump-and-dump, is extraordinarily prejudicial and drowns whatever (non-existent) probative value it may have *against Mr. Archer. See, e.g.*, *United States v. Basciano*, No. 05-cr-60 (NGG), 2007 WL 3124622, at *5 (E.D.N.Y. Oct. 23, 2007) (severance granted based on prejudicial effect of proffered Rule 404(b) evidence that a co-defendant had previously been convicted for the same conduct for which the defendant was currently on trial); *United States v. Lujan*, 529 F. Supp. 2d 1315, 1326 (D.N.M. 2007) (finding that the introduction of additional murders perpetrated by co-defendant, which would not be admissible against the moving defendants in a separate trial, would create the possibility "that a jury might infer [the defendants'] guilt because of the enhanced likelihood of [the co-defendant's] guilt," and was a "factor weighing in favor of severance"); *see also United States v. Figueroa*, 618 F.2d 934, 947 (2d Cir. 1980) (remanding for new trial where Rule 404(b)

evidence erroneously admitted against one defendant caused sufficient likelihood of prejudice to co-defendants); *United States v. Upton*, 856 F. Supp. 727, 736–37 (E.D.N.Y. 1994) (granting severance in part because defendants would have to endure a trial involving many incidents of misconduct which did not involve them, and finding that accumulation of evidence during the course of the trial would place the uninvolved defendants at risk of spillover prejudice because the jurors may not be able to prevent themselves from attributing the evidence to the uninvolved defendants).

Thus, if the Court does not exclude the proffered evidence entirely, Mr. Archer is entitled to a severance to ensure that the jury does not come to the mistaken conclusion that he is guilty simply because "birds of a feather are flocked together." *Krulewitch*, 336 U.S. at 454 (Jackson, *J.*, concurring).

For precisely that reason, the introduction of the proffered evidence will also heighten the adversity between Mr. Archer and the other defendants. In the event that the Court admits this prior-act evidence – especially the Gerova fraud and the alleged Code Rebel pump-and-dump – Mr. Archer will have to go to great lengths to put distance between him and his co-defendants, accusing them of being Jason Galanis's recidivist criminal conspirators. This would "tend to preclude the acquittal" of Mr. Archer's co-defendants, *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1995), turn Mr. Archer's legal team into a "second prosecutor," *United States v. Shkreli*, 260 F. Supp. 3d 247, 256 (E.D.N.Y. 2017), and lead to skirmishes amongst defense counsel that will be debilitating "from a trial management perspective," *id.* at 257.

If the Court is inclined to admit this evidence against Mr. Archer's co-defendants, therefore, a severance is absolutely necessary in order to avoid the "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. *See, e.g.*, *United*

*States v. Serpoosh*, 919 F.2d 835, 837-38 (2d Cir. 1990) (holding that the "conflict between the

defenses of" two defendants tried together had led "the jury [to] infer that both defendants [we]re

guilty solely due to the conflict" because of, among other things, "the sparring between counsel

for the two defendants in which each characterized the other defendant as a liar who concocted

his story to escape blame," and that "each defense counsel attacked the credibility of the other

defendant as well as his version of events" during summations).

### C.     Any Extrinsic Acts Evidence Must Be Accompanied By A <u>Robust And Specific Limiting Instruction</u>

For the reasons set forth above, the evidence proffered by the government in its Motion is

inadmissible in a trial involving Mr. Archer.  Should the Court nonetheless permit it, it is critical

that the jury be given powerful limiting instructions, early and often, that is specific to the facts

of this case rather than the sort of "laundry list" limiting instruction that merely tracks the

language of Rule 404(b).  *See*; *United States v. Hardwell*, 80 F.3d 1471, 1491-92 (10th Cir.

1996) (holding that court's limiting instruction was "overbroad," explaining: "'Laundry list'

limiting instructions that simply recite all of the purposes listed by Rule 404(b) are disapproved

because they do not adequately advise the jury of the limited purposes for which the evidence

was admitted."); *United States v. Harvey*, 845 F.2d 760, 762 (8th Cir. 1988) ("Initially, we

observe the district court's 'laundry list' approach to rule 404(b) is of little help to us.  Rather

than making a broad reference which merely restates the components of the rule, the district

court should specify which components of the rule form the basis of its ruling and why.  To that

end, the court should require the party invoking the rule to explain clearly its 404(b) analysis.

(citations omitted)).

In the event that the Court determines that any of the government's proffered evidence is admissible in a trial involving Mr. Archer, he will propose appropriate language for a limiting instruction with respect to that evidence.

## CONCLUSION

The government's motion should be denied.  To the extent that the Court permits the government to introduce any of its proffered evidence, the Court should sever Mr. Archer's trial and/or give the jury an appropriate limiting instruction, as the case may be.  In addition, if the Court permits the government to introduce any of the categories of evidence that are the subject of this Motion, Mr. Archer reserves the right to object to or move to exclude particular exhibits or testimony, as appropriate.  Finally, Mr. Archer joins in the arguments of his co-defendants, to the extent applicable to him.

Dated:      March 23, 2018
            New York, New York

Respectfully,

 /s/ Matthew L. Schwartz
Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

*Attorneys for Devon Archer*
