```
 1   UNITED STATES OF AMERICA
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                              16 Cr. 371 (RA)

 5   JOHN GALANIS, et al.,

 6                  Defendants.

 7   ------------------------------x

 8                                     New York, N.Y.
                                       June 11, 2018
 9                                     9:15 a.m.

10
     Before:
11
                        HON. RONNIE ABRAMS,
12
                                       District Judge
13

14                         APPEARANCES

15   ROBERT KHUZAMI
          Acting United States Attorney for the
16        Southern District of New York
     BY:  BRENDAN F. QUIGLEY,
17        REBECCA G. MERMELSTEIN,
          NEGAR TEKEEI,
18             Assistant United States Attorneys

19   PELUSO & TOUGER
          Attorneys for Defendant John Galanis
20   BY:  DAVID TOUGER

21   BOIES, SCHILLER & FLEXNER LLP (NYC)
          Attorneys for Defendant Devon Archer
22   BY:  MATTHEW LANE SCHWARTZ
          LAURA HARRIS
23        CRAIG WENNER

24

25
```

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
          Attorney for Defendant Bevan Cooney
4              – and –
     O'NEILL and HASSEN
5          Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ–HASSEN
6

7

8    Also present:  Kendall Jackson, Paralegal
                    Ellie Sheinwald, Paralegal
9                   Eric Wissman, Paralegal
                    Special Agent Shannon Bienick, FBI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Trial resumed; jury not present)

2          THE COURT:  Good morning, everyone.  There are a

3  couple of things I want to talk about before we bring the jury

4  in.  First of all, what's your order of witnesses this morning?

5          MS. MERMELSTEIN:  We're going to call Steve Shapiro,

6  Raycen Raines, Patricia Walch.  We have another e-mail reading

7  module, and then if we get to it -- and I don't know that we

8  will -- Daniel Turney.

9          THE COURT:  Who is after Walch?

10          MS. MERMELSTEIN:  Daniel Turney.

11          THE COURT:  And reading before that.  OK.

12          So, as for the testimony of Mr. Raines, I circulated

13  an order on Saturday concerning the cross-examination of him on

14  pay day lending.  I'm sure you saw it.  Correct?

15          MR. TOUGER:  Yes, your Honor.  I do have one point of

16  clarification.

17          THE COURT:  OK.

18          MR. TOUGER:  Do you want to do that now?

19          THE COURT:  Sure.

20          MR. TOUGER:  Your Honor, I understand the Court's

21  ruling, although I obviously object to it.  I understand the

22  court's ruling, and we will obviously abide by it, but my

23  question is if the government opens the door by bringing out

24  testimony through Mr. Raines about the detriment to the

25  reputation of the WLCC because of what happened here, I think

1     that would open the door to me saying that the WLCC's

2     reputation has been harmed much more so by the effect of online

3     lending and what it has done.

4           If you Google the WLCC or Raycen Raines, the bonds

5     don't come out until the 14th page.  What comes out long before

6     that is all the complaints, lawsuits, articles against the WLCC

7     and Mr. Raines.  So, the court has made its ruling, and

8     obviously, as I said, I about abide by it, but if the

9     government had opened during their opening and said they were

10    going to prove that these bonds hurt the reputation of the WLCC

11    and the Wakpamni, I believe that should open the door that

12    other things hurt it a lot more than these bonds.

13          THE COURT:  Do you intend to have him testify about

14    the reputational harm?

15          MS. MERMELSTEIN:  Your Honor, I'm not -- I am not

16    asking any questions on direct examination that call for that

17    answer, but that certainly is Mr. Raines' very strong view, and

18    the way he answers questions it could be that that comes out.

19    I don't think that that at all opens the door.

20          The suggestion that this harmed your reputation, I

21    don't think that opens the door to saying, well, aren't there

22    other things that were more harmful to your reputation?  I mean

23    so what?  I don't think it opens the door to that being a

24    proper ground of cross-examination.

25          I don't think that the order in which things appear in

1    a Google search reflects the significance of them to people who

2    are actually doing business with each other, although I will

3    note that the bond issue does in fact appear in the first page

4    of the Google results if you Google the matter.  But the notion

5    that your involvement in something that some people think is

6    unseemly is as damaging to the willingness of other financial

7    partners to do business with you as having issued $65 million

8    of bonds that you're not paying back I think is wrong; it's

9    certainly not what Mr. Raines would say; and I think it's the

10   tail wagging the dog to say that if he says something about

11   reputational harm, that that opens the door to other things

12   that might have also harmed their reputation.

13           THE COURT:  Let's see what he says, and then I'll rule

14   on it. OK.  Look, I think it potentially does open the door.  I

15   mean I do think it's relevant if there are other reputational

16   harms, but I think it depends on how he phrases it.  I mean if

17   he just says like it's done harm to our reputation, fine; but

18   if he says that harm to our reputation has prevented us from,

19   you know, entering deals with X, Y and Z, then I think it's

20   fair for Mr. Touger to get at other potential reasons that the

21   WLCC has not been able to pursue, you know, deals with other

22   entities.  So that's all I meant to say in reserving ruling.

23           MS. MERMELSTEIN:  I understand.  Just so I understand,

24   if Mr. Raines testifies merely that this has harmed their

25   reputation and generally had a negative effect on their ability

1   to do business --

2              MR. TOUGER:  No, that's where I --

3              THE COURT:  But I think it's the ability to do

4   business.  So if he talks generally about harm to reputation,

5   then I don't think it opens the door, but if he says that it

6   has affected their ability to do business, then I think it is

7   fair for Mr. Touger to ask questions about other things that

8   have affected their ability to do business.

9              I don't want to spend too much time on it, because I

10  think I'm concerned about that, but that's how I'm looking at

11  this.

12             MS. MERMELSTEIN:  Understood.  If we just make sure we

13  hit a break before he testifies, we will make sure to speak to

14  him about that issue before he gets on the stand.

15             THE COURT:  That's fine.

16             MS. NOTARI:  Your Honor, I just want to renew my

17  motion.  We have litigated this many times before today, but I

18  continue to believe that Mr. Shapiro is about to testify about

19  the CNB loan is entirely prejudicial.  I think now that the

20  court has a better view of this case and you've seen the

21  evidence, there is no direct evidence against Mr. Cooney.

22  They're just continuing to try to convict him based on

23  prejudicial evidence which has absolutely nothing to do with

24  the bond.  And in particular now, the prejudice, there is still

25  prejudice against us with this Code Rebel because the jury is

1   going to hear evidence, you know, about Francisco Martin's Code

2   Rebel shares, and they're going to hear evidence about -- they

3   already heard Hugh Dunkerley got paid --

4          THE COURT:  Well, I'm going to talk about Francisco

5   Martin's Code Rebel shares in a minute, but go on.

6          MS. NOTARI:  But in any event, now we're forced in

7   this position that the jury is going to hear that Mr. Cooney

8   had attained a loan for $1.2 million based on his Code Rebel

9   stock, and obviously the jury is going to -- some of the

10  smarter jurors are going to put it together, and they're going

11  to question.

12         As part of the loan there was a lot of questions about

13  the source of payment, and we're not able to go into that now

14  because the government is claiming that Mr. Cooney was never

15  paid for his shares, although there is a promissory note, there

16  is a wire transfer, there is all kinds of evidence that he did

17  pay for his shares.  But, obviously, we will open the door if

18  we go into the fact that he paid for his shares, and so we're

19  limited.

20         THE COURT:  Why don't I address Mr. Martin on the Code

21  Rebel share issue, and then if there is anything else you want

22  to say, you can say it.

23         So, first of all, one other minor issue I wanted to

24  talk about is I received a letter from Mr. Touger regarding the

25  potential testimony of Mr. Raines, that he patronized

 1    prostitutes with Derrick Galanis, another son.  I assume the

 2    government wasn't going to into that.

 3         MS. MERMELSTEIN:  Absolutely not.

 4         THE COURT:  I wasn't going to let it in anyway, just

 5    to be clear on that.

 6         And then yesterday, as I said, I want to address the

 7    issue of Mr. Martin's receipt of Code Rebel shares and the

 8    relevance of Mr. Archer's purchase of his own shares of Code

 9    Rebel, and I got letters on this yesterday.

10         I agree that Mr. Martin should not be cross examined

11    on his receipt of Code Rebel shares.  To the extent that any of

12    the defendants cross-examine him on this topic, I do think they

13    will open the door to evidence of the receipt of shares by Mr.

14    Archer and Mr. Cooney; and given the relationship between

15    Mr. Martin's receipt of shares that he held for the benefit of

16    Jason Galanis and the pump and dump, cross-examination on that

17    topic would potentially also open the door to evidence of the

18    pump and dump more generally.

19         I also agree with the government that the defendants

20    may not cross-examine Mr. Martin on his involvement in leaving

21    a fake paper trail to make his receipt of Code Rebel shares

22    appear to be a loan, because while it is probative of his

23    character for truthfulness, this again was part and parcel of

24    the effort to conceal the pump and dump, and accordingly would

25    also open the door to such evidence.

1           As for the relevance of Mr. Archer's purchase of the

2   Code Rebel shares, is it correct that that fact is already in

3   evidence?

4           MR. SCHWARTZ:  The fact that he possessed shares is

5   for sure in evidence, because it's in the Rosemont Seneca Bohai

6   brokerage statements; and from memory I believe that the wire

7   transfer to Signature Bank to pay for those shares is also in

8   evidence.

9           I think it might be helpful just stepping back to

10  understand what it is the government intends to elicit on

11  direct about Code Rebel from Mr. Martin, because -- I don't

12  want to get into Code Rebel at all in any way, shape or form,

13  but my real concern is that on direct the government is going

14  to bring out a lot more than is necessary and is going to dirty

15  up everything having to do with Code Rebel.  And if that

16  happens, I feel like I have to defend Mr. Archer.

17          If it's very limited and it's simply a money tracing

18  exercise -- the sort of thing that could equally be done with a

19  summary witness -- then that's fine, I don't have any need to

20  touch the topic.  But if they really are going to demonstrate

21  that Mr. Martin created these sham entities, that these sham

22  entities controlled 80 something percent of the offering, that

23  bond proceeds were used to purchase whatever overwhelming

24  percentage of the offering is and, therefore, illegitimized the

25  entire transaction, then I think we have to meet that evidence.

1     If they're simply going to say bond money went in and

2 shares were redeemed to pay the coupon on the bond, then I

3 would just as soon stay away from this entirely.

4     MS. NOTARI:  And I reiterate those points, because to

5 the extent they go into that on direct, it's going to

6 prejudice.  Mr. Cooney and all of the evidence that's going to

7 come in about his Code Rebel shares, the jury is going to hear

8 that he had this stock, and that it increased in value to $12

9 million, and they're going to be left to wonder was this part

10 of -- it's just a very -- I think it prejudices him the most,

11 and I just would like to know whether or not they're going to

12 elicit it on direct.

13     MS. MERMELSTEIN:  So, with respect to what we intend

14 to elicit from Mr. Martin, we are very cognizant of your

15 Honor's ruling.  We have made every effort to ask questions

16 that hue to a line that gets at the relevant evidence with

17 respect to Wakpamni and not with respect to the pump and dump.

18 What that means is we will elicit from Mr. Martin that he was

19 asked to create the Thunder Valley and Seymour Capital

20 accounts, both the entities and then the brokerage accounts,

21 for the purpose of receiving shares.  He is going to say that

22 he did that at Jason Galanis' and Gary Hirst's direction in

23 order to hide their involvement, but that is both a part of the

24 pump and dump scheme and the efforts to obfuscate the bond

25 proceeds and the recycling of that, and so it's not at all

1    designed to suggest that there was anything about the sort of

2    IPO itself that was improper.  Then he is going to say that he

3    sold the shares at their direction and that he transferred the

4    money --

5              THE COURT:  Is he saying how much the shares were

6    worth?

7              MS. MERMELSTEIN:  No.  I mean, look --

8              THE COURT:  I asked if he was going to say how much

9    the shares were worth at the time that they were sold.

10             MS. MERMELSTEIN:  The answer is I think both yes and

11   no, your Honor.

12             The government is not going to elicit information

13   about the fact that the stock price shot up.  There is going to

14   be -- there has to be in order to tie the proceed of the bonds

15   to the purchase of these shares evidence about the dollar value

16   of shares that were purchased.  But that doesn't -- that

17   doesn't -- and then he is just going to say like I transferred

18   a lot of money.  He will talk about a couple different

19   transfers, but it's not clear how much total was transferred so

20   there is no -- the jury can't line up that the value went way

21   up.  There is no way for them to know that, and we're not

22   intending to get into that.

23             THE COURT:  OK.

24             MS. MERMELSTEIN:  And so that is our intention.

25             With respect to Mr. Archer's shares -- I don't know if

1    in light of that Mr. Schwartz still wants to offer that.

2              MR. SCHWARTZ:  Can I ask you one more question,

3    because I think you're on the right track.  Does the government

4    --

5              THE COURT:  Can you bring the mic closer, please.

6              MR. SCHWARTZ:  Does the government intend to get into

7    the percentage of the float?

8              MS. MERMELSTEIN:  No.  Because that's related to the

9    pump and dump scheme.

10             MR. SCHWARTZ:  To me that's the critical issue.  And

11   you can use Apple shares, IBM shares, any kind of stock to

12   launder the proceeds of a fraud scheme.  If that's all that

13   they're proving -- obviously we will have to see how the

14   testimony comes in -- but I think I can stay away from it

15   entirely.

16             MS. MERMELSTEIN:  That's fine.  I will note with

17   respect to Mr. Archer owned shares of what is actually in

18   evidence, Mr. Schwartz is right that there is evidence in the

19   RSB bank statements of the ownership of Code Rebel shares.

20   Those are not the shares that Mr. Archer paid for; those are

21   the shares that we fought about.  So, I don't think that -- I

22   think letting in the fact that he owned them, it's going to be

23   confusing and factually incorrect to suggest that he paid for

24   those shares.  He didn't.  The shares he paid for actually went

25   to Burnham.  We are not going to get into the fact that Burnham

1      held those Code Rebel shares, so again I think that that door

2      should stay closed.

3               THE COURT:  All right.  And if you need to lead

4      Mr. Martin, I will let you do so.

5               MS. MERMELSTEIN:  Thank you.

6               One other issue with respect to Code Rebel, your

7      Honor, is that the Cooney recording issue triggers the Code

8      Rebel issue, in the government's view, because, as is put forth

9      in the parties' papers, the defense is seeking to offer a

10     limited portion of that recording, which gives a misimpression

11     that Cooney is involved in legitimate businesses and is talking

12     about legitimate businesses, and it's being offered to suggest

13     I think two things:  One, falsely, that Mr. Cooney is a

14     legitimate business person; and, two, to get at the way he

15     talks about Mr. Archer, including the references to Mr.

16     Archer's political connections.

17              THE COURT:  I'm sorry, are you talking about 4908 and

18     4904, the Cooney-Crafton recordings?

19              MS. MERMELSTEIN:  Yes.

20              So, as the government put forth in its letter, if the

21     defendants offer that, the government thinks that that entitles

22     the government to offer other portions of that recording in

23     which Mr. Cooney talks about his participation in, among other

24     things, Arben Kane companies -- Arben Kane is the CEO of Code

25     Rebel -- and his efforts to participate in pump and dumps.  He

1    talks about, for example, efforts to control all the shares of

2    a stock, to park them places with investors who aren't going to

3    sell them.  And if the Code Rebel door is being opened wide by

4    virtue of that, I think we need to know that before Francisco

5    Martin testifies, since he's the witness who will explain the

6    pump and dump, and so I think we need to know the answer on the

7    Cooney recording.

8            THE COURT:  Well, wouldn't the recording come in on

9    the defense case anyway if they chose to do that?

10           MS. MERMELSTEIN:  No, I don't think so.  I think if

11   your Honor allowed that in, we would put in the whole thing,

12   both the portions that they're talking about and the portions

13   that relate to the pump and dump scheme, in one segment in the

14   government's case.

15           THE COURT:  I see.  I had not appreciated that.  I

16   thought that that was an issue for the defense case.

17           MS. MERMELSTEIN:  I don't think it is.  I also think

18   that as a practical matter, even if that were true, if they're

19   going to only the door, we should be allowed to ask Francisco

20   Martin those questions now rather than have him testify and get

21   back on a plane to Italy and bring him back in a rebuttal case.

22           THE COURT:  Do you want to be heard on that?

23           MR. SCHWARTZ:  Sure.  I mean just two quick points.

24   First of all, procedurally this is putting the cart before the

25   horse a little bit, but I don't agree with Ms. Mermelstein's

 1    proposal.  This has always been marked as a defense exhibit.

 2    The government originally marked it and told us they were

 3    withdrawing it as an exhibit, which is when we told them that

 4    we want to put it in.  And now they seek to coopt it and make

 5    it part of the government case.

 6          Just as I was not allowed to put in additional e-mails

 7    or cross-examine their document reader, they shouldn't be

 8    allowed to put a defense exhibit in on the government case just

 9    because --

10          THE COURT:  But they can change their mind and put the

11    whole exhibit in as a government exhibit if they want to.

12          MR. SCHWARTZ:  Oh, I mean I don't think that's right,

13    your Honor.  I think they're taking advantage of the fact that

14    we made early disclosure of our exhibits by agreement.  And,

15    you know, throughout this trial the agreement has always been

16    when we have done that they were receiving information on the

17    condition that they not preempt us through the use of the

18    exhibit, so I don't think that's very fair.

19          With respect to the subject matter of the tape, look,

20    the government has always been clear that in their view if it

21    is admitted they want to offer other parts of the tape for

22    completeness, which is fine by me.  I don't know what parts

23    they are; obviously we may disagree with the specific parts;

24    but the concept is fine.  But there is no reference anywhere on

25    that tape to my memory to Code Rebel, so I don't understand how

1    this would open the door to Code Rebel.

2              THE COURT:  I'm sorry, just to be clear, did you say

3    Martin is testifying today or tomorrow?

4              MS. MERMELSTEIN:  I expect he will testify tomorrow,

5    your Honor, but obviously to the extent that there is going to

6    be a significant change in the scope of his testimony, we need

7    to know I think by the end of today.

8              THE COURT:  I understand.

9              MS. MERMELSTEIN:  But just to be clear, let me say two

10   things.  One is there is no agreement between the parties that

11   the government won't offer anything in its case in chief.  With

12   respect to any agreement, the agreement was that the government

13   would give significant advanced notice of which exhibits it

14   intended to use with which government witness, and in return

15   the defense would identify the night before which exhibits they

16   intended to use on cross-examination, so that we could more

17   easily handle any objections to those.

18             We're not talking about that.  No one has talked about

19   which witness the Cooney recording will come in through.  That

20   was just marked as a defense exhibit sort of at the time the

21   defense exhibits were marked.  And the word Code Rebel is not

22   on the recording, to be clear, but there is explicit

23   conversation about Cooney's involvement in more than one pump

24   and dump scheme involving Arben Kane companies, one of which is

25   Code Rebel.  The government intends to offer that.  If the

1    defense wants to offer the other portion of the Cooney

2    recording, that obviously opens the flood gates to the Code

3    Rebel story, and I think we should not wait and put in that

4    whole case in a rebuttal case; we should handle it now.

5         MR. SCHWARTZ:  I guess my suggestion would be --

6    because my memory is that it is not nearly as clear as the

7    government is saying that that is what is being discussed, so

8    my suggestion is the government should tell us exactly which

9    portions of the tape it intends to counterdesignate, and then

10   we can all look at it and have a discussion.

11        THE COURT:  Let's do that, but I just found out the

12   jury is all here, so can we do that during the break?

13        MS. MERMELSTEIN:  We can, your Honor, but I think

14   there is one more Steve Shapiro issue we need to take up.

15        THE COURT:  All right.

16        MS. MERMELSTEIN:  Which is that Ms. Notari has

17   provided a list of exhibits, including a few that were marked

18   for the first time this morning, that she intends to use to

19   cross-examine Mr. Shapiro.  The government has objections to a

20   few of them.  Ms. Notari also has objected to a number of

21   exhibits that the government intends to offer with Mr. Shapiro.

22   He is the first witness.

23        So, I can start with I guess Ms. Notari's exhibits

24   with respect to cross-examination.  We have no objection to a

25   number of them, so I won't go through those.  There are five

1   that we object to.

2          Defense Exhibit 3172 -- can I ask you to pull that up,

3   Mr. Wissman -- is an e-mail between Matthew Fillman -- an

4   employee of Fulton & Meyer -- and Mr. Cooney, in which

5   Mr. Fillman tells Mr. Cooney to fill out his personal financial

6   statement with big round numbers, not too detailed.

7   Mr. Shapiro is not on this e-mail.

8          THE COURT:  All right.  How are you going to use this?

9          MS. NOTARI:  Your Honor, this e-mail was sent to my

10  client from his business manager who was attempting to get him

11  a loan, and in connection with the financial statement that

12  Mr. Cooney filled out -- the only financial statement that

13  Mr. Cooney filled out in relation to this loan -- Matthew

14  Fillman tells him.

15         THE COURT:  But how can you ask Mr. Shapiro that?

16         MS. NOTARI:  Because I think it goes towards my

17  client's state of mind; it goes towards his effect on the

18  listener that he was told when he filled out this application,

19  you know, to use big round numbers, not too detailed.

20         THE COURT:  But this is not something that Steve

21  Shapiro knows about, right?

22         MS. NOTARI:  Well, I want to ask him if he knows about

23  it, but I also think that it should be admitted as an exhibit.

24  I think the jury should know that that was --

25         THE COURT:  But what is the basis for asking this

1       witness about this exhibit?

2                   MS. NOTARI:  I want to ask him if he knows that this

3       is what he was told, and if he was -- you know, if he -- you

4       know, I want to ask him if he knows what he was told.  But also

5       I think that the exhibit is admissible for the jury to consider

6       along with the financial statement that that's what my client

7       was told.

8                   THE COURT:  It doesn't sound like there is a basis to

9       ask this witness about this exhibit.

10                  MS. NOTARI:  Well, would your Honor consider admitting

11      the exhibit as state of mind?

12                  THE COURT:  On what basis?

13                  MS. NOTARI:  On the ground that it's relevant

14      towards --

15                  THE COURT:  But who is going to authenticate it?

16      What's the foundation for it?

17                  MS. NOTARI:  The e-mail is from my client.  It's

18      already authenticated.  It's from my client's e-mail.

19                  THE COURT:  I don't think you've provided a proper

20      basis for the admission of the exhibit.  I don't think you've

21      called -- I mean you can call a witness who can testify that he

22      knows what this exhibit is, and then you can provide a basis

23      for it, but I don't think you've done that, so it doesn't seem

24      like it should come in, so that's 3172.

25                  MS. MERMELSTEIN:  Yes, your Honor.  The next one is

1     four exhibits; they are actually I think in many ways related.

2     Government Exhibit 426 is an e-mail from Mr. Cooney to

3     Mr. Shapiro providing a full opinion with respect to the Code

4     Rebel bond.

5               MS. NOTARI:  Your Honor, I'm not going to admit that.

6     I told them that what I want to do -- again, this touches on

7     the Code Rebel issue.  I'm not going to admit this exhibit.

8               What I want to just be able to do is ask the witness,

9     you know, that certain questions were being asked of Mr. Cooney

10    to provide -- they were trying to get the restriction lifted

11    off the Code Rebel stock, and one of the things they talked

12    about was seeking a lawyer to assist, and in fact a lawyer did

13    provide -- so this would just be used to refresh his

14    recollection, but it wouldn't be admitted into evidence, and I

15    wouldn't go into the substance of the e-mail which talks about

16    again payments; it talks about wire evidence.

17              THE COURT:  So you're not going to use it.

18              MS. NOTARI:  No, I'm not.

19              THE COURT:  But what are you going to ask him?

20              MS. NOTARI:  I just may refresh his recollection.

21              THE COURT:  Well, you don't know that he doesn't

22    remember something.

23              MS. NOTARI:  I understand, but if he doesn't --

24              THE COURT:  What are you going to ask him?

25              MS. NOTARI:  I'm just going so say and there came a

         1    time when you tried to get -- you and Mr. Cooney spoke about

         2    getting legal assistance, and in fact you contacted a lawyer --

         3    he contacted a lawyer and he provided you with a legal opinion.

         4             THE COURT:  And you're he not going to say what that

         5    legal opinion was?

         6             MS. NOTARI:  Well, the legal opinion was toward

         7    helping to get the restriction lifted off the Code Rebel stock.

         8             THE COURT:  But are you going to try and elicit the

         9    legal opinion?

        10             MS. NOTARI:  No.

        11             THE COURT:  OK.

        12             MS. NOTARI:  And again I just want clarification that

        13    there are certain things around Code Rebel that I'm not going

        14    to get into, but, look, one of the things that I want to ask

        15    this witness is that he understands in his 3500 material he

        16    says that Mr. Cooney -- his understanding was he was helping

        17    take Code Rebel public; that was why he was getting the shares.

        18    I'm not going to go beyond that.

        19             But I think it's relevant, you know, why if he knew --

        20    because he was giving him a $1.2 million loan.  So I mean of

        21    course he was doing his due diligence in trying to determine,

        22    you know, why Mr. Cooney had the stock.  So, to the extent that

        23    Mr. Cooney was an investor and he was helping promote the stock

        24    and take it public, I think if I stop there, I think that's not

        25    opening the door.

1          MS. MERMELSTEIN:  Your Honor, the problem is Ms.

2     Notari's rendition wildly mischaracterizes what happened and is

3     an effort to suggest to the jury that there was a stamp of

4     legitimacy on this by a lawyer, when in fact the series of

5     e-mails that relate to this -- which I understand she is not

6     trying to put in but she's trying to get at -- are the very

7     evidence that Code Rebel was a fraud and that Mr. Cooney was

8     lying about his receipt of the shares.

9          We're not putting that in for obvious reasons, but she

10    can't put in the piece that makes it sound OK and then say the

11    government can't put in the evidence that it was a fraud.

12          And here is the issue:  Mr. Cooney -- when the loan

13    went bad, City National Bank wanted to take possession of the

14    Code Rebel shares.  They were in a City National account in

15    Mr. Cooney's name.  They wanted to hold themselves and be able

16    to sell them themselves to pay off a loan.  In an effort to do

17    that, there was compliance-related disclosures about how

18    Mr. Cooney had come to own the bond that Mr. Cooney had to make

19    to the bank and which he did make to the bank.  Having

20    previously said to the bank that he had acquired the shares,

21    that he was paid as compensation for his work on the IPO in

22    shares, and that was how he came to own so many Code Rebel

23    shares, when the bank then said to him many months later, well,

24    we need the documentation that proves that, there was no

25    documentation that proved that because it wasn't true.

1    Instead, Mr. Cooney for the first time submitted various

2    purported loan agreements between himself and Thorsdale which

3    purported to represent that Thorsdale had loaned Cooney

4    $100,000, that Cooney had used that money to buy the Code Rebel

5    shares and had then paid back the loan.  And in connection with

6    those fake agreements there was a legal opinion saying sort of

7    I've reviewed these agreements and these are what they say

8    basically.  Right?  Those documents are fake; there was no such

9    loan from Thorsdale.

10         MS. NOTARI:  And there is testimony from Mr. Dunkerley

11   that he created fake documents and didn't tell people that they

12   were fake.

13         THE COURT:  Go ahead.

14         MS. MERMELSTEIN:  They were fake.  Mr. Cooney of

15   course knew that there had been no such agreement.  It's

16   exactly the same story with Mr. Martin -- although we're not

17   going to elicit that from him -- he too got shares, the same

18   exact agreements used to paper over that after the fact.

19         You can't put in the fact of the legal opinion without

20   opening the door to the fact that that legal opinion was based

21   on false documents intentionally submitted by Mr. Cooney.

22         THE COURT:  I agree with that.  All right.  Are there

23   other issues?  Can we bring the jury in?

24         MS. MERMELSTEIN:  Sorry, your Honor.

25         MS. NOTARI:  I'm not sure.  So I cannot ask --

1    THE COURT:  I think if you ask about a legal opinion

2    and suggest propriety in that fashion, then you're opening the

3    door, and the government can bring the rest of it in.

4    MS. NOTARI:  OK.

5    MS. MERMELSTEIN:  The last three, your Honor, there

6    are e-mails from Mr. Cooney -- so City National Bank says we

7    want to take possession of them ourselves so we can be in

8    control of selling them.  Mr. Cooney initially says yes.  He

9    then says, no, I'm not going to let you have possession of

10   them.  Mr. Cooney then says, no, I'm not going to let you have

11   possession of them; I want to be the one who is going to sell

12   them; and he transfers them out of the City National securities

13   account out of City National Bank.

14        The e-mails -- the last three e-mails that were

15   produced to the government this morning by Ms. Notari -- 3717,

16   3718 and 3738 -- all pertain to that.

17        I first of all don't think it's relevant sort of what

18   happened at the end of the day there, but more than that, they

19   include statements from Mr. Cooney to the effect of like I have

20   to look out for my family; I'm just trying to do the right

21   thing; I'm going to ultimately be able to sell these and make

22   you whole; and all of that is inappropriate hearsay, without

23   any relevance.

24   MS. NOTARI:  We're not putting those in.

25   MS. MERMELSTEIN:  OK.  And then the government's view

1    on 408, 410, 418 and 419 is that they're all admissible for

2    nonhearsay purpose us.  I would note among other things that I

3    expect Mr. Shapiro will lay a foundation that Mr. Fillman

4    operated as Mr. Cooney's agent for purposes of obtaining the

5    loan, and statements by Mr. Fillman are thus statements by

6    Mr. Cooney for purposes of coconspirator statements and

7    statements of the defendant, etc., so I think they're

8    admissible.  I don't know if your Honor wants to take those up

9    now or as they come in.

10             THE COURT:  Do you want to be heard?

11             MS. NOTARI:  It's up to you, your Honor, because I'm

12   objecting to 408, 418 and 419, because they are clearly

13   hearsay; they're e-mails between Matthew Fillman and Steve

14   Shapiro.  And I've never heard this theory about Steve Shapiro

15   acting as a coconspirator agent.

16             THE COURT:  Why don't we see how the foundation is

17   laid for that.

18             MS. MERMELSTEIN:  That's fine, your Honor.  I will

19   then just offer the rest of the exhibits without objection at

20   the beginning of the Q and A, and I will lay a foundation for

21   those as we go.

22             THE COURT:  OK.  And I'm going to look at those now.

23             MS. NOTARI:  Your Honor, if I can just have a moment

24   to just factor in what just happened.

25             THE COURT:  OK.  But I do want to bring the jury in.

1          MR. SCHWARTZ:  I just want to be clear on the

2     record -- because obviously Code Rebel runs through a good deal

3     of Mr. Shapiro's testimony -- that whatever happens there

4     should not open the door to anything involving Code Rebel and

5     Mr. Archer.  Are we all agreed on that?

6          MS. MERMELSTEIN:  I mean I don't think --

7          MR. SCHWARTZ:  Otherwise I'm going to have to object

8     very aggressively, and I really want to be able to sit back.

9          THE COURT:  I mean the government is going to -- I'm

10    sure it will abide by my ruling, and so let's see what happens.

11    I mean I can't tell you if Ms. Notari will open the door.

12         MR. SCHWARTZ:  That's my point.  Even if she does, it

13    should be only with respect to her client.  This witness has

14    nothing to do with Mr. Archer.

15         THE COURT:  I assume that will be the case.  That's

16    what I expect.  So, let's just bring the jury in.

17         MR. SCHWARTZ:  Thank you.

18         THE COURT:  It was 408, 410, 418 and 419?

19         MS. MERMELSTEIN:  I think it's now 408, 418 and 419.

20    I think Ms. Notari said he's not objecting to 410.

21         THE COURT:  OK.

22         MS. NOTARI:  Can I have that list again?  I'm sorry.

23         THE COURT:  408, 418 and 419.

24         (Continued on next page)

25

1          (Jury present)

2          THE COURT:  Good morning, everyone.  I hope you all

3    had a nice weekend.  Please be seated.

4          MS. MERMELSTEIN:  The government calls Steven Shapiro.

5     STEVEN SHAPIRO,

6        called as a witness by the government,

7        having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. MERMELSTEIN:

10   Q.  Good morning, Mr. Shapiro.

11   A.  Good morning.

12   Q.  Let me ask you to keep your voice up.  The acoustics are

13   terrible.  Where do you work?

14   A.  City National Bank.

15   Q.  And how long have you worked at City National Bank?

16   A.  Approximately 19 years.

17   Q.  What is your current title?

18   A.  Senior vice president, team leader and sales manager.

19   Q.  And what are your general duties and responsibilities as a

20   senior vice president, team leader and sales manager?

21   A.  As a team leader I supervise 11 employees that take care of

22   all aspects of our clients' affairs, banking affairs, including

23   loans and deposits, investments, etc., and I cover about 6,000

24   clients.

25          As a sales manager I take care of all of the sales and

I6B7GAN1                        Shapiro - Direct

1    marketing activities for the entertainment division of City

2    National Bank for our offices in Beverly Hills, New York,

3    Nashville and Atlanta.

4    Q.  Are you familiar with someone named Bevan Cooney?

5    A.  I am.

6    Q.  Have you ever met him in person?

7    A.  I have.

8    Q.  Do you think you would recognize him if you saw him again?

9    A.  Yes.

10   Q.  Let me ask you to look around the courtroom and see if you

11   see him.  And if you do, can you point him out and indicate an

12   item of clothing he is wearing?

13   A.  Mr. Cooney is sitting at the defense table.  I believe -- I

14   can't quite see him, but I think it's a pink tie.

15          MS. MERMELSTEIN:  Can I ask that the record reflect

16   that the witness has identified Mr. Cooney.

17          THE COURT:  It will so reflect.

18   Q.  Now, how do you know Mr. Cooney?

19   A.  Mr. Cooney was a client of City National Bank.

20   Q.  Are you familiar with something called Fulton Management?

21   A.  I am.

22   Q.  What is Fulton Management?

23   A.  It's a business management firm.

24   Q.  Did it go by any other names?

25   A.  It was known as Fulton & Meyer as well.

I6B7GAN1                        Shapiro - Direct

1   Q.  What if any relationship did Fulton Management or does

2   Fulton Management have with City National Bank?

3   A.  Fulton Management is a client of City National Bank, as are

4   between any of 300 to 500 of their clients also are clients of

5   ours.

6           MS. NOTARI:  Your Honor, I missed that answer.

7           THE COURT:  Repeat your answer, please.

8   A.  Certainly.  Fulton Management is a business management

9   firm.  Their relationship with City National Bank is that

10  Fulton Management is a client of our bank as are approximately

11  300 to 500 of their clients.

12  Q.  I want to turn your attention now to early 2015.  Were you

13  involved in making a loan to Mr. Cooney at that time?

14  A.  I was.

15  Q.  Was that the first time that City National Bank had made a

16  loan to Mr. Cooney?

17  A.  No, it was not.

18  Q.  Who generally was your point of contact with respect to the

19  loan that Mr. Cooney sought?

20  A.  Fulton Management was, and their representatives Matthew

21  Fillman, Eric Fulton and others.

22  Q.  And did Mr. Fillman act as Cooney's authorized agent in the

23  communications seeking the loan?

24  A.  Yes, he did.

25  Q.  What size loan was Mr. Cooney seeking in early 2015?

1    A.   Approximately $100,000.

2            MS. MERMELSTEIN:  The government will now offer, your

3    Honor, without objection, Government's Exhibits 405, 409, 410,

4    411, 412, 414, 423 and 424.

5            THE COURT:  They will be admitted.

6            (Government Exhibits 405, 409, 410, 411 received in

7    evidence)

8            (Government Exhibits 412, 414, 423 and 424 received in

9    evidence)

10   Q.   I want to turn your attention to what is now in evidence as

11   Government Exhibit 405.

12           Can we please pull that up, Mr. Wissman.

13           Looking at the top e-mail, that's an e-mail from

14   Matthew Fillman to you on February 4, 2015?

15   A.   That is correct.

16   Q.   And if we can go to the attachment, what is attached to

17   that e-mail?

18   A.   This is a personal financial statement on a City National

19   Bank form where Mr. Cooney is listing his assets and his

20   liabilities.

21   Q.   Why was this sent to you?

22   A.   In conjunction with the loan request for approximately

23   $100,000 this would have been one of the required forms that we

24   would have had him complete.

25   Q.   I should note for you that there is a hard copy of the

I6B7GAN1                    Shapiro - Direct

1    documents in fronts of you.  In particular this one seems a

2    little hard to read on the screen.

3           So let's look at the second page of this personal

4    financial statement.  And on the left hand side of the page, do

5    you see the section titled assets?

6    A.  Yes.

7    Q.  What is listed as Mr. Cooney's listed stocks and bonds?

8    A.  He lists $5 million worth of bonds and $2 million worth of

9    stock.

10   Q.  And does it indicate approximately how much cash he has on

11   hands?

12   A.  $49,000.

13   Q.  And if we can zoom back out, please, and if you look on the

14   right-hand side what does that indicate about Mr. Cooney's

15   liabilities?

16   A.  His liabilities listed are $93,000 with City National Bank,

17   other revolving debt of $150,000, and other installment debt of

18   $100,000, real estate loans of $95,000.  Total liabilities are

19   $438,000.

20   Q.  Why does City National Bank request that information in

21   considering a loan?

22   A.  In order to determine whether somebody has the ability to

23   repay we look for two primary sources:  One is that their

24   income is sufficient to repay; and should their income not be

25   sufficient to repay, we look for a secondary source of

I6B7GAN1                        Shapiro - Direct

 1    repayment in the form of assets that they would own that could

 2    easily be liquidated in the case of a loan default.

 3              MS. MERMELSTEIN:  Can we pull up Government Exhibit

 4    408, please, for the witness, court and the attorneys.

 5    Q.  Now, did there come a time that you received additional

 6    information about the $5 million of bonds listed on

 7    Mr. Cooney's personal financial statement?

 8    A.  Yes.

 9              MS. MERMELSTEIN:  Your Honor, I think there is now a

10    foundation for the admission of Government Exhibit 408.

11              MS. NOTARI:  Your Honor, we object.

12              THE COURT:  I will allow it.

13              MS. MERMELSTEIN:  The government offers Government

14    Exhibit 408, and let's that to publish that to the jury now,

15    please.

16              THE COURT:  It will be admitted.

17              (Government Exhibit 408 received in evidence)

18    Q.  So, let me direct your attention, in the middle of the page

19    you e-mail Mr. Fillman in response to having received a

20    personal financial statement and say:  $100,000 personal line,

21    correct?  How does will Mr. Fillman respond?

22    A.  His response is at the top where he has written "He bought

23    the attached $5 million in bonds ... these were the ones that

24    CNS" -- which stands for City National Securities -- "could not

25    custody.  NPC/Pershing is ... we are in process of having the

I6B7GAN1                          Shapiro - Direct

issuer merge this series with the previous series ... so they

will be more marketable.  You will see the outstanding wire for

$5 million to buy them.  They split the issue to accommodate

his order but doing so meant that he bought the entire quantity

of the second series, so it has no market price since there are

no bonds trading, as he owns them all."

Q.  What did he mean that these were the ones that CNS could

not custody?

            THE COURT:  What did you understand him to mean?

A.  Certainly.  At some point in time near this particular date

the goal was for the bond itself to be held in custody by City

National Securities, which is the broker arm of City National

Bank.  By holding it there it makes it more readily -- readily

easy to buy, sell, trade when it's being held in custody by a

securities firm.

            (Continued on next page)

I6B5gal2                         Shapiro – direct

1    BY MS. MERMELSTEIN:

2    Q.  If it wasn't held at City National Securities, where was

3    this bond held?

4    A.  According to Mr. Fillman, it was held at NPC Pershing, a

5    different brokerage house.

6    Q.  Let's go to Government Exhibit 409, please?  Directing your

7    attention to the bottom of the page, an e-mail from Richard

8    Isaacs to Bevan Cooney.  Let me ask you to read just the first

9    line of that e-mail.

10   A.  Bevan, great news.  Attached please find the account

11   balance showing the bonds as held with Pershing.

12   Q.  If we can go up one e-mail in the chain where Mr. Cooney

13   forwards the e-mail to Matthew Fillman, what did Mr. Cooney

14   write to Mr. Fillman?

15   A.  Matthew, Pershing now reflecting my bonds with the value of

16   $5.5 million.  This should be helpful for loan.

17   Q.  Do you see at the top Mr. Fillman forwarded that e-mail to

18   you?

19   A.  Yes, he did.

20   Q.  With respect to efforts to obtain a loan, was it helpful

21   from City National's perspective that there was now a value

22   reflected for these bonds?

23   A.  Yes.  Absolutely.

24   Q.  Did City National Bank ever issue the $100,00 loan that was

25   requested?

I6B5gal2                              Shapiro - direct

1    A.  Yes, we did.

2    Q.  Did there come a time that Mr. Cooney requested a larger

3    loan from City National Bank?

4    A.  Yes, there was.

5    Q.  Approximately when was that?

6    A.  Approximately May of 2015.

7    Q.  Let me direct your attention now to Government Exhibit 411

8    and if we can go to the second page and let me ask you to read

9    Mr. Fillman's e-mail to you on May 20th of 2015.

10   A.  Is this the Steven Shapiro that works for

11   crappy-loans-are-us?  Please call me back.

12   Q.  What did you understand him to mean by that reference?

13   A.  Matthew Fillman and I have worked together for many, many

14   years and he understands what City National Bank's typical loan

15   underwriting requirements are.  He knew that this particular

16   request fell outside of our normal parameters.

17   Q.  Let me ask you to actually go back for just one moment to

18   Government Exhibit 409, and if you can look at the last page of

19   that exhibit, please?  Let me ask you then, Mr. Shapiro, what

20   is the $5 million bond Mr. Cooney holds, according to this

21   attachment that you own?

22   A.  I am not seeing it in my book under 409.  Oh, I'm sorry.

23   Yes, I am.

24   Q.  Very last page of 409.

25   A.  This is a brokerage statement showing the Wakpamni Lake

I6B5gal2                    Shapiro - direct

1    Community Corporate municipal bonds with a position value of

2    $5,523,600.

3    Q.  That's Wakpamni.  W-A-K-P-A-M-N-I?

4    A.  Correct.

5    Q.  Let's go back to 411, please, and I think I interrupted you

6    when you were explaining Mr. Fillman's reference to the crappy

7    loans are us.

8    A.  Yes.

9    Q.  What did you understand that to mean?

10   A.  Mr. Fillman was asking for a $1.2 million loan.  He knew

11   that that would have been a stretch under our normal

12   underwriting parameters, therefore he is setting the stage for

13   me to keep an open mind to this particular request.

14   Q.  Let's go to the first page of this e-mail, please, and if

15   we can look at the e-mail that is second from the bottom from

16   Mr. Fillman to you, what does Mr. Fillman tell you?

17   A.  He is telling us that he is requesting a stock-secured

18   single stock, Nasdaq-traded, at least it is not a penny stock,

19   IPO was yesterday.

20   Q.  Let me stop you right there and let's go to the top portion

21   of the e-mail or the top two, I guess.

22        How do you respond to him?

23   A.  The first one, which is the second e-mail, my response was

24   that I wanted to see if our credit administrators would allow

25   taking that stock as collateral.  Normally the minimum price

1     per share is $10 and it has to be seasoned, but at this kind of

2     loan to value -- LTV -- we will see.

3     Q.   Then Mr. Fillman responds to you.   What does he say?

4     A.   He says $190,000 of the proceeds would pay off your

5     existing credit, which is the loans that City National already

6     had outstanding to Mr. Cooney, $90,000 on the term loan and

7     $100,000 personal money line -- PML.   We could possibly put a

8     limited share stop loss order in place just in case.   Run it

9     the blue ladder.

10    Q.   What is the reference to the blue ladder?

11    A.   The blue ladder is the symbol of City National Bank and

12    therefore he is making another reference to run it up our chain

13    of command.

14    Q.   What did you understand Mr. Fillman to mean -- excuse me

15    $190,000 of the proceeds would pay off existing credit, $90,000

16    on term loan and $100,000 PML?

17    A.   At that point in time in May he had two outstanding loans

18    with City National Bank, a $90,000 term loan and $100,00

19    personal money line which is the one we had granted earlier in

20    the year.

21         So, $190,000 of the loan proceeds would be used to

22    pay -- of the new loan proceeds would be used to pay those two

23    off.

24    Q.   Did there come a time that you were asked to do a medallion

25    guarantee for Mr. Cooney?

1   A.  Yes, there was.

2   Q.  What is the medallion guarantee?

3   A.  Medallion guarantee is a signature guarantee on a

4   marketable security, a stock or a bond.  So, similar to what a

5   notary would do on real estate documents or other kinds of

6   documents where you are guaranteeing somebody's signature, you

7   use a medallion guarantee to guarantee somebody's signature on

8   a stock or bond-related matter.

9   Q.  Can that be done with -- does it have to be done in person

10  or can someone send their signature to you to be medallioned?

11  A.  In almost all cases they are done in person, but with our

12  relationship with various business management firms,

13  Fulton & Meyer being one of them, if the client had signed in

14  front of them and they sent it to me, I would take their word

15  for it but it's not -- it doesn't happen often.  Most of the

16  time people are in person presenting identification to me.

17  Q.  I want to direct your attention now to Government Exhibit

18  410, and if you look at the third to last page, and if I can

19  direct your attention to the April 24th, 2015 e-mail from

20  Alexis Gluckman to you, who was Alexis Gluckman?

21  A.  He was an employee at Fulton & Meyer, Fulton Management.

22  Q.  What is Alexis Gluckman asking you here?

23  A.  She is asking to send me a form that Mr. Cooney will sign

24  in front of me and I will place my medallion guarantee stamp on

25  the form to verify that it is his signature.

I6B5gal2                         Shapiro - direct

1  Q.  Let's look at what is attached to this form; what is that?

2  A.  This is an irrevocable stock or bond power in which

3  Mr. Cooney would be either selling, assigning or transferring

4  to Burnham Financial $5 million worth of bond with a particular

5  QSIP number listed there.

6  Q.  Did you in fact medallion this form?

7  A.  To the best of my recollection, I did.

8  Q.  Then if we go to Government Exhibit 412, please?  And if

9  you look at, if you go again to the second page, please?  What

10 is Ms. Gluckman asking you on May 27?

11 A.  She stated when we did the original bond power for Bevan

12 they gave us the wrong name for the transfer.  Can Bevan come

13 down and get a new medallion stamp on the new form?

14 Q.  Can we look at the attachment,please?

15         What is this document?

16 A.  Once again, irrevocable stock or bond power in which

17 Mr. Cooney would be selling, assigning, or transferring to

18 Bonwick Capital Partners Limited a $5 million bond with a

19 particular QSIP number.

20 Q.  Did you in fact medallion this form?

21 A.  I did.

22 Q.  Did you meet Mr. Cooney in person in order to do so?

23 A.  I did.

24 Q.  Now, at the time of this e-mail from Ms. Gluckman, what was

25 status of Mr. Cooney's request for the $1.2 million loan?

A.   The $1.2 million loan had not yet been documented.  It was

something that we were prepared to issue our commitment, and we

were probably a week away from being able to fund the loan.

Q.   While meeting with Mr. Cooney in person to medallion this

form, did you have any discussion with him about the loan?

A.   I did.

Q.   What did you say?

A.   I said, we are looking at doing a $1.2 million loan for

you.  He agreed.  I said, we are using the Code Rebel stock as

the primary source of repayment.  When the restriction gets

lifted off of this particular stock you are going to pay back

our loan; is that correct?  He answered in the affirmative.  I

said, and if something goes wrong with that particular stock,

you are going to liquidate the $5 million muni bond that you

hold?  Is that correct as well?  And he acknowledged in the

affirmative as well.

Q.   Looking at the actual document that you medallioned, did

you understand in medallioning this document that Mr. Cooney

was transferring or selling or otherwise moving his Wakpamni

bonds to Bonwick?

A.   No.  I had no knowledge whether, what bond these were.  I

did not look up the QSIP number.

Q.   Did you have any idea whether he -- withdrawn.

          Does City National Bank agree to issue the

$1.2 million loan?

I6B5gal2                        Shapiro - direct

1    A.  We did.

2    Q.  And that was based on both the Code Rebel shares and the

3    Wakpamni bonds?

4    A.  That is correct.

5    Q.  Did Mr. Cooney sign any documentation in connection with

6    $1.2 million loan?

7    A.  Yes, he did.

8    Q.  Let me direct your attention to Government Exhibit 414.

9    What is that?

10   A.  This is a promissory note for a $1.2 million loan between

11   City National Bank and Mr. Cooney.

12   Q.  What is the date on which this loan was made?

13   A.  The date of the document is June 24th, 2015.

14   Q.  When does that mean that the loan is due?

15   A.  In the first paragraph where it says the promise to pay and

16   the payment in the second paragraph, it says that all principal

17   plus any accrued unpaid interest would be due and payable on

18   January 1, 2016.

19   Q.  Let's go to the second page of this document and direct

20   your attention to the section titled financial statement

21   certification and ask you to read that to the jury.

22   A.  Financial statement certification.  Borrower represents and

23   promises to lender that, (a) the most recent financial

24   statements borrower has given to lender are true and correct in

25   all respects, (b) they fairly represent borrower's financial

I6B5gal2                       Shapiro - direct

condition as of the date shown on the statements, and (c) no

material adverse change has occurred in the borrower's

financial condition since that date.  Borrower further

represents and promises to lender that the most recent federal

income tax return and all schedules attached to such return

"federal tax return," that I have given to the lender, are a

true and correct copy of such federal tax return filed with the

Internal Revenue Service for the tax period ending on the date

indicated in such federal tax return.

Q.  At the time that Mr. Cooney signed this promissory note,

who was the most recent personal financial statements on file

with City National Bank?

A.  The one that we reviewed earlier in this testimony from

January of 2015.

Q.  Let's go to the third page of this document, please, and if

you look at the statement in bold above the signature line

financial condition, let me ask you to read that as well.

A.  Financial condition.  By signing this authorization, I

represent and warrant to lender that the information provided

above is true and correct and that there has been no material

adverse change in my financial condition as disclosed in my

most recent financial statement to lender.  This authorization

is dated June 24, 2015.

Q.  Now, can you remind us, when was this loan due?

A.  January 1st, 2016.

I6B5gal2                          Shapiro - direct

1   Q.  What happened when it came due?

2   A.  Mr. Cooney was unable to repay the loan at that point.

3   Q.  Let me pull up, just for the witness, the Court, and the

4   parties, Government Exhibit 418, please.  Do you recognize this

5   e-mail?

6   A.  Yes.

7   Q.  How do you recognize it?

8   A.  418 is an e-mail that was sent from Matthew Fillman to

9   myself.

10              MS. MERMELSTEIN:   The government offers Government's

11  Exhibits 418.

12              THE COURT:  It will be admitted.

13              (Government's Exhibit 418 received in evidence)

14  BY MS. MERMELSTEIN:

15  Q.  Let's go to the bottom e-mail in that chain from

16  Mr. Fillman to Mr. Cooney on January 14th of 2016.  Let me ask

17  you to read just the first three paragraphs.

18  A.  Bevan, sorry I missed your call.  Let me know what you are

19  thinking as far as repayment.  I know the Code Rebel stock has

20  dropped even further.  Not sure what your thoughts are on its

21  longer term prospects.  I am also not sure where you are on the

22  re-registration of the Wakpamni Town Center bonds.  If these

23  were consolidated with the first offer and are truly trading,

24  they would be good collateral.  The original request with the

25  clear understanding there would be no extensions, as both the

1  stock and bonds, were not acceptable collateral under credit

2  policy.  I know the stock is well below the loan payoff amount.

3  Q.  Then let's go up further in the chain, please, Mr. Fillman

4  forwards that to you.  What is Mr. Fillman asking for?

5  A.  Think you can sell a 90-day extension or short clear?  Or

6  90-day interest only and $100,000 a month thereafter?  Expect

7  we can pay in full or at a minimum 50 percent in 90 days.

8  Happy for him to be on the hook monthly in exchange for the 90

9  days.  Call me when you can.

10  Q.  How does Mr. Fillman respond?

11  A.  That was Mr. Fillman's e-mail to me, so my response was:

12  Give the plan of sources of funds if we stretch this out.

13  Thanks.

14  Q.  What do you mean by the plan of sources of funds if we

15  stretch this out?

16  A.  So, Mr. Fillman is asking for a 90-day extension beyond the

17  maturity date of January 1st, 2016, and my question to him was

18  where is the money coming from within the next 90 days.

19  Q.  Can we pull up Government Exhibit 419 for the witness,

20  Court and parties, please?

21         Do you recognize this e-mail?

22  A.  I do.

23  Q.  Is it an e-mail from your e-mail account?

24  A.  Yes, it is.

25         MS. MERMELSTEIN:  Government offers Government Exhibit

1    419.

2              THE COURT:  It will be admitted.

3              (Government's Exhibit 419 received in evidence)

4    BY MS. MERMELSTEIN:

5    Q.  In we can publish that to the jury, please?

6              Starting at the bottom e-mail from you to Matthew F.

7    at Fulton Management, who is Matthew F. at Fulton Management?

8    A.  Matthew Fillman.

9    Q.  What do you write to him?

10   A.  I ask him to please call the broker and see how much you

11   can get to sell this and how long it would take to get the

12   money.

13   Q.  How does he respond?

14   A.  It's not there anymore.  He moved it when they could not

15   list a market price.  Already checked, that was Rich Isaacs who

16   used to work with Gwen/Dan and Merchantile.

17   Q.  When you asked Mr. Fillman to call the broker and see how

18   much you could get to sell this, what was the "this" you are

19   referring to?

20   A.  The $5 million Wakpamni Town bonds.

21   Q.  What did you understand him to be telling you was his

22   response?

23   A.  That it was no longer with the original broker that had

24   held it the year before where he had given me a statement

25   showing where the money was and the one that had confirmation

1    from that particular broker that he was holding that bond.  So,

2    what Mr. Fillman is telling me the broker Rich Isaacs doesn't

3    hold the bond anymore.

4    Q.  Did you understand from this e-mail that Mr. Cooney didn't

5    own the bond at all anymore or just that it was in a different

6    account of Mr. Cooney's?

7    A.  Different account.

8    Q.  Did there come a time that you met in person with

9    Mr. Cooney in connection with the failure to repay the loan?

10   A.  Yes, there was.

11   Q.  Who else was at that meeting?

12   A.  At that meeting from City National Bank were myself, my

13   direct supervisor Patricia Wheeler, and a representative from

14   our special assets department.  From Mr. Cooney's side there

15   was Mr. Cooney and there was Eric Fulton.

16   Q.  What was discussed at that meeting?

17   A.  What was discussed at the meeting was that the loan had

18   come due and our expectations were to understand how he was

19   intending to pay us back.

20   Q.  Was there any discussion about the Code Rebel shares?

21   A.  Yes, there was.

22   Q.  What was discussed?

23   A.  There was a number of discussions of why Code Rebel shares

24   still had a restriction against trading against them; that he

25   was not able to sell Code Rebel shares while that restriction

1    was on, and that it was imperative that the restriction get

2    lifted so that a sufficient number of shares could be sold to

3    repay our loan or at least as much that the value would allow

4    to repay.

5              So, the Code Rebel was an important part of the

6    discussion of how do you get the restriction lifted and can you

7    turn those shares over to City National Bank where we can do an

8    orderly or a rushed liquidation to repay our loan.

9    Q.   Was there any discussion of the Wakpamni bonds in that

10   meeting?

11   A.   There was.

12   Q.   What was the nature of that conversation?

13   A.   We asked the question why can't you simply sell the bonds

14   and pay us back?  Mr. Cooney's response was he doesn't have

15   them anymore, he never really had them, he had to pledge them

16   as collateral for someone else.  But, those are off the table,

17   he doesn't have them anymore.

18   Q.   Let me direct your attention to Government Exhibit 423 and

19   let's just look at the attachment, please.  What is this?

20   A.   This is a new personal financial statement created by

21   Mr. Cooney dated March 21st, 2016.

22   Q.   What prompted the submission of a new personal financial

23   statement?

24   A.   When Mr. Cooney was not able to repay the loan and City

25   National Bank was to consider alternative means or methods to

I6B5gal2                          Shapiro - cross

 1    repay our loan, we asked for updated personal financial

 2    information from him at that point in time.

 3    Q.  Will you go all the way to the end of this and look at the

 4    section list being long term liabilities.

 5    A.  Yes.

 6    Q.  Do you see the entry loan to/from Thorsdale Fiduciary in

 7    the amount of $5,407,000?

 8    A.  Yes.

 9    Q.  Was your receipt of this document the first time you

10    learned that Mr. Cooney had a loan in that amount?

11    A.  Yes, it was the first time.

12    Q.  Sitting here today, has City National ever received

13    repayment of the loan?

14    A.  We received approximately $80,000 of the $1.2 million.  The

15    rest was a loss.

16    Q.  So a loss of more than $1.12 million?

17    A.  Correct.

18            MS. MERMELSTEIN:  No further questions, your Honor.

19            THE COURT:  Cross-examination.

20            MS. NOTARI:  If I can just have a moment, your Honor?

21    CROSS EXAMINATION

22    BY MS. NOTARI:

23    Q.  Good morning, Mr. Shapiro.

24    A.  Good morning.

25    Q.  You testified that you came to know Mr. Cooney because he

I6B5gal2                        Shapiro - cross

1   was a client of yours for many years, correct?  He was a client

2   of City National Bank?

3   A.  Correct.

4   Q.  And Mr. Cooney was a long-standing customer of

5   Fulton & Meyer, correct?

6   A.  Correct.

7   Q.  And Fulton & Meyer was owned by Eric Fulton?

8   A.  At that point in time co-owned by Eric Fulton.

9   Q.  Co-owned, right.

10          And eventually Eric Fulton went on his own and opened,

11  he changed the name to Fulton Management, correct?

12  A.  Correct.

13  Q.  And it's fair to say that you had a very long-standing

14  relationship with Fulton Management?

15  A.  Yes.

16  Q.  And Matthew Fillman, who worked for Fulton Management, was

17  previously a banker at City National Bank?

18  A.  Correct.

19  Q.  And how many years did you work with Matthew Fillman?

20  A.  I worked with Matt for approximately 17 years, both at City

21  National and at our previous employer Wells Fargo Bank.

22  Q.  And, as far as you know, during the time that Matthew

23  Fillman worked with you, Fulton & Meyer was actually a client

24  of City National Bank?

25  A.  That is correct.

I6B5gal2                           Shapiro – cross

1    Q.  And it is fair to say that a large percentage -- you said

2    that you had two to three hundred customers from

3    Fulton & Meyer, correct?

4    A.  Correct.

5    Q.  Now, you were assigned to the entertainment division of

6    City National Bank?

7    A.  I am.

8    Q.  Are you still part of that division?

9    A.  I am.

10   Q.  And, in fact, Fulton & Meyer represents a lot of athletes,

11   celebrities.  They do a lot of work in the entertainment field?

12   A.  They do.

13              MS. MERMELSTEIN:  Objection.

14              THE COURT:  Overruled.

15   BY MS. NOTARI:

16   Q.  And, Mr. Cooney was referred to your division because he

17   was a customer of Fulton & Meyer, correct?

18   A.  That is correct.

19   Q.  But also because he owned The Viper Room and he did a lot

20   of investing in the entertainment industry?

21              MS. MERMELSTEIN:  Objection.

22              THE COURT:  I will allow it.

23              THE WITNESS:  I had no prior knowledge of that.  I'm

24   sorry.

25   BY MS. NOTARI:

I6B5gal2                         Shapiro - cross

1    Q.  Okay.

2            Now, your knowledge of Mr. Cooney was that he was an

3    investor?

4    A.  He was, quote unquote, a deal maker.

5    Q.  And, can you give us an explanation as to what you mean by

6    that?

7    A.  That he was acting as a quasi-investment banker to find

8    buyers and sellers and put the deal together and get paid a

9    commission for putting buyers and sellers together.

10   Q.  And, in fact, he did some work promoting IPOs, correct?

11   Taking stocks public?

12   A.  I have no personal knowledge of that.

13   Q.  So, and it is a fair description to say that Fulton & Meyer

14   were his business managers?

15   A.  That is correct.

16   Q.  In fact, you call them a business management company?

17   A.  I do.

18   Q.  And, in addition to doing his bidding for loans helping him

19   to get loans, they also did his accounting, correct?

20           MS. MERMELSTEIN:  Objection.

21           THE COURT:  Sustained.

22   BY MS. NOTARI:

23   Q.  Do you know if, as part of your inquiry into this loan, did

24   you have to obtain verification of, for example, Mr. Cooney's

25   tax returns?

I6B5gal2                          Shapiro - cross

1    A.  Yes.

2    Q.  And were they able to provide that information to you?

3    A.  Yes.

4    Q.  And, you just referred to Government Exhibit 423, an asset

5    and liabilities sheet.  As far as you know Fulton & Meyer

6    prepared that, correct?

7    A.  I would say that the first four pages on the City National

8    Bank form, that it appears that Mr. Cooney signed, it could

9    have been prepared by Mr. Cooney but the following pages that

10   list a balance sheet on it, the final two pages of this

11   document are consistent with other documents that I have seen

12   prepared by Fulton Management.

13   Q.  So, it was your understanding -- in fact, that document was

14   sent to you by Matthew Fillman, correct?

15   A.  Yes.

16   Q.  So, it is your understanding that that document was

17   prepared by them?

18   A.  That this particular document pages -- the last two pages

19   were prepared by Fulton Management.

20   Q.  And, it is fair to say that Mr. Cooney had several accounts

21   with City National Bank?

22   A.  I don't recall how many accounts he had with City National

23   Bank.  I clearly know that he had at least one.

24   Q.  He had a securities account, correct?

25   A.  I'm not aware because we weren't holding the Code Rebel

I6B5gal2                         Shapiro - cross

shares, nor were we holding the municipal bonds so I'm not

positive whether he had an active City National Securities

account.

             MS. NOTARI:  Your Honor, may I approach the witness?

             THE COURT:  Okay.

Q.  Defendant's Exhibit 3580; does that refresh your

recollection or is that something you have seen before?

A.  This is the City National Securities application to open up

a brokerage account dated October of 2014.

Q.  So that doesn't refresh your recollection?

A.  I am not an employee, so --

Q.  You are not entirely sure if he had a securities account?

A.  I don't know if it was open at the point in time in

question but he appears to have had an account that was open in

October of 2014.

Q.  And in addition to that he had other business accounts, he

brought other business to City National Bank, correct?

A.  I don't know if he brought them.  Fulton & Meyer, Fulton

Management certainly brought other accounts that Mr. Cooney was

a signer on, I believe.  One of them was Code Rebel itself.

Q.  This was not the first loan that Mr. Cooney obtained from

City National Bank.  Let's first refer to the January 2015, the

$100,000 line of credit.  This was not the first loan that

Mr. Cooney obtained, correct?

A.  He had one previous to that for $200,000.

I6B5gal2                        Shapiro - cross

1    Q.   And that particular loan did not go into delinquent status?

2    A.   No, it did not.

3    Q.   And it's fair to say that at the time that Mr. Cooney was

4    applying for these loans he had good credit?

5    A.   That is correct.

6    Q.   And you made inquiry as to his, again, you made inquiry as

7    to his tax returns?

8    A.   Yes.

9    Q.   And regards to the loan, the $1.2 million loan you in fact

10   verified that in 2012 he made almost $1.7 million?

11   A.   I'm not aware in 2015 whether I looked at 2012 tax returns

12   as the basis of judgment.  What we would be looking at tax

13   returns for would be to see does he have the recurring or

14   consistent or predictable income to be able to pay us back, and

15   at the point in time of $1.2 million he had no reliable cash

16   flow income.  So, using tax returns would have been pretty

17   moot.

18   Q.   But you did attempt to, you did ask Matthew Fillman for

19   information as to his AGI?

20   A.   As far as I can remember, certainly.

21   Q.   I will come back to this question.

22            And so, your primary point of contact for Mr. Cooney

23   was actually Eric Fulton, correct?

24   A.   Correct.

25   Q.   And Eric Fulton was the owner of Fulton & Meyer?

I6B5gal2                          Shapiro - cross

```
 1    A.  Co-owner of Fulton & Meyer.

 2    Q.  Co-owner.  He was the top of the chain of command?

 3    A.  He had a partner at that time, they were equal partners.

 4    Q.  Before, I would say, early 2016, you didn't have much

 5    contact with Mr. Cooney, correct?

 6    A.  Correct.

 7    Q.  Most of the business that he conducted was conducted on

 8    behalf of his business managers, correct?

 9    A.  That is correct.

10    Q.  So, if he needed something they would call him or they

11    would e-mail you and you would talk about what his needs were?

12    A.  That is correct.

13    Q.  Now, there came a time in, and you referenced Government

14    Exhibit 408 and 409 and those documents referenced Mr. Cooney's

15    Wakpamni bonds?

16    A.  Correct.

17    Q.  And, initially, you were contacted because Fulton & Meyer

18    wanted to deposit the bonds in your accounts, correct?  They

19    wanted you to take custody of them?

20    A.  At City National Securities, correct.

21    Q.  But it was determined that for whatever reasons you were

22    unable to do that, correct?

23    A.  Correct.

24    Q.  It is not uncommon that sometimes, with certain kinds of

25    bonds, that it is difficult to take custody of them?
```

I6B5gal2                        Shapiro - cross

1    A.  That would be correct.

2    Q.  And, in fact, eventually -- well, Mr. Cooney physically

3    delivered the bonds to you, do you recall that, to City

4    National Bank?

5    A.  I do not recall that.

6    Q.  So, the bonds at one point were -- if I could just refer

7    you to Government's Exhibits 403?  It might just be easier if I

8    could approach?  If you could look at that?

9    A.  Okay.

10   Q.  Does that refresh your recollection?

11   A.  I understand what that document is requesting but I have no

12   recollection of that transaction from October of 2014.

13   Q.  So you have no memory of -- but it is fair to say that

14   early on there was discussion about Mr. Cooney's Wakpamni

15   bonds, correct?

16   A.  Yes.

17   Q.  Now, there came a time, you said, that in approximately

18   February 4, 2015 you were contacted by Fulton & Meyer because

19   Mr. Cooney was seeking a $100,000 line of credit?

20   A.  Correct.

21   Q.  And an application was forwarded to you from Matthew

22   Fillman which is being referenced as Government Exhibit 405?

23   A.  Not quite an application but it's a personal financial

24   statement.

25   Q.  Okay, a personal financial statement.

1          Do you remember if you actually forwarded this to

2   Mr. Fillman or he typically has one in his office?

3   A.   He may have a blank form.  I may have sent him a blank

4   form.  Either way, our form has not changed in many years.

5   Q.   Now, this is a very standard form, correct?

6   A.   Correct.

7   Q.   In fact, anybody that is applying for an individual line of

8   credit or a joint line of credit with their spouse would have

9   to fill out this form?

10  A.   It would be this form or a similar one.  It is a formal

11  application that has the same information listed on it.

12  Q.   Did you ever see an e-mail from Matthew Fillman as part of

13  the e-mail thread where --

14          MS. MERMELSTEIN:  Objection, your Honor, to this being

15  referenced.

16          THE COURT:  Sustained.

17  BY MS. NOTARI:

18  Q.   Typically, this financial statement, when it is filled out

19  by a borrower, it is not always the ultimate financial

20  statement that is used in connection with a loan, correct?

21  A.   Why?  I don't understand that question.

22  Q.   Well, in this particular instance, this was the only

23  financial statement that was used in connection with the

24  $100,000 loan?

25  A.   Yes, it was.

I6B5gal2                    Shapiro - cross

1   Q.  And, in fact, it was filled out on January 28th, 2016?

2   A.  '15.

3   Q.  I'm sorry; 2015.

4   A.  Correct.

5   Q.  And part of this application, there were -- Mr. Cooney was

6   required to fill out his income and he was required to fill out

7   his assets, correct?

8   A.  We don't always make them fill out the income section if we

9   are using tax returns, but in this particular case he did fill

10  out his income as well as his assets and liabilities.

11  Q.  And he also filled out the fact that, he included as part

12  of the package, verification of his assets, correct?

13  A.  Whether he gave that to me or Mr. Fillman did, somebody

14  did.

15  Q.  In fact, you are not entirely sure if Mr. Cooney filled

16  this out or if Mr. Fillman filled this out, correct?

17  A.  My understanding is that Mr. Cooney signed this and Matthew

18  Fillman forwarded it to me after he signed it.

19  Q.  And it is fair to say that as -- and Matthew Fillman

20  forwarded to you the attachments verifying the assets, correct?

21  A.  Correct.

22  Q.  So, as part of the assets you can see that there was, in a

23  statement from Wilson Davis & Company which verified that

24  Mr. Cooney had 1 million shares of stock which was worth

25  approximately $1.9 million, right?

I6B5gal2                         Shapiro - cross

1   A.  Correct.

2   Q.  And he also had, there was an investment statement in the

3   NETX investor account which showed the Wakpamni bonds in his

4   name, correct?

5   A.  Correct.

6   Q.  And those were worth also $5 million?

7   A.  Correct.

8   Q.  And the financial statement was dated January 28, 2015?

9   A.  Correct.

10  Q.  And this was the only financial statement that was

11  submitted in connection with the application for $100,000,

12  correct? $100,000 line of credit?

13  A.  That is correct.

14  Q.  Is it fair to say that you said the Wakpamni bonds were a

15  source of secondary payment?

16  A.  Correct.

17  Q.  And as far as you know, the Wakpamni bonds were private

18  placement bonds?

19  A.  As far as I knew they were bonds that could be bought,

20  sold, or traded.

21  Q.  Okay.  And typically --

22          If I could just get my drink of water?

23          THE COURT:  Sure.  Go ahead.

24  Q.  Typically, as far as collateral, a bond like this is not a

25  preferred asset over something like cash, correct?

1    A.  No.  We prefer to take stocks or bonds or cash as

2    collateral versus doing a loan unsecured, but because we could

3    not custody the bonds, because the stock had a restriction

4    against trading on it, we could not take either of them as

5    collateral.

6    Q.  The loan that was ultimately given to Mr. Cooney was a

7    $100,000 -- it was ultimately a $100,000 loan and as far as you

8    know the loan started on February 17th, 2015 and it expired --

9    the maturity date was one year, it expired February 17th,

10   2016.?

11   A.  Yes.  That's my understanding.

12              MS. NOTARI:  Your Honor, this is Defendant's Exhibit

13   3755 and we would move this into evidence.

14              THE COURT:  Any objection?

15              MS. MERMELSTEIN:  No objection, your Honor.

16              THE COURT:  It will be admitted.

17              (Defendant's Exhibit 3755 received in evidence)

18   BY MS. NOTARI:

19   Q.  Now, at some point you testified that after Mr. Cooney --

20   let's just go back to the hundred thousand dollar line of

21   credit.  This was an unsecured loan?

22   A.  Unsecured line of credit, correct.

23   Q.  And there was no collateral tied to this loan, correct?

24   A.  Correct.

25   Q.  Now, is it true that the bonds were not acceptable

I6B5gal2                              Shapiro - cross

1   collateral under City National Bank's credit policy?

2   A.   That is correct.

3   Q.   Can you just explain that to us?

4   A.   The bonds could not be custodied by City National

5   securities.  We would have required them to be custodied by

6   City National securities in order to be able to take it as

7   collateral.  So, without our ability to custody, no collateral.

8   Q.   Now, in addition to the other documentation, Mr. Cooney

9   represented that he had $5 million of life insurance.  Was that

10  verified?

11  A.   No.

12  Q.   I'm sorry?

13  A.   Not that I can recall, no.

14  Q.   Okay.

15          But, it is fair to say that you had a close

16  relationship with Matthew Fillman and if you needed additional

17  verification, you would ask him and he would do whatever he

18  could to provide that to you, correct?

19  A.   Certainly.

20  Q.   And fair to say that you had a very solid relationship of

21  trust?

22  A.   Had a very solid relationship of trust with Fulton & Meyer,

23  correct.

24  Q.   Now, on January 28th, 2015, at the time that Mr. Cooney

25  applied for the $100,000 line of credit, it is fair to say

I6B5gal2                        Shapiro - cross

1    that, based on that application, he would not have qualified

2    for a $1.2 million loan, correct?

3    A.   At that point in time there is no even discussion of that

4    and I would hate to answer in the hypothetical.

5    Q.   I'm sorry?

6    A.   I would not want to hypothesize at that point in time

7    because nobody had requested a $1.2 million loan.

8    Q.   But subsequently there was a change in his circumstance and

9    he had a stock that was worth $12 million?

10             MS. MERMELSTEIN:  Objection.

11             THE COURT:  I will allow it.

12             Do you know the answer to that?

13             THE WITNESS:  Yes.  At the point in time that he asked

14   for $1.2 million, the Code Rebel stock was valued at

15   approximately $12 million.

16   BY MS. NOTARI:

17   Q.   Even at that point you said it was a crappy loan?

18   A.   There was a restriction on his ability to sell that stock.

19   It was indicated to me that the restriction was going to be

20   lifted in December of 2015 so it was that leap of faith that

21   the restriction would be lifted, he would be able to sell

22   enough stock to be able to pay back $1.2 million and that it

23   would take something really bad going on for the value to drop

24   below $1.2 million from $12 million.

25   Q.   Now, at some point you indicated that on April 1st, 2015,

I6B5gal2                        Shapiro - cross

1    you were contacted by Fulton & Meyer to see if you could

2    provide a medallion guarantee of Mr. Cooney's WLCC bonds,

3    correct?

4    A.  I don't know what the bonds were but I was asked to provide

5    a medallion guarantee.

6    Q.  And there was several e-mails from Alexis Gluckman and she

7    asked if you could personally meet with Mr. Cooney at your

8    office so that you could do the medallion transfer of his

9    bonds, correct?

10   A.  Correct.

11   Q.  You said that this was an irrevocable transfer of the

12   bond's power on the bond so that essentially that would

13   transfer bond power from Mr. Cooney to the entity where he was

14   placing the bonds, correct?

15   A.  It was transferring, selling, or assigning from Mr. Cooney

16   to the place that he was placing them.

17   Q.  And she provided you the form in advance of that meeting?

18   A.  Correct.

19   Q.  And that particular form said he was transferring the bond

20   to Burnham?

21   A.  Transferring, assigning, or selling to Burnham.

22   Q.  And Mr. Cooney showed up at your office at about one day

23   and you met with him, you signed the medallion guarantee,

24   correct?

25   A.  Correct.

I6B5gal2                         Shapiro - cross

1    Q.  And, subsequently, a messenger picked up document?

2    A.  That I don't recall.

3    Q.  I'm sorry?

4    A.  I don't recall if a messenger picked up the document or

5    not.

6    Q.  Now, at some point in May 27, 2015, you received another

7    e-mail from Alexis Gluckman and she informed you -- by the way,

8    Alexis Gluckman was Mr. Cooney's account manager?

9    A.  Ms. Alexis Gluckman was his account manager at

10   Fulton & Meyer.

11   Q.  So she also was a person that would contact you on behalf

12   of Mr. Cooney and ask you for his needs, correct?

13   A.  Correct.

14   Q.  There was no one particular person that was exclusively

15   working on his behalf?

16   A.  No.  It was -- to the best of my recollection it was Alexis

17   Gluckman, Matthew Fillman, it was Eric Fulton.

18   Q.  And fair to say that they were all reputable?

19   A.  Yes.

20   Q.  Now, on May 27, 2015, Alexis Gluckman contacted you and she

21   informed you that the original medallion guarantee for the form

22   you had filled out for Burnham provided an incorrect name or

23   the wrong name, they wanted to actually change that, and

24   another appointment was made for them to come to your office;

25   correct?

I6B5gal2                         Shapiro - cross

1    A.   That is correct.

2    Q.   And Mr. Cooney, you made another appointment, he came to

3    your office and this particular time the bond was transferred

4    to Bonwick Capital?

5    A.   That is correct.  Transferred, sold, or assigned.

6              MS. NOTARI:  Your Honor, may I approach?

7              THE COURT:  Yes.

8    BY MS. NOTARI:

9    Q.   Do you recall signing that?

10   A.   I do.

11   Q.   Can you just read the top of that document?

12   A.   Irrevocable stock or bond power.  For value received, the

13   undersigned does/do hereby sell, assign, and transfer to

14   Bonwick Capital Partners, Limited.

15   Q.   Could we bring that up on the screen?

16             MS. MERMELSTEIN:  Are you offering it.

17             MS. NOTARI:  Yes, I am offering this into evidence.

18             THE COURT:  Any objection?

19             MS. MERMELSTEIN:  No, your Honor.

20             THE COURT:  It will be admitted.  Now you can bring it

21   up on the screen.

22             MS. NOTARI:  3162B, it is the same document.

23             Your Honor, this is also, it is the same document, it

24   is also being identified as 3162B.  I'm fine to admit this one

25   into evidence.

1           THE COURT:  Any objection to using this version?

2           MS. MERMELSTEIN:  I don't think it is the same

3    document but no objection to the admission of 3162B.

4           MS. NOTARI:  We can resolve this.

5           THE COURT:  It sounds like no objection in any event,

6    so 3162B will be admitted.

7           (Defendant's Exhibit 3162B received in evidence)

8    BY MS. NOTARI:

9    Q.  Mr. Shapiro, this document says clearly it is a irrevocable

10   stock or bond transfer to Bonwick Capital Partners and it is

11   dated May 28th, 2015, correct?

12   A.  Correct.

13   Q.  Now, this transfer of bond power this was for, your

14   understanding, for the Wakpamni bond?

15   A.  No, I did not say that.

16   Q.  Okay.  So --

17   A.  This is a $5 million bond with a QSIP on it.  It doesn't

18   have any reference to a name of a bond.

19   Q.  But it was your understanding that Mr. Cooney did own a

20   $5 million?

21   A.  It was my understanding that he owned a $5 million bond,

22   yes.

23   Q.  And this was signed on May 28th, 2015, correct?

24   A.  Correct.

25   Q.  And that was after he had obtained the $100,000 line of

I6B5gal2                    Shapiro – cross

1    credit?

2    A.  Correct.

3    Q.  This was before he signed the promissory note for the

4    $1.2 million loan?

5    A.  Correct.

6    Q.  Now, you said that, in your understanding, the effect of a

7    medallion guarantee is like a notary?

8    A.  It is simply guaranteeing his signature, correct.

9    Q.  And it is actually required, in most instances, in order

10   for there to be a transfer of bond power?

11   A.  That would be correct.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

I6B7GAL3                          Shapiro - Cross

1    Q.  And since you were Mr. Cooney's own personal banker, it was

2    not unusual for his business manager to call upon you to

3    provide this kind of service?

4    A.  That's correct.

5    Q.  Did people typically call you up off the street and say,

6    oh, can you provide a medallion guarantee?

7              MS. MERMELSTEIN:  Objection.

8              THE COURT:  Sustained.  You know what, we're just

9    going to take a one minute break now, and anyone who needs to

10   stand and stretch or use the restroom can do so.

11             Maybe we will make this our morning break after all,

12   so why don't we take five minutes instead.

13             (Recess)

14             MS. NOTARI:  Your Honor, may we approach?  I don't

15   want to say it in front of the witness.

16             THE COURT:  Yes, go ahead.

17             MS. MERMELSTEIN:  I don't think Mr. Schwartz is here.

18             THE COURT:  He is here.  We are just waiting for Mr.

19   Galanis.

20             (Continued on next page)

21

22

23

24

25

I6B7GAL3                        Shapiro - Cross

1              (At the side bar)

2              MS. NOTARI:  Your Honor, I think now that this witness

3    has testified about his trust with Matthew Fillman, allowing

4    these e-mails in as far as he is an agent of Mr. Cooney, that

5    this e-mail -- I should be able to get into evidence that he

6    told Mr. Cooney when he --

7              THE COURT:  Who is he?

8              MS. NOTARI:  I'm sorry, Matthew Fillman told

9    Mr. Cooney when he sent him the application, sure, I can work

10   something out, but you can take a minute and complete the

11   attached, big round numbers, not too detailed.  I mean it's

12   just --

13             THE COURT:  Why would this witness now about that?

14             MS. NOTARI:  It's not that this witness would know

15   that.  I think the document should be admissible.

16             THE COURT:  But what's the evidentiary basis for

17   getting the document in?

18             MS. NOTARI:  That it's --

19             THE COURT:  Do you want to be heard on this?

20             MS. MERMELSTEIN:  I think a couple things.  One, this

21   witness is not on this e-mail.  There is zero indication that

22   he has ever seen or knows about it, and so this is not an issue

23   for him now.

24             THE COURT:  Do you want to listen to this?  Go ahead.

25             MS. MERMELSTEIN:  I think as a preliminary matter this

I6B7GAL3                    Shapiro - Cross

1    is not an e-mail that this witness is on; there is no

2    indication that he knew anything about it.  The fact that

3    Mr. Fillman was Mr. Cooney's agent doesn't mean that Mr.

4    Shapiro knew about all of Mr. Fillman and Mr. Cooney's

5    communications.

6           And so we have been following a procedure in this

7    trial throughout where you can't put into evidence anything

8    that the witness is not on on the cross-examination of that

9    witness.

10          Ms. Notari thinks there is a basis to admit this

11   e-mail in the defense case.  We certainly are not going to

12   dispute that it's an authentic e-mail, but it cannot come in

13   now, and it's not appropriate to ask this witness anything

14   about it.

15          THE COURT:  That's why I asked you initially, why is

16   it you think this witness knows anything about this?

17          MS. NOTARI:  Well, it's not that this witness.  It's

18   just that the document should come in, the e-mail should come

19   in.

20          THE COURT:  So then we will talk about it in the

21   defense case.

22          MR. SCHWARTZ:  I just want to say I don't care about

23   this document, but I've made this point a few times.

24          When an exhibit properly comes into evidence there are

25   some occasions where it's just not appropriate and it's

I6B7GAL3                          Shapiro - Cross

1    misleading for a witness to testify about an entire course of

2    dealings, and simply because they weren't on a communication,

3    for that communication to be excluded until two weeks later in

4    the defense case.

5              Sometimes -- I don't know if this is such a time -- I

6    have no opinion on this -- but I think there may be other times

7    that are coming up in the next day or two where it's just

8    absolutely critical that an exhibit that everyone agrees should

9    come into evidence needs to come in to complete the story.

10             THE COURT:  Well, if everyone agrees that the exhibit

11   should come into evidence, I agree with you.

12             MS. MERMELSTEIN:  Wait, wait, because I very strongly

13   disagree with that.  This has been an ongoing effort by the

14   defense to cut off the government case and force the government

15   to put on a case the way they want.  That's not how trials go.

16   It is of course always the case that evidence comes in in bits

17   and pieces.  I would love to have the jury hear it in a

18   coherent narrative where we put on one witness for five minutes

19   and then a different witness.  We don't do that.

20             THE COURT:  No, my point was that if there are

21   exhibits that you stipulated to the admissibility of those

22   exhibits, and you have somebody who is testifying, and you want

23   to ask them a question about that exhibit on cross-examination,

24   it should be proper to do that if there is a stipulation, the

25   exhibit is in evidence, right, to ask that person about that

I6B7GAL3                    Shapiro - Cross

1    exhibit.  This witness we have no reason to believe knows

2    anything about this exhibit.

3          MR. SCHWARTZ:  Nobody is talking about wasting

4    people's time.

5          MS. MERMELSEIN:  But what Mr. Schwartz said as a

6    general principle where something is a real document, he should

7    be able to show it to someone who is not on it as a way to try

8    and indicate to the jury in the middle of the government's case

9    that he thinks they're missing something.  That's wrong.  If

10   the witness is on, and you want to ask a witness about it, of

11   course they can be asked on cross.

12         THE COURT:  Well, that's what I'm talking about.  I'm

13   talking about if it's proper to ask a witness, but you have no

14   reason to believe this witness --

15         MS. NOTARI:  I do.  I do.  My point is that he is

16   going to -- he has already said crappy loans are us, and that

17   in the end we're going to get to the point where relations

18   broke down and that he was upset with Matthew Fillman for his

19   shoddy work on this.  He trusted Matthew Fillman.  And this

20   is -- he should be able to look at this and say, you know, is

21   this acceptable?  Is this acceptable that you relied on a

22   financial statement -- his business manager ultimately relied

23   on a financial statement which now the government is arguing,

24   you know, is the reason Mr. Cooney should be convicted in a

25   federal trial.  He should be able to look at this and say, you

I6B7GAL3                        Shapiro - Cross

1  know, in his course of practice if this is an acceptable line

2  of communication to a client.  Did he sanction this?  Is this

3  something that he would sanction, this comment?  I think that's

4  acceptable.

5            MS. MERMELSTEIN:  I disagree.  He did not know about

6  this communication.  It's not for him to opine on the

7  acceptability of communications between business managers and

8  their clients.

9            And let's be clear, what Ms. Notari is trying to say

10  is Mr. Cooney was sort of misled into thinking he didn't have

11  to disclose everything because he was told to use round

12  numbers.  He didn't disclose a $5 million loan; it's not

13  relevant.

14            MS. NOTARI:  He did disclose a $5 million loan.  This

15  is the financial statement in regards to the $100,000 line of

16  credit.

17            THE COURT:  I don't think this is a proper witness.  I

18  mean do you want to call Mr. Fillman?  You can do that.

19            MS. MERMELSEIN:  Your Honor, can I say one other thing

20  while we are at sidebar, which is Ms. Notari has tread very

21  close to the line, and I have been trying not to object.

22            THE COURT:  I know, and I did not -- I should have

23  known that that was coming on that one objection, and I didn't

24  see it.

25            When you're getting into Code Rebel, you should be

1  careful.

2          Go on.

3          MS. MERMELSTEIN:  Nothing.  I don't want to draw

4  attention to it.  We're trying to honor your Honor's ruling.

5  But getting into Code Rebel, and even into Flikmedia, which was

6  another one of these same things, is treading very closely to

7  the line of falsely suggesting to the jury something that's not

8  true.  And we're trying to navigate this carefully, but I just

9  want to say that I don't want to surprise anyone, I think Ms.

10  Notari should be very careful here, because we're getting too

11  close to the line.

12          MS. NOTARI:  The only other thing I'm going to say

13  about Code Rebel is it's nothing to do with Code Rebel.  It's

14  just after the fact when there was the resettlement, part of it

15  was he assigned his bond power to City National Bank so that

16  they could liquidate this stock.

17          MS. MERMELSTEIN:  No, he didn't.

18          MS. NOTARI:  He did.

19          MS. MERMELSEIN:  No, he refused to sign over the Code

20  Rebel shares --

21          MS. NOTARI:  No, he did.

22          MS. MERMELSEIN:  -- and instead he transferred the

23  shares out of City National.

24          MS. NOTARI:  He signed -- there was a meeting, and he

25  signed over his bond power.

I6B7GAL3                        Shapiro - Cross

1            MS. MERMELSTEIN:  No, there was a meeting in which he

2    said he would do it and then he refused to sign it.

3            Look, you can ask those questions if you want.  I

4    don't think they're actually relevant to this, but that's fine.

5    I don't think it triggers a Code Rebel pump and dump problem to

6    talk about the transfer of the shares, so that's fine.

7            THE COURT:  All right.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   (In open court)

2      STEVEN SHAPIRO, resumed.

3      CROSS-EXAMINATION (Continued)

4      BY MS. NOTARI:

5      Q.  Welcome back, Mr. Shapiro.  Where we left off, we were

6      talking about Mr. Cooney, about May 20, 2015, Matthew Fillman

7      contacted you to see if he could secure a $1.2 million bridge

8      loan on behalf of Mr. Cooney; is that correct?

9      A.  Correct.

10     Q.  And this was approximately four months after Mr. Cooney had

11     already obtained a $100,000 line of credit?

12     A.  Correct.

13     Q.  And the basis of that loan was because he had a stock and

14     it increased in value, correct?

15     A.  The basis of our grant --

16     Q.  Let's focus on what was previously admitted into evidence

17     as Government Exhibit 411.

18     A.  OK.

19     Q.  Now, if we start --

20                 MS. MERMELSTEIN:  Your Honor, sorry.  Can we approach?

21                 THE COURT:  Yes.

22                 MS. MERMELSTEIN:  And can we take that down, please.

23                 THE COURT:  Sure.

24                 (Continued on next page)

25

I6B7GAL3                         Shapiro - Cross

1          (At the sidebar)

2          MS. MERMELSTEIN:  Ms. Notari I think is about to ask

3    this witness about a portion of an e-mail that I very

4    explicitly skipped in asking questions.  I frankly hadn't

5    realized that line was in there until it was up, and so I moved

6    on.  It says that the stock price was -- I can't remember

7    exactly the language, but sort of, you know, the IPO was five,

8    and it's now trading at three to five times that.  I think

9    we've all strenuously tried to avoid that issue.  Ms. Notari

10   has already talked about, I think her first question was

11   increased in price.

12         MS. NOTARI:  All right.  I'm just going to go -- first

13   of all, the document is in evidence, isn't it?  Didn't you move

14   it into evidence?

15         MS. MERMELSTEIN:  Yes, but I think there is a

16   difference.  As we've all agreed, there is evidence in the RSB

17   statements.

18         THE COURT:  Can you redact that reference?

19         MS. MERMELSEIN:  We can, yes.

20         MR. SCHWARTZ:  Throughout the exhibits the government

21   introduced -- I'm not faulting them -- but there are references

22   to the stock going up, going down, this stock was more than

23   enough to pay because of the loan to value.

24         MS. NOTARI:  I'm not going to talk about that.  I just

25   want to focus on what is not in the e-mail.  I just want to --

I6B7GAL3                          Shapiro - Cross

1          THE COURT:  Can you do that without showing it to the

2     jury right now?

3          MS. NOTARI:  Sure.  So I'm not even going to go

4     over -- I mean this is really kind of a dance, let me tell you.

5     It's a dance.

6          THE COURT:  I know.  Look, if you want it could come

7     in, that's fine too, right?

8          MS. NOTARI:  I don't even want to call it Code Rebel.

9     I'm just trying to just get through this and do my dance.

10          THE COURT:  Just do it carefully.  So we will redact

11     that line anyway.

12          MS. MERMELSTEIN:  Yeah.  And we can talk.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I6B7GAL3                         Shapiro - Cross

BY MS. NOTARI:

Q.   This is an e-mail thread regarding May 20, 2015 and Matthew
Fillman is on this e-mail.

A.   Correct.

Q.   And it's only you and Matthew Fillman.

A.   Correct.

Q.   And there is discussion about -- this is the crappy loans
are us e-mail, and you subsequently ask Mr. Fillman what is the
basics of said exciting loan request.

A.   Correct.

Q.   And I take it you guys are friends, and this is sort of an
informal way that you kind of banter on your e-mails.

A.   Correct.

Q.   It's not unusual -- did you have a personal relationship
outside of work?

A.   Mr. Fillman has been a friend for many, many years.

Q.   Yes, so it wasn't uncommon for you to joke around on
e-mails, correct?

A.   Not uncommon.

Q.   I take it he doesn't really believe that you provide crappy
loans.

A.   He knows that it has to be a sound loan, otherwise we're
not doing it.

Q.   OK.   On this particular e-mail you're discussing the basis
for the loan request, and he sets forth what he thinks are his

I6B7GAL3                              Shapiro - Cross

1    reasons regarding the stock, and there is nothing in that

2    e-mail about the WLCC bonds, correct?

3    A.   That is correct.

4    Q.   And there is no mention in this whole e-mail thread about

5    the bonds, correct?

6    A.   That is correct.

7    Q.   OK.   Now, at some point you e-mailed Mr. Fillman, or you

8    communicated with him that you were prepared to offer

9    Mr. Cooney a $1.2 million loan, and I just want to talk about

10   the terms of that loan.

11           Now, this was a six month loan that commenced in

12   January -- in June of 2015, and it expired in January of 2016,

13   correct?

14   A.   Correct.

15   Q.   And it's fair to say that -- is this unusual for a loan to

16   be in this amount, $1.2 million, for such a short period of

17   time?

18   A.   No, you characterized it properly in your prior statement

19   where you called it a bridge loan.   It's a short term loan

20   bridging the timing of one event to another event.

21   Q.   And it's fair to say that the purpose of the loan, as you

22   understood it, was to help Mr. Cooney pay for personal expenses

23   and tax obligations, correct?

24   A.   That is correct.

25   Q.   And the reason why there was a six month restriction was

I6B7GAL3                       Shapiro - Cross

1    specifically because there was a six month restriction on the

2    stock that was expected to be lifted, and at the time that it

3    was lifted Mr. Cooney would be able to sell his stock and pay

4    off his CNB loan, correct?

5    A.   Correct.

6    Q.   And the hope was that he would not only pay off the $1.2

7    million loan but that he would pay off his previous loan,

8    correct?

9    A.   No.   The $1.2 million loan, $190,000 of those proceeds were

10   to pay off his prior two loans so all he had left was the $1.2

11   million loan.

12   Q.   And it's fair to say that based on Mr. Cooney -- this was a

13   restricted stock.   As far as you know, Mr. Cooney's previous

14   loan in 2012, was that also -- did that also involve a

15   restricted stock?

16             MS. MERMELSTEIN:   Objection.

17             THE COURT:   I will allow that.

18   A.   Not as far as I know.   It was an unsecured $200,000 loan

19   that he had from years before, and his $100,000 loan had no

20   condition of a restriction being lifted; it was a personal line

21   of credit.

22   Q.   Now, I take it that in terms of your assessing whether you

23   were going to give Mr. Cooney this loan, we talked about before

24   that you made certain requests from Matthew Fillman, including

25   you asked for his W-2s, you asked for tax returns.   Is that

I6B7GAL3                        Shapiro - Cross

1   typical?

2   A.  Yes, it is.

3   Q.  And you did that in this case.

4   A.  Yes.

5   Q.  And just to refresh your recollection, just for the

6   witness, Government Exhibit 420?

7   A.  420 is not in my book.

8   Q.  We're trying to get it for you.

9   A.  OK.

10  Q.  Is there a second page on that?

11          MS. NOTARI:  Your Honor, if I could have just one

12  moment.

13          THE COURT:  Sure.

14          MS. NOTARI:  We're going to get back to this.

15  Q.  And again, Mr. Cooney, do you recall what his credit rating

16  was?

17  A.  I do not recall.

18  Q.  But it's fair to say that he had good credit?

19  A.  My recollection is that he had good credit, correct.

20  Q.  And as far as the terms of the loan, you did not take

21  possession of Mr. Cooney's stock certificate?

22  A.  I did not.

23  Q.  But he was required to deposit the stock certificate in a

24  City National Securities account?

25  A.  No, that was at his discretion.

I6B7GAL3                    Shapiro - Cross

1   Q.   That was at his discretion?

2   A.   Initially when we granted the loan there was no requirement

3   that he deposit those stocks with City National Securities.  In

4   fact City National Securities at that point couldn't take them

5   because of the restriction on the stock.

6   Q.   OK.  Now it's fair to say that you viewed -- you testified

7   previously that this was what you would consider a risky loan.

8   A.   There were elements of risk to this transaction.  I would

9   not have done it if it were a risky loan, but there weren't the

10  normal underwriting criteria to this loan.  It wasn't a person

11  that had predictable cash flow to be able to repay a loan of

12  this size, and therefore we were 100 percent reliant on either

13  the liquidation of the stock or the liquidation of the bond.

14  Q.   And is it fair to say that if Mr. Cooney was just the

15  average person who walked off the street without his

16  long-standing reputation and knowing Fulton & Meyer, that you

17  probably would not have agreed to this loan?

18              MS. MERMELSTEIN:  Objection.

19              THE COURT:  Sustained.

20  Q.   It's fair to say that all of the factors, as far as you

21  considered -- Mr. Cooney's credit rating, his long-standing

22  relationship with City National Bank, the fact that he had

23  previously made good on his loans -- and your relationship with

24  Fulton & Meyer, were all factors you considered in granting

25  this loan?

I6B7GAL3                      Shapiro - Cross

1    A.  Those were some of the factors, correct.

2    Q.  Now, I'd like to focus on Government Exhibit 414.

3         Now, this was the actual promissory note that

4    Mr. Cooney signed, and he signed this on June 24, 2015,

5    correct?

6    A.  I'm not sure if he signed it that date.  That's the date

7    that the loan documents were dated, but he did not put a date

8    on any of these documents.

9    Q.  OK.  And again this document, you forwarded the promissory

10   note to Mr. Cooney, and it was forwarded to him by Matthew

11   Fillman, and Fulton & Meyer was involved in this process, and

12   ultimately he was brought in to sign the note, correct?

13   A.  I don't know if he was brought in to sign the note.  Our

14   typical protocol would be to send this information to Fulton &

15   Meyer, and Fulton & Meyer would obtain the signatures of their

16   clients.

17   Q.  Now, you previously we went to page 2.  If you could just

18   go to the section where it says financial statement

19   certification.

20   A.  Yes.

21   Q.  Now, this particular promissory note was based on the

22   financial statement that was filed in January of 2015 with

23   regard to the $100,000 line of credit, correct?

24   A.  That is correct.

25   Q.  So in January 2015 there was $100,000 line of credit, and

I6B7GAL3                         Shapiro - Cross

1    there was a personal statement that was filed in connection

2    with that, correct?

3    A.  Correct.

4    Q.  And with regard to this particular promissory note, you did

5    not ask Mr. Cooney to prepare or sign another financial

6    statement.

7    A.  No, we were relying on the one from January.

8    Q.  So now when you say you relied, you, Matthew Fillman, that

9    decision was made by Mr. Cooney's representative and you,

10   correct?

11              MS. MERMELSTEIN:  Objection.

12              THE COURT:  Sustained.

13   Q.  Who made that decision?

14              MS. MERMELSTEIN:  Objection.

15              THE COURT:  Sustained.

16   Q.  It's fair to say that you could have asked Mr. Cooney to

17   prepare a new financial statement, correct?

18              MS. MERMELSTEIN:  Objection.

19              THE COURT:  That I will allow.

20   A.  It is our normal protocol to accept personal financial

21   statements --

22   Q.  Sorry.  I can't hear you.

23   A.  It is our normal protocol to accept personal financial

24   statements that are dated within six months of the new loan

25   request.

I6B7GAL3                          Shapiro - Cross

1   Q.  Now, this financial statement specifically says that there

2   has been no material adverse change occurred in borrower's

3   financial condition since that date.  Is that correct?

4   A.  That is correct.

5   Q.  And it's fair to say that if someone is suddenly in a

6   position where they're owning stock that is valued at $12

7   million, that that is a material change in their financial

8   circumstances?

9            MS. MERMELSTEIN:  Objection.

10            THE COURT:  Sustained.

11   Q.  At no time did you make any attempt to have Mr. Cooney file

12   a new statement, correct?

13   A.  I did not ask for a new statement, correct.

14            MS. NOTARI:  Your Honor, if I could just --

15            THE COURT:  Yes.

16   Q.  Now, Mr. Cooney's loan on the $1.2 million matured on

17   January 1, 2016?

18   A.  Correct.

19   Q.  And as far as you know, during the time that the loan was

20   current, Mr. Cooney was servicing the loan?

21   A.  He was making the interest payments monthly, correct.

22   Q.  And at some point in early of 2016 you contacted Fulton

23   Management at this time, and there was discussion about the

24   fact that the loan was in delinquent status, correct?

25   A.  Correct.

I6B7GAL3                         Shapiro - Cross

1    Q.  And initially you dealt almost exclusively with

2    Mr. Cooney's business manager at Fulton & Meyer regarding

3    repayment of the loan.

4    A.  Correct.

5    Q.  And it's fair to say that the majority of the discussions

6    and the ultimate meeting on February 23, 2016 were now with

7    Eric Fulton, correct?

8    A.  The majority of the discussions were with Matthew Fillman

9    and Eric Fulton.

10   Q.  So they were both involved.  And Eric Fulton participated

11   in the meeting.

12   A.  He did.

13   Q.  And is there any reason why Matthew Fillman did not

14   participate in that meeting?

15   A.  It was up to Eric Fulton.

16   Q.  There was an e-mail where Matthew Fillman --

17              MS. MERMELSTEIN:  Objection.

18              THE COURT:  Sustained.

19   Q.  Now, at some point you learned from Mr. Cooney's business

20   manager that he was having difficulty lifting the restriction

21   on the stock.

22   A.  Correct.

23   Q.  And it's fair to say that there was cordial discussion

24   about working out repayment of this loan.

25   A.  Initially there was cordial discussion, correct.

I6B7GAL3                        Shapiro - Cross

1     Q.  And you explained to Mr. Cooney and Eric Fulton that the

2     loan was being referred to special assets, correct?

3     A.  Correct.

4     Q.  It was not being referred to a collection agency.

5     A.  It was our internal department, special assets department.

6     Q.  And it was determined that the primary source of repayment

7     for the loan which was the stock was now less worth than what

8     Mr. Cooney owed.

9     A.  Correct.

10    Q.  The value of the stock had gone down.

11    A.  Correct.

12    Q.  And the restriction was still not lifted.

13    A.  Correct.

14    Q.  And it's fair to say that there were efforts on behalf of

15    yourself and Mr. Cooney to get the restriction lifted, correct?

16    A.  I'm aware of my efforts, correct.

17    Q.  Now, at some point Mr. Cooney -- you e-mailed Mr. Cooney

18    and Eric Fulton -- I'm sorry -- you e-mailed Eric Fulton and

19    you said that we really --

20              MS. MERMELSTEIN:  Objection.

21              THE COURT:  Why don't you rephrase the question.

22    Q.  At some point you discussed with Eric Fulton the fact that

23    you thought it would be helpful to have a personal meeting?

24    A.  Correct.

25    Q.  And in fact Mr. Cooney cooperated, and he came to your

I6B7GAL3                         Shapiro - Cross

1   office with Eric Fulton, correct?

2   A.   Correct.

3   Q.   And that was on February 23, 2016, correct?

4   A.   Correct.

5   Q.   And during that meeting your supervisor was also present?

6   A.   Correct.

7   Q.   And who else was present?

8   A.   Representative from our special assets department and a

9   gentleman by the name of Mel Rineking.

10  Q.   During that meeting there was discussion about how the

11  restriction on the stock, how you could effectively accomplish

12  that.

13  A.   It was our intention to have Mr. Cooney give the stock to

14  City National Bank and to do everything possible to assist with

15  the lifting of the restriction so that we could sell the shares

16  of stock for whatever value we could get to partially repay the

17  $1.2 million loan.

18  Q.   So the hope was that he would transfer power of -- his

19  power of the stock to you -- and you would be able to get the

20  restriction lifted and liquidate the stock.

21  A.   We could not lift the restriction on our own; we needed his

22  cooperation to assist with that.

23  Q.   And during that meeting he ultimately signed a document

24  which transferred power to you.

25  A.   I'm not aware of that particular document.  Do you have

1  that for me to review?

2  Q.  Well, if we could just review your -- at some point in the

3  past, in January -- you met with the government several times

4  to prepare for your testimony here?

5  A.  I spoke with them.  I didn't meet personally with them.

6  Q.  And one of your -- and all of your meetings were by video,

7  or conference, phone conference?

8  A.  Phone conference.  Only one was video.

9  Q.  OK.  And that first meeting was on June 16, 2016?

10  A.  Roughly.

11  Q.  OK.  If I could refer you to -- this is just for the

12  witness to refresh his recollection -- 3553-1, the second page.

13  I refer you to the third paragraph.  If you could just read

14  that paragraph.

15  A.  It's not up on my screen yet.

16          Is this the highlighted paragraph in question?

17  Q.  Yes.

18  A.  "Shapiro began direct communications" --

19          MS. MERMELSTEIN:  Objection to the reading of the

20  document.

21          THE COURT:  Yes, sustained.

22          You shouldn't read it.

23          Do you have a question?

24          MS. NOTARI:  Yes, I want to know if this refreshes his

25  recollection.

1       THE COURT:  Just read it to yourself.  You don't have

2   to read it out loud.

3       And the question is if it refreshes his recollection?

4       MS. NOTARI:  As to whether Mr. Cooney signed the

5   document --

6       THE COURT:  -- which transferred the power over; is

7   that correct?  Is that the question?

8       MS. NOTARI:  Yes, the transfer of power to City

9   National Bank.

10  A.  Yes, this refreshes my memory.  Thank you.

11  Q.  So can you please -- now let's go back for a moment.  You

12  said that there was a meeting with Fulton Management, Patricia

13  Wheeler and Mel Rineking at special assets at City National?

14  A.  Correct.

15  Q.  Are you talking there about the February 23, 2016 meeting?

16  A.  Yes, I am.

17  Q.  And in that meeting you spoke about how the restriction on

18  the stock could be lifted, correct?

19  A.  Correct.

20  Q.  And there was a document prepared in that meeting which

21  Mr. Cooney signed.

22  A.  My recollection is that he signed a similar irrevocable

23  stock or bond power that would transfer the ability to sell

24  that stock to City National Bank.

25  Q.  So Mr. Cooney actually in fact did cooperate and sign that

I6B7GAL3                    Shapiro – Cross

1    document.

2    A.  My recollection is yes.

3    Q.  Now, it's fair to say that this meeting with the parties

4    you've described was not recorded, correct?

5    A.  Correct.

6    Q.  And there were no videos -- no video recording, no audio

7    recordings, there was no tape?

8    A.  Correct.

9    Q.  And no notes were taken at this meeting?

10   A.  Not as far as I can find out.

11   Q.  And your supervisor Patricia Wheeler was present?

12   A.  She was.

13   Q.  And it's fair to say at this point feelings were cordial

14   but there was some agitation on your part that the loan had

15   failed -- the loan was in delinquent status.

16   A.  I would say that once he revealed that he didn't own the

17   bonds, the discussion was no longer cordial.

18   Q.  OK.  Now, when you say he said he didn't own the bonds, it

19   became clear that the source -- the bonds were no longer

20   available as a source of repayment.

21   A.  That is correct, and it was at that meeting that was the

22   first that we learned of that.

23   Q.  That was the first you learned about it, but in fact you

24   did medallion guarantee his bonds to transfer them to Bonwick

25   Capital back on May 28, 2016, correct?

I6B7GAL3                          Shapiro - Cross

1    A.  As I previously testified, I guaranteed his signature via

2    medallion guarantee stamp with a CUSIP number and a $5 million

3    amount listed.  I had no recollection, knowledge, whatsoever

4    that these particular bonds that he had committed to sell

5    should he have a problem selling Code Rebel stock.

6    Q.  Now, it's fair to say that there was no legal requirement

7    that you had to medallion guarantee Mr. Cooney's bonds,

8    correct?

9                MS. MERMELSTEIN:  Objection.

10               THE COURT:  Sustained.

11   Q.  It's fair to say that Mr. Cooney could have gone to someone

12   else to have -- if he were trying to hide the fact that he was

13   transferring his bonds, he could have gone to a different bank

14   to get the medallion guarantee, correct?

15               MS. MERMELSTEIN:  Objection.

16               THE COURT:  Sustained.

17   Q.  Medallion guarantee, it's a notarizing type of process,

18   correct?

19   A.  Correct.

20   Q.  And any -- what are the qualifications to provide that

21   service?

22   A.  For a medallion guarantee, typically it is a bank that's a

23   member of the New York Stock Exchange or a bank based in New

24   York that's able to offer a medallion guarantee, and there are

25   certain requirements for banks to be able to issue such a

I6B7GAL3                      Shapiro - Cross

1    guarantee on marketable securities documents.

2    Q.  Now, it's fair to say that you, Mr. Cooney and Fulton

3    Management attempted to renegotiate an agreement for him to

4    repay his loan.

5    A.  That is correct.

6    Q.  And as part of that process there were many phone calls and

7    e-mails going back and forth?

8    A.  That is correct.

9    Q.  And there were certain things that Mr. Cooney was asked to

10   provide in the way of documentation?

11   A.  That was after the February 23rd meeting, not prior to

12   that.  Initially the conversations, once the loan matured, we

13   saw one e-mail earlier today that asked for a 90 day extension

14   of that.  There were other e-mails that said that if he can pay

15   down a significant amount of approximately $500,000 then we can

16   look at extending another 90 days.  But the significant down

17   payments were met with resistance, to the best of my

18   recollection, and Mr. Cooney was insistent that we just convert

19   the $1.2 million to a five year repayment plan, and that was

20   something we rejected outright.

21   Q.  Well, Mr. Cooney was afraid that if he gave you the power

22   to liquidate his stock, that you would sell it at a lower

23   price.

24            MS. MERMELSTEIN:  Objection.

25            THE COURT:  Sustained.

I6B7GAL3                        Shapiro - Cross

1   Q.  Now, you previously referred to Government Exhibit 408 --

2   I'm sorry -- 418.

3   A.  418 is not -- oh, I'm sorry, here it is.  Got it.  I've got

4   it.  I've got it.

5   Q.  Do you have it in front of you?

6   A.  I do.

7   Q.  OK.  This is an e-mail conversation with you and Matthew

8   Fillman in January of 2016 regarding -- the subject title of

9   the e-mail is call "matured loan"?

10  A.  Yes.

11  Q.  And in that discussion again it's talking about a possible

12  strategy to repay the loan, correct?

13  A.  Correct.

14  Q.  And nowhere -- and this was -- Mr. Cooney was not on this

15  thread.  This was Matthew Fillman acting as his broker,

16  correct?

17  A.  Acting as his authorized agent, correct.

18  Q.  And it's fair to say there were many e-mails going back and

19  forth about different ideas about how to repay the loan.

20  A.  Correct.

21  Q.  And one of those ideas was that Mr. Cooney was hopeful that

22  he could restructure the loan over a five year period.

23  A.  Correct.

24  Q.  And that was not acceptable to you.

25  A.  Not without a principal reduction, correct.

I6B7GAL3                         Shapiro - Cross

1    Q.  OK.  So if we refer to Government Exhibit 419, this is on

2    February 9.  Do you have that in front of you?

3    A.  I do.

4    Q.  This is another e-mail between you and Matthew Fillman, and

5    it's almost one month later, February 9, 2016, correct?

6    A.  February 9, 2016, correct.

7    Q.  So this is almost a month after the previous e-mail that we

8    just talked about, and in this e-mail you're still trying to

9    figure out a plan, correct?

10   A.  This particular e-mail is dealing with the bond.

11   Q.  Right.  And the question is asked, you know, about the

12   bond, and you're informed that the bond is in a different

13   place.

14   A.  Correct.

15   Q.  And you knew it was in a different place because you signed

16   the medallion guarantee several months earlier.

17   A.  Once again, I did not know that we were talking about this

18   particular bond.  We have a whole lot of months going by here

19   where nobody told me the bond is not there anymore.

20   Q.  The bond was simply in a different place, correct?

21   A.  The bond is in a different place.

22   Q.  And it was not available to repay the loan, correct?

23   A.  I didn't learn that until February 23, 2016.

24   Q.  OK.  But all of your discussions in February of 2016 were

25   figuring out strategies to repay the loan, correct?

I6B7GAL3                          Shapiro - Cross

1    A.  Correct.

2    Q.  And so you were trying to assess whatever assets Mr. Cooney

3    had to repay the loan.

4    A.  Correct.

5    Q.  And your goal was to work with Mr. Cooney and to serve the

6    interests of City National Bank towards repaying the loan.

7    A.  That is correct.

8    Q.  And the inquiry as far as the bond was just a question as

9    far as whether it was available to repay the loan, correct?

10   A.  Correct.  Can I add something?

11   Q.  No.

12   A.  If I may.  No?

13   Q.  Unfortunately I'm asking the questions.

14   A.  All right.

15           If I could have just one moment.

16           THE COURT:  Sure.

17   Q.  Now, if we could just focus on Government Exhibit 423.  You

18   said that at some point during the time when you were trying to

19   figure out a repayment of the loan you e-mailed Matthew Fillman

20   another financial statement.  Correct?

21   A.  I asked him to complete a new personal financial statement,

22   correct.

23   Q.  And this time actually a new financial statement was

24   generated, correct?

25   A.  Correct.

I6B7GAL3                       Shapiro - Cross

1   Q.  And this March 2016 financial statement was after the

2   $100,000 line of credit, and it was after the $1.2 million

3   loan, correct?

4   A.  This is after our meeting with Mr. Cooney in February of

5   2016, well after all of those other events.

6   Q.  So at this point the purpose of the financial statement was

7   more toward figuring out what assets he had and what loans and

8   the liabilities in terms of repayment of the loan, correct?

9   A.  Right.

10             MS. MERMELSTEIN:  Object to the form.

11             THE COURT:  Why don't you rephrase the question,

12   please.

13   Q.  At this point the personal financial statement that was

14   provided to you was more about -- it was about repayment of the

15   loan.

16   A.  It was used to determine what assets and liabilities

17   Mr. Cooney had that would be used or could be used for

18   repayment of the loan.

19   Q.  And in this -- if we could go to Government Exhibit 423.

20             Now, you said earlier that it was your understanding

21   that the first portion -- the latter portion of this document,

22   the last two pages which are entitled balance sheet, were

23   prepared by Fulton & Meyer, correct?

24   A.  Correct.

25   Q.  And this statement is a statement of as of February 28,

I6B7GAL3                          Shapiro - Cross

1   2016 Mr. Cooney's assets, correct?

2   A.   Assets and liabilities, correct.

3   Q.   Now in fact City National Bank was where Mr. Cooney had his

4   business account, correct?

5   A.   Can you refresh my memory.

6   Q.   His business checking and savings account all came out of a

7   City National account?

8   A.   Yes.  I don't know whether it was a business account or

9   personal account.

10  Q.   So you were able to verify a lot of the different entries

11  on this chart, correct?

12  A.   On the balance sheet that's listed, that was prepared by

13  Fulton & Meyer, there is one account listed for CNB with

14  $7,709, and the only other that I would be able to verify for

15  City National Bank would be on the last page under long-term

16  liabilities the City National Bank loan of $1.2 million.  I

17  would not have had any other way to verify the rest of the

18  information.

19  Q.   But at no time did you ask for further documentation from

20  Fulton & Meyer, correct -- Fulton Management?

21  A.   I didn't.  And let me restate one thing I just said.  Under

22  other current assets of CNB MGR-200234 with a value of $666,000

23  and some change, that is the Code Rebel stock that we were

24  trying to liquidate.

25  Q.   OK.  You relied upon Fulton Management as far as preparing

1   this document in terms of its reliability?

2   A.  I relied on them, and I also relied on the fact that

3   Mr. Cooney signed the personal financial statement putting "see

4   attached" that he would have also agreed with the information

5   provided.

6   Q.  Now on the second sheet we have the liabilities listed,

7   correct?

8   A.  Correct.

9   Q.  And under one of the liabilities is in fact a loan to

10  Thorsdale, correct?

11  A.  Correct.

12  Q.  Did you ask for documentation of that loan?

13  A.  No, this was a result of our February 23rd meeting.

14  Q.  So Mr. Cooney in fact disclosed that the bonds were an

15  asset and that in fact there was a liability of a loan on the

16  bonds, correct?

17  A.  That he presented it in March of 2016, correct.

18  Q.  And prior to March of 2016 -- you said prior to 2016 you

19  had limited contact with Mr. Cooney.  You spoke with his

20  business managers, correct?

21  A.  That is correct.

22  Q.  Now, according to this balance sheet his assets are

23  approximately $7,973,589.78, correct?

24  A.  Correct.

25  Q.  And his liabilities are actually about the same.

I6B7GAL3                         Shapiro - Cross

1    A.  Correct.

2    Q.  So it's fair to say that at that point in time Mr. Cooney

3    was in a difficult place to pay back a $1.2 million loan?

4    A.  His total equity listed was $810,000.

5    Q.  And at some point in October of 2016 Mr. Cooney actually

6    did renegotiate the terms of his loan.  Are you aware of that?

7    A.  I'm aware that there was a forebearance agreement that was

8    agreed to which required a $75,000 down payment and monthly

9    payments of about $6,000 each, and he made a couple of those

10   payments and then stopped.

11   Q.  And Mr. Cooney actually in good faith made -- the agreement

12   required --

13               THE COURT:  Sustained.  Rephrase that, please.

14   Q.  Mr. Cooney -- the terms of the agreement were that

15   Mr. Cooney had to pay $75,000 before October 14, 2016, correct?

16   A.  That's my recollection, correct.

17   Q.  And that would bring down the balance of the loan from $1.2

18   million to $1.125 million, correct?

19   A.  Plus interest and fees, correct.

20   Q.  And Mr. Cooney made that payment.

21   A.  He did.

22   Q.  And then the additional requirements were that he make

23   monthly payments of $6,996.38 each month beginning November

24   2016 and including September 1, 2021.

25   A.  That is correct.

I6B7GAL3                        Shapiro - cross

1   Q.  And Mr. Cooney made two payments on that plan.

2   A.  That is correct.

3   Q.  So Mr. Cooney actually paid $90,000 towards repaying the

4   loan.

5   A.  $12,000 plus $75,000.  $87,000 or so.

6   Q.  So?

7   A.  That's correct, about 90 is correct.

8   Q.  So at some point Mr. Cooney filed for bankruptcy, correct?

9   A.  That's my understanding.

10          MS. MERMELSTEIN:  Objection, your Honor.

11          THE COURT:  Sustained.

12          MS. NOTARI:  If I could just have a moment.

13          Your Honor, I have no further questions.

14          THE COURT:  OK.

15          MS. NOTARI:  No further questions.

16          THE COURT:  No more questions?

17          MS. NOTARI:  No more.

18          THE COURT:  OK, thanks.  Any additional

19   cross-examination?

20          MR. TOUGER:  Not from me, your Honor.

21          THE COURT:  All right.

22   CROSS EXAMINATION

23   BY MS. HARRIS:

24   Q.  Good afternoon, Mr. Shapiro.  My name is Laura Harris, and

25   I represent Devon Archer.  Just so the record is clear, can I

I6B7GAL3                         Shapiro - Redirect

1    ask you to confirm that you have never met Mr. Archer or

2    communicated with him in any, shape or form?

3    A.   Not aware of having met him, correct.

4           MS. HARRIS:   No further questions.   Thank you.

5           THE COURT:   Redirect.

6           MS. MERMELSTEIN:   Thank you, your Honor.

7    REDIRECT EXAMINATION

8    BY MS. MERMELSTEIN:

9    Q.   Good afternoon.   Just to clarify a few points.   So we've

10   talked this morning about the $100,000 loan obtained in

11   February of 2015 and then the $1.2 million loan in the spring

12   of 2015.   Do I have that right?

13   A.   Correct.

14   Q.   With respect to the $100,000, at the time that City

15   National made that loan, did Mr. Cooney own the Code Rebel

16   shares that we've discussed?   Did he own them yet at that point

17   in time?

18   A.   I'm not overly familiar.   He listed $2 million on his

19   personal financial statement, but he didn't detail whether it

20   was Code Rebel or a different stock.

21   Q.   And are you familiar with -- I think Ms. Notari showed you

22   a document that indicated that that was a stock called

23   Flikmedia?

24   A.   I don't have a recollection of that.

25           (Continued on next page)

I6B5gal4                        Shapiro - recross

1   BY MS. MERMELSTEIN:

2   Q.   With respect to the $1.2 million loan, that had a primary

3   or secondary source of the assets that you relied on in making

4   the loan; is that right?

5   A.   That is correct.

6   Q.   And what were the primary and secondary sources?

7   A.   Liquidation of the Code Rebel stock was the primary

8   repayment source.  The liquidation of the muni bond was the

9   second repayment source.

10  Q.   Right there, when you say muni bond, is that the same thing

11  as the Wakpamni bond?

12  A.   Exactly.

13  Q.   Was the existence of the secondary source of repayment

14  important to City National Bank?

15  A.   It was.

16  Q.   And why is that?

17  A.   We, very rarely, will make a single source of repayment

18  loan, we always want a back door if something goes wrong.  So,

19  in typical case it would be a person says that here is my

20  income, my income is sufficient to make the payments on this,

21  but if something happens to my income I've got some assets that

22  I can liquidate to pay off the loan.  Primary is the income,

23  secondary is going to be the assets that they own.

24          In this case he did not have any kind of reliable

25  income or cash flow that we could count on, everything was

I6B5gal4                     Shapiro - recross

dependent on his ability to sell the stock and that the stock

retained sufficient value to pay off the $1.2 million loan but

we would not have done the loan if there weren't a backup

source.  We needed those Wakpamni bonds to act as the backup

that if something happened with the stock, he would sell the

bonds.

Q.  Now, you talked a little bit about whether or not these

assets were collateral and you have talked about how you relied

on their existence in issuing the loan.  Can you explain the

difference between those two things?

A.  Collateral gives the bank unilateral authority to liquidate

the securities in the case of a default, so if we physically

had possession of the stock, if we physically had possession of

the bonds, there would have been security agreements that would

have given us the right to redeem those or cash those in at our

discretion should they default on the loan.

          So, in this case we could not physically take those as

collateral.  They were all reliant on their words and their

statements to let us know that their intention was to liquidate

the stocks or liquidate the bonds upon the maturity date or

before.

Q.  Can we pull up Government Exhibit 423, quickly, and go to

the liability section of the attachment?

          Just so it is clear, I think when it was not totally

clear on cross-examination, the loan to/from Thorsdale, because

I6B5gal4                              Shapiro - recross

1   it is in the liability section that's a loan from Thorsdale to

2   Mr. Cooney?

3   A.  That is correct.

4   Q.  Now, you were asked a little bit about whether or not

5   Mr. Cooney signed a document empowering City National to

6   liquidate his Code Rebel shares.  Ultimately Mr. Cooney refused

7   to allow City National to liquidate his shares, right?

8   A.  That is correct.

9   Q.  Ms. Notari asked you a number of questions about whether

10  you understand from medallioning the transfer document that the

11  Wakpamni bonds were being moved.  As a preliminary matter, can

12  you tell from a stock transfer form whether or not something is

13  being sold versus whether or not something is just being

14  transferred?

15  A.  Not at all.

16  Q.  If someone was selling the asset and $5 million of cash was

17  coming into their account, would that sort of put them in the

18  same financial position, from City National's perspective, in

19  terms of getting a loan?

20  A.  They would have had no need for a loan.

21  Q.  Fair enough.  But if they had wanted one would that have

22  mattered to you if it was cash versus the bond?

23  A.  It would have mattered whole lot.  We could have done

24  something secured with that cash and taken the cash as

25  collateral.

I6B5gal4                              Shapiro - recross

Q.  Now, with respect to your understanding at the time that
the $1.2 million loan was issued that Mr. Cooney owned and held
the Wakpamni bonds, let me ask Mr. Wissman, can we pull up on
the screen, side by side, just for Mr. Shapiro, the Court and
the parties, Government's Exhibits 439 and 440?

          Mr. Quigley, do you mind giving hard copies to
counsel?

          Do you recognize these two e-mails as e-mails from
your e-mail account?

A.  Yes, I do.

          MS. MERMELSTEIN:  The government offers Government's
Exhibits 439 and 440.

          MS. NOTARI:  Your Honor, I have not seen these and
I --

          THE COURT:  Okay.  Take a minute to look them over.

          MS. NOTARI:  Can we approach, your Honor?

          THE COURT:  Sure.

          (Continued next page)

1           (At side bar)

2           MS. NOTARI:  Do you have a copy of this.

3           MS. MERMELSTEIN:  Use mine.

4           MS. NOTARI:  First of all, I have never seen this

5   before and it is 404(b) evidence and it's just more of them

6   throwing mud on the walls.  What difference does it make?  It

7   is completely --

8           THE COURT:  First of all, as to disclosure?

9           MS. MERMELSTEIN:  These were first produced as Rule 16

10  discovery, your Honor.

11          MR. TOUGER:  Your Honor, may I make a suggestion?  Can

12  we have the jury go out and have the -- my client needs to go

13  to the restroom.

14          THE COURT:  Is this going to take a while?

15          MS. MERMELSTEIN:  I have three more questions.  This

16  is the witness whose wife is ill.

17          THE COURT:  He can go to the rest room if he needs to,

18  come right back.

19          MR. TOUGER:  Yes.

20          THE COURT:  So, this is produced Rule 16 discovery so

21  that's the disclosure point.

22          Go ahead.

23          MS. MERMELSTEIN:  It was not marked as an exhibit, we

24  didn't obviously offer it initially, but Ms. Notari has

25  suggested through cross-examination that Mr. Shapiro in fact

I6B5gal4                    Shapiro - recross

1    knew the bond had been transferred.  These may have other bases

2    for admissibility as well but they're his prior consistent

3    statements that he clearly did not know that the bond had been

4    transferred in February of 2016.

5             MS. NOTARI:  That's not so much of the problem.  The

6    problem is where he is talking about, *Matt has been doing*

7    *yeoman's work on this but we feel we are dealing with someone*

8    *acting less honorably, all of his speculation, he is in a tough*

9    *spot.*  This needs to be redacted.

10             MS. MERMELSTEIN:  That's fine.  I can ask him to read

11   it without publishing to the jury, your Honor, the portions

12   that are relevant and we can redact that part.

13             THE COURT:  So why don't you do that.

14             MR. SCHWARTZ:  I am looking, there is a lot of

15   description about the fluctuation.

16             THE COURT:  These aren't going to come in.

17             MS. MERMELSTEIN:  I won't offer them but I won't

18   publish them and I will say what I'm going to have him read.

19             MS. NOTARI:  What page?  Let me know.

20             MS. MERMELSTEIN:  I will do that right now.

21             So, on 439 I am going to have him read the February

22   2nd e-mail from Fillman to Cooney asking if anything has

23   progressed on the --

24             MR. SCHWARTZ:  But not the paragraph above that?

25             MS. MERMELSTEIN:  Just that line.  I will then have

I6B5gal4                        Shapiro - recross

1    him read again --

2              MS. NOTARI:  This right here?

3              MR. SCHWARTZ:  Here.

4              MS. MERMELSTEIN:  That nothing progressed on the bond

5    deal.

6              Then the next e-mail, *any update on the status of the*

7    *stock removal?  What about the bond deal?*  And then I will

8    elicit that sort of Cooney doesn't respond to any of these

9    e-mails, and I will do the one at the very top again asking

10   about the $500,000 coming in from the bond.

11             With respect to 440, I'm going to just have him read

12   the second paragraph where I left this is that Cooney is

13   raising $100,000 now out of the bond sale money in 90 days, and

14   paragraph no. 2, proof that the order to sell his muni bonds

15   has been made but I think some of this is nonetheless

16   admissible but we can fight about what to redact afterwards.

17             MR. SCHWARTZ:  I'm fine.

18             THE COURT:  I will allow that.

19             MS. MERMELSTEIN:  Thank you, your Honor.

20             MS. NOTARI:  This one and what else?

21             MS. MERMELSTEIN:  Where I left this, and no. 2.

22             THE COURT:  Go ahead.

23             MS. MERMELSTEIN:  Thank you.

24

25

1           (In open court)

2   BY MS. MERMELSTEIN:

3   Q.  So you were asked on cross-examination, Mr. Shapiro, a fair

4   amount about conversations following the default of a loan,

5   about strategies to repay the loan, right?

6   A.  Correct.

7   Q.  And in those conversations there was a fair amount of

8   discussion about the possibility of selling the Wakpamni bonds,

9   right?

10  A.  Correct.

11  Q.  It wasn't until that in-person meet, however, that

12  Mr. Cooney first admitted that he didn't have them, right?

13  A.  Correct.

14  Q.  So, let me direct your attention to Government Exhibit 439,

15  let's do that one first, please, Mr. Wissman.  We are going to

16  publish it for the witness, Court, and defense counsel, but the

17  government offers 439 and 440 subject to the agreements.

18           THE COURT:  They will be admitted, subject to those

19  redactions.

20           (Government's Exhibits 439 and 440 received in

21  evidence)

22  BY MS. MERMELSTEIN:

23  Q.  Starting with 439 with your attention on page 3 of that

24  e-mail to the February 2nd e-mail from Mr. Fillman to Bevan

25  Cooney and to Mr. Fulton, and let me ask you to read just the

I6B5gal4                        Shapiro - recross

1    one little, the couple of lines beginning:  Has anything

2    progressed?

3    A.  Has anything progressed on the bond deal?  Are we likely to

4    see any cash coming in if I can't get them to agree to nothing

5    now?

6    Q.  What do you understand this reference to the bond deal to

7    be?

8    A.  My understanding is that he was either trying to liquidate

9    the bond, sell part of the bond, get something that was going

10   to get a significant amount of cash.

11   Q.  And when we say bonds you mean the Wakpamni bonds?

12   A.  I do.

13   Q.  Let's go one e-mail up on that chain to the next day,

14   February 3rd of 2016, and let me ask you to read that e-mail

15   from Mr. Fulton to Mr. Cooney.

16   A.  In working on stock legend removal, probably a month out.

17   The company is in the middle of a big merger and won't issue

18   the opinion I need until merger is completed.

19   Q.  I'm so sorry.

20   A.  The other one?

21   Q.  Yes.

22   A.  Hey Bevan.  Any update on the status of the stock legend

23   removal?  What about the $500,000 bond deal?  Do you have a

24   closing date?  What can we pay now?  Eric.

25   Q.  Looking up this chain, does Mr. Cooney respond in any

I6B5gal4                          Shapiro - recross

1    fashion to the question about the sale of the bonds?

2    A.  He did.

3    Q.  What does he indicate -- does Mr. Cooney respond?

4    A.  Oh, I'm sorry.  No.  He is talking about the stock legend

5    removal.

6    Q.  And if you look at the very top e-mail on this page from

7    Mr. Fillman to you, let me ask you to read just the first

8    paragraph, not the second paragraph.

9    A.  He left me a --

10   Q.  Very top of the e-mail beginning:  Okay, but please...

11   A.  This is an e-mail from me to Matthew Fillman.  *Okay, but*

12   *please find out exactly how the 500,000 is coming.  Did he*

13   *issue the sell order?  Who is selling?  Can I get confirmation*

14   *and expected payment date?  Is the money coming into an account*

15   *that Fulton management controls?*

16   Q.  Let me stop you there.

17           When you say did he issue the sell order, what are you

18   talking about?

19   A.  He issued an order to, whatever broker was holding the

20   bonds, to sell them.

21   Q.  Let me now direct your attention to Government Exhibit 440

22   in evidence.  This is an e-mail from you to Eric Fulton and

23   Matthew Fillman, subject Cooney.

24           Do you see that?

25   A.  I do.

I6B5gal4                        Shapiro - recross

1    Q.  February 8 of 2016; is that right?

2    A.  Correct.

3    Q.  Let me ask you to read the second paragraph beginning:

4    Where I left...

5    A.  Where I left this with Matt earlier today is that Cooney

6    was raising $100,000 now, would have $500,000 from bond sales

7    in 90 days, and is requesting to pay off the rest at $150,000

8    per month.  I have asked Matt for some proof and thus far we

9    have nothing.

10   Q.  Then let me ask you to also read the paragraph that is

11   no. 2 beginning:  Proof.

12   A.  No.  2.  Proof that the order to sell his muni bonds has

13   been made and, if so, anticipated amount that will be received,

14   by when, and whether the funds are being sent to you or will

15   still be under Mr. Cooney's control.  I also need to understand

16   why it is taking 90 days to sell muni bonds and why it cannot

17   be done right now.

18   Q.  So, fair to say that in February of 2016 you did not

19   understand that Mr. Cooney had in fact transferred the Wakpamni

20   bonds and no longer owned them for many months?

21   A.  That is not something that I ever understood, correct.

22          MS. MERMELSTEIN:  No further questions.

23          THE COURT:  Thank you.

24          Ms. Notari?

25   RECROSS EXAMINATION

BY MS. NOTARI:

Q.  Now, the e-mails that you were just asked about,

Government's Exhibits 440, 439, those e-mails were on February

8th, 2016, correct?

A.  Correct.

Q.  And it's fair to say that you had extensive e-mail

communication with Mr. Cooney after that, correct?

A.  With Mr. Cooney directly?

Q.  Yes.

A.  I don't know if I would characterize it as extensive but I

had a number of conversations via e-mail with Mr. Cooney after

that February 23rd, 2016 e-mail.

Q.  And these were communications with just you and Mr. Cooney,

correct?

A.  I don't recall.  I would have to look to see if Fulton or

Fillman were copied on them.

Q.  If I could refresh your recollection with Defendant's

Exhibit 3734, 3742, 3738, 3741, 3717, 3718?  Can you please

read through these e-mails?

A.  Okay.  These e-mails are from April of 2016 that were

dealings between myself and Mr. Cooney, correct.

Q.  Are you done reviewing them?

A.  Yes, I am.

Q.  Thank you.

          So, these e-mails are all e-mails, communications of

1   just you and Mr. Cooney on April 12th, April 11th.  There is

2   numerous e-mails going back and forth where you are talking

3   about how he can repay the loan, correct?

4   A.  Correct.

5           MS. MERMELSTEIN:  Objection to form and these

6   documents are no longer in front of the witness.

7   BY MS. NOTARI:

8   Q.  Do you recall these e-mails?  I mean, can you speak

9   generally about the content of the e-mails?

10  A.  I can speak generally about the content of the e-mails,

11  sure.

12  Q.  So, Mr. Cooney was answering your e-mails, correct?

13  A.  He was initiating some.  We were having a conversation back

14  and forth.

15  Q.  And it is fair to say that if we refer to Government

16  Exhibit 420, on February 11th, again, this is after

17  Government's Exhibits 440 and 439 which is dated February 8,

18  2016, correct?

19  A.  Right.

20  Q.  And in these e-mails you are asking about what about the

21  bonds, correct?

22  A.  What about the bonds was from February of 2016.  The

23  communication with Mr. Cooney directly with me was April of

24  2016.

25  Q.  And you said that Mr. Cooney was not answering your

I6B5gal4                    Shapiro - recross

1  questions about the bonds, correct?  Is that your testimony?

2  A.  I said that the first that I learned of his non-owning of

3  these particular bonds was February 23rd, 2016 so that there

4  was no further discussion.  After that point in time we were

5  focused solely on the Code Rebel stock.

6  Q.  It is fair to say in February 2016 it was an issue,

7  repayment of the loan, and so suddenly sources of collateral

8  was on the table.  It was now relevant discussion?

9  A.  Absolutely.

10  Q.  So before the loan was delinquent there was no need to talk

11  about the bonds, correct?

12  A.  He was paying, as agreed.  We didn't have any discussions

13  about repayment until we realized that he wasn't going to pay

14  in full when it came due.

15  Q.  You testified earlier that Mr. Cooney did not answer your

16  questions about the bond, correct?  Was that your testimony?

17  A.  There was one e-mail in here that there is -- that was

18  between Eric Fulton and Bevan Cooney where he asked a question

19  about the bond and Bevan talked only about the stock and did

20  not talk about the bond.

21  Q.  Now, on February 11, 2016, you wrote Eric Fulton a letter

22  and the subject was Bevan Cooney --

23          MS. MERMELSTEIN:  Objection.

24  Q.  Do you recall this e-mail?

25          MS. MERMELSTEIN:  Objection.

I6B5gal4                          Shapiro - recross

```
 1              THE COURT:  I will allow that but what's your next
 2      question?
 3              Well, first, you can answer it?  Do you recall the
 4      specific e-mail?
 5              THE WITNESS:  I would have to look at it to see which
 6      one she is referencing.
 7              THE COURT:  Okay.
 8      BY MS. NOTARI:
 9      Q.  If you could look at Government Exhibit 420?  Just the
10      witness?
11      A.  Okay.
12      Q.  If you go to the e-mail entry 12:32 a.m.?
13      A.  Yes.  I've got it.
14      Q.  If you read the paragraph To Bevan, starting there, read
15      that paragraph?
16      A.  Bevan is not being sent that one?
17      Q.  Yes.  You don't have to read it, you can just read it to
18      yourself.
19      A.  Thank you.  Okay.
20      Q.  So, in that e-mail from you --
21              MS. MERMELSTEIN:  Objection, your Honor.  It is not in
22      evidence and the government objects on hearsay grounds.
23              THE COURT:  Let's have a side bar.
24              (Continued next page)
25
```

1          (At side bar)

2          THE COURT:  Ms. Notari, tell me where you are going

3     with this.

4          MS. NOTARI:  Clearly there were very clear

5     explanations that were given to him where he knows exactly what

6     the situation is with the bond.  He says paid right after this

7     whole e-mail.

8          The government is trying to present there was no

9     discussion, he wasn't being told about the bond and this is

10    specifically -- he is regurgitating what they're telling him.

11    He knows exactly what happened to the bond.  He says the

12    secondary payment source, his muni bond, now seems to have been

13    pledged as collateral somewhere or used as an investment in one

14    of Bevan's other deals.

15         THE COURT:  Why can't she cross him on this?  I mean

16    this is an e-mail he wrote.

17         MS. MERMELSTEIN:  She can ask him about it but I

18    don't -- I think that she is just reading from the e-mail and I

19    don't think that's appropriate.

20         THE COURT:  Oh.  That's fine.  Yes, just ask him a

21    question.  Agreed.

22         MS. NOTARI:  Thank you.

23

24

25

I6B5gal4                          Shapiro - recross

1              (In open court)

2     BY MS. NOTARI:

3     Q.   In this e-mail -- did you have a chance to review the

4     paragraph?

5     A.   Yes.

6     Q.   So, in this e-mail you are telling Eric Fulton that the

7     secondary repayment source, Mr. Cooney's muni bond, now seems

8     to either have been pledged as collateral somewhere else or

9     used as an investment in one of Bevan's other deals.  In either

10    case, the bond no longer looks like it is available to be used

11    to repay the loans.

12             Do you recall telling him that?

13             MS. MERMELSTEIN:  Objection to the reading, your

14    Honor.

15             THE COURT:  Just ask a question that if something

16    happened at the time.

17    BY MS. NOTARI:

18    Q.   Did that happen?  Did you say that?

19    A.   I said that.

20    Q.   You said that.  Okay.

21             So, it is fair to say that the fact that Mr. Cooney's

22    municipal bonds were not available as a source of repayment was

23    something that was just upsetting to you and you wanted him to

24    try to have access to those bonds but he didn't, correct?

25             MS. MERMELSTEIN:  Object to the form, your Honor.

I6B5gal4

1          THE COURT:  Sustained.

2     BY MS. NOTARI:

3     Q.  It is fair to say that the bonds were not available for

4     repayment?

5     A.  It is fair to say, correct.

6     Q.  And the basis of you telling Mr. Cooney, Mr. Fulton that

7     information, was this information was relayed to you, correct?

8     You weren't pulling this out of thin air?

9     A.  Correct.

10          MS. MERMELSTEIN:  Objection.

11          THE COURT:  Sustained.

12          MS. NOTARI:  No further questions.

13          THE COURT:  Okay.  All right.

14          MS. MERMELSTEIN:  Nothing further, your Honor.

15          THE COURT:  You may step down.  Thank you.

16          (Witness excused)

17          THE COURT:  The government can call its next witness.

18          MS. MERMELSTEIN:  One moment, your Honor?

19          THE COURT:  Sure.

20          (Counsel conferring)

21          MS. MERMELSTEIN:  The government calls Raycen Raines.

22     RAYCEN RAINES,

23         called as a witness by the Government,

24         having been duly sworn, testified as follows:

25     DIRECT EXAMINATION

I6B5gal4                          Raines - direct

1    BY MS. MERMELSTEIN:

2    Q.  Good afternoon, Mr. Raines.

3    A.  Hello.

4    Q.  Are you a member of any Native American tribe?

5    A.  Yes.

6    Q.  Let me ask you to keep your voice up so everyone can hear

7    you.

8         Which tribe are you a member of?

9    A.  The Oglala Lakota Sioux Tribe.

10   Q.  What is the Oglala Lakota Sioux Tribe?

11   A.  It is a band of the Seven Council Fires that makes up the

12   great Sioux nation in North and South Dakota.

13   Q.  Is the Oglala Sioux Tribe sometimes referred to as the

14   Lakota nation?

15   A.  Yes.

16   Q.  Is the tribe also sometimes referred to as Oglala Indians?

17   A.  Yes, it can be.

18   Q.  Why is that?

19   A.  In the Constitution it refers to American Indians -- Native

20   Americans originally, as Indians, and we are the Oglala band.

21   And so, that's one of the many names that could be given us.

22   Q.  When you say the Constitution, you mean the American

23   Constitution?

24   A.  Yes.

25   Q.  Where is the Oglala Sioux Tribe located?

I6B5gal4                         Raines - direct

1    A.  In the Pine Ridge Indian reservation.

2    Q.  Where is that?

3    A.  In the State of South Dakota.

4    Q.  Did you grow up on the Pine Ridge reservation?

5    A.  No, I didn't.

6    Q.  Where were you born?

7    A.  I was born in Oregon.

8    Q.  How did you come to be in Oregon?

9    A.  All four of my grandparents belonged to their own

10   respective Indian tribes, one of them being Pine Ridge, South

11   Dakota, and during the federal policy of assimilation they all

12   were moved, as children, to --

13              (audible noise)

14              THE COURT:  I don't know what that is.  We will find

15   it.

16   A.  All four of my grandparents were moved, as children, to the

17   State of Oregon.  There is a Native American boarding school

18   that they all attended, and from there they met each other and

19   had my parents and my parents had me and so we have all lived

20   in Oregon for most -- for a lot of the time, even though we

21   have gone back to their respective reservations.

22   Q.  And so your grandparents are members of four different

23   Native American tribes?

24   A.  Yes, each one is.

25   Q.  How did you become a member of the Oglala Sioux Tribe?

I6B5gal4                        Raines - direct

1    A.  My father is enrolled at the Oglala Sioux Tribe and I am

2    enrolled under my father.

3    Q.  What level of education have you obtained?

4    A.  High school education, some college, and some licensing in

5    insurance and estate planning.

6    Q.  What did you do when you left high school?

7    A.  I joined the United States Navy.

8    Q.  What did you do in the Navy?

9    A.  I was a master Helmsman.  I drove the ships during

10   restricted maneuvering, aircraft carrier, and guided missile

11   cruiser.  I did Panama canal.  Things where it was required,

12   more technical steering.

13   Q.  How long did you serve in the Navy?

14   A.  Four years.

15   Q.  What kind of career path did you pursue when you left the

16   Navy?

17   A.  All four grandparents and many of my aunts and uncles,

18   parents as well, all worked in Indian country at some various

19   capacity, whether it was tribal leadership or healthcare

20   education or in business, and I wanted to work in Indian

21   country as well at some point, I just didn't know how exactly,

22   when I got started.

23   Q.  And so what did you initially do?

24   A.  I apprenticed under my uncle who was an independent

25   insurance broker and estate planner, and so I learned under him

I6B5gal4                        Raines – direct

1   for many years and worked in the field for many years until I

2   had a depth of understanding of different insurance and

3   financial products that I thought would be of value to

4   ultimately take into Indian country.

5   Q.  Did there come a time that you began to work in Native

6   American finance?

7   A.  Yes.

8   Q.  What is the difference, if any, between Native American

9   finance and just finance?

10  A.  Because Indian country has many different rules and laws,

11  most of the financial dealings in Indian country are creative

12  by nature because they can't get conventional financing through

13  banks, mostly because of the trust status of the land.

14  Q.  So, explain what you mean by that, that conventional

15  financing is not available because of the trust status of the

16  land.

17  A.  So, because the lands are owned or they're under federal

18  government ownership through the -- administered through the

19  Bureau of Indiana affairs under the Department of Interior, so

20  that land can't be collateralized or borrowed against which

21  makes it very difficult for tribal projects to be financed and

22  developed.

23  Q.  Do you mean that, unlike in a traditional mortgage, the

24  bank can't come seize land that is on the reservation if

25  someone doesn't pay back the loan and, as a result, the bank

1    doesn't want to make the loan?

2    A.   That's correct.

3    Q.   Does the Oglala Sioux Tribe have a tax base, the way, say,

4    New York State does?

5    A.   No.

6    Q.   Why not?

7    A.   Because the tribes aren't able to tax their members and

8    that's with all reservations, really.

9    Q.   Now, did there come a time that you moved from working,

10   generally, in the Native American world to working with a

11   particular tribal community?

12   A.   Yes.

13   Q.   Approximately when was that?

14   A.   That was in 2011.

15   Q.   And what tribe or community did you focus on working with

16   at that point in time?

17   A.   With the Oglala Sioux Tribe, the tribe I am enrolled with.

18   Q.   Did you physically move to the Pine Ridge reservation?

19   A.   Yes.

20   Q.   How many people live on the Pine Ridge reservation?

21   A.   It is one of the poorest counties in United States.  It

22   routinely rates as first or second on any given year.  It has

23   like an 80 percent or more unemployment rate, it is a very

24   remote area of South Dakota, it is about two hours away from

25   the nearest major city one way where people go and get their

I6B5gal4                    Raines - direct

1   groceries.  80 percent of the roads are unpaved.  It is one and

2   two for diabetes rate, ranks in the highest for teen suicide,

3   teen pregnancy.  And it just has a lot of pretty dismal

4   statistics that even get worse in winter.

5   Q.  How many people live on the Pine Ridge reservation?

6   A.  Approximately 45,000.

7   Q.  Is that all of the members of the Oglala Sioux Tribe?

8   A.  No.  There is roughly 20,000 that live in surrounding

9   townships and communities that are able to seek out work.

10  Q.  Now, is the Pine Ridge reservation divided in any fashion

11  into subdivisions of geographic regions?

12  A.  Yes.

13  Q.  In what fashion?

14  A.  They have nine districts and then within those districts

15  are the communities.

16  Q.  And how big, as a matter of geographic size, is the Pine

17  Ridge reservation?

18  A.  It is around 3 million square acres.  It is about the size

19  of Rhode Island and Connecticut combined.  Very large place.

20          MS. MERMELSTEIN:  May I approach, your Honor?

21          THE COURT:  Yes.

22  Q.  So, you said you mentioned, I think, communities just a

23  moment ago.  What is a community?

24  A.  A community is a -- it is a subdivision of a district where

25  the bloodlines of hereditary families stay on their allotted

I6B5gal4                        Raines - direct

1   lands that were originally given to them during the creation of
2   the reservation.
3   Q.  And do communities and districts have -- well, does the
4   Oglala Sioux Tribe have a government?
5   A.  Yes.
6   Q.  Do districts and communities have local governments?
7   A.  Yes.
8   Q.  Let me ask you to look for identification at Government
9   Exhibit 4050.  We can pull that up just for the witness,
10  parties, and Court, please.  You have a hard copy in front of
11  you, if that's easier.
12          Do you recognize that?
13  A.  Yes.  That's a map of the State of South Dakota.
14  Q.  And does it show the correct location of the Pine Ridge
15  Reservation?
16  A.  Yes; in the bottom left-hand side of the state.
17  Q.  Now, is it just the coloring on my screen or is it very
18  hard to see the shading that demarcates the Pine Ridge
19  Reservation on your map?
20  A.  It does look a little light.
21  Q.  Let me ask you to look at the hard copy in front of you.
22  Does that accurately depict the location of the Pine Ridge
23  Reservation in South Dakota?
24  A.  Yes.  It's the bottom left-hand side of the state.  It goes
25  up almost, reaches up almost to Rapid City and borders the

I6B5gal4                    Raines - direct

1    Nebraska state line.

2              MS. MERMELSTEIN:  The government offers Government

3    Exhibit 4050.

4              MR. SCHWARTZ:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibit 4050 received in evidence)

7    BY MS. MERMELSTEIN:

8    Q.  If we can publish that to the jury?

9              Then, Mr. Wissman, perhaps you can highlight where we

10   are looking.  Is there a gray area there that demarcates the

11   Pine Ridge Reservation in the circle?

12   A.  Yes.  It's faint.

13   Q.  And, are you a member of any particular community?

14   A.  Yes.

15   Q.  Which one?

16   A.  The Wakpamni Lake Community.

17   Q.  And if we can zoom out for a moment?

18             Where on the Pine Ridge Reservation is the Wakpamni

19   Lake Community located?

20   A.  It's on the bottom right-hand side.  It's the most remote

21   community and it borders Nebraska on the state line.

22   Q.  So sort of all the way to the right bottom corner of the

23   Pine Ridge Reservation?

24   A.  Yes.

25   Q.  Now, what made you move to the -- let me ask you this.

1        What community did you physically move to when you

2  moved to Pine Ridge?

3  A.   Wakpamni Lake Community.

4  Q.   What made you move to that community?

5  A.   I had family there and I was invited there by the

6  traditional leadership.

7  Q.   What district is the Wakpamni Lake Community a part of?

8  A.   It is part of the Wakpamni District.

9  Q.   Who leads the Wakpamni Lake Community?

10  A.   President Geneva Lonehill, and there is a board.

11  Q.   And who is on the board?

12  A.   The Board is Sandy Two lance, Wilma Standing Bear is the

13  secretary, and Deb Blue Bird is the member.

14  Q.   Now, when you first moved to Pine Ridge, was it your

15  intention to work on behalf of the Oglala Sioux people or on

16  behalf of the Wakpamni Lake Community?

17  A.   A little of both.

18  Q.   Did you end up principally working up for the Oglala Sioux

19  Tribe or for the Wakpamni Lake Community?

20  A.   For the Wakpamni Lake Community.

21  Q.   Are you familiar with something called the Wakpamni Lake

22  Community Corporation?

23  A.   Yes.

24  Q.   Is that often known as the WLCC?

25  A.   Yes.

I6B5gal4                         Raines - direct

1    Q.   What is it?

2    A.   That is the wholly-owned subsidiary of the Wakpamni Lake

3    Community, the political part that is focused on just

4    commercial or private enterprise activity.

5    Q.   So, the Wakpamni Lake Community leadership is the political

6    part and the Wakpamni Lake Community Corporation is the

7    economic development arm?

8    A.   That's correct.

9    Q.   How is it formed?

10   A.   It is formed by the voting members of the community itself.

11   Q.   Does the Oglala Tribe's Rules and Constitution permit the

12   creation of such a corporation?

13   A.   Yes.  Under Article 6 of the Constitution that was drafted

14   in 1934 it allows districts and communities to pursue economic

15   development for the benefit of its membership.

16   Q.   Who are the leadership of the Wakpamni Lake Community

17   Corporation?

18   A.   The Board as well.

19   Q.   The same Board as is the political leadership?

20   A.   Yes.

21   Q.   Approximately when was the Wakpamni Lake Community

22   Corporation formed?

23   A.   In 2012.

24   Q.   Do you have a current role with the Wakpamni Lake Community

25   Corporation?

I6B5gal4                        Raines - direct

1   A.   Yes.  I'm currently the CEO of WLCC.

2   Q.   How long have you held that, or a similar role?

3   A.   About six years.

4   Q.   And how are you generally compensated for your work on

5   behalf of the Wakpamni Lake Community Corporation?

6   A.   Through a success fee that is based on the success or

7   profitability of a project getting started and ultimately being

8   sustainable.

9   Q.   Did there come a time when you met an individual named

10  Yanni Galanis?

11  A.   Yes.

12  Q.   Would you recognize him if you saw him again?

13  A.   Yes.

14  Q.   Let me ask you to look around the courtroom and if you see

15  him, point him out to the jury and identify a piece of clothing

16  he is wearing.

17  A.   I see him there with the purple tie.

18              MR. TOUGER:  He has identified my client.

19              THE COURT:  Record shall so reflect.

20  BY MS. MERMELSTEIN:

21  Q.   Thank you, your Honor.

22              When did you first meet Yanni Galanis?

23  A.   In 2014.

24  Q.   Where were you when you met him?

25  A.   I was at a conference in Las Vegas for -- it was a tribal

I6B5gal4                          Raines - direct

1    economic development conference.

2    Q.   What is a tribal economic development conference?

3    A.   There is a conference every year called RES.  The acronym

4    R-E-S, stands for Reservation Economic Summit.  It is an annual

5    conference where there is tribal leaders, tribal business

6    people meeting with consultants, bankers, and vendors, all

7    meeting over a course of about four days talking about new

8    projects, project development, and opportunities.

9    Q.   Who else -- well, how did you come to meet Mr. Galanis?

10   A.   I was invited to a luncheon that was during that

11   conference.

12   Q.   And who else was there?

13   A.   There was approximately seven or eight people, a couple

14   tribal leaders, a gentleman I worked with already a guy named

15   Steven Haynes, an attorney Tim Anderson, and a few people I

16   didn't know.

17   Q.   How did Yanni Galanis present himself?

18   A.   As a businessman and project developer and person who

19   financed and put together projects.

20   Q.   What, if anything, did he say about his professional

21   background?

22   A.   Just that he had experienced developing projects in the

23   past and developing and selling business.

24   Q.   During that meeting did Yanni Galanis present a proposal

25   involving bonds?

I6B5gal4                        Raines - direct

1    A.  Yes.

2    Q.  And what were the general contours of that proposal?

3    A.  That a tribe would be able to take advantage of a new

4    opportunity out there regarding social responsible capital,

5    investors that were interested in investing in Indian country

6    as opposed to, say, a foreign country that would allow that on

7    tribal lands to create new employment, some new income, and

8    develop new business.

9    Q.  What, if anything, did Yanni Galanis say in that meeting

10   about the use of an annuity to structure those bonds?

11   A.  The annuity would be similar -- it would be like an

12   insurance wrapper that would protect the principal investment

13   and generate annual income to cover the interest on the bond as

14   well as generate additional income for the business.

15   Q.  Over the course of several months following that lunch, did

16   you continue to discuss the idea of a bond with Yanni Galanis?

17   A.  Yes.

18   Q.  Were there any other frequent participants in those

19   conversations?

20   A.  Yes.

21   Q.  Who was that?

22   A.  Steven Haynes, Tim Anderson, various business people, and

23   specific businesses.

24   Q.  How did you generally communicate with Yanni Galanis?

25   A.  On the phone or in person, text message, or messenger apps.

I6B5gal4                    Raines - direct

1  Q.  Did you communicate by any particular messenger app?

2  A.  WhatsApp, Wickr.

3  Q.  And how did you come to use Wickr?

4  A.  It was an invite was sent out through the app itself as a

5  working -- for the working group to communicate.

6  Q.  Who sent it out?

7  A.  Yanni.

8  Q.  Let's turn back to the bonds themselves.  What, if

9  anything, did Yanni Galanis tell you about the various entities

10  that would be involved in entering the bond?

11        MR. TOUGER:  Date?

12        MS. MERMELSTEIN:  I am talking about the months

13  following the Native American development conference.

14        MR. TOUGER:  Are we talking about after the meeting?

15        MS. MERMELSTEIN:  I'm sorry.  I can't hear what you

16  are saying --

17        MR. TOUGER:  Are we talking about after the meeting.

18        MS. MERMELSTEIN:  Yes, after the meeting, the months

19  that follow.

20        THE WITNESS:  I'm sorry.  Can you repeat the question?

21  BY MS. MERMELSTEIN:

22  Q.  I assume you can't remember each individual conversation

23  that you had in the months that follow that first lunch; is

24  that right?

25  A.  Right.

I6B5gal4                          Raines - direct

1   Q.  In the course of those conversations in the months

2   following that first lunch what, if anything, did Yanni Galanis

3   tell you about the entities that would be involved in issuing

4   the bond?

5   A.  There would be a brokerage firm which would be the

6   placement agent, be an insurance company, then there would be

7   law firms representing everybody.

8   Q.  And did he tell you the identity of the brokerage firm that

9   would serve as the placement agent?

10  A.  Yes.

11  Q.  What was that?

12  A.  Burnham Securities.

13  Q.  What, if anything, did Yanni Galanis say about his own

14  connection to Burnham Securities?

15  A.  That they had generated the initial interest in the

16  socially responsible capital and that he had a son that worked

17  there.

18  Q.  Did he tell you his son's name?

19  A.  Yes.

20  Q.  What was that?

21  A.  Jason Galanis.

22  Q.  Did you ever meet Jason Galanis?

23  A.  No.

24  Q.  Did Yanni himself work at Burnham Securities?

25  A.  I don't believe so.

1    Q.  What, if anything, did you understand about how Yanni

2    Galanis would be compensated for his involvement in structuring

3    his bond deal?

4    A.  I understood that he would receive a success fee from

5    Burnham Securities for putting together the deal.

6    Q.  During these months of discussing the bond deal, did

7    Mr. Yanni Galanis ever mention an entity called Sovereign

8    Nations Development Corporation?

9    A.  No.  Not that I recall.

10   Q.  Now, you mentioned that Yanni Galanis also talked to you

11   about an insurance wrapper or an annuity.  What is an annuity?

12   A.  An annuity is an insurance contract similar to a pension

13   before it is turned on.  Monies go in and have a guaranteed --

14   to principal or interest earned and ultimately come out in a

15   paid out schedule.

16   Q.  What, if anything, did Yanni Galanis say about whether the

17   payments by the annuity would be guaranteed?

18   A.  The payments would be guaranteed for the annual interest

19   rate to the bond owed as well as income coming out for the

20   tribal business to help cover operating costs.

21   Q.  Just so I understand, the structure was that the annuity

22   would throw off guarantee payments to pay both the interest and

23   payments to the tribal entity that issued the bonds?

24   A.  Yes.

25   Q.  Were all of the expected payments under the annuity

I6B5gal4                         Raines - direct

1   guaranteed?

2   A.   They all were except for their, at the end of the term, the

3   20-year term.   The funds that were based on the performance of

4   the investment were not guaranteed.   They were projected to

5   be -- there was projected to be payment that would be at the

6   very end but that part was variable.

7   Q.   What, if anything, did Yanni Galanis tell you about who

8   would provide the annuity?

9   A.   A company called Wealth Assurance AG.

10  Q.   And what did Yanni Galanis tell you what Wealth Assurance

11  AG was?

12  A.   It was a large insurance company, very reputable, had a

13  $80 million valuation, and has been in the insurance business

14  for a long time.

15          MS. MERMELSTEIN:   Your Honor, I'm about to turn to a

16  new topic so I don't know if this is a logical time to break.

17  I am also happy to keep going.

18          THE COURT:   Sorry?

19          MS. MERMELSTEIN:   I am about to turn to a new topic.

20          THE COURT:   That is fine.   I didn't hear you.   That is

21  fine.   So why don't we take our lunch break now.

22          Just remember don't discuss the case and keep an open

23  mind.

24          (Continued on next page)

25

I6B5gal4                          Raines – direct

1                (Jury not present)

2                THE COURT:  If you can come back in an hour?  I will

3     see you after lunch.

4                MR. SCHWARTZ:  2:00?

5                THE COURT:  How about five to 2:00, please.

6                (Luncheon recess)

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6B5gal4                           Raines – direct

1                   A F T E R N O O N   S E S S I O N

2                              2:00 p.m.

3           (Jury not present)

4           MR. SCHWARTZ:  Can we discuss one quick thing?

5           THE COURT:  At the side bar?

6           MR. SCHWARTZ:  Yes, please.

7           THE COURT:  Why don't we bring the jury in in the

8    meantime.

9

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6B5gal4                          Raines - direct

1                    (At the sidebar)

2              MR. SCHWARTZ:  So it occurred to me over lunch that

3      depending on what the government intend to do on direct, they

4      may elicit some of the alleged misstatements that John Galanis

5      made about the purchase of the second bond issuance by Messrs.

6      Archer and Cooney, which was one of the two areas we had

7      discussed as being subject to a midtrial limiting instruction

8      about reasonable foreseeability, so I just wanted to flag if

9      that's something they intend to elicit that may come up.  This

10     is basically from the language that your Honor dictated at the

11     final pretrial conference.

12             MS. MERMELSTEIN:  I don't intend to elicit anything

13     that was said to him about the --

14             MR. SCHWARTZ:  So I mean if they don't elicit anything

15     about sort of the representations about demand and things like

16     that on the second bond issuance, then that's fine.

17             MS. MERMELSTEIN:  I'm going to elicit that he was told

18     by Yanni Galanis that there was demand and that's why they

19     should do another round of bonds but that's it.

20             MR. SCHWARTZ:  Right, this was the point, there was

21     misrepresentation that is effectively about Mr. Archer and

22     Cooney, even thought it may not say the name.

23             MS. MERMELSTEIN:  I don't think that that's

24     sufficiently correct that saying that there's demand is about

25     them.  As is now in the record, for example, Mr. Cooney was

I6B5gal4                    Raines - direct

1   kind of a very late comer to buying the bonds; it appears there

2   was a different plan first that didn't work out, so I don't

3   think the mere fact that he said that there was demand triggers

4   the need for this instruction, which I think is going to just

5   be confusing.

6           MR. QUIGLEY:  Especially since they've already heard

7   about representations made in connection with -- Anderson

8   testified about representations made in connection with the

9   second bond issuance.  There have been other witnesses who have

10  testified about that.  I think essentially doing it in this way

11  targeted to Mr. Archer and Mr. Cooney is essentially arguing

12  for the defense at a early juncture of the trial.

13          MS. MERMELSTEIN:  Look, there are all kinds of

14  evidentiary issues that your Honor is going to instruct the

15  jury about that you're going to give legal instructions at the

16  end that they will look back at the evidence.  I don't think

17  this is a basis for one now, and I think that it is a

18  misleading suggestion that there is something that this

19  particular evidence, in a trial that's had lots of different

20  kind of evidence, so I think it's not necessary on the facts,

21  it's not triggered by what the government is doing, and even if

22  we were eliciting more, I would object to it.

23          MR. SCHWARTZ:  This was subject of a ruling.  I mean I

24  didn't mean to come over and start a big thing.  This was

25  already the subject of a ruling.  We said that there were going

I6B5gal4                     Raines - direct

1     to be two and only two instances.  One is this.  This is the

2     first time that we're hearing about the misrepresentations

3     being made to an alleged victim here.  And the other is the

4     form ADV, which may not come out again.  I think I was sort of

5     slow to react when it came back out on the redirect of Mr.

6     Dunkerley because the ruling sort of came in about the scope of

7     ADV after his direct was closed and before the redirect.  So,

8     we may not come back to the form ADV, but this is the other

9     instance that was subject to your Honor's ruling, so I'm simply

10    proposing the language that's used.

11            THE COURT:  I mean I said that I would give it.  I

12    will give it.  So you can stand and let me know.

13            Do you have any objection specifically to the language

14    here?

15            MR. QUIGLEY:  I think the fact that it says Mr. Archer

16    and Mr. Cooney.  I mean if you want to give a generic

17    instruction along these lines, but again this is more in the

18    way of argument about specific coconspirators in this case.  If

19    you want to say please keep in mind evidence about acts by

20    other people is admissible against the codefendants only if you

21    find those people were members of the conspiracy and that the

22    acts taken by those other people were in furtherance of the

23    conspiracy, and reasonably foreseeable to the defendants.  I

24    think highlighting --

25            MR. SCHWARTZ:  That's a little bit artificial.  I mean

I6B7GAL5                        Raines - Direct

1    there are three people on trial.  The evidence is going to be

2    that one of those people made the statements, and so the

3    instruction should be clear that we're talking about the other

4    two people.  It's not argument; it's just using proper nouns to

5    make things accessible to the jury.

6                 THE COURT:  I will think about it.

7                 (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (In open court)

2         (Jury present)

3    RAYCEN RAINES, resumed.

4    DIRECT EXAMINATION (Continued)

5    BY MS. MERMELSTEIN:

6    Q.  When we broke before lunch we were talking about Wealth

7    Assurance AG and Burnham Securities and the entities that were

8    to be involved in the proposed bond transaction.  I want to

9    move on to talking about who represented the various parties in

10   the transaction.  Who represented Burnham Securities?

11   A.  Burnham Securities was represented by the attorney Tim

12   Anderson.

13   Q.  Did you know Tim Anderson prior to this transaction?

14   A.  Yes.

15   Q.  Had he previously represented the Wakpamni Lake Community

16   Corporation in other deals?

17   A.  Yes, he did.

18   Q.  Why did he end up representing Burnham and not the Wakpamni

19   Lake Community Corporation?

20         MR. TOUGER:  Objection.

21   A.  Burnham Securities needed --

22         THE COURT:  I'm sorry.  What's your understanding of

23   why he represented Burnham?

24         MR. TOUGER:  Your Honor, with all due respect,

25   wouldn't that call for a hearsay conclusion?

I6B7GAL5                          Raines - Direct

1          MS. MERMELSTEIN:  Why don't I rephrase it.

2          THE COURT:  Why don't you rephrase.

3    Q.  Did you communicate with Mr. Anderson about whether he

4    would represent the Wakpamni Lake Community Corporation or

5    Burnham Securities?

6    A.  Yes.

7    Q.  And since Mr. Anderson had previously represented the

8    Wakpamni Lake Community Corporation, did he need your approval

9    in order to represent someone else in this transaction?

10   A.  Yes.

11   Q.  And in those conversations, what was your understanding of

12   why Mr. Anderson was going to represent Burnham Securities?

13   A.  Mr. Anderson would represent Burnham because it involved a

14   Native American Indian law, and Wakpamni Lake Community

15   Corporation had a number of other law firms that represented

16   us, therefore, Burnham Securities needed somebody familiar with

17   Indian law, and it was deemed that Tim Anderson would go on to

18   the Burnham side.

19   Q.  Now, who represented the Wakpamni Lake Community

20   Corporation in this transaction?

21   A.  Greenberg Traurig.

22   Q.  And had the Wakpamni Lake Community Corporation also worked

23   with Greenberg Traurig before?

24   A.  Yes.

25   Q.  What particular lawyers worked on this transaction from

I6B7GAL5                        Raines - Direct

1   Greenberg Traurig?

2   A.   Heather Dawn Thompson and Mike McGinnis.

3   Q.   What is your current relationship with Ms. Thompson?

4   A.   I'm married to Heather Thompson.

5   Q.   Were you married at the time?

6   A.   No.

7   Q.   What was your relationship then?

8   A.   Just dating at that time.

9   Q.   And did the Wakpamni Lake Community Corporation know about

10  your relationship?

11  A.   Oh, yeah.  Yes.

12  Q.   Who was the main point of contact between the Wakpamni Lake

13  Community Corporation on the one hand and the Greenberg Traurig

14  attorneys who were working on the bond project?

15  A.   Myself.

16  Q.   And how did you generally keep the board apprised of

17  developments?

18  A.   I would see them mostly every day back home, and then we

19  would have weekly meetings as well as board meetings that were

20  once or twice a month depending on documents or project

21  development.

22  Q.   As the bond transaction solidified, how much money was the

23  Wakpamni Lake Community Corporation set to receive at the time

24  that the bonds closed?

25  A.   Approximately $2 million.

I6B7GAL5                         Raines - Direct

1    Q.   And how much after that?

2    A.   Approximately $200,000 per year on the anniversary date.

3    Q.   And are those exact numbers or approximations?

4    A.   Approximate.

5    Q.   What did the community plan to do with the money?

6    A.   We were developing a distribution center within the

7    community grounds that would function as a -- it was a

8    distribution warehouse that met the minimum requirements to be

9    like a free trade zone distribution center that would be used

10   for importing and exporting goods to other reservations.

11   Q.   What if any are the economic advantages of locating a

12   distribution warehouse on a Native American reservation?

13   A.   So, on a reservation it's denoted as a HUB zone or a

14   Historical Underutilized Business zone, which gives it some tax

15   advantages as well as minority preference in the competitive

16   market advantage for sales to either the federal government or

17   other tribal governments.

18   Q.   Did that bond issuance come to fruition?

19   A.   Yes.

20   Q.   Now, in connection with issuing the bonds, did the Wakpamni

21   Lake Community Corporation waive its sovereign immunity?

22   A.   No.

23   Q.   And perhaps I should have asked, was there a partial waiver

24   of sovereign immunity?

25   A.   Yes.

I6B7GAL5                        Raines - Direct

Q.  Did that waiver apply to just the Wakpamni Lake Community

Corporation or to the Oglala Sioux Tribe as a whole?

A.  Just WLCC.

Q.  And were the bonds recourse or nonrecourse?

A.  Nonrecourse.

Q.  What does that mean?

A.  That means that the project is indemnified from other

projects or corporations.  You can only pursue in litigation

just that one project.

Q.  Meaning if the bonds fail, the investors could only go

after profits from the warehouse business but not other

endeavors of the Wakpamni Lake Community.

A.  Yes.

Q.  Who approved the bond transaction on behalf of the Wakpamni

Lake Community?

A.  The board.

Q.  And who actually executed the documents?

A.  Both Geneva and myself.

Q.  And when you say yourself, were you a signatory to the

documents?

A.  Yes, I had permission from our President Lonehill to sign

documents to move projects forward.

Q.  Just so we're clear, when you said you had permission to

sign documents, were you signing on her behalf in your name or

in your own name?

I6B7GAL5                        Raines - Direct

 1   A.  In her behalf.

 2   Q.  And was that authorization limited to this project, or is

 3   that a general way that you do business?

 4   A.  General way.

 5   Q.  Now, with respect to the annuity provider, when the bond

 6   transaction actually went forward, who was the annuity provider

 7   who was actually the annuity provider for the transaction?

 8   A.  Wealth Assurance Private Placement.

 9   Q.  And was that different than what had been initially

10   represented?

11   A.  Yes.

12   Q.  What if anything did Yanni Galanis tell you about the

13   relationship between Wealth Assurance AG that had been

14   initially mentioned and Wealth Assurance -- did you call it

15   Private Placement?

16   A.  Yes.

17   Q.  What did Yanni tell you about the relationship between the

18   two?

19   A.  That it was a subsidiary of the company.

20   Q.  Wealth Assurance Private Placement was a subsidiary of

21   Wealth Assurance AG or the other way around?

22   A.  Yes, it was a subsidiary of Wealth Assurance AG that

23   handled like high net worth policies.

24   Q.  Approximately when was the transaction completed?

25   A.  In August 2014.

I6B7GAL5                    Raines - Direct

1   Q.  Did the money from the bonds, that first two million or so,

2   become available?

3   A.  Yes.

4   Q.  Did plans move forward to build the warehouse?

5   A.  Yes.

6   Q.  Who was responsible for running the actual project of

7   building the physical warehouse?

8   A.  Steven Haynes was the project planner, and myself as the

9   project manager.

10  Q.  And how was Haynes compensated for his work as project

11  manager?

12  A.  He received transaction fees from the initial fund raise.

13  Q.  And what about you?

14  A.  And I received a percentage of Steven Haynes.

15  Q.  Did there come a time when Yanni Galanis proposed another

16  bond issuance?

17  A.  Yes.

18  Q.  Approximately when was that?

19  A.  It was soon after the first one.

20  Q.  And how soon?

21  A.  Well, there was -- it was immediately.

22  Q.  What, if anything, did Yanni Galanis say about why he was

23  proposing another bond issuance so shortly after the first one?

24  A.  There was investors that didn't make the initial bond

25  closure, and were interested in the social responsible capital

I6B7GAL5                        Raines - Direct

```
 1   bond structure, and they would be interested in working --
 2   investing in another bond right away.
 3            MS. MERMELSTEIN:  Your Honor, I think this raises the
 4   issue we discussed at sidebar.
 5            THE COURT:  Now?
 6            MR. SCHWARTZ:  Please.
 7            THE COURT:  So, members of the jury, I will instruct
 8   you on the law at length at the close of evidence, but I want
 9   to instruct you now on the liability of individuals, the acts
10   of statements of the alleged coconspirators.
11            If you find that a defendant is a member of the
12   conspiracy charged in the indictment, only reasonably
13   foreseeable acts done or statements made in furtherance of the
14   conspiracy by a person found by you to have been a member of
15   the same conspiracy may be considered against that defendant.
16            In other words, this evidence may only be considered
17   against Mr. Archer and/or Mr. Cooney if you find that they were
18   members of the same conspiracy, these acts were taken in
19   furtherance of the conspiracy, and these acts were reasonably
20   foreseeable to them.
21            MS. MERMELSTEIN:  Thank you, your Honor.
22            MR. SCHWARTZ:  Thank you.
23   Q.  Did you propose any changes to the structure or to the
24   entities to be involved with respect to the second bond
25   issuance?
```

I6B7GAL5                          Raines - Direct

1   A.  Yes.

2   Q.  Who did you suggest that to?

3   A.  To Yanni.

4   Q.  And what did you suggest?

5   A.  That we could shop around for another annuity provider;

6   maybe they would offer a competitive rate.

7   Q.  How did he respond?

8   A.  He said there is no reason to change, you know, a good

9   thing, the relationship that's existing the way the structure

10  is.

11  Q.  Let me direct your attention now to Government Exhibit 253

12  just for the witness, the court and the parties, please.  Do

13  you recognize this?

14  A.  Yes.

15  Q.  Is that an e-mail from your e-mail account?

16  A.  Yes.

17          MS. MERMELSTEIN:  Your Honor, the government offers

18  Government Exhibit 253.

19          THE COURT:  Any objection?

20          MR. SCHWARTZ:  No objection.

21          THE COURT:  It will be admitted.

22          (Government Exhibit 253 received in evidence)

23  Q.  If we could publish that to the jury and pull up the

24  attachment, please.

25          What is that?

I6B7GAL5                         Raines - Direct

A.   That is the total site plan to what we call the town center

in the community.

Q.   And what is the town center?

A.   So, on the left-hand side off the page where those trees

are on the left of the basketball court would be the

distribution center that was originally planned, and the

distribution center was for private enterprise or commercial

development to generate a profit.  This here was an expanded

version of the town center that was for civic use.

         And essentially the profits from the for-profit

business would fund and operate -- this one here for just

community use, you can see there is a day care, playground.

There was also a tutoring center there, the bingo hall, a

laundry.  There was a diabetes center that we were going to put

in there, a health center, and a coffee shop.

Q.   And the town center project, that was to be funded by the

second issuance of bonds?

A.   Yes.

Q.   Following the bond issuances in 2014, did you continue to

have discussions that other possible projects with Yanni

Galanis?

A.   Yes.

Q.   And in general terms what were some of those projects?

A.   One of them was propane distribution.  Propane is the most

used form of energy for heating and cooking in the Northern

1    Great Plains for both North and South Dakota tribes, and there

2    was not a tribal-owned propane distribution business, as well

3    as it was pretty underperforming, the existing one, so there

4    was a real opportunity there, as well as brush firefighting

5    where tribal brush firefighters would be dispatched throughout

6    the Greater Plains and all the way to California to fight fires

7    as a municipal fire fighting department, which would also earn

8    profit as well.

9    Q.  Did Yanni Galanis ever successfully bring financing to any

10   of those projects?

11   A.  No.

12   Q.  Has the Wakpamni Lake Community Corporation continued to

13   pursue those projects?

14   A.  Yes.

15   Q.  Now, have you ever met someone named Derrick Galanis?

16   A.  Yes.

17   Q.  Who is that?

18   A.  Yanni's son.

19   Q.  And in what context did you meet him?

20   A.  I met him at a dinner at one of the business meetings.

21   Q.  Was he involved in the issuance of the bonds?

22   A.  No.

23   Q.  Did he have any involvement with the Wakpamni Lake

24   Community itself?

25   A.  Yes.

I6B7GAL5                              Raines - Direct

1   Q.   In what way?

2   A.   He was a mixed martial arts instructor and had experience

3   with training both youth and adults in the martial arts and the

4   instruction of it, and he had developed a program that helped

5   our kids and kind of instilled in them values in discipline,

6   and he arranged for us to come and attend a mixed martial arts

7   camp in Las Vegas and attend a live event.

8   Q.   Who paid for the trip for children who were members of the

9   Wakpamni Lake Community -- excuse me -- children of members of

10  the Wakpamni Lake Community to attend the camp and see the

11  mixed martial arts performance?

12  A.   Yanni.

13  Q.   I want to turn your attention to 2015.  Did there come a

14  time that another round of bonds was suggested?

15  A.   Yes.

16  Q.   Who suggested it?

17  A.   Yanni.

18  Q.   And did the community agree to issue additional bonds?

19  A.   Yes.

20  Q.   Did that bond issuance in fact go forward?

21  A.   Yes, it did.

22  Q.   Did there come a time that payments to the community --

23  annual payments to the community from the bonds did not arrive?

24  A.   Yes.

25  Q.   Approximately when was that?

I6B7GAL5                        Raines - Direct

1   A.  That was one year from the anniversary date from the

2   initial bond, when we were expected to receive the first

3   distribution.

4   Q.  So that's the fall of 2015?

5   A.  Yes.

6   Q.  What happened when the money didn't arrive?

7   A.  A number of things happened.  We made some e-mails, phone

8   calls, inquiries to the U.S. Banking trustee as well as

9   ultimately to Wealth Assurance, just requesting distribution,

10  and we got like sent back -- we had to make a more formal

11  request, or wait for a policy anniversary date.  It seemed

12  pretty routine at the time until it didn't.

13  Q.  Let me show just to the witness, the court and the parties,

14  please, Government Exhibit 282.

15          Do you recognize that e-mail?

16  A.  Yes.

17  Q.  Is that an e-mail that you received?

18  A.  Yes.

19          MS. MERMELSTEIN:  The government offers Government

20  Exhibit 282.

21          THE COURT:  Any objection?

22          MR. TOUGER:  No.

23          MS. NOTARI:  No objection.

24          THE COURT:  It will be admitted.

25          (Government Exhibit 282 received in evidence)

I6B7GAL5                          Raines - Direct

1   Q.  If we could publish that to the jury.

2            How, who is sending this e-mail?

3   A.  This was from Hugh Dunkerley.

4   Q.  And who other than you is receiving it?

5   A.  Our attorneys, Steven Haynes, President Lonehill and our

6   trustee from U.S. Bank.

7   Q.  If we can zoom back in, please.

8            Let me direct your attention to the paragraph that

9   begins "The annuity contract number ..."  Can you read that

10  paragraph, please.

11  A.  "The annuity contract number WAPC-2014-0010 dated August

12  26, 2014 in the amount of $25,250,000, was purchased with

13  proceeds from the economic development program series of

14  special revenue bonds issued in connection with the trust

15  indentures dated August 25, 2014.  The contract provides for

16  annual distributions of $1,823,600 per annum for years 1 to 9,

17  $25,250,000 principal plus $500,000 to be paid at the tenth

18  anniversary, $350,000 in income for each of the subsequent 15

19  years ($5,250,000 cumulative), and a variable payment up to $5

20  million on the 25th anniversary.  We understood these payments

21  fund certain long-term tribal financial objectives.  The trust

22  indentures provides for annual payments of $250,000 to WLCC, as

23  you have indicated, within the first payment due on August 27,

24  2016."

25  Q.  Was that consistent with your understanding of the way in

1   which the annuity payments were structured?

2   A.  Yes.

3   Q.  Let me ask you, did you ever meet any other members of

4   Yanni Galanis' family?

5   A.  Yes.

6   Q.  Who is that?

7   A.  His wife.

8   Q.  And do you remember her name?

9   A.  Shandra.

10  Q.  Let's go down to the last paragraph of this e-mail, and let

11  me ask you to read that paragraph.

12  A.  "You indicated in your October 8th letter that Private

13  Equity management was engaged by Wealth Assurance and that you

14  intend to dismiss the manager.  Our records indicate that

15  WLCC -- not Wealth Assurance private client -- hired the

16  manager and approved the investment criteria.  We attach your

17  written instruction to U.S. Bank dated August 21, 2014."

18  Q.  Now, at the time that you were involved in the bonds being

19  issued, did you have an understanding of Private Equity

20  management's role in the bond transaction?

21  A.  No.

22  Q.  Did the WLCC ever communicate with anyone from Private

23  Equity Management with respect to the investment of the annuity

24  proceeds?

25  A.  No.

I6B7GAL5                        Raines - Direct

1    Q.  And after receiving this e-mail indicating that the

2    Wakpamni Lake Community Corporation had the legal relationship

3    with Private Equity Management, did the Wakpamni Lake Community

4    Corporation take steps to sever that relationship?

5    A.  Yes.

6    Q.  Since the payments ceased on the bonds, has construction of

7    the town center ever been fully completed?

8    A.  No.

9    Q.  How much has been accomplished?

10   A.  We put the outer shells of the buildings in that town

11   center site plan.

12   Q.  Is there a functioning warehouse distribution business?

13   A.  No.  And the long road and the driveway and the parking

14   lots were never completed, so they're still prairie.

15   Q.  Without the annuity, has the Wakpamni Lake Community

16   Corporation been able to make the interest payments that it

17   owes on the bonds?

18   A.  No.

19   Q.  Have any of the pension funds that bought the bonds reached

20   out to the Wakpamni Lake Community Corporation to discuss the

21   missing interest payments?

22   A.  Yes.

23   Q.  And what has the community told them about its ability to

24   pay?

25   A.  We spoke with them and said that we don't have functioning

I6B7GAL5                          Raines - Cross

1    businesses in there in order to make payments.

2    Q.  Does the Wakpamni Lake Community Corporation still owe

3    these interest payments?

4    A.  Yes.

5    Q.  If the warehouse became operational and was successful,

6    would that money be used to pay interest on the bonds?

7    A.  Yes.

8    Q.  In your view, is there a realistic possibility that the

9    warehouse could be successful enough to pay back $65 million?

10            MR. TOUGER:  Objection, your Honor.

11            THE COURT:  Overruled.

12   A.  No.

13            MS. MERMELSTEIN:  Nothing further, your Honor.

14            THE COURT:  Cross-examination, Mr. Schwartz?

15   CROSS EXAMINATION

16   BY MR. SCHWARTZ:

17   Q.  Good afternoon, ladies and gentlemen.

18            And good afternoon, Mr. Raines.

19   A.  Hello.

20   Q.  My name is Matthew Schwartz.  I'm one of Devon Archer's

21   lawyers.  I have just a few questions for you today.

22   A.  OK.  OK.

23   Q.  You've never met Mr. Archer, true?

24   A.  True.

25   Q.  And you have not communicated with him in any way, right?

I6B7GAL5                         Raines - Cross

1   A.   Right.

2   Q.   You have heard of Mr. Archer though; is that right?

3   A.   Yes.

4   Q.   You were told at the time that this deal was brought to you

5   back in 2014 and 2015 that Mr. Archer was somehow involved in

6   Burnham Securities, right?

7   A.   Yes.

8   Q.   And you were also told that Mr. Archer was friends with

9   someone named Hunter Biden; is that right?

10          MS. MERMELSTEIN:   Objection.

11          THE COURT:   Overruled.

12  A.   Yes.

13  Q.   And that Mr. Archer was business partners with Mr. Biden,

14  right?

15  A.   Yes.

16  Q.   And you knew that Hunter Biden was the son of Joe Biden,

17  right?

18  A.   Yes.

19  Q.   And of course you were aware that Joe Biden was the Vice

20  President of the United States at the time.

21  A.   Yes.

22  Q.   And you would agree with me, wouldn't you, that Mr. Biden's

23  name was mentioned more than once or twice, right?

24  A.   Yes.

25  Q.   Fair to say that his name was thrown around.   True?

I6B7GAL5                         Raines - Cross

1   A.  I don't know.

2   Q.  Well, you met with the government a few times to prepare to

3   testify, right?

4   A.  I met with the government, yes.

5   Q.  And do you recall saying that Mr. Biden's name had been

6   quote thrown around?

7   A.  I don't recall.

8            MR. SCHWARTZ:  Mr. Jackson, can we show the witness,

9   the judge and the lawyers 3529-8, and go to page 3, and can you

10  blow up the bottom third of the page, please, for Mr. Raines.

11  Q.  Just take a moment to read that bottom paragraph to

12  yourself.  The question is just whether this reminds you that

13  you previously told the government that Mr. Biden's name was

14  thrown around.

15  A.  I read here that it shows something I said.

16  Q.  I'm just asking you what you remembered.  Does this help

17  you remember that you previously said that Mr. Biden's name was

18  thrown around when you met with the government?

19  A.  No, it doesn't remind me.

20  Q.  That's fine.  It is fair to say though that you believed

21  that the involvement of Mr. Archer and Mr. Biden promoted the

22  credibility of Burnham Securities, true?

23  A.  No, I don't believe so.

24  Q.  Would you agree with me that Mr. Archer and Mr. Biden were

25  both well connected and had strong names?

I6B7GAL5                          Raines - Cross

1          MS. MERMELSTEIN:  Objection, your Honor.

2     A.  I don't know that.

3     Q.  Well, let me ask you to look again at what's on the screen

4     in front of you about six lines down.  Do you recall telling

5     the government in one of your meetings that Mr. Archer and

6     Mr. Biden were both well connected and had strong names?

7     A.  No.

8     Q.  In any case, you never spoke to Mr. Archer, so it wasn't

9     Mr. Archer telling you about himself and Mr. Biden, true?

10    A.  True.

11    Q.  It was other people, right?

12    A.  Yes.

13    Q.  One of those people was Jason Galanis, right?

14    A.  No.

15    Q.  Did you say no?

16    A.  I have never spoken with Jason.

17    Q.  Well, how about in writing, do you recall Mr. Galanis,

18    Mr. Jason Galanis, in writing boasting about Mr. Archer and

19    Mr. Biden's involvement with Burnham Securities?

20    A.  No.

21    Q.  Mr. Jackson, can we bring up for the witness, Judge Abrams

22    and the lawyers what has been marked for identification as

23    Defense Exhibit 1532, and can you show Mr. Raines page 5.

24          Do you see we're looking at a letter from Jason

25    Galanis?

I6B7GAL5                         Raines - Cross

1    A.  Yes.

2    Q.  And you see that you were one of the people that was cc'd

3    on this letter?

4    A.  Yes.

5    Q.  Can we go to page 3, please, Mr. Jackson, and can you blow

6    up the big paragraph in the middle of the page.

7          Take a moment to read that to yourself, Mr. Raines.

8    My question is simply:  Does this help you remember that Jason

9    Galanis boasted in writing about Mr. Archer and Mr. Biden's

10   involvement?

11   A.  No.

12   Q.  You would agree with me looking at this now that Mr.

13   Galanis did in fact boast about Mr. Archer and Mr. Biden's

14   involvement, right?

15   A.  In reading this now, yes.

16   Q.  Thank you.  And Mr. Galanis also boasted about someone

17   named Doug Band at Teneo Consulting.  Do you recall that?

18   A.  No.

19   Q.  Mr. Jackson, if you could back out and just blow up the

20   bottom paragraph of this same page.

21          Looking at that, Mr. Raines, would you agree with me

22   that Jason Galanis also boasted in writing about the

23   involvement of Doug Band and Teneo Consulting?

24   A.  Reading this, yes.

25   Q.  Thank you.

1          You can take that down, Mr. Jackson.

2          Another person who boasted about Mr. Archer and

3   Mr. Biden's involvement was Tim Anderson, true?

4   A.  I don't recall.

5   Q.  You don't recall Mr. Anderson mentioning to you that Mr.

6   Archer and Hunter Biden were involved in this deal?

7   A.  Yes, I recall that.

8   Q.  You do recall that, OK, thank you.

9          And I believe you testified on direct that you had

10  known Tim Anderson for a period of several years prior to the

11  time that this bond idea was brought to you; is that right?

12  A.  Yes.

13  Q.  And you had a high level of confidence in Tim Anderson; is

14  that right?

15  A.  Yes.

16  Q.  So when he told you that Mr. Archer and Hunter Biden were

17  involved in the deal, it lent some credibility; isn't that

18  right?

19  A.  Yes.

20  Q.  But again Mr. Archer never used Mr. Biden's name or his own

21  reputation, because you never communicated with Mr. Archer in

22  any way, shape or form, true?

23  A.  True.

24          MR. SCHWARTZ:  Thank you very much, Mr. Raines.  I

25  don't have any other questions.

1              THE COURT:  Any further questions?

2              MS. NOTARI:  Your Honor, Mr. Hassen is going to

3      question.

4              THE COURT:  Yes, of course.

5      CROSS EXAMINATION

6      BY MR. HASSEN:

7      Q.  Good afternoon.

8              Good afternoon, everybody.

9              I'm Abraham Hassen; I'm one of the lawyers

10     representing Bevon Cooney.  I just have a few questions.

11             So you're a member of the WLCC board, correct?

12     A.  No.

13     Q.  You're the CEO of the WLCC?

14     A.  That's correct.

15     Q.  And you sit on the board?

16     A.  No.

17     Q.  You advise the board.

18     A.  Yes.

19     Q.  You came to the WLCC board with significant financial

20     experience, correct?

21     A.  Yes.

22     Q.  You spent several years in various financial industries

23     prior to joining the WLCC.

24     A.  Yes.

25     Q.  And you acted as a liaison to the board, explaining things,

I6B7GAL5                          Raines - Cross

```
1    helping them with -- using your financial expertise.
2    A.  Yes.
3    Q.  You would digest information from various other financial
4    entities and explain it to the board because you had more
5    experience in the industry.
6    A.  Yes.
7    Q.  And you were paid a salary, and in addition you got a
8    success fee, which is akin to a commission.
9    A.  A success fee, yes.
10   Q.  And a success fee is if the deal goes well, you make --
11   everyone does well?
12   A.  That's correct.
13   Q.  In the deal doesn't do well, you don't do so well.
14   A.  Right.
15   Q.  So as part of your duties as CEO you're looking for
16   economic opportunities.
17   A.  Yes.
18   Q.  And as you said on your direct testimony, those are
19   difficult to find in the WLCC community, correct?
20   A.  Yes.
21   Q.  So, going to 2014 at the economic development summit, you
22   were presented with a lot of ideas, right?
23   A.  Yes.
24   Q.  And when you go to these conferences you get a lot of ideas
25   from a lot of people; is that fair to say?
```

I6B7GAL5                              Raines - Cross

1   A.  Yes, it is.

2   Q.  And you have been to a lot of these conferences.

3   A.  Yes.

4   Q.  And some of the -- you know, when you go to a conference,

5   some ideas pan out, most don't.

6   A.  Yeah, that's fair to say.

7   Q.  But this idea for the sovereign debt seemed like a good

8   one.

9   A.  Yes.

10  Q.  At the conference you were surrounded by people who you

11  knew pretty well and other people who you didn't know so well.

12  A.  Yeah, that's correct.

13  Q.  The people you knew well were Steven Haynes?

14  A.  Yes.

15  Q.  Someone you worked closely with.

16  A.  Yes.

17  Q.  Whose opinion you trusted?

18  A.  Yes.

19  Q.  Someone who added credibility to their involvement in a

20  deal.

21  A.  Correct.

22  Q.  Another person was Tim Anderson.

23  A.  Correct.

24  Q.  Someone you knew well?

25  A.  Yes.

I6B7GAL5                          Raines - Cross

1    Q.  Someone whose opinion you trusted.

2    A.  Yes.

3    Q.  Someone whose professionalism and experience added

4    credibility to the deal.

5    A.  Yes.

6    Q.  And he, Tim Anderson, at that time was your lawyer for the

7    WLCC?

8    A.  One of them, yes.

9    Q.  So what you liked about this idea was it had some

10   advantages over other forms of financing that you had explored.

11   A.  Yes.

12   Q.  Some tax advantages, some liability advantages.

13           I will rephrase it.  Is it fair to say this was a new

14   idea that you found interesting?

15   A.  Yes.

16   Q.  But it was just an idea.

17   A.  I had heard of social responsible capital investment sector

18   before.

19   Q.  But in 2014 at the conference at that point this was just

20   an idea.

21   A.  Yes.

22   Q.  And as we discussed before, most ideas don't ever happen.

23   When you go to a conference, you get a lot of ideas and most of

24   them don't happen.

25   A.  Yes.

I6B7GAL5                          Raines - Cross

1   Q.  So it's fair to say that at this conference this was still

2   a speculative plan.

3   A.  Yes.

4   Q.  There was a lot of ideas that needed to be worked out if it

5   was going to happen.

6            MS. MERMELSTEIN:  Objection to form, your Honor.

7            THE COURT:  Sustained.

8            Please rephrase that.

9   Q.  In your experience putting these kinds of deals together,

10  any kind of financial deal, from inception to execution

11  requires a lot of moving parts.

12  A.  Yes.

13  Q.  And particularly with these kinds of financing operations

14  there is a lot of complexity involved.

15  A.  Yes.

16  Q.  That's why you have lawyers and people with experience in

17  finance.

18  A.  Correct.

19  Q.  And you have a lot of expertise in finance and a lot of

20  history, correct?

21  A.  Not a lot.

22  Q.  You have a fair amount of experience.  I mean your role on

23  the WLCC was as a financial advisor largely, right?

24  A.  Project developer specifically.

25  Q.  And it was because of your experience that you had that

I6B7GAL5                         Raines - Cross

1    role.

2    A.  No, there was a lot of reasons why I had that role.

3    Q.  Fair enough.  But your experience was one of those reasons.

4    A.  Yes.

5    Q.  But you alone could not pull off a deal like this.

6    A.  No.

7    Q.  There is a lot of moving parts, and you needed to get a

8    team together to make it work.

9    A.  Yes.

10   Q.  You needed professionals, you needed the lawyers, you

11   needed the firms --

12   A.  Yes.

13   Q.  -- that we discussed earlier.  But this particular deal and

14   the people involved gave you comfort because you knew their

15   track record.

16   A.  Yes.

17   Q.  Again, Tim Anderson, Steven Haynes and others.

18   A.  Yes.

19   Q.  And as it began to progress, a lot more people and a lot

20   more entities got involved.

21   A.  Yes.

22   Q.  And is it fair to say that those names also gave you

23   comfort?  Some of the names we mentioned before, obviously

24   Hunter Biden was mentioned, but also Keith Henselen from U.S.

25   Bank, Heather Thompson, these were all people that you trusted

I6B7GAL5                          Raines - Cross

1    their professionalism.

2                MS. MERMELSTEIN:  Objection to form.

3                THE COURT:  Could you please restate that, please.

4    Q.  As more entities and people got involved, they generally

5    gave you a good impression.

6    A.  Yes.

7    Q.  And throughout this you describe Tim Anderson's role as the

8    quarterback.

9    A.  I don't watch sports, but I think I might have used that,

10   yeah.

11   Q.  We're all familiar with someone who is kind of a ring

12   leader.

13   A.  Yes.

14   Q.  Putting things together, making it happen.

15                Were you surprised when he switched from WLCC to

16   Burnham?

17   A.  No.

18   Q.  You felt comforted by that?

19   A.  Yes.

20   Q.  So as all these people and all these entities -- you

21   mentioned Wealth Assurance, a major insurance company -- that

22   gave you comfort?

23   A.  Yes.

24   Q.  And as the deal began to progress, you saw that this thing

25   was becoming real.

I6B7GAL5                          Raines - Cross

```
 1    A.  Yes.

 2    Q.  And you were excited by this new idea becoming a real

 3    thing.

 4    A.  Yes.

 5    Q.  And of all the names that came up, you weren't familiar

 6    with the name Bevon Cooney, were you?

 7    A.  No.

 8    Q.  You never really heard his name until this case started,

 9    correct?

10    A.  Correct.

11    Q.  And you never had any communications with him?

12    A.  No.

13    Q.  And you've never talked to him on the phone in any way, or

14    e-mail or nothing, right?

15    A.  No.

16            MR. HASSEN:  I have

17            MR. HASSEN:  No further questions.

18            THE COURT:  Mr. Touger?

19            MR. TOUGER:  Thank you, your Honor.  Sorry, it's a

20    long walk.

21    CROSS EXAMINATION

22    BY MR. TOUGER:

23    Q.  Good afternoon, Mr. Raines.

24    A.  Hello.

25    Q.  My name is David Touger.  I represent John Galanis who you
```

I6B7GAL5                        Raines - Cross

1    knew as Yanni Galanis.  Correct?

2    A.  Yes.

3    Q.  Have you ever met me before?

4    A.  No.

5    Q.  You know John real well though, right?

6    A.  Yes.

7    Q.  And you developed a very good relationship with him, right?

8    A.  Yes.

9    Q.  And have you ever talked to me before on the telephone?

10   A.  No.

11   Q.  Have you ever exchanged any e-mails with me?

12   A.  No.

13   Q.  And would I be correct in saying though that you have

14   talked to members sitting at the prosecution table before?

15   A.  Yes.

16   Q.  On many occasions.

17   A.  A few.

18   Q.  Well, you were interviewed personally by them, correct?

19   A.  Yes.

20   Q.  And they asked you a lot of questions, right?

21   A.  Yes.

22   Q.  And those interviews didn't just take five or ten minutes;

23   some of them lasted over an hour, right?

24   A.  Correct.

25   Q.  How long did the longest one last, approximately?  I know

I6B7GAL5                        Raines - Cross

1   you didn't sit there with your watch, but -- well, you probably

2   did toward the end, but...

3   A.   Let's see, maybe two and a half hours.

4   Q.   And would I be correct in saying that the shortest one was

5   also about an hour?

6   A.   That's correct.

7   Q.   So you talked to them for many hours, right?

8   A.   Yes.

9   Q.   You went over a lot of questions and a lot of answers.

10  A.   Yes.

11  Q.   Now, I want to take you back to the beginning of 2014.  OK?

12  A.   OK.

13  Q.   Would I be correct in saying that at that point in time you

14  were trying to get some TED bonds for the Oglala tribe?

15  Correct?

16  A.   The Oglala Sioux Tribe, yes.

17  Q.   And I believe the total amount was about $217 million?

18  A.   Yes.

19  Q.   And what is a TED bond?

20  A.   It stands for Tribal Economic Development bond.

21  Q.   And could you just give the jury some background of what

22  they are.

23  A.   Sure.  It's one of many examples of a federal program put

24  together to assist Native American tribes in creating finance

25  mechanisms for their economic development.

I6B7GAL5                          Raines - Cross

1    Q.  And you were involved in trying to get I believe you said

2    $217 million of those, correct?

3    A.  Yes, I was asked by the Tribal President to help put that

4    program together, explore it.

5    Q.  But one of the problems with TED bonds is they're very

6    narrow in their scope, right?

7    A.  Yes.

8    Q.  And it would have been hard for you to connect all your

9    ideas that you wanted to do and use TED bonds to finance those

10   ideas, correct?

11   A.  Yes.

12   Q.  Now, plus the TED bonds were going through the Oglala

13   counsel, correct?

14   A.  Through the President's office, yes.

15   Q.  Of Oglala.

16   A.  Of the Oglala.

17   Q.  Which is the whole tribe in general, correct?

18   A.  Yes.

19   Q.  They're like the Oglala would be the federal government,

20   and the Wakpamni Lake Community would be a city inside the

21   United States.

22   A.  That's correct.

23   Q.  And so the Oglala Council would have certain control over

24   those bonds, right?

25   A.  Let's see.  No, they were -- they were going to establish a

1   special office to deal with the economic development of that

2   project.

3   Q.   Through their auspices though, through the Oglala Council

4   as opposed to the Wakpamni Lake Community.

5   A.   Yes.

6   Q.   And you were not a member of the Oglala Council, right?

7   A.   No.

8   Q.   And I believe you said this on direct, but I just want to

9   make sure I'm correct that the WLCC is separate and distinct

10  from the Oglala Tribal Council or the Oglala economic

11  development team.

12  A.   Yes.

13  Q.   And the WLCC, the Wakpamni Lake Community Corporation,

14  right --

15  A.   Yes.

16  Q.   -- is a corporation created by the Wakpamni Lake Community

17  for its own specific economic development, right?

18  A.   That's correct.

19  Q.   And so the TED bonds were not going to be used through the

20  WLCC, right?

21  A.   Correct.

22  Q.   And so you were looking for ideas that were specific for

23  the WLCC to finance certain deals, right?

24  A.   Yes.

25  Q.   Now, let me just talk a little bit about Steven Haynes.

I6B7GAL5                        Raines - Cross

1     A.  OK.

2     Q.  You know him very well obviously.

3     A.  Yes.

4     Q.  And he is one of your business partners.

5     A.  Yes.

6     Q.  For how long has he been a business partner?

7     A.  Let's see.  I want to say maybe four and a half years,

8     somewhere in there.

9     Q.  And you've done many different ideas with him, business

10    projects?

11    A.  Yeah.  I mean he is unique in that he is a non-Native and

12    has been working in Indian country economic development since

13    19 --

14    Q.  Could you just repeat it.

15    A.  Yes.  I'm saying he is unique as a non-Native working in

16    Indian country since 1997.  You know, he has a really strong

17    track record in multiple industries working with specifically

18    with Indian country, yeah.

19    Q.  You anticipated my next question.  He's not a Native

20    American, right?

21    A.  Right.

22    Q.  We're on the same wave length here.  But he is more than

23    just a business partner; he is also a mentor to you, right?

24    A.  Yes.

25    Q.  And he is somebody that you have grown to respect and

I6B7GAL5                         Raines - Cross

1   really treasure his involvement in your work.

2   A.  Yes.

3   Q.  And he has a stellar reputation in the community that you

4   live in, correct?

5   A.  Yes.

6   Q.  And would you agree with me that you considered him a Wall

7   Street hard charger type of guy?

8   A.  Yes, definitely.

9   Q.  By the way, do you know who Pete Shannon is?

10  A.  Yes.

11  Q.  Have you ever met Pete Shannon?

12  A.  Yes.

13  Q.  And how are Pete Shannon and Steven Haynes related?

14  A.  Let's see.  I don't think they -- I know they know each

15  other.

16  Q.  Not familial relationship.  Business-wise.

17  A.  Right.  They know each other.  I don't know what deals they

18  have done together, but I --

19  Q.  But they definitely knew each other.

20  A.  They definitely knew each other.

21  Q.  And communicated about deals, correct?

22  A.  Yes.

23  Q.  And Pete Shannon had a liquor company, correct?

24  A.  I think he had a distribution company.

25  Q.  A distribution company, right?

I6B7GAL5                          Raines - Cross

1  A.  Yes.

2  Q.  Called SSH?

3  A.  That's right.

4          MR. TOUGER:  May I approach the witness, your Honor?

5          THE COURT:  Yes.

6          MS. MERMELSTEIN:  Mr. Touger, what are you showing

7  him?

8  Q.  Mr. Raines, have you ever seen this pamphlet?  You can look

9  at it?

10  A.  Let me take a look at it.  I think I did, yes.

11  Q.  And it's just a promotional?

12  A.  I know Andrew.  I don't know --

13  Q.  It's just a promotional pamphlet for the SSH company,

14  right?

15  A.  Yes.

16  Q.  And it just says they're an alcohol distribution company.

17  A.  Yes.

18  Q.  Now, would you agree with me that you knew that the

19  distribution company had its main warehouse in San Diego,

20  California?

21  A.  I believe so.

22  Q.  And would you also agree with me that Pete Shannon through

23  Mr. Haynes was looking for a way to partner with a Native

24  American tribe to distribute this alcohol?

25  A.  Yes.

1  Q.  And that was one of the ideas that you were talking about

2  at the convention that you went to, correct?

3  A.  Yes, they serve alcohol at most tribal casinos, so

4  therefore if there was a tribal owned alcohol distribution

5  company, they could probably, you know, have good relationships

6  for alcohol distribution.

7  Q.  And there would be certain tax advantages to it being a

8  Native American company also, correct?

9  A.  I believe so.

10  Q.  And certain distribution obviously advantages because there

11  are a lot of Native American casinos that serve lots of

12  alcohol, right?

13  A.  I believe so.

14  Q.  Now, would you agree with me that at some point during your

15  attendance to this convention -- I believe you said it was in

16  March of 2014?

17  A.  I think so.

18  Q.  And at some point you got a call from Steven Haynes saying

19  he wanted to meet with you, right?

20  A.  Yes.

21  Q.  And did he tell you that one of the things he wanted to

22  discuss at this meeting was this alcohol distribution business

23  of Mr. Shannon's?

24          MS. MERMELSTEIN:  Objection.

25          THE COURT:  Sustained.

1           MR. TOUGER:  Your Honor, may we approach?

2           THE COURT:  Sure.

3           (At the sidebar)

4           MR. TOUGER:  That's the last question.  It's just

5    setting up the whole idea that that's why John Galanis gets

6    invited to this meeting is to discuss this idea.

7           MS. MERMELSTEIN:  I mean he can just say -- I don't

8    think that that establishes what Mr. Touger thinks it

9    establishes.

10          MR. TOUGER:  That was the next question.

11          MS. MERMELSTEIN:  It calls for hearsay.

12          THE COURT:  I think it calls for hearsay.

13          MS. MERMELSTEIN:  Can I raise one issue?  Mr. Touger

14   just showed the witness a document which has never been

15   provided to anyone, and if it's just for impeachment, obviously

16   no one had to give it to us before right now.  But if we

17   haven't gotten already, you have to give us a copy when you

18   show it to the witness.  It's just not fair.  And if there are

19   more of those coming, I'd like to --

20          MR. TOUGER:  There is nothing more coming.

21          THE COURT:  And you're done with that anyway.

22          MS. MERMELSTEIN:  No, I meant more generally about

23   documents.

24          THE COURT:  No, I agree.

25          (Continued on next page)

1                    (In open court)

2                    THE COURT:  We're waiting for a juror.

3        BY MR. TOUGER:

4        Q.  So Mr. Haynes calls you and tells you I want to meet with

5        you, right?

6        A.  Yes.

7        Q.  And where did this meeting take place?

8        A.  In Las Vegas at the conference.

9                    (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. TOUGER:

Q.  Do you remember what hotel it was?

A.  The conference was at the Mandalay Bay.  I believe that
meeting was at the Four Seasons.

Q.  And when you got to the meeting Mr. Haynes was there,
correct?

A.  Yes.

Q.  And was there also the person named Mr. Henning there?

A.  Yes.

Q.  And do you know Mr. Henning?

A.  Yes.

Q.  And what is Mr. Henning's role?

A.  He is Pete Shannon's business partner.

Q.  Excuse me?

A.  Pete Shannon's business partner.

Q.  Isn't it a fact that he ran the warehouse in San Diego?

A.  I believe so.

Q.  And at that meeting was you, Steven Haynes, Mr. Henning and
other individuals, correct?

A.  Yes.

Q.  And one of the individuals they introduced you to was
Mr. Galanis?

A.  Yes.

Q.  And at that meeting, in the beginning Steven Haynes was
doing most of the talking, correct?

I6B5gal6                          Raines - cross

1   A.  Yes.

2   Q.  And he was describing this whole idea of trying to involve

3   the SSH company into a Native American company and alcohol

4   distribution?

5   A.  I believe so.

6   Q.  And there was also some talk of a winery deal also?

7   A.  Yes.  There was several deals including like an indoor

8   farm -- indoor vegetable farm and a few other things.

9   Q.  And the winery deal happened concerning having a Native

10  American tribe, in Northern California, start a winery, and

11  that would add to the distribution of the alcohol distribution

12  business, right?

13  A.  That's correct.

14  Q.  And John Henning -- his first name is John, right?

15  A.  I believe so.

16  Q.  And he was acting more as a moderator of the meeting,

17  right?

18  A.  I don't recall that, no.

19  Q.  And, by the way, it was Mr. Henning that introduced you to

20  John Galanis, right?

21  A.  I don't recall that either.

22  Q.  Well, from what you could tell at the meeting did

23  Mr. Haynes have any relationship with Mr. Galanis prior to the

24  meeting?

25  A.  I believe they may have met before, but I'm not certain.

I6B5gal6                          Raines - cross

1   Q.  But Mr. Galanis has obviously introduced you, right?

2   A.  Yes.

3   Q.  And I would be correct in saying that this is the first

4   time you ever met John Galanis?

5   A.  Correct.

6   Q.  First time you ever heard his name?

7   A.  Correct.

8   Q.  And he obviously didn't ask you to come to the meeting?

9   A.  Correct.

10  Q.  And the way he was introduced to you was this is somebody

11  that Pete Shannon and Mr. Henning wanted you to hear from?

12  A.  Not specifically.

13  Q.  Well, how was he introduced to you?

14  A.  That he had an economic -- he had socially responsible

15  capital investors interested in developing projects that would

16  meet the narrow scope of socially responsible capital bond

17  investment.

18  Q.  Right.

19          And at that meeting TED bonds were also discussed,

20  right?

21  A.  Yes.

22  Q.  And government resource bonds were discussed, right?

23  A.  I don't recall those ones specifically, but.

24  Q.  Well, there were other ideas --

25  A.  Other ideas, yes.

I6B5gal6                        Raines - cross

1    Q.   -- a lot of financing ideas were discussed at that

2    meeting?

3    A.   Correct.

4    Q.   And they were all bandying about the advantages and

5    disadvantages of each of the different ideas?

6    A.   Yes.  That was definitely the point of the whole

7    conference.

8    Q.   And Mr. Haynes was concentrating, though, on the fact that

9    the Native Americans, if they ran the company, they would have

10   sovereign immunity and would have tax advantages in that

11   aspect?

12            MS. MERMELSTEIN:  Objection.

13            THE COURT:  Sustained.

14            MR. TOUGER:  Sorry.  I didn't hear you.

15            THE COURT:  I said it was sustained.

16   BY MR. TOUGER:

17   Q.   It was definitely discussed that there would be advantages

18   for the Native American tribes to own the alcohol distribution

19   business?  Or partner with it?

20   A.   Yeah, that's fair to say.

21            The original wine company was owned by a tribe at the

22   time.

23   Q.   Right.

24   A.   Yeah.

25   Q.   And they wanted to try to bring in this SSH business as a

I6B5gal6                        Raines - cross

1     partnership in that business, right?

2     A.  To grow or distribute, yes.

3     Q.  And I would be correct in saying that nothing was hard-fast

4     decided at that meeting?

5     A.  Correct.

6     Q.  And, but John did mention, Mr. Galanis did mention that he

7     had a son who had influence over at Burnham, right?

8     A.  I believe so.  It might have been at that first meeting.

9     Q.  And he said specifically that his son had worked on special

10    projects for Burnham, right?

11    A.  I think so.

12    Q.  Now, and he also mentioned the name of Jason Sugarman?

13    A.  I don't recall that name.

14    Q.  And at this meeting you were more of a listener than a

15    speaker; would that be correct?

16    A.  Yes.

17    Q.  You were just taking in all the different information that

18    was coming out?

19    A.  Yes.

20    Q.  And it was at this meeting, and remember all of these

21    questions have to do just with this meeting, there was no

22    discussion of annuities at this meeting, right?  The annuity

23    idea didn't come to it until much later?

24    A.  I think I recall hearing an annuity.

25    Q.  And do you recall that there was no mention of Burnham

1    Securities at this meeting either, correct?

2    A.  I think I recall that name.

3    Q.  I would like you to look at -- by the way, one of the

4    interviews that you had with the government was on January 26,

5    2016, correct?

6    A.  I don't remember the exact date but I remember it was at

7    the beginning of the year, yes.

8    Q.  Could you just read this first part and the yellow part?

9    You can read the whole paragraph if you would like but those

10   specific parts --

11   A.  There was no mention --

12   Q.  No.  To yourself.

13          THE COURT:  Read it to yourself.

14   A.  Oh.

15   Q.  Finished?

16   A.  Yes.

17   Q.  Does that refresh your recollection that on January 26,

18   2016, you told the members of the prosecution that you were

19   talking to that there was no mention of Burnham Securities and

20   the idea of investing the tribal proceeds into an annuity came

21   much later in the project discussions?

22   A.  No, that doesn't refresh my recollection.

23   Q.  Now, and part of this deal that was being discussed was to

24   build, in the Wakpamni Lake Community, a warehouse to

25   distribute the alcohol, correct?

1    A.  Yes.

2    Q.  And that was the main interest to you, right?  Because that

3    was going to bring economic development to the Wakpamni Lake

4    Community?

5    A.  Yes.

6    Q.  And, how long would you say this meeting lasted?

7    A.  A lunch meeting, lunch was served; maybe an hour.

8    Q.  At some point you and Mr. Haynes have to leave because you

9    have other appointments, right?

10   A.  Yes.  The conference continued on.

11   Q.  And the meeting starts to break up and would you agree with

12   me that at that point you took Mr. Galanis over to the bar and

13   introduced him to Mr. Anderson?

14   A.  No.

15   Q.  What happened?

16   A.  What happened when?

17   Q.  How did Mr. Anderson join the meeting?

18   A.  He works with Steven Haynes.

19   Q.  I understand that.

20        Was he at the meeting from the very beginning or did

21   he join later on?

22   A.  I believe he was there from the very beginning.

23   Q.  He was.  Okay.

24        And would I be correct in saying that once the meeting

25   broke up, that was the last time you saw John Galanis up until

I6B5gal6                          Raines - cross

1      the first bond series was actually signed in August of that

2      year?

3      A.  No.  I had seen him during project development.

4      Q.  You did see him during the spring and summer of 2014?

5      A.  I believe so, yes.

6      Q.  About how many times did you see him?

7      A.  Maybe four.

8      Q.  Okay.  In Las Vegas or in other places?

9      A.  Las Vegas.

10     Q.  Okay.

11            Now, would I be correct in saying that from what you

12     could tell, Mr. Anderson was also intrigued by what John

13     Galanis had said?

14            MS. MERMELSTEIN:  Objection.

15            MR. TOUGER:  He was at the meeting, your Honor.

16            THE COURT:  Sustained.  I sustained the objection.

17            MR. TOUGER:  Okay.

18     Q.  Would I be correct in saying that you received, from

19     Mr. Anderson, a memorandum that he issued on April 4, 2014?

20     A.  I don't recall that.

21     Q.  You do or you don't?

22     A.  I don't.

23     Q.  You don't.

24            Now, but would you agree with me, though, that once

25     the meeting ended, as time went on the idea started to blossom?

I6B5gal6                         Raines - cross

1   A.  Yes.

2   Q.  And discussions started to take place about putting this

3   idea into actual effect?

4   A.  Correct.

5   Q.  And it gained a certain amount of momentum?

6   A.  Yes.

7   Q.  And would you also agree with me that you relied on Steven

8   Haynes and Tim Anderson to do most of the heavy lifting in

9   moving this idea forward?

10  A.  Yes.

11  Q.  And that they were the main communicators with people on

12  the other side of this deal?

13  A.  Yes.

14  Q.  That you were leaving it up to them?

15  A.  Yes.

16  Q.  And at this point you didn't know Mr. John Galanis very

17  well, right?

18  A.  Right.

19  Q.  But you trusted him because, of course, Steven Haynes had a

20  certain amount of trust in him, right?

21          MS. MERMELSTEIN:  Objection.

22          THE COURT:  Sustained.

23  Q.  Did you trust him at that point?

24  A.  I trusted Steven Haynes and his business background, yes.

25  Q.  Yes.

I6B5gal6                          Raines - cross

1              And, you trusted that he had done his due diligence on

2    the people he introduced you to?

3              MS. MERMELSTEIN:  Objection.

4              THE COURT:  If you can rephrase that?

5    Q.  You relied on Mr. Haynes to do the due diligence on John

6    Galanis?

7              MS. MERMELSTEIN:  Your Honor, may we approach?

8              THE COURT:  Sure.

9              (Continued next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6B5gal6                        Raines - cross

1            (At side bar)

2            MS. MERMELSTEIN:  Due diligence on John Galanis

3    includes some very bad things that are very easily found on the

4    Internet.  This is a line of questioning that risks an answer

5    that I can't stop from coming out because people did it.

6            MR. TOUGER:  Okay.

7            THE COURT:  I hear you.

8            MS. MERMELSTEIN:  We don't mind it coming in --

9            MR. TOUGER:  Okay.  I will move on.

I6B5gal6                        Raines - cross

1              (In open court)

2    BY MR. TOUGER:

3    Q.  Now, would I be correct in saying, and this is all during

4    this time period of the spring and summer of 2014, okay, that's

5    the time period we are discussing?

6    A.  Okay.

7    Q.  That during that time period you never worked alone with

8    John Galanis, there were always other people involved; lawyers,

9    insurance companies and other people of that nature?

10             MS. MERMELSTEIN:  Objection.

11             THE COURT:  Why don't you break it down.

12   Q.  Well, there were lawyers involved in this?

13   A.  Yes.

14   Q.  Right?  Everybody had a lawyer representing them?

15   A.  Yes.

16   Q.  And Tim Anderson started, in the beginning of the process,

17   was more of your representative than he was until he switched

18   over to the Burnham side, right?

19   A.  Yes.

20   Q.  And you trusted Tim Anderson with representing you, right?

21   A.  Yes.

22   Q.  No reason to distrust him?

23             MS. MERMELSTEIN:  Objection.

24             THE COURT:  Sustained.

25   Q.  By the way, what other deals had you worked with Tim

I6B5gal6                           Raines - cross

 1    Anderson on?

 2    A.  Let's see.

 3              MS. MERMELSTEIN:  Objection to relevance, your Honor.

 4              THE COURT:  I think that's right.  Why don't we move

 5    on from that.

 6    BY MR. TOUGER:

 7    Q.  Well, were they finance deals?

 8              I think it is relevant if it is not what area they're

 9    in, your Honor.

10              THE COURT:  Just very briefly.

11              MR. TOUGER:  Yes.

12    Q.  Were they finance deals?

13    A.  No.  We were working on class 2 gaming which is like a

14    bingo hall.

15    Q.  Now --

16    A.  That's Steven Haynes' area of expertise as well.

17    Q.  Casinos, right?

18    A.  Class 2, specifically.

19    Q.  And Mr. Anderson worked for a very large firm, right?

20    A.  Yes.

21    Q.  Dilworth Paxson.  Familiar to you?

22    A.  Yes.

23    Q.  And he had been your attorney, I think you said, for about

24    two years?

25    A.  Correct.

I6B5gal6                       Raines - cross

1   Q.  And you continued to use him so obviously there was no real

2   dissatisfaction with his work?

3           MS. MERMELSTEIN:  Objection.

4           THE COURT:  I will allow that.  But then move on.

5           MR. TOUGER:  I am.

6           THE COURT:  You can answer that.

7           THE WITNESS:  Yes.

8   BY MR. TOUGER:

9   Q.  By the way, was Mr. Haynes paid, besides the construction

10  fees that he got, was he paid a fee for his involvement, what

11  they call the success fees that you said?

12  A.  I don't believe so.

13  Q.  He didn't get any money at the end of closing that you

14  split with him?

15  A.  That's the only one that I'm aware of.

16  Q.  Right; and how much was that for?

17          MS. MERMELSTEIN:  If he can specify which transaction,

18  your Honor?

19  Q.  The first bond series Mr. Haynes was issued a success fee,

20  correct?

21  A.  Yes.

22  Q.  In quotes.  You call it a success fee, right?

23  A.  Yes.

24          MS. MERMELSTEIN:  Objection to the "in quotes," your

25  Honor.

I6B5gal6                          Raines - cross

1  Q.  Well, it is also known as a commission, right?

2  A.  Transaction fee.

3  Q.  Many different titles for the same thing.

4          And how much was that for?

5  A.  It's in that schedule of payments.  I don't remember the

6  exact number.

7  Q.  It was tens of thousands of dollars, right?

8  A.  Yes.

9  Q.  And you split that with him, right?

10  A.  I got a percentage of it, yes.

11  Q.  And, by the way, you were shown on direct a drawing of the

12  Wakpamni Town Center.  Do you remember that?

13  A.  Yes.

14  Q.  And, would I be correct in saying that Steven Haynes' wife

15  was the architect who drew that drawing?

16  A.  Yes.

17  Q.  And was she paid for her work?

18  A.  I believe so.

19  Q.  And, you got paid your success fee through Mr. Haynes'

20  company?

21  A.  Yes.

22  Q.  And would I be correct in saying that, in total, not just

23  for the first bond series but in total, you received

24  approximately $108,000 in success fees?

25  A.  No.  I think it was 88.

I6B5gal6                    Raines - cross

1    Q.  You were also interviewed by the government on October

2    17th, 2017, right?

3    A.  I believe so.  I don't remember the exact date.

4    Q.  But sometime in that time period, right?

5    A.  Yes.

6    Q.  And, again, you can read whatever you would like but I want

7    to point you to the last sentence here.

8    A.  I recognize that number but I think it was lower when I --

9    when it ultimately got paid out.

10   Q.  So, this doesn't refresh your recollection that on October

11   17th you told the government you were paid approximately

12   $108,000 in the form of two payments?

13   A.  Correct.

14   Q.  And the funds you were paid, either the 88 or the 108 or

15   somewhere in between, you got directly from the bond proceeds?

16   A.  It was the transaction success fee, yes.

17   Q.  Which came from the bond proceeds?

18   A.  Yes.

19   Q.  So, the money was paid to Haynes' company, went from the

20   WLCC to Haynes' company and then to you?

21   A.  Yes.

22   Q.  And as you stated on direct, you thought that Mr. Galanis,

23   John Galanis, would receive a similar success fee from Burnham?

24   A.  I thought so.

25   Q.  By the way, you never got any money from John Galanis for

I6B5gal6                              Raines - cross

1   doing this deal, right?

2   A.  Correct.

3   Q.  He never tried to bribe you?

4   A.  No.

5   Q.  Never tried to force you?

6   A.  No.

7   Q.  And you never got any money from Burnham Securities?

8   A.  No.

9   Q.  And you never got any money from a company named Thorsdale?

10  A.  No.

11  Q.  The only money you got from this deal is through Steven

12  Haynes' company?

13  A.  Correct.

14  Q.  And just like you said on direct, the WLCC Board knew all

15  about the payments you were getting from Mr. Haynes' company?

16  A.  Yes.

17  Q.  Nothing -- everything was above board on that, correct?

18  A.  Yes.

19  Q.  Because it is common for people, like yourselves and others

20  who work only deals, to get success fees when the deal works?

21          MS. MERMELSTEIN:  Objection.

22  Q.  As far as you knew?

23          THE COURT:  You can answer based on your general

24  understanding.

25  A.  Yes.

I6B5gal6                          Raines - cross

1   Q.  Matter of fact, I believe you testified that your total

2   payments from the WLCC, in general, all come on success fees.

3   You are not paid a salary by the WLCC?

4   A.  Correct.

5   Q.  By the way, are you still working with Mr. Haynes on other

6   projects?

7               MS. MERMELSTEIN:  Objection, your Honor.

8               THE COURT:  Sustained.

9   BY MR. TOUGER:

10  Q.  Did you keep any notes of your meetings with Mr. Galanis at

11  the time you were meeting with him or shortly thereafterwards?

12  A.  No.

13  Q.  You didn't keep a notebook?

14  A.  I had a notebook.  I didn't keep it.

15  Q.  Right.  But at the time you were taking notes?

16  A.  Yes.

17  Q.  But you don't know what happened to that notebook at this

18  time?

19  A.  Correct.

20  Q.  You never gave the government copies of those notes either,

21  right?

22              MS. MERMELSTEIN:  Objection.

23              THE COURT:  Overruled.

24  A.  No.

25  Q.  Now, at some point Anderson decides -- Mr. Anderson decides

I6B5gal6                          Raines - cross

1     that he is going to go and represent Burnham in the deal,

2     right?

3                MS. MERMELSTEIN:  Objection to Mr. Anderson deciding.

4                THE COURT:  Sorry?

5                MS. MERMELSTEIN:  I said objection to the question

6     about Mr. Anderson's decision-making.

7     BY MS. MERMELSTEIN:

8     Q.   I didn't ask him about -- Mr. Burnham went and represented

9     Burnham Securities, correct?

10                Mr. Anderson went and represented Burnham Securities?

11    A.   Correct.

12    Q.   And I believe, on direct, you stated the reasons why?

13    A.   Yes.

14    Q.   Could you go over that again that you answered on direct?

15                MS. MERMELSTEIN:  Objection to counsel's tone, your

16    Honor.

17                THE COURT:  Just ask a question.

18                MR. TOUGER:  She is objecting.  I asks the same

19    question she asks.

20                THE COURT:  I know, but if it has been asked and

21    answered already why go into it again.

22                MR. TOUGER:  I want to go into a little bit more

23    detail more than she did.  That's what cross-examination is

24    about.

25                THE COURT:  I understand, but just ask a different

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    question.

2    BY MR. TOUGER:

3    Q.  What were the reasons Mr. Anderson gave you for going to

4    represent Burnham?

5    A.  That Burnham needed Native American law familiarity

6    representation and that it would speed up the deal if they

7    didn't have such a long learning curve.

8    Q.  So Mr. Anderson said it would be beneficial to all parties

9    if he went and represented Burnham?

10   A.  Yes.

11   Q.  And you had no trouble with that decision whatsoever?

12   A.  Correct.

13   Q.  Because you had other lawyers you could use, right?

14   A.  Correct.

15   Q.  And you thought it would be advantageous to the WLCC to

16   have Mr. Anderson representing Burnham for the reasons you just

17   stated?

18   A.  Yes.

19   Q.  And I would think that you felt also that even though he

20   was representing Burnham, he would still not do anything to

21   harm the WLCC?

22            MS. MERMELSTEIN:  Objection.

23            THE COURT:  Sustained.

24   Q.  Now, you ended up being represented by Greenberg Traurig,

25   correct?

I6B5gal6                       Raines - cross

1   A.  Yes.

2   Q.  And Greenberg Traurig is another large law firm, right?

3   A.  Correct.

4   Q.  With vast -- representing native Americans in the United

5   States?

6   A.  Yes.

7   Q.  And I believe your then girlfriend, now wife -- by the way,

8   congratulations -- worked for Greenberg Traurig?

9   A.  Yes.

10  Q.  And they would bill the WLCC directly for their work?

11  A.  Yes.

12  Q.  Do you know how much, in total, Greenberg Traurig received

13  for the representation of the WLCC in this case in these bonds?

14  A.  I know it is in the scheduled payout.  I don't recall the

15  exact number.

16  Q.  And, again, it would be in the hundreds of thousands of

17  dollars though, correct?

18  A.  I believe so.

19  Q.  Now, getting back to the plan itself, the plan, as you

20  understood it, as you were described it by your lawyers and

21  others involved, was to fund, purchase, and grow companies to

22  generate an income for the WLCC?

23          MS. MERMELSTEIN:  Objection to form.

24          THE COURT:  Sustained.  Why don't you rephrase that.

25          MR. TOUGER:  I am having a hard time hearing you, your

I6B5gal6                        Raines - cross

1    Honor.  I'm sorry.

2              THE COURT:  I said sustained.  Why don't you rephrase

3    it or break it down.

4              MR. TOUGER:  Sure.

5    BY MR. TOUGER:

6    Q.  You had an understanding of what the deal was supposed to

7    do, right?

8    A.  Yes.

9    Q.  And one of the things that the deal was supposed to do, as

10   you understood it, was that they were going to take the funds

11   from the bonds to purchase and grow other companies, right?

12   A.  No.  It was supposed to fund the annuity specifically.

13   Q.  Right, and the annuity was to invest in private equity,

14   right?

15   A.  That part I'm not clear on.

16   Q.  But the idea was to generate income for the WLCC?

17   A.  That's correct.

18   Q.  Again, I would like you to read a part of your interview on

19   October 17th 2017 and see if that refreshes your recollection

20   that you told the government back then that the plan was to

21   fund, purchase, and grow companies to generate an income for

22   the WLCC.  Again, you can read whatever you want but I point

23   you to that part.

24             Does that refresh your recollection?

25   A.  Yes.

I6B5gal6                         Raines - cross

1    Q.  So, did you understand that that was what the plan was

2    supposed to do, correct?

3    A.  I still understood that it was to purchase an annuity.

4    Q.  Now, you liked the idea, right?

5    A.  Yes.

6    Q.  You thought it was a good, safe, well thought-out plan?

7    A.  Yes.

8    Q.  And you also thought that if it didn't work, the WLCC and

9    the Wakpamni Community wouldn't be on the hook for anything,

10   right?

11              MS. MERMELSTEIN:  Objection.

12   Q.  Those are your exact words, as a matter of fact?

13              MS. MERMELSTEIN:  Objection to the commentary.

14   A.  I don't recall.

15              THE COURT:  Sustained.  Just ask one question at a

16   time.

17   Q.  You stated on direct that these were non-recourse bonds,

18   right?

19   A.  Yes.

20   Q.  And non-recourse bonds means you can't be held responsible

21   for them, right?

22   A.  I believe so.

23   Q.  And again, the October 17th statement, just read the last

24   sentence?

25   A.  That was how it was presented to me.

I6B5gal6                        Raines – cross

1  Q.  Right.  It was presented to you by your lawyers and other

2  representatives that it was a good, safe, well thought-out plan

3  and the community would not be on the hook if it did not work

4  out?

5           MS. MERMELSTEIN:  Objection.

6           THE COURT:  I am going to overrule this one but why

7  don't we take a break now.  Okay?  Don't discuss the case, keep

8  an open mind, we will take our afternoon break.

9           Thank you.

10           (Continued on next page)

I6B5gal6                         Raines - cross

1          (Jury not present)

2          THE COURT:  If you can step down and come back in a

3     few minutes?  Thank you.

4          (Witness steps down)

5          THE COURT:  Do we have to talk about anything now?

6     Okay.  See you in a few minutes.

7          (Recess)

8          MR. SCHWARTZ:  Just so your Honor is aware, after this

9     witness, I think it is the government's intention to call a

10    document reader and there are a few issues that need to be

11    resolved in advance of that.

12         THE COURT:  Okay.  Do you want to just start to raise

13    them while we are waiting for the jury and stop as they come

14    closer.

15         MR. SCHWARTZ:  Sure do you want us to do it from here?

16         THE COURT:  Yes.

17         MR. SCHWARTZ:  The government has listed maybe 40

18    exhibits that they intend to read.  I only have problems with

19    three of them.  One of them is that Exhibit 2117, which has

20    been the subject of letter writing, and that's the e-mail where

21    every communication is from Mark Waddington and it is

22    principally hearsay, and hearsay within hearsay objection, but

23    also a 403 objection in light of the advice of counsel issues.

24         There is also an exhibit which the government just

25    added to its list this morning.  There are three exhibits that

I6B5gal6                        Raines - cross

1    the government has marked, all of them since Friday, on the

2    subject of an entity called Archer Diversified TCG.

3              THE COURT:  I'm sorry.  On the subject of?

4              MR. SCHWARTZ:  An entity called Archer Diversified

5    TCG.

6              THE COURT:  We will talk about it later.  Thank you.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6B5gal6                          Raines – cross

1              (Jury present)

2              THE COURT:  Everyone may be seated.

3              You may proceed.

4              MR. TOUGER:  Thank you, your Honor.

5     BY MR. TOUGER:

6     Q.  We were talking about the non-recourse bonds, correct?

7     A.  Yes.

8     Q.  And would I be correct in saying also that when the

9     resolution was passed by the Wakpamni Lake Community

10    Corporation to adopt these bonds, right?

11    A.  Yes.

12    Q.  And would I be correct in saying that in that resolution it

13    actually says that the revenue bonds shall never constitute the

14    debt or indebtedness of the Wakpamni Lake Community and shall

15    not give rise to the financial obligation of the Wakpamni Lake

16    Community or charged against its general credit or taxing

17    power?

18    A.  Yes.

19    Q.  And would I be correct in that it further states that there

20    will be no personal liability for the directors of the WLCC nor

21    any person executing the bonds also, correct?

22    A.  Yes.

23    Q.  You had no personal exposure either, right?

24    A.  Correct.

25    Q.  Now, who wrote that resolution?

I6B5gal6                         Raines - cross

1    A.  I believe our attorneys.

2    Q.  Excuse me?

3    A.  Our attorneys.

4    Q.  Greenberg Traurig?

5    A.  I believe so.

6    Q.  And would I be also correct in saying that once the whole

7    idea got accepted and was moving forward, that you became much

8    more focused on the WLCC side of the deal including the

9    logistics of building the building and the business of the

10   deal, correct?

11   A.  Yes.

12   Q.  And once that first bond was executed in August of 2014,

13   people were really just celebrating the idea that this actually

14   happened, right?

15   A.  Yes.

16   Q.  And nobody was really concerned about what was going on

17   because they were more happy about that the bonds were

18   executed?

19               MS. MERMELSTEIN:  Objection.

20               THE COURT:  Sustained.

21   BY MR. TOUGER:

22   Q.  Now, in total, from the bonds, if I can talk to you about

23   with all three series of the bonds you got $2.25 million when

24   the first bond series was signed to do the construction of the

25   warehouse, correct?

I6B5gal6                        Raines - cross

1    A.  Yes.

2    Q.  And that went to, as I said, the construction of the

3    warehouse?

4    A.  Correct.

5    Q.  It was done by Steven Haynes' company, right?

6    A.  There was a construction, architecture and --

7    Q.  The construction part was done by Steven Haynes' company,

8    right?

9    A.  No.

10   Q.  It wasn't?

11   A.  No.  There was a local tribal construction company.

12   Q.  And did Steven Haynes have anything to do with the

13   construction of the building?

14   A.  Yeah.  He had a hand in the design for the architecture and

15   just the overall planning of it.

16   Q.  He was like a general contractor on it?

17   A.  Yeah.  Exactly.

18   Q.  He made money on it, right?  He didn't do it for free?

19   A.  Correct.

20   Q.  And did you make any commissions or success fees from

21   Steven Haynes for that money that he got?

22   A.  No.

23   Q.  And would I also be correct in saying that in August of

24   2015 the WLCC got $1.83 million?

25   A.  I believe so.

I6B5gal6                           Raines - cross

1    Q.   And in September of 2015 the WLCC got $1.37 million?

2    A.   Yes.

3    Q.   And they also got approximately $520,000 in distributions,

4    right?

5    A.   I don't think we saw any of that money.

6    Q.   You didn't get the $250,000 for the first two years?

7    A.   No.

8    Q.   You are sure about that?

9    A.   I am pretty sure.

10   Q.   Okay.

11             Let's even put that money aside.  Taking that money

12   out, the WLCC got approximately $5 million from this bond deal?

13   A.   No.

14   Q.   If you add up 2.25 and 1.83 and 1.37 you get to about

15   $5 million, right?

16   A.   The other two numbers you mentioned, the 1.8 and 1.3, we

17   didn't see those.  We didn't get that.

18   Q.   Where did it go?

19   A.   I'm not sure.  I'm not sure where all of this went,

20   actually.

21   Q.   Didn't you tell the government that you got $1.83 million

22   in August of 2015 from Wealth Assurance?  When I say you I

23   meant the WLCC.

24   A.   Would have been U.S. Bank, the trustee.

25   Q.   They actually sent you the funds, right?

I6B5gal6                          Raines - cross

1    A.  I'm not sure.  We got $2 million.  That's what we built the

2    shells with of the buildings.

3    Q.  Now, in the bond deal, that building that you built was the

4    first commercial building built on the Pine Ridge Reservation

5    in almost 30 years, right?

6    A.  Maybe 20 years.

7    Q.  Okay.  Long time?

8    A.  Yeah.

9    Q.  And it was a spectacular event for the Wakpamni, correct?

10   A.  Correct.

11   Q.  And everybody was really happy about that?

12          MS. MERMELSTEIN:  Objection, your Honor.

13          THE COURT:  Sustained.

14   BY MR. TOUGER:

15   Q.  You had a ground breaking ceremony; is that correct?

16   A.  That's correct.

17   Q.  In November?

18   A.  Yes.

19   Q.  And a lot of Wakpamni came out for the ground breaking

20   ceremony?

21   A.  Yes.

22   Q.  Vast majority of them?

23   A.  Yes.

24   Q.  And Mr. Anderson came out for the ground breaking ceremony,

25   right?

I6B5gal6                        Raines - cross

1    A.  Yes.

2    Q.  And it was really cold out that day, right?

3    A.  Sure was.

4    Q.  Not weather you want to be out in, correct?

5    A.  Exactly.

6    Q.  But everybody came out because of the ground breaking

7    ceremony, right?

8              MS. MERMELSTEIN:  Objection.

9              THE COURT:  Sustained.

10   Q.  And that building didn't cost the WLCC a penny though,

11   right?  All the money came from the bond deal?

12   A.  Correct.

13   Q.  And I want to talk to you about who approached you for the

14   second series of bonds.  Okay?

15             Can we agree that you don't remember exactly who came

16   to you first with that idea?

17   A.  Yes.

18   Q.  That at some point you definitely have conversations with

19   Mr. John Galanis about it but you don't know who first broached

20   the idea to you?

21   A.  Correct.

22   Q.  And would I also be correct in saying that after August of

23   2014, your relationship with John Galanis continued to grow,

24   right?

25   A.  Yes.  I believe it was John that introduced the second

1      bond, though.

2      Q.  You have no distinct memory of that, right?

3      A.  Correct.

4      Q.  And going back to where we were, after all of 2014 your

5      relationship with John Galanis continued to grow, correct?

6      A.  Yes.

7      Q.  And you saw him many more times, right?

8      A.  Yes.

9      Q.  Even met members of his family, right?

10     A.  Yes.

11     Q.  And you went out to visit him in San Diego, right?

12     A.  Yes.

13     Q.  And you discussed many business projects together, right?

14     A.  Correct.

15     Q.  And would I be correct in saying that the business -- most

16     of the business projects you discussed were business projects

17     that you were bringing to him?

18     A.  Yes.

19     Q.  And, but Mr. Galanis brought to you, and Derrick brought to

20     you together the martial arts, right?

21     A.  Yes.

22     Q.  Matter of fact you said Mr. Galanis actually paid for that

23     to happen, right?

24     A.  Yes.

25     Q.  Would I also be correct in saying that these discussions

I6B5gal6                        Raines - cross

1     about business deals with Mr. Galanis continued to happen after

2     the last series of bonds were executed?

3     A.  Yes.

4     Q.  And these were very congenial business discussions, right?

5     These are discussions among friends, right?

6     A.  We presented business plans on the propane and the wildfire

7     fighting.

8     Q.  And you were not suspicious of John Galanis during this

9     period, right?

10              MS. MERMELSTEIN:  Objection.

11              THE COURT:  I will allow that.

12              Go ahead.  You can answer that.

13              THE WITNESS:  No.

14    BY MR. TOUGER:

15    Q.  Now, would I be correct in saying that prior to August of

16    2014 the WLCC was making approximately $50,000 to $150,000 per

17    year?

18              MS. MERMELSTEIN:  Objection to relevance, your Honor.

19              MR. TOUGER:  Once we get to the next question it will

20    become fairly obvious.

21              THE COURT:  I will allow it.

22              THE WITNESS:  Can you repeat the question?

23    BY MR. TOUGER:

24    Q.  Sure.

25              Prior to the bond execution in August of 2014 the WLCC

I6B5gal6                        Raines – cross

1   was making approximately $50,000 to $150,000 a year?

2   A.   Probably less than that.

3   Q.   And last year, though, the WLCC made close to $200,000 to

4   $250,000, right?

5           MS. MERMELSTEIN:   Objection, your Honor.   May we

6   approach?

7           THE COURT:   Yes.

8           (Continued next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6B5gal6                      Raines - cross

1           (At side bar)

2           MS. MERMELSTEIN:  I object to this whole line of

3    questioning.  First, the principal source of money that the

4    WLCC is making is from lending so I think we have to tread

5    carefully there.

6           THE COURT:  Is what?

7           MS. MERMELSTEIN:  From the lending, so we have to

8    tread carefully.  But, most significantly, it is completely

9    irrelevant and the only purpose of doing this is to suggest

10   that somehow this community has not in fact been harmed by the

11   conduct of the defendants.  That's not a proper argument.  The

12   fact that they have other sources of income, if they have

13   somehow mulled it together to make things work is not a

14   reasonable basis for cross-examination and the whole line of

15   questioning is inappropriate and should be precluded.

16          THE COURT:  Yes.

17          MR. TOUGER:  I'm glad that the government understands

18   what I'm doing.  That's not what I'm doing it for at all, your

19   Honor.

20          The idea here is that the -- he has testified to the

21   poverty of the Wakpamni and I am just bringing out that the

22   WLCC is making money and -- some money.

23          THE COURT:  Why is that relevant?

24          MR. TOUGER:  And that the next thing is that he is

25   making half of what the WLCC makes, he makes.  And so, I am

1    bringing that out and moving on.

2              THE COURT:  You still haven't told me the relevance of

3    how much money he is making.

4              MR. TOUGER:  Because it is not -- it is what he is

5    making off the WLCC, I think that is highly relevant when

6    they're going to stand up on summation and say they took

7    advantage of these poor Native Americans.  He is taking half of

8    what the WLCC is making as his own income.

9              MS. MERMELSTEIN:  That's inappropriate too.  The

10   suggestion that someone's disclosed fee should be held against

11   them is, I think, improper.  It suggests somehow he is not

12   behaving properly, which is false.  It's his --

13             MR. TOUGER:  I'm not suggesting that he is behaving

14   improperly at all.

15             MS. MERMELSTEIN:  It is intended to besmirch the

16   witness as why he is taking a big fee.  Nobody would work if

17   they couldn't make a living doing it, so to suggest that his

18   disclosed fee should be held against him or otherwise be

19   subject of cross-examination is inappropriate.

20             MR. TOUGER:  Right, I'm not saying --

21             MS. MERMELSTEIN:  There is no proper purpose.  What is

22   the relevance?

23             MR. TOUGER:  It not to be held against him, it is it

24   show that people -- exactly what you said.  People work for the

25   Native American financing to make money, and if he is making

I6B5gal6                        Raines - cross

1    money and there is a lot of other people trying to make money

2    also --

3              MS. MERMELSTEIN:  He has already said that he got a

4    fee on this deal.  That's fine.

5              THE COURT:  I don't think any of this is relevant.

6              MR. TOUGER:  Okay.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6B5gal6                         Raines - cross

1            (In open court)

2            THE COURT:  I will strike the last two questions and

3  one answer.

4            (Continued next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6B5gal6                          Raines - cross

1                (At side bar)

2                MR. TOUGER:  Just so we save ourselves a trip.

3                THE COURT:  Okay.

4                MR. TOUGER:  I'm not going to mention payday loans,

5      not going to do any of the complaints against him, I am not

6      going to do that at all but online lending is the reason that

7      WLCC gets founded and that's all I'm going to bring out.

8                MS. MERMELSTEIN:  It has been precluded by the Court's

9      order.

10               THE COURT:  You can focus on lending you, don't have

11     to focus on online lending.

12               MR. TOUGER:  Lending.

13               THE COURT:  Yes, generally.  That's what the ruling

14     said.

15               MR. TOUGER:  The problem is, your Honor, is that the

16     reason the WLCC is formed and he will say this, I mean it is in

17     his own affidavit, is because they didn't want -- the Wakpamni

18     district did not want to get involved in online lending.

19               That's the only thing I'm going to bring out.

20               THE COURT:  What difference does it make what kind of

21     lending it is?

22               MR. TOUGER:  If he will recognize when I say lending

23     that that's what I'm talking about.

24               MS. MERMELSTEIN:  He will, but wait a minute.  The

25     fact that -- why the WLCC was formed or what the Oglala tribal

I6B5gal6                          Raines - cross

government thought about the involvement of lending is also

completely irrelevant.

        If Mr. Touger wants to ask him about misstatements

that he made in connection with lending, whatever the proffered

basis has been to the Court, then fine, but none of this is

proper and we have been trying to litigate this since the

beginning.

        MR. TOUGER:  The only thing I am trying to bring out

is that the WLCC Wakpamni Lake district, it has nothing do with

the Wakpamni District, it only worked for the Wakpamni Lake

Community, and the only way to bring that out is to show why

the WLCC was created.  I don't know how else to do it.  That's

the reason.  The reason it was created is because when he went

to the Oglala Economic Council and said we have this deal from

Cash Crowd, it is going to pay us X amount of dollars, do you

want to do it?  The Wakpamni District originally said yes and

when the deal was negotiated, they refused to sign the document

and that is when the WLCC was formed.  And the only reason I am

bringing this out is to show, again, that this WLCC has nothing

do with Oglala, has nothing to do with the Wakpamni District.

It is solely and only unique to Wakpamni Lake Community.  That

is an important piece of evidence.  If you want to tell me how

to do that and that is the only thing, is that the Wakpamni

District's refusal to honor the contract.  If you want me to

say "lending" and he will say yes to that, that's fine, but I

I6B5gal6                      Raines - cross

1    have no problem, I will say -- if they want to take a break and

2    have him instructed that there was an issue with a finance deal

3    that they brought, that's fine also.  But the point is that's

4    why the WLCC was founded and I have a right to bring that out.

5           MS. MERMELSTEIN:  No, you don't.

6           We have elicited on direct, it could not be more clear

7    in the record that the Wakpamni Lake Community Corporation is

8    an economic development entity solely for the benefit of the

9    Wakpamni Lake Community.  It is crystal clear.  I will sign a

10   stipulation that says that.

11          We also did this on direct.  If you want to say to him

12   I want to be super crystal clear about something, the Wakpamni

13   Lake Corporation is solely for the benefit of the Wakpamni Lake

14   Community, that's fine.

15          MR. TOUGER:  And funds go directly to the Wakpamni

16   Lake Community and the Oglala and get no money.

17          MS. MERMELSTEIN:  Sure.  That's fine.  You can ask him

18   those questions but there is no need to get into what you are

19   asking him.  Why don't you ask him those questions?

20          MR. TOUGER:  They were coming.

21          THE COURT:  Well, it sounds like we are all in

22   agreement then.

23          MS. MERMELSTEIN:  Thank you, your Honor.

24          (Continued next page)

25

I6B7GAL7                        Raines - Cross

 1   BY MR. TOUGER:

 2   Q.  Let's just talk a little bit about the WLCC, OK?

 3   A.  OK.

 4   Q.  As we've already discussed, the Oglala Tribal Council is

 5   like the federal government, correct?

 6   A.  The Oglala, yes.

 7   Q.  And the Wakpamni District is like a state?

 8   A.  Correct.

 9   Q.  And the Wakpamni Lake Community is like a city in a state.

10   A.  Yes.

11   Q.  And they're all three separate distinct governmental

12   entities.

13   A.  Correct.

14   Q.  And they all have separate and distinct economic

15   development councils.

16   A.  Yes.

17   Q.  And would I be correct in saying that the Wakpamni Lake

18   Community Corporation only has to do with the Wakpamni Lake

19   Community?

20   A.  Correct.

21   Q.  It has no association with the Wakpamni District?

22   A.  Correct.

23   Q.  And no association with the Oglala Economic Council.

24   A.  True.

25   Q.  And all profits, if any, of the WLCC go to the Wakpamni

I6B7GAL7                         Raines - Cross

1    Lake Community and not to the Wakpamni District or the Oglala.

2    A.  Correct.

3    Q.  And that is accepted by the Oglala?

4    A.  Yes.

5    Q.  That is accepted by the Wakpamni District.

6    A.  Yes.

7    Q.  There is no dispute about that.

8    A.  No, there is an Ordinance 1217 that clearly lays that out

9    in Article 6 in the Tribal Constitution.

10   Q.  And also no doubt that the Wakpamni Lake Community had the

11   right to form the Wakpamni Lake Community Corporation.

12   A.  Correct.

13   Q.  That was done under Oglala law, right?

14   A.  Yes.

15   Q.  And it's registered in -- well, where is it registered?

16   A.  With the Tribe's UCC code.

17   Q.  Which is separate and distinct from being registered for

18   instance, a company registering in the United States, right?

19   A.  Correct.

20   Q.  It's registered as a Native American corporation.

21   A.  Correct.

22   Q.  And being a Native American corporation has certain

23   advantages, right?  Like you discussed on direct there are

24   government contracts that go to Native American tribes and

25   things like that?

I6B7GAL7                        Raines - Cross

1   A.  Yes, it has advantages and disadvantages.

2   Q.  Right, everything has advantages and disadvantages.  And it

3   has certain tax advantages, right?

4   A.  Yes.

5   Q.  And it has sovereign immunity because it's under the

6   auspices of the Wakpamni Lake Community.

7   A.  Yes.

8   Q.  And one of the reasons you founded -- when I say you, I

9   mean the Wakpamni Lake Community -- founded the Wakpamni Lake

10  Community Corporation is because the Wakpamni Lake Community

11  didn't feel it was getting enough attention from the Oglala

12  Economic Council.

13          MS. MERMELSTEIN:  Objection.

14          THE COURT:  Sustained.

15  Q.  Was it the opinion of the Wakpamni Council -- Wakpamni Lake

16  Community Council -- that they weren't getting enough funds

17  from the Oglala Economic Development Council?

18          MS. MERMELSTEIN:  Objection.

19          THE COURT:  Sustained.

20  Q.  By the way, in the end you were not allowed to bring the

21  alcohol onto the Pine Ridge Reservation, correct?

22          MS. MERMELSTEIN:  Objection to relevance, your Honor.

23          THE COURT:  Sustained.

24          MR. TOUGER:  Your Honor, may I approach?

25          THE COURT:  Sure.

I6B7GAL7                         Raines - Cross

1          (At the sidebar)

2          THE COURT:  Tell me the relevance of this.

3          MR. TOUGER:  As you heard, the reason that this

4    warehouse was built was to be a distribution center for

5    alcohol.  That's the reason it was built.  In the end the

6    Oglala have a rule that no alcohol can be brought onto the

7    reservation, and that is why that idea failed; it failed

8    because they can't bring alcohol onto the reservation.  That

9    two questions.  I don't see how that's not relevant.

10          MS. MERMELSTEIN:  Same objection.  It's not.  First of

11   all, it's not true that the sole idea for the warehouse was for

12   alcohol.  There were other import/export ideas with respect to

13   the warehouse, including for example, solar panels that have

14   tax benefits.  But I think the more important is this:  What

15   Mr. Touger is trying to do is suggest that it's not that the

16   bond didn't work out; it that the business idea didn't work

17   out.  And that's not true.  The warehouse never got –

18          THE COURT:  Just one at a time.  Finish what you were

19   saying.

20          MS. MERMELSTEIN:  Thank you, your Honor.  So, there is

21   no relevance to the fact that one particular business idea

22   didn't work out.  That's sort of irrelevant here.

23          What is relevant here is the representations that were

24   made concerning the bonds and what happened with the bonds.

25   The warehouse, the construction never was completed because the

1  money ran out.  The construction was never fully completed

2  because the money ran out.  If the business ideas that were

3  going to come in didn't work out, it's not relevant, and I

4  think they suggest something that's not true.

5        MR. TOUGER:  Your Honor, how could it not be relevant

6  that one of the men who negotiated this deal with the WLCC

7  didn't know that he wasn't going to be allowed to bring alcohol

8  onto the reservation?  That was part of the negotiation.

9        It's relevant to show how these negotiations proceeded

10  and what operations -- the ideas everybody was working under.

11        One of the main ideas that he's testified goes to have

12  the SSH company come in and use it as a distribution center for

13  Indian-owned casinos and distribute alcohol through them.  And

14  they were not allowed to do that by the Oglala.

15        And I'm not saying that's the only reason the bond

16  deal didn't work; I'm not saying that's the reason they didn't

17  get the bond money.  Obviously, they didn't get the bond money

18  because somebody stole $65 million, that's obvious.  It would

19  be ridiculous for me to argue that the reason everything went

20  bad is not because 65 million is missing.

21        THE COURT:  I will let you ask the two questions.

22        And you can follow up on redirect.

23        MS. MERMELSTEIN:  Thank you, your Honor.

24        (Continued on next page)

25

1        (In open court)
2   BY MR. TOUGER:
3   Q.  Mr. Raines, is it true that the Oglala have a rule that you
4   can't bring alcohol onto the reservation?
5   A.  Yes.
6   Q.  And so you could not use the warehouse for one of its
7   reasons, it was going to be used as an alcohol distribution
8   center?
9   A.  To clarify, they had just passed a memorandum that allowed
10  alcohol in, and then we also had an exception because we were
11  not opening the alcohol or selling it not only in the
12  reservation but within the State of South Dakota.
13  Q.  So you could then do it.
14  A.  Yes.
15  Q.  And the resolution that just passed was recent or --
16  A.  No, it was at that time.
17  Q.  At that time.  OK.  Now, when you went to Las Vegas, you
18  went there with an idea to bring -- to try to find programs
19  that would bring economic development to the Wakpamni Lake
20  Community.  That was one of your reasons for going.
21  A.  That's correct.
22  Q.  And to increase employment on the reservation?
23  A.  Yes, WLCC has four areas of focus, which is to create new
24  income, create new employment, new infrastructure and new
25  services for the community.

I6B7GAL7                        Raines - Cross

1   Q.  And the idea -- as far as you were concerned, with this

2   idea that hit fruition when the bonds were first executed in

3   August of 2014, was that this project building the warehouse

4   would bring employment?

5   A.  Yes.

6   Q.  Would bring funds?

7   A.  Yes.

8   Q.  And would bring a distribution center to the Wakpamni Lake

9   Community.

10  A.  Correct.

11  Q.  So all of those things that you went to Las Vegas in order

12  to find were actually happening when that first series of bonds

13  were signed.

14  A.  Yes.

15          MR. TOUGER:  Nothing further, your Honor.

16          THE COURT:  Any redirect?

17          MS. MERMELSTEIN:  Yes.  Thank you, your Honor.

18          MR. TOUGER:  Oh, I do have one other.

19  BY MR. TOUGER:

20  Q.  You were -- you are aware that in November of 2015 a mutual

21  release was signed, correct?  If you're not, I can show it to

22  you.

23  A.  Can you show it to me, please.

24  Q.  You can peruse this document and tell me if you recognize

25  it.

I6B7GAL7                        Raines - Cross

1    A.  Yes.

2    Q.  And?

3    A.  That was at the very end.

4    Q.  Right.  And on the last signature page is Geneva Lonehill's

5    signature, correct?

6    A.  Yes.

7    Q.  Now my question to you is:  Did you sign that for her or

8    did she sign that document, if you remember?

9    A.  Well, that's an electronic version, so I would have done

10   it.

11   Q.  You would have signed that document?

12   A.  Yes.

13   Q.  And would I be correct to say that you read the document

14   before she signed it?

15   A.  Yes.

16   Q.  Before you signed it, I should say.

17   A.  Yes.

18   Q.  And would I be correct in saying that paragraph G -- your

19   Honor, I would move this into evidence.

20           MS. MERMELSTEIN:  Your Honor, we haven't had an

21   opportunity to review it.  Mr. Touger didn't mark it or provide

22   it, so we would like an opportunity to take a look.

23           THE COURT:  OK.

24           MR. TOUGER:  This was read during Anderson's testimony

25   actually.

I6B7GAL7                      Raines - Cross

1   Q.  Well, maybe we can speed things up if I just ask simply:
2   In November of 2015 when you read this document, would you
3   agree with me that the WLCC -- and you being the one who signed
4   on their behalf -- were happy with the way the investments were
5   going in the bond deals?
6   A.  I think at that time there we had realized that something
7   was wrong, and that was our attorneys recommended that that
8   formal letter go out to cease and desist all activities so that
9   we could assess where the funds were.
10  Q.  Isn't it true that in the document itself the issuer --
11  that's the WLCC, right?  You issued the bonds, right?
12  A.  Yes.
13  Q.  Represented that you had reviewed the portfolio holdings of
14  a separate account and determined that it is consistent with
15  the investment guidelines as set forth in the governing
16  investment management agreement between Private Equity and
17  owner, and specifically investments were made in Private Equity
18  with a concentration in financial services and that the current
19  market value of the securities, holdings for the contract, are
20  in excess of the issuer's -- WLCC's obligations to the owner
21  set forth?
22          THE COURT:  You know what, since it's not in evidence,
23  why don't we not read it.
24          Do you need another minute, Ms. Mermelstein, to look
25  at it?

1    MS. MERMELSTEIN:  Yes, your Honor.  I'm sorry.  It's

2    just that it's a long document, so we have to be able to review

3    it.  I expect we won't have any objection, but we have to have

4    a chance to look at it.

5    MR. TOUGER:  This paragraph itself was brought out on

6    Mr. Anderson's --

7    THE COURT:  On direct or cross?

8    MS. MERMELSTEIN:  I don't recall that, your Honor,

9    although I may not be perfectly remembering the transcript.

10   THE COURT:  So just before you read it, why don't

11   you -- why don't we just wait a minute.  Do you want to look it

12   over now?

13   MS. MERMELSTEIN:  That's fine.

14   THE COURT:  Unless you have a shorter question in

15   which you don't have to read from the document not yet in

16   evidence, I'm amenable to that as well.

17   Q.  When you signed this -- and if you didn't, that's fine --

18   had you reviewed the investments?

19   A.  No.

20   Q.  But your lawyers said for you to sign this document anyway.

21   A.  Yes.

22   MR. TOUGER:  Nothing further, your Honor.

23   THE COURT:  All right.

24

25

 1   REDIRECT EXAMINATION

 2   BY MS. MERMELSTEIN:

 3   Q.  Can I ask you to please pull up Government Exhibit 282 in

 4   evidence, and can you go to the page that is WLCC4 at the

 5   bottom.  Can we put up side by side with the first page of this

 6   document.

 7           just so we put ourselves back in time, on direct you

 8   were asked about this e-mail on October 15 from Hugh Dunkerley

 9   to you, and we talked about the fact that after receiving this

10   e-mail the Wakpamni Lake Community Corporation terminated its

11   relationship with Private Equity Management, right?

12   A.  Yes.

13   Q.  Let's look at the attachment.  I don't know if you still

14   have your binder in front of you.

15           MR. TOUGER:  Your Honor, this document --

16           THE COURT:  This is 282 in evidence.  Do you have an

17   objection?

18           MR. TOUGER:  I did not go over this on cross, and John

19   Galanis had nothing to do with this document.

20           MS. MERMELSTEIN:  I don't think Mr. Touger's comments

21   about his client's activities are appropriate, but this is in

22   evidence and I'm about to ask questions that follow up on what

23   Mr. Touger just said.

24           THE COURT:  All right.  Go ahead.

25   Q.  So, I'm sorry it's hard to read, Mr. Raines.  The hard copy

1   is much easier.  But do you see attached to this e-mail was an

2   annual statement of account for an institutional single premium

3   variable annuity.  Do you see that?

4   A.  Yes.

5   Q.  And if you look at this sort of line items of the

6   transaction, you see that on September 14 -- excuse me --

7   September 26 of 2014 there was a wire received.  Do you see

8   that?

9   A.  Yes.

10  Q.  And then do you see the next line is that there was an

11  annuity purchased?

12  A.  Yes.

13  Q.  The purchase of an annuity was consistent with your

14  understanding of how the bond transaction was supposed to work,

15  right?

16  A.  Correct.

17  Q.  Nothing about this statement that was sent to you suggests

18  that -- tells you anything about what if anything the annuity

19  may have been invested in, right?

20  A.  Correct.

21  Q.  It doesn't say anything about the nature of those

22  investments, right?

23  A.  Yes.

24  Q.  OK.  Now, you were asked by Mr. Touger a number of

25  questions in which he suggested that John Galanis had told you

1    that Jason Galanis had influence at Burnham or worked on

2    special projects.

3            We can take that down, Ms.Sheinwald.  Thank you.

4            Just so we're clear, John Galanis told you that Jason

5    Galanis was a senior partner at Burnham, right?

6    A.  Yes.

7    Q.  And you were asked a number of questions about a statement

8    that you previously made in an interview.

9            And if I can approach, your Honor.

10           THE COURT:  Yes.

11           MR. TOUGER:  Can I see what you're showing him?

12           MS. MERMELSTEIN:  I will give you the Bates number.

13   Q.  So I just put in front of you what has been marked for

14   identification as 3529-8.  And let me direct your attention to

15   page 2.  Do you recognize it as a document Mr. Touger showed

16   you just a few minutes ago, right?

17   A.  Yes.

18   Q.  Let me ask you to read just to yourself, not out loud, the

19   bottom paragraph there.

20           MR. TOUGER:  Objection, your Honor.  May we approach?

21           THE COURT:  Sure.

22           (Continued on next page)

23

24

25

1          (At the sidebar)

2          MR. TOUGER:  At this point, your Honor, he hasn't

3     stated that he hasn't remembered -- doesn't remember anything.

4     She can't be impeaching her own witness, so why are we doing

5     this?

6          MS. MERMELSTEIN:  I think that this witness was not

7     given a fulsome opportunity to explain what he was saying in

8     this paragraph.  If you read the paragraph it is perfectly

9     clear that he was not on any kind of notice that the annuity

10    money was going to be used to fund other businesses, that the

11    reference to the businesses is to Wakpamni Lake's businesses

12    that were being grown.

13         MR. TOUGER:  So ask him the question.

14         MS. MERMELSTEIN:  I am going to, but I have to point

15    him to what he was being asked about before to be able to ask a

16    coherent question.

17         THE COURT:  You can ask him about it.  Don't read it,

18    but you ask him about it to provide context.

19         MR. TOUGER:  Ask about what?  I just want to know what

20    the acceptable question is.

21         THE COURT:  Well, she can reference the fact that you

22    asked questions about a certain document, and then she can

23    follow up with her own question.

24         MR. TOUGER:  Right.  But she can't ask him to read the

25    document before he has said he doesn't remember anything.  Why

I6B7GAL7                    Raines - Redirect

1    does he have to read the document?  What's the reason he is

2    reading that document?

3              THE COURT:  It's only to provide context.

4              MR. TOUGER:  So let her provide context through the

5    question.

6              THE COURT:  It's like saying you were asked questions

7    about the January whatever meeting.

8              MR. TOUGER:  There is no reason she can point him to

9    an answer.  She is pointing him to the answer.  She can't do

10   that.

11             MS. MERMELSTEIN:  I'm not pointing to an answer.  He

12   was shown something and didn't fully explain it, and I would

13   like to direct his attention to what he was shown and ask him

14   follow-up questions.

15             THE COURT:  Just direct his attention to what he was

16   shown and not to what you want to elicit.

17             MS. MERMELSTEIN:  Yes, no, this is what he was shown.

18             MR. TOUGER:  No.  Your Honor, I showed him one

19   sentence.

20             THE COURT:  Right, so she will reference the sentence

21   that he was shown to provide the context.

22             MS. MERMELSTEIN:  Will do.

23             MR. SCHWARTZ:  I think the question has to be sort of

24   from fresh start; it can't be didn't you tell the F.B.I.

25             MR. TOUGER:  Exactly.

1           MR. SCHWARTZ:  Because we can ask about prior

2    inconsistent statements.

3           THE COURT:  I agree with that.

4           MS. MERMELSTEIN:  I'm going to allow him to explain

5    what he was saying at this time.

6           THE COURT:  Just say you were asked about, and then

7    ask exactly what he was asked about.  You can reference the one

8    sentence, but you shouldn't be reading or having him read

9    anymore.

10          MR. TOUGER:  And he shouldn't have the document in

11   front of him.

12          MS. MERMELSTEIN:  Yes.

13          THE COURT:  That's fine.  Then you can take the

14   document back.

15          MS. MERMELSTEIN:  Thank you, your Honor.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

I6B7GAL7                          Raines - Redirect

1    (In open court)

2    BY MS. MERMELSTEIN:

3    Q.  Mr. Raines, do you remember being pointed to the sentence

4    in that paragraph concerning the plan to fund, purchase and

5    grow companies by Mr. Touger on cross-examination?

6    A.  Yes.

7    Q.  So put the document down now.  The plan to purchase and

8    grow companies that was being discussed there, to be clear, was

9    not the annuity was going to invest in companies growth.  Those

10   were companies that the Wakpamni Lake Community Corporation was

11   going to grow with the proceeds of the bonds, right?

12              MR. TOUGER:  Objection to leading, your.

13              THE COURT:  Yes.  Why don't you rephrase without

14   leading.

15   Q.  Sure.  In the sentence that Mr. Touger pointed you to on

16   cross-examination about the plan to fund, purchase and grow

17   companies, who was the entity being discussed there -- that you

18   were discussing -- who was going to purchase, grow and fund

19   companies from the proceeds of the bonds?

20   A.  WLCC.

21   Q.  Now, you were also asked some questions about nonrecourse

22   and sort of -- recourse I guess and nonrecourse bonds.  With

23   respect to these bonds, what was your understanding of whether

24   investors could go after the assets of the bonds themselves,

25   that is to say, the warehouse proceeds?

I6B7GAL7                         Raines - Redirect

1    A.  They would be limited to the warehouse proceeds.

2    Q.  You were also asked some questions about payments made to

3    the Wakpamni Lake Community Corporation, 1.8 million something,

4    1.3 million something.  The U.S. Bank had an account in the

5    name Wakpamni Lake Community Corporation, right?

6    A.  Yes.

7    Q.  And the way the structure of the bonds worked was that

8    money would come in from the annuity to that bank account and

9    then go out to pay whoever had bought, the bonds like the

10   pension funds, right?

11   A.  Yes.

12   Q.  So the Wakpamni Lake Community Corporation itself never

13   actually received that money to use for its own purposes.  It

14   was used for interest payments, right?

15   A.  Yes.

16   Q.  Now, you were also asked a number of questions about sort

17   of deals that you brought to Yanni Galanis.  Did any of those

18   ever go anywhere, ever come to fruition with Yanni?

19   A.  No.

20   Q.  So am I right that the only deals that went through with

21   him were the bond deals that he proposed?

22   A.  Yes.

23   Q.  And can we pull up Government Exhibit 214 in evidence,

24   please. and can we go to the settlement statement at the end of

25   the document.  I don't think it's quite the last page.  OK.

1    Can we zoom in on that, please.

2              You referenced I think the settlement statements a

3    number of times on cross-examination.  This is the settlement

4    statement for the first round of bonds.  You can see at the

5    bottom that there is $500,000 total closing statement issuance

6    costs, right?

7    A.  Yes.

8    Q.  So all the people getting money from the bond issuance are

9    listed here, right?

10   A.  Yes.

11   Q.  And this includes, for example, Haynes Investments, right?

12   A.  Yes.

13   Q.  About $60,000, right?

14   A.  Yes.

15   Q.  And your fees were paid as a share of that, right?

16   A.  Correct.

17   Q.  Burnham Securities, Inc. got $250,000, right?

18   A.  Yes.

19   Q.  And you understood that Yanni Galanis, if he received any

20   compensation, would get a share of that, right?

21   A.  Yes.

22   Q.  Just so we're clear?

23             MR. TOUGER:  Objection, your Honor.  Move to strike.

24             THE COURT:  No, overruled.

25   Q.  Nowhere on this schedule B is there an indication of a

1    payment to Sovereign Nations Development Corp., right?

2    A.   Correct.

3    Q.   No indication of a payment to John Galanis, right?

4    A.   Correct.

5    Q.   And you were not aware that John Galanis received $2.35

6    million from the --

7               MR. TOUGER:   Objection, your Honor.

8               THE COURT:   Overruled.

9               MR. TOUGER:   May we approach?

10              THE COURT:   Yes.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          (At the sidebar)

3          MR. TOUGER:  Your Honor, I objected to that first

4    question being allowed to answer about where Burnham was going

5    to pay him the money from.  Burnham can pay money from

6    anything.  They set their own commission fee.  There is no

7    conversation with him about what the commission fee would be.

8    That's all his guesswork.

9          So for them to say he had no idea that Burnham would

10   be paying -- from where Burnham would be paying him -- he has

11   no idea about that; nobody told him anything about that.  He

12   just assumed John would be getting a finder's fee because he

13   got one.  There was no comments ever made to him that John

14   Galanis was going to get any money.  So, if that is allowed

15   into evidence --

16         THE COURT:  Why can't you ask him that on recross?

17         MR. TOUGER:  Because why should it even be in

18   evidence?  It's complete conjecture on his part.  There is no

19   foundation in fact whatsoever.

20         MS. MERMELSTEIN:  Well, I don't agree with that.

21         MR. TOUGER:  Can I ask questions like that that have

22   no foundation in fact whatsoever?  Where is the foundation in

23   fact that that question was asked?

24         MS. MERMELSTEIN:  I think there is lots of foundation

25   in the record that the settlement statement sets forth the

closing and transaction costs.  Everyone who was legitimately

getting money is on there.  There have been questions put to

this witness about his understanding that people get paid on

commission, that there is nothing wrong with that, that people

who are part of transactions benefit from them.

He is a representative of WLCC; he was a party to this

transaction; and I don't think it's in any fashion

inappropriate to ask him whether or not he was aware of

something that happened.  He is not, obviously.  That's

important.  You can point out that maybe Burnham agreed to give

him money not from the transaction fees.  If you want to ask

that question, that's fine, but it's a perfectly legitimate

question.

MR. TOUGER:  Burnham could have given him 500,000, two

million or $10.  He has no foundation.  There was never any

discussion with him that he was even going to get one.  It's

pure assumption on his part.  And for him to be able to say

that he was supposed to get it from that, where does it say he

was supposed to get it from that distribution?  It doesn't say

anywhere.

And that's not even the normal course.  The company

gets to set what they find as a finders fee.  The finders fee

might be six percent of the total value of the deal, with is

way beyond $250,000.  We don't know what it is, and he

certainly doesn't.  He has no inkling what it is.  It was never

1    discussed with him or anything else.  That you let them ask

2    that question is --

3              THE COURT:  Well, first of all, stop accusing me.  You

4    guys know more about it.  So, if you want to make a motion in

5    advance of something, you can do that.

6              MR. TOUGER:  Well, I didn't even think that question

7    would even be asked.  I think it's totally improper.

8              THE COURT:  Right.  But in terms of like who has what

9    basis, you guys know that, I don't.  So that's the first thing.

10             Just give me one second.  Let me look at the

11   transcript.

12             THE COURT:  So, what is the relevance of his

13   understanding of the payment?

14             MS. MERMELSTEIN:  Sure.  Mr. Touger opened and said

15   everyone knew John Galanis was getting this money; this was not

16   some undisclosed payment.  That's not true.  At a minimum,

17   Mr. Raines has represented that the WLCC didn't know.  There

18   has been no testimony that Mr. Anderson knew.

19             Let's be clear about something, if you want to argue

20   to the jury that maybe Burnham decided to pay him this fee, you

21   can do that.  There is no evidence of that, and of course it's

22   not true.  That's not what any of the Burnham witnesses would

23   say.

24             So he is claiming he was entitled to this money.  He

25   wasn't.  There is a settlement statement that shows what was

1    going to be done with bond proceeds.  And let's be clear, if

2    Burnham wanted to pay him that money, I suppose it could have,

3    but it didn't.  The money that went to John Galanis came out of

4    the bonds proceeds, and that was not disclosed to the people

5    involved in the deal.

6         The government is certainly entitled to prove that he

7    received that money and that it wasn't being disclosed and that

8    people didn't know he was getting it.  And this is the person

9    who represents the Wakpamni Lake community.

10        MR. TOUGER:  They should have asked Tim Anderson or

11   someone from Greenberg Traurig that question.  He has already

12   said many time he just signed things because the lawyers told

13   him to sign it.  He already said he wasn't concerned with the

14   other parts of the transaction except for the building of the

15   building.

16        All I said on opening was that he got money.  I didn't

17   say an amount, I didn't say where it came from.  I said that he

18   got money that went to him, and that's what happened.

19        MS. MERMELSTEIN:  And that everyone knew it.

20        MR. TOUGER:  And he didn't assume it.  And so did

21   Anderson say the same thing.  You're wrong.  Anderson said the

22   exact same thing, that he assumed that Burnham would pay him a

23   commission, because that's what is done in financial

24   transactions.  Everybody would say that.  Every expert called

25   in here, everybody who is in private equity would say, yes, you

1    get a finders fee, or a commission fee, or a deal fee, whatever

2    way you want to put it, success fee.  That's what's done.

3         So the fact -- and the fact that they're now trying to

4    bring out that John Galanis didn't get $2.35 million.

5    Sovereign Nations did.  And who is control of Sovereign Nations

6    has yet to be even talked about yet.  But John Galanis I think

7    got a total of $375,000, something of that nature.  I don't

8    know the exact number.  I can get it; it's written down.

9         MS. MERMELSTEIN:  I can proffer to your Honor that the

10   evidence is very strong that $2.35 million of the bond proceeds

11   were directly wired to an account in the name Sovereign Nations

12   Development Corp.  It was opened just before that wire was

13   made, and that account was controlled exclusively by John

14   Galanis.  Like every one of these transactions, he had a

15   functionary who did the actual work at his direction.  That

16   person is going to testify, and that's what they're going to

17   say, and the evidence is going to be clear that that money went

18   to, among other things, things that are very clearly John

19   Galanis' personal expenses.

20        Whatever you want to say about Burnham's right to pay

21   a fee, that money came out of the bond proceeds; it was not

22   disclosed in the documents, and the parties were not aware of

23   it.  That's the most direct evidence that there is of John

24   Galanis' participation in this crime, and the government has to

25   be allowed to ask this question.

1           MR. TOUGER:  You can ask the question of Mr. McMillan

2     when he testifies, did John Galanis get $375,000.  Mr. McMillan

3     will also testify that Jason Galanis entities got money and a

4     lot of other entities got money.  Mr. Murphy got money for his

5     work on the deal.  Everybody got money from that Sovereign

6     Nations, not just John Galanis.  Out of the $2.35 million John

7     Galanis got $300,000 and change, I think it's 375.  I believe

8     that's the number.

9           And he has no idea about that whatsoever.  So if they

10    want to bring it out through McMillan, that's fine.  If they

11    want to bring him back, like they always say the order of the

12    trial is the order of the trial.  They decided to put this

13    witness in their order, and he has no idea about this at all,

14    and all his testimony is based on pure conjecture of something

15    he knows nothing about.

16          THE COURT:  Your last question was would it have

17    mattered?  Is that your last question?

18          MS. MERMELSTEIN:  My question is were you aware that

19    that was happening?  Did you know?  And he didn't.  That's

20    exactly the point.  The one thing we agree with is that he

21    didn't know that was happening, and that's incredibly

22    important.

23          THE COURT:  I am going to allow it.

24          MR. TOUGER:  But, your Honor, wait a minute.  He has

25    already said he didn't pay attention to this part of the deal.

1    All he was concerned about -- he said it directly -- all he was

2    concerned about was the building part of the bond deal.  He

3    just said he signed the addendum to the contract.

4            THE COURT:  They are allowed to qualify what he did

5    and didn't know.  And if you think that they are arguing

6    something that isn't the case, you can argue otherwise.  Or you

7    can --

8            MR. TOUGER:  I understand that, your Honor, but they

9    have already asked a question.  He is giving an answer that I

10   objected to and I am now moving to strike now that you know the

11   background.

12           THE COURT:  And I'm not going to strike it.  OK.

13           MS. MERMELSTEIN:  Thank you.

14           MR. SCHWARTZ:  Can I just say one thing?  There has

15   been a lot of leading on this redirect.

16           THE COURT:  There has been a lot of leading; that I

17   agree with.

18           MR. SCHWARTZ:  We got an answer to something this

19   witness to something he said very clearly he didn't know the

20   answer to on cross that with a leading question we got an

21   answer to.  I think it was the right answer, so I don't care.

22           MS. MERMELSTEIN:  I will be more careful.

23           THE COURT:  That I agree with.

24           (Continued on next page)

25

I6B7GAL7                      Raines - Recross

```
1    BY MS. MERMELSTEIN:
2    Q.  Mr. Raines, you weren't aware that John Galanis got $2.35
3    million of the bond proceeds, were you?
4    A.  No.
5              MS. MERMELSTEIN:  Nothing further.
6              THE COURT:  Any recross?
7              Mr. Schwartz?  Ms. Notari?  No recross?
8              MS. NOTARI:  No.
9              MR. SCHWARTZ:  No.
10             THE COURT:  Mr. Touger?
11             MR. TOUGER:  One second.
12             Just I would ask that the government bring up
13   Government Exhibit 217?
14             MS. MERMELSTEIN:  Sure.
15   RECROSS EXAMINATION
16   BY MR. TOUGER:
17   Q.  Do you recognize this document?  This is the closing
18   statement for the third --
19   A.  2015?
20   Q.  Yes.
21   A.  Yes.
22   Q.  Can we go to the distribution page, please.  Right there.
23   And if you can just highlight the --
24             So Haynes Investment in this bond issue got $130,000,
25   correct?
```

I6B7GAL7                         Raines - Recross

1   A.  Yes.

2   Q.  And did you get a percentage of that $130,000?

3   A.  Yes.

4   Q.  And what was your percentage of that $130,000?

5   A.  I don't know the exact percentage, but I received 88 in

6   total.

7   Q.  Of that 130 you got 88?

8   A.  No, of the project.

9   Q.  OK.  And you already saw in the first one that they got

10  60,000, right?

11  A.  Yes.

12  Q.  So that's a total of 190?

13  A.  Yes.

14  Q.  Plus on the second series of bonds he also got a finders

15  fee, correct -- or success fee.

16  A.  I believe so.

17  Q.  And would I also be correct in saying that upon the third

18  signing of the bond the WLCC -- upon the signing of the third

19  series of bonds the WLCC got $1.25 million?

20  A.  I don't recall.

21  Q.  You don't recall $1.25 million?

22  A.  No.  We got the original $2 million that we built the

23  shells of the building with.

24  Q.  And when you signed the addendum in November of 2016 you

25  don't recall getting $250,000?

I6B7GAL7                          Raines - Recross

1    A.  No.

2    Q.  And you don't recall when you signed the addendum in

3    November of 2015 getting $277,000.

4    A.  No.

5    Q.  And, by the way, you had no discussions whatsoever about

6    what type of service fee Mr. John Galanis would get, correct?

7    A.  Correct.

8    Q.  You never talked to anybody about that.

9    A.  Correct.

10   Q.  It's all conjecture on your part.

11   A.  What do you mean?

12   Q.  Well, you're just assuming that he would get one, correct?

13   A.  Yes.

14   Q.  But you had no idea what the amount would be, or who would

15   pay it or what it would be.

16   A.  Correct.

17   Q.  Nobody ever discussed that with you.

18   A.  Right.

19   Q.  And would I be correct in saying that a lot of things went

20   on in this deal that nobody ever discussed with you?

21          MS. MERMELSTEIN:  Objection, your Honor.

22   Q.  Well, when I finish my cross-examination, you said you

23   signed that mutual release without really going over all the

24   paragraphs with your lawyers, correct?

25   A.  I mean I had reputable law firms.

1    Q.  There is nothing wrong with it.  I'm just saying is that

2    true?

3    A.  I don't believe there was anything either.

4    Q.  Right, so you did just sign things when people asked you to

5    sign things.

6           MS. MERMELSTEIN:  Objection to form, your Honor.

7           THE COURT:  Why don't you rephrase that.

8    Q.  Did you sign the mutual release without reading and

9    understanding all of the words in that document?

10   A.  I trusted my attorneys.

11   Q.  So did you sign that document without reading and

12   understanding and discussing all the terms of that document?

13   A.  Yes.

14   Q.  And that happened on other occasions in this case, correct?

15   A.  Not that I recall.

16   Q.  That's the only document you didn't review.  You understand

17   the intricacies of every other part of this deal.

18          MS. MERMELSTEIN:  Objection, your Honor.

19          THE COURT:  I will allow that.

20          Can you answer that?

21   A.  I understood the concept, and I understood the attorneys

22   were represented on both sides of the deal, and there was a lot

23   of responsibility as well as government oversight on the

24   structure of the project, and I --

25   Q.  You trusted the system?

I6B7GAL7                          Raines - Recross

1    A.   I trusted the system.

2    Q.   Exactly.  And, as you said on cross you were really

3    concerned -- once the deal got going and it looked like it was

4    going to take place -- in what was going on on the Wakpamni

5    community, building the building and getting the logistics of

6    that done, correct?

7    A.   Yes.

8    Q.   That was the focus of your attention.

9    A.   Yes.

10   Q.   You weren't focused on what the annuity was doing, what it

11   was investing in or how much money it was making or not making,

12   correct?

13   A.   Correct.

14   Q.   You left that to the lawyers.

15   A.   Yes.

16             MR. TOUGER:  Nothing further, your Honor.

17             THE COURT:  All right.  Anything additional?

18             MS. MERMELSTEIN:  No, your Honor.

19             THE COURT:  You can step down.  Thanks.

20             (Witness excused)

21             THE COURT:  Are you reading documents now?

22             MS. TEKEEI:  Yes, your Honor, we would like to publish

23   some e-mails to the jury by reading them.

24             THE COURT:  OK.  Why don't we discuss the ones -- why

25   don't you read the ones that have been stipulated to initially.

I6B7GAL7

1           MR. QUIGLEY:  We're just going to table the other ones

2      for now.

3           MS. TEKEEI:  Thank you, your Honor.

4           THE COURT:  I remind you that you are still sworn that

5      you are to read as accurately as you can.

6           WITNESS:  Yes, your Honor.  Good afternoon.

7           MS. TEKEEI:  Thank you, your Honor.  May I proceed?

8           THE COURT:  Yes.

9           MS. TEKEEI:  Your Honor, we would like to offer into

10     evidence the following exhibits which are on agreement by the

11     parties:

12          Government's Exhibits 2223, 2300, 2112, 2227, 2039,

13     2041, 2042, 2043, 2045, 2047, 2049, 2050, 2052, 2231, 3215,

14     2053, 1272, 2232, 2233, 1226, 3216, 2234, 3217, 1236, 1273,

15     2241, 3276, 2256, 2263, 2267, 2070, 2072, 2276, 2118, 2075,

16     3245, 2077, 2079, 2086, 2084, 2092, 2093, 2094, 2095, 2098,

17     2099, 2119, 3272 and 2298.

18          MR. SCHWARTZ:  Hold on one second.

19          THE COURT:  They will be admitted.

20          MR. TOUGER:  Hold on one second?

21          THE COURT:  Sure.  While they're looking, as we

22     discussed we are going to go to five today, but tomorrow we are

23     going to sit from 9:30 to 5:30.  OK?

24          MS. TEKEEI:  If we could have just one moment,

25     Mr. Schwartz had a question.

I6B7GAL7

1          THE COURT:  Sure.  I mean there is so little time

2     left, if there is an issue about something, just don't read it

3     now and we can talk about it after court.

4          MS. TEKEEI:  Yes, we can deal with it today.

5          MR. SCHWARTZ:  So no objection to everything except

6     2095, which we will talk about.

7          THE COURT:  So all the others listed will be admitted.

8     Thank you.

9          (Government Exhibits 2223, 2300, 2112, 2227, 2039

10    received in evidence)

11         (Government Exhibits 2041, 2042, 2043, 2045, 2047

12    received in evidence)

13         (Government Exhibits 2049, 2050, 2052, 2231, 3215

14    received in evidence)

15         (Government Exhibits 2053, 1272, 2232, 2233, 1226

16    received in evidence)

17         (Government Exhibits 3216, 2234, 3217, 1236, 1273

18    received in evidence)

19         (Government Exhibits 2241, 3276, 2256, 2263, 2267

20    received in evidence)

21         (Government Exhibits 2070, 2072, 2276, 2118, 2075

22    received in evidence)

23         (Government Exhibits 3245, 2077, 2079, 2086, 2084

24    received in evidence)

25         (Government Exhibits 2092, 2093, 2094, 2098 received

I6B7GAL7

```
 1    in evidence)

 2               (Government Exhibits 2099, 2119, 3272 and 2298

 3    received in evidence)

 4               MS. TEKEEI:  Thank you.  Special Agent Kroll, if you

 5    could turn to Government Exhibit 2223 to begin with.

 6               Ms. Sheinwald, please publish that to the jury.

 7               And, Agent Kroll, if you could go ahead and read this

 8    e-mail.

 9    A.  This is an e-mail from Monday, September 8, 2014 from Jason

10    Galanis, subject Cliff, to Devon Archer.

11               "Arch, the Tribe and GT want to close on the 18th,

12    which is next Thurs.  We would need to wire to Cliff this week

13    so he can wire to you on Monday I would think.  The bonds can

14    be acquired on Thursday.  They are delivered same day ... DVP.

15    Of the nine custodians that hold the prior tranche that were

16    acquired, none had a single issue in taking delivery from U.S.

17    Bank.

18               "Morgan Stanley will hold $15 million of your

19    municipal portfolio.  You will diversify it over time.

20               "Not my place to have a work with Cliff.

21               "Jason."

22    Q.  Thank you.  If we could turn next to Government Exhibit

23    2300.

24               And, Ms.Sheinwald, if you could publish the e-mail on

25    the bottom first.
```

I6B7GAL7

1      E-mail from Clifford A. Wolff on September 24, 2014 to

2  Sebastian Momtazi, jason@holmbycompanies.com, Devon Archer,

3  subject Rosemont Seneca Harvest.

4      "Seb, I need the wire instructions for Rosemont Seneca

5  Harvest, LLC.  I'll be wiring funds into that account at MS.

6  Thanks.  Cliff."

7  A.  On the same day, jason@holmbycompanies wrote, "My notes say

8  it is Rosemont Seneca Bohai, LLC.  We were both a little off on

9  the name.  Seb, please confirm.  Cliff, we will need you to

10  send a direction letter to send the $15 million to the above

11  entity, less some legal we discussed generally.  J."

12  Q.  E-mail from Sebastian Momtazi, September 24 to Jason

13  Galanis, copying Cliff Wolff and Devon Archer:  "Confirmed.

14  Cliff, here are the instructions again:

15      "Account name:  Morgan Stanley Smith Barney, LLC, FFC

16  account name Rosemont Seneca Bohai LLC.  Seb."

17      Now, if we could turn next to Government Exhibit 2115.

18      MR. SCHWARTZ:  This is one of the ones.

19      MS. TEKEEI:  I'm sorry.  Please take that down.

20      2112.

21      Thank you.

22  Q.  E-mail from Jason Galanis on September 25, 2014 to

23  Sebastian Momtazi, cc Devon Archer, Cliff Wolff, subject

24  indentures trustee.  And attached wire instructions, Wakpamni

25  Town Center.pdf.

I6B7GAL7

1          "Seb, not for transmittal yet, but the attached are

2     the coordinates for the bond indenture trustee.  When we have

3     everything buttoned down, RSB LLC will want to originate the

4     trade to purchase the bonds.  Wanted you to have the attached

5     when that moment occurs."

6          Ms.Sheinwald, if we could next have Government Exhibit

7     2042.

8          And, Mr. Kroll -- Special Agent Kroll, if you could

9     begin with the e-mail from Ms. Driever on Monday, September 29

10    at 1:32 p.m.

11    A.  Sure.

12    Q.  I apologize.  Let's go back for one moment.

13         Ms.Sheinwald, if you could pull up the third page of

14    this e-mail, and I will begin with -- if you could pull that up

15    next to page 2 of the e-mail which is the beginning of this

16    e-mail chain.  E-mail from Sebastian Momtazi on Monday,

17    September 29 to Catharine Driever, cc Devon Archer, subject

18    bond purchase.

19         "Good morning, Catharine.  As discussed, we would like

20    to make the following bond purchase.  This is a new issue,

21    which is DTC eligible.  It can settle either DTC or physical

22    delivery.  From Rosemont Seneca Bohai LLC.  A purchase in the

23    amount of $15 million of issuer:  Wakpamni Lake Community Corp.

24    S D SPL LTD REV, dated September 26, 2014.  Issue description:

25    Taxable-town center development.

I6B7GAL7

1          "Please let me know what else you need from our end,

2      and we will be happy to provide."

3          Now, Ms.Sheinwald, if you could turn to the first page

4      of this exhibit.

5          And, Special Agent Kroll, if you could begin with the

6      e-mail from Ms. Driever at 1:32 p.m.

7      A.  Sent on September 29 as well to Sebastian Momtazi and Devon

8      Archer.

9          "Hi, Sebastian.  I'm waiting for confirmation from the

10     trader if we can hold the security on our platform.  Thanks,

11     Catharine."

12     Q.  E-mail from Catharine Driever on Monday, September 29 to

13     Sebastian Momtazi, cc Devon Archer.

14         "I spoke with Keith Henselen at U.S. Bank and the deal

15     is not closed yet.  He could not confirm whether the deal will

16     be set up yet on DTC.

17         "As I mentioned earlier, you cannot buy these bonds

18     through Morgan Stanley.  If you purchase them from the

19     placement agent and try to transfer them into MS via DTC, there

20     is a chance we may not be a able to hold them (similar to what

21     has happened with FLKM).  We would then have to send them back

22     to U.S. Bank.

23         "Moving forward, I'm not sure what your timeframe is

24     to purchase the bonds through U.S. Bank/the placement agent,

25     but we would need to get approval that we can hold them prior

I6B7GAL7

1    to attempting to transfer through DTC (if they can get set up

2    on DTC).  We would need to wait for the deal to close and then

3    I can send over the paperwork for you to fill out to try and

4    get an exception."

5    A.   Then Sebastian Momtazi wrote:  "J, see below."

6    Q.   E-mail from Devon Archer on September 29 to Sebastian

7    Momtazi and Jason Galanis:

8          "We can get the exception just not sure what the

9    timing is on the close?"  Devon Archer."

10          Now, Ms.Sheinwald, if you could please turn to

11   Government Exhibit 2043, and we will start with the e-mail on

12   September 29 at 4:34, e-mail from jason@holmbycompanies wrote:

13          "Dumbest e-mail I've ever seen in investment banking

14   or wealth management.  How can it be "closed" prior to paying

15   for the bonds?  It makes no sense on its face.  I'm

16   flabbergasted."

17   A.   Then Devon Archer wrote to jason@holmbycompanies cc'ing

18   Sebastian Momtazi:

19          "Do we know Keith?  And does he know anything?"

20   Q.   Ms.Sheinwald, if we could turn next to Government Exhibit

21   2045, and beginning with the e-mail from Ms. Driever on

22   September 30, 2014 to Sebastian Momtazi, cc'd Devon Archer and

23   Eugene Schatz re bond purchase:

24          "Hi, Seb.  This CUSIP is not set up on Bloomberg.  It

25   must be set up before we can proceed."

I6B7GAL7

A.   Then Sebastian Momtazi wrote to Devon Archer:

          "Should I give all the purchase information to Deutsche Bank and see if they can do it in theory?  Seb Momtazi."

Q.   E-mail from Devon Archer to Sebastian Momtazi:

          "Yes.  But it looks like we will get it done with MS first and we can move it if need be.  No issue asking DB though.  Don't say amount yet."

          OK, Ms.Sheinwald, if we could turn next to Government Exhibit 2047.  On September 30, 2014 Jason Galanis wrote:

          "Arch, MSSM seems to be trying to subscribe to the new issue like a "trade."  As a trade it involves coordination.

          "My suggestion at this stage is to simply DVP the transaction by wiring the money to U.S. Bank and U.S. Bank delivers the securities to MSSB.  Full stop.

          "The securities are recorded at the bond registrar -- which is U.S. Bank -- also serving as the indenture trustee for the seven year duration.

          "I think we direct them to wire U.S. Bank tomorrow and take delivery of your bonds.

          "We need a physical address for delivery.  We also need an e-mail address for U.S. Bank to correspond with at MSSB.  Jason."

A.   On Wednesday, October 1, 2014 Devon Archer wrote to Jason Galanis and Sebastian Momtazi:

I6B7GAL7

1           "Agreed.  Instruct.  Devon Archer."

2           (Continued on next page)

I6B5gal8

1   BY MS. TEKEEI:

2   Q.  Ms. Sheinwald, if you could turn next to Government Exhibit

3   2049?  If you could put up the first page of this exhibit on

4   the left next to the second page on the right, and beginning

5   with the bottom e-mail from Sebastian Momtazi on Wednesday,

6   October 1st, to Catharine Driever, cc Devon Archer, regarding

7   wire transfer request:

8        "Good morning, Catharine.  Per the attached

9   instructions, please wire $15 million from Rosemont Seneca

10  Bohai to U.S. Bank National Association, ref Wakpamni Town

11  Center.  Devon will be available for a voice confirmation at

12  646-436-3745.  Thanks and best, Seb."

13  A.  On October 1st as well.  Catharine Driever responded to

14  Sebastian Momtazi, cc-ing Devon Archer, Eugene Schatz:

15       "Confirming receipt.  We will call shortly with Gene

16  to give a status on holding the Wakpamni bonds.  Thanks,

17  Catharine."

18  Q.  E-mail from Sebastian Momtazi to Jason Galanis and Devon

19  Archer.  Forward wire transfer request:

20       "Surely we should instruct to accepted and work on

21  next steps after?"

22  A.  Then Jason@Holmsby companies wrote:

23       "See last e-mail.  Thanks for staying on this."

24  Q.  E-mail from Devon Archer to Sebastian Momtazi and

25  Jason@Holmsbycompanies.com:

I6B5gal8

         "Seb, I initiated the wire and awaiting voice confirm.
Devon Archer."

         MS. TEKEEI:  Your Honor, as it is 5:00 I think this
would be a good place to stop.

         THE COURT:  Great.  Thanks.

         Ladies and gentlemen, we will see you tomorrow and we
will go from 9:30 to 5:30.  Remember to keep an open mind and
don't research or discuss the case.

         Thank you.

         (Continued on next page)

I6B5gal8

1        (Jury not present)

2        THE COURT:  We can discuss things in the morning.  I'm

3    going to ask you to be here at 9:10 so we can discuss the

4    issues that are outstanding but tell me the exhibit numbers

5    that are in dispute.  One was 2117?

6        MR. QUIGLEY:  2117, your Honor; 2115, 2122, and 2095.

7        MR. SCHWARTZ:  So, 2095 was not on your list before so

8    I haven't seen it so there may be no objection.  But, I will

9    look at it and let everyone know.

10        THE COURT:  Okay.

11        MR. SCHWARTZ:  2117 was the subject of letter writing

12    so your Honor has the arguments.

13        THE COURT:  I will rule on that first thing in the

14    morning.

15        MR. SCHWARTZ:  2115 is very straightforward.  It is an

16    automated alert that says that the $15 million exceeded a $125

17    threshold.  The only purpose, as far as I can tell, is to show

18    that, try and suggest there is something suspicious about the

19    wire but it has no independent relevance, it is cumulative of

20    the other evidence, and it should be excluded under 403.

21        2122 is a more substantial issue and that's this and I

22    will say it briefly to sensitize your Honor to the issue.  I

23    can put it in a letter if you want.

24        After your Honor issued the Code Rebel ruling last

25    week, the government marked a series of new exhibits for the

I6B5gal8

1    first time, we started getting them on Friday and got one as

2    recently as yesterday, about an entity called Archer

3    Diversified TCG.  Archer Diversified TCG has nothing to do with

4    Mr. Archer.  It is Jason Galanis' entity, it is an entity that

5    he used to purchase a condominium in Tribecca.  It appears that

6    at least the $1 million downpayment for the $10 million home

7    came from Wealth Assurance Private Client directly to the law

8    firm that was handling the escrow.  I don't object to that.

9          The government, however has marked this e-mail, which

10   is an e-mail between, from Cliff Wolff, the lawyer, to

11   Sebastian Momtazi, with Mr. Archer on copy saying basically we

12   are going to create this entity called Archer Diversified to

13   take advantage of Mr. Archer's cache.

14         That is literally his only connection to this

15   transaction, that he was cc'd and did not respond to this

16   e-mail.  Jason Galanis signed every other piece of paper that I

17   am aware of relating to that transaction.  The money never went

18   through Mr. Archer's hands, Rosemont's Seneca Bohai's hands,

19   anything like that.  So, I think it is incredibly misleading to

20   suggest that that purchase, which was done with misappropriated

21   bond proceeds, had anything to do with Mr. Archer.

22         That's my objection to that.

23         MR. QUIGLEY:  To respond briefly?

24         On 2115, which is the first e-mail, this is one of the

25   e-mails that your Honor had deemed not subject to the crime

I6B5gal8

1    fraud exception relatively close to trial.  We are not

2    intending to argue that there is anything suspicious in and of

3    itself about this wire transfer, but it is relevant to show

4    that Mr. Archer's awareness that the wire, that money was

5    coming from Jason Galanis, the money that was used to purchase

6    the bond.  Essentially, Jason Galanis is forwarding Mr. Archer,

7    Mr. Wolff, and Mr. Momtazi an alert that $15 million has been

8    sent out of his account at Thorsdale.  It is centrally relevant

9    to the case especially in light of arguments that Mr. Archer

10   didn't know where the money was coming from.

11           MR. SCHWARTZ:  But it doesn't say anything about

12   Thorsdale on the exhibit which is the point and we have heard

13   five other e-mails that made the point that Mr. Galanis was

14   originating and in charge of that wire.

15           MR. QUIGLEY:  Your Honor, I don't think it is

16   cumulative of anything.  It shows Mr. Archer's involvement,

17   being apprised of the movement of funds in the transaction.  It

18   is coming from Jason Galanis.  I think it is relatively

19   straightforward.

20           On the other, the issue with 2115.  So, I'm not sure

21   there is --

22           THE COURT:  I thought you just talked about 2115.

23           MR. QUIGLEY:  I'm sorry.  2122.

24           THE COURT:  Right, Archer Diversified.

25           MR. QUIGLEY:  So, there is evidence in the record now,

I6B5gal8

specifically in Government Exhibit 512 and specifically in

testimony of Mr. Dunkerley that one of the first wires out of

the WAPC account went to an entity called Katsky Korins.  The

government seeks to establish through not any of the exhibits

listed by Mr. Archer but other exhibits that Katsky Korins was

the representative seller in Mr. Galanis' purchase of 260 West

Broadway.  So, that's directly relevant to show where the bond

proceeds went.  The issue is that Mr. Galanis purchased that

entity in the name of Archer Diversified -- sorry purchased the

condominium in a name using the name Archer Diversified.  And

the reason that 2122 is relevant is to show Mr. Archer's

awareness that his name was being used.  There has been a

continual defense theme and I expect it will continue that

Mr. Galanis, we heard some of it today, suggesting in the

cross-examination of Raycen Raines, for example that,

suggesting that Jason Galanis and others used the name Devon

Archer and Hunter Biden to kind of entice people to do

business.

        The issue here is that Mr. Archer was aware, he was on

notice that Archer Diversified was being used to purchase this

condominium.  We are not suggesting that he was involved other

than that was involved in purchasing the condominium, but it is

relevant to preclude and rebut any argument that Archer

Diversified was, and his name was being unwittingly used in

this transaction, and the fact that the transaction involved

I6B5gal8

1    the use of bond proceeds is obviously highly relevant to show

2    that the funds were misappropriated.

3              THE COURT:  Why don't you do this.  Can you e-mail to

4    my chambers' e-mail the exhibits that I don't have that aren't

5    part of the binders?

6              MR. QUIGLEY:  Yes, your Honor.

7              THE COURT:  Any of the new exhibits that haven't been

8    previously marked, if you can send them to chambers and I can

9    look at them tonight?

10             MS. MERMELSTEIN:  We will of course send them to

11   chambers.  I believe that your exhibit binder should have been

12   updated but we can easily e-mail them.

13             THE COURT:  If I have them then it is no issue.

14             MS. MERMELSTEIN:  We will send them anyway.

15             THE COURT:  So, I will see you all at 9:10 tomorrow.

16             MS. MERMELSTEIN:  Your Honor, I'm so sorry.  I know

17   you are trying to get off the bench.  A few matters I want to

18   put on the record, on everyone's radar.

19             THE COURT:  Yes.

20             MS. MERMELSTEIN:  Two things.

21             Given where we are now, I expect that tomorrow we will

22   call -- we are going to have to keep reading some of these

23   e-mails and we will call Walsh, Turney and Martin.  And maybe

24   defense lawyers have a different view of cross-examination but

25   I think given the likely long cross-examination of Martin, I

I6B5gal8

think that likely, including a few more e-mail reading modules,

takes us through the end of Wednesday.  If we need to we will

also called the Bit Board witness.  There are two witnesses

left then, I expect, barring the need to authenticate documents

or something else changing who I expect we will call Monday,

Mark McMillan and Special Agent Dayna Kendall.  They are both

unavailable until Monday.  Mr. McMillan is on vacation and I'm

happy to proffer ex parte why Agent Kendall is not available.

I don't think it is going to be an issue at all.

  I wanted to let your Honor know that's where we are.

  THE COURT:  All right.

  MS. MERMELSTEIN:  So, that's one thing, on scheduling.

I think with respect to the Cooney recording --

  THE COURT:  I am going to rule first thing in the

morning.  I just have a meeting right now --

  MS. MERMELSTEIN:  Okay.

  THE COURT:  -- that I am late for.

  MS. MERMELSTEIN:  Okay.  Okay.

  MS. NOTARI:  Your Honor, I would need to know what

they're trying to put in.

  THE COURT:  Okay.  I can get a ruling out tonight.  I

just have to go to this meeting now.  So, I understand you want

to know about the Cooney recording.

  MS. MERMELSTEIN:  Yes.

  THE COURT:  I will do a short ruling on that tonight

I6B5gal8

1    and I will meet you tomorrow at 9:10 and I will rule on all of

2    the other issues.  I have already told you the gold bars are

3    coming out.  I think on Martin everything else we have

4    discussed.

5            MS. MERMELSTEIN:  I have one incredibly small thing to

6    raise but it can be handled in the morning.

7            THE COURT:  Tell me what it is, generally, if I need

8    to read anything tonight.

9            MS. MERMELSTEIN:  A different witness testified about

10   their understanding of Mr. Galanis' SEC bar.  Mr. Schwartz said

11   he didn't think it was going to come in in that way.  I think

12   it is fine that it did.  Mr. Martin is similarly going to say

13   that he had an understanding that Galanis was barred by the SEC

14   in connection with Penthouse and some kind of misstatement with

15   respect to the accounting.

16           I think these witnesses are allowed to say what they

17   understood about Jason Galanis' bad history but given

18   Mr. Schwartz' feeling about the last time it happened, I didn't

19   want there to be a surprise.

20           We can talk about it in the morning.

21           MR. SCHWARTZ:  I don't understand why that needs to be

22   elicited again.  It was hearsay the first time, it is hearsay

23   the second time.  They have a reason to put the fact into

24   evidence which is a non-hearsay reason which is why I thought

25   we were going to do it by stipulation.  But, now that it is in,

I6B5gal8

1   I can't see any reason why we should be going back there.

2              THE COURT:  We will talk about that tomorrow.  9:10.

3   Thank you.

4              (Adjourned to June 12, 2018 at 9:10 a.m.)

1

INDEX OF EXAMINATION

2

Examination of:                              Page

3

STEVEN SHAPIRO

4

Direct By Ms. Mermelstein  . . . . . . . . . .1729

5

Cross By Ms. Notari  . . . . . . . . . . . .1750

6

Cross By Ms. Harris  . . . . . . . . . . . .1804

7

Redirect By Ms. Mermelstein  . . . . . . . .1805

8

Recross By Ms. Notari  . . . . . . . . . . .1817

9

RAYCEN RAINES

10

Direct By Ms. Mermelstein  . . . . . . . . . 1824.

11

Cross By Mr. Schwartz  . . . . . . . . . . .1863

12

Cross By Mr. Hassen  . . . . . . . . . . . .1869

13

Cross By Mr. Touger  . . . . . . . . . . . .1876

14

Redirect By Ms. Mermelstein  . . . . . . . .1939

15

Recross By Mr. Touger  . . . . . . . . . . .1956

16

GOVERNMENT EXHIBITS

17

Exhibit No.                             Received

18

405, 409, 410, 411  . . . . . . . . . . . .1732

19

412, 414, 423 and 424  . . . . . . . . . .1732

20

408  . . . . . . . . . . . . . . . . . . .1734

21

418  . . . . . . . . . . . . . . . . . . .1745

22

419  . . . . . . . . . . . . . . . . . . .1747

23

439 and 440  . . . . . . . . . . . . . . .1813

24

4050  . . . . . . . . . . . . . . . . . . .1831

25

253  . . . . . . . . . . . . . . . . . . .1855

```
 1    282      . . . . . . . . . . . . . . . .1859

 2    2223, 2300, 2112, 2227, 2039   . . . . . . . .1962

 3    2041, 2042, 2043, 2045, 2047   . . . . . . . .1962

 4    2049, 2050, 2052, 2231, 3215   . . . . . . . .1962

 5    2053, 1272, 2232, 2233, 1226   . . . . . . . .1962

 6    3216, 2234, 3217, 1236, 1273   . . . . . . . .1962

 7    2241, 3276, 2256, 2263, 2267   . . . . . . . .1962

 8    2070, 2072, 2276, 2118, 2075   . . . . . . . .1962

 9    3245, 2077, 2079, 2086, 2084   . . . . . . . .1962

10    2092, 2093, 2094, 2098   . . . . . . . . . .1962

11    2099, 2119, 3272 and 2298   . . . . . . . .1963
```

12                         DEFENDANT EXHIBITS

13    Exhibit No.                               Received

```
14    3755     . . . . . . . . . . . . . . . . .1762

15    3162B    . . . . . . . . . . . . . . . . .1768
```

16

17

18

19

20

21

22

23

24

25