I6KJGAL1

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                        16 Cr. 371 (RA)

JOHN GALANIS, et al.,

             Defendants.

------------------------------x

                              New York, N.Y.
                              June 20, 2018
                              9:00 a.m.

Before:

                  HON. RONNIE ABRAMS,

                              District Judge

                      APPEARANCES

ROBERT KHUZAMI,
    Acting United States Attorney for the
    Southern District of New York
BY:  BRENDAN F. QUIGLEY,
    REBECCA G. MERMELSTEIN,
    NEGAR TEKEEI,
        Assistant United States Attorneys

PELUSO & TOUGER
    Attorneys for Defendant John Galanis
BY:  DAVID TOUGER

BOIES, SCHILLER & FLEXNER LLP (NYC)
    Attorneys for Defendant Devon Archer
BY:  MATTHEW LANE SCHWARTZ
    LAURA HARRIS
    CRAIG WENNER

I6KJGAL1

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
          Attorney for Defendant Bevan Cooney
4              – and –
     O'NEILL and HASSEN
5          Attorneys for Defendant Bevan Cooney
     BY:   ABRAHAM JABIR ABEGAZ-HASSEN
6

7

8    Also present:   Kendall Jackson, Paralegal
                     Ellie Sheinwald, Paralegal
9                           Eric Wissman, Paralegal
                            Special Agent Shannon Bienick, FBI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6KJGAL1

1          (Trial resumes)

2          (In open court; jury not present)

3          THE COURT:  Good morning, everyone.  Be seated.  Are

4  we ready for the jury?

5          MS. TEKEEI:  Yes, your Honor.

6          THE COURT:  Yes.

7          MS. MERMELSTEIN:  Your Honor, we have a number of

8  issues to take up before the government rests.

9          THE COURT:  Bring the mike a little closer.

10         MS. MERMELSTEIN:  There is a fair amount to talk about

11  both before the government rests today and before the defense

12  case against.  It doesn't have to be right this minute, though.

13         THE COURT:  We are checking to see if they're here

14  anyway.  Why don't we start with whatever issues you want to

15  raise.

16         MS. MERMELSTEIN:  Okay.  So, first of all, we received

17  at 11:30 last night, I think, a purported demonstrative for a

18  witness testifying today.  Leaving aside that is just not

19  within the bounds of the agreements about when things are going

20  to be produced, I don't think it is an appropriate

21  demonstrative.

22         THE COURT:  For one of the experts?

23         MS. MERMELSTEIN:  It is.  I think the government

24  objects to the use of the Power Point slides that have been

25  provided for both experts.  They are not sort of just a chart

I6KJGAL1

1   or something that is designed to try to help the jury

2   understand what the testimony that is being said is; they're

3   filled with sort of clip art and texts that really does not

4   help explain their testimony.  It is just designed to give a

5   venire of Power Point's authority to what they're saying.  It

6   does not, in fact, aid the jury in understanding.  So I don't

7   think it is appropriate.

8          For example, a slide has examples of broker-dealers

9   that has the insignia of various broker-dealers on it, Morgan

10  Stanley, E*Trade, et cetera.  It doesn't add anything to the

11  witness's testimony, and so I don't think that is appropriate.

12         I will also note that with respect to Mr. Filler, who

13  is the replacement expert witness, there are slides that relate

14  to what is an investment adviser.  Separate from the fact that

15  I don't think the summary of his testimony that appears is

16  appropriate, there was no notice in the expert notice that any

17  expert witness for the defense would discuss investment

18  advisers.

19         This is impermissibly beyond the scope of the expert

20  notice.  I will note that the government produced as 3500 for

21  Martha Haines, who the government ultimately did not call, 3500

22  that was a lot like this, a slide deck that she had prepared,

23  we didn't intend to offer it as an exhibit, so she prepared it

24  and it was put in the 3500.

25         When that happened, Mr. Schwartz raised with the court

I6KJGAL1

1    he didn't know if we were trying to do that, but if we were

2    going to try to use it as a demonstrative, he would have

3    significant objections.  He has done the exact same thing he

4    said he would have objected to with respect to the defense

5    experts.  We oppose the use of the slides and we oppose any

6    questioning about investment advisers which was not part of the

7    notice.

8              THE COURT:  Do you want to respond?

9              MR. SCHWARTZ:  So, look, what you have in front of you

10   are the slides for Professor Filler, and Mr. Jackson can just

11   flip the pages.  They really could not be more benign.  They

12   simply illustrate some background principles to accompany his

13   testimony, and I think it is easier for the jury, what has been

14   a long and not, as a result of anyone's fault, boring trial,

15   and this sort of thing, you know, helps them focus.  That is

16   why we want to put it in.

17             THE COURT:  What was your objection to the

18   government's --

19             MR. SCHWARTZ:  So those slides, right, I never really

20   articulated it because they said they weren't offering the

21   slides.  Those slides that Ms Haines had prepared included

22   opinions that were specific to the facts of this case, when her

23   notice was not on any facts case specific opinions.  Her notice

24   was like what they did with Professor Laby, it was generic

25   principles of bonds and municipal securities.  It was simply

I6KJGAL1

that there were things that were in there that were far, far

not only beyond their notice, but beyond really their use of

experts in this case.

I have no objection to using demonstrative slides with

experts.  I mean for what it is worth, I have used some of

these very slides before in trials in this courthouse.  These

are just helpful to help the jury understand.

THE COURT:  I will let you use these.  They shouldn't

be admitted into evidence.

MR. SCHWARTZ:  Correct.

THE COURT:  They can be used during the course of the

testimony.

MR. SCHWARTZ:  Exactly right.

MS. MERMELSTEIN:  That is fine, your Honor.  Two

things.  One is Mr. Schwartz's characterization of the slides

that were marked for the bond expert is just wrong.  It does

not contain any expert opinion about the bonds.  To the extent

that -- if things are -- this is exactly what he objected to.

It is one-to-one, and even if these slides are coming in, there

is one that is what is a registered investment adviser, and

goes on to talk about it.  There has been no notice of that.

You can't ask an expert about topics you didn't give notice

for.  This slide has to come out and there can't be any

questions on this topic.

THE COURT:  Why were you going into investment

I6KJGAL1

1    advisers?

2            MR. SCHWARTZ:  Again for background principles.  If

3    that causes heartache, he we will take it out.

4            THE COURT:  What is the next issue?

5            MS. TEKEEI:  Your Honor, we understand that the

6    defense intends to call Crista Archer today.  We put in a

7    letter last night.  We are not trying to be difficult here and

8    we're certainly not trying to get into into any defense

9    strategy, but it is the case the parties have been respectful

10   toward each other during this trial.

11           We raised issues to the court when we think there is

12   going to be issues with testimony in advance.  Nobody has to be

13   objecting in the middle of testimony, and in particular here

14   when the testimony could be very sensitive, we don't want to

15   have to object in the middle of it.  So we asked counsel last

16   night to give us at least a topical outline.  We asked for

17   additional Rule 26.2.

18           THE COURT:  What is the relevance of her testimony?

19           What I don't want to do is embarrass you or her by

20   cutting her off in the -- (inaudible) -- trying to appeal to

21   the sympathy of the jury.

22           MR. SCHWARTZ:  I will be happy to come to sidebar and

23   complete THE proffer what her testimony will be.  It will be

24   very, very brief.  She was a percipient witness to certain

25   interactions with Jason Galanis.  She will testify about those.

I6KJGAL1

1    She will identify Mr. Momtazi.  She will go through some sort

2    of other things she is a first-hand witness to.  She will offer

3    character testimony.

4         She is not doing anything for sympathy.  I am going to

5    mention, because it is relevant, the fact I mentioned in it

6    openings, during the time period this was all happening, two of

7    the Archer's children were born.  We are going to get in their

8    birth dates.

9         THE COURT:  I want that very short because again what

10   I don't want to do is cutting you off and embarrassing you or

11   Dr. Archer.

12        MR. SCHWARTZ:  Again for the second time, if it gives

13   everyone any comfort, Ms. Harris will be doing that

14   examination.

15        THE COURT:  Is there anything else?

16        Is there anything else you want to know beyond that?

17   As I said, I will keep the family testimony very, very brief

18   and bare bones.  Is there anything else you think you need to

19   know?

20        MS. TEKEEI:  Your Honor, I think we're all in

21   agreement on the rules of evidence and that specific instances

22   of conduct to prove character will not be elicited or testimony

23   regarding that.  There has been discussion about political

24   affiliations during this trial.  That is inappropriate with

25   this witness or with any discussion about relationships with

I6KJGAL1

1    former members of the U.S. Attorney's Office, that would be

2    inappropriate, friendships or otherwise.

3            Any discussion about the details of Mr. Archer's home

4    and family life, it sounds like they're going to elicit the

5    fact they have children and the birthdates, and that's it.

6    Then discussions about -- and we have heard plenty of

7    discussion now about all the different Heinz family members and

8    Biden family members that Mr. Archer talked to people about,

9    and I think any further discussion about that would also be

10   inappropriate.

11           THE COURT:  I will allow it to the extent that they're

12   trying to elicit the connections, we have heard about it, I

13   will allow it to be very brief to Heinz and Biden, but again I

14   want that to be brief and we'll move on from there.

15           MS. TEKEEI:  Thank your Honor.

16           THE COURT:  Is the jury here?  Not yet?  We are still

17   missing two.

18           MR. QUIGLEY:  One issue is Government Exhibit 955.

19           Your Honor was going to reserve ruling on that until

20   the close of the government's case.  That is the email from

21   Michelle Morton where she says she emails Daniel Turney and

22   says OP CAP as a result of the buy.  Again there has been,

23   based on the timing, ample testimony that the Atlantic

24   acquisition was even if not criminal in and of itself, it was

25   an act in furtherance of the conspiracy, in that right after

I6KJGAL1

Atlantic was bought, a couple of weeks after that, the entire Ford transit bonds was placed with Atlantic.

This is a statement in furtherance of that conspiracy because she is moving to sell forward and taking steps to provide color to her financial backers.  As I said --

THE COURT:  For some reason, I thought you reached agreement on this.  I guess I was wrong about that.

MR. SCHWARTZ:  The issue here is that there is a suggestion in this email, more than a suggestion, that there was a meeting with what Michelle Morton is describing as the board of Wealth Assurance, chairman of the board of Wealth Assurance and two board members on or about March 25th.

As we have pointed out in a letter a long time ago, that is literally impossible.  It couldn't have been given what we know about the membership of the boards of directors of the Wealth Assurance entities and who was possibly present there. It could not have been the chairman of the board and two board members of any of the Wealth Assurance members.  That is confusing.

The reason why your Honor had reserved ruling because this intersected with a series of text messages the government wanted to introduce that created a misleading impression of a meeting between Mr. Archer and Ms. Morton.  That was the issue with the text messages and the counter-designations of text messages that I thought we had reached resolution on, and now

I6KJGAL1

1    it seems maybe we have back-slid.

2          Actually, Ms. Harris knows what is going on here more

3    than I do, so I will let her speak to it.  I think that there

4    is still an issue about the underlying proof which is really

5    the text messages and how this intersects with that.

6          MS. HARRIS:  Your Honor --

7          MS. TEKEEI:  Your Honor, the government has designated

8    a series of text messages that indicate, we think, that Ms.

9    Morton had multiple meetings on March 25th, 2015.  There is one

10   set of text messages in Government Exhibit 3004 A, in which she

11   appears to be talking about a meeting that she had with someone

12   named Jerry Thunelius.  We weren't there.  We don't know if

13   they actually met, but that is the suggestion.  Immediately

14   after those text messages are text messages with Jason Galanis

15   about her having met Devon Archer that day as well.

16          The defense has pointed out to us that the sequencing

17   of those events makes it appear as though the substance of the

18   conversation that Ms. Morton is relaying to Jason Galanis about

19   her meeting with Jerry Thunelius was about her meeting with

20   Devon Archer.  We do not intend to argue that the substance of

21   that conversation that may have happened with Jerry Thunelius

22   was the conversation with Devon Archer.

23          We have told that to defense counsel.  We can split up

24   those text messages in our exhibit to make that less -- to

25   reduce the suggestion of that.  This morning when we read the

I6KJGAL1

1    text messages, we will split them up so there is no suggestion

2    of that.  The defense has counter-designated a series of text

3    messages that show more of how she had multiple meetings that

4    day.

5            I don't think there is a dispute that she had multiple

6    meetings that day.  We certainly don't intend to argue that the

7    text messages that everyone this about Jerry Thunelius --

8            THE COURT:  Are you objecting to their text messages

9    with respect to the other meetings?

10           MS. TEKEEI:  Well, to certain portions of them, your

11   Honor.  In particular, we have some objections about some of

12   the innuendo that is in those text messages between Morton and

13   Jason Galanis, but in terms of the ones about the meeting,

14   look, we think they over-designated a little bit.  I don't

15   think they need quite so many text messages between, for

16   example, Michelle Morton and a person named Michael Allen to

17   show that she was meeting with Jerry Thunelius prior to her

18   text messages about Devon Archer.  There is just an

19   over-designation.  It is hearsay and it is not relevant.

20           MS. HARRIS:  A few things:

21           First, with respect to 955, we also argue it is not a

22   statement in furtherance of the conspiracy.  With respect to

23   the text messages in particular, we haven't yet received those

24   specific objections.  Ms. Tekeei just mentioned, so I am --

25           THE COURT:  I am going to give you a minute to try to

I6KJGAL1

1    figure that out to see if you can sort that out with respect to

2    the text messages.  The jury is here.  Can we take this up at

3    the break?

4            MS. TEKEEI:  Yes, your Honor.

5            MS. HARRIS:  We would just say, though if you're

6    intending to read them, we think that in fairness, they should

7    be presented together so that the sequence of events is clear.

8            We know that there were at least three meetings on

9    that day in addition to a phone call, and I think we would

10   argue that this is all very much confusing and difficult for

11   the jury to sort there.  It is not clear from the designations

12   that are in the government's exhibit that any meeting took

13   place.

14           So to the extent that the government intends to read

15   them in today, we think it makes sense for all of them to be

16   presented in sequence so that the jury has a fuller

17   appreciation of what exactly happened on March 25th.

18           THE COURT:  Is there any stipulation or instruction

19   that I can give that can clarify things?

20           MS. TEKEEI:  Your Honor --

21           THE COURT:  Obviously, I don't want to testify.  I am

22   asking if there is some resolution to avoid the confusion to

23   the jury.

24           MS. TEKEEI:  We can look at some of the ones the

25   defense has designated and see if we can read in some portions

I6KJGAL1

1    of those to make it more clear during our reading of these text

2    messages that there were multiple meetings that day.

3             MS. HARRIS:  We are happy to talk to the government,

4    your Honor.

5             THE COURT:  All right.

6             MS. TEKEEI:  I think we intend to do this right after

7    Mr. McMillan's testimony, so we'll figure out how they can mark

8    the limited ones they think are appropriate while Mr. McMillan

9    is testifying.

10             THE COURT:  Tell me if we need to take a break.

11             MS. TEKEEI:  Sure.

12             THE COURT:  And then tell me how it affects 955.

13             MS. TEKEEI:  Okay.

14             THE COURT:  Thanks.

15             (Off-the-record discussion)

16             MR. QUIGLEY:  Judge, on 955, as long as you rule at

17    some point before summation, I think we are not going to read

18    it in.

19             THE COURT:  The one thing of 955, it wasn't clear to

20    me who she was referring to, who she is referring to having met

21    with.  That was my hesitation of 955.

22             (Jury present)

23             THE COURT:  Good morning, everyone.

24             THE JURY:  Good morning.

25             THE COURT:  Be seated.  Thank you.  Thank you.

I6KJGAL1                    McMillan – direct

1           I am going to remind you you're still under oath, Mr.

2    McMillan.

3     MARK MCMILLAN,

4          called as a witness by the Government,

5          having been prviously duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MS. TEKEEI:

8    Q.  Good morning, Mr. McMillan.

9    A.  Good morning.

10   Q.  Before we ended yesterday, we were reviewing a few

11   documents that we are not sure were in front of the jury.  Just

12   very quickly if you could, turn to Government Exhibit 1514 in

13   your binder.  Ms. Sheinwald, if you could publish that to

14   everyone.  It is in evidence.

15           Mr. McMillan, is this the printout of the Quick Books

16   register that you kept in connection with the Sovereign Nations

17   Development Corp. bank accounts?

18   A.  It is.

19   Q.  Sir, do you see toward the bottom of that page there are a

20   series of notations for made in a branch/store?

21   A.  Yes.

22   Q.  Are those the withdrawals that we talked about yesterday

23   that didn't show up as wire transactions on the bank account

24   statements?

25   A.  Yes.

I6KJGAL1                      McMillan - direct

1    Q.  If you look over to the far-left column, do you see where

2    some of those -- well, the notations in the section that

3    appears, "ask my accountant"?

4    A.  Yes.

5    Q.  What is the "ask my accountant" designation?

6    A.  In Quick Books for accounting purposes you have to select

7    the text category, and I am not a CPA, so I selected that by

8    default for all those items.

9    Q.  Below that if you'll see the first one where it says Feiner

10   Family Trust, is that your notation or is that imported from

11   the bank account statements?

12   A.  Those are my notations.

13   Q.  Why did you make those notations in the Quick Books

14   register?

15   A.  So I'd know what party things were being transferred to,

16   and those came off of the deposit slips.

17   Q.  So do you see the second to the bottom transfer there to

18   Jason Galanis?

19   A.  Yes.

20   Q.  What was the amount of that transfer?

21   A.  $20,000.

22          MS. TEKEEI:  Ms. Sheinwald, if you could turn to Page

23   4 of this document.

24          Mr. McMillan, do you see next to September 16th, 2014,

25   do you see where it says Appendix A?

I6KJGAL1                    McMillan - direct

A.  Yes.

            MS. TEKEEI:  Ms. Sheinwald, if you could turn to Page
7 of this document.

            Do you see there, Mr. McMillan, next to October 10th
and October 14th where it says Appendix A?

A.  Yes.

Q.  What are those references to?

A.  Reflecting on what I was talking about yesterday, if I did
a withdrawal from the account, there is no way in Quick Books
to represent if I put that money into more than one account, so
Appendix A is the list of single withdrawals to multiple
accounts.

            MS. TEKEEI:  So, Ms. Sheinwald, if you could pull up
Government Exhibit 1513.

            Is this Appendix A, Mr. McMillan?

A.  It is.

Q.  Are these the references or do these correspond to the
references to Appendix A in Government Exhibit 1514?

A.  They do.

            MS. TEKEEI:  Now, thank you Ms. Sheinwald.  You can
take that down.

            Mr. McMillan, did you have a chance to review the
records of disbursements and account statement activity for
Sovereign Nations Development Corp. in advance of your
testimony today?

I6KJGAL1                    McMillan - direct

1    A.  Yes, I did.

2    Q.  That would include the bank statements.  Is that right?

3    A.  That's correct.

4    Q.  And the Quick Books and Appendix A notations that we just

5    saw?

6    A.  Yes.

7    Q.  Was your recordkeeping with respect to the disbursements

8    that came from the bank withdrawals in the Sovereign Nations

9    Development Corp. checking account, was that perfect?

10   A.  No.

11   Q.  Were there gaps in that recordkeeping?

12   A.  Yes.

13   Q.  What were those gaps?

14   A.  I believe they were three totaling approximately $67,000

15   that I couldn't account for.

16   Q.  Do you know where that money went?

17   A.  I'm not certain.

18   Q.  Did you take it for yourself?

19   A.  No.

20          MS. TEKEEI:  Let's turn now to Government Exhibit 1512

21   which is in your binder.  Ms. Sheinwald, if you could publish

22   that everyone.

23          Mr. McMillan, what is reflected in Government Exhibit

24   1512?

25   A.  This is a report on transfers to John Galanis.

I6KJGAL1                         McMillan - direct

1   Q.  Are those the wire transfers to John Galanis?

2   A.  Yes, those are all wire transfers to John Galanis.

3   Q.  Does this sheet include any of the withdrawals that were

4   then rerouted or redirected to John Galanis?

5          MR. TOUGER:  I don't understand the question.

6          THE COURT:  Sorry?

7          MR. TOUGER:  I don't really understand the question.

8          THE COURT:  Do you want to rephrase the question,

9   please.

10  BY MS. TEKEEI:

11  Q.  Mr. McMillan, we saw on Government Exhibit 624 the notation

12  for withdrawal from a bank/branch, and you I think testified

13  that you would make notations as to where that money went in

14  Quick Books and on Appendix A.  Do you recall that?

15  A.  Yes.

16  Q.  Does this register here show those particular withdrawals

17  or is it just the wire transactions?

18  A.  This looks like it is just the wire transfers because of

19  the specific notations in the memo that was automatic and that

20  came directly from Wells Fargo.

21          MS. TEKEEI:  Now, directing your attention back to

22  December of 2014, and looking at Government Exhibit 624, Ms.

23  Sheinwald, if you could turn to Page 30.  I think it is

24  actually one more page over.  My apologies.

25  A.  31?

I6KJGAL1                        McMillan - direct

1    Q.  That will do right there.  Ms. Sheinwald, if you could blow

2    up the activity summary section.

3            Mr. McMillan, at the end of December of 2014, on

4    December 31st, what was the balance in the checking account for

5    Sovereign Nations Development Corp.?

6    A.  $637 and change.

7    Q.  What, if anything, happened to, with respect to the

8    checking account at the end -- well, subsequent to December of

9    2014?

10   A.  It was closed.

11   Q.  Who closed it?

12   A.  I did.

13   Q.  Why did you close it?

14   A.  John Galanis told me to.

15   Q.  What, if anything, did John Galanis tell you in connection

16   with closing the checking account?

17   A.  That I could take the remaining funds which were a little

18   over $500.00.

19   Q.  Did he tell you why you should close the checking account?

20   A.  No.

21           MS. TEKEEI:  Now, think you, Ms. Sheinwald.  You can

22   take that down.

23           Mr. McMillan, did you ever transfer money from the

24   Sovereign Nations bank accounts without John Galanis'

25   authorization?

I6KJGAL1                         McMillan – direct

1    A.   Yes.

2    Q.   When?

3    A.   In 2015, between April and August.

4    Q.   How much did you withdrawn?

5    A.   Almost $20,000.

6    Q.   What, if anything, did you do with the Sovereign Nation

7    Development Corp. remaining bank account after the last

8    withdrawal?

9    A.   Sorry.  There was a savings and a checking account.  After

10   the checking account, I did nothing with it.  The savings

11   account, by August it was closed and again I did nothing with

12   it after that.

13   Q.   Did there come a time when you resigned from Sovereign

14   Nations Development Corp.?

15   A.   Yes.

16   Q.   How, if at all, did you communicate that to John Galanis?

17   A.   Through a letter.

18   Q.   What was his reaction?

19   A.   He accepted it.

20   Q.   Mr. McMillan, during the entire time period now from August

21   2014 through August of 2015, when you were the sole director,

22   president, secretary, vice president and treasurer of Sovereign

23   Nations Development Corp., did you consult with any Native

24   American tribes?

25   A.   No.

I6KJGAL1                        McMillan - cross

1    Q.   Did you work on any Sovereign Nation development business

2    projects?

3    A.   No.

4    Q.   Did you discuss any such business endeavors with John

5    Galanis?

6    A.   No.

7    Q.   Did John Galanis ever ask you for your opinion on Sovereign

8    Nation development issues?

9    A.   Certainly not.

10   Q.   Did he during that time period discuss with you bonds that

11   were issued by the Wakpamni Lake Community Corporation?

12   A.   No.

13   Q.   Other than withdrawing the remaining approximately $20,000

14   from the savings account that you just described, did you ever

15   take actions with respect to the Sovereign Nations Development

16   accounts that you did not make John Galanis aware of?

17   A.   No.

18   Q.   Did you take any actions that he had not directed you to

19   take?

20   A.   No.

21           MS. TEKEEI:   No further questions at this time.

22           THE COURT:   All right.   Cross-examination.

23   CROSS EXAMINATION

24   BY MR. TOUGER:

25   Q.   Good morning, Mr. McMillan.

I6KJGAL1                         McMillan – cross

1    A.  Good morning.

2    Q.  The $20,000, you kept that money, right?

3    A.  Yes.

4    Q.  You did that, as you just said, without Mr. Galanis'

5    pre-authority, correct?

6    A.  Without his express approval.

7    Q.  Did he ever complain to you about that?

8    A.  No.

9    Q.  Would I be correct in saying there was a time period that

10   elapsed between the first time you worked with John Galanis and

11   the second time you worked with John Galanis?

12   A.  Yes.

13   Q.  Would I be correct in saying that during that time period,

14   you called John Galanis asking for work?

15   A.  Yes.

16   Q.  After one of those calls, he employed you, right?

17   A.  That's correct.

18   Q.  So you sought him out, right?

19   A.  Yes.

20   Q.  Now let's go back to the beginning if we could, okay?

21           You developed a relationship with Derrick Galanis

22   first, right?

23   A.  That's correct.

24   Q.  That is how you met John Galanis?

25   A.  That's right.

I6KJGAL1                           McMillan - cross

1   Q.  You worked for John Galanis back in 2010?

2   A.  Yes.

3   Q.  Basically doing the same thing you did in 2014?

4   A.  Basically.

5   Q.  That meant you opened up bank accounts and disbursed funds,

6   right?

7   A.  Yes.

8   Q.  In 2010, you also opened up a brokerage account, correct?

9   A.  That's correct.

10  Q.  Just to be clear, those accounts had nothing to do with the

11  Sovereign Nations accounts?

12  A.  That's correct.

13  Q.  Totally separate, right?

14  A.  Definitely separate.

15  Q.  As a matter of fact, those accounts were closed in 2013?

16  A.  That's probably correct.  I'd have to look at the actual --

17  Q.  But somewhere around that time?

18  A.  Yes.

19  Q.  When you first started to work with John Galanis back in

20  2010 through 2013, you said there came a point in time where

21  John Galanis told you don't follow instructions from Jason

22  Galanis, right?

23  A.  Yes.

24  Q.  Prior to that, he had never said that?  You had worked for

25  him a period of time before he said that?

I6KJGAL1                         McMillan - cross

1   A.  Yes.

2   Q.  Is a better way of asking that question?

3   A.  Yes.

4   Q.  Sorry for the inartful question.

5        Would I be correct in saying that there was an event

6   that caused that instruction to occur?

7   A.  I don't know if the instruction came before or after an

8   event, but I believe I know what event you're talking about.

9   Q.  Why did you think that Mr. John Galanis gave you that

10  instruction?

11  A.  Well, my recollection is the instruction to only take

12  direction from himself or the two attorneys was to just

13  maintain control, oversight over the accounts.

14  Q.  Would you agree with me that although they were working

15  partners, they had separate interests?

16  A.  I would agree with that.

17  Q.  Would you agree with me that both John and Jason guarded

18  their interests and kept them separate?

19  A.  Yes.

20        MS. TEKEEI:  Objection.

21        THE COURT:  Overruled.

22  BY MR. TOUGER:

23  Q.  Just to be clear, when you began working with John Galanis

24  in 2010, that instruction was never given?

25  A.  Yes.

I6KJGAL1                      McMillan - cross

1  Q.  Can we also be clear that during your time working with the

2  Sovereign Nations account, Jason Galanis never called you?

3  A.  That's true.

4  Q.  And never texted you?

5  A.  That's true.

6  Q.  And never emailed you?

7  A.  That's true.

8  Q.  Would I also be correct that say Barry Feiner, though, did

9  give you instructions with that account?

10  A.  Yes.

11  Q.  Obviously, Mr. Galanis gave you many more than Barry Feiner

12  did, right?

13  A.  Excuse me?  You're talking about the Sovereign Nations?

14  Q.  Yes, the Sovereign Nations?

15  A.  Barry Feiner's instructions were minimal.

16  Q.  Most of the instructions came from John Galanis?

17  A.  That's correct.

18  Q.  Would I be correct in saying that basically John Galanis

19  gave you instructions, and you followed them?

20  A.  Yes.

21  Q.  No questions asked, no discussion, do this, you did it, and

22  you went on to the next assignment, right?

23  A.  That's correct.

24  Q.  By the way, you spoke about yesterday the formation of

25  Sovereign Nations.  Do you remember that?

I6KJGAL1                          McMillan - cross

1    A.  Yes.

2    Q.  I believe you testified that that was on a conference call

3    between you, Barry Feiner and John Galanis, right?

4    A.  Yeah.

5    Q.  That was the first call relative to Sovereign Nations you

6    had with Mr. Galanis?

7    A.  That's right.

8    Q.  Barry Feiner is an attorney, right?

9    A.  Yes.

10   Q.  By the way, nothing improper or abnormal about setting up

11   an account in Delaware, is there?

12           MS. TEKEEI:  Objection.

13           THE COURT:  Sustained.

14   BY MR. TOUGER:

15   Q.  Have you set up a lot of businesses in your time?

16   A.  Can you define, "a lot"?

17   Q.  More than three?

18   A.  When I was working for John, I did set up more than three.

19   Q.  Are you familiar with the State of Delaware, setting up

20   corporations in the State of Delaware?

21   A.  I've done that.

22   Q.  Is there anything abnormal about a person setting up a

23   business, incorporating it in the State of Delaware?

24           MS. TEKEEI:  Objection.

25           THE COURT:  Sustained.

I6KJGAL1                              McMillan - cross

1           MR. TOUGER:  May we approach, your Honor?

2           THE COURT:  You can ask it a different way.

3    BY MR. TOUGER:

4    Q.  Have you ever set up accounts before in the State of

5    Delaware?

6    A.  I've done that.  If you are asking have I ever done that,

7    yes.

8    Q.  They were for corporations that weren't, shall we say,

9    operating in the State of Delaware?

10   A.  Correct.

11   Q.  One of the reasons you said that you set up this account in

12   the State of Delaware is because they're quick?

13   A.  Yes.

14   Q.  And John Galanis told you he needed this account set up

15   quickly, right?

16   A.  Yes.

17   Q.  And also in your experience in setting up accounts, there

18   is nothing abnormal about somebody being the president, vice

19   president, secretary and treasurer?

20           MS. TEKEEI:  Objection.

21           THE COURT:  Yes, sustained.

22   BY MR. TOUGER:

23   Q.  Have you set up companies before where you were the

24   president, vice president, secretary and treasurer?

25   A.  This was the only one.

I6KJGAL1                          McMillan - cross

1   Q.  Did that give you any worry when you did that?

2   A.  Yes.

3   Q.  Did John Galanis tell you when you opened the accounts up

4   in Arizona, right, the bank accounts?

5   A.  Yes.

6   Q.  Did John Galanis tell you to keep his name off the bank

7   records?

8   A.  Not explicitly.

9   Q.  Now, would I be correct in saying that you did not do the

10  incorporation papers, they were done by the attorney Barry

11  Feiner, right?

12  A.  That's correct.

13  Q.  You just signed them?

14  A.  That's correct.

15  Q.  Because he is the lawyer, he did the legal work, and you

16  were just signing the papers, right?

17           MS. TEKEEI:  Objection.

18           THE COURT:  I'll allow it.  You can answer that.

19  A.  Can you repeat the question.

20  BY MR. TOUGER:

21  Q.  Sure.  Barry Feiner, the attorney, did the legal work.

22  Then you just signed the paperwork that he did?

23  A.  Yeah, reviewed what he sent to me and signed it.

24  Q.  Right.  Now, by the way, you were paid for your services,

25  right?

I6KJGAL1                        McMillan - cross

1    A.  Yes.

2    Q.  And you got some extra payments, shall we say, right?

3    A.  Yes.

4    Q.  You got the $30,000 in the beginning, right, the $20,000 at

5    the end that you just took, and Mr. Galanis didn't mind you

6    doing at the end, right?

7               MS. TEKEEI:  Objection.

8               THE COURT:  Overruled.

9    A.  Yes.

10   Q.  Were there any other payments in the middle beyond your

11   6500 per month?

12   A.  Yes.

13   Q.  How much were those for?

14   A.  There was one for 10,000 and one for 15,000.

15   Q.  15?

16   A.  15.

17   Q.  Thank you.

18          Now, I believe it is clear in the record, but just so

19   the jury understands it, Mr. Murphy also got money from the

20   Sovereign Nations account, too, right?

21   A.  There were two Murphys that received wire transfers.  I

22   don't know who they are.

23   Q.  One of them you do know is the attorney, right?

24   A.  I am sorry.  One of them was an attorney, yes.

25   Q.  He's also a friend of Mr. Galanis?

I6KJGAL1                          McMillan - cross

1    A.  I don't know.

2    Q.  But you know him as a lawyer, correct?

3    A.  I know him, yes, it says attorney at law on the wire.

4    Q.  By the way, Mr. Feiner got payments from the Sovereign

5    Nations account, too, right?

6    A.  Yes.

7    Q.  And he did work for Sovereign Nations, obviously?

8    A.  Yes.

9    Q.  I believe you also testified that Jared Galanis got some

10   payments from the Sovereign Nations account, right?

11   A.  Yes.

12   Q.  And Jared Galanis is also an attorney?

13   A.  That's correct.

14   Q.  Do you remember a payment to a man named Rayce Raines?

15   A.  I didn't know how was his name was pronounced but, yes.

16   Q.  I don't know if it is actually pronounced that way, either.

17   You remember that payment made to him, correct?

18   A.  $5,000.00.

19   Q.  $5,000.00 was paid to Mr. Raines, too, correct?

20   A.  That's correct.

21   Q.  You spoke about this Car Sync.  Do you remember that?

22   A.  Yes.

23   Q.  Would I be correct in saying that was a used car

24   dealership?

25        MS. TEKEEI:  Objection.

I6KJGAL1                          McMillan - cross

1        THE COURT:  Overruled.

2   A.  I don't know.

3   BY MR. TOUGER:

4   Q.  Do you know that Jessie Galanis owned that business?

5        MS. TEKEEI:  Objection.

6        THE COURT:  Sustained.

7   BY MR. TOUGER:

8   Q.  Do you know who Kevin Ryan is?

9   A.  Yes.

10  Q.  Is he an attorney also?

11  A.  Yes.

12  Q.  And he got money from the Sovereign Nations account also,

13  right?

14  A.  Yes.

15  Q.  And you know a man named Dan Ha?

16  A.  Yes.

17  Q.  Would I be correct in saying there were payments made to

18  him from the Sovereign Nations account, and I don't know if I

19  am pronouncing this right, either Persuvis?

20  A.  There were transfers to Persuvis.  Maybe it is what you

21  said.  It began with a P.

22  Q.  It began with a P and ends with an S.  You know that was

23  payments to Dan Ha through that company, correct?

24        MS. TEKEEI:  Objection.

25        THE COURT:  Ha.

I6KJGAL1                         McMillan - cross

1           MR. TOUGER:  If he knows.

2           THE COURT:  Sustained.

3   BY MR. TOUGER:

4   Q.  Do you know that the company starts with a P and ends with

5   an S is relative to Dan Ha?

6   A.  I am not sure.

7   Q.  Do you know who Sherry Wheeler is?

8   A.  No.

9   Q.  Do you know who Rebecca Rivetti is?

10  A.  I am not certain.  There was someone, a family friend that

11  might have been that person I think had loaned John money.  I

12  am not sure.

13  Q.  By the way, you never took out from the bank any cash,

14  right?

15  A.  I'm sorry?

16  Q.  You never went to the Sovereign Nations account?

17  A.  The savings account, I think those withdrawals were cash.

18  Q.  But you never had cash in hand, right?

19  A.  From the savings, I believe I did.  From the checking, it

20  was done, the teller would actually never take cash out,

21  withdraw the funds on paper and put them in on paper.

22  Q.  It was just a way of saving the $30.00 for the wire fee,

23  correct?

24  A.  Yes.  I did, however, run a deposit over to Bank America,

25  which was about a block away.  I believe that was cash, about

I6KJGAL1                         McMillan - cross

1      $2,000.

2      Q.   $2,000?

3               But when the government lists cash withdrawals, they

4      are not actually cash withdrawals; they're just withdrawals

5      coming out and then being deposited into other accounts?

6               MS. TEKEEI:  Objection.

7               THE COURT:  The same objection?

8               MS. TEKEEI:  What the government does or did, if there

9      is a particular document Mr. Touger wants to refer him to.

10              THE COURT:  I'll sustain that.

11              MR. TOUGER:  I want to make it clear for the jury.

12     BY MR. TOUGER:

13     Q.   Again you went to the bank, you gave them with a withdrawal

14     slip, right?

15     A.   The actual process, I would bring --

16     Q.   Tell us the process.

17     A.   Bring them a piece of paper I had printed everything out

18     on, it had the account name, the account number and the amount,

19     and I would, for anything that was going to be done that wasn't

20     a wire, I would hand that to a teller.  The teller would then

21     fill out a withdrawal slip and fill out the corresponding

22     deposit slips and take care of it all.

23     Q.   No cash ever came into your hands?

24     A.   On those kinds of transactions, no.

25     Q.   Most cash you ever took out you walked that one block to

I6KJGAL1                         McMillan - cross

1    Bank America was one time for $2,000?

2    A.  It might have been more than once, but, yeah, they were

3    small, from that perspective, they were $2,000 or less.

4    Q.  Would I be correct in saying you never consistently took

5    out $10,000.00 in cash and gave it to somebody in cash?

6    A.  You would be correct.

7    Q.  As a matter of fact, you never gave anybody a cash payment,

8    you went to a bank, Bank of America and deposited it into their

9    account?

10   A.  That is true.

11   Q.  You never paid anybody in cash?

12   A.  I don't recall ever having paid anyone any cash.

13   Q.  So for about August of 2014 to December 2014, you

14   controlled the funds that were -- when I say "controlled," I

15   don't mean you had any decision-making powers, or you did, you

16   exercised any decision-making powers, you controlled the

17   account of Sovereign Nations at the Wells Fargo Bank, correct?

18   A.  I was the only signatory on the bank accounts at Wells

19   Fargo.

20   Q.  To your knowledge, did John Galanis make any withdrawals

21   from that account?

22   A.  I don't believe he had the capacity to do that.

23   Q.  Exactly!  You were the only one who had that capacity,

24   right?

25   A.  That's correct.

1    Q.  That was never a bone of argument with you and Mr. Galanis,

2    correct?

3                MS. TEKEEI:  Objection.

4                THE COURT:  Overruled.

5    A.  He never any point about that.

6    BY MR. TOUGER:

7    Q.  Right.  As I said, $2.35 million came in, a few months

8    later it went out, and you have no idea why or the wherefores

9    of why anything went in or out of that account?

10   A.  That's correct.

11               MR. TOUGER:  Thank you very much.

12               THE COURT:  Any additional cross-examination?

13               MR. SCHWARTZ:  Just a few, your Honor.

14   CROSS EXAMINATION

15   BY MR. SCHWARTZ:

16   Q.  Good morning, folks.  Good morning, Mr. McMillan.

17   A.  Good morning.

18   Q.  My name is Matthew Schwartz.  I am one of Devon Archer's

19   lawyers.  I have just a very few questions for you and you can

20   be on your way.

21               First of all, can I have you confirm for the purpose

22   the record you have never met Devon Archer?

23   A.  That's correct.

24   Q.  You have never communicated with Devon Archer in any way,

25   true?

I6KJGAL1                          McMillan - cross

1    A.   True.

2    Q.   Is it also true that you've never met or communicated with

3    a person named Matt Norgrin?

4    A.   I don't know that name.

5    Q.   The same with Paul Rohan?

6    A.   (No response)

7    Q.   You have met Jason Galanis, true?

8    A.   Yes.

9    Q.   And am I right in saying you first met Jason Galanis about

10   10 years ago?

11   A.   That's around the time-frame, yeah.

12   Q.   2008-2009, thereabouts?

13   A.   That's correct.

14   Q.   You met him at his house in Bel Air.  Is that right?

15   A.   I did go to his house.  That might have been the first time

16   I met him.

17   Q.   I am not going to show you pictures, but it was that big

18   house he had in Bel Air he had back 10 years ago, true?

19   A.   Yes.

20   Q.   At the time you were working for Jason's brother Derrick,

21   true?

22   A.   Yes.

23   Q.   You recall you went to a dinner with Jason Galanis early

24   on?

25   A.   I do.

1    Q.  At that dinner Jason Galanis spoke with you about the

2    possibility of starting an investment fund?

3    A.  Yes.

4    Q.  He was going to attract the seed money for the fund, right?

5    A.  Right.

6    Q.  In fact, he set up a couple of meetings for you about

7    potentially setting up that fund?

8    A.  Yes.

9    Q.  You recall he had an interest in a financial company called

10   Adviser Shares?

11   A.  He was CEO, and one of his lieutenants were at that

12   meeting.

13   Q.  Right.  He set up a meeting with some folks from Adviser

14   Shares, right?

15            MS. TEKEEI:  Objection; relevance.

16            THE COURT:  I will give you a little bit of leeway on

17   this.  You can answer the question.  It has already been

18   answered?

19   A.  Do you want to ask the question again.

20            MR. SCHWARTZ:  Could you read it back.

21            THE COURT:  I think you said, "Right.  He set up a

22   meeting with some folks from Adviser Shares, right?"

23            THE WITNESS:  That's correct.

24   BY MR. SCHWARTZ:

25   Q.  In connection with starting this potential fund, true?

I6KJGAL1                      McMillan - cross

1    A.  Yes.

2    Q.  That ended up not working out with Adviser Shares, right?

3    A.  Yes.

4    Q.  When that didn't work out, he suggested that you could run

5    a fund with some people from a company called Morris Hill,

6    right?

7    A.  That's correct.

8    Q.  Morris Hill already had sufficient assets to start a fund,

9    true?

10             MS. TEKEEI:  Objection.

11             THE COURT:  Overruled.  You may answer.

12   A.  Morris Hill had an existing fund.  It was going to be

13   shuttered if someone didn't take it over, so that was the

14   opportunity.

15   Q.  Fair to say that Jason Galanis was negotiating the deal,

16   right?

17   A.  Yes.

18   Q.  Now, I think you testified on direct about the same time

19   you wrote some articles for something called Equities Magazine?

20   A.  That's correct.

21   Q.  Equities Magazine was a financial news source of some kind?

22   A.  Yeah, it was originally a physical magazine and it went to

23   an electronic format.

24   Q.  Am I correct that Jason Galanis owned a stake in Equities

25   Magazine?

I6KJGAL1                        McMillan - cross

1   A.   Yes.

2   Q.   Just to step back for a second, you understood that the

3   Galanis family was very wealthy, true?

4   A.   That was my belief, yeah.

5   Q.   You thought they had family money, right?

6   A.   Yes.

7   Q.   In fact, you would agree with me, wouldn't you, you thought

8   the Galanis family was worth about $400 million?

9   A.   I don't know if I had any specific thought of what they

10   were worth.  I had read an article before.

11   Q.   You thought they were worth hundreds of millions of

12   dollars?

13   A.   I thought they were worth millions.  I never quantified it.

14   Q.   Do you recall telling the government in an interview that

15   you thought that the Galanis family was worth about $400

16   million?

17   A.   I don't recall that specific conversation.

18   Q.   Mr. Jackson, can you show just for Mr. McMillan, the

19   lawyers and Judge Abrams 3523-1.

20            Do you see what this is, Mr. McMillan, just yes or no?

21   A.   It's a memo or --

22   Q.   Just yes or no?

23   A.   Yes.

24   Q.   Mr. Jackson, can you go to Page 5 of this document, maybe

25   Page 6 of this document.  I am sorry.  If you can blow up what

I6KJGAL1                        McMillan – cross

1  looks like the 7th bullet from the bottom.  Just read that to

2  yourself.

3          My question is, does this remind you that you told the

4  government that the Galanises with worth about $400 million?

5          MS. TEKEEI:  Objection.

6          THE COURT:  Overruled.

7          THE WITNESS:  Your Honor, if I could just get to the

8  point?

9          THE COURT:  Does it help you remember?

10          THE WITNESS:  No, it doesn't help me to remember.  I

11  know where the 400 million came from if I did, in fact, say

12  that.

13          THE COURT:  Tell us.

14          MR. TOUGER:  May we approach, your Honor.

15          THE COURT:  All right, you may approach.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

I6KJGAL1                          McMillan – cross

1          (At sidebar)

2          MS. TEKEEI:  My objection was I think it is hearsay.

3          I think he is about to say he read an article that

4    discusses the net worth of John Galanis, the lines about John

5    Galanis specifically, not the Galanis family.  Mr. Schwartz is

6    trying to be careful, but it wasn't accurate to say does this

7    remind you the Galanis family is worth $400 million.  Mr.

8    Touger might have additional concerns about this question.

9          MR. TOUGER:  I don't know where he said it.  I know

10   why he said that.  I don't know where.

11         THE COURT:  Do you know what article he read?

12         MR. SCHWARTZ:  I will just move on.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I6KJGAL1                         McMillan - cross

1              (In open court)

2              MS. TEKEEI:  We move to strike that question.

3              THE COURT:  I am just going to strike that last

4      answer.  Thank you for trying to, clarify but we'll just move

5      on from this.

6      BY MR. SCHWARTZ:

7      Q.  We left it at it doesn't refresh your recollection and

8      we'll stop.  My point was just you believe the Galanises were

9      very rich?

10     A.  Yeah.

11     Q.  By the way, how many times did you go to Jason Galanis'

12     home in Bel Air?

13     A.  Only once, I believe.

14     Q.  Only once?  Did you notice what kind of car he drove?

15     A.  I know what car he drove me down to the dinner in.

16     Q.  What was that?

17     A.  It was his wife's car or he told me it was his wife's car

18     and it was either a Bugatti or Bentley.  It was not like a

19     limousine-type car, it was more of a sports car.

20             MR. SCHWARTZ:  Thank you very much.  I don't have any

21     other questions.

22     CROSS EXAMINATION

23     BY MS. NOTARI:

24     Q.  Good morning, Mr. McMillan.  My name is Paula Notari.  I

25     represent Mr. Bevan Cooney, who is seated over there.  You have

I6KJGAL1                        McMillan – cross

1    never met Mr. Cooney, correct?

2    A.  No.

3    Q.  You have never spoken to him, correct?

4    A.  Correct.

5    Q.  You have never spoken to any of his business managers at

6    Fulton & Meyer?

7    A.  No.

8              MS. NOTARI:  Thank you.

9              THE COURT:  Any redirect?

10             MS. TEKEEI:  No, your Honor.

11             THE COURT:  Thank you.  You may step down.  Thank you.

12             (Witness excused)

13             MS. TEKEEI:  Before we call Special Agent Kendall,

14   there was that one issue we needed a couple of minutes to

15   resolve.  Now would be a good time to do that and then we can

16   move forward.

17             THE COURT:  We are going to take a very short break so

18   the testimony moves faster for you.  So we'll do that now.

19   Thank you.

20             (Jury excused)

21             THE COURT:  Why don't you try and work it out and let

22   me know if you need me for anything.

23             (Recess)

24             (Continued on next page)

25

I6K7GAL2

1              (Jury not present)

2              THE COURT:  Did you all work everything out?

3              MS. TEKEEI:  For today's purposes we have.  We have

4    included some excerpts that Mr. Archer's counsel wanted us to

5    include in the text messages in Government Exhibit 3004A that

6    help provide a little bit more detail about the timing of the

7    meetings and who Ms. Morton met with.

8              We have separate objections on Defense Exhibit 3004B,

9    but that is not an issue for the moment.

10             THE COURT:  OK.  And after this do you intend to rest?

11             MS. TEKEEI:  After Special Agent Kendall.

12             THE COURT:  All right.  Thank you.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I6K7GAL2

1          (Jury present)

2          THE COURT:  Everyone can be seated.  Thank you.

3          MS. TEKEEI:  Thank you, your Honor.  With Special

4    Agent Kroll we will now read in some portions of text messages

5    from Ms. Morton's phone.

6          THE COURT:  Fine.  Thank you.

7          MS. TEKEEI:  Ms.Sheinwald, can you publish to the jury

8    what is Government Exhibit 3004-O.  And turning to page 2,

9    Apple ID mamorton2@gmail.com, phone number (732) 598-5189.

10         Ms.Sheinwald, can you now publish to the jury page 15

11   of Government Exhibit 3004A, and highlighting the participants,

12   text messages between Michelle Morton, Hugh Dunkerley and Jason

13   Galanis on July 14, 2014.

14   A.  "Michelle, we putting our COR or Burnham foot forward with

15   Frankie?"

16   Q.  "Burnham."

17   A.  "COR Fund Advisors is the lead.  Not likely to be held in

18   regulated Burnham.  Not sure necessary to make distinction for

19   this call."

20   Q.  "I will do whatever you say."

21   A.  "What's our term sheet say?  CORFA I thought."

22   Q.  "COR Fund Advisors directly or through its affiliate

23   Burnham Financial Group."

24         Ms.Sheinwald can you now turn to page 1 of Government

25   Exhibit 3004A, and at the bottom text messages between Michelle

I6K7GAL2

Morton and Jason Galanis on July 21, 2014:

"Should know how $ we can proceed with bonds soon getting information."

A.  "I'm confident you will figure it out."

Q.  "I will."

And turning now to page 2, Ms.Sheinwald.

A.  "And will form BFG Socially Responsible Investments LLC tomorrow as sub of Burnham Financial Group."

Q.  "Ooooooooh, I like that idea."

Turning next to page 3.

"Let's be clear, if you want the bonds to go in, I have no say.  I am not sitting in the position of making a judgment.  If you invested in Hughes for this sole purpose than it is your call not mine.  You're not in my hands I'm doing the same thing that I have always done, providing information.  If you are thinking that I can or would stop this then I have totally screwed up my communication."

Turning next to page 4:

"Guarantee as written may compromise minority status. Need to have the "judgment" step included.  Argument could be made that if you step in if we don't make payment, that Wealth Assurance actually has control and we are a shell. Unscrupulous people could use this against us.  We cannot agree to the term because standard remedies must be in place.  No guarantor would step in immediately.  My two cents."  February

I6K7GAL2

1    4, 2015.

2           And, Ms.Sheinwald, if you could now turn to page 5.

3    March 5, 2015:

4           "In regard to our morning meeting, the one question

5    that I think we should be prepared to address is the reason we

6    need to place the bonds."

7    A.   "What have you said?"

8    Q.   "I have not been asked the question because I presented the

9    placement as something I need to do.  Jerry is cool with this

10   so far but we need to prepare for Elaine.  Hence, we need to

11   arm Jerry with the information.  I don't know because I've

12   gotten into the habit of saying "how high" instead of "why"...

13   My bad but there it is ... need to delay call until 7:30 (1 hr)

14   gotta discuss a consent issue with Atlantic.  Hate to do this

15   to you but we don't need additional bond info.  It's just

16   placement strategy and J things we should have those

17   discussions on our own.  I of course will report back to you."

18          Ms.Sheinwald, can you turn next to page 6.  March 5,

19   2015:

20          "Who's Bevan again?"

21   A.   "Best friend of 23 years and equitu holder in all the

22   businesses."

23   Q.   Turning next to page 7:

24          "I thought Sugey was your best friend."

25   A.   "He is a professional connector.  Cooney is from Missoula.

I6K7GAL2

1   Grew up with Kevin Washington.  Washingtons are homegrown

2   dollar zero multi billionaires, $9 billion.  Beverly

3   Hillbillies."

4   Q.  "Cooney?  Missoula?  Huh?"

5   A.  "Montana style, Bevan Cooney."

6   Q.  And Ms.Sheinwald, turning next to page 16 of this exhibit,

7   text messages between Michelle Morton and Bevan Cooney on March

8   5, 2015.

9   A.  "Michelle nice talking with you.  Send me the Roc Nation

10  Sports presentation to my e-mail btcooney@gmail.com.  This is

11  my cell.  Call any time.  Best, Bevan."

12  Q.  And turning to page 17:

13          "Thank you Bevan.  It was a pleasure meeting you.  I

14  will get the proposal to you next week.  PS, take care of my

15  Jason, he is really precious to me."

16  A.  "Perfect.  I always look out for our Greek.

17  Q.  "Faux Greek.  He's American.  We just let him play a Greek.

18  Don't tell him though.  Ha ha."

19  A.  "He is.  Def doesn't speak the language ..."

20  Q.  "Except when he yells.  I think I'm the only one that

21  points to him and laughs when his temper flares, but I love him

22  to death."

23  A.  "He loves you, LOL.  You are the Greek whisperer."

24  Q.  "I am texting with him now.  I adore him but sometimes he's

25  a dope, but he cracks me up."

I6K7GAL2

1   A.   "Excited to is see your Roc Nation pres.  Talk next week

2   Michelle.  True ... we all have our moments."

3   Q.   March 6, 2015:

4            "Bevan, need to work on integration plan for the

5   acquisition and a project with Jason.  Consequently, I don't

6   think I will be able to have a proposal to you until the end of

7   next week.  I hope this is OK."

8   A.   "Michelle take your time.  You have a lot on your plate

9   right now."

10  Q.   And, Ms.Sheinwald, turning now to page 8, and at the

11  bottom, text message on March 25, 2015 from Ms. Morton:

12           "Love Devon Devin."

13  A.   "Great human.  I'm glad you got time with him.  And you met

14  Andrew officially."

15  Q.   "Great sense of humor.  Love Andrew too.  I'm very, very

16  lucky and I know it.  We are going to have so much fun.  I

17  can't wait.  Knowing the people makes it so much better."

18  A.   "Makes the entire difference.  We all really have a

19  relationship and that includes you."

20  Q.   Turning next to page 9 and beginning at the text message on

21  March 26, 2015 from Ms. Morton:

22           "Arrived safe.  Talk to you tomorrow.  OMG, OMG, OMG.

23  I was just thinking about our meeting and thought "gosh, that

24  Devin guy looks familiar" and then I realized holy crap ... I

25  teased and was goofy with ... Devon Archer.  I am so pissed at

I6K7GAL2

myself I should have made a better impression, but I was so

darn tired.  Please apologize to him.  I did not mean to be so

familiar."

          And turning now to page 10, continuing on March 26,

2015:

          "Good one ... was yesterday's Devon the Archer one?"

A.  "Yes."

Q.  "Wow...I'm such a dope."

A.  "Naw."

Q.  Turning to page 11:

A.  "Not at all.  Nope.  Big deal.  For sure."

Q.  "He's a biggy and not just some random white guy."

A.  "Really talented, super savvy.  Will be an ambassador one

day, easy pivot for him, after net worth accumulation phase, ha

ha ha ha ha."

Q.  And turning now to page 12, April 5, 2015 from Ms. Morton:

          "Strange?  Given the situation it's difficult to be

excited.  I am supposed to make magic with a company mired in

debt.  I will not know until tomorrow if systems are on the

brink of being turned off.  I've already requested greater

clarity on the amount of debt only to find out that they

misrepresented the numbers and it is higher than it was the

week I saw you and some of the money is owed to employees.  I

can't make the payroll because the billing will not be

completed and because of all of this I am working for 35K just

I6K7GAL2

so that I can get health insurance.  I supported the closing

because I was assured I would not be in this position.  I

explained that I did not have the time or the information

necessary to prepare an "ask" and that the closing should be

delayed until I did."

Text messages between Ms. Morton and Jerry Thunelius,

March 25, 2015:

"Just got off with investors who I will see shortly.

We're going to propose taking money off the back end and

they're going to front the money, the working capital, if I

want it.  I have to think about it and let them know what I

want to do in two hours.  I would love to get some face time

with you.  I'll be done with this board meeting by 11:30.  I

wrap the day at 3 p.m.  I can delay" --

Just for clarification, your Honor, I'm reading from

something that we don't have on the screen, and that's fine

intentionally.

THE COURT:  OK, thank you.

Q.  "My financial people meeting is at the Mandarin Hotel and

then a quick meeting with the lawyers who are on Park Avenue.

Where will you be?"

At approximately 3:26 p.m.:  "OK, on way in ten.

They're just finishing presentation.  I am in and grabbed a

table."

Then at 6:51 p.m.:  "Thanks for spending time with me.

I6K7GAL2

Getting the investment team strategy laid out was great.  It's

one major thing off my plate and in such a positive way.

You're the best, and you and Mike are going to be a wonderful

team.  I am a very, very, very lucky woman."

        And, Ms.Sheinwald, if you could turn back to

Government Exhibit 3004A, and turning to page 8, text messages

between Michelle Morton and Jason Galanis on March 25, 2015:

        "Just finished up.  Going to be tough to put up a

trade beforehand but he has other ideas where to place it (he

came prepared) but I am super confident because he Mike and

Cliff are on top of it.  If we go with an April 1 I am very

confident that we will be able to get it placed within 48 hours

depending on U.S. Bank settlement issues of which I am not

aware."

A.  "I thought that would be the issue.  He might even be

right.  You have confidence though post close?"

Q.  "Just getting to Penn Station will text more in a couple of

minutes."

A.  "OK.  That's plenty for me."

Q.  "Yes I am willing to put my credibility with you on the

line and take responsibility personally.  I am really really

feeling good about it.  But because he was ready, discussed the

multiple clients in which the bond to would fit.  He was

prepared with information.  That gave me the confidence to put

myself on the line."

I6K7GAL2

1          And text message from Ms. Morton to Richard Deary:

2          "Really good.  Going to give you tons of info that

3    will make you feel really good.  Glad we can talk to Nick and

4    his team.  Just finished up a meeting with Jerry so I have bond

5    info.  Things are starting to go our way."

6          And, Ms.Sheinwald, if you could go back to 3004A, page

7    13, back to text messages between Ms. Morton and Jason Galanis

8    on April 15, 2015:

9          "Can you do me a favor?  Can you put together talking

10   points for the bond so that I can study and have them handy

11   just in case?  Send to my g-mail address.  I must sign the

12   accredited investment letter because of my position in the

13   fund.  Are you OK with that?  Only respond if you are not.

14   Otherwise, I will move forward."

15         And turning now to page 14 of Government Exhibit

16   3004A, later on April 15, 2015:

17         "Going nite nite, but please get Tim or someone to get

18   us the tribes financials."

19   A.  It's received the same time, but "I suggest we paper the

20   foe" -- correction -- "file".

21         MS. TEKEEI:  Thank you Special Agent Kroll.

22         THE COURT:  All right.

23         MS. MERMELSTEIN:  The government calls Special Agent

24   Dayna Kendall.

25

I6K7GAL2                          Kendall - Direct

 1   DAYNA KENDALL,

 2        called as a witness by the government,

 3        having been duly sworn, testified as follows:

 4   DIRECT EXAMINATION

 5   Q.  Good morning, Special Agent Kendall?

 6   A.  Good morning.

 7   Q.  Let me ask you to keep your voice up.  It's a little hard

 8   to hear in here.

 9   A.  OK.

10   Q.  Where do you work?

11   A.  The Federal Bureau of Investigation.

12   Q.  And what is your current title?

13   A.  Special agent.

14   Q.  How long have you been a special agent with the F.B.I.?

15   A.  Four years.

16   Q.  Are you assigned to any particular squad or unit within the

17   F.B.I.?

18   A.  I investigate securities fraud.

19   Q.  What did you do before joining the F.B.I.?

20   A.  I worked for a financial services firm.

21   Q.  Are you familiar with a securities fraud investigation

22   involving the Wakpamni bonds?

23   A.  Yes I am.

24   Q.  Are you one of the agents assigned to that case?

25   A.  No, I'm not.

I6K7GAL2                          Kendall - Direct

1   Q.  Generally speaking did you participate in that
2   investigation?
3   A.  Generally, no, but I was present for a couple of witness
4   interviews.
5   Q.  Why was that?
6   A.  I was asked to be because other agents were unavailable.
7   Q.  Let me ask you to try harder to lift your voice or slide
8   into the microphone.
9   A.  OK.
10  Q.  Have you participated in -- let me ask you to give that
11  answer about your participation in the investigation again.
12  A.  I was present for a couple of witness interviews, and that
13  was because other of the case agents were unavailable.
14  Q.  Have you participated in the preparation of summary charts
15  in connection with this trial?
16  A.  Yes, I have.
17  Q.  Generally speaking, what kinds of things did you review in
18  connection with the preparation of those charts?
19  A.  Generally, bank statements, closing statements, paper
20  documentation, e-mails, and in some cases other testimony.
21  Q.  Meaning portions of the transcript of this trial?
22  A.  Yes.
23  Q.  Where did you get the materials that you received?
24  A.  The prosecution team presented them to me.
25  Q.  And in broad strokes what kind of analysis did you do?

I6K7GAL2                          Kendall - Direct

A.   Generally I looked at the bond series, the various bond

series that were issued, and then the cash flow and expenses

and things related to that cash flow.

Q.   Let me direct your attention to what has been marked for

identification in front of you as Government's Exhibits 4003

through 4016.  They are in that binder in front of you.

A.   Yes.

Q.   What are those?

A.   These are the summary charts that I created.

Q.   And did you participate in the preparation of those summary

charts?

A.   Yes.

Q.   Are each of these charts based on documentary evidence or

testimony admitted at this trial?

A.   Yes.

Q.   And are each of these charts accurate based on the evidence

you have reviewed?

A.   Yes.

          MS. MERMELSTEIN:  The government would offer --

          MR. TOUGER:  Objection.  May we approach?

          THE COURT:  Sure.

          (Continued on next page)

1          (At the sidebar)

2          MR. TOUGER:  I believe all three of us have the same

3     objection to the word accurate.  There is no way -- that's a

4     conclusion; there is no proof.  As a matter of fact, we say the

5     charts aren't accurate at all in many instances.

6          THE COURT:  You can cross-examine her on that.

7          MR. SCHWARTZ:  I have a further foundational basis,

8     which is, Ms. Mermelstein just elicited some of the materials

9     that she relied upon.  Now, the charts themselves note what

10    they relied upon, and she just testified to categories of

11    evidence that were not noted in the charts, for example,

12    testimony and things like that.  I think we need to have a

13    better foundation of what she actually relied upon if it's not

14    what is noted in the charts.

15         MS. MERMELSTEIN:  Well, the charts themselves have

16    transcript citation references on the chart where it cites to

17    exhibits, so I think it is clear what she means by that.

18         I frankly think it's hard for the jury to understand.

19    We're going to go through the fact that those are the cross

20    references.  So, I wanted to get it in and then walk through

21    it.  If you want me to ask a few more of those foundational

22    questions first, I certainly can.

23         MR. SCHWARTZ:  I be looking at three versions ago.  If

24    you are representing that everything she relied upon is

25    footnoted in the charts, then I don't care.

I6K7GAL2                        Kendall - Direct

1              MS. MERMELSTEIN:  Yes.  The only exception where the

2    transcript page is not present is from McMillan's testimony

3    because of the timing of when he testifies; it just says

4    McMillan testimony.  Everything else has an actual transcript

5    cite.

6              MR. SCHWARTZ:  And it was based on his testimony

7    yesterday.

8              MS. MERMELSTEIN:  Right.  She reviewed the pages of

9    the transcript, but we didn't update it with a page number.

10             MR. SCHWARTZ:  I understand.

11             THE COURT:  I will allow it.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

I6K7GAL2                         Kendall - Direct

1              (In open court)

2              MS. MERMELSTEIN:  So the government offers Exhibits

3     4003 through 4016.

4              THE COURT:  All right.  They will be admitted.

5              (Government Exhibits 4003 through 4016 received in

6     evidence)

7     BY MS. MERMELSTEIN:

8     Q.  Let's pull up Government Exhibit 4003, please.

9              Agent Kendall, generally speaking what does this chart

10    show?

11    A.  This is the --

12    Q.  And I should have said, can we pull this up for everyone,

13    Ms.Sheinwald?

14    A.  This is the first Wakpamni bond series, generally the flow

15    of funds from the issuance to where it went after that initial

16    date.  The dates on this chart are for August 25, 2014 through

17    September 22, 2014.

18    Q.  Let me direct your attention to the bottom corner of this

19    chart.  There is a long list of government exhibits followed by

20    and indication "McMillan testimony."  What is the significance

21    of those references?

22    A.  These are the government exhibits I used for the underlying

23    data of this chart.

24    Q.  So let's start on the left-hand side of this chart, and let

25    me ask you to explain to the jury what is shown here.

I6K7GAL2                          Kendall - Direct

1   A.  So, the names, entities on the left-hand side are the

2   Hughes clients that were part of this initial bond issuance

3   that sent money to U.S. Bank.

4          The Hughes clients listed are Terrapin, Chicago

5   Transit, WSSC, Birmingham Water Works, Michelin, MILA, RRS,

6   PHA/Prudential and Milk Drivers.

7   Q.  Now, how do you know that these are all Hughes clients?

8   A.  I looked at the investment management agreements between

9   Hughes and these entities.

10  Q.  I'm not going through every document you looked at, but

11  let's just do an example.

12          Can we pull up side by side please Government Exhibit

13  100, which is the first exhibit referenced at the bottom.

14          What is this?

15  A.  This is the investment counsel agreement between Hughes

16  Capital Management and the Waterworks and Sewer Board of the

17  City of Birmingham, as indicated on the chart as Birmingham

18  Water Works.

19  Q.  So, let's go back just to 4003, please.  What does this

20  show about the transfer of money from these Hughes clients?

21  A.  The aggregate total was $27,077,436 sent from these clients

22  to U.S. Bank, Wakpamni Lake Community Corporation account,

23  abbreviated here at WLCC, between the dates of August 25 and

24  August 28 of 2014.

25  Q.  And again how do you know that that amount of money was

I6K7GAL2                          Kendall - Direct

1    transferred in that date range?

2    A.  I referenced the U.S. Bank statement for WLCC.

3    Q.  So let's look at that very quickly.  Let's pull up

4    Government Exhibit 643 side by side.  If we can go to page 5 of

5    that exhibit, please, Ms.Sheinwald.

6           So looking at just, for example, the third entry down,

7    what does that indicate?

8    A.  Washington Suburban Sanitary Commission, I believe, is what

9    the abbreviation is for, $4,118,076, was a cash receipt into

10   the U.S. Bank account for the Wakpamni Lake Community Corp.

11   2014 proceeds.

12   Q.  Let's go back to 4003, and let's turn to the next page of

13   the exhibit, please.  So what does this show happened next?

14   A.  Well, first was -- not first -- but first up here we will

15   look at is Burnham Securities received $250,000 from U.S. Bank

16   WLCC on August 26 of 2014 as part of a transaction fee.

17   Q.  And are the fees that went to Burnham on this chart, are

18   those the only transaction fees that came out of the U.S. Bank

19   account in connection with this transaction?

20   A.  No.

21   Q.  Generally speaking with respect not just to this chart but

22   all of the summary charts we're going to look at, do they

23   demonstrate every single transaction from every referenced

24   account?

25   A.  They do not.

1    Q.  So let's look just as an example at Government Exhibit 214.

2    What is this?

3    A.  This is the closing statement for the Wakpamni Lake

4    Community Corporation series of 2014 bonds.

5    Q.  And if you go to page 5 to schedule B, what is shown there?

6    A.  Excuse me.  This is the closing statement issuance costs.

7    Q.  And what does this show about the fee paid to Burnham as

8    part of the closing statement?

9    A.  You'll see that Burnham Securities, Inc. placement agent

10   fee of $250,000 was listed here as an issuance cost.

11   Q.  And can we pull back up the second page of 4003 side by

12   side, Ms.Sheinwald.

13          And while we're getting that, the $250,000 that you

14   were just referencing in Government Exhibit 214, that's the

15   $250,000 on your chart that goes to Burnham Securities; is that

16   right?

17   A.  That's correct.

18   Q.  These other fees that were paid don't appear on the chart;

19   it would be kind of crowded, I think.

20   A.  Correct.

21   Q.  So, now, what does this indicate about -- beyond Burnham

22   Securities, who else got money out of the U.S. Bank account?

23   A.  The Wakpamni Lake Building Fund Junction 18 Development

24   received $2,250,000 on August 26, 2014, and additionally

25   $24,320,936 was sent to Wealth Assurance Private Client Corp.

1   on August 27 and August 28 of 2014.

2   Q.  Let's take down Exhibit 214 so that we can have 4003 be a

3   little larger.

4        Now you have indicated here that the starting balance

5   for Wealth Assurance Private Client Corp. on August 26, 2014

6   was zero dollars.  What is the significance of that?

7   A.  That the money that is transferred into Wealth Assurance

8   was from these proceeds, and the money that goes out is the

9   proceed money.

10  Q.  Let's go to the next page of this chart, please.  What does

11  this show happened next?

12  A.  On August 28, 2014, $2,350,000 was sent to Sovereign

13  Nations, and on August 28 through September 11 of 2014

14  $4,656,250 was sent to Thorsdale.

15  Q.  Now, underneath Sovereign Nations on this chart appears the

16  name John Galanis in parentheses.  Why is that?

17  A.  Because John Galanis controlled the Sovereign Nations

18  account.

19  Q.  And is that the reference to the McMillan testimony?

20  A.  It is.

21  Q.  Let's turn to the next page of this chart.  In general

22  terms what happened to the money that was transferred to

23  Sovereign Nations?

24  A.  There are various debits and transfers out of the account

25  in the form of cash, payments to John Galanis, cars, jewelry

I6K7GAL2                         Kendall - Direct

1    and payments or withdrawals to Mark McMillan.

2    Q.   And again is that all of the categories or just a sampling?

3    A.   No it's just a sample, just general categories.

4    Q.   Are we going to get to the more detailed breakdown shortly?

5    A.   We will.

6    Q.   And what about Thorsdale, generally speaking what kind of

7    things did the Thorsdale money go to?

8    A.   Expenses such as travel, restaurants, cars, attorneys and

9    transfers or withdrawals to the Galanis family.

10            I also wanted to add about the Wealth Assurance

11   Private Client Corp., in subsequent slides we will see it as

12   just Wealth Assurance just for ease of reading.

13   Q.   OK.  So I think I understand what you're saying, and we

14   will get to that in just a moment.

15            Let's move on to Government Exhibit 4004.  And again

16   in broad terms, what is this chart showing?

17   A.   This is the second Wakpamni bond series, but it's part 1 of

18   the series.  We will know another part, but this is from the

19   dates of September 23, 2014 through May 29 of 2015.

20   Q.   Now, on this chart there is a reference to Wealth

21   Assurance; it's in that same green color.  What were you saying

22   about references to Wealth Assurance?

23   A.   That it's the same account that I'm referencing there, and

24   that's how to follow it through, as it's on many of these

25   charts.

1  Q.   So every reference in these charts that says just Wealth

2  Assurance is a reference to that Wealth Assurance Private

3  Client corp. account?

4  A.   Correct.

5  Q.   Wealth Assurance Private Client just wouldn't fit in the

6  little box?

7  A.   Yes.

8  Q.   Is it the same green color all the way through?

9  A.   Yes.

10 Q.   Generally speaking, is that true, the various colors

11 consistently either identify entities or groups of related

12 things?

13 A.   Yes.

14 Q.   OK.  So let's start walking through this chart.  What is

15 shown on the very first page?

16 A.   On September 23th of 2014, $15 million was transferred from

17 Wealth Assurance to a Thorsdale account.

18 Q.   Let's go to the next page.  What happened next?

19 A.   $15 million was transferred on September 24th of 2014 from

20 Thorsdale to the Wolff Law Firm.

21 Q.   So one day later.

22 A.   Yes.

23 Q.   OK.  Turn to the next page.  What happened next?

24 A.   $15 million was transferred from Wolff Law Firm on

25 September 24 to Rosemont Seneca Bohai account abbreviated here

I6K7GAL2                    Kendall - Direct

1   as RSB.

2   Q.  So the transfer to RSB from Wolff was the same day as the

3   transfer from Thorsdale to Wolff?

4   A.  Yes.

5   Q.  And underneath RSB is the name Archer.  Where does that

6   come from?

7   A.  The statements said Rosemont Seneca Bohai care of Devon

8   Archer, so I referenced the last name there.

9   Q.  Let's look at that very briefly.

10         Can we pull up Government Exhibit 301 side by side.

11  And let me ask, Ms.Sheinwald, can we zoom in on the statement

12  of the top left-hand corner of the statement.

13         Let me ask you to read that, Special Agent Kendall.

14  A.  "Statement for:  Rosemont Seneca Bohai LLC c/o Devon

15  Archer."

16  Q.  If we can zoom out for a minute.  What is the address

17  associated with Rosemont Seneca Bohai LLC, c/o Devon Archer on

18  this statement?

19  A.  152 West 57th Street, 47th Floor, New York, New York 10019.

20  Q.  Let's go back then just to Government Exhibit 4004, please,

21  and let's look at what happens next.

22  A.  $15 million was transferred from RSB to U.S. Bank WLCC on

23  October 1, 2014.

24  Q.  And based on your review of the documents referenced, what

25  was the purpose of this transfer?

1   A.   For the purchase of an annuity.

2   Q.   I'm sorry.  I think we're one step ahead of yourself.  The

3   transfer from RSB to U.S. Bank.

4   A.   That was for the bond issuance.

5   Q.   To purchase the Wakpamni bonds?

6   A.   To purchase the Wakpamni bonds, yes.

7   Q.   Let's look at the next page.  What does this show?

8   A.   This shows that $220,000 was transferred out of U.S. Bank

9   WLCC for transaction fees on October 1, 2014.  Of that

10  $220,000, $65,000 was sent to Burnham.

11  Q.   And in this case the $220,000, is that all of the

12  transaction fees?

13  A.   That is in this case.

14  Q.   OK.  Let's look at what happened next.

15  A.   The $14,780,000 was sent from U.S. Bank WLCC on October 1,

16  2014 back to Wealth Assurance.

17  Q.   And based on your review of the documents, what was the

18  purpose of that transfer?

19  A.   This was for the annuity purchase.

20  Q.   So in total, looking at this chart, of the $15 million that

21  left Wealth Assurance on September 23, 2014, how much of that

22  came back into the Wealth Assurance account about a week later

23  on October 1, 2014?

24  A.   $14,780,000.

25  Q.   And can you do in your head, what is the difference between

I6K7GAL2                        Kendall - Direct

1   15 million and 14,780,000?

2   A.  $220,000.

3   Q.  So essentially all of the money comes back around minus the

4   transaction fees.

5   A.  Correct, yes.

6   Q.  Let's go to the next page, please.  What does this show?

7   A.  This is a transfer of approximately $15 million in bonds

8   sent from -- Wakpamni bonds -- sent from RSB to a VL Assurance

9   account on April 9, 2015.

10          Then on May 18, 2015 approximately $15 million in

11  bonds was sent from that VL Assurance account to another VL

12  Assurance account.

13          Then on May 29, 2015, approximately $2.6 million in

14  Wakpamni bonds was sent from VL assurance to Burnham

15  Securities.

16  Q.  And these green dotted lines, those just indicate that it's

17  bonds beings transferred, not cash?

18  A.  Correct.

19  Q.  If we can quickly pull up side by side Government Exhibits

20  306 and 322, the VL Assurance accounts referenced.  Can you

21  just indicate to the jury whose name is associated with the VL

22  Assurance accounts?

23  A.  Care off David Ezekiel and Jason Sugarman.

24  Q.  And is that true of both VL Assurance accounts that the

25  bonds went through?

I6K7GAL2                         Kendall - Direct

1    A.  Yes.

2    Q.  Let's go back to Government Exhibit 4004, please.  And

3    finally, underneath Burnham Securities it says net capital.

4    What is that?

5    A.  The securities were used for net capital purposes.

6    Q.  Let's turn to Government Exhibit 4005.  In broad terms what

7    does this show?

8    A.  This is the second part of the second Wakpamni bond series

9    from the dates of October 6, 2014 through May 29, 2015.

10   Q.  And what is the first indication here?

11   A.  That $5,970,000 was transferred from Wealth Assurance to

12   Thorsdale on October 6, 2014.

13   Q.  Go to the next page, please.  What happens next?

14   A.  $5,000,050 was sent from Thorsdale to Bevan Cooney on

15   October 6, 2014.

16   Q.  I think you said $5,000,050.

17   A.  I'm sorry, $5,050,000.

18   Q.  So same day?

19   A.  Same day, yes.

20   Q.  What happens next?

21   A.  $5 million is sent from Bevan Cooney to the U.S. Bank WLCC

22   account on October 9, 2014.

23   Q.  And again based on your review of the documents, what was

24   the purpose of that transfer?

25   A.  This is for the bond issuance.

I6K7GAL2                          Kendall - Direct

1   Q.  To purchase Wakpamni bonds?

2   A.  Yes.

3   Q.  Let's go to the next page.  What does this show?

4   A.  That $10,000 was sent to Burnham on October 9, 2014 for

5   transaction fees.

6   Q.  Just says Burnham there.  Is that the same Burnham

7   Securities?

8   A.  It is.

9   Q.  And again is that $10,000 the entirety of the transaction

10  fees or just the money that went to Burnham?

11  A.  Just the money that went to Burnham.

12  Q.  So let's look at what happened next.

13  A.  $4,966,500 sent to Wealth Assurance from U.S. Bank WLCC on

14  October 9, 2014.

15  Q.  Let's look just briefly at Government Exhibit 216, and

16  let's go to the page that says C-1 at the bottom, schedule C.

17  What does this indicate in section 2 about the purpose of the

18  $4,966,500 that was transferred from U.S. Bank to Wealth

19  Assurance Private Line Corp.?

20  A.  It was for an annuity purchase payment.

21  Q.  Let's go back to Government Exhibit 4005 and turn to the

22  next page.  What does this indicate?

23  A.  This shows approximately $5 million in Wakpamni bonds were

24  sent from Bevan Cooney to Bonwick on May 29, 2015.

25  Q.  And again what is the reference to net capital?

I6K7GAL2                          Kendall - Direct

1    A.  That the bonds were used for net capital purposes for

2    Bonwick.

3    Q.  Leave this up on the screen, Ms.Sheinwald, and pull up the

4    last page of 4004 side by side.

5            So, Agent Kendall, we just walked through how the

6    money moved from Wealth Assurance to Thorsdale to purchasers of

7    the bonds to U.S. Bank and back to Wealth Assurance.  Have you

8    done anything to look at where the money went when it came all

9    the way back around to Wealth Assurance?

10   A.  Yes, I have another chart for that.

11   Q.  OK.  Let's go to the next exhibit then.  And what does this

12   show about where some of the money went after it came back to

13   Wealth Assurance?

14   A.  So generally this chart shows part 1 and part 2 of the

15   previous two charts side by side with these cycles, and it

16   shows that the money that went out of Wealth Assurance went

17   through the cycles and back to Wealth Assurance, was then sent

18   to Thorsdale, and $11,070,000 is the net amount deposited to

19   Thorsdale between the dates of October 2 and November 14, 2014.

20   Q.  And just so that's clear, let's go back to 4005 for one

21   second, the last page, please.  In essence, it's as though you

22   drew another arrow from Wealth Assurance to Thorsdale and it

23   came one more step around the circle.

24   A.  Yes, correct.

25   Q.  Let's go to Government Exhibit 4007.  And in broad terms,

I6K7GAL2                        Kendall - Direct

1    what does this chart show?

2    A.   This is showing how some of the bond proceeds were

3    transferred to an entity called Vaudoise through various

4    accounts.

5    Q.   Why don't you walk us through the first set of transfers

6    there.

7    A.   The first transfer is from Thorsdale for $100,000 on

8    November 10, 2014; it was transferred to Bevan Cooney.  Then on

9    November 12, 2014 from Wealth Assurance, $3,895,000 was sent to

10   Bevan Cooney.

11   Q.   Now, you described this chart as showing the use of bond

12   proceeds, or the transfer of bond proceeds to Vaudoise.  How do

13   you know that money that was transferred from Wealth Assurance

14   was the bond proceeds?

15   A.   The balance of the Wealth Assurance accounts were very low

16   or at zero before the proceeds came from each of the bond

17   issuances, so the money that was in there came from the bond

18   issuances.

19   Q.   In other words, there wasn't really any other money in the

20   Wealth Assurance account at this time.

21   A.   Correct.

22   Q.   Let's go to the next page of this exhibit, please.  What

23   does this show happened next?

24   A.   $100,000 was transferred from Bevan Cooney's account to a

25   Camden Escrow account on November 12, 2014, and $3,850,000 was

1    sent on November 13, 2014 from Bevan Cooney to Camden Escrow.

2    Q.  So essentially within a day or two of those first two wires

3    coming in, the same amount, the $100,000, and then a slightly

4    lower amount of $3,850,000 was transferred to Camden?

5    A.  Yes.

6    Q.  Let's pull this down for one moment and keep it in our

7    heads and look at Government Exhibit 3224 and 3225 side by

8    side.  What do these e-mails indicate was the stated purpose of

9    the wires from Bevan Cooney to Camden Escrow?

10   A.  It was for a real estate purchase.

11   Q.  OK.  Let's take that down, please.

12          And if we can now go to the next page of Government

13   Exhibit 4007, what does this show happened to the money that

14   went to Camden Escrow?

15   A.  $100,000 was sent to Wolff Law Firm on November 13, 2014,

16   and $3,850,000 was sent to Wolff Law Firm from Camden Escrow on

17   November 14, 2014.

18   Q.  So how long after Camden received those two wire transfers

19   were the identical amounts wired out to the Wolff law firm?

20   A.  Within one day of each transfer.

21   Q.  Let's go to the last page of the exhibit.  What does this

22   show happened to the money that was wired to the Wolff Law

23   Firm?

24   A.  Wolff Law Firm sent $925,000 to Vaudoise on November 14,

25   2014 and $3 million on November 14, 2014.

1   Q.  OK.  Let's move on to Government Exhibit 4008.  In general

2   terms what does this chart show?

3   A.  This is the flow of proceeds for the third Wakpamni bond

4   series.

5   Q.  And what is demonstrated on the first page here?

6   A.  $16,200,000 was transferred to U.S. Bank Wakpamni Lake

7   Community Corporation on April 16, 2015.

8   Q.  And again based on your review of the documents, what was

9   the purpose of that transfer?

10  A.  That's for the Wakpamni bond issuance.

11  Q.  Let's go to the next page, please.  What happened next?

12  A.  $80,000 was transferred from U.S. Bank WLCC to Burnham

13  Securities on April 16, 2015, and $15,850,000 transferred to

14  Wealth Assurance on April 16, 2015.

15  Q.  And again what was the approximate starting balance of

16  Wealth Assurance at that time?

17  A.  At that time $5,000.

18  Q.  And with respect to the transfer to Burnham, again is that

19  all of the transaction fees or just the costs to Burnham?

20  A.  Just the costs to Burnham.

21  Q.  OK.  What happened next?

22  A.  $1,250,000 was transferred from Wealth Assurance to U.S.

23  Bank WLCC on April 28, 2015.

24  Q.  So just a few days later a portion of the money comes back

25  to U.S. Bank?

I6K7GAL2                          Kendall - Direct

1    A.   Yes.

2    Q.   Let's look at Government Exhibit 217, and look at that

3    transfer.  Can we go to Roman numeral 2 in this document.  Do

4    you see the disposition of funds available at settlement?

5    A.   Yes.

6    Q.   What does that indicate about the amount of money that's

7    going to the annuity purchase payment?

8    A.   $15,850,000 was to go to the annuity purchase payment.

9    Q.   So that's the same amount that you show being sent on April

10   16, 2015?

11   A.   Yes.

12   Q.   And then can you read the section with the asterisk at the

13   bottom there.

14   A.   "On April 17, 2015, the annuity provider (Wealth Assurance

15   Private Client Corporation) shall pay to the trustee for

16   deposit into the revenue fund the amount of $1,250,000, which

17   the trustee shall transfer to the project fund for funding of a

18   portion of the Wakpamni Lake distribution project or any

19   economic development project."

20   Q.   Let's go back then to Government Exhibit 4008.  So that's

21   the $1.25 million you show coming back?

22   A.   Yes.

23   Q.   Can you tell from the records you reviewed whether or not

24   that money was actually ever distributed to the Wakpamni Lake

25   Community Corporation?

I6K7GAL2                    Kendall - Direct

1    A.  No, I cannot.

2    Q.  OK.  Let's look at what happens next.  What does this show?

3    A.  $1,100,000 was transferred from Wealth Assurance to

4    Thorsdale over the dates of April 17 through May 21, 2015.

5            At the bottom is $4,336,000 sent to Seymour Capital

6    and Thunder Valley accounts between the dates of April 29 and

7    May 18 of 2015.

8            And then there is another box there that sames

9    numerous individuals and entities received money, and that will

10   be looked at on another chart.

11   Q.  OK.  Let's go to the next page of this chart.  What does

12   this show happens?

13   A.  On May 18, 2015, Seymour Capital and Thunder Valley sent

14   $4,000,335 to Code Rebel for the purchase of Code Rebel shares.

15   Q.  I'm sorry.  So $4,335,000?

16   A.  I'm sorry.  $4,335,000, yes.

17   Q.  And what was the purpose of that transfer?

18   A.  It was to purchase Code Rebel shares.

19   Q.  And where did the Code Rebel shares go when Seymour Capital

20   and Thunder Valley bought them?

21   A.  They were deposited into Seymour Capital and Thunder Valley

22   accounts.

23   Q.  OK.  What happened next?

24   A.  On September 2, 2015, $1,312,000 was transferred from

25   Seymour Capital and Thunder Valley accounts back to Wealth

1    Assurance from the sales of Code Rebel shares.

2    Q.  OK.  Next page.  What happens next?

3    A.  $1,776,000 was sent from Code Rebel account to Thorsdale on

4    May 21, 2015.

5    Q.  OK.  Let's go to Government Exhibit 4009.  So you indicated

6    when we were talking about the last chart that there was a

7    following chart with a break-out of other transfers.  Why don't

8    you walk us through what this shows?

9    A.  This shows those other debits out of the account -- out of

10   Wealth Assurance -- to include $75,836 to Amex; $5,439,622 to

11   New Line, which purchased Fondinvest; $650,000 to Burnham

12   Financial Group; $305,000 to Hughes Capital Management; $75,000

13   to Bevan Cooney; $236,000 to Jason Sugarman; $4,635,000 to VL

14   Assurance.

15   Q.  Now, you indicate again on this chart that the starting

16   balance in the Wealth Assurance account at the time that

17   approximately almost $16 million was received from U.S. Bank

18   was about $54.  What is the significance of that?

19   A.  That the proceeds -- that the payments or the money that

20   left the account were from the proceeds of the bonds.

21   Q.  In other words, all of the things that are listed as having

22   received money on the right-hand side of this chart received

23   bond proceeds.

24   A.  Yes.

25   Q.  Let's go ahead and look at Government Exhibit 4010.

I6K7GAL2                      Kendall - Direct

1   Generally speaking what does this show?

2   A.   This is the interest payment on the first Wakpamni bond

3   series, general flow of the cash.

4   Q.   And can you walk us through the specifics of the cash flow

5   here.

6   A.   So, the entities on the left -- including Devon Archer,

7   Seymour Capital, Daniel White and Thunder Valley -- sent a

8   total of $1,812,000 to Wealth Assurance.  Specifically Devon

9   Archer sent $250,000 on September 1, 2015; Seymour Capital sent

10  $1,060,000 on September 2, 2015, $122,000 on September 2, 2015;

11  Daniel white sent $250,000 on September 2, 2015; and Thunder

12  Valley sent two transfers -- $71,000 and $59,000 -- on

13  September 2, 2015.

14  Q.   The chart under Daniel White indicates the name Jason

15  Sugarman.  Why is that?

16  A.   The wire transfer had a reference in the line to Jason

17  Sugarman.

18  Q.   OK.  And again what was the starting balance approximately

19  of the Wealth Assurance Private Client Corp. account at the

20  time that the roughly $1.8 million was received?

21  A.   Approximately $2,000.

22  Q.   OK.  So let's look at what happens next.

23  A.   $1,546,417 was sent from Wealth Assurance to U.S. Bank WLCC

24  between the dates of September 2 and September 3 of 2015, and

25  $240,000 was sent to Thorsdale on September 4, 2015.

1    Q.  Again in light of the starting balance in the Wealth

2    Assurance account, is it the case that the money from Devon

3    Archer, Seymour Capital, Daniel White and Sugar Valley is the

4    money that went to U.S. Bank WLCC and --

5    A.  Yes.

6    Q.  Let's look at what happened next.

7    A.  Interest payments were made to the pension fund bondholders

8    in September of 2015.  Those pension fund bondholders are the

9    same as referenced on the first bond series chart that we named

10   earlier.

11   Q.  Let's look at the next government exhibit, Government

12   Exhibit 4011.  In general terms, what does it show?

13   A.  This shows the interest payment on the second Wakpamni bond

14   series and the flow of that cash.

15   Q.  Why don't you walk us through the first line is.

16   A.  1 million was sent out of the VL Assurance account to

17   Burnham Financial Group on September 30, 2015.

18   Q.  What happened after that?

19   A.  903,000 was sent from Burnham Financial Group on September

20   30th, 2015 to U.S. Bank WLCC and $294,311.11 was sent from

21   Burnham Financial Group to U.S. Bank WLCC on October 1, 2015.

22   Q.  Where did it go from there?

23   A.  903,000 was sent from U.S. Bank WLCC to RSB on October 1,

24   2015, and $294,311.11 was sent to Bonwick on October 1, 2015.

25   Q.  We looked earlier this morning at transfers of bonds from

I6KJGAL3                          Kendall - direct

1   Bevan Cooney to Bonwick and Devon Archer through VL Assurance

2   to Burnham.  At the time of these wires in October of 2015, did

3   RSB hold any Wakpamni bonds?

4   A.   No.

5   Q.   What happened next?

6   A.   Wires were reversed, that 903,000 wire was reversed and

7   payments are sent to Burnham Securities for $156,520.00 on

8   October 1, 2015, and $746,480 was sent to another VL Assurance

9   accounts on October 1, 2015.

10  Q.   At the time of the wire transfers, were Burnham Assurance

11  and VL Assurance holders of the bonds?

12  A.   Yes.

13  Q.   Looking at the million dollars that was wired out by VL

14  Assurance on September 30th and the $750,000 roughly received

15  on October 1, what was the net result of these wire transfers

16  from VL Assurance?

17  A.   They received roughly 750,000 back of their million that

18  they sent out, so 250,000 -- sorry, 250,000 out of the account

19  roughly.

20  Q.   So they basically paid themselves the interest on the

21  bonds?

22  A.   Yes.

23  Q.   Let's go to Government Exhibit 4012.

24  A.   This is a visual representation of the Thorsdale proceeds

25  after they received money and where it goes to from the bond

1   proceeds.

2   Q.  Again is this every single dollar in and out of the

3   Thorsdale account?

4   A.  No.

5   Q.  Or general representation?

6   A.  General representation.

7   Q.  What does this show about the general sources of money

8   coming into the Thorsdale account in this time period?

9   A.  They show approximately 38 million from Wealth Assurance

10  going into the Thorsdale account and then 5 million from other

11  sources.

12  Q.  That is that same Wealth Assurance Private Client account?

13  A.  Yes.

14  Q.  Can you walk us through, in terms of the dollar amounts

15  listed on this chart and elsewhere, are they generality rounded

16  to the closest dollar?

17  A.  They are.

18  Q.  What does this show about some of the places that the money

19  went from Thorsdale?

20  A.  Generally expenses out to various individuals, various

21  places.

22  Q.  Let me ask you to start at the top and walk us through

23  them?

24  A.  $24,128.00 out of ATM.  $930,500 to family members, and I

25  have further broken that out into a few individuals there.

I6KJGAL3                          Kendall - direct

1     237,000 to Chandra Galanis, 41,500 to Jason Galanis, 291,000 to

2     Monet Berger and Hilltop Trust, 235,000 to John Galanis.

3              The next category in the middle is $5,431,732.00 to

4     home and Cars Sync.

5              $545,046 to restaurants, travel, clothing, jewelry.

6              $16,600,168 to accountants and lawyers, of which

7     $15,287,334.00 wasn sent to the Wolff Law Firm.

8              $220,600.00 wasn sent to Code Rebel Bump Network.

9              $523,500 to the IRS.

10             Various other individuals, some of which include

11    $20,485.000 to Hugh Dunkerley, $175,000 to Francisco Martin,

12    $5,557,000 to Bevan Cooney, $69,681.00 to Lucas Mann, $47,500

13    to Jason Sugarman.

14    Q.   Let me stop you right there.

15             Are these all the individuals who got money from the

16    Thorsdale account?

17    A.   No.

18    Q.   How did you select which individuals would appear on this

19    chart?

20    A.   I was asked to put these individuals on the chart.

21    Q.   By the prosecutors?

22    A.   By the prosecutors, yes.

23    Q.   Let me ask you to keep going.

24    A.   $8,384,500 to Wealth Assurance Holdings.

25             $117,370.00 to Valdoise.  $1.3 million to Rosemary and

1    Rue, and $700,513.00 to RSB.

2    Q.  Why does the $1.3 million to Rosemary and Hugh indicate

3    Hirst, Dunkerley?

4    A.  They are referenced in the articles of incorporation.

5    Q.  We won't pull them up but that is Government Exhibit 1104

6    and 1107?

7    A.  Yes.

8    Q.  What about Monet Berger and her affiliation with Hilltop

9    Trust, is that Government Exhbit 2255?

10   A.  Yes.

11   Q.  We talked about RSB, the Devon Archer connection?

12   A.  Yes.

13   Q.  When you were putting together this chart, how did you make

14   a determination about what kind of expense something was?

15   A.  Generally it was on the bank statements listed as such, so

16   it might say for restaurants, would say restaurant, might say

17   for clothing, might be a known clothing place.  Lawyers, would

18   say law firm.  Otherwise, Wealth Assurance would actually have

19   the name of the individual, the name of the entity it went to.

20   It it was an ATM, it said ATM.

21   Q.  Were there expenses that came out of Thorsdale where you

22   either weren't familiar with or couldn't identify the nature of

23   the expense?

24   A.  Yes.

25   Q.  Are those expenses on this chart?

I6KJGAL3                        Kendall - direct

1   A.  No.

2   Q.  So if we add up the numbers, it is not going to total all

3   the money that came into --

4   A.  It will not.

5   Q.  Let's look next at Government Exhibit 4013.  In broad

6   strokes, what does this show?

7   A.  This is proceeds out of the Sovereign Nation account from

8   the bond proceeds.

9   Q.  Walk us through it.

10  A.  Wealth Assurance transferred $2,350,000, was sent from

11  Wealth Assurance to Sovereign Nations on August 28th, 2014.

12  Q.  At the time of that transfer or on August 22, 2014, what

13  was the balance in the Sovereign Nations account?

14  A.  Zero.

15  Q.  Where did the money go from there?

16  A.  395,000 was transferred to John Galanis.  $1,111,670.00 in

17  cash or withdrawals, further broken down on the right, $212,500

18  to Jesse Galanis Car Sync, 25,000 to Derrick Galanis.  15,000

19  to Chandra Galanis, $20,010 to Delmar Hilton, 86,000 to Jared

20  Galanis, Galanis PC Iolta, 25,000 to Oleksandra Galanis, and

21  20,000 to Jason Galanis.

22  Q.  Now, when you say that amount, these are amounts that were

23  cash, what does that mean?

24  A.  On the statement it said withdrawal, and presumably in cash

25  or withdrawal in the branch store, so I further was able to get

1    some of this detail from an appendix and Quick Books document

2    that is referenced here to see where the payments or the cash

3    actually went to.

4    Q.  With respect to the other individuals who received payment

5    in that last category, are Mike Murphy and Mark McMillan all or

6    some of the individuals who received money?

7    A.  No.  They're just some of the individuals.

8    Q.  You grouped Jesse Galanis and Car Sync.  Why is that?

9    A.  Jesse Galanis was an agent referenced on the Car Sync

10   articles of incorporation.

11   Q.  Let's take a quick look at that.  That is Government

12   Exhibit 1101.  Let me direct your attention to the middle

13   section, the name and complete address of any manager or

14   managers.  Who is the first person listed?

15   A.  Jesse Galanis.

16   Q.  Let's go to the next page, please.  I am sorry, the next

17   page of the summary chart.  Moving onto 4014.  What generally

18   does this show?

19   A.  This shows the bond proceeds used to purchase 260 West

20   Broadway, so just the document, the flow of that cash.

21   Q.  So why don't you walk us through what this shows on the

22   face of the chart.

23   A.  1 million was sent from Wealth Assurance to Katsky Korins

24   on August 28th of 2014.

25   Q.  According to the documents, who is Katsky Korins?

1    A.  Seller's counsel for 260 West Broadway.

2    Q.  What was the stated purpose of the million dollars that

3    went to Katsky Korins?

4    A.  For closing.

5    Q.  On 260?

6    A.  On 260 West Broadway, yes.

7    Q.  If you can do it side-by-side, that would be great, on

8    Government Exhibit 225.  So this is the contract of sale for

9    260 West Broadway?

10   A.  Yes.

11   Q.  Who is listed as the purchaser according to that first

12   paragraph?

13   A.  The purchaser is Archer Diversified TCG, LLC.

14   Q.  What is the address listed for Archer Diversified TCG, LLC?

15   A.  152 West 57th street, 47th floor, New York, New York 10019.

16   Q.  Do you recognize that address?

17   A.  Yes.

18   Q.  What is it?

19   A.  It was on the RSB bank statement.

20   Q.  So Archer Diversified TCG, LLC's address listed on this

21   contract is the same as RSB's address listed on its bank

22   statements?

23   A.  Yes.

24   Q.  Can we go to Paragraph 3 of the contract of sale.  Let me

25   ask you to read Roman numeral I, the million dollar section.

A.   $1 million down payment on the signing of this contract by

bank check subject to collection, the receipt of which is

hereby acknowledged, to be held in escrow pursuant to para 16

and.

Q.   Looking at the total purchase price of 260 West Broadway

according to Paragraph 3, what is the total purchase price?

A.   The total purchase price is $10 million.

Q.   Page 13 of this exhibit, please.

          According to this, who is the seller's attorney in the

bottom-left-hand corner?

A.   Katsky Korins, LLP.

Q.   Who is the purchaser's attorney?

A.   The Wolff Law Firm.

Q.   Let's move on to Government Exhibit 4015.  What does this

show?

A.   This shows the Valor Life and Thorsdale fund closing on 260

West Broadway.

Q.   Why don't you walk us through what is happening here?

A.   Thorsdale sent 12,500 to the Wolff Law Firm on December 5,

2014.  On December 5, 2014, $7,110.80 was sent out of Wolff Law

Firm to Katsky Korins.  Valor Life sent $3,194,877.00 on

December 8th, 2014 to the Wolff Law Firm, and on December 8,

the same date, 2014, $3,202.345.11 was sent to Freedom Land

Title Agency regarding 260 West Broadway.

Q.   Again you have indicated the starting balance of the Wolff

I6KJGAL3                          Kendall – direct

1   Law Firm account on December 1.  What is the significance of

2   that reference?

3   A.  That these transfers or proceeds were used for this closing

4   on this property.

5   Q.  Pull up government Government Exhibit 226 side-by-side if

6   we can.  Look at the bottom of this first page of the Archer

7   Diversified TCG, LLC mortgagor.  Who is the title company

8   listed?

9   A.  Freedom Land Title Agency, LLC as agent for Fidelity

10  National Title Insurance Company.

11  Q.  Can we go to Page 21.  If you look at the top of the page,

12  who has signed this document on behalf of Archer Diversified

13  TCG, LLC?

14  A.  Jason Galanis.

15  Q.  How is he listed?

16  A.  President and manager.

17  Q.  Then let's turn to the last summary chart, please, the

18  Government Exhibit 4016.  This is different.  What does this

19  summary chart show?

20  A.  This is generally the provisions of the agreements with the

21  Hughes clients for Hughes.

22  Q.  In the left-most column, what is indicated?

23  A.  The clients, the Hughes client and pension funds.

24  Q.  Assignment ratings requirement and contemplation maximum,

25  those are terms of the investment management agreements.  Is

I6KJGAL3                      Kendall - direct

1    that right?

2    A.   Yes.

3    Q.   If you look at, for example, the first row, Chicago Transit

4    Authority says no assignment without prior approval, underneath

5    it there is a reference to Government Exhibit 110.  Is that the

6    investment management agreement that you're referencing?

7    A.   Yes.

8    Q.   We won't through every single provision, but in general

9    were assignments permitted without approval under any of the

10   investment management agreements you reviewed?

11   A.   They were not.

12   Q.   Let's go through a few of these.  Looking at Chicago

13   Transit, what was the maximum concentration permitted in the

14   Hughes portfolio?

15   A.   10 percent.

16   Q.   There is a little asterisk there.  Go to the last page,

17   what is the indicated by the asterisk?

18   A.   Does not apply to U.S. Government or U.S. Government

19   guaranteed investments.

20   Q.   Let's go back up to the top line then.

21         What percentages of the Chicago Transit portfolio was

22   invested in Wakpamni bonds?

23   A.   5.29 percent.

24   Q.   What does the last column indicate?

25   A.   The date that Hughes was notified of the termination of the

I6KJGAL3                        Kendall - direct

1    agreement.

2    Q.  And with respect to Chicago Transit, when were they

3    notified?

4    A.  October 2014.

5    Q.  Let's look at Terrapin Insurance.  What was the

6    concentration maximum there?

7    A.  8 percent.

8    Q.  And what was the percentage of the portfolio invested in

9    the Wakpamni bonds?

10   A.  8.43 percent.

11   Q.  I guess we should -- these are the bonds that were

12   purchased in August of 2014.  Is that right?

13   A.  Yes.

14   Q.  When was Hughes notified of its termination by Terrapin?

15   A.  October 23rd, 2014.

16   Q.  Let's look at Michelin.  What was the concentration maximum

17   there?

18   A.  10 percent.

19   Q.  What percentage was invested in Wakpamni bonds?

20   A.  10.54 percent.

21   Q.  What date was Hughes notified it had been terminated by

22   Michelin?

23   A.  October 10, 2014.

24   Q.  Go to the second page, look at Management International

25   Longshoreman's Association.  With respect to the ratings

I6KJGAL3                          Kendall - direct

1   requirements, what did the investment management agreement

2   provided for MILA provide for purchase of unrelated bonds?

3   A.  Can you repeat your question.

4   Q.  Were unrated bonds permitted in MILA's accounts, according

5   to its investment management agreement?

6   A.  No.

7   Q.  What was its concentration maximum?

8   A.  5 percent.

9   Q.  What percentage of its portfolio was invested in Wakpamni

10  bonds?

11  A.  5.27 percent.

12  Q.  Let's go onto Birmingham Waterworks & Sewer bond.  Were

13  unrated bonds allowed in those accounts?

14  A.  No.

15  Q.  What was the concentration maximum?

16  A.  5 percent.

17  Q.  What percentage of the portfolio was invested in Wakpamni

18  bonds?

19  A.  12.68 percent

20  Q.  Going to Richmond Retirement.  Were unrated bonds

21  permitted?

22  A.  No.

23  Q.  What was the concentration maximum?

24  A.  5 percent.

25  Q.  What was the percentage of the portfolio invested in

I6KJGAL3                    Kendall - direct

1    Wakpamni bonds?

2    A.  5.33 percent.

3    Q.  Approximately when was Hughes notified it had been

4    terminated by Richmond Retirement?

5    A.  September 2014.

6    Q.  Go to the last page, please.

7           Looking at the entry for milk drivers, what was the

8    concentration maximum?

9    A.  5 percent.

10   Q.  And how much was invested in Wakpamni bonds?

11   A.  4.98 percent.

12   Q.  When was Hughes notified that they had been terminated by

13   milk drivers?

14   A.  September 14th, 2015.

15   Q.  Finally, looking at Philadelphia Housing Authority, what

16   was the concentration maximum?

17   A.  6 percent.

18   Q.  What percentage was invested in Wakpamni bonds?

19   A.  5.97 percent.

20   Q.  And when was Philadelphia Housing Authority terminated

21   by -- when did they terminate Hughes?

22   A.  September 10th, 2014.

23   Q.  So virtually all of the pension funds listed were Hughes

24   clients listed on this chart fired Hughes in the 8 days after

25   the bonds were purchased?

I6KJGAL3                         Kendall - direct

1    A.  Yes.

2                MS. MERMELSTEIN:  No further questions.

3                THE COURT:  Let's take a five-minute break because I

4    know we took one earlier, all right?  Just remember keep an

5    open mind, don't discuss the case.

6                (Jury excused)

7                THE COURT:  You may be seated.  I wanted to advise you

8    of something that I have been inform of that is Michelle

9    Morton's lawyer has reached out and indicated that she intends

10   to withdraw her plea.  I have not received a motion to that

11   effect.  I received an ex-parte submission.

12               I reached out to her attorney and just advised him

13   that I was going to notify all of you, so I wanted that to be

14   on the record.  I don't think that it affects anything here,

15   but I did want to make sure that you knew that.  All right?

16               MR. SCHWARTZ:  Thank your Honor.  I knew that two days

17   ago.  Ms. Morton's attorneys I think inadvertently filed that

18   on the public docket of a case in South Carolina where Ms.

19   Morton is a co-defendant with Mr. Archer and others.

20               THE COURT:  I was not aware of that.  Her attorney

21   wanted me to hold off, but I wanted to make sure I advised you

22   before the government closed, before the government closed its

23   case.  Again I don't think it affects anything in this case

24   legally and no formal motion has been made.

25               MS. MERMELSTEIN:  We also knew.  I don't think it

1    affects anything.

2              THE COURT:  Okay.

3              MS. MERMELSTEIN:  Thank your Honor.

4              THE COURT:  I'll see you in five minutes.

5              (Recess)

6              THE COURT:  Everyone may be seated.  We're waiting for

7    Mr. Schwartz.  Okay.  (Pause)

8              Can we bring the jury in now?

9              MR. QUIGLEY:  Before we rest, we neglected to move one

10   email item in.  We can do that now.  It is a stipulation,

11   Government Exhibit 2082.

12             THE COURT:  Fine.  We'll bring the jury in.

13             (Jury present)

14             THE COURT:  Everyone may be seated.

15             THE COURT:  Do you want to publish it?

16             MR. QUIGLEY:  No.

17             THE COURT:  Just note the number for the record?

18             MR. QUIGLEY:  2082.

19             THE COURT:  It will be admitted.

20             (Government's Exhibit 2082 received in evidence)

21             MR. SCHWARTZ:  There is no objection, but we are going

22   to have a conversation about the exact form of it.

23   CROSS EXAMINATION

24   BY MR. TOUGER:

25   Q.  Good morning.

I6KJGAL3                          Kendall - cross

```
1    A.  Good morning.

2    Q.  You work for the FBI, correct?

3    A.  Yes.

4    Q.  And you've never spoken to myself before, have you?

5    A.  No.

6    Q.  You obviously have never spoken to John Galanis, correct?

7    A.  No.

8    Q.  You have never spoken to anybody at that defense table,

9    have you?

10   A.  No.

11   Q.  Would I be correct in saying the FBI is a law enforcement

12   agency for the United States Government?

13   A.  Yes.

14   Q.  You work in the Department of Justice, correct?

15   A.  Yes.

16   Q.  The same department that these individuals sitting at this

17   table work for, correct?

18   A.  Yes.

19   Q.  Would I also be correct -- and I don't mean to insult you

20   at all -- all FBI agents are special agents?

21   A.  Correct.

22   Q.  Your mother and your father think you're special, and I am

23   sure you are.

24            MS. MERMELSTEIN:  Objection.

25            THE COURT:  You don't have to answer that.
```

I6KJGAL3                          Kendall - cross

 1   BY MR. TOUGER:

 2   Q.  Would I also be correct in saying that you, the only

 3   information you have about this case is information that the

 4   government has, the government, the prosecutors, has given you?

 5   A.  For these charts predominantly, yes, that is true.

 6   Q.  You have no knowledge -- I would presume that -- about the

 7   negotiations that went into the bond deal between the attorneys

 8   and everybody else, correct?

 9   A.  Correct, I have no knowledge.

10   Q.  You have not read any of the bond documents themselves?

11   A.  I have only read the documents presented on the charts

12   Q.  The charts, the ones we saw but no other documents.

13   A.  Correct.

14   Q.  In dentures, the trust indentures, any of those documents

15   you haven't read, correct?

16   A.  No.

17   Q.  You have no knowledge about, according to those documents,

18   how the money was to be invested or anything of that nature,

19   correct?

20   A.  Correct.

21   Q.  I would also be correct in saying that you received no

22   documents from the defense in making these charts?

23   A.  That is correct.

24   Q.  I would also be correct in saying that you followed certain

25   instructions that were given to you by the prosecutors in

I6KJGAL3                         Kendall - cross

1  making these charts?

2  A.  Yes.

3  Q.  If you could bring up, Ms. Sheinwald No. 4003.  If you

4  could go a few pages to the end, I guess.

5          Now, the green box is Wealth Assurance Private Client

6  Corp., right?

7  A.  Yes.

8  Q.  And that fits in that box perfectly easily, right?

9  A.  Yes.

10  Q.  You could have made it smaller by doing WAPCC, right?

11  A.  Yes.

12  Q.  By the way, going to the Sovereign Nations box, do you see

13  that box, the orange box?

14  A.  Yes.

15  Q.  Do you have that box up there cash?

16  A.  Yes.

17  Q.  You know no cash was taken out of that account, right?

18  A.  I don't know.

19  Q.  Now, by the way, going down to the box -- go to the.

20  Disbursements chart, the page before.  Let's just say you did

21  the disbursements out of the bond proceeds, correct, for the

22  first bond series?

23  A.  Yes.

24  Q.  You did not, as you said, include all of the disbursements

25  in there, correct?

I6KJGAL3                    Kendall - cross

1    A.  Do you mean the fees?

2    Q.  Right, the fees?

3    A.  Correct, the transaction fees.

4    Q.  You left out the lawyers made approximately $178,000?

5    A.  I did not include any other entities on the chart, just

6    Burnham.

7    Q.  You did that based on the instructions of the prosecutors

8    sitting at this table, correct?

9    A.  Yes.

10   Q.  For instance, if we can go to 4004, now here that green box

11   you have written "Wealth Assurance," correct?

12   A.  Yes.

13   Q.  And you testified on direct that that Wealth Assurance is

14   abbreviation for Wealth Assurance Private Client Corporation?

15   A.  It is shortened, yes.

16   Q.  And you used "Wealth Assurance" because the prosecutors

17   told you to use the title Wealth Assurance, right?

18   A.  It made sense to include it this way because the other one,

19   the other account as well as --

20   Q.  You could have used the initials WAPCC, which would have

21   been even shorter, right?

22   A.  Yes.  No, I did not use those.

23   Q.  You used Wealth Assurance again.

24         Did the prosecutors instruct you to use that name, or

25   did they tell you not to use that name because it is confusing

I6KJGAL3                         Kendall - cross

1    with other corporations?

2    A.  No, they didn't direct me in such a way.

3    Q.  When they saw it, they didn't tell you don't use Wealth

4    Assurance, there are other Wealth Assurance companies?

5    A.  No, they didn't direct me one way or another with that

6    Wealth Assurance.

7    Q.  Now, if you could go back to the first bond Series 4003 to

8    the end, do you see the arrow coming down from U.S. Bank to

9    Wakpamni Lake Building Fund?

10   A.  Yes.

11   Q.  The $2.25 million?

12   A.  Yes.

13   Q.  Were you given any evidence to show how that $2.25 million

14   was spent?

15   A.  I referred to the closing statement for where that was to

16   go to, but --

17   Q.  Were you given any documents that showed you the

18   clarification of how the Wakpamni Lake Building Fund spend that

19   $2.25 million?

20   A.  No.

21   Q.  Past --

22   A.  I used the closing statement.

23   Q.  Another arrow going down?

24   A.  Correct.

25   Q.  You were not given any information from the prosecutors how

I6KJGAL3                        Kendall – cross

1   that money was spent?

2   A.  No.

3            MR. TOUGER:  Nothing further.

4            THE COURT:  Any additional cross-examination?

5   CROSS EXAMINATION

6   BY MR. SCHWARTZ:

7   Q.  Good morning, Agent Kendall.

8   A.  Good morning.

9   Q.  My name is Matthew Schwartz.  I am one of Devon Archer's

10  lawyers, and just so the record is clear, you have never met or

11  communicated with Mr. Archer, right?

12  A.  No.

13  Q.  You testified on direct that you're not part of this

14  investigation, true?

15  A.  That is true.

16  Q.  You were simply assigned a discrete task here, which is to

17  prepare an analysis that went into these charts, correct?

18  A.  Yes.

19  Q.  Let me ask you who are the people that had input into what

20  are on these charts?

21  A.  I did and the prosecutors.

22  Q.  Anyone else?

23  A.  No.

24  Q.  Did you rely on work done by anyone else?

25  A.  I did not rely on work done by anybody else, no.  I did and

I6KJGAL3                          Kendall - cross

1    verified all work.

2    Q.  Did you consult work that had been done by anyone else?

3    A.  I used a spreadsheet that had all the transactions listed

4    for the various accounts.  I believe that was given to me by

5    the prosecutor.

6    Q.  The spreadsheet was given to you by whom?

7    A.  The prosecutor, which I used, verified and made my own

8    changes.

9    Q.  And so it is your testimony that you verified everything

10   that was on that spreadsheet?

11   A.  Yes.

12   Q.  Do you have an understanding of who actually prepared that

13   spreadsheet?

14   A.  I don't know who actually prepared that.

15   Q.  It was one of these prosecutors that gave it to you?

16   A.  Correct.

17   Q.  Do you know who Christopher Ferrante is?

18   A.  I do.

19   Q.  Who is that?

20   A.  He is an employee --

21           MS. MERMELSTEIN:  Objection, your Honor, to this line

22   of questioning.

23           THE COURT:  Based on relevance?

24           MS. MERMELSTEIN:  Yes, your Honor.

25           THE COURT:  Sustained.

1           MR. SCHWARTZ:  We'll come back to Mr. Ferrante in a

2    little bit.

3    BY MR. SCHWARTZ:

4    Q.  Fair to say that you reviewed all of the underlying records

5    that are referenced in your chart?

6    A.  Yes.

7    Q.  Did you review additional records that you didn't

8    reference?

9    A.  I don't recall specifically, but -- I don't recall.

10   Q.  Pretty much if you looked at it, you referenced it in your

11   chart?

12   A.  Yes.

13   Q.  Did you look at parts of the testimony in this trial other

14   than what's referenced in your chart?

15   A.  No, no.

16   Q.  Do you recall who are the witnesses whose testimony you

17   relied upon in preparing your work?

18   A.  I relied upon Mark McMillan, I was shown pages of

19   testimony, and I don't recall.

20   Q.  Anyone other than Mr. McMillan?

21   A.  I don't recall, no.

22   Q.  Is it that you don't recall who they were or you don't

23   recall whether there are any?

24   A.  I am sorry.  I don't recall who they were.

25   Q.  You were shown pages, but you didn't know whose testimony

I6KJGAL3                      Kendall - cross

1   it was?

2   A.  I don't recall who it was.

3   Q.  Therefore, you did not engage in any sort of analysis of

4   whether the testimony made sense or was credible, true?

5   A.  I relied on the testimony that was given.

6   Q.  You took it at face value because the prosecutors gave it

7   to you and told you to rely on it, true?

8   A.  They gave me the transcripts.  I read that, the page of the

9   comment made in trial.

10  Q.  You took the testimony in those transcripts to be true,

11  correct?

12  A.  I did, yes.

13  Q.  If in the course of your work you had questions, where you

14  felt like you needed additional documentation, you asked for

15  it, true?

16  A.  I would ask questions, yes, yes.

17  Q.  There must have been times where you wanted to see some

18  additional record if it existed, true?

19  A.  Yes.  I would ask questions and I would either be presented

20  with a document that would typically be referenced here.

21  Q.  Or not, as the case may be?

22  A.  Yeah, I can't recall something specific.

23  Q.  But at the end of the day, the work that is reflected in

24  the charts you just walked through with Ms. Mermelstein

25  represented your work, correct?

1   A.  Yes.

2   Q.  And you verified everything in those charts, true?

3   A.  I did.

4   Q.  And they are accurate to the nearest dollar, true?

5   A.  Yes.

6   Q.  And you stand by them 100 percent?

7   A.  I do.

8   Q.  One of the last charts -- actually, two of the last

9   charts -- that you looked at with Ms. Mermelstein had to do

10  with the purchase of a condominium at 260 West Broadway.  Do

11  you recall that?

12  A.  I do.

13          MR. SCHWARTZ:  Mr. Jackson, can we just put those back

14  up side-by-side.  It is Exhibits 4014 and 4015.

15  Q.  On direct examination you looked at the contracts and -- is

16  it on everyone's screens -- and you looked at the underlying

17  contract of sale and mortgage, true?

18  A.  Yes.

19  Q.  It was in the name of an entity called Archer Diversified

20  TCG, LLC, true?

21  A.  True, yes.

22  Q.  And Ms. Mermelstein had you read the address for it,

23  correct?

24  A.  Yes.

25  Q.  And then she asked you is that address the same address

I6KJGAL3                         Kendall - cross

1    that was listed on Rosemont Seneca Bohai bank statements.  Do

2    you recall that?

3    A.  I do.

4    Q.  Did the prosecutors tell you, however, that the parties

5    have stipulated that Mr. Archer had at no point had an

6    ownership interest in Archer Diversified TCG, LLC, nor is there

7    any evidence that Mr. Archer had any affiliation, association

8    or involvement with Archer Diversified TCG, LLC?

9    A.  No, they did not tell me that.

10            MR. SCHWARTZ:  For the record, that is transcript Page

11   2494.

12   Q.  They didn't tell you that?

13   A.  No.

14   Q.  You can take those down, please, Mr. Jackson.

15            Now, where possible, you verified everything that is

16   in your charts through numerous forms of documents, true?

17   A.  Yes.

18   Q.  Bank records, where they were available?

19   A.  Yes.

20   Q.  Wire records and transaction records, true?

21   A.  Yes.

22   Q.  Communications reflecting the purpose of wires?

23   A.  Yes.

24   Q.  Other emails?

25   A.  Yes.

I6KJGAL3                    Kendall - cross

Q.  Or other documents?

A.  Yes.

Q.  Some agreements?

A.  Yes.

Q.  Were there cases, however, where you made assumptions?

A.  Not on what numbers existed or account names or where things were transferred to or from.  Can you clarify your question?

Q.  Sure.  Let's look at an example.  Can you bring up, please, Mr. Jackson, Exhibit 4004.

        You testified that this is Part One of the second series of WLCC bonds, correct?

A.  Yes.

Q.  Here you have an arrow drawn from Wealth Assurance, which means Wealth Assurance Private Client Corporation, true?

A.  Yes.

Q.  To Thorsdale, correct?

A.  Yes.

Q.  That is an assumption, isn't it?

A.  The bank statement was transferred, the wire was transferred from Wealth Assurance to Thorsdale.  I would have to see the exact entry to see if it listed Thorsdale as the beneficiary, but the accounts and in some cases the accounts were checked, some were wires.  I would have to look at the statement to see exactly what this one said.

I6KJGAL3                    Kendall - cross

1    Q.  But you're a hundred percent sure when we look at these

2    records in about five seconds, we're going to see it is crystal

3    clear money was transferred from Wealth Assurance Private

4    Client Corporation to Thorsdale?

5    A.  I would like to see the bank statement before I answer that

6    question.

7    Q.  That is a good idea.  Mr. Jackson, can you pull up Exhibit

8    512.

9    Q.  You agree with me, Agent Kendall, that this is the bank

10   statement for Wealth Assurance Private Client Corporation,

11   correct?

12   A.  Yes.

13   Q.  And can we go to Page 6.  Mr. Jackson, can you blow up that

14   September 23rd transaction.

15            That one just says "withdrawal," right?

16   A.  Correct.

17   Q.  You agree with me we can't tell where that is going from

18   this record, true?

19   A.  Yes.

20   Q.  Yes?

21   A.  Yes.

22   Q.  Okay.  So let's take that down.  Now let's look at your

23   chart, Exhibit 4004.  Can we go back to that for a second.

24            So we just looked at the Wealth Assurance side.  We

25   agree we couldn't tell from the bank record, right?

I6KJGAL3                    Kendall - cross

1   A.  Ah-huh, yes.

2   Q.  Let's look at the Thorsdale side.  Can we see Exhibit 522.

3   You agree with me that this is the Thorsdale Fiduciary &

4   Guaranty Company, Limited bank record, correct?

5   A.  Yes.

6   Q.  Can we go to Page 47, please.  Can you blow up the 9-23

7   transaction.  You agree with me that one says "deposit,"

8   correct?

9   A.  Yes.

10  Q.  And we can't tell where it came from, true?

11  A.  From the statement, no.

12  Q.  Right.  You relied upon the statements in drawing your

13  chart, correct?

14  A.  I did in other documentation.

15  Q.  You relied on some documentation that was not footnoted in

16  your chart?

17  A.  It is possible.  There were canceled checks and deposits

18  that may have been in another exhibit that is not listed on

19  this chart, but is an a government exhibit.

20  Q.  Right, so you might have looked at some stuff you didn't

21  put on this chart, right?

22  A.  That I didn't reference in the government exhibit, correct.

23  Q.  So can we go back to 4004, Page 1.

24          You see at the bottom there all of the exhibits that

25  you've referenced, correct?

1   A.  Yes.

2   Q.  Now, in order to draw the line from Wealth Assurance to

3   Thorsdale, you did not rely on any of those exhibits, correct?

4   A.  Correct.

5   Q.  You relied on a deposit ticket, correct?

6   A.  Yes.

7   Q.  That was Exhibit 565, please, Mr. Jackson, at Page 2.

8           What you relied upon was the notation there on the

9   side that said transfer to Thorsdale Fiduciary & Guaranty

10  Limited, correct?

11  A.  Yes, that's correct.

12  Q.  This is the document that you relied upon in preparing your

13  chart but did not list as a source document, correct?

14  A.  That's correct.

15  Q.  Thank you.  You can take that down.

16          By the way, just going back to the Thorsdale

17  statements for a second, that is Exhibit 522, at Page 51, if

18  you blow up that 9-24 transaction for $15 million, you would

19  agree with me, wouldn't you, that it's crystal clear where the

20  money went out to?

21  A.  Yes.

22  Q.  It went out to the Wolff Law Firm, true?

23  A.  Yes.

24  Q.  Thank you.  You can take that down.  Now let's look at

25  Exhibit 4012.  This is another chart that you prepared that

1    shows where all the money from Thorsdale went, true?

2    A.  Yes.

3    Q.  And, Mr. Jackson, can you just for the witness, the lawyers

4    and Judge Abrams pull this up side-by-side with Defense Exhibit

5    8012.

6         Would you agree with me, Agent Kendall, that these two

7    charts are identical except that I've put a defense exhibit

8    sticker on it?  Take your time.

9         MS. MERMELSTEIN:  Objection to the point of this, your

10   Honor.

11        THE COURT:  Is this a trick question?

12        MR. SCHWARTZ:  No, no, it is not a trick question.  We

13   are going to make this accurate.

14        THE COURT:  Make what accurate?

15        MR. SCHWARTZ:  We are going to correct a few things in

16   this exhibit.

17        MS. MERMELSTEIN:  Objection to the characterization of

18   what Mr. Schwartz is saying.  I don't see the point of saying

19   is this the same thing and I put my exhibit sticker on it.

20        THE COURT:  If it is the same thing, you can represent

21   it is the same thing.

22        MR. SCHWARTZ:  I represent it is the same thing.  It

23   is not a trick question.  Can I publish 8012 as an aid to the

24   jury?

25        THE COURT:  Yes.

I6KJGAL3                          Kendall - cross

1           MR. SCHWARTZ:  Mr. Jackson, can you turn on the jury's

2    screens so they can see these two side-by-side and then just

3    blow up the one on the left, Defense Exhibit 8012.  Don't blow

4    it up.  Just make it that exhibit.  I want to talk about this

5    for a little while, okay?

6    Q.  Now, first of all, you testified a moment ago that the

7    reference here to Wealth Assurance is actually a reference to

8    Wealth Assurance Private Client Corporation, correct?

9    A.  Yes.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SCHWARTZ:

2    Q.  And although you're not part of the investigative team

3    here, you would agree with me that there are several other

4    entities with Wealth Assurance in their name in this case,

5    true?

6    A.  I believe that's true.

7    Q.  I mean you've looked at records for some of them, correct?

8    A.  Yes.

9    Q.  One of them is Wealth Assurance Holdings, true?

10   A.  Yes.

11   Q.  And you've looked at some bank records for Wealth Assurance

12   Holdings, right?

13   A.  I don't recall specifically but yes.

14   Q.  And another entity is Wealth Assurance AG, correct?

15   A.  I can't recall.

16   Q.  And that one you didn't look at any bank records for

17   because the government never gathered bank records for Wealth

18   Assurance AG, true?

19   A.  I don't know.

20   Q.  But this Wealth Assurance refers to Wealth Assurance

21   Private Client Corporation, correct?

22   A.  Yes.

23   Q.  Or WAPC, right?

24   A.  WAPCC.

25   Q.  So can we go to the next slide here.  Let's fix that.  Now,

1  at the bottom of this chart in orange you show $700,513 going

2  to RSB, correct?

3  A.  Yes.

4  Q.  And I presume the prosecutors told you to make that orange,

5  right?

6  A.  We decided on a color.

7  Q.  Well, told you to make it a different color from the rest

8  of the column.

9  A.  Yes.

10  Q.  In fact that $700,513 is comprised of two separate wires,

11  true?

12  A.  Yes.

13  Q.  One wire for $100,000, right?

14  A.  I recall, yes.

15  Q.  And there was one wire for $600,513, true?

16  A.  Yes.

17  Q.  Can we talk to the $100,000 first.

18  A.  Yes.

19  Q.  So, Mr. Jackson, if you could show the jury Exhibit 522.

20  Again this is the Thorsdale Fiduciary and Guaranty Company

21  records, right?

22  A.  Yes.

23  Q.  And go to page 104.  This is where you saw that $100,000

24  transferred to Rosemont Seneca Bohai, correct?

25  A.  $100,000 was transferred to RSB LLC.

I6K7GAL4                       Kendall - Cross

1   Q.  And that's the first transfer listed on April 24, correct?

2   A.  Yes.

3   Q.  But you know that this $100,000 was actually repayment of a

4   loan, true?

5   A.  I would have to see the documentation; I don't recall.

6   Q.  Well, you're aware that this was repayment of $100,000,

7   true?

8   A.  I am aware that a wire transfer occurred on April 24 for

9   $100,000.

10  Q.  Can I show you page 93 of this same exhibit, the Thorsdale

11  bank records.

12  A.  Yes.

13  Q.  And do you see one month earlier on March 24 there is an

14  incoming wire from Morgan Stanley in the amount of $100,000?

15  A.  Yes, I see that.

16  Q.  And you see at the bottom it says "loan disbursement"?

17  A.  Yes.

18  Q.  And that $100,000 came from Rosemont Seneca Bohai, true?

19  A.  I would have to see that other statement to confirm that.

20  Q.  I mean isn't it true that just last week your chart didn't

21  have that $100,000 on it?

22  A.  Yes.

23  Q.  You took it off because you knew that that was repaid,

24  true?

25              MS. MERMELSTEIN:  Objection.

 1                THE COURT:  I'll allow it.

 2                You can answer that.

 3   A.  No.

 4   Q.  Well, put differently --

 5   A.  I didn't know that.

 6   Q.  -- your chart originally had $700,513, correct?

 7   A.  Yes.

 8   Q.  And then last week you took off the $100,000, right?

 9   A.  Yes.

10   Q.  And today when you testified you put it back on, right?

11   A.  Yes.

12   Q.  And that $100,000 you know did come from Rosemont Seneca

13   Bohai, right?

14   A.  The change was because how it was listed was Rosemont and

15   RSB, so it was missed when we went to confirm numbers.  Then we

16   saw RSB when we searched for Rosemont, and that they're one in

17   the same.  I don't know if it was a loan.  I don't know this.

18   Q.  Well, I'm not sure I totally followed you.  Do you agree

19   with me that this March 24th deposit came from Rosemont Seneca

20   Bohai?

21   A.  I don't see that on the statement.

22   Q.  OK.  Do you know that to be true from the other things you

23   looked at?  Or should we walk through them all?

24   A.  We can walk the $100,000 from Rosemont Seneca Bohai.

25   Q.  You're aware that Rosemont Seneca Bohai had what is called

I6K7GAL4                        Kendall - Cross

1    a portfolio loan account, true?

2    A.  I am not aware of that.

3    Q.  You didn't look at any of the portfolio loan account

4    statements for Rosemont Seneca Bohai?

5    A.  I looked at transactions.  I looked at the statements; I

6    looked at transactions.  I don't recall that.

7    Q.  You didn't look at all of the Morgan Stanley records for

8    Rosemont Seneca Bohai?

9    A.  I don't recall the information on the statements.

10   Q.  You did, however, look at some of the communications that

11   confirm the purposes of wires, true?

12   A.  There is one that I referenced on one of the charts.

13   That's the one I recall.  If there is another, I don't recall.

14   Q.  Sure.  Well, let me show you just for the witness, the

15   lawyers and Judge Abrams Exhibit 4505.  You would agree with me

16   that the purpose of the $100,000 wire from Morgan Stanley to

17   Thorsdale on March 24 was a loan, true?

18   A.  From this e-mail it appears that there is a loan for

19   $100,000.

20             MR. SCHWARTZ:  I offer 4505.

21             THE COURT:  Any objection?

22             MS. MERMELSTEIN:  I'm just reading it, your Honor.

23             THE COURT:  Sure.

24             MS. MERMELSTEIN:  No objection.

25             THE COURT:  All right.  It will be admitted.

I6K7GAL4                         Kendall - Cross

1                (Defendant's Exhibit 4505 received in evidence)

2       Q.  If you can display that, Mr. Jackson.

3                And the first line here is "Seb, please paper short

4       term loan for $100K from PLA for Greek."  True?  Did I read

5       that right?

6       A.  Yes, you read that correctly.

7       Q.  And do you know from your review of documents in this case

8       that Greek referred generally to Jason Galanis?

9       A.  I don't know that.

10      Q.  OK.  And then $100,000 was in fact disbursed from the PLA

11      account at Morgan Stanley to Thorsdale, correct?

12      A.  I would have to see the statement.  I can't make that

13      determination without seeing the statement.

14      Q.  Sure.  Let me show you Exhibit 361.  This is in evidence,

15      correct?

16               No?  I'm told no, so don't show it to the jury just

17      yet.

18               Look at page 3 of this document, please.  And you see

19      that there was a PLA disbursement request made on March 24,

20      true?

21      A.  I see that here, yes.

22               MR. SCHWARTZ:  I offer this document.

23               MS. MERMELSTEIN:  Your Honor, may we approach?

24               THE COURT:  Sure.

25               (Continued on next page)

I6K7GAL4                    Kendall - Cross

1           (At the sidebar)

2           MS. MERMELSTEIN:  I obviously have no objection to the

3   witness being asked about what she was shown, wasn't shown,

4   etc.  If she says she has never seen something, even if it's

5   admissable, I don't think it should be being put in now.  There

6   obviously are going to be defense summary charts; they can do

7   anything they want then.  If she said she hasn't seen it, then

8   we should move on.

9           MR. SCHWARTZ:  No, this is all admissible as

10  impeachment.  Her testimony was that the money ended up -- that

11  was her testimony -- that that chart reflects where the

12  Thorsdale money ended up, and she depicted the $700,513 ending

13  up at Rosemont Seneca Bohai.  And as I will demonstrate, zero

14  of those dollars ended up at Rosemont Seneca Bohai.  And

15  moreover she double counted, and that money ended up elsewhere

16  on that chart.

17          THE COURT:  I think you can use this, but you should

18  clarify what she has seen and what she hasn't seen.

19          MR. SCHWARTZ:  I will absolutely do that.

20          MS. MERMELSTEIN:  I object to the admission during her

21  testimony.

22          THE COURT:  But you don't object to their

23  admissibility; you are just objecting to it being used with

24  this witness.

25          MS. MERMELSTEIN:  Yeah.  He can say you weren't shown

I6K7GAL4                        Kendall - Cross

this document, that's fine, and she will say she hasn't been

shown it.  And I think he has mischaracterized her testimony

pretty significantly, but he can put in whatever arguments he

wants.

          What I don't think is proper -- we've been fighting

about this the whole trial -- is for him to try to co-opt every

government witness.  If he wants to make summary charts that

are different, he should feel free.

          He can establish that she didn't look at these and

make the arguments from that, but I don't think that it's

appropriate to be spending all of the time showing her things

and saying not just that she hasn't seen them but then kind of

walking her through them.

          THE COURT:  OK, I am going to allow it.

          (Continued on next page)

I6K7GAL4                           Kendall - Cross

1          (In open court)

2          MR. SCHWARTZ:  We were looking at Exhibit 361 at page

3    3.  And I offer the document, your Honor.

4          THE COURT:  I am going to admit it.

5          I just want to be clear, if you haven't seen

6    particular documents and you need time to review them, just let

7    us know that.

8          WITNESS:  OK.

9          THE COURT:  Thank you.

10         (Defendant's Exhibit 361 received in evidence)

11   BY MR. SCHWARTZ:

12   Q.  This is new to you, true?

13   A.  This is new, not part of my examination.

14   Q.  This was not one of the documents the prosecutors gave you

15   to prepare your charts.

16   A.  Correct.

17   Q.  You see at the bottom there is an e-mail from someone at

18   Morgan Stanley, correct?

19   A.  Yes.

20   Q.  And then on top of that there is an e-mail to that same

21   person at Morgan Stanley, Iris Gomez, from Sebastian Momtazi,

22   chief operating officer of Rosemont Capital, saying please see

23   attached signature page.  Correct?

24   A.  I see that, yes.

25   Q.  Can we now go to page 5 of this document.  I am showing you

I6K7GAL4                          Kendall - Cross

1   now that signature page.  Do you see that?

2   A.  Yes.

3   Q.  And at the very top you see the heading "Section 2,

4   destination instructions for loan disbursements?"

5   A.  I see that, yes.

6   Q.  And then in the middle of the page it says "beneficiary

7   information," and there is an account number, right?

8   A.  Yes.

9   Q.  And from your work you recognize that account number to be

10  the account of Thorsdale Fiduciary and Guaranty Company that we

11  were just looking at, true?

12  A.  I would have to review it again.

13  Q.  OK, we will do that.  But underneath that you see that it

14  says Thorsdale Fiduciary and Guaranty Company, correct?

15  A.  Yes, I see that.

16  Q.  OK.  Can you hold that account number in your head, or do I

17  have to come back to it?

18  A.  You can switch to the other.

19  Q.  OK.  Ending in 3181, correct?

20  A.  Yes.

21  Q.  I want to now show you -- you can take that down -- for the

22  witness, the lawyers and Judge Abrams, Exhibit 4503.  This is a

23  portfolio loan account statement for RSB LLC, correct?

24  A.  Yes.

25          MR. SCHWARTZ:  I offer this document, which is the

I6K7GAL4                    Kendall - Cross

1    subject of a business record stipulation.

2              MS. MERMELSTEIN:  No objection.

3              THE COURT:  It will be admitted.

4              (Defendant's Exhibit 4503 received in evidence)

5    Q.  Can I ask you to turn --

6              Can you publish that, please, Mr. Jackson.  And can I

7    ask you to turn to page 2.

8              Now, if you blow up the top half you see that on March

9    24 there is an advance of $100,000, correct?

10   A.  I see that, yes.

11   Q.  And that is the same day and the same amount as the

12   incoming $100,000 from Morgan Stanley to Thorsdale and the

13   Thorsdale bank records, correct?

14   A.  I would have to see some more underlying data that this is

15   where this transfer went and review more things.  I mean based

16   on this I see that there is an advance of $100,000.

17   Q.  I promise you I will show you everything.  My question

18   right now is:  This is the same day and same amount as the

19   $100,000 that we saw on the Thorsdale account statements coming

20   from Morgan Stanley, correct?

21   A.  Yes.  From what you showed me earlier, yes.

22   Q.  And what I showed you earlier, to be clear, was the

23   Thorsdale bank statement that you relied upon in preparing your

24   chart.

25   A.  Yes.

I6K7GAL4                        Kendall - Cross

1   Q.  You can take this down.  And can we show, please, to the

2   witness, the lawyers and Judge Abrams Exhibit 4535.

3            And this is an e-mail from the same person at Morgan

4   Stanley dated March 24, 2015, the same day we have been talking

5   about, correct?

6   A.  Yes.

7            MR. SCHWARTZ:  I offer Exhibit 4535.

8            MS. MERMELSTEIN:  No objection.

9            THE COURT:  All right.  That will be admitted.

10            (Defendant's Exhibit 4535 received in evidence)

11   Q.  Can you publish that, please, Mr. Jackson.  Now, can you

12   move that over to the left side for a second.  And can I ask

13   you to bring up next to it Exhibit 522, and can you go to page

14   93.

15            This is the Thorsdale bank record that you reviewed

16   showing the $100,000 coming in, correct?

17   A.  Yes.

18   Q.  Thank you.  You can keep that blown up real big, please,

19   Mr. Jackson.  And on top of that, can you blow up on the right

20   side where it says "please be advised that your wire request

21   has been processed; the reference number is..." and then there

22   is a very long number, correct?

23   A.  Yes, that's what that says.

24   Q.  OK.  And you would agree with me, would you not, that the

25   wire reference number on the e-mail on the right, 4535, is the

I6K7GAL4                    Kendall - Cross

1   same as the wire reference number in the Thorsdale bank records

2   for the $100,000?

3   A.  It appears to match, yes.

4   Q.  So, Mr. Jackson, could you highlight after the words "loan

5   disbursements" there is a long number.  And then can you

6   highlight above that, just lopping off the year 2015 and

7   starting 032.

8          Those what we are talking about, Agent Kendall.  Those

9   numbers are the same, true?

10  A.  Yes.

11  Q.  And so would you agree with me that the $100,000 that came

12  into Thorsdale on March 24 came from Rosemont Seneca Bohai?

13  A.  On this it appears that way.

14  Q.  You can say it is.  It's true, right?

15         MS. MERMELSTEIN:  Objection.  Objection to what the

16  agent can say.

17         THE COURT:  Sustained.

18  Q.  We can agree the $100,000 that came back to Thorsdale on

19  March 24 was from -- not came back to -- that went to Thorsdale

20  on March 24 came from Rosemont Seneca Bohai, correct?

21  A.  Based on this, it came from -- Mr. Archer sent -- yes, I

22  believe it did.

23  Q.  Can we go back to 8012, please, Mr. Jackson.  I think we

24  were on page 2.  So can we knock off that $100,000 in advance

25  to page 3?

I6K7GAL4                         Kendall - Cross

1    A.  I would say I have an "other" category for other money that

2    went into the account, which without doing some more -- this

3    was just showing disbursements and money out of the account.

4    Q.  I promise we will talk about everything.

5    A.  OK, good.

6            MS. MERMELSTEIN:  Objection to the commentary, your

7    Honor.

8            THE COURT:  To what?

9            MS. MERMELSTEIN:  To Mr. Schwartz's ongoing commentary

10   about the testimony.

11           THE COURT:  OK, let's not comment on the testimony,

12   but you can move on.

13   Q.  Can we go to the next page of this exhibit, please.

14           All right.  So now we've got $600,513 from Thorsdale

15   to Rosemont Seneca Bohai.  That was a single wire, true?

16   A.  From my recollection, yes, that's true.

17   Q.  And that one also was canceled out by a $600,513 wire going

18   in the other direction, correct?

19   A.  You have to show me that too.

20   Q.  I would be happy to.  Now, your citation here again is to

21   Thorsdale bank records, correct?

22   A.  Yes.

23   Q.  And that was Exhibit 522 that we were looking at a second

24   ago, right?

25   A.  522 and 523, yes.

I6K7GAL4                        Kendall - Cross

1    Q.  So let's pull up, please, Mr. Jackson, Exhibit 522.

2              THE COURT:  And if you need copies of any of the

3    exhibits because you don't recall offhand, just let us know

4    that.

5    Q.  And can we go now to page 66.

6              OK.  If you look three lines down --

7              If you could blow that up, please, Mr. Jackson.

8              This is $600,513 that came from Rosemont Seneca Bohai

9    to Thorsdale.  I must be boring.

10             This is $600,513 that came to Thorsdale from Rosemont

11   Seneca Bohai, correct?

12   A.  Yes.

13   Q.  And this is the entry that you were looking at and that you

14   relied upon when you drew your chart, correct?

15   A.  Yes.

16   Q.  Can we go back two pages to page 64 of Exhibit 522.  And

17   can you blow up the top few entries.

18             There you see a $600,513 wire coming into Thorsdale

19   from something called Crone Kline & Rinde it looks like.  Do

20   you see that?

21   A.  Yes.

22   Q.  Same amount, $600,513?

23   A.  Yes.

24   Q.  One is an income can wire and one is an outgoing wire,

25   correct?

1   A.  Yes.

2   Q.  And you know that this $600,513 came from Rosemont Seneca

3   Bohai, true?

4   A.  I don't know that.  I would have to see the backup

5   documents.

6   Q.  Well, we know that you looked at Rosemont Seneca Bohai's

7   bank statements to prepare your charts, correct?

8   A.  Yes.

9   Q.  And you used that, for example, to prepare the very first

10  slide we talked about, which was the second bond issuance,

11  right?

12  A.  Yes.

13  Q.  But on the slide that we're talking about now, the

14  distribution of Thorsdale money, you did not cite Rosemont

15  Seneca Bohai's bank records, correct?

16  A.  No.

17  Q.  And that's because you didn't look at Rosemont Seneca

18  Bohai's bank records in connection with that part of your

19  analysis, true?

20  A.  For that slide I relied on the exhibits that are listed

21  there.

22  Q.  And you agree with me that Rosemont Seneca Bohai's records

23  were not listed on that slide.

24  A.  That's correct, yes.

25  Q.  But let's look at that.  Can we pull up, please,

1    Mr. Jackson, Exhibit 301, and can we go to page 74.

2              So, if you look on the first entry on November 10 --

3              And blow that up.

4              -- that's a transfer in from Thorsdale Fiduciary and

5    Guaranty, correct?

6    A.  Yes, it is.

7    Q.  And that is the flip side, the other half of the bank

8    statement that is reflected on your chart, correct?

9    A.  Yes.

10   Q.  In other words, we looked before, and you relied upon the

11   Thorsdale record, and this is the Rosemont Seneca Bohai record

12   for the same exact transaction, correct?

13   A.  It appears that way.  I'm trying to do this without looking

14   at them side by side, so I mean...

15   Q.  Now, can I ask you to blow up, please, Mr. Jackson.

16             On the 12th, you see that there is a transaction with

17   Crone Kline & Rinde in the amount of $600,513, correct?

18   A.  Yes.

19   Q.  And that is the exact same party that was listed on the

20   Thorsdale records, correct?

21   A.  Yes.

22   Q.  And the exact same amount, correct?

23   A.  Yes.

24   Q.  And fair to say that you did not make any efforts to

25   determine whether this was in connection with any sort of loan

I6K7GAL4                          Kendall - Cross

1    like the $100,000.

2    A.  Yes, that's fair to say.

3    Q.  But you did know when you drafted your slides that that

4    $600,000 didn't remain with Rosemont Seneca Bohai, correct?

5    A.  For that slide, I don't recall offhand.

6    Q.  OK.  Let me show the witness, the lawyers and Judge Abrams

7    Exhibit 4529A.  This is a screen shot of the Excel spreadsheet

8    you referenced before, correct?

9    A.  Yes.

10   Q.  This is the spreadsheet that someone else prepared; is that

11   right?

12   A.  Yes.

13   Q.  But you verified all the information, correct?

14   A.  Yes.  I made some changes.

15   Q.  And you made some changes?

16   A.  Notes, yes.

17   Q.  So you got in there and you played with the Excel, right?

18   A.  I did, yes.

19   Q.  And do you remember I asked before about that fellow Chris

20   Ferrante?

21   A.  Yes.

22   Q.  He also --

23          MS. MERMELSTEIN:  Objection, your Honor.  This was

24   already sustained, this line of questioning.

25          MR. SCHWARTZ:  Well, I'm going to connect it up right

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I6K7GAL4                    Kendall - Cross

1    now.

2              MS. MERMELSTEIN:  Then we should have a sidebar, I

3    think.

4              THE COURT:  All right, let's have a sidebar.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6K7GAL4                          Kendall - Cross

 1              (At the sidebar)

 2              MR. SCHWARTZ:  So this document was produced to us in

 3    native form.  This is the Excel that she testified she reviewed

 4    and verified.  I have reason to believe that it was prepared by

 5    or certainly at least had input by Chris Ferrante of the SEC.

 6    In particular, he put comments in the documents.  One of the

 7    comments which I'm about to show her recognizes that this

 8    $600,513 was offset in exactly the way that I'm trying to

 9    prove.

10              THE COURT:  And that she would have had access to that

11    but didn't include it in her chart?

12              MR. SCHWARTZ:  Exactly.

13              THE COURT:  Do you want to respond?

14              MS. MERMELSTEIN:  Yes.  I don't think it's relevant,

15    first of all, to the extent there were comments --

16              Well, first of all, let me say this.  It doesn't

17    matter who prepared it.

18              THE COURT:  I agree with that.  I don't think it

19    matters who it is.  But if she saw it and she was on notice of

20    some discrepancy which she didn't include in her chart, I this

21    that's proper impeachment.

22              MR. SCHWARTZ:  It also impeaches her testimony that

23    she says that the only information she got came from these

24    prosecutors.  Chris Ferrante is from the SEC.

25              MS. MERMELSTEIN:  But she testified that the

I6K7GAL4                          Kendall - Cross

1    prosecutors gave her the chart.  I don't understand how that

2    impeaches her testimony.  I mean let's be clear, I gave it to

3    her.  Right?  And I'm not suggesting Chris Ferrante didn't

4    prepare it.  He of course did prepare it.  But the relevance of

5    a parallel SEC investigation is completely confusing and

6    irrelevant.

7              She got a chart.  If you want to ask her didn't this

8    chart indicate something to you that you then didn't put into

9    your final documentation, I think that's fine.  I think the

10   existence of Chris Ferrante and his involvement has no place

11   here and it shouldn't be referenced, and that's the issue.

12             MR. SCHWARTZ:  Well, I don't know what is so bad about

13   talking about the SEC in a securities fraud investigation, but

14   the comment -- like any other comments in an electronic

15   document -- it's got an author, so it says that it's from C

16   Ferrante.  If they want me to elicit it without saying the SEC

17   and it's some minnion of the government, I'm happy to do that,

18   but I think I'm entitled to confront her with it and I'm

19   entitled to show it to the jury.

20             THE COURT:  I don't think it matters whose comment it

21   was, but I think you're allowed to elicit the fact that there

22   was this comment and that she apparently was on notice of

23   something that she didn't put in her chart, so I will allow

24   that, but I don't think it matters who said it.

25             MR. SCHWARTZ:  The only reason I'm asking the question

1    is because his name is in the comment bubble.

2            THE COURT:  But you're trying to suggest that he was

3    right and she was wrong, and given who he was that matters.  I

4    don't think that's relevant.  If you want to call him, you can

5    call him, but I think that, you know, his statement is hearsay.

6    The fact that she was on notice about it impeaches her, so I'm

7    allowing you to impeach her with it, but I don't think it

8    matters who said it.

9            MR. SCHWARTZ:  All right.  So I'm still going to show

10   it; I just won't comment on who it is?

11           MS. MERMELSTEIN:  That's fine.  It can't be offered

12   obviously.  She can be asked about it; it doesn't get in front

13   of the jury.

14           MR. SCHWARTZ:  It should be offered.

15           MS. MERMELSTEIN:  Why?

16           MR. SCHWARTZ:  It's something that she saw, and it

17   impeaches her testimony.

18           MS. MERMELSTEIN:  But if she says she saw it --

19           MR. QUIGLEY:  It's not a prior inconsistent statement

20   of hers.  Extrinsic evidence being used for impeachment is

21   classic 608(b).

22           MS. MERMELSTEIN:  Unless she is going to deny having

23   seen it, I don't see how it comes into evidence.

24           THE COURT:  Let's just see.  If she acknowledges

25   seeing it and not incorporating it, that's sufficient to make

I6K7GAL4                    Kendall – Cross

1    your point.

2              MS. MERMELSTEIN:   Thank you.

3              (Continued on next page)

I6K7GAL4                         Kendall - Cross

 1              (In open court)

 2              MR. SCHWARTZ:  I'm sorry.  Was this in or not.

 3              MS. MERMELSTEIN:  No.

 4              MR. SCHWARTZ:  OK.  So I offer 4529A.

 5              MS. MERMELSTEIN:  I think your Honor just ruled that

 6   it was not going to be admitted.

 7              MR. SCHWARTZ:  Well, this is not that.

 8              THE COURT:  Yeah, I don't think we addressed this.

 9              MR. SCHWARTZ:  Let me ask a question or two more.

10              THE COURT:  OK.

11   BY MR. SCHWARTZ:

12   Q.  So I think I asked this before, but this is the document

13   that you reviewed and verified and you said played around in,

14   right?

15   A.  Yes.

16   Q.  Yeah.

17              MR. SCHWARTZ:  So I offer 4529A.

18              MS. MERMELSTEIN:  No objection.

19              THE COURT:  All right.  It will be admitted.

20              (Defendant's Exhibit 4529A received in evidence)

21   Q.  If you can publish that to the jury, please, Mr. Jackson.

22   You see line 277 all the way on the left.  That corresponds to

23   this $600,513 transfer that we have been talking about,

24   correct?

25   A.  Yes.

I6K7GAL4                          Kendall - Cross

1   Q.  And, by the way, the spreadsheet that we are looking at is

2   in essence someone has taken the wire activity from the

3   Thorsdale bank record and dumped it into a spreadsheet,

4   correct?

5   A.  I believe it's all transactions from the account, not just

6   wire activity.

7   Q.  Thank you.  So all of the transactions and dumped them into

8   a spreadsheet, correct?

9   A.  Yes.

10  Q.  So that $600,513 transfer on November 10, 2014.  Now, you

11  see in the balance amount there is this little red triangle up

12  there in the corner?

13  A.  Yes.

14  Q.  You know what that is, right?

15  A.  It usually indicates a comment.

16  Q.  Did you look at the comments in this document?

17  A.  I looked at some.  I don't remember if I looked at them

18  all.

19  Q.  Well, let me show to the witness, the lawyers and Judge

20  Abrams Defense Exhibit 4529.  And this is simply a screen shot

21  with the comment exposed.  Did you look at this comment?

22  A.  I don't recall.

23  Q.  You don't recall knowing that the $600,513 came back to

24  Thorsdale from Crone Kline?

25  A.  No.

I6K7GAL4                        Kendall - Cross

1    Q.  But you looked at some of the comments, correct?

2    A.  Yes.

3    Q.  And let me show you also -- we can take that down --

4    Exhibit 4527 just for the lawyers, the witness and Judge

5    Abrams.  I'm sorry, 4527A.  And you would agree with me that

6    this is another screen shot of the very same spreadsheet,

7    correct?

8    A.  Yes.

9           MR. SCHWARTZ:  I offer 4527A.

10          MS. MERMELSTEIN:  No objection.

11          THE COURT:  All right, it will be admitted.

12          (Defendant's Exhibit 4527A received in evidence)

13   Q.  And there is the November 14, 2014 $600,513 transfer

14   involving Crone Kline, correct?

15   A.  Yes.

16   Q.  And again there is a little red triangle in the balance

17   amount that indicates that there is a comment, correct?

18   A.  Yes.

19   Q.  Do you recall if you looked at that comment?

20   A.  No, I do not recall.

21   Q.  These were not your comments, correct?

22   A.  Not that I am aware of.  I don't remember putting any

23   comments in.

24   Q.  So someone else had put in comments, and you might have

25   looked at some and may have ignored others?

I6K7GAL4                         Kendall - Cross

1    A.  Yes.

2    Q.  Can we show the witness, the lawyers and Judge Abrams

3    Exhibit 4527.  This is the same slide with the comment exposed.

4    Do you recognize that?

5    A.  I don't recognize the comment, no.

6    Q.  So isn't it the case that you knew when you reviewed this

7    chart that the $600,513 did not stay with Rosemont Seneca

8    Bohai?

9    A.  I don't recall that.

10   Q.  And based on all of the records that we've just looked at

11   that show the same amounts and the same days between Rosemont

12   Seneca Bohai, Crone Kline & Rinde and Thorsdale, wouldn't you

13   agree with me now that that $600,513 didn't stay in the

14   account?

15   A.  A cursory review of what we have looked at today, it does

16   appear that way.

17   Q.  So can we go back to Exhibit 8012.  And we were on slide 3.

18   Now let's go to slide 4 and just knock that off.  One more.

19            All right.  So, now we've talked about the fact that

20   that $700,513 that was depicted on your original chart, none of

21   it stayed with Rosemont Seneca Bohai.  But there is another

22   problem with this chart, right?  Because when that money went

23   back into Thorsdale, you double counted it in some of these

24   other boxes; isn't that true?

25   A.  I don't recall.  I don't know.  I would have to look at all

I6K7GAL4                          Kendall - Cross

1    the documentation.

2    Q.  Well, let's just do one example.  Right?  A lot of that

3    money went to Vaudoise, didn't it?

4    A.  Yes.

5    Q.  A lot of the $700,513 that you had represented as going to

6    Rosemont Seneca Bohai is double counted here and went to

7    Vaudoise; isn't that true?

8    A.  This chart shows debits out of the account, and it also

9    shows inflows into the account.  So the debits are reflected in

10   what was sent out to those.  Where that money came from is in

11   the other side of that chart where other funds are put in

12   WAPCC.  So, when I say that a lot of money went to Vaudoise

13   from the Thorsdale account, I would have to trace back in the

14   other category where that came from.

15   Q.  Certainly it was not your intention in creating these

16   charts to count the same dollars more than once, correct?

17   A.  It was not my intention to count money twice.

18   Q.  But you did, right?

19   A.  This is the debits of the account.  That's what is shown

20   here.

21   Q.  So let's, for example, go back to Thorsdale's bank records.

22   Can we go to Exhibit 522.  And I think before we looked at page

23   64.  If we can go back to that.  And that's where we saw at the

24   very top that $600,513, correct?

25   A.  Yes.

I6K7GAL4                         Kendall - Cross

1   Q.  Now, if we go back one page, Mr. Jackson, to page 63, and

2   just blow up where it says "checking summary".

3            This says that the ending balance for the account for

4   the month of November of 2014 was about $107,494.  Correct?

5   A.  Yes.

6   Q.  And so would you agree with me that that means that by

7   definition most of that $600,513 that was transferred back into

8   Thorsdale in the middle of the month couldn't have remained

9   there by the end of the month.  Right?

10  A.  It appears no.

11  Q.  At least about $500,000 of that had to have left the

12  account, correct?

13  A.  Yes.

14  Q.  Now let's turn to page 66.  And if you blow up the bottom

15  half of the page from November 20 down, please, Mr. Jackson.

16           You can see that there are two wires -- one on the

17  20th and one on the 24th -- that go to Vaudoise Assurances

18  Holding, correct?

19  A.  Yes.

20  Q.  And those two wires sum to the $117,370 that's reflected on

21  your chart, correct?

22  A.  Yes.

23  Q.  Now just a little bit further down on this page you see

24  that there were checks written on November 14 and November 17

25  in large amounts, right, one for more than $6 million and one

I6K7GAL4                         Kendall - Cross

1    for a million dollars, correct?

2    A.  Yes.

3    Q.  And these are reflected on your chart as transfers to

4    Wealth Assurance Holdings, correct?

5    A.  Yes.

6    Q.  And you know that because you have at least the partial

7    checking account number here, and you can match that to the

8    Wealth Assurance Holdings checking account number, correct?

9    A.  Yes.

10   Q.  And do you recall which of the exhibits cited on your chart

11   show that these are checks to Wealth Assurance Holdings?

12   A.  I do not recall.

13   Q.  Your chart actually doesn't cite to any bank records for

14   Wealth Assurance Holdings, does it?

15   A.  I don't believe that it does, no.

16   Q.  So is this another instance where you had looked at and

17   relied upon some piece of information that was not reflected on

18   your chart?

19   A.  Not listed in the government exhibit list, correct.

20   Q.  Correct.  Thank you.

21          Now, let me show you just for the witness, the lawyers

22   and Judge Abrams Exhibit 539.  You would agree with me that

23   this is the bank records for Wealth Assurance Holdings Ltd.

24   that you looked at, correct?

25   A.  Yes.

I6K7GAL4                        Kendall - Cross

 1              MR. SCHWARTZ:  I offer Exhibit 539.

 2              MS. MERMELSTEIN:  No objection.

 3              THE COURT:  It will be admitted.

 4              (Defendant's Exhibit 539 received in evidence)

 5   Q.  And can we go to page 17 of this document, please,

 6   Mr. Jackson, and sort of blow up the bottom there.

 7              This is the other side of the transaction that we were

 8   just looking at, those checks in the amounts of a little bit

 9   more than $6 million and $1 million, correct?

10   A.  The transfers, yes.

11   Q.  All right.  And you know that because again you can match

12   at least the last four digits of the checking accounts,

13   correct?

14   A.  Yes.

15   Q.  Now let's just show this.  Can we bring this up next to

16   Exhibit 522, please, Mr. Jackson, and go to page 66.

17              So there we're seeing two sides of the same

18   transaction, correct?

19   A.  Yes.

20   Q.  Now on the right side, please, Mr. Jackson, Exhibit 539,

21   could you go to page 18.  And you can put that down.

22              You see that that money is transferred to Vaudoise

23   Assurances Holding?

24   A.  Can I see that it's transferred to --

25   Q.  Sure.  Can you blow that up?  I think you have to go a

I6K7GAL4                          Kendall - Cross

1     little bit bigger.  There you go.  Can you show us a little bit

2     more at the top on the 14th.

3               A little crooked, but you agree with me, would you

4     not, that that money is transferred on to Vaudoise?

5     A.  I see that transfer, yes.

6     Q.  And on the left side -- and you may have to take the

7     bubbles down, Mr. Jackson --

8               Other than the transfers to Vaudoise -- meaning the

9     $117,000 in direct wires to Vaudoise, and the $7 million or so

10    in checks that went through Wealth Assurance Holdings to

11    Vaudoise -- would you agree with me that there are no other

12    wires of more than $25,000 going out in November of 2014?

13    A.  To those places?

14    Q.  Excuse me?

15    A.  To those places?  Because there are other wires.

16    Q.  I'm sorry.

17    A.  There are other wires that went out in November.  I'm

18    asking you to clarify your question or repeat it.

19    Q.  I'm sorry.  So from the transactions that we are looking

20    at, from the dates of those transactions, when the big money

21    goes out directly and indirectly to Vaudoise, you agree with me

22    that there are no other wires that go out in excess of $25,000,

23    correct?

24    A.  To Vaudoise and Wealth Assurance out of the 8017 account

25    for this November.

I6K7GAL4                    Kendall - Cross

1   Q.  Out of the -- maybe I'm being confusing.

2              Can we just bring up 522 alone at page 66.

3              Thorsdale account, correct?

4   A.  Yes.

5   Q.  And my question is simply:  After the large amounts are

6   transferred directly and indirectly as we've just reviewed from

7   Thorsdale to Vaudoise, there are no wires greater than $25,000,

8   correct?

9   A.  After -- so after November 24?

10  Q.  After November 14.  Let's put it that way.

11  A.  After November 14, out of this account.

12  Q.  Correct.

13  A.  November 20 to Vaudoise, which is over $25,000.  I'm not

14  asking -- I'm not understanding what you want.

15  Q.  Here is my point.  We looked at the fact that the ending

16  balance of this account was about $107,000, correct?

17  A.  Yes.

18  Q.  And so based on the transaction activity that we have just

19  reviewed, the $600,000 that comes in on the 10th -- excuse me

20  that goes out on the 10th and returns -- and all the other

21  transfers, wouldn't you agree with me that at least $500,000 of

22  Rosemont Seneca Bohai's money ended up at Vaudoise?

23  A.  I'm sorry, I'm still not comfortable answering that

24  question without doing the analysis and working through it.

25  Q.  Let me just back up.  One of the accounting methodologies

I6K7GAL4                          Kendall - Cross

1    you can use to trace where money went is based on the balance

2    of an account, right?

3    A.  Yes.

4    Q.  For example, have you heard the term lowest intermediate

5    balance?

6    A.  No.

7    Q.  Never heard that?  If the balance on an account drops to a

8    certain level, you can say with some confidence that any

9    transfers that preceded it must have gone to certain places

10   depending on the transaction activity, true?

11   A.  I'm not -- I'm not able to answer that.

12   Q.  Well, let me say it this way.  There was only $117,000 in

13   the account at the end of the month, correct?

14   A.  Yes.

15   Q.  More than $600,000 had come in from Rosemont Seneca Bohai.

16   We saw that, correct?

17   A.  Yes.

18   Q.  In the interim basically all of the money went out directly

19   and indirectly to Vaudoise, correct?

20   A.  Which account are we talking about?

21   Q.  The Thorsdale account.  I'm only talking about the

22   Thorsdale account.

23   A.  And this is the Thorsdale account that's up here?

24   Q.  That's correct.

25   A.  There is money that went other places, so I guess that's

I6K7GAL4                        Kendall – Cross

1    why I'm confusing what you're saying as the only money that

2    went out.

3    Q.   Relatively small amounts of money went to other places,

4    correct?

5    A.   Relative to what?

6    Q.   OK.

7    A.   I just want to make sure I answer the question.

8    Q.   Why don't we pause here.  I will either take a lunch break

9    now, or I can move on to something else and we can return to

10   this a little bit later on.

11            THE COURT:  We can take our lunch break now.  That's

12   fine.  So, we will come back in approximately one hour.  Just

13   remember don't discuss the case and keep an open mind.  Thank

14   you.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I6K7GAL4                          Kendall - Cross

1          (Jury not present)

2          THE COURT:  Is there anything you want the witness to

3    look at over the lunch break?  Or no?

4          MR. SCHWARTZ:  It may be helpful to have simply a hard

5    copy of the Thorsdale records so that you can spend a little

6    bit more time with them, but other than that, no.

7          THE COURT:  OK.  So, no, but you're going to give her

8    something when we return?

9          MR. SCHWARTZ:  Or we can give a hard copy now.

10         MS. MERMELSTEIN:  Your Honor, I don't think it's

11   appropriate for Mr. Schwartz to assign the witness homework,

12   and I do think that it is --

13         THE COURT:  I agree with that.  I just meant that if

14   it would speed things up and put her in a better position where

15   she has the time to actually look at stuff, I'm just raising

16   it.  But I agree with you, I didn't think it was appropriate.

17   It was my idea; I was just trying to make things easier for the

18   witness.

19         MS. MERMELSTEIN:  I don't want to interrupt the way

20   Mr. Schwartz is conducting his examination, but we're getting

21   to a point where I think it's unfair to a witness to be

22   expecting a witness to do math in their head with all these

23   different entries and something on a screen.  It's not

24   realistic to expect a person to be able to do that.

25         So, I think fairness dictates that a witness have a

1   hard copy and the time to sort of make sure they're getting it

2   right.  Otherwise, you're asking someone to agree with

3   something when they say they can't, and you're suggesting,

4   well, they can't do it, but it's not really reasonable.

5           THE COURT:  I agree with that.  I think it's fair

6   impeachment.

7           MS. MERMELSTEIN:  I agree.

8           THE COURT:  But that's why I was suggesting and not

9   trying to assign work, but suggesting is there anything you

10  think would be helpful to have her look at.  Can we either get

11  copies of things to have in front of her?  But I agree with the

12  sentiment.

13          MS. MERMELSTEIN:  Yes.

14          THE COURT:  The question is how best to facilitate

15  that.

16          MS. MERMELSTEIN:  My own view is Mr. Schwartz should

17  have to give her a hard copy of whatever he is showing her, so

18  that she can have the whole statement, and not I'm blowing up

19  this and you can't cross reference.

20          THE COURT:  I think that's fair.

21          MS. MERMELSTEIN:  So that's my suggestion.

22          MR. SCHWARTZ:  I'm not sure we should be having this

23  conversation in front of the witness.

24          MS. MERMELSTEIN:  We can ask the witness to step out.

25          THE COURT:  Thank you.

I6K7GAL4                        Kendall - Cross

                    MR. SCHWARTZ:  Any time that's necessary, I'm happy to
        do it.  I'm trying not to kill more trees than are necessary.
        I'm often just showing one entry that's not controversial; it's
        in isolation; it doesn't rely on anything else.  This is really
        the only place where I'm sort of talking about the way balances
        work in the accounts.
                    MS. MERMELSTEIN:  Yeah, but it's impossible --
                    THE COURT:  I think it's fair to have hard copies and
        print them out.  I think in the scheme of all the trees that
        have been killed in the course of this case that, you know, we
        don't need to feel too bad about it.
                    MR. SCHWARTZ:  Sure.
                    THE COURT:  About this one issue.  So I think you
        should do that.
                    MS. MERMELSTEIN:  How much longer do you have?
                    MR. SCHWARTZ:  It depends if she starts having to page
        through a hundred pages of bank records, it's going to go very
        slowly.  He mean I have a few more separate areas that need to
        be addressed.
                    THE COURT:  OK.  So I don't think we got a firm
        answer.
                    MR. SCHWARTZ:  At least half an hour.
                    THE COURT:  OK.  So I will see you all.
                    MS. MERMELSTEIN:  Can we get an order for defense
        witnesses?  We are going to rest after this, so we would like

I6K7GAL4                        Kendall - Cross

1    to know who is coming up after this.

2            THE COURT:  So who is next?

3            MR. SCHWARTZ:  So we are going to begin by reading a

4    very few number of e-mails.

5            THE COURT:  And are those in dispute?

6            MR. QUIGLEY:  Well, they may be.

7            THE COURT:  Anyone who wants to sit down should sit

8    down, by the way.

9            MR. SCHWARTZ:  We can tell them the order, and then we

10   can talk about any disputes.

11           THE COURT:  So tell us the order first.

12           MR. SCHWARTZ:  So I think I may have to speak with

13   Ms. Harris.  We were planning to call Paul Atkins, but I know

14   that we have a scheduling issue with Professor Filler, so we

15   may have to flip them.

16           THE COURT:  So it's either going to be Atkins or

17   Filler first.

18           MR. SCHWARTZ:  Correct.

19           THE COURT:  OK.

20           MR. QUIGLEY:  So we got one set of exhibits last night

21   that Mr. Schwartz said he is going to introduce today, and then

22   at 1 a.m. today we got an e-mail from Ms. Harris saying

23   essentially these exhibits are coming in Thursday.  So based on

24   what I have reviewed so far, I can just give the Court the

25   exhibit numbers we have objections to.

I6K7GAL4                      Kendall - Cross

1        MR. SCHWARTZ:  There are only four we are going to

2   read today; it's the four that were in my e-mail.

3        THE COURT:  So what are the four?  Tell me the four,

4   and then at the end of the day tell me the rest.  Or tell me

5   them all now.  Because I also have a meeting over lunch.

6        MR. QUIGLEY:  1446, 2000, 2038, 2064, 2430, 4388,

7   4606, 4770, 4800, 4825, 4826, 4835, 4837 and 4839.  And our

8   objections are largely hearsay, your Honor.  I mean they are

9   e-mails by either the defendants or other people who are not

10   testifying at this trial, and they're clearly coming in for the

11   truth of the matter asserted.  There is one e-mail where Mr.

12   Archer writes somebody his biography essentially.

13        THE COURT:  So tell me the ones, those that you are

14   going to use today and tell me what your response is.

15        MR. SCHWARTZ:  The ones today are 4055.  Is that

16   objected to? -- so the four for today are 4055, 4719, 4332, and

17   4387.

18        And then I should say I guess there are two others

19   that we're not intending to read but that we will move in if we

20   get to our first summary witness.  I don't think that those

21   could be objectionable.  Those are 4388 and --

22        THE COURT:  4388 is one of the ones apparently there

23   is an objection to.

24        MR. SCHWARTZ:  And 2038.

25        THE COURT:  Yes, I think there is an objection to

I6K7GAL4                       Kendall - Cross

1     those two.  Those are the only two on the list.

2                    MS. MERMELSTEIN:  Are those for summary charts we have

3     already?

4                    MR. SCHWARTZ:  Yes.  So those two we're intending to

5     move in if we get there -- which I'm thinking we may not -- for

6     the first summary witness.

7                    And these, the objection is hearsay.  These are here

8     largely to authenticate the attachment, which are portions of

9     the letter that I reviewed with Ms. Moynihan yesterday that

10    they objected to not understanding where it came from, so

11    they're just to show where they come from.

12                   THE COURT:  I'm sorry.  It's another attachment of the

13    same letter, the same letter but with a different cover?

14                   MR. SCHWARTZ:  You recall yesterday I went over with

15    Ms. Moynihan four versions with the same document, and one was

16    the government had introduced which had no transmission

17    information; one was the unsigned version that came to her from

18    Andrew Godfrey where we put in the transmission; and the other

19    two I introduced just the attachments, so I just wanted to show

20    her the letter.  These simply show where they came from.

21    That's all it is.

22                   THE COURT:  All right.

23                   MR. QUIGLEY:  So 4332, this goes to the similar

24    objection to this.  This is an e-mail from Jon Burnham about

25    how the board's list of conditions is really ridiculous

I6K7GAL4                          Kendall – Cross

1    overkill.  I think that gets into similar issues as we talked

2    about yesterday in terms of Mr. Burnham's state of mind.

3              THE COURT:  Sorry.  I thought we were talking about

4    4388.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6KJGAL5                        Kendall - cross

1          THE COURT:  Mr. Schwartz, are we talking about 4388?

2          MR. SCHWARTZ:  That was a different one.  We have 2038

3    and 4388 go together and they're simply because the government

4    objected on authenticity grounds to the able to impeach.  This

5    is just to -- (Inaudible) -- and the other ones they have

6    substantive objections to, I am happy to talk about.  Two of

7    them are with Jon Burnham.

8          It is exactly the issue we had with Ms. Moynihan

9    yesterday and what we discussed was if there was reason to

10   believe Mr. Archer got the information, then it would be

11   relevant.  These are communications from Jon Burnham to Mr.

12   Archer, basically talking about the negotiations with the BIT

13   Board and all of that.  It is squarely responsive to what we

14   understood the parameters to be from yesterday.

15         THE COURT:  That is which exhibit?

16         MR. SCHWARTZ:  4332 and 4387.

17         MR. QUIGLEY:  So 2038, I think we have a hearsay

18   objection to the middle email in there.

19         THE COURT:  Can you you pull that up.

20         MR. SCHWARTZ:  I think it is present-sense impression,

21   but if they desperately want it to be redacted to read, we will

22   get done ASAP, that is fine.

23         THE COURT:  Okay.  We'll redact that.  That is 2038.

24   Then 4388?

25         MR. QUIGLEY:  4388, no objection.

I6KJGAL5                    Kendall - cross

1           THE COURT:  What?

2           MR. QUIGLEY:  No objection?  Okay.  Then so the other

3   two, did you, Mr. Quigley, have an objection to 4332 or 4387?

4           MR. SCHWARTZ:  The Jon Burnham ones.

5           MR. QUIGLEY:  Yes.  I think that gets into the issue

6   again we talked about yesterday in terms of Jon Burnham's state

7   of mind.

8           THE COURT:  Right, but if they're statements that Mr.

9   Archer saw, I think that was the discussion we had yesterday

10  that Mr. Schwartz has referenced.

11          MR. SCHWARTZ:  Here, for example, is 4332, this is a

12  communication from Mary Moynihan that gets forwarded to Mr.

13  Archer and Mr. Godfrey, with comments from Jon Burnham, and the

14  other exhibit is to similar effect.

15          MR. QUIGLEY:  I don't think Mr. Burnham's statement

16  this is really ridiculous overkill is relevant.

17          MR. SCHWARTZ:  It is totally relevant.

18          MR. QUIGLEY:  That gives him permission to lie to the

19  board, that Mr. Burnham thought this was ridiculous overkill,

20  that the representations didn't matter?

21          MR. SCHWARTZ:  He didn't lie, and I am going to prove

22  it was literally true.  Mr. Burnham was the chairman of the BIT

23  Board.  This is the chairman of the BIT Board saying the other

24  members of the board are going crazy and it is overkill, and

25  that goes directly to Mr. Archer's state of mind in these

I6KJGAL5                        Kendall - cross

conversations.

          THE COURT:  I think it is consistent with my ruling
yesterday that I am not going to allow in hearsay about what
Burnham said unless it was forwarded to Archer, unless it is
something that Archer saw.  I am going to allow this in, but I
am happy to give a limiting instruction.

          MR. QUIGLEY:  4387.

          MR. SCHWARTZ:  87.

          MR. QUIGLEY:  4387.

          MR. SCHWARTZ:  This is the same thing, a string
between Mr. Burnham and Mr. Archer, talking about the state of
play with the BIT Board.

          MR. QUIGLEY:  This gets into her fees.  Your Honor
sustained an objection to this yesterday.

          MR. SCHWARTZ:  I don't know why.  I didn't want a
sidebar because I try not to take the jury's time, but there is
nothing really objectionable about getting into the fact that
one of the deal points, including in many, many of the exhibits
the government introduced, was that the investor group led by
Mr. Archer pay the fees, and then here that is part of the
discussion.

          THE COURT:  What is the relevance of the fees?

          MR. SCHWARTZ:  It goes to the relationship between the
parties.  Look, this illustrates the fact that Mr. Burnham
believed and expressed to Mr. Archer that the independend

1    trustees were being ridiculous and were being extortionate.

2    That is a significant framing concept for the course of

3    negotiations.

4            The government got in all sorts of information about

5    their side of the story.  This is the side of the story I feel

6    like I should have been able to explore more yesterday, but

7    within the spirit of it's ruling, this is something Mr. Archer

8    saw at the time and informed what was in his head when he made

9    the representations a month and a half, less than a month and a

10   half later the government contends are lies.  In fairness, it

11   needs to be introduced.

12           MR. QUIGLEY:  The issue whether the representations

13   are true or not what Ms. Moynihan's fees are.  I don't see how

14   those two things are connected.  He thought she was getting

15   paid too much, so it is okay to lie.

16           MR. SCHWARTZ:  Yesterday the issue was only what was

17   in Mr. Archer's head and not anyone else.  This is what was in

18   Mr. Archer's head.

19           MR. QUIGLEY:  It is not connected to what the issue

20   was, his representations about Jason Galanis.

21           MR. SCHWARTZ:  The issue was the agreement which was

22   not just about one thing, but which was about many things

23   between the investor group and the BIT Board.

24           THE COURT:  Let me think about her fees and I'll let

25   you know.  Is this coming in early in the day?

I6KJGAL5                        Kendall - cross

1          MR. SCHWARTZ:  The first thing we will do in our case

2     would be read four emails.

3          THE COURT:  I will let you know if I think these need

4     to be redacted in any way.  I have already ruled that 4832 can

5     come in, but let me just think about this.

6          MS. MERMELSTEIN:  On the record, your Honor, as your

7     Honor knows, defense counsel has refused to provide their

8     summary charts which are going to be used tomorrow, has put the

9     government in a crunch.  The witness for whom is on the stand,

10    we are not going to talk to her on cross-examination, so we

11    would like them now.  If they're not in the courtroom, we would

12    like them when the court day ends today.

13         THE COURT:  I have ruled you should get them today.

14         MS. MERMELSTEIN:  They say we are going to get them at

15    the end of the day, and we get them at 1:00 o'clock in the

16    morning.

17         MR. SCHWARTZ:  We'll give it to you the second she is

18    off the stand.

19         MS. MERMELSTEIN:  Just so that is clear.

20         THE COURT:  Good.  Thank you.

21         (Luncheon recess)

22         (Continued on next page)

23

24

25

I6KJGAL5                          Kendall - cross

 1              AFTERNOON SESSION

 2              2:00 pm

 3              (Trial resumes)

 4              (In open court; jury not present)

 5              THE COURT:  Everyone can be seated.  Are we ready for

 6    the jury?

 7              MS. MERMELSTEIN:  Yes, your Honor.

 8              THE COURT:  We'll start to bring them in.

 9              MS. TEKEEI:  I don't think we decided on 955 yet, but

10    as long as there is a chance for us to put it in, we can rest

11    today.  I just didn't want to lose track of that one issue.

12              MR. SCHWARTZ:  Just to be clear, it has been moved

13    into evidence and is pending a ruling.

14              MS. TEKEEI:  That is exactly right.

15              THE COURT:  Why don't you pull up 955 for a minute

16    while we're waiting for the jury.

17              (Pause)

18              MR. SCHWARTZ:  Just to remind you, the government

19    wants to say there was a meeting with Mr. Archer on the 25th.

20    I believe they want to say this is the meeting.  The problem is

21    it is impossible because the only Wealth Assurance board that

22    Mr. Archer was a part of was the Wealth Assurance Holdings

23    board.

24              THE COURT:  You can't hear?

25              MR. SCHWARTZ:  The only Wealth Assurance entity board

                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

I6KJGAL5                        Kendall - cross

1    that Mr. Archer was ever a part of was Wealth Assurance

2    Holdings, and we know that the other board members included

3    Hugh Dunkerley, who was never in the same place as Mr. Archer

4    at the same time.  That couldn't possibly be what this is.

5            There were a number of meetings, as you sort of saw in

6    part through the text messages the government read, that

7    Michelle Morton may have had on March 25th.  This only adds

8    confusion and no substance.

9            MR. QUIGLEY:  I think, Judge, a couple of things.

10           Number one, it is very indicative and relevant to Ms.

11   Morton's state of mind in entering into the Atlantic

12   acquisition which closed a week later and in buying the

13   Wakpamni bonds which closed, the fourth tranche which closed

14   two weeks after that.

15           The idea she met with the chairman of the board of

16   Wealth Assurance and two board members, it is clear from the

17   text messages we read in she had multiple meetings that day.

18   People in ordinary email conversations differentiate between

19   Wealth Assurance Holdings and AG.

20           She is saying she met with people who were financial

21   backers.  She understood she would get operating capital, which

22   she did get shortly after she placed the Wakpamni bonds.  It is

23   relevant to show her state of mind in going forward with the

24   buy, which is the purchase of Atlantic, and her understanding

25   that she would get additional operating capital from her

I6KJGAL5                        Kendall - cross

1   financial backers to do that.

2            MR. SCHWARTZ:  For those points, they have already

3   made that point crystal clear a number of times.  They read a

4   text this amongst Michelle Morton that said to Jason Galanis

5   basically this is why you want to do this deal.  I have no

6   choice to do what you want me to do and put the bonds where you

7   want me to put them.  That is in evidence, right?

8            That point is made, which they say is relevant to the

9   same point is far less probative on that point and adds a whole

10  lot of confusion by making a suggestion that somehow Mr. Archer

11  was part of this conversation when he was not.

12           MR. QUIGLEY:  The email or text Mr. Schwartz referred

13  to is prior to the Hughes acquisition.

14           (Jury present)

15           THE COURT:  You may be seated.

16  CROSS-EXAMINATION continued

17  BY MR. SCHWARTZ:

18  Q.  Mr. Jackson, do we have the screen back.  Good afternoon,

19  Agent Kendall.

20           When we broke for lunch, we were discussing the

21  closing balance of the Thorsdale account in November 2014.  Do

22  you recall that?

23  A.  Yes.

24  Q.  I want to hand you a physical copy of Exhibit 522 which are

25  the Thorsdale records that you looked at.

I6KJGAL5                          Kendall - cross

1    A.  Thank you.

2    Q.  Mr. Jackson, you can bring up on the screen Exhibit 522.

3           So you turn to the November 2014 statement which, Mr.

4    Jackson, is Page 63 of the PDF, and Agent Kendall, is the page

5    with the Bates stamp ending 265 at the bottom.

6    A.  Yes.

7    Q.  Got it?

8    A.  Yes.

9    Q.  We talked about this.

10          This shows the ending balance in November 2014 for the

11   Thorsdale Fiduciary & Guaranty Company account at Chase was a

12   little bit more than $107,000, correct?

13   A.  Yes.

14   Q.  So by definition, all of the money that had been in that

15   account went someplace else by the end of the month except for

16   that $107,494.00, true?

17   A.  Yes.

18   Q.  Now, if you turn the page, you see the deposit from Crone

19   Kline on November 14th, the $600,513.00 deposit?

20   A.  Yes.

21   Q.  You recall we talked about how that is the same money that

22   was wired to Rosemont Seneca Bohai on November 10th, 2014,

23   right?

24   A.  Yes.

25   Q.  If you turn to Page 4 of 6 in the statement, which is PDF

I6KJGAL5                    Kendall - cross

1    Page 66 of the exhibit, Mr. Jackson, these are the electronic

2    withdrawals from the Thorsdale account, correct?

3    A.  Yes.

4    Q.  We discussed how on November 20th and 24th, there were two

5    wires to the Vaudoise and one for a little more than a hundred

6    thousand dollars, and one for a little bit more than $17,000,

7    correct?

8    A.  Yes.

9    Q.  Those are the ones that are reflected on your chart,

10   correct?

11   A.  Yes.

12   Q.  We also talked about how there were at the bottom of the

13   page, checks or transfers that went to Wealth Assurance

14   Holdings, correct?

15   A.  Yes.

16   Q.  And that money was then transferred on from Wealth

17   Assurance Holdings to Vaudoise, correct?

18   A.  Yes.

19   Q.  So if you back out of that, Mr. Jackson, and just expand

20   the transfers that are on or after November 14th, so other than

21   the transfers that we just talked about, the two wires directly

22   to Vaudoise and the two transfers that went through Wealth

23   Assurance Holdings to Vaudoise, are there any other outgoing

24   wires for more than $25,000 in the month of November 2014?

25   A.  No.

I6KJGAL5                          Kendall - cross

1   Q.  As we saw, the closing balance for November 14 for

2   Thorsdale account was $107,000, correct?

3   A.  Yes.

4   Q.  So would you agree with me that of the $600,513.00 that was

5   returned to Thorsdale from Rosemont Seneca Bohai via Crone

6   Kline, at least $500,000 ended up at Vaudoise?

7   A.  500,000?  We're looking at transfers for 1-17.  I am sorry

8   that I don't follow where the 500,000 --

9   Q.  I am rounding.  I am taking the difference between the

10  600,500 whatever dollar transfer and ending balance, right?

11  A.  And the ending balance, okay.  If you take it from that,

12  yes, okay, that is the difference, approximately $500,000.

13  Q.  And that money must have ended up in Vaudoise, correct?

14          Is it easier, if you're hung up on the numbers, is it

15  fair to say at least hundreds of thousands of dollars that came

16  back into Thorsdale from Rosemont Seneca Bohai ended up in

17  Vaudoise?

18  A.  I show 117 that went directly as a debit from the

19  statement.

20  Q.  Right.  There was 117,000 directly from Thorsdale to

21  Vaudoise, correct?

22  A.  Yes, yes.

23  Q.  And then there was a little bit more than 7 million

24  indirectly to Vaudoise?  That is at the bottom of the page,

25  correct?

I6KJGAL5                         Kendall – cross

1    A.  Yes, that was to the Wealth Assurance other account.

2    Q.  To Wealth Assurance Holdings, and then the very next day to

3    Vaudoise, we looked at the Wealth Assurance Holdings account

4    record.  Do you recall that?

5    A.  Yes.

6    Q.  And so counting all of that as ending up at Vaudoise, would

7    you agree with me at least hundreds of thousands of dollars

8    that was returned to Thorsdale from Rosemont Seneca Bohai

9    through Crone Kline ended up at Vaudoise?

10   A.  I believe it did.  I am unable to see this and I prefer to

11   have things where I can see.  I feel like I have sort of put

12   this together, but I believe we went overall of them.

13           MR. SCHWARTZ:  Now, Mr. Jackson, can we go back to

14   Exhibit 8012, at Page 6.  Now that we've fixed this one up.  I

15   offer Defense Exhibit 8012.

16           MS. MERMELSTEIN:  Objection.

17           THE COURT:  I am sorry.  Clarify for me what has

18   changed here?

19           MS. MERMELSTEIN:  May we do this at sidebar, your

20   Honor?

21           THE COURT:  Yes, sure.

22           (Continued on next page)

23

24

25

I6KJGAL5                    Kendall - cross

1                    (At sidebar)

2                    THE COURT:  I don't have an understanding how many

3       you're going to do.  This is the corrected version?

4                    MR. SCHWARTZ:  This is the end of this, of her slide.

5                    THE COURT:  Right.

6                    MR. SCHWARTZ:  Then there is one more that I will

7       change like this and then there are other errors I'll put out.

8       Look, she is a summary witness.  Her summary charts were

9       incorrect.  I have elicited testimony to correct them, and I am

10      entitled to offer that as a summary chart as well.  It fairly

11      summarizes her testimony.

12                   MS. MERMELSTEIN:  I don't think it fairly summarizes

13      her testimony.  They're not incorrect.  That is misleading.

14      We'll do that on redirect.  She said yeah, I think you're

15      right, but I am not comfortable with doing this in this

16      fashion, so he hasn't gotten her to be -- he can call someone

17      to say they have done it and take her model and change it.

18                   I don't think that she has adequately felt comfortable

19      saying on the fly put up this and this, yep, this is right.

20                   MR. SCHWARTZ:  She said she is not comfortable.  I

21      want to be clear about one thing.  I have not changed anything

22      to reflect this last conversation about the money to Vaudoise.

23      All this is, it is the same thing I showed her before I got

24      into this where we removed Rosemont Seneca Bohai and changed

25      Wealth Assurance to -- and that reflects this part

I6KJGAL5                        Kendall - cross

double-counting issue she is uncertain of.

          MS. MERMELSTEIN:  We should do this on redirect.  I
don't think what Mr. Schwartz is saying is incorrect is
incorrect.  I don't think she said that on cross-examination.
She was very clear -- I won't say what I -- I don't think he is
right.

          THE COURT:  See what she says.  Ask her.

          MR. SCHWARTZ:  She has agreed that this is accurate.

          We walked through the backing of $100,000, the
$600,503.00.  She agrees there are transfers, and that money
did not end up at Rosemont Seneca Bohai.  I don't feel like I
need to ask her the open question, you know, tell me what you
think about this version of the chart.  If they want to ask it
on redirect, they can.  This chart is now an absolutely
accurate chart.

          THE COURT:  Ask her that question.

          MS. MERMELSTEIN:  It is not.  She said no, this chart
shows debits and credits, money in and out.  It was accurate as
it was done in the first instance because it is not purporting
to show profit.  It is purporting to show debits in and out.
Taking the debits out to just show Rosemont Seneca Bohai is, in
fact, not at all accurate.  She hasn't said that is true.

          She has agreed with him that the money went like this,
and she is not agreeing the chart, which is meant to show
credits and debits, is inaccurate.  Taking out one of them

I6KJGAL5                          Kendall - cross

1     makes it inaccurate.  I don't think there is a foundation for

2     putting it in on this record.

3                THE COURT:  I will leave it to her to decide if this

4     is an accurate summary chart.  You can ask her and then I will

5     decide.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6KJGAL5                          Kendall - cross

1              (In open court)

2    BY MR. SCHWARTZ:

3    Q.  Mr. Jackson, can we go back to Page 1 of this slide,

4    Defense Exhibit 8012.  Again you can publish this as a

5    demonstrative aid to the jury for now.  I just want to recap

6    what we have done.  This is the first page, this one we just

7    changed the sticker from government exhibit to defense exhibit.

8              Then stepping to Page 2, please, Mr. Jackson, we just

9    changed Wealth Assurance to WAPCC to differentiate the

10   different Wealth Assurance entities?

11             THE COURT:  Is there --

12             MS. MERMELSTEIN:  Is there a question here?

13             THE COURT:  Ask one question at a time to confirm.

14   BY MR. SCHWARTZ:

15   Q.  This is accurate, correct?

16   A.  Yes.

17   Q.  Then stepping to the next page, Mr. Jackson, we backed out

18   the $100,000 which we agreed was returned, correct?

19   A.  Yes, it is still a debit out of the Thorsdale account.

20   Q.  Right, but if this reflects, as you testified on direct,

21   where the money ended up, you agree with me that that hundred

22   thousand dollars did not end up --

23             MS. MERMELSTEIN:  Objection.

24   Q.  -- to Rosemont Seneca Bohai?

25             MS. MERMELSTEIN:  Objection to mischaracterizing what

I6KJGAL5                          Kendall - cross

1   is the testimony.  That is not what she said.

2            THE COURT:  Why don't you rephrase the question.

3   BY MR. SCHWARTZ:

4   Q.  Isn't it true the $100,000 that we talked about before did

5   not end up at Rosemont Seneca Bohai?

6   A.  That is true, yes.

7   Q.  And stepping to the next slide, and the next, the

8   $600,503.00 also did not end up at Rosemont Seneca Bohai,

9   correct?

10  A.  Yes.

11           MR. SCHWARTZ:  I offer Defense Exhibit 8012.

12           MS. MERMELSTEIN:  The same objection.

13           THE COURT:  Is this a fair and accurate summary, would

14  you say?

15           THE WITNESS:  No.

16           THE COURT:  Why?

17           THE WITNESS:  Because the categories to the right of

18  Thorsdale show the debits out of the account.  Those are

19  debits, so now you're effectively, that debit is now taken out

20  and doesn't show it was a debit for the account.

21  BY MR. SCHWARTZ:

22  Q.  Didn't we discuss just a moment ago that the debits-out

23  aren't accurate, either, because you double-counted dollars?

24  A.  No.

25           MS. MERMELSTEIN:  Objection.

I6KJGAL5                          Kendall - cross

1           THE COURT:  I'll allow the answer.

2    BY MR. SCHWARTZ:

3    Q.  Well, this chart reflects the $117,000 to Vaudoise we

4    talked about a second ago, correct?

5    A.  Yes.

6    Q.  It also reflects $8,384,500 to Wealth Assurance Holdings,

7    correct?

8    A.  Yes.

9    Q.  And part of that $8,384,500.00 were the two checks that we

10   just talked about a second ago, correct?

11   A.  Yes.

12   Q.  And we just agreed that at least hundreds of thousands of

13   dollars of those two categories was the same as the money you

14   had attributed to Rosemont Seneca Bohai, true?

15   A.  This shows the debits out of the account.  Those were

16   debits out of the account.

17   Q.  Right.  So by counting every dollar, every debit without

18   regard to the substance of the transactions or what came in,

19   you have double-counted dollars, as we just discussed, true?

20   A.  There are also deposits in the account.

21   Q.  Sure, but that is why we looked at the ending balance for

22   November 2014, and we were able to agree that this chart

23   between the Wealth Assurance Holdings line and the Vaudoise

24   line is including dollars that you had to depicted as going to

25   Rosemont Seneca Bohai, true?

I6KJGAL5                        Kendall - cross

1            MS. MERMELSTEIN:  Objection.  This has been asked and

2       answered and asked and answered.

3            THE COURT:  I'll allow it.

4       A.  These are debits out of the account.  That's what -- this

5       is the outflow out of the account.  They're the debits out of

6       the account.

7       BY MR. SCHWARTZ:

8       Q.  Let's talk about something else for a little while, okay?

9       You can take this down.  Mr. Jackson, can we have Agent

10      Kendall's Exhibit 4011.  Can you go to Page 4.  This is the

11      last page of this chart that you prepared, true?

12      A.  Yes.

13      Q.  You know what is wrong about this, right?

14      A.  No.

15      Q.  Can we swap this for Defense Exhibit 8011.  I'll represent

16      to you it is exactly the same except I've stuck a defense

17      exhibit sticker on it, okay?

18            All right.  You see that you have depicted a wire for

19      $903,000 from U.S. Bank WLCC to Rosemont Seneca Bohai, correct?

20      A.  Yes.

21      Q.  And you have sort of going to the left -- this is on

22      everyone's screens -- going off to the left, you have the words

23      "wire reversed" written in connection with wires to Burnham

24      Securities and to VL Assurance, correct?

25      A.  Yes, the wires are reversed from Rosemont Seneca Bohai.

I6KJGAL5                          Kendall - cross

```
1    Q.  The wire was reversed, right?

2    A.  Yes.

3    Q.  Not in this way, true?

4    A.  It was reversed out of the RSB account.  I don't know

5    what -- what do you mean?

6    Q.  Let me show you Exhibit 301 in evidence, which is the

7    Rosemont Seneca Bohai bank statement.  This is one of the

8    exhibits you relied upon in preparing the chart we just looked

9    at, correct?

10   A.  Yes.

11   Q.  Mr. Jackson, can we go to Page 190 of this exhibit.

12          If you look on the first entry in October 1st, you can

13   blow that up and you see there is a wire in for $903,000,

14   correct?

15   A.  Yes.

16   Q.  Now, Mr. Jackson, can you turn the page.  On October 12th,

17   there is a cash adjustment with a comment REV incoming wire in

18   the same amount, correct?

19   A.  Yes.

20   Q.  That is October 12th, true?

21   A.  Yes.

22   Q.  You are aware from your work, are you not, that the wire on

23   the 1st for $903,000 that came into Rosemont Seneca Bohai was a

24   mistake that Morgan Stanley made, true?

25   A.  Based on the reversal, I would agree, yes.
```

I6KJGAL5                        Kendall - cross

1   Q.  Not just based on reversal; based on other things you

2   reviewed, too?

3   A.  Yes, I am sorry, yes.

4   Q.  It was just a mistake, correct?

5   A.  Yes.

6   Q.  In fact, that money never should have been sent to Rosemont

7   Seneca Bohai in the first place, correct?

8   A.  Yes.

9   Q.  When the wire was reversed, that was an internal correction

10  at Morgan Stanley to fix their mistake, right?

11  A.  Can we go back to the other slide for a moment, my slide?

12  Q.  Of course.  Can we go back to Exhibit 8011, please.

13          So you have depicted a transfer of $903,000 from U.S.

14  Bank to Rosemont Seneca Bohai on October 1st, correct?

15  A.  Yes.

16  Q.  And then you have also depicted wires from Rosemont Seneca

17  Bohai to Burnham Securities and VL Assurance, dated October

18  1st, correct?

19  A.  Yes.

20  Q.  But that is not what happened, true?

21  A.  Those were deposited into those accounts.

22  Q.  Not from Rosemont Seneca Bohai?

23  A.  No.

24  Q.  Right.  You have not depicted the reversal of the wire on

25  the 12th, correct?

I6KJGAL5                         Kendall - cross

1  A.  I did not put the date on there, no.

2  Q.  What really happened was money went from from U.S. Bank to

3  Morgan Stanley, true?

4  A.  Yes.

5  Q.  Morgan Stanley mistakenly credited it to Rosemont Seneca

6  Bohai, true?

7  A.  Yes.

8  Q.  Morgan Stanley fixed their mistake about two weeks later

9  and retroactively credited wires to Burnham Securities and VL

10  Assurance, true?

11  A.  Yes.

12  Q.  And recorded those transfers as have come, as they ought to

13  have been, from U.S. Bank to Burnham Securities and VL

14  Assurance, true?

15  A.  I show the deposits in the Burnham Securities and VL

16  Assurance account on those dates.

17  Q.  Well, shall we look at some records?  Would that be easier?

18  A.  Sure.

19  Q.  Let me first show you Exhibit 4523 just for the witness,

20  the lawyers and Judge Abrams.

21       You recognize this to be internal communications

22  within Morgan Stanley about this mistake, true?

23  A.  I am sorry.  I have not seen this.  I will need to read it.

24  Q.  I am sorry?

25  A.  I have not seen this.  I need to read it.

I6KJGAL5                    Kendall - cross

1   Q.  Please do.  Would you like a hard copy?

2   A.  No, thank you.

3   Q.  Mr. Jackson, you might want to start at Page 3 -- actually,

4   Page 6.

5   A.  (Pause)

6   Q.  Just focusing on the bottom half there, you agree with me

7   this concerns the mistaken wire, correct?

8   A.  I think on the next page had some detail about the

9   accounts, and that looked correct.

10  Q.  Let's look at those.

11         MR. SCHWARTZ:  I offer Exhibit 4523.

12         THE COURT:  Any objection?

13         MS. MERMELSTEIN:  No.

14         THE COURT:  It will be admitted.

15         (Defendant's Exhibit 4523 received in evidence)

16  BY MR. SCHWARTZ:

17  Q.  Mr. Jackson, if you can publish Defense Exhibit 4523 and

18  let's just stick on Page 6.  Can you please read the email at

19  the bottom of the page from Lisa Budnichuk.

20  A.  Please reverse payment to incorrect client today and then

21  we can wait for the outcome of the dollar sign discrepancy.

22  Also, the payment instructions at the agent need to be updated

23  so that future payments are not wired with a reference to this

24  client account.

25  Q.  Now, Mr. Jackson, can you go to Page 1 of this exhibit.

I6KJGAL5                          Kendall - cross

1          Can you read the email at the top of the page from

2     Andrew Gott.

3     A.   Thanks for clarifying.  So end result is this:  We need to

4     debit account 654-031823 for the $903,000 wire that was book to

5     their account.

6          Then I need to credit account 654-032278, $156,520.00

7     on 2.6 MM and credit account 654-032073, 746, 480 on 12.4 MM.

8     I will make those adjustments today.

9     Q.   And the date on this is October 12th, 2015, correct?

10    A.   Yes.

11    Q.   That is the same date that the wire was actually reversed

12    on the Rosemont Seneca Bohai records we looked at a moment ago,

13    correct?

14    A.   Yes.

15    Q.   By the way, there are a lot of Morgan Stanley people on

16    this email, correct?

17    A.   Yes.

18    Q.   And no one that is not Morgan Stanley, true?

19    A.   Yes.

20    Q.   Now, in this email where Mr. Gott is referring to a credit

21    of $156,500.00 and a credit of $746,480, those two account

22    numbers and amounts correspond to transfers to Burnham

23    Securities and VL Assurance, correct?

24    A.   Transfers in those amounts occurred in those accounts.  I

25    would have to see the statement to confirm the account numbers.

I6KJGAL5                         Kendall - cross

1    I don't remember them off the top of my head.

2    Q.   Those are the amounts that are reflected in your chart as

3    going to Burnham Securities and VL Assurance, correct?

4    A.   Yes.

5    Q.   Those wires to Burnham Securities and VL Assurance, they

6    don't come from Rosemont Seneca Bohai, correct?

7    A.   They don't.

8    Q.   Let's look at Exhibit 308.  This is a bank statement for VL

9    Assurance Bermuda Limited, correct?

10   A.   Yes.

11   Q.   This is one of the statements that you relied upon in

12   preparing your chart, true?

13   A.   Yes.

14   Q.   Can we go to Page 40, please, Mr. Jackson.

15           First of all, you would agree with me there are no

16   transactions with Rosemont Seneca Bohai reflected on this page,

17   correct?

18   A.   That is correct.

19   Q.   I can hand you a hard copy, we can flip the pages, but you

20   would agree with me there are no transactions with Rosemont

21   Seneca Bohai on this statement, true?

22   A.   Yes, true.

23   Q.   Now, you do see there, however, the October 1st wire for

24   $746,480.00, correct?

25   A.   Yes.

1    Q.  And that's the wire you reflect on your chart, correct?

2    A.  Yes.

3    Q.  The description on that is Wakpamni Lake, correct?

4    A.  Yes, yes.

5    Q.  And then underneath that, I N T on 12.4 MM, correct?

6    A.  Yes.

7    Q.  And that matches the email we looked at a second ago,

8    right?

9    A.  It does.

10   Q.  Now let's look at Exhibit 327, which are the Burnham

11   Securities bank statements.  This is another exhibit that you

12   relied upon in making your chart, correct?

13   A.  Yes.

14   Q.  Can we go to page -- actually, can we show next to each

15   other 40 and 41 here.  This is the cash activity for October

16   2015, right?

17   A.  Yes.

18   Q.  And again there is no transaction of any kind with Rosemont

19   Seneca Bohai here, correct?

20   A.  Correct.

21   Q.  On October 1st, the second entry there is the deposit of

22   $156,520.00 that is reflected on your chart, correct?

23   A.  Yes.

24   Q.  And the description of where that money came from also is

25   Wakpamni Lake, right?

1    A.   Yes.

2    Q.   Underneath that it says, I N T on 2.6 MM, right?

3    A.   Yes.

4    Q.   And that matches Andrew Gott's email we looked at a second

5    ago, right?

6    A.   Yes.

7    Q.   One of the other things you relied upon in preparing this

8    slide was a spreadsheet that was prepared by Morgan Stanley,

9    right?

10   A.   I don't recall.

11   Q.   Can we show I think only to the witness, the lawyers and

12   Judge Abrams Exhibit 380.

13          MS. MERMELSTEIN:   It is in evidence.

14          (Inaudible)

15   BY MR. SCHWARTZ:

16   Q.   So this is one of the documents you relied upon in

17   preparing your chart, correct?

18   A.   I have seen this document, yes.

19   Q.   You understand this is something that was produced by

20   Morgan Stanley, correct?

21   A.   Yes.

22   Q.   The first page of this chart shows the reversal of the

23   $903,000 that we just discussed, correct?

24   A.   Yes.

25   Q.   If we go to Page 2, that shows the wires to VL Assurance

I6KJGAL5                         Kendall - cross

1   and Burnham Securities which showed up on the account

2   statements as of October 1st, correct?

3   A.  Yes.

4   Q.  But what this chart reflects is that consistent with Andrew

5   Gott's emails, these adjustments were actually made internally

6   at Morgan Stanley on October 12th, correct?

7   A.  Yes.

8   Q.  So Morgan Stanley basically back-dated the transaction by

9   twelve days in order to make it the way it ought to have been,

10  true?

11  A.  To October 1st, 2015, yes.

12  Q.  From October 12th, 2015 to October 1st?

13  A.  Yes.

14  Q.  So let's now go back to Exhibit 8011.

15          Now, we just reviewed the fact that the wire to RSB

16  was reversed, correct?

17  A.  Yes.

18  Q.  And on the account statements of Burnham Securities and VL

19  Assurance, it reflects transfers in from Wakpamni Lake,

20  correct?

21  A.  Yes.

22  Q.  And we also looked at the fact that there are no transfers

23  of any kind in October 2015 between Rosemont Seneca Bohai and

24  Burnham Securities, correct?

25  A.  Yes.

I6KJGAL5                          Kendall - cross

1    Q.  And there were also no transfers of any kind between

2    Rosemont Seneca Bohai and VL Assurance in October 2015,

3    correct?

4    A.  Yes.

5    Q.  And yet you still chose to show the money flowing through

6    Rosemont Seneca Bohai before it went to Burnham Securities and

7    VL Assurance.  Isn't that right?

8    A.  Yes.

9    Q.  But you've always known that the $903,000 went back to

10   WLCC, correct?

11   A.  I did not see a reversal or I don't recall seeing a

12   reversal back to U.S. Bank WLCC.

13   Q.  Well, you always knew that there were no transfers between

14   Rosemont Seneca Bohai and either Burnham Securities or VL

15   Assurance in October 2015, correct?

16   A.  Yes.

17   Q.  And you knew that this was not a fair way to present this

18   information, true?

19            MS. MERMELSTEIN:  Objection.

20            THE COURT:  Sustained.

21   BY MR. SCHWARTZ:

22   Q.  You knew that this was not an accurate way to present this

23   information, true?

24            MS. MERMELSTEIN:  Objection.

25            THE COURT:  I'll let you answer that.

I6KJGAL5                        Kendall - cross

1    A.  I realize now that because I didn't show a transfers from

2    U.S. Bank WLCC, I wanted to show that the wire was reversed out

3    of RSB, and maybe there is a better way, another step that I

4    missed.

5    Q.  There is a better way, and you knew that, right?

6                MS. MERMELSTEIN:  Objection.

7                THE COURT:  Sustained.

8    BY MR. SCHWARTZ:

9    Q.  Let me show the witness, the lawyers and Judge Abrams what

10   has been marked as 3517-5.  Can we go to Page 67.

11               You've seen this, correct?

12   A.  Yes.

13               MR. SCHWARTZ:  I offer 3517-5, Page 67.

14               MS. MERMELSTEIN:  Objection.

15               THE COURT:  Is this something you relied on in

16   creating your chart?  Is this something you saw but did not

17   incorporate?

18               THE WITNESS:  I don't recall a purpose for this chart,

19   like my circle would have been to confirm that amount.  I don't

20   recall using it for any purpose.

21               THE COURT:  All right.  I am not going to let it in.

22   BY MR. SCHWARTZ:

23   Q.  Well, you reviewed a chart that accurately depicted the

24   $903,000 as returning because of Morgan Stanley's mistake from

25   Rosemont Seneca Bohai to WLCC, correct?

I6KJGAL5                          Kendall - cross

1               MS. MERMELSTEIN:  Objection.

2               THE COURT:  I'll allow that.  Are you talking about

3      this chart?

4               MR. SCHWARTZ:  I am.

5               THE COURT:  I am just going to ask the question that I

6      asked again.  Did you review this chart when you were creating

7      your charts?

8               THE WITNESS:  I have seen it, yes.

9               THE COURT:  Do you know if you saw it before the

10     creation of the chart that you utilized?

11              THE WITNESS:  I don't recall.

12              THE COURT:  Okay.  You can follow up the specific

13     questions, Mr. Schwartz.

14     BY MR. SCHWARTZ:

15     Q.  You reviewed a version of your chart that accurately

16     depicted the $156,000 payment going from WLCC to Burnham

17     Securities rather than through Rosemont Seneca Bohai, true?

18     A.  This, if I remember correctly at this time, I was still

19     piecing together the parts of the transaction.  So it was a

20     work.  I don't recall at this time what I thought that I knew.

21     Q.  We have just agreed that there were no wires that went from

22     Rosemont Seneca Bohai to VL Assurance and Burnham Securities,

23     Incorporated in October 2015, correct?

24              MS. MERMELSTEIN:  Objection, your Honor.

25              THE COURT:  Overruled.

I6KJGAL5                    Kendall - cross

1    A.  Yes, we have.

2    Q.  In the course of your work in preparing to testify today,

3    you reviewed a chart, a draft of the chart that I guess someone

4    else prepared that accurately depicted the payments going to

5    Burnham Securities and VL Assurance from WLCC, correct?

6    A.  This was a work product.  I don't recall seeing a wire

7    reverse back to the U.S. Bank WLCC account.

8            I think at that time -- I don't know that it was

9    accurate.  I don't know if it I was better.  I created charts,

10   I created charts that I thought I explained or I thought that

11   showed what happened.

12   Q.  Who created this chart?

13   A.  This was part of my work product, too.

14   Q.  You created this chart?

15   A.  I worked with the prosecutors on this.  This is very

16   similar to what we have shown, and we show that 746 there.

17            MR. SCHWARTZ:  I offer 3517-5, at Page 67.

18            MS. MERMELSTEIN:  The witness said she does not

19   believe this was accurate, so there is no basis for its

20   admission.

21            THE COURT:  Just to clarify, what is not accurate

22   about this?

23            THE WITNESS:  At that time I don't remember knowing

24   where -- like I said, I was trying to piece together the

25   transactions in the account and where they went, and it wasn't

I6KJGAL5                          Kendall - cross

1    as clear that it came out of U.S. Bank WLCC, so I wasn't

2    sure --

3              THE COURT:  But now looking at this chart, do you

4    think it is accurate?

5              THE WITNESS:  I think the wire was reversed.  I'd have

6    to look at U.S. Bank statement again to see if it went back

7    there in order to say that part was accurate.  You know --

8              THE COURT:  Why don't we show --

9              THE WITNESS:  That is the part --

10             THE COURT:  That is fine.

11   BY MR. SCHWARTZ:

12   Q.  We know this was an internal adjustment at Morgan Stanley,

13   correct?

14   A.  Right, yes.

15   Q.  We know that you created a version of your chart that

16   accurately did not reflect payments going from RSB, Rosemont

17   Seneca Bohai to Burnham Securities or VL Assurance, correct?

18   A.  Yes.

19   Q.  And you created a version of your chart that accurately

20   reflected that those transfers went to Burnham Securities and

21   VL Assurance from U.S. Bank?

22             MS. MERMELSTEIN:  Objection.

23             THE COURT:  Is that an accurate statement?

24             THE WITNESS:  I don't recall seeing transfers directly

25   out of U.S. Bank WLCC to VL Assurance or Burnham Securities.

I6KJGAL5                          Kendall - cross

1   BY MR. SCHWARTZ:

2   Q.  Agent Kendall, didn't we just look at the bank statement

3   for VL Assurance?

4   A.  Yes.

5   Q.  It showed a transfer-in from WLCC, correct?

6   A.  Not from the U.S. Bank account.

7   Q.  From Wakpamni Lake, correct?

8   A.  Right, but it didn't have a bank account on there.

9   Q.  But you know from looking at the Morgan Stanley records

10  that that was the $903,000 that came came from U.S. Bank,

11  right?

12          THE COURT:  Is there something you feel you need to

13  look at to assess whether this other chart is accurate?

14          THE WITNESS:  Well --

15          THE COURT:  I know it is hard on the spot to look at

16  something and assess if it is accurate in its entirety.  Is

17  there something else you want to look at to make that

18  determination?

19          THE WITNESS:  I would like to look at the U.S. Bank

20  WLCC statement for that time period.

21  BY MR. SCHWARTZ:

22  Q.  Well --

23  A.  I don't think it would have been accurate to leave that

24  arrow from U.S. Bank WLCC.  Do I think that maybe there may be

25  another way or something I could have added to show that part

I6KJGAL5                      Kendall - cross

1    of the transaction?  It is possible.

2    Q.  Look, let's go back to your chart, 8011.

3              MS. MERMELSTEIN:  Your Honor, the witness has asked to

4    see the U.S. Bank statement.  Perhaps she should be allowed to

5    see it.

6              MR. SCHWARTZ:  Which exhibit is it?

7              MS. MERMELSTEIN:  Government Exhibit 645.

8              THE COURT:  Pull it up for the witness, the lawyers

9    and myself and see if it refreshes your recollection.

10             MS. MERMELSTEIN:  It is in evidence, your Honor.

11             THE COURT:  There you go, so everyone can see it.

12             (Pause)

13             MR. SCHWARTZ:  Mr. Jackson, can you pull up for the

14   witness, the lawyers and Judge Abrams, Exhibit 645 and page

15   forward to the October 1st, 2015 transaction.  Go back one.

16   No.  You were there.  Right there.  Blow up the bottom two

17   entries.  If you want to blow up the one two above that.

18   BY MR. SCHWARTZ:

19   Q.  That says, "cash disbursement."  That didn't help?

20   A.  Correct.  That is why I didn't want to say the money went

21   directly from WLCC to Rosemont Seneca Bohai -- I am sorry -- VL

22   Assurance.

23   Q.  The one thing, if we can take that down and go back to

24   Agent Kendall's chart, Exhibit 8011, the one thing that we have

25   absolutely disagreed upon is that this money did not go through

I6KJGAL5                          Kendall - cross

1    Rosemont Seneca Bohai -- you can put this up.

2              THE COURT:  Disagreed or agreed?

3              MR. SCHWARTZ:  I want to make sure it is up.

4              THE COURT:  Okay.

5    BY MR. SCHWARTZ:

6    Q.  The one thing that we agree upon is that this $903,000

7    absolutely did not go through Rosemont Seneca Bohai on its way

8    to Burnham Securities and VL Assurance, correct?

9    A.  Correct.

10   Q.  Can you go to the next page of this slide, please, Mr.

11   Jackson.  That depicts what happened, correct?

12   A.  I agree.

13   Q.  And can we go one more.  Really that depicts what happened

14   because that was just a mistake, the $903,000 to Rosemont

15   Seneca Bohai, correct?

16   A.  It was a mistake, and I thought we would show where the

17   money went, to make sure that the jury had that information.

18   Q.  Of course, you were taking instructions from the

19   prosecutors on how this would be presented?

20   A.  Yes.  However, I interpreted things myself as well, so.

21              (Continued on next page)

22

23

24

25

1              MR. SCHWARTZ:  I offer 8011.

2              MS. MERMELSTEIN:  Your Honor, same objection as

3     before, to hold off until after redirect.

4              THE COURT:  I'm going to allow 8011.

5              But go back to the last one right before this.  Do you

6     think -- which of the two do you think is more accurate?

7              WITNESS:  So, my problems with either of these is that

8     I wasn't able to show the transfers directly, the wire reverse

9     back into the U.S. Bank account.  There is no entry for that,

10    and then there was no entry outbound for the correction.  It

11    happened, as defense counsel showed, at Morgan Stanley.

12             So, I don't -- I think that to show that the money did

13    not come from RSB, I agree that this is a better reflection.

14    But it didn't necessarily come direct from U.S. Bank but by a

15    note written by Morgan Stanley of where it was from.

16             THE COURT:  OK.

17             WITNESS:  So I don't know if that made it more clear.

18             THE COURT:  All right.

19             So this one you feel uncomfortable about because it's

20    coming from and going directly to U.S. Bank.

21             WITNESS:  In that the bank statement doesn't reflect

22    that, but maybe if there was a box that said Morgan Stanley

23    correction or something like that, that may have --

24    Q.  But the next one is correct, right?

25    A.  But this one again, the 903,000 that comes out of U.S.

I6K7GAL6                        Kendall - Cross

1    Bank, again if there is maybe something else indicating that

2    note.

3    Q.  If we write Morgan Stanley at that little juncture where it

4    splits?

5              MS. MERMELSTEIN:  Objection.

6              THE COURT:  Look, I mean I'll admit the chart, but I

7    think that, you know, you should put an asterisk about the

8    Morgan Stanley note to reflect Agent Kendall's testimony.

9              MR. SCHWARTZ:  Sure.  And we should probably do the

10   same to the government's exhibit.

11             THE COURT:  You can leave the government exhibit alone

12   for now.

13             MS. MERMELSTEIN:  Thank you, your Honor.

14             THE COURT:  But you can use your exhibit and make it

15   consistent with Agent Kendall's testimony.

16             MR. SCHWARTZ:  Thank you.

17             (Defendant's Exhibit 8011 received in evidence)

18   Q.  Can we bring up your chart, Exhibit 4015.  We talked about

19   this for a second at the beginning, but this chart purports to

20   show that money from Valorlife principally was used to purchase

21   260 West Broadway, correct?

22   A.  Yes.

23   Q.  Now, in your work you relied on a number of different

24   things including bank records that we've just looked at,

25   correct?

I6K7GAL6                        Kendall - Cross

1    A.  Yes.

2    Q.  And wire advice records, correct?

3    A.  Yes.

4    Q.  And other communications demonstrating the purpose of

5    wires, correct?

6    A.  Yes.

7    Q.  Isn't it correct that the purpose of the wire from

8    Valorlife to the Wolff Law Firm was to purchase WLCC bonds?

9    A.  I don't recall that.

10   Q.  Mr. Jackson, can you show for the witness, the lawyers and

11   Judge Abrams Exhibit 4824.

12        You see this is a December 9, 2014 e-mail from someone

13   at Valorlife to a number of people?

14        MS. MERMELSTEIN:  Objection to reading from the

15   document not in evidence, your Honor.

16        MR. SCHWARTZ:  I'm just identifying what it is.

17        MS. MERMELSTEIN:  The witness has never seen it, so I

18   don't see how that's relevant.

19        THE COURT:  So let's just confirm if the witness has

20   seen this.

21        WITNESS:  No, I have not seen this.

22   Q.  This was not something you were shown, true?

23   A.  True.

24   Q.  Can we turn to page 3 of this document, and if you could

25   sort of blow up the substance there.

I6K7GAL6                      Kendall - Cross

1            You would agree with me, however, that this document

2       describes the transaction that is depicted on your chart,

3       correct?

4       A.   The dollar amount was slightly different but it's the same;

5       it's for approximately the same amount and the same date.

6       Q.   And you know from your experience that sometimes there are

7       minimal wire fees that are extracted, correct?

8                MS. MERMELSTEIN:  Objection.

9                THE COURT:  Overruled.

10      A.   I can't speak to wire fees.

11      Q.   You don't know anything about wire fees?

12               THE COURT:  Sustained.

13               MR. SCHWARTZ:  I offer Exhibit 4824.

14               MS. MERMELSTEIN:  Objection.

15               THE COURT:  Sustained.  She has never seen it.

16      Q.   They never showed you this, 4824?

17      A.   No, I have not seen this document.

18      Q.   You can take that down, and let's go back to the chart

19      then.

20               Now, we have talked about a number of your charts, and

21      at the beginning you said that you had verified all of the work

22      and were confident that it was all exactly correct rounded to

23      the nearest dollar, correct?

24      A.   Rounded and -- yes, yes.

25      Q.   Do you still think that?

I6K7GAL6                           Kendall - Cross

1   A.  I would say more that some were approximate because, for

2   example, the 112,000 I don't remember if it was just a dollar

3   that it was rounded to, so...

4   Q.  And that's why you have that little wavy sign, the tilde

5   that means about?

6   A.  In that case, yes.

7   Q.  But where you have things down to pennies, that's supposed

8   to be accurate to the penny, correct?

9   A.  Yes.

10  Q.  And when you have things to the whole dollar without a

11  tilde, that's supposed to be rounded to the nearest dollar,

12  correct?

13  A.  I can't remember specifically.  I know that that was -- I

14  believe it is, yes.

15  Q.  So, this exhibit, Government Exhibit 4015, shows a wire

16  from the Wolff Law Firm to Freedom Land Title Agency, correct?

17  A.  Yes.

18  Q.  And the amount of the wire on your chart is $3,202,345.11.

19  Correct?

20  A.  Yes.

21  Q.  This is one of the ones that's right to the penny, correct?

22  A.  I believe so, yes.

23  Q.  Mr. Jackson, can you show the witness Exhibit 654 and go to

24  page 9.  And if you can blow up the second transfer from the

25  bottom.

1          That shows that $3,202,345.11 transfer, correct?

2    A.  Yes.

3    Q.  Now, as of yesterday your chart read $3,202,245.11,

4    correct?

5    A.  A previous version read that, yes.

6    Q.  Up until yesterday, true?

7    A.  I'm not sure when you had it.  I know I corrected it last

8    weekend.

9    Q.  And that's because you were constantly examining and

10   reevaluating the material that was in your testimony, correct?

11   A.  I double check numbers.  I discovered that number was

12   wrong.

13   Q.  And you wanted to make sure that you were exactly right,

14   correct?

15   A.  I made that attempt everywhere I could.

16   Q.  Because precision matters in these things, true?

17   A.  It matters, yes.

18   Q.  And what we're doing is serious, correct?

19   A.  Yes.

20          MS. MERMELSTEIN:  Objection, your Honor.

21          THE COURT:  Sustained.

22   Q.  Let me last show you Exhibit 4010.  And if you could go to

23   the last page of this slide, please, Mr. Jackson.

24          This is titled "interest payment on the first bond

25   series," correct?

I6K7GAL6                        Kendall - Cross

1    A.  Yes.

2    Q.  And by the way, do you have an understanding from your

3    review of records that Thorsdale or Thorsdale Fiduciary and

4    Guaranty Company is an entity associated with Jason Galanis?

5    A.  I do, yes.

6    Q.  And this box, the orange one at the top left, says Devon

7    Archer.  Do you see that?

8    A.  Yes.

9    Q.  And this is the only place where you've written Devon

10   Archer instead of RSB, correct?

11   A.  Yes.

12   Q.  And that's because this is the only place in all of the

13   transactions that you reviewed where there was a transaction

14   involving an account in Mr. Archer's name as opposed to in the

15   name of Rosemont Seneca Bohai, correct?

16   A.  Yes.  I believe that wire referenced the name.  I'd have to

17   check the statement, but yes.

18   Q.  It came from a City account in the name of Devon Archer,

19   true?

20   A.  I remember the name Devon Archer on the statement.

21   Q.  And this reflects a total of $1,812,000 going into Wealth

22   Assurance, correct?

23   A.  Yes.

24   Q.  And before that there was virtually nothing, $2,000,

25   correct?

I6K7GAL6                          Kendall - Cross

1   A.  Yes.

2   Q.  And, by the way, Wealth Assurance here means Wealth

3   Assurance Private Client Corporation, correct?

4   A.  Yes.

5   Q.  And most of the money coming out during this time period,

6   the first two days of September 2015, goes to the WLCC account

7   at U.S. Bank, correct?

8   A.  Yes.

9   Q.  But $240,000 of it goes to Thorsdale, correct?

10  A.  Yes.

11  Q.  So $250,000 went from Mr. Archer to Wealth Assurance,

12  correct?

13  A.  Yes.

14  Q.  And $240,000 went from Wealth Assurance to Thorsdale,

15  correct?

16  A.  Yes.

17  Q.  So am I right in saying that another way to express what

18  happened here is that $250,000 went from Mr. Archer, and Jason

19  Galanis put it in his pocket?

20          MS. MERMELSTEIN:  Objection, your Honor.

21          THE COURT:  Sustained.

22          MR. SCHWARTZ:  Thank you, Agent Kendall.

23          THE COURT:  Any additional cross-examination?

24          MR. HASSEN:  Yes, your Honor.

25          THE COURT:  OK.

I6K7GAL6                          Kendall – Cross

1    CROSS EXAMINATION

2    BY MR. HASSEN:

3    Q.  Good afternoon, Agent Kendall?

4    A.  Good afternoon.

5    Q.  I'm Abraham Hassen, and I represent Bevan Cooney over here.

6    Give me one second.

7            So, referring to the charts you made, the government

8    exhibits that we have been going over this afternoon, you

9    personally made all of these, right?

10   A.  I did make them.  I did participate in making them, yes.

11   Q.  You participated in making them.

12   A.  Yes.

13   Q.  And for the process of making these charts it's fair to say

14   you reviewed a lot of documents.

15   A.  I did.

16   Q.  Hundreds?

17   A.  Hundreds of pages.

18   Q.  Hundreds of pages?  Maybe thousands of pages?

19   A.  I'm not sure.

20   Q.  But it's fair to say throughout this case from your

21   experience there are millions of documents.

22            MS. MERMELSTEIN:  Objection.

23            THE COURT:  I'll allow it.

24            If you know.

25   A.  I don't know how many documents are involved in this case.

I6K7GAL6                        Kendall - Cross

1  Q.  You don't know.  But you know generally the process of this

2  kind of case.

3          MS. MERMELSTEIN:  Objection, your Honor.

4          THE COURT:  Sustained as to "this kind of case".

5  Q.  You know generally how to investigate and prosecute a fraud

6  case.

7          MS. MERMELSTEIN:  Objection.

8          THE COURT:  I'll allow that.

9  A.  I am an investigator, so I generally know how to

10  investigate cases.

11  Q.  And you understand that to get the documents that you later

12  reviewed, you subpoena various entities and various people and

13  get documents in return.

14          MS. MERMELSTEIN:  Objection, your Honor.

15          THE COURT:  I will allow that. you can answer that.

16  A.  Yes, I know you subpoena to get documents.

17  Q.  And you don't use all of those documents.  You don't need

18  all of those documents, but someone reviews them.

19  A.  Yes.

20  Q.  And there is a process of filtering from a lot of documents

21  to fewer documents.

22          MS. MERMELSTEIN:  I renew my objection to this, your

23  Honor.

24          THE COURT:  I will allow that.

25  A.  Yes, there is review of the documents.

1    Q.  And at each step you make choices of which you think are

2    relevant and which you don't.

3          MS. MERMELSTEIN:  Your Honor, I think that this really

4    an improper line of questioning with general respect to how a

5    case is investigated.

6          THE COURT:  I'll give a little bit of leeway, but

7    let's try and focus on something.

8          MR. HASSEN:  I'll get right to it.

9          THE WITNESS:  Can you repeat your question, please.

10   Q.  The question was there is a filtering process to filter

11   from the lots of documents that you have subpoenaed to a

12   smaller number that you're focused on.

13   A.  Yes.

14   Q.  And you are continuing that filtering process by choosing

15   which documents you are going to use in your charts to show to

16   us today.

17   A.  I was presented the exhibits for these charts.  I didn't

18   review many other documents for this.  I wasn't part of that

19   part of the investigation.

20   Q.  But it's fair to say you didn't put everything you reviewed

21   in the charts; you also made choices to whittle down what you

22   put in the charts.

23   A.  Yes, there are certain transactions, say, that aren't

24   depicted on these charts, so in that way maybe there is

25   something such as the fees that we've gone over that I didn't

1    include on the charts but were part of the documents.

2    Q.  Thank you.  And in the case of the charts specifically

3    related to Bevan Cooney, you reviewed his bank statements.

4    A.  Yes.

5    Q.  From CNB, City National Bank.

6    A.  I would have to see the bank statement again.  I don't

7    recall the bank.  I'm sorry.

8    Q.  But you reviewed his bank statements.

9    A.  I did review bank statements of Bevan Cooney, yes.

10   Q.  And those bank statements showed lots of transactions going

11   in and out.

12   A.  Yes.

13   Q.  And you picked some to put on the chart, and you didn't put

14   others.

15   A.  Yes.

16   Q.  You also reviewed documents from Bevan Cooney's management

17   firm that managed all of his money, Fulton Management.

18   A.  I don't recall.

19           THE COURT:  Is this something that's in evidence?

20           MR. HASSEN:  Yes.

21           THE COURT:  OK.

22           MR. HASSEN:  Well, first let me just show the witness

23   a copy of one of the charts.

24           THE COURT:  Is this in evidence?

25           MR. HASSEN:  This is a photocopy, so it's black and

I6K7GAL6                    Kendall - Cross

1    white, but it's a version of the chart, so I just want to make

2    sure that she --

3            THE COURT:  Is it in evidence or not?

4            MR. HASSEN:  Yes, the chart itself is in evidence.

5            THE COURT:  The exhibit itself.  Son then you can put

6    it up.

7    Q.  So, this is the last page of 4005.  So you're familiar with

8    this document?

9    A.  Yes, I am.

10   Q.  If we could go to the last page.  And if we look at the

11   bottom it shows the exhibits that you reviewed for this

12   particular chart.

13   A.  Yes.

14   Q.  And one of those is 412.

15           JUROR:  Excuse me, your Honor.  A juror needs a

16   bathroom break.

17           THE COURT:  All right.  Oh, it's already 3:15.  Why

18   don't we take our afternoon break now.  Thank you for letting

19   me know, and we will be back shortly.

20           (Continued on next page)

21

22

23

24

25

I6K7GAL6                         Kendall - Cross

1            (Jury not present)

2            THE COURT:  We can take our break.  I am going to let

3    955 in, not for the truth of the matter but to show her state

4    of mind.  I don't know if it's too late for an instruction, but

5    that's my ruling on 955.

6            Is there anything else you are waiting on with respect

7    to the government case?  I think not.  All right.  So we will

8    take a break.

9            (Government Exhibit 955 received in evidence)

10           (Recess)

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  You can be seated.  Thank you.

3          You may proceed.

4          MR. HASSEN:  Thank you, your Honor.

5   DAYNA KENDELL, resumed.

6   CROSS-EXAMINATION (Continued)

7   BY MR. HASSEN:

8   Q.  Going back to the last page of 4005, in your preparation of

9   the chart you reviewed Government's Exhibits 3274 and 412.

10  A.  Yes.

11  Q.  And those were e-mails from Alexis Gluckman -- or to Alexis

12  Gluckman at Fulton Management.

13  A.  I don't recall.  I would have to see the exhibit to

14  confirm.

15          MR. HASSEN:  Could I get Exhibit 412, please.

16  A.  Yes, that is from Alexis Gluckman.

17  Q.  And that's an e-mail about the transfer of the bond, which

18  is part of the chart.

19  A.  Yes.

20  Q.  And if we look at 3274, that's instructions for

21  transferring the bond.

22  A.  Yes.

23  Q.  And it wasn't Bevan Cooney transferring the bond.

24  A.  He provided the information.

25  Q.  He provided the information to his manager Alexis Gluckman.

I6K7GAL6                        Kendall - Cross

1    A.  Yes, he provided the information to transfer.

2    Q.  And so let me go back to the Elmo, please.

3              THE COURT:  Who is controlling the Elmo?

4              MR. QUIGLEY:  We are.

5              THE COURT:  OK, thanks.

6              DEPUTY COURT CLERK:  Do you want the Elmo?

7              MR. HASSEN:  Yes, please.

8              DEPUTY COURT CLERK:  And this is for everyone.

9              MR. HASSEN:  Yes.

10   Q.  So, in this particular transfer at least it's fair to say

11   that Alexis Gluckman was negotiating the transfer between

12   parties.

13             MS. MERMELSTEIN:  Objection, your Honor.

14             THE COURT:  Yes, sustained.

15   Q.  You saw from the e-mail that the instructions were given to

16   Alexis Gluckman and by Alexis Gluckman for the transfer of the

17   bonds.

18   A.  Yes, he provided instructions to transfer the bond.

19   Q.  So it's fair to say that Alexis Gluckman -- it wasn't Bevan

20   Cooney directly transferring that bond; Alexis Gluckman was

21   part of that process.

22             MS. MERMELSTEIN:  Objection.

23             THE COURT:  Sustained.

24   Q.  So, looking at this chart, this chart actually holds --

25   this actually is doing two different things.  It's showing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I6K7GAL6                         Kendall - Cross

1    money flows on one side and a bond transfer on the other.

2    A.  Yes.

3    Q.  I'll draw a line here, because those are two very different

4    types of transactions.

5    A.  Yes.

6    Q.  Money flows were referenced by you through bank statements.

7    A.  Yes.

8    Q.  And the bond transfer through e-mails.

9    A.  If that's a question, no, actually there are statements

10   from Bevan Cooney's account to Bonwick, I believe, for the

11   bonds.  I'd have to double check the exhibits here, but I

12   believe I checked a Bonwick statement.

13   Q.  So what is referenced on here is Exhibit 412 that I

14   previously showed you, Exhibit 3274 which I showed as well.

15   There is no other -- there is no other exhibit regarding the

16   bond transfer.

17   A.  My recollection was that there was a statement.  I can

18   check all of these exhibits to make sure.

19   Q.  OK.  Let's just start from the beginning.  Can we have

20   Exhibit 512.  All right, let's skip to 330.  So this is what

21   you're referring to as the Morgan Stanley Bonwick statement.

22   A.  Yes.

23   Q.  But this wasn't the only document you relied on to document

24   the bond transfer.  This just shows that Morgan Stanley

25   received the bond.

I6K7GAL6                          Kendall - Cross

1    A.  Yes.  If you could go through the statement to show that

2    transaction.

3    Q.  Sure.

4    A.  So there is the $5 million transferring into the account of

5    Wakpamni Lake for the bonds.

6    Q.  On 5/29, right?

7    A.  Yes.

8    Q.  And the instructions for that were sent from Alexis

9    Gluckman to Bevan Cooney.  Rather, the instructions were

10   sent -- Alexis Gluckman in Exhibit 412 reports to Bevan Cooney

11   the process of transferring the bond.

12   A.  I don't know who -- that's what it appears on that e-mail.

13   I don't know who Alexis Gluckman is or this role.  I can see

14   that Bevan Cooney provided instruction and an account number.

15   Q.  Yeah.  And then the process of transferring a bond -- this

16   was not an electronic transferable bond, right?

17   A.  I don't know the answer to that.  I saw the transfer occur

18   on the statement.

19   Q.  But you saw on Exhibit 412 that Steve Shapiro was involved

20   in transferring the bond?

21   A.  I see an e-mail from him.

22   Q.  From Steve Shapiro.  And the proof of the actual

23   transfer --

24              If we could get 2093, page 2.

25              This is the actual transfer document of the bond?

I6K7GAL6                         Kendall - Cross

1    A.  That's the bond power document, yes.

2    Q.  If we could blow up the signature guaranteed region.  There

3    is a medallion guaranteed by City National Bank.

4    A.  I can almost make that out but it's very unclear.

5    Q.  It's signed by --

6    A.  It is a medallion guarantee.

7    Q.  It's signed by Steve Shapiro at City National Bank to

8    transfer bond power.

9    A.  OK.

10   Q.  So going back to the last page of 4005.  On October 6

11   $5,050,000 goes into Mr. Cooney's account from Thorsdale?

12   A.  Yes, that's what happened.

13   Q.  And then on the 9th, 5 million goes to U.S. Bank.  Right?

14   Correct?

15   A.  Yes.

16   Q.  And those transactions are documented through Exhibit 432.

17   A.  And a couple of --

18   Q.  Yeah.  For each transfer it's fair to say that there is

19   going to be an output on one bank and an input on another,

20   right?

21   A.  I attempted to show that everywhere, yes.

22   Q.  So there is multiple sources for each transaction because

23   there is multiple banks.

24   A.  Yes.

25   Q.  So 432 -- if we could get 432 -- shows CNB Bank transfers

I6K7GAL6                          Kendall - Cross

1  starting January 2014.  And if we could go to the second page

2  and ending October 2015.  Is that right?

3  A.  Yes.

4  Q.  And so all the transfers in Bevan Cooney's account in the

5  charts you made are reflected in this document; is that right?

6  A.  The $5,050,000.

7  Q.  The $5,050,000.

8  A.  Yes, it is.

9  Q.  And all of the rest of them as well.

10  A.  Sure, yes, there are other transactions.

11  Q.  We can get back to that as we go through the other charts.

12        If we could get back to 4005, the last page.

13        So, as we discussed earlier, the solid arrows are bank

14  transfers, correct?

15  A.  Yes.

16  Q.  And those bank transfers are one to one.

17  A.  Cash transfers, yes.  Well, one to one in that one

18  transaction?  What do you mean?

19  Q.  The bank transfer, for example, from Thorsdale to Bevan

20  Cooney's account doesn't say that the money came from Wealth

21  Assurance before it went to Thorsdale.

22  A.  Correct.

23  Q.  Because that's how money works, right?  That's how money

24  works.  It's not -- there is no name on money.

25        MS. MERMELSTEIN:  Objection.

I6K7GAL6                        Kendall - Cross

1          THE COURT:  Sustained.

2    Q.  Needless to say, it's one to one the transfer.

3          MS. MERMELSTEIN:  Objection to form, your Honor.  I

4    don't know what that means.

5          THE COURT:  Sustained.

6          Why don't you rephrase that.

7          MR. HASSEN:  It's OK, I'll withdraw it.

8    Q.  Let's move on to 4007.  Can we go to the last page, please.

9    So this is documenting what you've labeled as bond proceeds to

10   Vaudoise, correct?

11   A.  Yes.

12   Q.  And as far as Bevan Cooney is concerned here, there is

13   $100,000 on November 10, $3.8 million on November 12, and both

14   of those transactions go out November 12 and November 13.

15   A.  Yes.  The same amount of money leaves Bevan Cooney's

16   account on those dates.

17   Q.  Thank you.  And this $100,000 Thorsdale to Cooney is also

18   reflected on another chart; is that right?

19   A.  I believe that amount is included on another chart, yes.

20   Q.  And so basically this money was in there for a couple days,

21   and then it went out for real estate transaction.

22   A.  Yes.

23   Q.  And again for this you reviewed e-mails between Bevan

24   Cooney and Alexis Gluckman.

25   A.  I reviewed an e-mail from Bevan Cooney, yes.

I6K7GAL6                        Kendall - Cross

1    Q.  If we could get 3224.

2            So you would agree that the money that went in and

3    went out was for a real estate purchase on behalf of Bevan

4    Cooney.

5    A.  That's what was indicated in that first line on that

6    e-mail.

7    Q.  And you used it as a source for your chart.

8    A.  Yes.

9    Q.  And if we could go -- if we could just look at that first

10   line, Bevan Cooney said to classify that as a loan.

11   A.  To open escrow for a real estate purchase.

12   Q.  And it says incoming wire was a loan.  Right?

13   A.  Yes.

14   Q.  And if we look at 3225, again it's Alexis Gluckman doing

15   the wiring.

16   A.  From what appears to be Bevan Cooney's direction, yes.

17   Q.  But it's fair to say that every transaction Bevan Cooney

18   does is through Fulton Management.

19           MS. MERMELSTEIN:  Objection.

20           THE COURT:  Sustained.

21   Q.  In your exhibits.

22           MS. MERMELSTEIN:  Objection.

23           THE COURT:  Well, she doesn't know; she just reviewed

24   documents.  Right?

25   Q.  In the exhibits used for the charts you made --

I6K7GAL6                          Kendall - Cross

1              THE COURT:  OK.  Why don't you rephrase the question.

2              MR. HASSEN:  OK.

3    Q.  Is it fair to say that in the specific e-mail exhibits for

4    Bevan Cooney that you used to make the charts, they all involve

5    Alexis Gluckman?

6    A.  These exhibits, yes, they involved Alexis Gluckman.

7    Q.  So let's move on to 4009.  Now, this shows $75,000 from

8    Wealth Assurance to Bevan Cooney, right?

9    A.  Yes.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  This shows $75,000 from Wealth Assurance to Burnham, right?

2   A.  Yes.

3   Q.  And again it is not listed here as a source, but this

4   transaction can be found on Exhibit 432, correct?

5   A.  I can't recall what 432 is.

6   Q.  How about if I gave you a copy of 432.

7            MR. HASSAN:  May I approach?

8            THE COURT:  Yes.

9            (Pause)

10  BY MR. HASSAN:

11  A.  I can't recall the exact date of this transaction, so --

12  Q.  Look around, it would be the April 24th.

13  A.  Yes, I see that.

14  Q.  On April 24th, there was a transfer of $75,000 from Wealth

15  Assurance Private Client?

16  A.  Yes.

17  Q.  For this chart you just picked a very narrow time-frame and

18  showed one transaction, right, concerning Bevan Cooney?

19  A.  This was in relation to the time period of the third bond

20  series, yes, we picked those dates.

21            (Multiple voices).

22  Q.  A very narrow focus?

23  A.  As a cutoff, yes.

24  Q.  Going back to looking at 432, this is one transaction among

25  many, and this is just showing a small part of it?  And as we

I6KJGAL7                         Kendall - cross

1    saw in the other exhibits, the other transactions from other

2    exhibits are from other charts are on 432?

3              MS. MERMELSTEIN:  Objection to the form of that

4    question.

5              THE COURT:  Sustained.

6    BY MR. HASSAN:

7    Q.  Exhibit 432 shows many transactions?

8    A.  Yes.

9    Q.  And it shows all of the transactions that are on your

10   charts that involve Bevan Cooney's account?

11             MS. MERMELSTEIN:  Objection to form.

12             THE COURT:  Sustained.

13   BY MR. HASSAN:

14   Q.  Let's just go and move on and we'll come back to that in a

15   second.

16             So let's look at 4012.  Again this is an narrow time

17   period of -- not super-narrow, a period of August 2014 to

18   October 30, 2015, correct?

19   A.  Yes.

20   Q.  And this shows money going, those $5.5 million going into

21   Bevan Cooney's account?

22   A.  $5,557,000 was transferred out from Thorsdale is what is

23   depicted on this chart.

24   Q.  All of these transactions can be seen in Exhibit 432?

25             MS. MERMELSTEIN:  Objection to the form of that

I6KJGAL7                        Kendall - cross

1    question.

2    BY MR. HASSAN:

3    Q.  Let's go into how you calculated this number.  You

4    calculated this 5.57 -- $5.557 million by adding up the

5    transfers into Bevan's account from Thorsdale?

6    A.  I used Thorsdale's bank account to see the outgoing

7    transactions to Bevan Cooney as referenced in those

8    transactions.  I did not use 432 for this chart.

9    Q.  You didn't look at his account?

10   A.  I did not.

11   Q.  When you were cross-checking, you just looked at one

12   account?

13   A.  I looked at, this was for debits out of Thorsdale's account

14   based on what that statement said.

15   Q.  You're saying now you didn't cross-check that account to

16   see that the money was received?

17   A.  No.  I used the bank statements on Thorsdale to see where

18   the debits went on that account, so I used these statements,

19   and the debits that are listed there.

20   Q.  So let's go through those.  If we could go to -- you have

21   522 in fron of you, in front of you, right?

22   A.  I do.

23   Q.  If we can go to 522, Page 22.

24   A.  I don't have that ability, so I'll have to -- month and

25   date?

I6KJGAL7                          Kendall - cross

1   Q.  8-28.

2   A.  I have located it.

3   Q.  There is a transfer of a hundred thousand, right?

4   A.  Yes.

5   Q.  And 9/08?

6   A.  I have located it.

7   Q.  And 10/06?

8   A.  Yes.

9   Q.  And 11/06?

10   A.  Yes.

11   Q.  And 11/10?

12   A.  Located it.

13   Q.  And 1-13-2015?

14   A.  Okay.

15   Q.  And 2-04?

16              THE COURT:  Sorry?

17              (Off-the-record discussion)

18   BY MR. HASSAN:

19   Q.  3-25, which is Page 97, about in the middle.  Confirm that

20   one.

21   A.  I see it.

22   Q.  And 10-04, Page 104, 4-21, and Page 113, 5-22, and Page

23   122?

24              MS. MERMELSTEIN:  Is there a question?

25              THE COURT:  I don't know.  Is there?

I6KJGAL7                          Kendall - cross

1              MR. HASSAN:  Yes, I guess I want to -- let me

2       approach.  I want to give a spreadsheet calculating all of

3       these deposits or transfers.

4              THE COURT:  Do you want to do that with the witness on

5       the defense case?  I am happy to see you at sidebar.

6              MR. HASSAN:  Okay.

7              (Off-the-record discussion)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6KJGAL7                          Kendall - cross

1                (At sidebar)

2                THE COURT:  I am fine with you impeaching charts she

3      created with her which I allowed Mr. Schwartz to do.  If you

4      are trying to introduce your own chart, I don't expect her on

5      the fly while this jury is sitting here waiting to add

6      everything up.  You can call your own summary witness on your

7      case.

8                MR. HASSAN:  I want --

9                THE COURT:  What is the goal here?

10               MR. HASSAN:  I want to verify where that number came

11     from and she didn't agree that it can be calculated from his

12     bank account statement.  I offered Exhibit 432 because it has

13     his bank account, but she didn't agree that that was how she

14     calculated it.  I was going to show her this just to show the

15     numbers add up.  That was the point.

16               MS. MERMELSTEIN:  She said on the Thorsdale account

17     and the outliers are out, and you can look at the other side,

18     she said she didn't.  You can make her a spreadsheet and say

19     these numbers -- no one can possibly do that on the fly.  It is

20     not reasonable.

21               THE COURT:  If you want to ask her what she relied on,

22     numbers she used in the chart, feel free to do so.

23               MR. QUIGLEY:  She answered that question a few minutes

24     ago.

25               MS. NOTARI:  There are things on this spreadsheet she

I6KJGAL7                        Kendall – cross

1    didn't put in her chart.  It is very relevant.  We need --

2             THE COURT:  Ask her specifically if she relied on

3    specific things to the extent you haven't asked already.  Let's

4    not ask her to do calculations on the fly or admit separate

5    summary charts through her.

6             MS. MERMELSTEIN:  She did map by taking all outliers

7    out.  If you will say here is a different document that

8    purports to have all the Cooney wires incoming and outgoing,

9    isn't the --

10             THE COURT:  Listen to this.

11             MS. MERMELSTEIN:  My concern is what you're about to

12   do is this, which is what I think you're doing, she added up

13   all the wires out of Thorsdale.  That is the number.

14             On 423 is a different document that has all wires in

15   and out of Cooney's accounts, so theoretically shouldn't that

16   add up to the same number?  Why don't you add it up for us on

17   the fly and admit it is different.

18             MS. NOTARI:  We are not doing that.

19             (Continued on next page)

20

21

22

23

24

25

I6KJGAL7                      Kendall - cross

1              (In open court)

2    BY MR. HASSAN:

3    Q.  So if we can go back to 522.  Needless to say, you are

4    quite familiar with this document?

5    A.  Yes.

6    Q.  I'll stop torturing.  If we can go to Page 128.  At the top

7    there, the first three -- let me get one more, please.  (Pause)

8              What are those?

9    A.  They're deposits from Bevan Cooney to the Thorsdale

10   account.

11   Q.  You didn't put those on your chart to calculate that $5.57

12   million?

13   A.  No.

14   Q.  If we look back, so that was money going back from Bevan

15   Cooney's account to Thorsdale, right?

16   A.  Yes.

17   Q.  You didn't put any of that money on your chart, right?

18   A.  I believe it was included in the other category in the

19   beginning of the chart.

20   Q.  If we look at that $5 million going back to Exhibit 4005,

21   that $5,050,000.00 from Thorsdale went right out to U.S. Bank,

22   right?

23   A.  550 -- 5,050,000 from Thorsdale went to Cooney's account

24   and then from Cooney to U.S. Bank.

25   Q.  Yeah, so if we're talking about money from Thorsdale into

I6KJGAL7                          Kendall - cross

1   Mr. Cooney's account, 5,050,000 went in, 5 million went out?

2   A.  Out of Cooney's account, yes.

3   Q.  And we didn't count $150,000 that went from Cooney's

4   account into Thorsdale?

5   A.  Is that a question?  I am not sure what your question is.

6   Q.  Let's go back to 4012.

7   A.  Yes.

8   Q.  This $5,050,000.00, if we include the money that went back

9   to Thorsdale, that takes $150,000 off, right?

10  A.  This chart shows debits out of this account.

11  Q.  Excuse me?

12  A.  This chart shows the debits out of the Thorsdale account.

13  We counted for the 5,050,000 as part of the other chart.

14  Q.  You agree that Bevan Cooney did not keep a million $50,000

15  or $5.5 million?

16  A.  This chart is not indicating that.  This chart says that

17  debits went out of Thorsdale and went to these individuals,

18  these places.  This chart does not depict the end result of

19  money per se.  This is showing the debits out of that account.

20  Q.  It doesn't reflect the end result of the money?

21  A.  Not necessarily.  It doesn't reflect that.

22  Q.  It doesn't reflect money that was loaned back-and-forth

23  before August 2014?

24  A.  Correct.

25  Q.  And it doesn't reflect money that was sent back between

I6KJGAL7                        Kendall - redirect

1    August 2014 and October 2015? right?

2    A.  The deposits into the account are in there.  It is not

3    broken out.

4    Q.  It doesn't include any money that went back and it doesn't

5    include any money that came during other periods?

6                MS. MERMELSTEIN:  Objection to form.  That question is

7    confusing.

8                THE COURT:  Yes, sustained.

9                MR. HASSAN:  No further questions.

10               THE COURT:  Redirect.

11   REDIRECT EXAMINATION

12   BY MS. MERMELSTEIN:

13   Q.  Good afternoon, Agent Kendall.

14               Let's look at Government Exhibit 4005 for a minute.

15   Go to the last page.  Mr. Hassan was just asking you a couple

16   of questions about this.  Just so from the beginning, this is a

17   summary chart, right?

18   A.  Yes.

19   Q.  All of your charts are summary charts, right?

20   A.  Yes.

21   Q.  Do they contain every transfer, every dollar that left

22   every account that is referenced on these charts?

23   A.  No.

24   Q.  Do these charts contain, for example, information about who

25   is directing the money flows that are depicted in the charts?

I6KJGAL7                          Kendall - redirect

1    A.  No.

2    Q.  In some cases there is information about that in the

3    exhibits that you reference, though, right?

4    A.  Yes.

5    Q.  Let's look just as an example at this one.

6            You were asked whether or not Mr. Cooney had himself

7    been involved in the transfer.  Let me just ask you as a

8    preliminary matter, what does this chart itself indicate about

9    the transfer of bonds from the orange Cooney box to the green

10   bond box.  What does that mean happened?

11   A.  At approximately 5 million in bonds was transferred from a

12   Cooney account to a Bonwick account.

13   Q.  On the face of the chart, you're opining on who did it?

14   A.  Correct.

15   Q.  Let's go ahead and look at Government Exhibit 2093, if we

16   can do it side-by-side.  Start at the top.

17           Can you just read who this email is from and who it is

18   to?

19   A.  It is from Bevan Cooney and it is to Sebastian Momtazi.

20   Q.  What is the date of that email?

21   A.  May 28th of 2015.

22   Q.  What is the date of that email relative to the date of the

23   transfer of the bonds from the Cooney account to the Bonwick

24   account?

25   A.  The email was sent on the eve of the day before the

I6KJGAL7                          Kendall - redirect

1    transfer of the bonds.

2    Q.  One day before the bonds get transferred?

3    A.  Yes.

4    Q.  Let's look at the attachment for one second.  I guess it is

5    hard to read the signature.  Do you see the signature is signed

6    in the first letter B?

7    A.  Yes.

8    Q.  This was an email sent by Bevan Cooney?

9    A.  Yes.

10   Q.  Let's look at Government Exhibit 4011 for a minute.  We can

11   take it up just by itself, please.  Thank you, and go to the

12   last page, please.

13           Broadly speaking, the point of all these charts is to

14   try and highlight for the jury sort of the movement of money in

15   ways that matter to this case without forcing them to look at

16   hundreds of pages of bank records, right?

17   A.  Yes.

18   Q.  With respect to this chart which Mr. Schwartz had a lot of

19   questions about, did you observe in the bank records a wire

20   transfer from U.S. Bank to the RSB account?

21   A.  Yes.

22   Q.  Do you have any personal knowledge about sort of whether or

23   not that was intentional or not?

24   A.  No.

25   Q.  Having reviewed other documents in this case, do you know

I6KJGAL7                          Kendall - redirect

1   whether or not Rosemont Seneca Bohai, in fact, held any bonds

2   at the time of that transfer?

3   A.  No, they did not.

4   Q.  Fair to say they weren't entitled to interest statements?

5   A.  Yes.

6   Q.  Do you similarly observe deposits into Burnham Securities

7   and VL Assurance accounts in the amounts listed?

8   A.  Yes.

9   Q.  If you look -- let's pull one up.  Can we do 327 and 308

10  side-by-side.  They're both Page 40.  It is a little hard to

11  read.

12          Let's look at the one on the right, Government Exhibit

13  308, and let me direct your attention to the second line in

14  cash flow activity by date.  Do you see the line that begins

15  10-1, interest income, ADJ?

16  A.  Yes.

17  Q.  Sorry.  The second line, do you see it says Wakpamni Lake,

18  I N T on 12.4 MM?

19  A.  Yes.

20  Q.  So the statements reflect the purpose of this payment is it

21  is an interest payment on the bonds?

22  A.  Yes.

23  Q.  It doesn't say one way or the other whether the payment is

24  coming from a Wakpamni Lake account, right?

25  A.  Yes.

I6KJGAL7                     Kendall - redirect

1   Q.  If we can pull up 645, please.  I think it is Page 4 or 5.

2   Scroll down.  One more up, please.  There we go.

3          So there is a wire out for $903,000, right?

4   A.  Yes, a cash disbursement.

5   Q.  There is no wire back in on 10-12 or whatever the date of

6   the Rosemont Seneca Bohai reversal, right?

7   A.  Correct.

8   Q.  So if we can go back now to Government Exhibit 4011 for a

9   minute.  There we go, the last page.

10          It really would not be accurate to show the reversed

11   wire going back to U.S. Bank because it does not appear to have

12   gone back to U.S. Bank, right?

13   A.  Correct.

14   Q.  On your chart is there a date for the day the wire was

15   reversed?

16   A.  No.

17   Q.  The chart is not suggesting the wire went directly from RSB

18   to these other accounts, just that the money wasn't for RSB, so

19   it went to these other two accounts, right?

20   A.  Yes.

21   Q.  Is there anything inaccurate about that?

22   A.  No.

23   Q.  Let's last look at Government Exhibit 4012.  This is

24   another chart you got asked a lot of questions about.  You

25   talked, you answered a number of times this just reflected

```
 1  credits and debits.
 2              Can you explain what you mean by that?
 3  A.  On the left-hand side of the chart it shows credit of money
 4  into the account, and on the right-hand side it shows money
 5  leaving the account in various forms, so debits to the account.
 6  Q.  Money in, money out?
 7  A.  Yes.
 8  Q.  Does this chart, for example, show what the IRS did with
 9  the money after they got it?
10  A.  No.
11  Q.  Does it show you what Chandra Galanis did with the money
12  after she got it?
13  A.  No.
14  Q.  Does it show how Francisco Martin spent $175,000?
15  A.  No.
16  Q.  The chart, though, is accurate with respect to money that
17  came in to Thorsdale and the money that went out of Thorsdale,
18  right?
19  A.  Yes.
20  Q.  It is agnostic, fair to say, on why that happened?
21              It doesn't say one way or the other why the money came
22  in or out?
23  A.  Correct.
24  Q.  Can we put this up side-by-side for a second with 4004.  Go
25  to the last page of that.  Mr. Schwartz asked you a whole bunch
```

1   of questions about the money that came out of Thorsdale and

2   went to Rosemont Seneca Bohai at the bottom of Government

3   Exhibit 4012.  Do you remember that?

4   A.  Yes.

5   Q.  It is accurate that Thorsdale transferred $700,513.00 to

6   RSB, the account in the name of Devon Archer, right?

7   A.  Yes.

8   Q.  This doesn't purport to show whether or not Devon Archer

9   had at other points in time sent money to Thorsdale, right?

10  A.  Correct.

11  Q.  Although the other bucket contains all the other transfers

12  that came into Thorsdale, right?

13  A.  Yes.

14  Q.  In many cases, with respect to Government Exhibit 4012,

15  there are steps that happen after the initial transfer from

16  Thorsdale that are reflected in other charts?  Does that make

17  sense as a question?

18  A.  Say it one more time.

19  Q.  Sure.  Let me do it this way.

20          You see that Thorsdale is in red on 4012?

21  A.  Yes.

22  Q.  It is in red on 4004, right?

23  A.  Yes.

24  Q.  We can see on 4012 a transfer from Thorsdale to the Wolff

25  Law Firm, right?

I6KJGAL7                        Kendall - redirect

1   A.  Yes.

2   Q.  There is more than one transfer, and the total is more than

3   $15 million, right?

4   A.  Yes.

5   Q.  We can see at least some of what the Wolff Law Firm did

6   with that money on Government Exhibit 4004, right?

7   A.  Yes.

8   Q.  Because the Wolff Law Firm transferred $15 million to

9   Rosemont Seneca Bohai, right?

10          So you could on the touch screen, in theory on 4012,

11  you could have drawn an arrow to the Wolff Law Firm back all

12  the way around to Rosemont Seneca Bohai to demonstrate that

13  transfer?

14  A.  Yes.

15          MR. TOUGER:  Objection; leading.

16          THE COURT:  I will allow it.  Watch the leading.

17  BY MS. MERMELSTEIN:

18  Q.  But 4012 cuts off after one round of transfers out of

19  Thorsdale, fair?

20  A.  4012 cuts off.

21  Q.  4012 could show where money went from there, but that is

22  not what this chart does?

23  A.  Correct.

24  Q.  Let's put up 4004 and 4005 side-by-side if we can.

25          These charts show you more about the way the money

I6KJGAL7                    Kendall - redirect

1    moved, right?

2    A.  Yes.

3    Q.  Can you walk us just one more time, start with the second

4    bond series, Part One, which is on the right and can you walk

5    us through the date and amounts of the transfers from Wealth

6    Assurance all the way back around.

7    A.   Wealth Assurance transferred 15 million to the Thorsdale

8    account on September 23rd, 2014.  Then 15 million went from

9    Thorsdale to the Wolff Law Firm on September 24th, 2014.  The

10   Wolff Law Firm transferred 15 million to RSB, the Rosemont

11   Seneca Bohai account on September 24th, 2014.

12        15 million was transferred from RSB to U.S. Bank WLCC

13   on October 1st, 2014, and then from there we have transaction

14   fees in the amount of 220,000 out of U.S. Bank, from the WLCC

15   account on October 1st, 2014, with 65,000 of that going to

16   Burnham.  Then $14,780,000 from U.S. Bank WLCC to Wealth

17   Assurance on October 1st, 2014.

18   Q.  I won't make you read all the numbers again on the Bevan

19   Cooney chart, but fair to say the same pattern there, Wealth

20   Assurance transfers money to Thorsdale, transfers it to Cooney,

21   Cooney buys the bonds and sends it to U.S. Bank, and the money

22   comes back to Wealth Assurance?

23   A.  Yes.

24             MR. TOUGER:  Objection.

25             THE COURT:  Sustained.  Watch the leading and the

I6KJGAL7                          Kendall - redirect

 1    compound questions.

 2    BY MS. MERMELSTEIN:

 3    Q.  Rosemont Seneca Bohai, what was the date on which Rosemont

 4    Seneca Bohai received the money to purchase the bonds?

 5    A.  September 24th, 2014.

 6    Q.  How many days later were the bonds purchased?

 7    A.  Seven.

 8    Q.  Mr. Cooney purchased or received the money, received the

 9    $5,050,000.00 on what day?

10    A.  October 6th, 2014.

11    Q.  How many days later were the bonds purchased?

12    A.  Three.

13    Q.  With respect to the transfer of those bonds, what was the

14    date on which the bonds were transferred to Bonwick?

15    A.  In both cases, on May 29th, 2015.

16    Q.  The May 29th, 2015 transfer from Mr. Cooney was to Bonwick.

17    Where did it go with respect to Mr. Archer?

18    A.  I am sorry.  Mr. Archer went through two VL Assurance

19    accounts, and then a portion of which was sent to Burnham

20    Securities on May 29th, 2015.

21    Q.  Have you reviewed any documents that demonstrate that

22    Bonwick or Burnham paid for those shares?

23    A.  I don't recall.  I don't recall.  I only saw the transfers.

24          MS. MERMELSTEIN:  Nothing further, your Honor.

25          THE COURT:  Any additional new recross?

1         MR. TOUGER:  Very briefly, your Honor.

2    RECROSS EXAMINATION

3    BY MR. TOUGER:

4    Q.  Good afternoon.

5         Ms. Mermelstein started off her redirect examination

6    by saying to you that the purpose of these charts is to

7    summarize thousands of pages of bank records and other

8    documents, right?

9    A.  I don't know if she used the word "thousands," but bank

10   records.

11   Q.  That is the purpose, right?

12   A.  Yes.

13   Q.  You would agree with me that you have not looked at --

14   withdrawn.  You agree with me the government has not given you

15   every document in this case?

16   A.  Yes.

17   Q.  So your charts are not based on every document in this

18   case, right?

19   A.  Correct.

20   Q.  You would also agree with me that for your charts -- also

21   the charts are to be reflective of what you did look at, right?

22   A.  Yes.

23   Q.  That is the goal?

24   A.  Yes.

25   Q.  If they're not reflective of those documents, then they

1    really have no value, right?

2              MS. MERMELSTEIN:  Objection.

3              THE COURT:  Sustained.

4    BY MR. TOUGER:

5    Q.  If your charts are incorrect, then the value to this jury

6    is nil?

7              MS. MERMELSTEIN:  Objection.

8              THE COURT:  Sustained.

9    BY MR. TOUGER:

10   Q.  But you did say, I believe, to one of Mr. Schwartz's

11   questions that accuracy is very important?

12             MS. MERMELSTEIN:  Objection.

13             THE COURT:  Overruled.

14   A.  I did say that.

15   BY MR. TOUGER:

16   Q.  That is a correct statement, right, accuracy is what is all

17   important in these cases, right?

18   A.  Yes.

19   Q.  Now, you would agree with me that as you just said, you

20   only looked at documents that the government showed you,

21   correct?

22   A.  Yes.

23   Q.  Your charts didn't reflect the documents that the defense

24   lawyers have showed you here today?

25             MS. MERMELSTEIN:  Objection to this being very far

I6KJGAL7                    Kendall - recross

1   beyond the scope of the cross and redirect.

2           MR. TOUGER:  We can argue this at the Bench or here.

3           MS. MERMELSTEIN:  I am happy to do that.  This is

4   getting out --

5           THE COURT:  I will give you a little bit of leeway.

6   You don't need --

7           (Multiple voices)

8   BY MR. TOUGER:

9   Q.  Your chart didn't reflect a lot of the paperwork you were

10  shown here today, correct?

11  A.  Correct.

12  Q.  So these charts only reflect the paperwork that you were

13  shown by these individuals?

14  A.  Yes.

15  Q.  So they basically reflect what the government wanted to

16  show you?

17          MS. MERMELSTEIN:  Objection.

18          THE COURT:  Sustained.

19  BY MR. TOUGER:

20  Q.  And they don't show you these charts that you've put into

21  evidence to show this jury --

22          MS. MERMELSTEIN:  Objection before the question is

23  finished, your Honor.

24          MR. TOUGER:  I don't think it is objectionable, so

25  I'll ask it.

I6KJGAL7                          Kendall - recross

1    BY MR. TOUGER:

2    Q.  These charts show this jury a synopsis of the documents you

3    viewed.

4             MR. TOUGER:  Is that okay?

5             THE COURT:  I think this has been asked and answered.

6    BY MR. TOUGER:

7    Q.  Finally, the question really comes down to, do your charts

8    reflect the documents that you were given by these three

9    individuals, not every document in this case?

10            THE COURT:  Asked and answered.

11   BY MR. TOUGER:

12   Q.  And are only accurate as that, correct?

13            THE COURT:  Sustained.

14            MR. TOUGER:  Nothing further.

15   RECROSS EXAMINATION

16   BY MR. SCHWARTZ:

17   Q.  Good afternoon again, Agent Kendall.

18            Mr. Jackson, can we pull back up Government Exhibit

19   4011, at Page 4.  I just want to be clear here.

20            Ms. Mermelstein asked you if you observed a payment

21   from U.S. Bank to Rosemont Seneca Bohai.  Do you recall that?

22   A.  Yes.

23   Q.  You said "yes," right?

24   A.  I don't recall.

25   Q.  This should be on everyone's screens, Mr. Jackson.

I6KJGAL7                          Kendall - recross

1   A.   I observed a payment from our Rosemont Seneca Bohai to U.S.

2   Bank in regards to this?

3   Q.   Ms. Mermelstein asked you if you observed a payment from

4   U.S. Bank to Rosemont Seneca Bohai; in other words, this arrow

5   that is depicted here?

6   A.   Yes.

7   Q.   When you said "yes," that was a true answer, right?

8   A.   Yes.

9   Q.   Because that was reflected on the bank statement, correct?

10  A.   Yes.

11  Q.   That was the mistake that we went over at length, correct?

12  A.   Yes.

13  Q.   So although you observed it, you also know it to be a

14  mistake, true?

15  A.   Based on some of the documents that you presented, yes.

16  Q.   Are there any other mistakes that you chose to include in

17  these charts?

18          MS. MERMELSTEIN:  Objection.

19          THE COURT:  Sustained.  Are you talking about the

20  mistake Morgan Stanley made?

21  BY MR. SCHWARTZ:

22  Q.   Well, again, you have depicted a line here for a transfer

23  that you know to be a mistake, correct?

24          MS. MERMELSTEIN:  Objection, your Honor.

25          MR. SCHWARTZ:  Let me ask a different question.

I6KJGAL7                         Kendall - recross

1    BY MR. SCHWARTZ:

2    Q.  Your chart, Exhibit 4011, Page 4, shows this line from RSB

3    that splits in half and goes to Burnham Securities and VL

4    Assurance, correct?

5    A.  Yes.

6    Q.  You recall that Ms. Mermelstein asked you that wasn't

7    intended to show that the money went directly from RSB to

8    Burnham Securities and VL Assurances, right?

9    A.  Yes.

10   Q.  And you agreed with that, correct?

11   A.  Yes.

12   Q.  Is there any place else on these charts where these lines

13   are not meant to indicate that the money goes from Point A to

14   Point B?

15   A.  No.

16   Q.  You can take that down.  Can we bring up 4015, please, Mr.

17   Jackson.  One of Ms. Mermelstein's questions again was summary

18   charts don't contain every bit of information in the case,

19   correct?

20   A.  These summary charts don't include, contain every

21   transaction, correct.

22   Q.  She said they're intended to highlight what matters in this

23   case, right?

24            MS. MERMELSTEIN:  Objection.  I don't think that is

25   what I said.

I6KJGAL7                        Kendall - recross

1             THE COURT:  Is that in the question?

2             MR. SCHWARTZ:  We can read it back if we really want

3    to.

4    BY MR. SCHWARTZ:

5    Q.  Here is my question.  You don't know what really matters in

6    this case, right?

7    A.  I worked with prosecutors to understand what needed to be

8    presented or what would be presented here, but I don't know the

9    details because I wasn't involved in the investigation.

10   Q.  You got an assignment and you prepared charts to present

11   the points that they wished for you to present, true?

12   A.  Yes.

13   Q.  But the one thing we all agree upon is that they need to be

14   accurate, correct?

15   A.  Yes.

16   Q.  This chart up here, 4015, depicts a $3,194,877.00 wire from

17   Valor Life to the Wolff Law Firm, correct?

18   A.  Yes.

19             MS. MERMELSTEIN:  Objection, your Honor.  This was not

20   the subject of any redirect.

21             THE COURT:  I'll allow it.  Go on.

22   BY MR. SCHWARTZ:

23   Q.  If you can put that on the left, please, Mr. Jackson.

24             Two of the exhibits you relied upon in creating this

25   chart were 653 and 654, correct?

I6KJGAL7                          Kendall - recross

1    A.   Yes.

2    Q.   Those are the Valor Life and Wolff Law Firm records, true?

3    You don't remember the numbers?

4    A.   I am sorry.

5    Q.   Let me show you 654 first.  Can we go to Page 3, please.

6    This is one of the documents you relied upon, correct?

7    A.   Yes.

8    Q.   Mr. Jackson, can you blow up the bottom transaction there,

9    please.  This reflects the transfer or the originator is Valor

10   Life and the beneficiary is Clifford A. Wolff, PA, correct?

11   A.   Yes.

12   Q.   This is one of the records you relied upon, true?

13   A.   Yes.

14   Q.   What is the amount of this transfer?

15   A.   3 million 194 -- 194,000 -- 199 -- 977,000.

16   Q.   What is the amount you wrote on your chart?

17   A.   $3,194,877.00.

18   Q.   And you double-checked this against the other side of the

19   transaction, right, so can we take down that bank record and

20   bring up 653, 4015 on one side.  On 653 cab can go to Page 35.

21            If you blow that up, this is another one of the

22   records you relied upon in preparing this chart, correct?

23   A.   Yes.

24   Q.   This is the Clifford Wolff account, correct?

25   A.   Yes.

I6KJGAL7                          Kendall - redirect

1   Q.  What is the amount of that transfer?

2   A.  $3,194,977.00.

3   Q.  What did you put on your chart?

4   A.  $3,194,877.00.

5   Q.  That was a mistake, true?

6   A.  Yes.

7   Q.  This was the chart we talked about that you had corrected

8   just this past week, correct?

9   A.  Yes.

10  Q.  You double-checked everything, right?

11  A.  Yes.

12  Q.  But here we just looked at both sides of this transaction,

13  and that number was wrong, correct?

14  A.  Yes.

15  Q.  Accuracy matters, right?

16  A.  Yes.

17          MR. SCHWARTZ:  Thank you, Agent Kendall.

18          MS. MERMELSTEIN:  Just one question.

19  REDIRECT EXAMINATION

20  BY MS. MERMELSTEIN:

21  Q.  Mr. Schwartz's last point on that is in 50 pages of summary

22  charts, there is a typo?

23  A.  Yes.

24          MS. MERMELSTEIN:  Nothing further.

25          THE COURT:  You can step down.  Thank you.

I6KJGAL7

1            (Witness excused)

2            MS. MERMELSTEIN:  One housekeeping matter, your Honor.

3     I think that it appears, although there has been consent to

4     these, the exhibits referenced in the summary charts have

5     necessarily all been admitted.  We can give your Honor a list,

6     but we move to admit all the exhibits referenced in the summary

7     charts in the citation.

8            THE COURT:  Do we know if there is any objection to

9     any of the underlying documents?

10           MR. SCHWARTZ:  I don't think so, certainly not to the

11    extent they're relied upon by the witness.

12           THE COURT:  They will be admitted.

13           MS. MERMELSTEIN:  The government rests, your Honor.

14           THE COURT:  Thank you.  Who is going to go first on

15    behalf of defendants?  None of you have to present a case at

16    all, of course.  The burden is on the government.

17           Would you like to do so?

18           MR. SCHWARTZ:  I am always happy to start, your Honor.

19    How do you want us to handle -- I do have a motion.

20           THE COURT:  We are going to reserve, as we discussed

21    yesterday.  We'll just proceed at this point.

22           MS. NOTARI:  I reserve also.

23           THE COURT:  Understood.

24           MR. SCHWARTZ:  So there was the one email that we were

25    awaiting a decision on.

I6KJGAL7

1              THE COURT:  On 955, on Moynihan?

2              MR. SCHWARTZ:  4387.

3              THE COURT:  Bring a copy up.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6KJGAL7

1          (At sidebar)

2          THE COURT:  Understood.  You are okay with this?

3          MR. TOUGER:  I want --

4          MR. SCHWARTZ:  I am happy to do that.

5          THE COURT:  Of course.  My issue with this is just the

6    relevance of her fees.  So I am happy to hear you out on that.

7          MR. SCHWARTZ:  This is one of the 11 or 12 editions

8    that independent trustees insisted upon at the end of the day.

9    What you see is -- (inaudible) -- as they do with respect to

10   other matters, independent trustees are abusing their

11   authority.

12          In particular, the fact that they're entering these

13   negotiations and feel like they're being extorted is directly

14   relevant to Mr. Archer's state of mind at the time that he

15   makes representations.  That includes this very thing.

16          THE COURT:  Why?  Why would someone be less

17   forthcoming if they feel like they were being extorted.  Is

18   that your argument?

19          MR. SCHWARTZ:  I do not believe that there was

20   anything false about what Mr. Archer said, and I intend to

21   argue it was true.  The fact that this was so highly lawyered

22   and so sharp-elbowed sort of goes to that point because I think

23   that they are on rebuttal going to be forced to argue this

24   violated perhaps the spirit of the undertaking, but not the

25   letter of the undertaking.

I6KJGAL7

1          So I think understanding the back-and-forth and nature

2     of the negotiations, it is critical and that shows it didn't

3     come through in the testimony because we weren't able to get

4     into anything other than when Mr. Archer was there in the room.

5     There is no prejudice to the government.

6          MR. QUIGLEY:  There is prejudice.  It is designed to

7     make the witness look bad.

8          THE COURT:  I am inclined to redact the portions about

9     her fee but leave in the rest.

10         MR. SCHWARTZ:  That is fine as long as we leave in

11    particular the sort of extortion line.  I suspect the

12    government would want the fees in in that case because

13    otherwise -- there is no harm to the government.

14         MR. QUIGLEY:  This is impeachment of a witness.  This

15    is designed to make the witness look bad.  He has other emails

16    in that genre.

17         THE COURT:  As I said yesterday, what I would allow in

18    is what was represented to Archer about the negotiations

19    back-and-forth.  I do think it is irrelevant and prejudicial

20    what remarks were made about a witness's fees.  So if there is

21    a way to redact this, that is what I would like to do.  You

22    tell me if there is a way to do that that is logical.

23         MR. QUIGLEY:  So I think this -- may I write on this?

24         MR. SCHWARTZ:  Yes.

25         THE COURT:  That is your copy.

I6KJGAL7

1          MR. QUIGLEY:  So this, that, that.

2          (Pause)

3          MR. SCHWARTZ:  That is not right, removing the

4     references to black male.

5          THE COURT:  Black male is in connection with the fee.

6     It has nothing to do with his statements.

7          (Multiple voices)

8          MR. SCHWARTZ:  Prejudice than probative --

9          THE COURT:  What is prejudicial about it?

10          MR. SCHWARTZ:  It is not the amount of fees; it is the

11     nature of the negotiations.  This goes to exactly the

12     discussion we had yesterday, it goes to Mr. Archer's state of

13     mind that these were hard-nosed negotiations between

14     professionals where no one was giving a quarter.

15          THE COURT:  I thought you were talking about when you

16     said the negotiations about exactly what role Galanis could

17     have had, not about what fees a witness got as the lawyer.

18          MR. SCHWARTZ:  It is about everything, everything.  It

19     goes to the entire thing.  This is part of the same set of

20     representations that include Galanis.

21          THE COURT:  I don't see the relevance.

22          MR. SCHWARTZ:  It prejudices me if I am only able to

23     argue the Galanis part and not the other part because they're

24     all of a piece.

25          MR. QUIGLEY:  I don't see it.

I6KJGAL7

1            THE COURT:  First, it was marginally relevant to begin

2    with, so I'll say that at the start.  I don't see the relevance

3    at all of how much this witness got paid or wasn't, didn't get

4    paid or if they thought the lawyer was charging too much.  I

5    don't think that that provides context for whether his

6    statements were true or untrue, were misleading in some

7    fashion, and --

8            MR. SCHWARTZ:  It is not about the fees; it is about

9    they feel their arm is getting twisted into the final

10   agreement, which includes the fees and includes the Galanis

11   thing.

12           THE COURT:  I want to take out all the references to

13   her fee and her payment.  Then you can choose to put in the

14   rest or not.

15           MR. SCHWARTZ:  I would like to get started.  We'll

16   table this.

17           THE COURT:  Fine.

18           (Continued on next page)

I6KJGAL7

1             (In open court)

2             MR. SCHWARTZ:  On behalf of Mr. Archer, first of all,

3     I offer defense Exhibits 4055, 4719, 4322, 4387, 2038 and 4388

4     pursuant to our discussions during the course of the day.

5             THE COURT:  All right.

6             MR. QUIGLEY:  Pursuant to discussions.

7             THE COURT:  Yes, pursuant to our discussions, they

8     will be admitted.

9             (Defendant's Exhibits 4055, 4719, 4322, 4387, 2038 and

10    4388 received in evidence)

11            MR. SCHWARTZ:  I would like to begin by reading a

12    document or two with Mr. Jackson.

13            THE COURT:  Sure.

14            THE COURT:  Mr. Jackson, I will swear you in like I

15    did the previous witness who assisted with the reading, that

16    you swear or affirm you will read the statements as accurately

17    as you can to the best of your ability?

18            MR. JACKSON:  I do.

19    BY MR. SCHWARTZ:

20    Q.  Ms. DIllingham, can we put up Defense Exhibit 4055.

21            Mr. Jackson, could I ask you to read the header

22    information and then the body of this email.

23    A.  Email from Jason Galanis to Devon Archer, CC James Bolger,

24    Andrew Godfrey, sent Tuesday, July 22nd, 2014 at 12:01 a.m..

25    Subject:  Response to request for financials.

I6KJGAL7

1          Devon on, requested financial information about

2     Burnham and affiliates and about Wealth Assurance Holdings and

3     affiliates in connection with the proposed combination of the

4     businesses.  Attached are:

5          1.  2013 audited financials-Wealth Assurance Holdings

6     Ltd (PWC).

7          2.  2013 audited financials-Wealth Assurance AG (PWC)

8          3.  2013 audited financials-Valor Life (untranslated

9     KPMG.

10          4.  Summary of 2013 audited financial statements

11     (Deloitte).

12          5.  March 2014 appraisal on Wealth Assurance (Ernst &

13     Young).

14          6.  2013 audited financials-Burnham Securities (Grant

15     )Thornton.

16          7.  2013 audited financials-Burnham Asset Management

17     (Grant Thornton).

18          8.  2013 audited financials-Mid-America Financial

19     Services, Inc.

20          9.  Org. Charts-pre and post transactions.

21          We will provide the Valor Life appraisal tomorrow.

22     You also requested that we summarize the proposed combination.

23     The structure of the proposed combination is a straightforward

24     tuck-under of Burnham Financial Group as a 100 percent owned

25     subsidiary of Wealth Assurance Holdings, the publicly quoted

I6KJGAL7

1    holding company.

2            The Wealth Assurance name would be retired in favor of

3    Burnham and Co., which would be adopted as a new name of the

4    publicly quoted holding company.

5            The holding company would have three drop down

6    subsidiaries consisting of operations in securities, asset

7    management, and wealth assurance/specialty insurance.

8            The business model is intended to combine the

9    favorable asset gathering characteristics of insurance, with

10   the stable fee income characteristics of asset management, and

11   the cross-border transactional capabilities of investment

12   banking capital markets.

13           The model is very much an emulation of the Guggenheim

14   structure which has successfully built a $210 billion business.

15   Hope this responds to what you requested.   Jason.

16   Q.   Ms. Dillingham, can I ask you to show the jury Page 3 of

17   this document.   Can I ask you to to show Page 16.   Page 26,

18   please.   Page 40.   Page 59.   Page 65.   Page 82.   Page 96.   Flip

19   to the next page, please.

20               (Continued on next page)

21

22

23

24

25

I6K7GAL8

1    Q.  You can take that down.  Can I ask you to bring up Defense
2    Exhibit 4719.
3            Mr. Jackson, could I ask you to read the bottom --
4    excuse me, the e-mail in the middle from Matt Nordgren.
5            The one below that.
6            You can read it, Mr. Jackson.
7    A.  From Matt Nordgren.  Date:  December 3, 2014.  To:  Gary
8    Hirst, jason@holmbycompanies.com, Jason Sugarman; cc'd Joyce
9    Ricafort, P. Rohan and darcher@rosemontcapital.com.  Subject:
10   A forward e-mail.
11           "Stongphoto@gmail.com has sent you a file via Re
12   Transfer.  See the link below.  Your headshots.  Thanks."
13   Q.  And then the same day from jason@holmbycompanies.com to
14   Matt Nordgren, same subject:
15           "Nordgren, if you fucking e-mail Devon and Rohan ever
16   in the same fucking e-mail I disown you.  Do not risk our
17   relationships.  All we have."
18           You can take that down.
19           Your Honor, Mr. Archer calls Paul Atkins.
20           THE COURT:  All right.  Thank you.
21    PAUL ATKINS,
22        called as a witness by the defendant,
23        having been duly sworn, testified as follows:
24           MR. WENNER:  Your Honor, while we wait, how long you
25   would like me to go to?

I6K7GAL8                    Atkins - Direct

1    THE COURT:  You know, just a little after five or

2    five.  So just for a few minutes.  Why don't we stop at five.

3    MR. WENNER:  This is one of our expert witnesses.  I

4    will try to qualify him in the time we have.

5    THE COURT:  OK.

6    MR. WENNER:  I don't know if I will be able to

7    complete that process.

8    THE COURT:  Understood.

9    DIRECT EXAMINATION

10   BY MR. WENNER:

11   Q.  Good afternoon, Commissioner Atkins.

12   A.  Good afternoon.

13   Q.  Where are you currently employed?

14   A.  I'm the CEO of Potomac Global Partners.  We're based in

15   Washington D.C.

16   Q.  And how long have you been at Potomac Partners?

17   A.  I started the firm back in 2009 after I left the

18   government.

19   Q.  And how large was the firm when you founded it?

20   A.  We had about four people.

21   Q.  And now?

22   A.  About two dozen.

23   Q.  And what is the business of Potomac Partners?

24   A.  We are a consulting firm.  We focus on the financial

25   services industry; and we basically focus on compliance with

I6K7GAL8                         Atkins - Direct

1   regulations and laws.

2   Q.   Maybe for the jury maybe you could just explain a little

3   bit what is the business in regulatory compliance that Potomac

4   engages in?

5   A.   Well, again we try to help -- our clients are mostly banks,

6   and insurance companies, and broker dealers, and mutual funds

7   and things like that, and so we try to help them understand the

8   laws and the rules that they have to abide by, and make sure

9   that they follow, you know, the law and comply with it.

10  Q.   And other than regulatory compliance, are there other

11  services that Potomac Partners provides?

12  A.   We do.  So, for example, I'm here today, so we help if

13  people get in trouble, if the government is going after them

14  with respect to --

15            MR. QUIGLEY:  Objection.

16            MR. WENNER:  I can rephrase the question, your Honor.

17            THE COURT:  Why don't you.  Thanks.

18  Q.   Is strategic advice one of the services that Potomac

19  Partners provides?

20  A.   Yes.

21  Q.   And could you explain briefly what strategic advice means.

22  A.   It means that we help companies and others understand --

23  tray and understand what is going on with respect to laws

24  coming from Congress and from the various states that might

25  affect their business.

1  Q.  And does Potomac Partners advise companies and clients on

2  how to grow within the market?

3  A.  Sorry.  How to?

4  Q.  How to grow within the market.

5  A.  Yes.  Yes.  How to grow their business and within the

6  construct of what the laws are that affect them.

7  Q.  And while at Potomac Partners, have you had any other

8  appointments?

9  A.  Yes.  I was appointed by Congress to be part of the

10  congressional oversight panel for the Troubled Asset Relief

11  Program which came out of the financial crisis back in 2008.

12       The Treasury received a fair amount of money from the

13  taxpayers, so we were supposed to look at how they were

14  spending it, to make sure they were spending it in accordance

15  with the law that Congress had passed.

16  Q.  That was a congressional appointment?

17  A.  A congressional appointment, yes, by the Senate of the

18  United States.

19  Q.  And since you've been with Potomac Partners, have you had

20  any judicial appointments?

21  A.  Yes, I have served as -- I'm serving as a monitor now with

22  respect to a financial institution pursuant to a litigation

23  that's between the Commodity Futures Trading Commission and

24  that particular bank, and so I was appointed by a judge of this

25  particular district.

I6K7GAL8                     Atkins - Direct

1   Q.  And apart from those public service positions, have you

2   been appointed to any in the private sector since you've been

3   with Potomac?

4   A.  Yes, I served as a chairman of the Board of Bats Global

5   Markets, which is a stock exchange, now part of the Chicago

6   Board Options Exchange.  And I am chairman of the Audit

7   Committee of the American Council in Germany, and I'm a

8   visiting scholar at the American Enterprise Institute.

9   Q.  And where did you start your career?

10  A.  Here in New York.  I started with a law firm downtown,

11  Davis Polk & Wardwell it's called; it focuses on especially

12  financial services issues, stock offerings and mergers and

13  acquisitions and that sort of thing.  And that was -- I had a

14  law degree when I started.

15  Q.  And when you left Davis Polk, where did you work next?

16  A.  I went to Washington.  I was chief of staff for the

17  Chairman of the Securities and Exchange Commission Richard

18  Breeden, and then stayed on with his successor Arthur Levitt

19  who was appointed by Bill Clinton.

20  Q.  Can you give the jury a sense of what you did as chief of

21  staff for Chairman Breeden?

22  A.  Well, the main job was to try to help the wheels turn at

23  the Agency.  At the time it had about 3300 or so people with

24  about 12 offices, regional offices around the country.  There

25  were always -- we had issues to try to figure out what the

I6K7GAL8

1    direction of the Commission would be, what we would emphasize

2    with respect to making rules, and then dealing with Congress

3    and the White House and that sort of thing, and then trying

4    to -- there are always human resource issues with employees and

5    that sort of thing with an agency like that.

6    Q.  Did your duties differ when you were working as counselor

7    to Chairman Levitt?

8    A.  No, some thing.  So basically, you know, help advise the

9    Chairman with respect to enforcement decisions that came before

10   the Commission and in rule making.

11   Q.  And what did you do after working for Chairman Levitt?

12   A.  I left the government and I became a partner with Coopers &

13   Lybrand, which is a big accounting firm, and then it merged

14   with Price Waterhouse, PWC.

15            THE COURT:  I think we can stop here for the day.  All

16   right?

17            So, ladies and gentlemen, we are going to adjourn.  I

18   will see you first thing in the morning.  Please remember don't

19   discuss or research the case, and keep an open mind.  Thank

20   you.  We are starting again at 9 o'clock.

21            (Continued on next page)

22

23

24

25

I6K7GAL8

1              (Jury not present)

2              THE COURT:  You can step down.  Everyone can be

3     seated.  Just a few things I think we need to discuss.

4              First of all, for the record, I also started my career

5     at Davis Polk.  I don't believe that Mr. Atkins and I

6     overlapped, but just for completeness I am noting that.

7              I think what we should do is I just want to allocute

8     Mr. Cooney, Mr. Archer and Mr. Galanis on the fact that they

9     have a right to testify but they also have a right not to

10    testify, and I want to make sure you understand that.  I know

11    you've heard me say that to the jury.

12             But you have an absolute right both to testify and not

13    to testify, and if you choose not to testify -- and I will

14    instruct the jury to this effect -- they can't hold that

15    against you in any way, so no inference or suggestion of guilt

16    can be made from the fact that you chose not to testify.  And

17    it's important that you understand that.

18             The decision whether to testify or not to testify is

19    entirely up to each of you, and you will make that decision in

20    consultation with your lawyer, but it's ultimately your

21    decision.

22             So, Mr. Cooney, do you understand that?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Do you have any questions about it?

25             THE DEFENDANT:  No, your Honor.

I6K7GAL8

1                THE COURT:  Mr. Archer, do you also understand that?

2                THE DEFENDANT:  I do.

3                THE COURT:  And, Mr. a Galanis, do you understand

4        that?

5                THE DEFENDANT:  I do.

6                THE COURT:  What, if anything, else do we need to

7        discuss tonight?

8                MS. MERMELSTEIN:  A few things, I guess, your Honor.

9                As Mr. Schwartz mentioned, one of the things that the

10       defense may want to do is put in prior inconsistent statements

11       vis-a-vis the 302s.  It's hard to opine on that until they tell

12       us what they mean by that.

13               But, look, I don't know if the defense is likely to

14       rest tomorrow or if this is going into Monday, but there is an

15       enormous amount of outstanding things that I think means sort

16       of it's going to be hard for the government to review summary

17       charts and get through that stuff.

18               If they're going to want us to stipulate to what an

19       agent would say if they were called about what was in a 302, we

20       have to know what they're asking obviously, and I think we need

21       that immediately, frankly, because there is a lot to do.  We

22       will get Mr. Schwartz's summary charts obviously.

23               Mr. Touger indicated that he wants to offer --

24               THE COURT:  So the summary charts should be handed

25       over now.  OK.  So that's the first thing.  Thank you.

I6K7GAL8

1                And I agree with respect to inconsistent statements.

2        I mean if you can tell the government, and then anything that

3        needs to be teed up for me, please do so as soon as possible.

4                MS. MERMELSTEIN:  Right.  Because obviously I expect

5        we are likely to find a way to stipulate, but if we disagree,

6        and we have to fight about it, and if there has to be -- you

7        know, I don't want to have to go down that road.

8                Mr. Touger has indicated that he wants to put two

9        exhibits into evidence as part of the defense case.  They're

10       not marked as exhibits, I don't think, so they don't have

11       defense stickers yet.  But the two exhibits are both documents

12       that I believe were produced by the government by Steven

13       Haynes.  Your Honor will recall that Steven Haynes worked on

14       the actual warehouse project. Haynes Consulting received fees

15       from the bond proceeds as part of the settlement, and Raycen

16       Raines testified that he received payments through those fees.

17       One is an August 15, 2014 invoice to the WLCC for $270,000.

18       And one it's not totally clear frankly what it is.  It's some

19       kind of internal something that shows fees that -- it appears

20       to show anyway fees that Haynes received, some of which went to

21       expenses and some of which was shared with Raycen Raines.

22               And I gather that Mr. Touger's point is that if this

23       document is accurate and sort of relevant to the time period,

24       etc., that it suggests that Raycen Raines in estimating how

25       much money he got was slightly off.  I don't remember what he

I6K7GAL8

said, but I think maybe he said 88, this suggests it's more

like 100.

Ah, Mr. Quigley corrects me that what he said was it

was either 88 or around 100; he couldn't remember.

In any event, the government is not comfortable

stipulating these into evidence.  First of all, I think these

are being offered as impeachment of Mr. Raines.  But Mr. Raines

testified, and Mr. Touger had an opportunity to ask him about

it.  He didn't.  It's not clear that these are in fact

inconsistent with what he said, given that that's not clear

what they are or the nature of his testimony.

Mr. Touger indicated that if we're not going to

stipulate, then we have to produce Mr. Raines on Monday.  I

would say two things about that.  One is I don't think

Mr. Raines knows anything about these exhibits.  I think if

Mr. Touger wants to call a witness to talk about these –– which

I don't think is proper for the sole purpose of impeaching

Mr. Raines –– it's Mr. Haynes who is the witness to these.  And

I don't think you can recall Mr. Raines for the sole purpose of

impeaching him on something you didn't ask him about.

THE COURT:  Why didn't you use these on Raines on

cross?

MR. TOUGER:  First of all, let's get the testimony

exactly correct.  Mr. Raines first testifies that it was either

88 or 108, and then he convinced himself it was 88 and withdrew

I6K7GAL8

1      the 108 and said, no, it's 88.

2            It's clear these are business records from Mr. Haynes.

3      They clearly show that Mr. Raines got 108 from Mr. Haynes.

4      Therefore, I think they go in as business records just like

5      every other business record in this case.

6            THE COURT:  Well, who is going to lay the foundation

7      for the business record?

8            MR. TOUGER:  Well, they're obvious on their face.  I

9      mean the first one is an invoice; that's an obvious business

10     record.  The second one, if you look at the document also makes

11     up the fact that this is an accounting business record.

12            So, it's really a very simple solution, your Honor:

13     They can either stipulate that according to these documents Mr.

14     Haynes -- these documents -- Mr. Raines, I should say -- got

15     $108,000, or we can just put the documents in, and we can both

16     make our arguments from them, or I think I should be allowed to

17     call Mr. Raines and say isn't it true that these documents

18     reflect that.

19            THE COURT:  Why didn't you do it on cross?  I mean he

20     was here.

21            MR. TOUGER:  Throughout this whole case they were

22     yelling how we can't prove our case with their witnesses.

23            THE COURT:  I have not prevented you -- any of you, I

24     don't believe -- from cross-examining any of the witnesses.

25            MR. TOUGER:  Using other documents?  You certainly

I6K7GAL8

1    have.

2              THE COURT:  Sorry?

3              MR. TOUGER:  Using other documents?

4              THE COURT:  No, but to impeach a witness, I mean tell

5    me a time where I have prevented you from impeaching a witness.

6              MR. TOUGER:  But they're not just as impeachment.

7    They are going in as a business record that this is what

8    happened.  This is rock solid proof of the payments that he

9    got.

10             THE COURT:  Well, first of all, you need to lay a

11   foundation for business records.  You can't just say without a

12   certification that on its face it's a business record unless

13   there is a stipulation to that effect.  I don't know why you

14   are going to make Mr. Raines fly out here again.  Where does he

15   live?

16             MS. MERMELSTEIN:  He lives on the Pine Ridge

17   Reservation.  I mean, look, obviously the government can't

18   produce him; we don't control him.  If Mr. Touger wants him

19   here, he is going to have to subpoena him.

20             MR. TOUGER:  Give me his address and I will.

21             MS. MERMELSTEIN:  His attorney is Troy Eid at

22   Greenberg Traurig.  You can Google him.  He lives on the Pine

23   Ridge Reservation; it's two hours outside of Rapid City.

24             THE COURT:  I'm not going to hold up trial for this.

25   This is something you could have done in advance.

I6K7GAL8

1    MR. TOUGER:  They got my e-mail saying I want to put

2    in these documents a week ago, and they never responded, never

3    said they were objecting, never did anything, so I perfectly

4    assumed -- when they've answered every other e-mail that I've

5    sent or other counsel sent within hours -- I sent this document

6    in an e-mail to them June 15 and got nothing back.

7    THE COURT:  OK.  So you can try and subpoena him, or

8    you can subpoena Haynes and lay the foundation for the business

9    record.  I mean I can't make them stipulate, just like I

10   couldn't make you stipulate to anything.

11   MR. TOUGER:  That's fine, I will subpoena Mr. Raines.

12   THE COURT:  But again I'm not going to hold up this

13   trial for someone who was already a witness when you had this

14   opportunity.  I am just going to make that clear.

15   All right.  What's the next issue?

16   MR. QUIGLEY:  Your Honor, we just -- I mean this is

17   Mr. Archer's exhibits which they sent us a list ever 1 a.m.

18   this morning.  We are still going through them so, we may have

19   additional issues.

20   THE COURT:  I'm going to ask you to just do your best

21   to work out any issues and any redactions that may be

22   appropriate -- I don't know that any are -- and, you know, let

23   me know as soon as possible what I need to look at.

24   MR. SCHWARTZ:  So just to understand the state of

25   play, because you ran out a list of maybe ten exhibits you

I6K7GAL8

1     objected to.

2              MR. QUIGLEY:  That is inclusive of what you sent us

3     over.  You sent us a short list and then a longer list.  Those

4     are the exhibits we had objections to on the short list.  We

5     will go through the longer list.  There is going to be some

6     overlap I think.

7              MR. SCHWARTZ:  Was the short list one that I sent or

8     she sent?

9              THE COURT:  I think the short list was 1446, 2000,

10    2064, 2430, 4606, 4770, 4800, 4825, 4826, 4335, 4837 and 4839.

11    I think we have dealt with the others.

12             MR. QUIGLEY:  One correction, your Honor.  You said

13    4335.  It's 4835, not 4335.

14             THE COURT:  4835.  OK, thank you.

15             MR. SCHWARTZ:  No, I got that list --

16             THE COURT:  And 4387?  I don't know if we dealt with

17    that or not yet.

18             MR. QUIGLEY:  I think 4387.

19             MR. SCHWARTZ:  Yeah, 4332 and 4387 I think you dealt

20    with.  Those were the two with the attachments.  She ruled that

21    part of it would be redacted.

22             MR. QUIGLEY:  Right.

23             MR. SCHWARTZ:  I understood that; I got all that. that

24    was objections to what are you referring to as the short list?

25             MR. QUIGLEY:  There was -- I believe there was a list

I6K7GAL8

1    that Mr. Schwartz sent earlier last evening, and then there was

2    a longer list that Ms. Harris sent at about 1 a.m.

3                MR. SCHWARTZ:  I was just trying to understand.

4                THE COURT:  I understand.  I understand you need to

5    know the context.

6                MR. SCHWARTZ:  We will obviously try and work through

7    whatever can be worked through.

8                I think the only other thing we're awaiting a rule on,

9    if I'm not mistaken, is the other part of the Michelle Morton

10   texts.  So, we resolved this morning the stuff around the March

11   25 meeting, but there was the other part of it which had to do

12   with the relationships between various people.  Your Honor has

13   briefing on that.  I can remind you where that is.  I don't

14   think anyone needs to talk about it anymore.

15               THE COURT:  Just tell me what the text numbers are so

16   that I can -- is it 3004B?  Is that the issue?  Is it in that

17   exhibit?

18               MS. HARRIS:  That's right, your Honor.

19               MS. TEKEEI:  Yes.  And, your Honor, I will just

20   clarify I think we are in agreement on 4817.  We incorporated

21   into the Government's 3004A the portions of 4817.  I think we

22   agreed on those portions.  We will revise 3004A.  And I think

23   that means -- correct me if I'm wrong -- that you're no longer

24   offering 4817 in its entirety.

25               MS. HARRIS:  That's right.

I6K7GAL8

1              MS. TEKEEI:  OK.

2              THE COURT:  So with respect to 3004B, are we talking

3       about the entirety of the exhibit?  Can you narrow it down for

4       me what is left?

5              MS. HARRIS:  Sure, your Honor.  3004B consists of

6       excerpts that we created from the government's originally

7       marked 3004B.  So, we have designated text messages that we

8       think are relevant either to Michelle Morton's state of mind,

9       discussions between Michelle Morton and Jason Galanis that

10      indicate their course of dealings, and references to a number

11      of individuals including Mr. Archer that we think are relevant,

12      as we expressed in our letter, for a whole host of reasons.  We

13      can go into that more specifically now, but I think most of our

14      arguments are in the briefing that your Honor already had in

15      front of you.

16             THE COURT:  If you can just remind me exactly where

17      the briefing is.

18             MS. HARRIS:  Sure.  I think it was 517.

19             THE COURT:  Yes, or course.

20             MR. SCHWARTZ:  And we can send an e-mail to confirm.

21             THE COURT:  OK.  I am sure we have it and I know I've

22      read it.  I just --

23             MS. HARRIS:  We may have a copy in court, and I'm

24      happy to hand it up.

25             THE COURT:  So I will look at that.

I6K7GAL8

1          MS. MERMELSTEIN:  I thought of something else while we

2    were talking.

3          So I guess it would be helpful because I think there's

4    been a lot of moving pieces in terms of the availability of

5    defense witnesses, so it wasn't clear what is the order for

6    tomorrow.  Do you expect that the defense will rest tomorrow?

7          Obviously, the defendants don't have to decide if

8    they're testifying until sort of the game is over, but I will

9    note the government will certainly have a motion about things

10   that would come in on the cross-examination of various

11   defendants that have been precluded so far.  So, I think just

12   to float that if someone is going to testify, we are going to

13   be heard.  We don't have to go down that road until somebody

14   decides.

15         MR. SCHWARTZ:  So in terms of order for tomorrow,

16   obviously Mr. Atkins has just started.  Now, Mr. Filler --

17   we're dealing with scheduling constraints -- is not available

18   until the afternoon, so we will need to get him on just after

19   lunch.

20         We also have up for tomorrow summary witnesses that go

21   with three separate sets of summary charts.  The government has

22   them all now.  Dr. Archer, of course.  And then we have e-mails

23   to put in, we have texts to put in, we have the recording to

24   put in, and I think that's what we have for tomorrow.  I don't

25   think that we will have any difficulty filling the day.

I6K7GAL8

1          THE COURT:  I think the question is do you think it's

2     going to bleed over to Monday, or is it hard to tell?

3          MR. SCHWARTZ:  And then I know Ms. Notari has a

4     summary witness as well.  I think the answer is it's going to

5     depend upon, as it always does, on the cross-examination.

6          I mean the summary witnesses on direct are not too

7     long, but between all of it it might take two hours.  And then

8     the experts on direct all in might take three hours, three and

9     a half hours.

10          So, I think between that and other exhibits it's going

11     to be -- you know, it's going to be the day.  It's quite

12     possible -- especially I don't know beyond the fact that it's a

13     summary witness what Ms. Notari's witness is -- I think it's

14     quite possible we bleed into Monday, which means we have to

15     figure out how it interacts with the rest of the schedule.

16          But to the last point -- you know, by the way, I take

17     Ms. Mermelstein's point about what would happen if the

18     defendants were to testify.  I think I've said -- although

19     decisions will be made at the right time -- I don't anticipate

20     that to happen here.

21          MR. QUIGLEY:  Just if I could clarify one thing on the

22     record.  Is Mr. Schwartz still intending to call three experts

23     or just Mr. Atkins?

24          MR. SCHWARTZ:  So, as I told the government, there is

25     a substantial scheduling problem with Mr. Finnerty.  And he is

I6K7GAL8

1  definitely not available tomorrow, so he's not testifying

2  tomorrow.  And I am not sure he is available Monday.  Right now

3  he is not available until Tuesday.  And given the incremental

4  value, and given the fact that we are probably not going to sit

5  on Tuesday -- and I'm obviously not asking your Honor to

6  adjourn a day to take that testimony -- I think it is likely --

7  unless things play out differently than anticipated -- it's

8  just not going to be possible to put him on, and we're OK with

9  that.

10             MR. QUIGLEY:  OK.  We appreciate that.

11             THE COURT:  All right.  So I will see you all tomorrow

12  let's say 8:45.  OK?  Thank you.  Good night.

13             (Trial adjourned to June 21, 2018 at 8:45 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                                Page

3    MARK MCMILLAN

4    Direct By Ms. Tekeei . . . . . . . . . . . .2904

5    Cross By Mr. Touger  . . . . . . . . . . . .2911

6    Cross By Mr. Schwartz  . . . . . . . . . . .2925

7    Cross By Ms. Notari  . . . . . . . . . . . .2932

8    DAYNA KENDALL

9    Direct Q. . . . . . . . . . . . . . . . . .2944

10   Cross By Mr. Touger  . . . . . . . . . . . .2984

11   Cross By Mr. Schwartz  . . . . . . . . . . .2990

12   Cross By Mr. Hassen  . . . . . . . . . . . .3088

13   Redirect By Ms. Mermelstein  . . . . . . . .3112

14   Recross By Mr. Touger  . . . . . . . . . . .3122

15   Recross By Mr. Schwartz  . . . . . . . . . .3125

16   Redirect By Ms. Mermelstein  . . . . . . . .3130

17   PAUL ATKINS

18   Direct By Mr. Wenner . . . . . . . . . . . .3141

19                        GOVERNMENT EXHIBITS

20   Exhibit No.                               Received

21    4003 through 4016  . . . . . . . . . . . .2949

22    2082   . . . . . . . . . . . . . . . . . .2984

23    955  . . . . . . . . . . . . . . . . . . .3093

24

25

```
 1                        DEFENDANT EXHIBITS

 2   Exhibit No.                                Received

 3   4505    . . . . . . . . . . . . . . . . .3007

 4   361     . . . . . . . . . . . . . . . . .3010

 5   4503    . . . . . . . . . . . . . . . . .3012

 6   4535    . . . . . . . . . . . . . . . . .3013

 7   4529A   . . . . . . . . . . . . . . . . .3025

 8   4527A   . . . . . . . . . . . . . . . . .3027

 9   539     . . . . . . . . . . . . . . . . .3032

10   4523    . . . . . . . . . . . . . . . . .3066

11   8011    . . . . . . . . . . . . . . . . .3081

12   4055, 4719, 4322, 4387, 2038 and 4388   . . .3137

13

14

15

16

17

18

19

20

21

22

23

24

25
```