I6QJGAL1

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

          v.                               16 Cr. 371 (RA)

JOHN GALANIS, et al.,

          Defendants.

------------------------------x

                              New York, N.Y.
                              June 26, 2018
                              11:00 a.m.

Before:

                  HON. RONNIE ABRAMS,

                            District Judge

                    APPEARANCES

ROBERT KHUZAMI,
     Acting United States Attorney for the
     Southern District of New York
BY: BRENDAN F. QUIGLEY,
     REBECCA G. MERMELSTEIN,
     NEGAR TEKEEI,
        Assistant United States Attorneys

PELUSO & TOUGER
     Attorneys for Defendant John Galanis
BY: DAVID TOUGER

BOIES, SCHILLER & FLEXNER LLP (NYC)
     Attorneys for Defendant Devon Archer
BY: MATTHEW LANE SCHWARTZ
     LAURA HARRIS
     CRAIG WENNER

I6QJGAL1

Appearances (Cont'd)


PAULA J. NOTARI
     Attorney for Defendant Bevan Cooney
          – and –
O'NEILL and HASSEN
     Attorneys for Defendant Bevan Cooney
BY:  ABRAHAM JABIR ABEGAZ-HASSEN



Also present:  Kendall Jackson, Paralegal
               Ellie Sheinwald, Paralegal
                    Eric Wissman, Paralegal
                    Special Agent Shannon Bienick, FBI

I6QJGAL1

 1              (Trial resumes)

 2              (In open court; jury not present)

 3              THE COURT:  Good morning, everyone.  You may be

 4     seated.  Are we waiting for anyone?  Is Mr. Cooney going to be

 5     here?  Do you want us to wait for Mr. Cooney?

 6              MS. NOTARI:  No.

 7              THE COURT:  And Mr. Quigley?

 8              MS. MERMELSTEIN:  No.

 9              THE COURT:  Before we get to the issue of whether the

10     door to Gerova has been opened, I want to ask that once we give

11     this case to the jury and the verdict has been reached, I want

12     to hear from the government and Mr. Touger whether Mr. Touger

13     should be sanctioned personally for his flagrant violation of

14     my order with respect to Code Rebel.  Honestly, I don't know

15     what you were thinking about.  So we can save that for another

16     day.  That is the first thing.

17              Second, I have obviously read your letters and the

18     cases.  Do you want to be heard further?

19              MR. TOUGER:  I just want to show you that my, why I

20     thought I could say what I said in a similar --

21              THE COURT:  I read the cases you submitted.

22              MR. TOUGER:  I want to say what I said in the Roseman

23     summation, which is what I think is tantamount to what I said

24     in this one and Judge Kaplan didn't say I opened the door

25     there?  Remember in that case the only issue at summation --

I6QJGAL1

```
 1              THE COURT:  That was a proffer agreement.  Here I
 2    could not have been clearer.  I could not have possibly been
 3    clearer, and you intentionally misled this jury.
 4              MR. TOUGER:  No, your Honor.
 5              THE COURT:  Intentionally you led them to have a
 6    misleading impression of what the facts are, and I've been so
 7    lenient in saying that you had not previously opened the door,
 8    and I warned you time and time again.
 9              I explicitly said what was going to happen if you made
10    the explicit argument on summation, and you chose to do it.
11    You didn't bring your cases to me.  You didn't ask to see me
12    ex-parte.  You didn't ask to talk about this.  You
13    intentionally tried to mislead this jury, and they are now left
14    with a misleading impression.
15              MR. TOUGER:  I don't think I did that.  In all
16    honesty, I don't think I did that.  What I said was in both the
17    opportunities, in both the passages that the government quotes,
18    I had done a whole list of people who were lied to and I said,
19    yes, I said at the end the evidence shows he lied to everyone.
20    Afterwards I said something specifically about John Galanis.  I
21    never said he lied to John Galanis.  I never said he duped John
22    Galanis.  I never said that, your Honor.
23              THE COURT:  Does the government want to be heard?  We
24    both have the transcript, obviously.
25              MS. MERMELSTEIN:  Yes.  I don't think I have a lot to
```

I6QJGAL1

add.  I think it is clear that a reliance on the triggering of
a proffer agreement language is just completely irrelevant here
and that, as your Honor has said, the court could not have been
more clearer, you were giving the defense a lot of latitude in
questioning of witnesses, but if the door was opened, there was
going to be a consequence.

         I think there are many more citations from the record.
I think your Honor knows what was said in closings.  I am not
sure there is any point in going through them.  Mr. Touger made
a strategic decision here to play chicken and do something he
knew was inappropriate, not to ask for permission, which he
wouldn't have been given, but to take the chance that he would
get away with it and there would be no consequence.  That was a
strategic decision that he made.  It was clearly -- I think if
the court allowed it in, in retrospect, it would have been a
wrong decision.

         He made that decision.  The jury cannot be allowed to
think that sort of John Galanis had no reason to think that
Jason Galanis was up to no good.  That is so preposterous on
the facts that actually existed as everyone knows them to be.

         MR. TOUGER:  I want to be clear that I did not make
this decision in an effort to -- I made the decision based on
the summation I gave in another trial in this courthouse.
There was no gamesmanship on my part involved, and --

         THE COURT:  You came armed with case cites.  You knew

I6QJGAL1

this was going to be an issue as soon as you sat down.

MR. TOUGER:  That letter was in my file since the
trial began.  That letter was in there waiting to be used since
the trial began because I know the government would say it, and
as they said throughout the case, I opened the door.  I had
that letter with me the whole trial.

THE COURT:  I don't think you remember citing those --

(Multiple voices)

THE COURT:  I agree with the government.  The cases
cited by you are wholly inapposite to the present situation.
In each of those cases, the issue before the court was whether
defense counsel had triggered the waiver provision of a proffer
agreement with the government by making a factual assertion.
The Rosemond case, 841 F.3d at 109, 108-109; United States
versus Roberts, 660 F.3d at 157-58; United States versus
Oluwanisola, 605 F.3d at 131-33; and United States versus
Barrow, 400 F.3d at 115-23.

Mr. Touger's obviously correct that in those cases the
Second Circuit found that a factual assertion that triggers the
waiver provision of a proffer agreement does not result when a
defendant merely attempts to demonstrate why the facts put in
evidence by the prosecution are insufficient and challenges the
sufficiency of the government proof on elements such as
knowledge, intent, without triggering the factual assertions.
Rosemond.

I6QJGAL1

1          The basis of keeping out evidence of keeping out
2    Gerova has nothing to do with 410's prohibition of introduction
3    of statements made during the course of plea negotiations or
4    the government's ability to introduce evidence pursuant to the
5    waiver provision of a proffer agreement.  It is of no
6    consequence Mr. Touger couched his argument what the evidence
7    adduced at trial proves.

8          Indeed, the only reason the purported summary of the
9    evidence was factual accurate was I explicitly kept out the
10   most probative direct evidence that John Galanis was fully
11   aware that Jason Galanis has a history of committing fraud and
12   was in no way a legitimate businessperson.  That ruling was
13   based in part on representations Mr. Touger made that he would
14   not advance the precise argument that he made in summation.
15   Although evidence of Jason Galanis' guilty plea in Gerova was
16   plainly admissible from the start pursuant to Rule 404 (b), I
17   initially excluded it on Rule 403 grounds at a time when Gary
18   Hirst was still a defendant in this case, and unlike John
19   Galanis, was convicted in Gerova following a jury trial and was
20   appealing his conviction.

21         At that time, however, I explicitly specified that
22   there were likely arguments the defendants could make that
23   would open the door to evidence of their involvement in Gerova,
24   and that is from the transcript of 8-13, at 26, lines 9 through
25   15.  At the final pretrial conference on May 16th, after

I6QJGAL1

1    receiving supplemental submissions from the parties, I refused

2    to alter my previous ruling that I would not admit John

3    Galanis' guilty plea in Gerova.  I specified, however, the

4    particular ways in which Mr. Touger could open the door to such

5    evidence; namely, by arguing that, "John Galanis didn't know

6    that Jason Galanis had a history of engaging in fraudulent

7    activity or that John Galanis was duped by Jason in the context

8    of this conspiracy."  That is the May 16th transcript, Page 9,

9    Line 7 through 10.

10          After saying he would not defend this case on the

11   basis that John Galanis was just following the instructions of

12   Jason Galanis and trusted him to the nth degree, Mr. Touger

13   expressed his agreement with my assessment of which argument

14   would open the door, saying, "I would agree with your Honor."

15   That's at Page 99, lines 1 through 11.

16          On June 14th, in the middle of trial, the government

17   again attempted to introduce evidence of Gerova on the basis

18   Mr. Touger had opened the door by virtue of his

19   cross-examination of certain government witnesses.  I denied

20   that motion, but reiterate to Mr. Touger that he would open the

21   door if he made -- and I am now quoting -- an explicit argument

22   that John Galanis was unaware of Jason Galanis' history of

23   fraud or that he was duped by Jason Galanis in the context of

24   this conspiracy.  Transcript of June 18th, Page 2457, lines 18

25   to 21.

I6QJGAL1

```
 1              Moreover, I specifically cautioned Mr. Touger that he
 2      could still open the door during summations, and if he did, I
 3      would not hesitate to permit the government to introduce
 4      evidence of John Galanis' guilty plea in Gerova, and I cited
 5      the Alcantara case, 674 Federal Appendix 39, 24-34 at that
 6      time.  That is precisely what happened yesterday, and perhaps
 7      the most egregious example of Mr. Touger's intentionally
 8      attempting to mislead the jury, and I think there are many, and
 9      thus opening the Gerova door, he argued the following to the
10      jury:
11              The evidence demonstrates Jason Galanis was able to
12      fool each and every person in this case, get each and every one
13      at some time to do what he wanted without letting them know the
14      real reason for what really happened.  Jason fooled two of the
15      largest successful law firms.  He fooled Mr. Raines.  He fooled
16      the most respected accounting firms in the world that all the
17      deals were on the up and up.  He fooled the marketing.  He
18      fooled his own cronies.
19              The evidence clearly shows, and the prosecution has
20      not produced any evidence to the contrary, this proves the fact
21      that Jason could fool anyone.  Through it all, the prosecution
22      has produced no evidence that shows that John Galanis had any
23      idea or involvement with what his son was doing, and he, John
24      Galanis, was still held in high regard to the end.  That is the
25      transcript of yesterday, 3764.
```

1          To be clear, Mr. Touger was not precluded from arguing

2     that John Galanis was not involved in the fraud, that the

3     transaction itself was not fraudulent or even that John Galanis

4     lacked the requisite knowledge or intent to be convicted, but

5     in order to avoid opening the door to Gerova, he was not

6     allowed to argue that John Galanis lacked the requisite

7     knowledge or intent because he was duped by Jason Galanis.

8          The government now seeks to introduce portions of John

9     Galanis' plea and sentencing allocutions from Gerova.  In

10    entering his guilty plea, John Galanis stated the following:

11         I, John Galanis, along with others, conspired to

12    commit securities fraud in or about 2009 to in or about 2011,

13    in that I and others openly managed brokerage accounts of an

14    individual and effected the sale of Gerova stock and received

15    and concealed proceeds derived therefrom, knowing that this

16    activity was designed to conceal from the investing public the

17    true ownership and control of that Gerova stock.

18         Then at sentencing he stated most of my involvement in

19    the Gerova matter started when Jason came to me and asked me to

20    sell the shares on an arrangement he had made with an

21    investment adviser.  Jason explained the deal would be the

22    investment adviser would buy shares which would save him and

23    Gerova.  I am going to permit the government to introduce this

24    evidence of John Galanis' guilty plea at sentencing proceeding.

25         Although Rule 404 (b) bars the introduction of other

I6QJGAL1

act evidence to prove that the defendant has a propensity to

commit the offenses charged, it allows admission of such

evidence for another purpose, such as motive, opportunity,

plan, preparation, absence of mistake or lack of accident.

The Second Circuit has adopted an inclusionary

approach to Rule 404 (b) under which all other act evidence is

generally admissible unless it serves the sole purpose of

showing a defendant's bad character.  See the Siddiqui case,

699 F.3d 702.  To determine admissible under 404 (b), the court

should consider whether the evidence is offered for a proper

purpose.  The evidence is relevant to a disputed issue, and the

probative value of the evidence is substantially outweighed by

its prejudicial effect.  See the Curley case, 639 F.3d at

56-57.

Evidence of John Galanis' guilty plea in Gerova is not

barred by 404 (b).  It is not being offered as propensity

evidence, but rather as probative of John Galanis' knowledge

and intent in this case.  Indeed, counsel for John Galanis

argued at length yesterday that he was fooled by Jason Galanis

in the context of a WLCC scheme and lacked knowledge as to the

fraudulent aspects of the bond offerings, that John Galanis had

previously pled guilty to committing securities fraud with

Jason Galanis is, thus, exceptionally probative of John

Galanis' knowledge and intent.

Moreover, this evidence does not run afoul of Rule

I6QJGAL1

403.  It is probative that evidence that will not result in
unfair prejudice to John Galanis.  In fact, in light of the
affirmative arguments amassed by Mr. Touger, it is the
government that will be unfairly prejudiced if the jury is left
with the false impression that John Galanis was unaware of
Jason Galanis' mentioned fraud.

As I detailed, defense counsel for John Galanis was
put on notice on several occasions that were he to advance the
very argument he made including during his summation, the
Gerova evidence would be submitted, but he nonetheless
proceeded to intentionally and fraglantly run afoul of my
numerous previous warnings opting strategically not to raise
this issue with me before summation, ex-parte or otherwise, due
to his purported misplaced reliance an inapposite case law.

Given these circumstances, the jury cannot be left
with a wholly inaccurate impression that resulted from this
argument.  I will, of course, offer a robust limiting
instruction as to both Mr. Archer and Mr. Cooney and will also
need to add 404 (b) instruction to the jury charge.

When the government introduces this evidence, here is
what I propose, drawing on the government's proposed 404 (b)
charge and the limiting instructions I have given previously
with respect to Jason Galanis' arrest in Gerova.  The
government has offered evidence tending to show that on another
occasion, John Galanis engaged in conduct similar to the

I6QJGAL1

charges in the indictment.  In that connection, let me remind you that John Galanis is not on trial for committing acts not alleged in the indictment.

Accordingly, you may not consider this evidence of similar acts as a substitute for proof that John Galanis committed the crimes charged, nor may you consider this evidence as proof that John Galanis has a criminal personality or bad character.  The evidence of other similar acts was admitted for a much more limited purpose, and you may consider it only for that limited purpose.

If you determine that John Galanis committed the acts charged in the indictment and the similar acts as well, then you may, but need not draw an inference in doing the acts charged in the indictment, John Galanis acted knowingly and intentionally and not because of some mistake, accident or other innocent reasons.  Evidence of similar acts may not be considered by you for any other purpose.

Specifically, you may not use this evidence to conclude that because John Galanis committed the other act or acts, he must have committed the acts charged in the indictment.  Then I will add, and Mr. Schwartz will note, I will hear you out on this, I will add it is also important for you to know John Galanis' guilty plea was to charges stemming from the investigation that resulted in John Galanis' arrest in September of 2015 which you have already heard about.

I6QJGAL1

                  I reiterate to you now that the conduct for which

Jason Galanis was arrested and John Galanis pled guilty was

entirely unrelated to this case.  I further instruct you that

Mr. Archer and Mr. Cooney were not subjects of that

investigation and there is no evidence that either of them knew

about Jason or John Galanis' fraudulent conduct until after

Jason Galanis was arrested in September of 2015.  You are not

to consider this evidence in any way against Mr. Archer or Mr.

Cooney.

                  MS. NOTARI:  Your Honor, my concern is not only the

fact that there is the phone call to Francisco Martin about the

arrest of Jason Galanis regarding Gerova, but that the

government's, you know, not suggesting anything from the

evidence that after the arrest of Jason Galanis, that that

should be indicative of anything, providing I don't go that

direction with my argument.  Hopefully --

                  THE COURT:  Can you clarify that?

                  MS. NOTARI:  In other words, they can't argue any

post-evidence of Jason Galanis' arrest that Mr. Cooney should

have known or this is some kind of conscious avoidance because

now more than ever this is right in front of the jury.

                  THE COURT:  It was in front of the jury before with

respect to Jason Galanis' arrest.  The only additional fact

with respect to your client was John Galanis was part of it.

                  Has there been any evidence of contact between your

I6QJGAL1

1    client and John Galanis?

2                MS. NOTARI:  No, no.

3                THE COURT:  I can understand the prejudice if this

4    related to someone that he was close to or in contact with with

5    Archer or Cooney, but instead this really just goes to John

6    Galanis, and I think that everyone has essentially acknowledged

7    they had no connection to one another, correct?

8                MR. SCHWARTZ:  John Galanis and Mr. Archer and Cooney?

9                THE COURT:  Yes.

10               MR. SCHWARTZ:  That is not in dispute.

11               THE COURT:  Okay.

12               MR. SCHWARTZ:  So I have a number of thoughts.

13               THE COURT:  Sure.

14               MR. SCHWARTZ:  I may have missed it, but is it your

15   Honor's intention to allow the government to admit that

16   evidence that they suggested in their letter?

17               THE COURT:  Yes.

18               MR. SCHWARTZ:  You would do it in the way they

19   suggested, in other words, that would be introduced now?

20               THE COURT:  Correct.

21               MR. SCHWARTZ:  And we would have supplemental argument

22   limited or however you do it by time or by subject matter with

23   Mr. Touger, or I guess the government first and Mr. Touger?

24               THE COURT:  I was going to let them do that so that

25   you could say what you wanted to say.  I wanted it before your

I6QJGAL1

summation and Mr. Cooney's summation, but I am happy to hear
you out.

          MR. SCHWARTZ:  It is like a big stink bomb right
before I speak.  I understand we are where we are, and I am not
weighing in on what happened, but it is prejudicial to Mr.
Archer for all the reasons I said before.

          I guess if I had a logistical proposal, it would be
this, and I am not sure there is any exact precedent for this.
It is sometimes the case, for example, in trigger lock cases
where an issue is submitted to the jury, and then after they
come back --

          THE COURT:  There is no way to do that because the
whole issue with respect to -- there is no way to bifurcate
this.

          MR. SCHWARTZ:  What I would suggest, your Honor, is I
could close, Ms. Notari could close, the government could
rebut.  The jury could be instructed to deliberate solely with
respect to Mr. Archer and Mr. Cooney, and after they return a
verdict, assuming they return a verdict, they could receive
this evidence, there could be supplemental argument, and that
way there wouldn't be a taint with respect to the Gerova
arrest.

          THE COURT:  I am not going to do that.  I will if you
wanted me to wait and have the government do it after your
summations, I am happy to do that or before.  I also want to be

I6QJGAL1

1   clear that the government's supplemental summation has to be

2   really short and cannot attack Mr. Touger.

3           I don't want a suggestion that there was an attempt to

4   mislead the jury, but I am open to the timing, but I am not

5   going to otherwise follow that recommendation.

6           MR. SCHWARTZ:  I would like to put distance between

7   this issue and my remarks.  I'll say out loud, but I know what

8   your Honor's answer is going to be.  I propose you do this now,

9   and I get to sum up in the morning so that I don't have to go

10  right on the heels of this new and highly prejudicial issue.

11          THE COURT:  But I don't think it taints your client in

12  any way.  I am giving this specific instruction that is almost,

13  almost helps him in a way, no?

14          MR. SCHWARTZ:  Look, I appreciate that, I appreciate

15  the instruction.  I think that is very robust, and we had

16  proposed something way back when that was a little bit more

17  definitive, but I can't really take issue with the language of

18  your Honor's instruction.

19          Nonetheless, the suggestion that -- not the

20  suggestion -- the proof that John Galanis and Jason Galanis

21  previously committed securities fraud together during the time

22  period of this case, and combined with the arguments that the

23  government made yesterday and that I anticipate they'll make in

24  rebuttal about the way the various defendants reacted when

25  Jason Galanis was arrested, I think are deeply prejudicial.

I6QJGAL1

1          MS. NOTARI:  At this point, the only evidence they

2     have against Mr. Cooney -- absolutely CNB is ridiculous, okay?

3     It is ridiculous.  And you're going to see how it is

4     ridiculous, but the whole evidence of 1920 Bel Air, their own

5     cooperator fully knew about 1920 Bel Air.

6          THE COURT:  Just focus on this --

7          (Multiple voices)

8          MS. NOTARI:  About Francisco Martin is that he came --

9     I don't think there was any mention of him yesterday except for

10    the phone call, and that is basically their evidence against

11    Mr. Cooney is this phone call that now is like going to be

12    blown up into something more, and it is --

13         THE COURT:  I don't think it is being blown up.

14         Look, the jury knows there was a fraud, they know

15    Jason Galanis who both of your clients knew well was in on it.

16    The fact that his father, who they didn't have connections to,

17    was also in on this previous fraud, I don't think it hurts your

18    clients in particular because I am giving this very clear

19    instruction that not only can this evidence not be considered

20    against either of them, but I am instructing them factually,

21    with the government's consent, that Mr. Archer and Mr. Cooney

22    were not subjects of that investigation and there is no

23    evidence that either of them knew about Jason or John Galanis'

24    fraudulent conduct until after Jason Galanis was arrested in

25    September 2015.

I6QJGAL1

1          MS. NOTARI:  The evidence against my client at this

2     point is that Jason Galanis and Bevan Cooney are childhood best

3     friends, they are best friends.  Every witness who had nothing

4     to say about Mr. Cooney's knowledge testified that they are

5     best friends.  They blew up on a screen they're childhood best

6     friends and now we know about this arrest.  Well, what kind of

7     best friend doesn't know about your father's prior conviction?

8          THE COURT:  But the best friend's arrest was already

9     in evidence a while back.  So the fact his father was in on it,

10    I am not sure how that hurts your client.

11         MS. NOTARI:  Because it is common sense.

12         With all respect to your Honor, I know you're trying,

13    and this is something that we're all going on the fly here, but

14    literally juries are smart, and this is common sense.  That

15    would be the first thing that I would talk about if I were in

16    the jury room, was you know what, there is none of this

17    evidence, but we know they're best friends and they have this

18    very close childhood relationship, and, of course, Mr. Cooney

19    knew that John Galanis was a convicted fraudster with his son,

20    and that is the bottom line.  That is all they need.  They're

21    being allowed to convict Mr. Cooney based on that evidence, and

22    it is just so prejudicial.

23         THE COURT:  I honestly don't think it is prejudicial.

24         Go ahead.

25         MS. MERMELSTEIN:  I completely agree.  I, frankly,

I6QJGAL1

having made these arguments, there is no doubt, maybe I am
wrong, Mr. Schwartz and Ms. Notari will get up and say to the
jury look, there was a fraud here and there were people here in
it and people who weren't in it.  John Galanis was sort of
doing other frauds with Jason Galanis, and you heard him.

Look, we consented to the court's instructions with
respect to the no evidence language, but it is very different
for the court to give that instruction than for a lawyer to be
able to argue there was no evidence in the trial.  I think it
is a windfall to them.  I don't think it is necessary to be
clear for it to be given again.

There is no suggestion they were, and I think it
oversells the situation.  They're definitely going to use this
as a way to separate themselves from the fraud, and that is
fine.  I am not suggesting they shouldn't be allowed to do
that.  The notion it is prejudicial to them when the jury
already knows Jason Galanis was arrested, to learn that John
Galanis was in on that is just silly.

With respect to the best way to proceed, I think it
should be handled now, it shouldn't wait until the end, and I
think there is no reason that -- I agree with your Honor, the
summation is about this new piece of evidence and nothing else,
it will be short.  Mr. Touger will be short.  We'll take a
10-minute break and Mr. Schwartz can start.  I want to make
sure I was understanding what your Honor said about attack on

I6QJGAL1

1    Mr. Touger.  I am not going to suggest that sort of he violated

2    the court's order or that he did something nefarious.

3              THE COURT:  You --

4              (Multiple voices)

5              MS. MERMELSTEIN:  What he said, right, he made an

6    argument to the jury, and that argument is wrong.

7              THE COURT:  Yes, yes absolutely.  I just didn't

8    want --

9              MS. MERMELSTEIN:  We want --

10             (Multiple voices)

11             THE COURT:  I was just going to tell the jury that the

12   evidentiary record is being briefly reopened.  I wasn't going

13   to say why.

14             MS. MERMELSTEIN:  Okay.

15             THE COURT:  I didn't want to place personal blame.

16             This is essentially what happened in Alcantara, and so

17   it was affirmed by the circuit, and so I think that is the best

18   way to go.

19             MS. MERMELSTEIN:  Logistical, in terms of the

20   substance of what is going to come in, I know how your Honor

21   wanted to do that.  I think that the plea and sentencing

22   transcripts are largely sort of -- they're helpful.  He only

23   says it to Jason.  There is no dispute it is Jason Galanis.

24             I think we are in a pretty different situation than we

25   were when Gary Hirst was in the trial about concerns about

I6QJGAL1

1    referencing the fact of arrest and conviction than we were when

2    there was a bigger case.  I wanted to understand how your Honor

3    wanted to do it.

4         I assume there is not going to be need to call

5    witnesses to authenticate the transcripts from those things

6    themselves, although I will note I have communicated with the

7    court reporters for both of them, and they're both working

8    today, working on other trials and they're busy and they're

9    here if we need to do it.

10        MR. TOUGER:  For the record, I would ask for an

11   adjournment to call Jason Galanis as a witness in the trial.

12        THE COURT:  That request is denied.  You knew full

13   well what was going to happen if you chose to make the

14   arguments you did.  The evidentiary portion of this trial is

15   over.  I also, frankly, don't quite understand this request

16   because this goes to his knowledge, intent previously.  You

17   could have called him as a witness anyway in this case.  His

18   knowledge and intent has always been an issue in dispute.

19        MR. TOUGER:  Calling Mr. Jason Galanis has pluses and

20   minuses to it, and we made the strategic decision during the

21   trial that the minuses outweighed the pluses, but at this point

22   I don't think that is true any more, that Jason Galanis would

23   come here and say John Galanis had no knowledge of this

24   situation.

25        THE COURT:  I don't think that that would be proper

I6QJGAL1

1   rebuttal to the plea unless you're literally saying that that

2   was not him that made those statements.  I don't think it is

3   proper rebuttal anyway.

4           MS. MERMELSTEIN:  I note for the record it may moot

5   this issue, your Honor is exactly right in any event.  By

6   complete happenstance, I ran into Mr. Jason Galanis' lawyer

7   this morning, who has been following the trial out of

8   curiosity.  I noted Mr. Touger indicated he would seek to call

9   Mr. Galanis, and his counsel indicated that Jason Galanis would

10  certainly not be willing to testify.

11          MR. TOUGER:  That is exactly the opposite of what he

12  told me, Jason Galanis told me.

13          THE COURT:  How recently was that?

14          MR. TOUGER:  Excuse me?

15          THE COURT:  When was that?

16          MR. TOUGER:  I personally spoke to Jason Galanis

17  months ago.

18          THE COURT:  It seems like right now his lawyer is

19  saying --

20          MR. TOUGER:  He has been in communication with his

21  mother and other people.

22          THE COURT:  In any event, you could have called him.

23  I don't think it is proper rebuttal.  You knew exactly what was

24  going to happen if you did this, and you made a strategic

25  decision that this was in your client's interest.

I6QJGAL1

1          MR. TOUGER:  That is the court's ruling, and I will

2     abide by it.

3          THE COURT:  Okay.

4          MR. TOUGER:  So if I am understanding you correctly,

5     what is going to happen is what is in the government's letter?

6          THE COURT:  Yes.  The question is do we need to call a

7     witness from the court reporter's office?

8          MR. TOUGER:  No.

9          THE COURT:  I don't think so.  You said that is not an

10    issue.

11         MS. MERMELSTEIN:  My question, it wasn't clear to me

12    in the way your Honor was describing what the --

13         THE COURT:  What would you propose?

14         MS. MERMELSTEIN:  The question is whether or not the

15    jury will understand the thing that Jason Galanis was arrested

16    for in 2015 is this thing because the conduct itself is in 2009

17    through to 2011, it is not clear it is the same thing and not

18    yet another Jason Galanis fraud.

19         I also think it is relevant to the arguments Mr.

20    Touger made that Mr. John Galanis was arrested at that same

21    time because one of the arguments that Mr. Touger advanced

22    yesterday was that sort of like no one else was talking to John

23    Galanis.  Late in the game, that is among other reasons he is

24    arrested in the Gerova case.

25         So the stipulation that was previously proposed in

I6QJGAL1

1    light of the court's then ruling was not going to be allowed to

2    get into any fact of arrest or conviction.  That is why we

3    pulled this language.  I think that now, giving the lay of the

4    land, it is appropriate to, if nothing else, indicate that John

5    Galanis was arrested in September of 2015 for this conduct.

6              MR. TOUGER:  Actually the evidence in this case is

7    slightly different than that.  The evidence in the case was Mr.

8    Raines and Mr. Anderson continued to speak to Mr. Galanis past

9    the day he was arrested.

10             MS. MERMELSTEIN:  Yes, some people did.

11             There has been a real focus on why was John Galanis

12   kept away from everybody else, and that is part of the story.

13   Mr. Touger is not wrong that some of the witnesses did not

14   immediately cut off Mr. Galanis.  I also think it is confusing

15   to the jury.  It leaves a weird question of were we talking

16   about the same thing or aren't we?  Since we are, it makes

17   sense to make that clear.

18             THE COURT:  What would you propose in terms of -- do

19   you want to jump in?

20             MR. SCHWARTZ:  Is it important to the government's

21   argument it is the same?

22             MS. MERMELSTEIN:  I think it is confusing.  Because of

23   where we were then, the government did not elicit from

24   witnesses that the 2015 arrest related to the Gerova conduct.

25   You'll recall Francisco Martin said that --

I6QJGAL1

1          MR. SCHWARTZ:  I agree with you entirely.  This case

2    would have been entirely different.

3          MS. MERMELSTEIN:  Sure.  If you now put in they don't

4    know that the 2015 related to Gerova given the time of the

5    conduct, they're not going to have any reason to think that the

6    conduct which John Galanis admitted in Gerova was sort of the

7    arrest that was in 2015, and it leaves open the notion for the

8    jury they're being told for the first time additional bad

9    conduct by John Galanis, not the same bad conduct.  No one is

10   arguing John Galanis is a good guy.  I am not worried them

11   thinking that.  I think it is confusing.

12         THE COURT:  Let me know what you propose.

13         I what I had suggested saying, but I don't want to

14   testify to something that there is not consent to, or I don't

15   want to testify at all, obviously, but I don't want to say

16   something there isn't an agreement on.

17         I was going to say that the guilty plea was to charges

18   stemming from the investigation that resulted in Jason Galanis'

19   arrest in September 2015 which you have already heard about.  I

20   reiterate to you now the conduct for which Jason Galanis was

21   arrested and John Galanis pled guilty was entirely unrelated to

22   this case.  If that is not in evidence, I don't want to say it

23   unless there is consent.

24         MR. SCHWARTZ:  Can I think about that for a minute?

25         I am taking this all in, and I think I probably will

I6QJGAL1

1    get to where Ms. Mermelstein is if I can have two minutes, as

2    we talk about other things to reflect on it.

3              THE COURT:  Sure.

4              MR. SCHWARTZ:  On a separate note, I do think your

5    Honor should say something to the jury about why this evidence

6    is coming in now.  This is not like other instances where 404

7    (b) has been entirely excluded, so when it comes in, it is a

8    new thing.  Here we have been dabbing around this issue

9    especially if you associate it with the September 2015 arrest.

10             MR. TOUGER:  I have no problem if you say because of

11   the arguments I made.

12             THE COURT:  Okay, then I will.

13             MR. SCHWARTZ:  I agree with Ms. Mermelstein at a

14   minimum there should be a break between this portion and my

15   argument.

16             THE COURT:  That is fair.  I agree with you on that.

17   Back to how this is coming in --

18             MS. MERMELSTEIN:  What your Honor has proposed, I

19   think to couple what your Honor has said, on July 20, 2016, in

20   connection with the entering of guilty plea, John Galanis said

21   the following.  I am sorry.  I am thinking on the fly, and I am

22   wondering if there is a more straightforward way to do to tell

23   the jury.  We are fine with your Honor instructing the jury.  I

24   think there won't be any dispute about the facts, right, that

25   between X date and Y date -- can I have one moment to think

I6QJGAL1

without doing it out loud?

        THE COURT:  Think about it and let me know.  Why don't we take a break for five minutes.  Think about it and let me know what you want me to say very specifically other than what I -- well, I have already told you what I plan to say in terms of my 404 (b) instruction.  Tell me if that needs to be tweaked at all.

        MS. MERMELSTEIN:  With respect to the 404 (b) --

        THE COURT:  The second paragraph with respect to the evidence, we'll print you that paragraph for everybody.

        (Recess)

        THE COURT:  What would you propose?

        MS. MERMELSTEIN:  We would propose that your Honor or the government, by stipulation, tell the jury that on July 20th of 2016, John Galanis pled guilty to conspiracy to commit securities fraud in or about 2009 to 2011.

        THE COURT:  Is this language on consent?

        MS. MERMELSTEIN:  I ran it by Mr. Schwartz and Ms. Notari, but I didn't run it by Mr. Touger, to whom it would be most important.  Then I think we can use the language from the plea allocutions.  It can't be disputed as being accurate, in that -- let me start over.

        I, John Galanis, along with Jason Galanis and others, conspired to commit securities fraud in or about 2009 to in or about 2011, in that I and others openly managed brokerage

I6QJGAL1

1    accounts of an individual and effected the sale of Gerova stock

2    and received and concealed proceeds derived therefrom, knowing

3    that this activity was designed to conceal from the investing

4    public the true ownership and control of that Gerova stock.

5            In essence, it is the first paragraph of the proposed

6    language from the plea, with the added notation it was made in

7    connection with his plea and that one of the others is Jason

8    Galanis.  I think that is an easier and cleaner way to tell the

9    jury that information.

10           I think we are agnostic whether or not the jury should

11   be told this conduct was the conduct for which Jason Galanis

12   was arrested in 2015.  I think the defense, at least Mr.

13   Schwartz was inclined to do that, and that is fine with us.

14           THE COURT:  Mr. Touger, I understand you have an

15   objection to this coming in at all, but given my ruling, do you

16   have an objection to that language?

17           MR. TOUGER:  The language in the letter?

18           THE COURT:  Sorry?

19           MR. TOUGER:  It is --

20           THE COURT:  It is tweaked a little bit.  You add the

21   name Jason to the plea transcript, where it was in the

22   sentencing transcript.

23           MS. MERMELSTEIN:  It is cleaner to do it that way.

24   There is no dispute it was with Jason Galanis.

25           THE COURT:  You could say to be accurate in connection

I6QJGAL1

1    with this case, but I am open to whatever you all --

2              MR. TOUGER:  We should mimic the language that is in

3    the letter.

4              MS. MERMELSTEIN:  The issue there is that the

5    sentence, he references Jason in the sentencing.  It is not

6    apparent from that it is Jason Galanis.  There is no dispute it

7    is Jason Galanis.  The indictment only charges one Jason.  It

8    is obviously Jason Galanis.

9              MR. TOUGER:  If you have Jason Galanis, I have no

10   objection to that.

11             MS. MERMELSTEIN:  Then you don't --

12             THE COURT:  Fine.

13             MR. TOUGER:  What was that?

14             MS. MERMELSTEIN:  Do you want me to reread what we are

15   going to say?

16             MR. TOUGER:  Yes.

17             MS. MERMELSTEIN:  The government can read a

18   stipulation or your Honor, if people prefer, can instruct the

19   jury on July 20th, 2016, John Galanis pled guilty to

20   participating to conspiring with Jason Galanis and others to

21   commit securities fraud in or about 2009 to in or about 2011,

22   in that John Galanis and others openly managed brokerage

23   accounts of an individual and effected the sale of Gerova stock

24   and concealed and proceeds derived therefrom, knowing this

25   activity was designed to conceal from the investing public the

I6QJGAL1

1    true ownership and control of the Gerova stock.

2             It tweaks the first paragraph to make clear it was his

3    plea and it was Jason Galanis.

4             MR. TOUGER:  That is fine.

5             THE COURT:  That is fine.  You should do it in light

6    of the consent of Mr. Touger on this point.  I understand he is

7    not consenting generally.

8             In light of an argument Mr. Touger made yesterday, I

9    will say I am going to briefly allow the government to

10   supplement the evidentiary record.  Then I am going to let you

11   read it, and then I was going to read the two paragraphs that I

12   handed out unless there is again an objection to the specific

13   language.

14            MS. MERMELSTEIN:  One objection to the specific

15   language, I think in some ways -- well, I think the issue with

16   respect to the re-instruction about Archer and Cooney is that

17   the language is too broad.  All your Honor is saying, and all

18   that would be accurate to say, is that they didn't, there is no

19   evidence that they knew of this particular fraudulent conduct

20   by Jason Galanis and John Galanis, right, the Gerova conduct.

21   There is, in fact, evidence they knew of other fraudulent

22   conduct by Jason Galanis, and I wouldn't want the jury to think

23   your Honor was telling them more than really is correct.

24            So we would propose that -- I don't think this

25   instruction is needed, but if it is going to be given, we

I6QJGAL1

propose it say, "I further instruct you Mr. Archer and Mr.
Cooney were not subject of that investigation and there is no
evidence that either of them knew about Jason and John Galanis'
fraudulent conduct in connection with that investigation or
Gerova until after Jason was arrested."

            THE COURT:  How about in connection with that matter?

            MS. MERMELSTEIN:  That is fine, your Honor.

            THE COURT:  So again I am just going to say, "In light
of an argument Mr. Touger made yesterday, I will briefly allow
the government to supplement the evidentiary record."  You are
going to read what you're going to read, and then I will read
this instruction.  Does anyone else want to be heard?

            MR. TOUGER:  Could I have a sidebar?

            THE COURT:  Yes.

            (At sidebar)

            MR. TOUGER:  If you remember Mark McMillan testifying
during his testimony that there was an event that took place
that caused the separation of John and Jason.  That is why
John -- (inaudible) -- in Dutchess County.  I want to say about
that, I want to make sure it is okay with you that now you know
what that event was.

            THE COURT:  Yes, I think that is fine.  It is
argument, so it is fine.

            (In open court)

            MR. SCHWARTZ:  So most of the second paragraph is

I6QJGAL1

1    adapted from what your Honor has said before, but before the

2    jurors knew there was an arrest, but not that it was securities

3    fraud or that there was an investigation.

4              I think the last sentence just needs to be tweaked to

5    say that I further instruct you that Mr. Archer and Mr. Cooney

6    were not subjects of that investigation and there is no

7    evidence that either of them knew about Jason and John Galanis'

8    fraudulent conduct in that matter, or the investigation of it,

9    until after Jason Galanis was arrested in September of 2015.

10             MS. NOTARI:  Your Honor, just for the record, I do

11   want to move for a mistrial.  I think there is no coming back

12   from this prejudice.  I don't think Mr. Cooney can have a fair

13   trial at this point.  I do think that if this had been the case

14   in our pretrial hearing, we would have likely asked for

15   severance.  I am moving for mistrial.

16             THE COURT:  That motion is denied.  For all the

17   reasons I said, I don't think your client is prejudiced, and

18   that motion is denied.

19             MR. SCHWARTZ:  If we can just join for the record.

20   Thank you.

21             THE COURT:  Yes.

22             MR. SCHWARTZ:  Thank you.

23             THE COURT:  Are we set up?

24             MS. MERMELSTEIN:  I am sorry, your Honor.  We were

25   doing too many things at once and I didn't hear what was being

I6QJGAL1

said.

(Off-the-record discussion)

MS. MERMELSTEIN:  Your Honor, with respect to the
knowledge of the investigation, I think there is too much of a
windfall here being given to Mr. Archer and Mr. Cooney by
having the court direct that they didn't know something or they
have already been instructed.

I don't think we should give them a more comprehensive
instruction in part because I don't think it is, in fact, clear
they didn't know.  I agree the government hasn't put forward
that evidence, but a lot of people knew this investigation was
going on because a lot of people had been spoken to.  I think
it risks that your Honor's telling the jury something that
isn't necessarily factually correct, and I think it coming from
the court rather than from a lawyer saying well, there is no
evidence that they knew that, it gives it too much of an
imprimatur because the jury believes everything the court tells
it.  It knows the arguments of counsel are just argument.

We agree to this struck previously.  We are not
withdrawing that, but I don't think any further additional
instructions should be given.

THE COURT:  Tell me why the investigation matters.

MR. SCHWARTZ:  So previously all that was in evidence
was that there was an arrest in September 2015.  There was no
indication of what it was.  There was no indication that it was

I6QJGAL1

a securities fraud, that it involved numerous co-conspirators
or that there was an investigation which your Honor has
explicitly referencing here, and which this jury knows from
their common sense, having seen the kind of work that goes into
putting together a securities fraud and conspiracy
investigation, and so absent that instruction, it would be
absolutely reasonable for the jurors to infer, although they
may not have known Jason Galanis' criminal conduct, they knew
he was under investigation, right?

        They have heard that starting in October 2015,
everyone knew this case was under investigation because
subpoenas started dropping and it wouldn't be hard for them to
assume everyone knew in that case subpoenas started dropping.

        I have no idea what the government did with subpoenas,
but it is objectively true that there is no evidence in this
trial record and to my knowledge there is no evidence, period,
Mr. Archer was aware of any such investigation.  He was totally
removed from those people, those players, those facts, and I
think that is fair.

        If the government is going to get to put in this
evidence, which is prejudicial to Mr. Archer and Mr. Cooney,
then that has to be cauterized so that it is about John
Galanis.  The statement to the jury, notwithstanding whatever
the government thinks they know from their other investigation,
there is no evidence that Mr. Archer and Mr. Cooney knew about

I6QJGAL1

1    the investigation or the conduct is an accurate statement.

2          I had fought before, if you recall, to say

3    affirmatively Mr. Archer and Mr. Cooney did not know, and the

4    government, even though they had no evidence that they knew,

5    didn't want to subscribe to that fact, and so we arrived at

6    this way of saying it.  That is also a fair way to say it about

7    the investigation.

8          THE COURT:  I'll just consider that whether to put in,

9    "Or the investigation of it."  Otherwise, we are ready to

10   proceed.  Then we'll take a break, right?  So we'll just be

11   here for a minute or two, we'll take a break and then we'll

12   come back and hear your summation.  We're going to check on the

13   jury.

14         MR. SCHWARTZ:  Were we going to go over the other

15   outstanding elements of the charge?

16         THE COURT:  I am happy to.  Tell me what you need to

17   know.

18         MS. MERMELSTEIN:  I am sorry to interrupt.  I want to

19   make sure, because we have edited the proposed stipulation the

20   government will read on the fly here, I am saying what everyone

21   agrees I should say.  Do you want me to say this is in

22   connection with the 2015 arrest?

23         MR. SCHWARTZ:  The court will say that.

24         THE COURT:  I will say that.

25         MS. MERMELSTEIN:  I will say this.

I6QJGAL1

1           THE COURT:  It is my understanding everyone consents

2     to my saying it was to charges stemming from the investigation

3     that resulted in Jason Galanis' arrest in September 2015 which

4     you already heard about.

5           MS. MERMELSTEIN:  That is totally fine, your Honor.

6     Thank you.

7           THE COURT:  All right.  We'll see if the jury is here.

8     Why don't we start talking about the remaining issues on the

9     charge.  If they're here, we'll bring them in at least for this

10    small portion, and we can talk about anything else you need to

11    know before your summation.

12          MR. TOUGER:  We are going to do the -- (Inaudible).

13          THE COURT:  Yes.

14          MR. SCHWARTZ:  I didn't have anything specific.  I

15    thought that was before this came up.  I thought that was the

16    reason we were coming in early.

17          THE COURT:  We were initially.

18          MR. SCHWARTZ:  Events have overtaken us, I understand.

19          THE COURT:  I can hand out new drafts of -- I was

20    going to circulate it initially at 12:00, but then we went on

21    to this.  I am happy to circulate a new draft now.  If there is

22    any issue, any language you want to rely on, I am happy to talk

23    about it specifically now.  Otherwise, we can talk about it at

24    the end of the day.

25          MR. SCHWARTZ:  There are parts of the charge.  I don't

I6QJGAL1

1    think there was anything that we were discussing that I am

2    going to talk about, although I may talk about the conscious

3    avoidance.  I don't know if the language has changed.

4              THE COURT:  I don't think so.

5              MR. SCHWARTZ:  Any information you have for us would

6    be helpful.

7              MS. TEKEEI:  Your Honor, in case Mr. Schwartz intends

8    to rely on potential instructions related to the unanimity of

9    the government's theory, which we oppose, we would like to be

10   heard on that before he does that or before the court allows

11   for such an instruction.

12             MR. SCHWARTZ:  I don't think we got anything new from

13   the court on that.

14             THE COURT:  The conscious avoidance hasn't been

15   changed at all.  To be clear, I will print out a redline

16   version.  On unanimity I wasn't going to use a verdict form in

17   the way that you did, but I was going to make clear, and I will

18   get out the language with respect to unanimity, we'll print

19   that out now and I can read you what I was intending to

20   instruct the jury.  Again if there is anything you wanted to

21   rely on for the purposes of your summation, we should talk

22   about it now.

23             MR. SCHWARTZ:  I will take another look and talk about

24   reasonable doubt.  I am sure it hasn't changed.

25             On this point, I will look at what your Honor had

I6QJGAL1

said.  I was going to talk about factually what the government
has charged in this case and the two aspects of the securities
fraud, but I didn't have charging language and I wasn't
intending to put charging language in.

MS. TEKEEI:  We disagree that factually it has been
charged in two separate theories, and that is what we wanted to
talk about before the court settled on any language that would
get to that.  We don't think there is a basis in the case law
for such an instruction, and the case was not charged in that
way.

MR. SCHWARTZ:  I am not going to argue the law.  I am
going to simply put up the "to wit" language of the securities
fraud count and say this is really talking about two things,
two sets of victims, and all the things that I have been saying
without any reference to how they have to deliberate or
anything like that.

MS. NOTARI:  Your Honor, my microphone is not working.
I will speak loudly.  I just also, if the court is not inclined
to grant a mistrial, I just consulted with some others, and I
am moving for a severance.  I just want the record to be clear.

THE COURT:  That motion is denied.

MS. NOTARI:  I see this is catastrophically
prejudicial.

THE COURT:  I totally disagree, but your objection and
motion are preserved for appellate purposes.

I6QJGAL1

1          MR. QUIGLEY:  Just one other housekeeping issue while

2     we are at it.  I know Mr. Schwartz handed out Power Points in

3     his final witness yesterday.  I want to make sure those were

4     collected and were not back in the jury room, which I don't

5     think would be appropriate.

6          THE COURT:  I don't know.  I will see.  If they're

7     exhibits, we'll take them so we send back everything at once.

8          MR. QUIGLEY:  Thank you.

9          THE COURT:  Yes.

10         MS. TEKEEI:  If we are waiting for the jury?

11         THE COURT:  We are.

12         MS. TEKEEI:  Your Honor, we read Mr. Schwartz's letter

13    that he filed yesterday.  We read the cases.  We think that

14    this is clearly the defendants' way of trying to get in a

15    multiple conspiracy charge, and we think that for the same

16    reasons that the court rejected their multiple conspiracy

17    language, it should reject the attempt to impose two separate

18    theories onto the government's indictment and charging

19    language.

20         The charging language in the indictment clearly

21    charges one scheme by a single theory, and they're trying to

22    cut that up, which I understand they want to do in argument,

23    and while that may be fine, we don't think that there is a

24    basis in the law to cut up the charging language in the

25    instructions.

I6QJGAL1

1          The Count 2 states that the defendants engaged in a

2     scheme to misappropriate the proceeds of several bond issuances

3     by the WLCC and also caused investor funds to be used to

4     purchase the bonds for which there was no secondary market,

5     through which such bonds could be redeemed without disclosure

6     to those investors of material facts, including the existence

7     of multiple conflicts of interest and which investments in some

8     cases --

9          THE COURT:  Hold on.  One second.

10         MS. TEKEEI:  Sure.

11         (Pause)

12         THE COURT:  You know what?  I want to talk about this.

13    I want to hear you out on this.  I wouldn't put it here anyway

14    at the end.

15         MS. TEKEEI:  I will note what the court said

16    yesterday, which is that -- and this is transcript Page 3590 --

17    the court has already agreed that all of the misrepresentations

18    made in this case were clearly in furtherance of the same goal;

19    namely, to misappropriate the bond proceeds for the personal

20    use of the co-conspirators.  There would have been no bond

21    proceeds to misappropriate had the investors not purchased

22    them, and that's why the defendants needed to control the

23    investment advisory firms with the pension fund clients to

24    purchase them.

25         The government has not proceeded under two separate

I6QJGAL1

1    theories.  It has proceeded under the single scheme that is set

2    forth in Count 2 of the indictment.  There are multiple aspects

3    to that single scheme and phases of that single scheme, but it

4    is not the case that the government has split up its theory.

5    The cases that counsel have cited, many of them to do with when

6    there are false statements and separate false statements that

7    are being put into -- or the charges relate to those separate

8    false statements.

9              If you look at Shaoul, which is one of the cases they

10   cite, the example instruction that the Second Circuit provided

11   in that case applied only when the indictment accused the

12   defendants of committing a crime in one of two different ways.

13   That is not what the indictment here even suggests.  The

14   indictment here accuses the defendants of committing a single

15   over-arcing scheme.

16             THE COURT:  Let me get the indictment out.

17             MS. TEKEEI:  Sure.  We have a copy of it, too, your

18   Honor.

19             THE COURT:  If you have it there, that would be great.

20             (Pause)

21             MR. SCHWARTZ:  Of course, there is no dispute that the

22   indictment literally charges a single count.  If it didn't, we

23   wouldn't be having this conversation.  Ms. Tekeei just put the

24   emphasis on the wrong word.  She put the emphasize on the "a

25   scheme" instead of the big and in the middle of it, that and

I6QJGAL1

separates two fundamentally different kinds of conduct.

One is the investment adviser conduct and the criminal breaches of fiduciary duty, and the other is the theft of bond proceeds.  If the government wants an instruction that the jury has to find that the defendants joined a scheme with both purposes, that would be fine, but that is not their argument.

Their argument that one or the other is sufficient to convict, that it is sufficient, for example, if a defendant only knew and intended that these bonds would be stuck to the clients of Atlantic and Hughes, in violation of those investment advisers' fiduciary duties regardless of any misappropriation.

If that is the way that they conceive of their charges, then it runs -- as we discussed before, and I think as your Honor appropriately found in crafting language that you handed out -- it runs the very material risk that jurors could convict without unanimity on what these defendants actually did in terms of what scheme they joined.  This is totally different than the multiple conspiracies point.  This goes to the substantive securities fraud, not the conspiracy charge.

MS. TEKEEI:  Your Honor, to cut it up that way is simply incorrect and unfair.  There was a single scheme.  The defendants participated in it in different ways, sometimes in different times, but the government has proceeded under a single theory.  There is no basis in the case law for them to

I6QJGAL1

1    cut up the government's theory in this way, and the cases that

2    they cite are squarely related to when there are multiple

3    possible theories of guilt or, for example, the Natelli case,

4    when each, each predicate, when there is more than one

5    specification as a predicate for the charge -- I am sorry --

6    for the charges in the indictment, each dependent on particular

7    evidence which is unrelated to the other, it would be sound

8    practice, the Second Circuit said, to instruct the jury that

9    they must be unanimous on a particular specification to

10    convict.

11            First, the evidence in this case or the theory and

12    what is stated in Count 2 is not dependent on particular

13    evidence that is unrelated to the other evidence.  It is all

14    related to the same scheme and the same fraudulent enterprise

15    that the defendants entered.

16            So while even in this scenario where it would be --

17    even in the scenario when the charging instrument is cut up,

18    the Second Circuit has said it would be sound practice to

19    instruct the jury.  This is a case where the charging language

20    clearly charges a single scheme.  The evidence of that single

21    scheme as we have said from the very beginning, especially in

22    connection with the defendant's various severance motions, all

23    relates to each other because it is a single scheme all the

24    defendants participated in.

25            There is no basis in the case law to cut up the

I6QJGAL1

1   government's theory in an instruction when the government's

2   theory is clear as it is in the charging language.

3           THE COURT:  Let me just take a look at the cases

4   before your summation over the break, okay?  I will let you

5   know.

6           MR. SCHWARTZ:  That is fine.  To be clear, your Honor,

7   I was not intending to argue the legal point.  I was simply

8   going to point out to the jury the different kinds of conduct

9   that are encompassed within the securities fraud count and

10  discuss them separately.

11          THE COURT:  Were you going to focus on the need for

12  unanimity with respect to one theory?

13          MR. SCHWARTZ:  I won't now.

14          THE COURT:  I am asking what you need to know for

15  summation.

16          MR. SCHWARTZ:  What I will say to the jury is there

17  are basically two parts to the securities fraud that they're

18  asking you to consider.  One is all of these conflicts of

19  interest, and honestly I think that can be dispatched very

20  quickly with respect to Mr. Archer.  Then there is the

21  misappropriation.  That is what I will spend most of my time

22  talking about.  That is really the way I intend to address it.

23          MS. TEKEEI:  So what we'll just add, your Honor, is

24  that the Second Circuit has also been clear, for example, that

25  juries do not need to be instructed -- sorry -- the jury does

I6QJGAL1

not need to be unanimous as to the overt acts in the indictment

and the jury does not need to be unanimous as to principal

liability or aiding and abetting liability.  That is the realm

we are in right now.

THE COURT:  Right.  I don't think that is in dispute,

right?

MS. TEKEEI:  We disagree with Mr. Schwartz's

characterization that the misrepresentations were part of a

different scheme.

MS. NOTARI:  When you have a chance, I want to address

another issue about summing up.

THE COURT:  Okay.  Go ahead.

MS. NOTARI:  This completely changes a lot of my

closing that I wasn't prepared to argue for.  I feel like at

this point I need to scour the record and possibly --

THE COURT:  I issued an order last night indicating

that, clearly suggesting I was going to do this.  I don't

understand what the surprise is.

MS. NOTARI:  I don't think there is a lot of precedent

for this.

THE COURT:  I indicated previously to Mr. Touger, and

then I issued an order last night, I think, suggesting I was

inclined to do this or at least raising the issue of whether I

was going to do it.  I am a little bit baffled by the surprise.

I got letters from both sides on whether it was appropriate,

I6QJGAL1

1    knowing this was a serious possibility.

2              MS. NOTARI:  I didn't think this would happen.

3              (Continued on next page)

I6QJGAL1

1           THE COURT:  Mr. Schwartz is going first anyway.

2           MR. SCHWARTZ:  Did we -- sorry.  Did we find out or

3  agree on what our hours are today?

4           THE COURT:  We haven't.  Do you want me to ask?

5           MR. SCHWARTZ:  It might be helpful.

6           THE COURT:  OK, I'll do that.

7           MR. SCHWARTZ:  So this is going to happen, I'm not

8  sure how long it's going to take.  And then I will go.  I find

9  it --

10           THE COURT:  Why don't we bring the jury in and talk

11  about it.

12           MR. SCHWARTZ:  I find it highly unlikely that we will

13  get to Ms. Notari today.

14           THE COURT:  All right.  We'll see.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I6QJGAL1

1        (Jury present)

2        THE COURT:  Everyone can be seated.  So, ladies and

3    gentlemen, in light of an argument that Mr. Touger made

4    yesterday, I'm going to briefly allow the government to

5    supplement the evidentiary record.

6        So you can do that now.

7        MS. MERMELSTEIN:  Thank you, your Honor.

8        It is hereby stipulated and agreed between the parties

9    that on July 20, 2016, John Galanis pled guilty to conspiring

10   with Jason Galanis and others to commit securities fraud in or

11   about 2009 through in or about 2011, in that John Galanis and

12   others openly managed brokerage accounts of an individual and

13   effected the sale of Gerova stock, and received and concealed

14   proceeds derived therefrom, knowing that this activity was

15   designed to conceal from the investing public the true

16   ownership and control of that Gerova stock.

17       It is further stipulated and agreed, by and among the

18   parties, that this stipulation is admissible as a Government

19   Exhibit at trial.  The government offers this stipulation as

20   Government Exhibit 4506.

21       THE COURT:  All right.  It will be admitted.

22       MR. SCHWARTZ:  No objection.

23       MS. NOTARI:  No objection.

24       (Government Exhibit 4506 received in evidence)

25       THE COURT:  The government has offered evidence

I6QJGAL1

attempting to show that on another occasion John Galanis

engaged in conduct similar to the charges in the indictment.

In that connection let me remind you that John Galanis is not

on trial for committing acts not alleged in the indictment.

Accordingly, you may not consider this evidence of similar acts

as a substitute for proof that John Galanis committed the

crimes charged.  Nor may you consider this evidence as proof

that John Galanis has a criminal personality or bad character.

        The evidence of the other similar acts was admitted

for a much more limited purpose, and you may consider it only

for that limited purpose.

        If you determine that John Galanis committed the acts

charged in the indictment, and the similar acts as well, then

you may -- but need not -- draw an inference that in doing the

acts charged in the indictment John Galanis acted knowingly and

intentionally and not because of some mistake, accident or

other innocent reasons.

        Evidence of similar acts may not be considered by you

for any other purpose.  Specifically, you may not use this

evidence to conclude that because John Galanis committed the

other act or acts he must also have committed the acts charged

in the indictment.

        It is also important for you to know that John

Galanis' guilty plea was to charges stemming from the

investigation that resulted in Jason Galanis' arrest in

I6Q7GAL2                    Summation - Ms. Mermelstein

1    September 2015 which you have already heard about.  I reiterate

2    to you now that the conduct for which Jason Galanis was

3    arrested and John Galanis pled guilty was entirely unrelated to

4    this case.

5              I further instruct you that Mr. Archer and Mr. Cooney

6    were not subjects of that investigation, and there is no

7    evidence that either of them knew about Jason or John Galanis'

8    fraudulent conduct in that matter or in the investigation of it

9    until after Jason Galanis was arrested in September of 2015.

10   You are not to consider this evidence in any way against either

11   Mr. Archer or Mr. Cooney.

12             Is there anything additional you would like to add to

13   your summation in light of this?

14             MS. MERMELSTEIN:  Yes.  Thank you, your Honor.

15             Good morning.  There wasn't any question before --

16   there wasn't any question that John Galanis is guilty.  But if

17   you needed one more thing, if you were still looking for the

18   beef, you have it.  There can be no question that John Galanis

19   knew exactly what he was doing.

20             And Mr. Touger's summation yesterday was all about why

21   he didn't know that anything was wrong, that he didn't suspect

22   that there was any fraud afoot.  And I'm not going to go

23   through every single thing he said yesterday, because I don't

24   think you need us to do that, but let me just show you two

25   things he said that are preposterous.

1            Can we pull up the first slide please, Ms.Sheinwald.

2            He said that the government wants you to convict John

3    Galanis because he's Jason's father, and that's why he had to

4    know that not only Jason was involved but that he agreed to

5    help him steal the money.

6            He's not guilty because he's Jason's father.  But when

7    you think about what he knew in this case, he already was

8    committing crimes with Jason Galanis.  When Jason Galanis

9    talked to him about seeking out Native American tribes to do a

10   bond deal, what did he think was going on?  They were already

11   committing securities fraud together.  They're not just father

12   and son; they were already coconspirators.

13           Let's look at one other example.  Here is what

14   Mr. Touger said to you yesterday:  To argue this prosecution to

15   you, the prosecution has failed to prove John Galanis had

16   direct knowledge of his son's guilt; that doesn't matter

17   because he should have realized that it's going on all around

18   him and his son was as crook.

19           And he asked you again where is the evidence of this.

20   Where is the evidence of this?  He knew his son was a crook.

21   He knew his son was a crook before the very first day that they

22   had a plan with respect to the bonds.  He knew it because all

23   the way back in 2009 and all the way through 2011 they were

24   already committing securities fraud together.

25           Ladies and gentlemen, that is game over; there is

I6Q7GAL2                    Summation - Ms. Mermelstein

1   simply nothing else to say.

2          And when you think about what John Galanis knew and

3   what he understood in this case, at every step of the way you

4   have to think about, well, what did he know about his son.

5   Right?  When he is referring deals to Jason Galanis at Burnham

6   in 2014, he knows he is a criminal; he knows that he has

7   committed securities fraud -- and not just that Jason Galanis

8   did it; they did it together.  How could John Galanis think

9   that he was being asked to participate in a regular transaction

10  given what he knew about Jason Galanis?

11         Leaving aside all the reasons we talked about

12  yesterday that you already know that John Galanis is guilty and

13  knew exactly what he was doing, this leaves just no question.

14         What does it mean when John Galanis e-mails Tim

15  Anderson and says, look, there are other people at Burnham but

16  Jason Galanis is going to be your point person?  What does it

17  mean when he takes a person that he knows has committed

18  securities fraud in the past, that he committed securities

19  fraud with that person, and he says make sure that's who you

20  talk to?  What does that mean?

21         What about when he says, oh, by the way, we're not

22  going to do Wealth Assurance AG anymore, we're going to do

23  Wealth Assurance private client Corp.?  He thinks that's

24  legitimate?  He knows who is pulling the strings here and whose

25  idea it was, and he knows that person has committed securities

1    fraud and that he committed securities fraud with him.

2            There can be just no question that he could not have

3    believed and did not believe that this was legitimate.  When he

4    gets $2.35 million that's not on any of the documents, he

5    thought that was OK because of who Jason Galanis was?  He

6    thought that this was legitimate because he trusted his son?

7    You can't trust your son if you're committing crimes with your

8    son.

9            And when he deposits it into an account that he tries

10   to keep his name off of so that no one else will know it's his

11   money, that's because he knew it was criminal proceeds.  And if

12   you didn't know before, you know it a hundred percent now,

13   because they had already done it together; because there is no

14   question that he could not trust Jason Galanis.  And given what

15   he knew about Jason Galanis, the only thing he could have

16   thought was that they were getting ready to do it again.  Their

17   other fraud ended in 2011, and they why ready to start over.

18           That's it, ladies and gentlemen, John Galanis is

19   guilty, no question.

20           Thank you, your Honor.

21           THE COURT:  Mr. Touger, is there anything you would

22   like to say?

23           MR. TOUGER:  Yes, your Honor.

24           Good afternoon, ladies and gentlemen.  So the

25   government has been allowed to reopen their case against John

1    Galanis based on my arguments which I made to you yesterday.

2              I want to say to you, ladies and gentlemen, one thing

3    before I start:  I stand by every argument I made yesterday.

4    Yes, in the past, in 2009 and 2011, John Galanis committed a

5    fraud with Jason Galanis.  He was arrested for that crime; he

6    pled guilty to that crime; and now he is here before you on a

7    separate and distinct crime, as the Court just told you.

8              The Court has told you that the conduct in that

9    crime -- the one from 2009 and 2011 -- had nothing to do with

10   the facts of this case, and it is only admitted to show that

11   John Galanis had personal knowledge of Jason Galanis' arrest --

12   which you probably assumed anyway, because he is his father --

13   and what you didn't know is that John Galanis committed that

14   crime with his son, and so that you can use to show that he had

15   knowledge of his son's activities.  Yes, John Galanis even

16   participated in that case.

17             But what is important to note is Mark McMillan's

18   testimony.  Go back and remember that testimony.  He told you

19   that in 2010 something happened, and that's when John Galanis

20   separated his business from Jason Galanis.  Now you know what

21   happened.  This is what happened, and why John made sure his

22   business entities were separate from Jason's.

23             What is important to note in this case is that there

24   is still no evidence that Jason Galanis involved his father in

25   these events.  He is still not involved in any of his business

1    activities; he is still not an investor in any of his accounts;

2    he still had the work at Burnham.  There is no doubt about it

3    that Jason Galanis was still working at Burnham and was doing

4    deals at Burnham and that his father could recommend deals to

5    him.  But that was where the contact between the two ended; the

6    evidence still shows that.  The evidence still shows that Tim

7    Anderson was the one pushing this deal, not John Galanis to

8    Jason Galanis.

9            The evidence still shows that John Galanis never

10   invested in any businesses that Jason had, and Jason Galanis

11   had no interest in any business that John had.

12           There is also no evidence to show that John Galanis

13   knew that Jason Galanis was going to commit another crime.

14   Their history together explains the separation between the two.

15   John, as per McMillan's testimony, wanted his business

16   enterprises separate and distinct from Jason Galanis, and now

17   you know why.  And Jason Galanis did not involve his father in

18   any of his business activities.

19           What is interesting to note is that even after John

20   Galanis was arrested -- and that was in the fall of 2015 --

21   both Tim Anderson and Raycen Raines told you they continued to

22   --

23           MS. TEKEEI:  Objection, your Honor.

24           THE COURT:  This is argument.  It's going to be up to

25   you to decide whether the arguments of the lawyers are

1    consistent with the evidence in the case; and if there is any

2    testimony you want read back, you're free to hear it at any

3    time.

4           But I'm going to overrule the objection.

5           MR. TOUGER:  You can ask to have the testimony read

6    back of Tim Anderson and Raycen Raines, that they continued way

7    past the fall of 2015 to try to do business with John Galanis

8    and that they respected him.

9           Yes, I stand by all my arguments made yesterday.  The

10   verdict still comes down to whether John Galanis is guilty

11   because of the fact he must have known because of his prior

12   acts with his son, and that Jason Galanis is his son, that he

13   is guilty of this crime.  That's what they're saying to you.

14   They are saying ignore all the other evidence of separation and

15   convict him based on that alone.

16          There is no denying the fact that this evidence must

17   have hit you like a ton of bricks, but when you give the

18   evidence a prudent, well thought out hearing, and combine it

19   with all the other evidence in this case, that the verdict for

20   John Galanis should remain the same:  Not guilty.  Thank you.

21          THE COURT:  All right.  Thank you.

22          So, ladies and gentle, now we're going to take a short

23   break and prepare for the next summation.

24          I want to ask you once again to tell Ms. Cavale what

25   your timing is for today, what time you need to leave by,

1    because it affects how many summations we will hear this

2    afternoon.  Thank you.  Just remember don't yet discuss the

3    case.  Thank you.

4              (Jury not present)

5              THE COURT:  So, Mr. Schwartz, 2 o'clock?  Does that

6    give you enough time?

7              MR. SCHWARTZ:  I think so.

8              THE COURT:  All right.  Thank you.

9              (Recess)

10             (Jury not present)

11             THE COURT:  Everyone can be seated.  So I'm not

12   prepared to rule on the unanimity, so it seems like it's OK for

13   you to make your arguments but not simply argue based on that

14   language.

15             I will let you know that the jury indicated that they

16   don't have any scheduling issues this afternoon, so I think we

17   can hear both of the defense summations.

18             MS. NOTARI:  Wait.  What happened?

19             THE COURT:  I said they don't have any scheduling

20   issues, so we will take a break after Mr. Schwartz, and then we

21   can hear your summation as well today, Ms. Notari.

22             MR. SCHWARTZ:  I may be lengthy.

23             THE COURT:  Excuse me?

24             MR. SCHWARTZ:  I said I may be lengthy.

25             THE COURT:  Is this a filibuster?

I6Q7GAL2                     Summation – Mr. Schwartz

1             MR. SCHWARTZ:  It's definitely not a filibuster, and I

2    have not done a run-through so I don't know how long it's going

3    to take, but I have a lot to cover.

4             THE COURT:  We'll figure it out.

5             (Continued on next page)

1              (Jury present)

2              THE COURT:  Everyone can be seated.

3              Mr. Schwartz.

4              MR. SCHWARTZ:  Thank you, your Honor.

5              And good afternoon, folks.

6              I've been waiting a very long time to come back up and

7    have the opportunity to speak to you directly, and, as you

8    know, this is going to be my last chance to talk to you

9    directly, and so I'm going to try to cover a lot of material,

10   and I'm going to try as hard as I can not to make it too dry.

11             But I want to start first of all by thanking each and

12   every one of you for your service here over the last month.  I

13   think certainly myself, Mr. Archer, Laura, Craig, Kendall

14   appreciate the hard work and attention you obviously are paying

15   every single day; and on this point at least I think I can

16   speak for the other lawyers, including the government and Judge

17   Abrams, and we thank you all very sincerely for your

18   attentiveness to the evidence.

19             I've said this a few times to witnesses over the last

20   few months, but what we are doing in this courtroom is

21   incredibly serious and incredibly important.  You all are being

22   called upon to judge people, some of your fellow citizens, and

23   to serve as a check on the power of government.  Three men's

24   lives are at stake, and the case is almost in your hands.

25             Now, that said, like me, some of you are probably

I6Q7GAL2                    Summation - Mr. Schwartz

1    thinking forward to next week when you'll get some time off.  I

2    know that I am.  Next week is the 4th of July, and I am looking

3    for the first time in a long time that I'm not going to have to

4    go to work over the weekend and prepare to come into this

5    courtroom and talk to you all, and I was thinking I might go to

6    the movies, which I haven't done in a very, very long time.

7            Personally I like scary movies.  I didn't used to, but

8    over the years I've come to enjoy scary movies.  There is one

9    called her Hereditary that is out now that I might go see, it

10   looks pretty good.  But I grew up -- is it good?

11           I grew up in the '80s, so I grew up with like

12   Nightmare on Elm Street and Friday the 13th, those kinds of

13   films, and those are the scary movies that I grew up with.

14   Then something happened in the '90s and horror movies started

15   to change a little bit, and the one I really remember was The

16   Blair Witch Project.  Do you remember that one?  The thing that

17   made The Blair Witch Project so terrifying, such a game

18   changer, was that it was told from the point of view of the

19   characters that were in the movie.  We didn't find out who the

20   Blair Witch was or what the Blair Witch was until the

21   characters also in the movie also found out.  I thought that

22   was revolutionary.  But most scary movies -- definitely the

23   ones I grew up on -- aren't told from that point of view.

24           In most scary movies you see the big picture, you see

25   how the characters fit in and how many the pieces fit together.

1    We knew that Freddy Krueger was hiding behind that door ready

2    to attack when the character opens it.  That's why no one wants

3    the character to only the door.  We knew that there is that

4    monster clown lurking in the gutter who is going to get that

5    little kid if he goes after his toy boat that fell into the

6    gutter.  That's what makes a lot of scary movies so scary,

7    because we see the monster -- we see the monster -- but the

8    characters in the movie don't.  We can anticipate what is going

9    to happen but the characters in the movie don't; they're taken

10   by surprise.

11          Now, yesterday Ms. Mermelstein gave an excellent

12   summation.  She is an excellent lawyer -- as all the government

13   lawyers are -- and she gave an excellent summation.  And, by

14   the way, as Judge Abrams told you before she started, and as

15   she will tell you again tomorrow, these arguments are just

16   arguments; they're not evidence.  The evidence is who you saw

17   up there and the documents that you saw on your screens and

18   held in your hands and the stipulations that the parties read

19   into evidence.

20          And I suspect you heard a bunch of things in

21   Ms. Mermelstein's argument that surprised you, that you hadn't

22   heard before, and it's your job to ask yourselves:  Does the

23   evidence actually say that, or was that just argument?

24          After a month sitting together throughout this trial,

25   if you heard it for the first time in argument then it's

1    probably just argument, not evidence.  And we will talk more

2    about that a little bit later.  But Ms. Mermelstein presented

3    her argument very, very smoothly and very, very smartly.  You

4    remember, it had four parts.  She started by laying out the

5    plot, and then she told us how it all worked, and then she told

6    us what different people did in that plot.

7          And what made that argument so powerful -- to me at

8    least -- was that just like in those horror movies I grew up

9    with, we all knew what was behind the door; we all knew who the

10   monster lurking in the sewer was; and in this story it was

11   Jason Galanis.  And laying it out that way, the way that

12   Ms. Mermelstein did in her summation, it seemed so obvious.

13   Right?  Because we knew after sitting here for a month, we knew

14   that Jason Galanis was committing this huge fraud.  There is no

15   dispute about that; I told you that on day one.  Jason Galanis

16   was committing this huge fraud, and we could see how he was

17   doing it and how he was pulling everyone's strings, and it all

18   seemed to make a lot of sense.

19         But the problem is Devon couldn't see the big picture,

20   Devon wasn't watching the movie; Devon was in the movie.  Devon

21   didn't find out that Jason Galanis was the monster until the

22   whole world did, when Galanis was arrested on unrelated charges

23   in September 2015 and the SEC started investigating this case

24   and the businesses involved in it and the businesses that Devon

25   was trying so hard to build.  And, as the Judge just told you,

unlike John Galanis, Devon had no idea about that.  Devon
didn't know about Jason and John Galanis' prior crimes.  There
is no such evidence; the Judge just told you that.

So, as you assess the evidence in this case, and as
you listen to the arguments -- my arguments and the
government's arguments -- the question you have to ask yourself
is:  What did Devon know then?  What did Devon believe?  What
did he intend?  Not what can we figure out now.

Because I will be the first to admit that Devon Archer
took actions which you've heard about that had the effect of
helping Jason Galanis.  I told you that right up front a month
ago in my opening statement Devon was used by Jason Galanis to
further his scheme, and he has regrets, that's not in doubt.
But a lot of people in this case took actions that helped Jason
Galanis' scheme who were definitely not a part of it.

Just think of the government's own witnesses.  Their
very first witness, Tim Anderson, the lawyer, he helped, in
fact he put together all the bond documents.  Raycen Raines, he
helped too, he was the one that brought the WLCC to the table.
Daniel Turney, remember him, the gentleman from Atlantic, even
though he had serious, serious concerns about what was going
on, he still went ahead and helped put those WLCC trades
anyway.  And all of those lawyers, accountants, and bankers,
and business managers, and professionals who touched all of
these deals, they helped too, but they didn't mean to; they

1    didn't know what they were doing; they certainly didn't intend

2    to defraud anyone; yet their actions had the effect of helping

3    Jason Galanis commit his crimes.  And I submit to you that

4    Devon Archer was in the same position.  He didn't intend to

5    defraud anyone, and the evidence of that is clear.

6          At the beginning of this trial I asked you to keep in

7    mind one question as you listened to the evidence.  I asked you

8    to ask yourself:  Does this show that Jason Galanis was

9    stealing the bond money?  Does the evidence the government is

10   showing you prove that Devon was part of a scheme to steal that

11   money?  And I told you then a month ago that the answer would

12   always be no, and I submit to you now that I was right, the

13   evidence does not show -- and certainly does not show beyond

14   each and every reasonable doubt -- that Devon knew that Jason

15   Galanis was stealing the bond money and that he intended to

16   help Jason Galanis do it.

17         Now, the other thing I'm looking forward to doing next

18   week, by the way, is maybe going to a barbecue or two to

19   celebrate Independence Day.  This is kind of a complicated time

20   in America, but I think the one thing that we can all agree

21   upon is that we can celebrate the Constitution and the Bill of

22   Rights.  And the Bill of Rights is actually why we're here

23   today.  The Bill of Rights is why you all are here today.  It

24   guarantees Devon and anyone a right to a jury of their peers.

25   And actually if you stop to think about it, a lot of the Bill

of Rights is about criminal trials.  And all of those rights

are there in the first ten Amendments to the U.S. Constitution,

and they are designed to hold the government in criminal cases

to the enormous -- the extraordinarily high burden of proof

beyond a reasonable doubt.

          Now, Judge Abrams is going to instruct you all on the

law probably tomorrow, and I know you all will listen closely

as you have throughout this trial, and I expect that she will

tell you that if you have any doubt, so long as it's based on

reason, then you have an absolute obligation, a duty to find

Devon Archer not guilty.

          So, in honor of the Bill of Rights, the first ten

Amendments to the U.S. Constitution, I want to spend my time

with you today talking about ten reasonable doubts that

absolutely permeate the government's case against Devon Archer.

          The first reasonable doubt actually comes from the

victims themselves.  Now, make no mistake, there was a fraud

here, there are victims, and actually there are two different

kinds of victims in this case.

          Mr. Wenner, if you could bring up the slides.

          Judge Abrams is going to instruct you that in the

securities fraud charge in this case -- this is the actual,

charge by the way -- there are two pieces to it.  The

allegation is that the defendants engaged in a scheme to

misappropriate the proceeds of several bond issuances by the

1    WLCC, and also that they caused investor funds to be used to

2    purchase the bonds in violation of fiduciary duties with all

3    those undisclosed conflicts of interest.

4           So, what that means is, according to the government --

5    and I think they're right about this -- there are two different

6    kinds of victims of Jason Galanis' scheme.  The WLCC is a

7    victim and the pension fund clients of Atlantic and Hughes are

8    victims.

9           So, where does the doubt come from?  The doubt comes

10   from the fact that Devon Archer had absolutely no interaction

11   with these victims.  Devon Archer did not communicate in any

12   way, shape or form with any of the victims in this case.  And

13   you know that from the evidence you've heard.  Devon had no

14   contact whatsoever with the WLCC.  The only witness that you

15   heard in this trial from the WLCC was Mr. Raines, and

16   Mr. Raines says he has never communicated with Devon Archer in

17   any way.

18          And, by the way, the government put in a multitude of

19   e-mails; none of those are between Devon Archer and the WLCC

20   either.  You can ask for anything.  So you can ask, please send

21   me all e-mails between Devon Archer and the WLCC, and you will

22   get nothing in run return.  That simply did not happen.

23          And, by the way, even though the lawyer who was

24   involved in the bond deal, Tim Anderson, he had no contact with

25   Devon Archer.

1          So, what about the pension funds?  The pension funds

2     also had absolutely no contact with Devon Archer.  Now, you

3     heard from several witnesses from the pension funds.  You heard

4     from Mr. Griffin he had never met Mr. Archer.  You heard from

5     Mr. Smith, the first gentleman who testified who came in from

6     Nebraska, he had never heard of, let alone spoken to Mr.

7     Archer.

8          You heard from Mr. Moore, who I believe was from the

9     Goodyear Company.  He had never interacted with Devon Archer.

10    You heard from Mr. Turney who worked at Atlantic, the

11    investment advisor, and he had never had any interaction with

12    Devon Archer.

13         It is simply not the case that Mr. Archer had any

14    communication whatsoever with any of the victims.  And so in

15    this case that's about a scheme that's defraud, to lie to the

16    WLCC and the pension funds, Mr. Archer did not tell any of

17    those lies.  That is undisputed in this case.  OK?  But also

18    Mr. Archer had no idea what was being said to these victims.

19         Now, the government showed you some e-mails

20    selectively that got forward by Jason Galanis -- and we will

21    talk about this later on -- but that was a tremendously

22    misleading intentionally by Jason Galanis presentation of what

23    happened.  Right?  And Mr. Archer certainly did not have -- and

24    the government wouldn't argue otherwise -- a full picture of

25    what was being said to these pension funds.  And that's

1    critical.  That's critical, because -- if you go to slide 11,

2    please, Mr. Wenner -- you heard from the government's expert --

3    this is the government's expert -- that there is nothing

4    inherently unlawful about an investment advisor having a

5    conflict of interest.

6         I mean, by the way, Devon Archer is not an investment

7    advisor.  He was not acting as an investment advisor; he was

8    not an executive of any of the investment advisors in this

9    case.  But even for the investment advisors themselves, the

10   evidence from the government's own witness is that an

11   investment advisor is not barred from having conflicts, but

12   those conflicts have to be disclosed.  You have to tell people

13   if there are potential conflicts that those conflicts exist.

14        Now, we all know -- because we've matched the movie --

15   we all know that's not what Michelle Morton did.  We all know

16   that she and Gary Hirst just went ahead and bought those bonds

17   without their clients knowing it and stuck it right in their

18   accounts, and they didn't even talk about it until later.  But

19   Devon didn't know that.  Devon didn't know that.  You know,

20   Devon had every reason to believe that any conflicts -- and I'm

21   not sure there is any evidence that he knew the conflicts

22   existed -- were disclosed.

23        Go to slide 10, please Mr. Wenner.

24        First of all, the government argued that Devon knew

25   that these bonds were being foisted upon the pension funds.

1   And they brought up this e-mail.  They read to you only the

2   second highlighted sentence here.  "I believe they will take

3   $28 million of the Wakpamni/Oglala Sioux issue that Greenberg

4   Traurig is working on."  That's the first bond issuance.

5           The government in their summation did not read to you

6   the sentence that preceded it, which is the last paragraph of a

7   lengthy e-mail from Jason Galanis, which says "We have agreed

8   to give the firm" -- meaning Hughes -- "an opportunity to

9   participate in Native American bond new issues."

10          Does that sound like two conspirators talking about

11  sticking the pension fund clients of Atlantic and Hughes with

12  bonds against their will?  No, it sounds like presenting an

13  investment opportunity to those clients.  And there is nothing

14  wrong with that, and that's what the government's own witnesses

15  say.

16          Now, what we also saw was evidence that the conflicts

17  were disclosed, and that's on slide 12.  The government didn't

18  use this document at all in their summation.  This is the

19  private placement memo, if you recall that.  And one of the

20  things -- and I went through this at great, great length with

21  Mr. Anderson when he was on the stand -- that private placement

22  memo had all sorts of disclosures if you recall that.  It

23  disclosed -- it's marketing material for potential

24  displeasures -- it disclosed the bonds were not rated; it

25  disclosed the bonds were restricted; it disclosed all the

1    things Mr. Touger talked about yesterday about how it was going

2    to be invested in private equity; but it also disclosed this

3    language:  "Certain officers and directors of the placement

4    agent" -- remember that's Burnham Securities Incorporated --

5    "are affiliated with the insurance provider" -- that is Wealth

6    Assurance.  That's a disclosure of the conflicts of interest.

7           So, how is Mr. Archer to know that there are

8    conversations that are taking place between Michelle Morton and

9    her clients, or not taking place and she is just sticking these

10   bonds in their portfolio accounts?  He doesn't know that.  What

11   he knows is the information that Jason Galanis selectively

12   chooses to show to him; and that's that this is an arms-length

13   opportunity for those clients and that any conflicts of

14   interest have been disclosed.  So, that's reasons one and two

15   why there is reasonable doubt here:  There is no contact with

16   the WLCC victims and no idea of what misrepresentations are

17   being told to them; and there is no contact with the pension

18   fund victims, no idea of what is being told to them, and every

19   reason to believe that those transactions are arms length and

20   legitimate.  So that's one and two.  I did two together so I'll

21   move faster.

22          Let's go to the third reasonable doubt in this case:

23   That's the real conspirators.  OK?  Other than Jason Galanis,

24   who lied to everyone about everything, the evidence is clear

25   that Devon Archer barely knew the real conspirators here.  All

I6Q7GAL2                    Summation - Mr. Schwartz

1   right?

2           That's Gary Hirst.  He's up in here on a page by

3   himself because there is absolutely no evidence connecting him

4   in any way, shape or form to Devon Archer, no communication

5   whatsoever.

6           Who else?  Michelle Morton.  Michelle Morton.  The

7   evidence that you have about interactions between Devon Archer

8   and Michelle Morton is incredibly limited, and you saw e-mails,

9   you saw texts, you saw phone records, and that amounts to

10  perhaps they had one conference call, they had two e-mails and

11  perhaps very very late in the game in 2015 they met for a

12  drink.  OK?

13          What the evidence shows is Michelle Morton did not

14  know Devon Archer.  You see this e-mail on slide 14.  This is

15  October 29, 2014, and Jason Galanis is for the very first time

16  introducing Michelle Morton and Devon Archer.  So think about

17  that for a second, October 29, 2014.

18          Yesterday Ms. Mermelstein did an excellent job I think

19  of talking about the time line and when things were happening.

20  What had already happened by October 29, 2014 in this case that

21  is about these fraudulent bonds and stealing their proceeds and

22  sticking them with the clients?  They had already done the

23  first two bond issuances.  They had already done the bond

24  issuance where Michelle Morton is supposedly sticking all of

25  her pension fund clients with these bonds.  Devon Archer and

I6Q7GAL2                    Summation - Mr. Schwartz

Michelle Morton have not even been introduced to each other on
e-mail.  That happens for the first time on October 29, 2014,
and that's because Mr. Archer is part of the group that's going
to potentially make an investment to acquire the company.  So
he is participating -- as he has throughout this case -- as a
potential investor.  Because, as I told you in opening
statements, what he is in this for was simply to build a
business, and he did not know -- and it doesn't make sense that
he would invest in -- the fact that Jason Galanis had put a
fraud at the heart of that business, that that business that
Devon Archer was trying to build was rotten.

          Now, look also on slide 15.  This is the text that I
was referring to a moment ago.  These are text messages between
Michelle Morton and Jason Galanis.

          And, by the way, you didn't see any of Devon Archer's
texts in this case.  Devon is not texting with these people.
They are not his friends.  He is doing business with them.
Jason Galanis is bringing these people into his orbit.  So,
this is a communication between Michelle Morton and Devon
Archer, and this is talking about that one brief meeting that
they had on March 25, 2015.  And there you see Michelle Morton
saying "I was just thinking about our meeting and thought,
gosh, that Devin guy looks familiar, and then I realized ...
holy crap, I teased and was goofy with Devon Archer.  I should
have made a better impression."

1          A few things.  What does that mean to you?  First of
2     all, she didn't even recognize him.  That was the first time
3     they were meeting in person.  She didn't even know who the guy
4     was until March 26, 2015.

5          And look at the nature of the relationship, right?
6     She is talking to Jason Galanis the next day, saying I should
7     have made a better impression; this is not something I can joke
8     with.  That's not the relationship that conspirators have with
9     one another.  This is Michelle Morton meeting with a potential
10    investor who is going to acquire her business.  That's the way
11    she approached it.  That's the way Mr. Archer approached it.
12    That's an arms length business meeting between strangers.

13         Now, all that said, Michelle Morton, the evidence
14    shows, still couldn't keep straight who Devon Archer is.  You
15    saw a bunch of texts where she can't tell the different between
16    Bevan and Devon and the other Devin, and there is a Kevin
17    apparently -- we didn't find out who that was -- but there is a
18    Kevin.  Michelle Morton does not know who Devon Archer is.

19         And if we go to slide 18, remember Mr. Santos, the
20    fellow who works at the U.S. Attorney's office who testified
21    about the analysis that he did on Michelle Morton's phone?
22    That was fascinating.  He had pulled out all of the contacts in
23    Michelle Morton's phone, and we saw that she spoke to Jason
24    Galanis like ten times more often than she spoke to her own
25    moment and dad.  But who was the one person who was not in that

1   phone at all?  It was Devon Archer.  Devon Archer just didn't

2   know Michelle Morton, his supposed coconspirator.

3          Let's talk about Francisco Martin, the fellow who

4   testified here.  He also never met Devon Archer.  And he

5   testified at length about the fact that Jason Galanis would go

6   out of his way to introduce him to people that were important

7   to his businesses and his fraudulent businesses.  All right?

8   He set up a lunch; he set up a meeting with Mr. Dunkerley that

9   did business with Gary Hirst; got together socially with

10  Mr. Cooney; he got together on a business meeting with

11  Mr. Sugarman.  There was never an effort to connect Francisco

12  Martin and Devon Archer.  They simply didn't no one another.

13         And you saw in the e-mail that we read yesterday that

14  when one of Mr. Archer's own associates, this fellow Neil

15  Callahan from one of the Rosemont companies says, hey, have you

16  ever heard this guy Francisco Martin, the honest response from

17  Devon was, no; should I know who that is?  He had no idea who

18  Francisco Martin, his alleged coconspirator was.

19         Now how about Hugh Dunkerley?  He did know who Hugh

20  Dunkerley was.  Right?  They were both on the board of

21  directors of Wealth Assurance Holdings together.  And that's

22  the company that sits at the top of that corporate org chart

23  that became the Valor Group.  But Mr. Dunkerley told you he had

24  never met Mr. Archer, he had spoken to him only on conference

25  calls, and that they never discussed anything improper and they

I6Q7GAL2                        Summation – Mr. Schwartz

1    certainly never discussed these WLCC bonds.

2            Look at page 21.  This is Mr. Dunkerley's testimony:

3    "Q. You had discussions with Mr. Galanis" -- Jason Galanis --

4    "about improper things, true?

5    "A. Absolutely.

6    "Q. And Gary Hirst, true?

7    "A. True.

8    "Q. And Francisco Martin, true?

9    "A. Yes."

10           But never Devon Archer.  They simply didn't have those

11   communications; that was not their relationship.

12           So all of these people that Devon Archer supposedly

13   conspired with, schemed with to steal the proceed of the WLCC

14   bond, he barely knew them, and that was by design.  Jason

15   Galanis controlled who knew what.  And you saw that over and

16   over and over again.

17           Look here early on, this is him -- this is excuse me

18   Francisco Martin -- telling you about what Jason Galanis did

19   with information, sending.

20           "Sending this to the entire team was not a good idea.

21   Jason Galanis is not pleased.  Jason is very sensitive on how

22   communication flows."

23           And you saw that Jason Galanis would ghost write

24   e-mails for Mr. Martin and other real coconspirators to send

25   out.  He was pulling their strings every step of the way.

I6Q7GAL2                     Summation - Mr. Schwartz

1              And that was true especially with Mr. Archer.  And if

2      you go to slide 25, you remember this e-mail.  This is Jason

3      Galanis absolutely irate that someone has breached his

4      information protocol.  "If you fucking e-mail Devon and Rohan

5      ever in the same fucking e-mail I disown you.  Do not risk our

6      relationships.  It's all we have."

7              That's what Devon Archer was to Jason Galanis.  He is

8      not a coconspirator; he's not a friend; he was a set of

9      relationships to be exploited.  And we are going to talk about

10     that later on, but you saw that over and over and over

11     throughout this trial, that Jason Galanis was using Devon

12     Archer to get at his connections to politics, to money and to a

13     good reputation, all things that Jason Galanis coveted.

14             And you saw that specifically with respect to the

15     facts of this case Jason Galanis took steps to hide information

16     from Devon Archer.  You remember this bit of testimony on slide

17     26 from Mr. Dunkerley?  Remember, they're on the board of

18     directors of Valor Group together, Mr. Dunkerley and Mr.

19     Archer, but they were never in the same room together, and that

20     was because that's how Jason Galanis wanted it.  Jason Galanis

21     told you.

22     "Q. "He instructed you not to physically a attend Valor Group

23     Ltd. board meetings when Devon Archer would be physically

24     present, true?

25     "A. That is true, yes.

1          Why?  Why is Jason Galanis keeping Hugh Dunkerley

2     apart from Devon Archer?  It's because he didn't want Devon

3     Archer to find out the truth.  And you see on the flip side the

4     very selective information that Jason Galanis chose to share

5     with Devon Archer.  Look here.  This is just before the first

6     bond issuance closes in late July of 2014.

7          According to the government, this scheme was in full

8     swing at this point.  But what is Jason Galanis providing to

9     Mr. Archer and what has he requested?  He has requested a full

10    package of all of the audited financials, all of the work that

11    those accountants had done about these various entities,

12    because he wanted to understand the actual bona fides of the

13    business.  He wanted to understand what these things are.  And

14    Jason Galanis was more than happy to provide that information.

15    He was more than happy, as he often did -- if we flip the

16    page -- to share the information, especially because he was

17    able to say that the biggest firms in the world were involved,

18    KPMG, Ernst & Young, Price Waterhouse Coopers.  All of these

19    big firms, he was able to say they are all involved in this,

20    and what we are doing, what this business is, the Wealth

21    Assurance Holdings business, the Valorlife business, is

22    absolutely legitimate.

23          Here you see on slide 30 this is the actual

24    organizational chart of the Valor Group controlled by

25    Mr. Sugarman.  And you recall Mr. Archer had received a small

1    number of class B shares in return for being a member of the

2    board of directors.  We will talk about that a little bit

3    later.  This is what Jason Galanis wanted Devon Archer to see.

4    And, by the way, this is what Devon was interested in; this is

5    the business that he was trying to build.  It was that

6    so-called roll-up plan, the financial conglomerate.

7            And over and over and over again Jason Galanis would

8    hammer that home to Devon.  Look at slide 31.  This is Jason

9    Galanis laying out the road map for the roll-up plan.  It's

10   going to involve investment banking, asset and wealth

11   management, insurance, private equity, real estate, renewables,

12   technology, special opportunities, structured finance.  And

13   Devon's response is, yes, that's exactly what I want to get

14   involved in; I feel more organized in this thinking.  Not, man

15   this is a great cover story for a big scheme to steal $60

16   million in bonds.  Yes, this is what we need to be doing.

17           Over and over and over again.  Look at slide 32.

18   Again, I'm not going to read these all to you, but there are so

19   many.  It is over and over.  Swiss Life Lichtenstein, Top Coat

20   of Switzerland, talking about building this financial services

21   conglomerate.  That's what they thought they were investing in.

22           Even that very same e-mail on slide 33 that I talked

23   about before and that Ms. Mermelstein spoke about yesterday,

24   that at the very bottom of it mentions giving the opportunity

25   to participate in Native American bond new issues, what's that

1    e-mail about?  It's not about the WLCC bonds; it's about

2    acquiring Hughes Capital Management, a firm that manages $900

3    million on a discretionary basis for institutional clients.

4    That's what was attractive to Devon; it was obtaining these

5    firms, combining them and hopefully selling them for more than

6    the sum of the parts.

7              Over and over.  Slide 34.  Jason Galanis is talking

8    about $12.5 billion in AUM -- that's assets under management.

9    Over and over he is dangling what Devon wants, which is this

10   financial services conglomerate.  But at the same time -- at

11   the same time -- he is also lying to Devon about the WLCC

12   bonds.

13             So, ask yourself this:  If Devon is part of a scheme

14   to steal the proceeds of those bonds, if he knows that Jason

15   Galanis is stealing that money, then why is he at the same

16   time -- he, Jason Galanis -- why is he lying to Devon about the

17   bonds?

18             Turn the page.  This is an e-mail on November 19,

19   2014.  Again, this is after the first two bond issuances.  And

20   Devon -- excuse me -- Jason Galanis is sending to Mr. Sugarman

21   and Mr. Archer pictures, saying, look, this is what the bonds

22   have been able to do; that money is really being put to work.

23             If Devon was part of a scheme to steal these proceeds

24   from the get-go -- remember, Ms. Mermelstein kept saying that,

25   from the get-go, the very first day the money comes in, where

1    does it go, to goes to Sovereign Nations and it goes to pay for

2    the down payment on that apartment the very first day.  That

3    was back in August of 2014.  But here we are in November of

4    2014 and Jason Galanis is still lying to Mr. Archer and saying,

5    no, these bond are doing what they are supposed to do; look,

6    look at the good work that they're doing.

7        Look at the next page.  This is six months later.

8    This is the very same month that they're closing the third bond

9    issuance, April 2010, and Jason Galanis is sending pictures of

10   active construction.  These are just lies.

11       Page 37, he is lying, he is saying, "They're getting

12   there, see attached, rewarding to see it happening."

13       By the way, we don't even know if these are actually

14   pictures of the reservation.  The testimony that we heard from

15   Mr. Raines was that they did the groundbreaking, they sort of

16   built the structure, and then there was nothing beyond that;

17   that was the money from the first bond issuance.  These may be

18   for all I know Google images pictures.

19       But what is clear as day is that Jason Galanis -- even

20   as they're closing the third and final batch of WLCC bond -- is

21   lying to Devon Archer and saying, yeah, the money is still

22   being put to the use that it was intended to be put for.  That

23   is not what you tell a coconspirator in a scheme to steal the

24   bond money.

25       But it didn't stop then.  Turn the slide.  This is

I6Q7GAL2                    Summation - Mr. Schwartz

August 4, 2015.  They're done with the bonds at this point.
Right?  There are no more WLCC bonds at this point.  But Jason
Galanis is still stringing Devon along; he is still telling
him, look, this is the bonded duty free warehouse being built
on the Pine River Reservation.  He is trying to convince Devon
that those bonds are real and those bonds are legitimate.

          If Devon were part of that scheme, why would this be
necessary?  If what Ms. Mermelstein said yesterday were true
and from the get-go Mr. Archer had been part of a scheme to
steal this money, why is Jason Galanis sending those pictures
to him?  It doesn't make any sense.

          By the way, slide 40, you see Mr. Archer's response.
"This is a beautiful thing."  That's what he thought.

          Now, Jason Galanis lied and hid the truth in other
ways as well.  So, one thing he did was simply not allow people
to talk to one another, not share information.  Another thing
he did, as we just talked about, was he told explicit lies.
Another thing that he did was he would stick people in the
middle.  And one thing that you may have noticed over and over
and over in the charts that the government put into evidence
was the presence of this thing called the Wolff Law Firm,
Clifford Wolff, and sometimes other lawyers as well.  Over and
over when Jason Galanis wanted to put separation between the
person that he was taking advantage of and where he was
stealing money to, he would put a law firm in the middle

I6Q7GAL2                        Summation - Mr. Schwartz

1    because a law firm gave legitimacy.

2           You saw that not only with the money that goes to

3    Rosemont Seneca Bohai that's ultimately used to pay for those

4    bonds -- and we will talk about that $15 million -- but you see

5    the same thing if you go to slide 42, when Jason Galanis and

6    Hugh Dunkerley were stealing money from Valorlife.

7           Now, I'm going to talk about this transaction a little

8    bit more later on.  I suspect that the full import of it may

9    not have hit at the time.  This is a totally separate crime

10   that Jason Galanis and Hugh Dunkerley are committing.  There is

11   no bonds on this picture, right?  There is no WAPC, there is no

12   U.S. Bank, there's no WLCC.  This is money that Jason Galanis

13   and Hugh Dunkerley simply embezzled from Valorlife.  And that

14   money ends up into Jason Galanis' Tribeca apartment.

15          But right there in the middle of it, as a screen

16   between the victim -- Valorlife -- and the recipient of the

17   money -- Jason Galanis' apartment -- is that law firm, and it's

18   designed to add legitimacy.  That's just what Jason Galanis did

19   with Devon and the $15 million, and did that when he stole that

20   money out of Valorlife and used it to buy his own apartment.

21   So, that's the third reasonable doubt, it's the conspirators

22   and the fact that Devon didn't know the conspirators, was lied

23   to by the conspirators, and was deceived over and over and over

24   again about everything that matters by Jason Galanis.

25          So, relatedly what is the fourth reasonable doubt?

1   The fourth reasonable doubt in this case comes from the two

2   conspirators that you heard from:  Hugh Dunkerley and Francisco

3   Martin.  And what was amazing was they told you how

4   extraordinarily limited their knowledge was.

5         Hugh Dunkerley told you that even though he was the

6   one who was running that Wealth Assurance Private Client

7   account, that piggy bank where the bond funds went and then

8   Jason Galanis caused to be spread all over the world, even

9   though he was running that account, even though he was the one

10  who signed as the placement agent and he signed as the annuity

11  provider, he was the one that created all of these conflicts,

12  he was the one that was there at the closing, he had no idea

13  that Jason Galanis was stealing this money until he actually

14  looked into the bank statements for Wealth Assurance Private

15  Client and saw the money being misappropriated.  Right?  He saw

16  nothing wrong with the deal.

17        It wasn't until he saw what happened to the money by

18  wiring it to different corporations and not putting it into a

19  variable annuity that he knew something was wrong.  That is

20  devastating.  That's true, by the way.  Right?  Hugh Dunkerley

21  didn't know until he saw where the money was going, but Devon

22  Archer never saw where the money was going.  OK?

23        Let's talk about that $15 million.  Hugh Dunkerley was

24  actually the person that transferred that $15 million from

25  Wealth Assurance Private Client Corporation to Thorsdale.  He

1    told you he did that; he went into the bank and he did that.

2    And he told you he did it in a very, very specific way.  Do you

3    recall that?  He did it in the same way that Mark McMillan did

4    with the Sovereign Nations account.  He went into the bank, he

5    filled out a withdrawal ticket, and then he filled out a

6    deposit ticket for another account rather than just sending a

7    wire.

8          Do you recall I talked to Mr. Dunkerley about this on

9    the stand.  He says, are you accusing me of having $15 million

10   in cash?  No, of course not.  But he did it as a cash

11   transaction to deliberately hide the source of the money.  That

12   was the government's own argument about the Sovereign Nations

13   bank account, and it's equally true about this account.  You

14   cannot look -- from the bank statements alone you cannot tell

15   where that money is coming from or where that is going to.

16         And, if you recall, when the F.B.I. agent, Agent

17   Kendall was on the stand, she admitted that.  She admitted that

18   if you look at bank statements, you can't tell, that she had to

19   go to other documents, other documents that weren't referenced

20   on her chart, including, if you flip the page, to those

21   withdrawal and deposit tickets.

22         And it's only because someone happened to write on the

23   left-hand side there of Exhibit 565 "transfer to Thorsdale

24   Fiduciary and Guaranty" that we can even be sure that it's the

25   same $15 million.  Now, it's a fair assumption, $15 million on

I6Q7GAL2                    Summation - Mr. Schwartz

1    the same day on the same bank branch.  But that was done very

2    specifically to break the paper trail.

3            Now, Ms. Mermelstein yesterday said, well, yes, it was

4    done to break the paper trail but not to hide it from Devon

5    Archer, it was to hide it from the F.B.I.

6            That doesn't make sense, if you think about it.  If

7    the purpose was to hide this from the F.B.I., they would have

8    done this at every step of the way.  But they didn't, and they

9    especially didn't do it when the money came to Devon Archer.

10   When the money came to Devon Archer, it came as a straight wire

11   transfer.

12           Now what's another thing, by the way, that the

13   government said yesterday?  They said on page 47 "Look who is

14   on the account" -- this is again talking about the Sovereign

15   Nations account -- page 47, "Look who's on the account, not

16   John Galanis, it's Mark McMillan, and that tells you that John

17   Galanis knew he was getting dirty money because he was hiding

18   his involvement."

19           Well, I don't know if that's right or that's wrong; I

20   leave that to you all; but one thing is crystal clear:  Devon

21   did everything in his own name in this case.  Right?  We saw

22   over and over again those Rosemont Seneca Bohai bank records,

23   and the government pointed out over and over they say right on

24   the front care of Devon Archer, and they showed you the account

25   opening documents that showed Mr. Archer and Mr. Momtazi as the

managing members.  Devon is not hiding anything.  The paper

trail to Devon is entirely clear.  That's because Jason Galanis

is not making any efforts to protect Devon Archer.

Now, on that $15 million in slide 49 the fascinating

thing was even Hugh Dunkerley who transferred that money, he

had no idea that that was money that was going to be invested

in the second bond issuance.

So, the government -- this is another example of being

in the movie versus watching the movie -- the government showed

you that chart with the money moving in a big circle.  That to

me was a very powerful chart.  The money did move that way, it

moved in a big circle, but Devon didn't know it, and in fact no

one who was involved in any step of that transaction knew it.

Hugh Dunkerley, who does the first step in that transaction, he

had no idea that that was money from the first issuance being

recycled and spent on the second bond issuance.

You remember Jason Galanis had made up this lie to

Hugh Dunkerley, he had said, no, no, that's Devon Archer's

Chinese investors, he's got some investment contracts with the

Chinese and it's going to expire if he doesn't place it, so it

has to be placed into bonds now, that's the $15 million.

That's what Jason Galanis tells Hugh Dunkerley.  And it wasn't

until after he was arrested and the government told him that's

what happened to the money that Hugh Dunkerley understood where

the money came from.

1          Here is the testimony on slide 50:

2     "Q. Even though you yourself had transacted $15 million from

3     the Wealth Assurance Private Client Corporation account to the

4     Thorsdale account, you did not know that this is the money that

5     was used to buy the second bond issuance, correct?

6     "A. Correct.

7     "Q. You did not know that until after you were arrested, true?

8     "A. True."

9          And he tells you that, it was not until he read the

10    complaint in this case that he learned that's what happened to

11    the money.

12         Now, I submit to you if Hugh Dunkerley didn't know

13    that, then how in the world could we think that Devon Archer

14    knew that money was traveling in a circle?

15         Remember, Hugh Dunkerley brought a whole lot more

16    background information about Jason Galanis than anyone else in

17    this case.  At the time that Hugh Dunkerley is telling us very,

18    very honestly that he doesn't know that this money is traveling

19    in a circle, he already knows that Jason Galanis is stealing

20    the bond proceeds; he's wiring it all over the place; and on

21    slide 51 he has committed this totally separate fraud with

22    Jason Galanis.  Remember that?  That was the so-called

23    Ballybunion fraud, where originally Wealth Assurance AG was

24    going to invest in this UK asset manager, and that deal didn't

25    work out, and so Jason Galanis said, no problem, I'll just make

1    an account for a new Ballybunion in Nevada, just send the money

2    there.  And that's what Hugh Dunkerley did.

3        So that's what Hugh Dunkerley knew he was dealing with

4    at the time that he is transacting in that $15 million, and

5    even he has no idea that it's moving in a big circle.  And yet

6    they expect you to believe that Devon knew that.  There is no

7    such evidence.

8        Now, let's talk about the second leg of that

9    transaction and also the second conspirator that you heard

10   from, and that was Francisco Martin.

11       You recall Mr. Martin -- the man who testified here

12   under a grant of absolute immunity from anything that he said;

13   it can't be used against him directly or indirectly; the

14   government promised not to arrest him if he came here, and let

15   him fly home to Spain where he can't be arrested -- what did he

16   tell you?  He told you he committed crimes with Jason Galanis

17   but even he didn't know that Jason Galanis was stealing the

18   bond money.  That's on slide 56.

19   "Q. At the time he was doing all of these things, that he was

20   signing on behalf of Private Equity Management, you did not

21   understand that Jason Galanis was going to steal any of the

22   bond money?

23   "A. At the time I did not know that, no."

24       Over and over he admitted to crimes to be sure, but

25   not that crime.  Francisco Martin couldn't bring himself to say

1  that he knew that that bond money was stolen.  And he was the

2  one who did the second leg of the transaction, that $15

3  million; he did it from Thorsdale to Cliff Wolff.

4         And here is another example on slide 57 of where Jason

5  Galanis is ghost writing something for Francisco Martin to say.

6  He is ghost writing an e-mail to the lawyer Cliff Wolf saying

7  "Thorsdale wired your firm $15 million.  Thank you for your

8  assistance in helping to settle this investment for your

9  client."

10        So he is telling Cliff Wolff this is going to be an

11 investment on behalf of Thorsdale.  That's the cover story.

12 This $15 million, it's Thorsdale's $15 million and it's going

13 to be invested in WLCC bonds, that's what Francisco Martin

14 tells the lawyer Cliff Wolff at Jason Galanis' instruction; and

15 I submit to you, that's what Devon Archer believed as well.

16        Now, I want to deal with one thing.  The government

17 yesterday tried to suggest that Francisco Martin actually knew

18 that Jason Galanis was stealing this money, and they did that

19 with one very, very careful bit of testimony.  It's on slide

20 58.  The question is -- this is about the purchase of

21 Fondinvest:

22 "Q. What was your understanding of how Jason Galanis'

23 investment in Fondinvest was funded?

24 "A. My understanding was that it was coming from bond proceeds.

25 "Q. Where did you get that understanding from?

1  "A. There was no other income that was generated from Jason

2  Galanis' business."

3  Q.  I submit to you that this was not true.  This was Francisco

4  Martin -- a man who is desperately trying to please these

5  prosecutors so he does not get prosecuted -- trying to give

6  them what they want, which is, yes, he knew the money was being

7  stolen.  And he can't quite bring himself to say that, but he

8  says, well, maybe I assumed it was bond money because there was

9  no other income that I was aware of from any of his businesses.

10      And I submit to you, first of all, you watched

11  Mr. Martin here.  Mr. Martin was not a credible witness.

12  Mr. Martin was not honest with you, and I think you know that

13  simply from observing him and from your own common sense.  And

14  we will talk about that more a little bit later.  But this

15  particular piece of testimony is absolutely absurd.

16      And this jibes with something that Ms. Mermelstein

17  tried to argue yesterday too for a second, which was that

18  somehow Jason Galanis was poor and needed money.  And if there

19  is one thing that we established over and over and over in this

20  case is that Jason Galanis was not a poor man.  It may have all

21  been stolen money, but he was not a poor man.  You heard that

22  over and over and over.

23      Slide 59.  You saw his multi-million dollar home.

24  This is Francisco Martin, by the way, who knew that he had that

25  $10 million house in Bel Air with maids and servants; he had

I6Q7GAL2                        Summation - Mr. Schwartz

1    done millions of dollars in home improvements.  You saw that

2    house.  I would like to play the video again, but I don't think

3    it was worth your time.  That was a gorgeous house.  No one

4    could think that Jason Galanis was poor.  That is absurd.  He

5    bought a $10 million in Tribeca again with stolen funds.  But

6    he was displaying all of the trappings of wealth.  He had $4

7    million of art on the wall, or so he said.

8         Look at Hugh Dunkerley who knew him well, his

9    testimony on slide 62:  He appeared to be a wealthy and

10   successful person.  He lived a very lavish life.  He

11   occasionally flew first class, he took private planes, he had

12   two Bentleys.

13        Francisco Martin himself on slide 63 said he appeared

14   to be financially successful; they were talking about buying a

15   private plane; he had all of the trappings of success and

16   wealth.  On page 64, he had family money, Thorsdale was the

17   Galanis family money.

18        It's ridiculous to suggest that anyone thought that

19   Jason Galanis was poor and had no other money.  By the way, not

20   having $15 million is not the same thing as being poor.  Let's

21   be very clear about that.  But Jason Galanis held himself out

22   as a man of enormous wealth so he could play with these people.

23        Let's talk about the super Bentley for a second.

24        MS. MERMELSTEIN:  I apologize for interrupting, but

25   there has been repeated things not in evidence in this these

1   slides, and so we object to the use of the slides if that's

2   going to continue.

3          THE COURT:  Why don't you move on from this slide.

4   All right?

5          MR. SCHWARTZ:  Sure.

6          To be clear --

7          THE COURT:  You can read the testimony from the

8   transcript.

9          MR. SCHWARTZ:  That's fine.  We never found out what

10  the super Bentley looked like.  We found out that Jason Galanis

11  had one.  But why do I keep bringing it up?

12         MS. MERMELSTEIN:  Your Honor, the slide is still up.

13         MR. SCHWARTZ:  Can you move past this slide and past

14  this one.

15         MS. MERMELSTEIN:  Same problem.  Same problem, your

16  Honor.

17         MR. SCHWARTZ:  No.

18         MS. MERMELSTEIN:  Yes.

19         MR. SCHWARTZ:  They saw all these people.

20         MS. MERMELSTEIN:  These are not in evidence, your

21  Honor.

22         MR. SCHWARTZ:  So the super Bentley, it's a real

23  point.  OK?  The reason I keep bringing it up is because

24  everyone remembered that.  Right?  You remember Mr. McMillan,

25  he said he had been to Jason Galanis' house once.  But I asked

1    him what kind of car he drove, and he remembered.  He

2    remembered it was a Bentley, it was a Bugatti or something like

3    that.  Jason Galanis did that for a reason.  Well, maybe he

4    liked driving those cars, but it's because he was showing off,

5    he was showing off the trappings of wealth, he was trying to

6    fit in with all of these people that he wanted to be like, he

7    wanted to be in business with.  That's why he was doing this.

8         So, the super Bentley is not a joke; it is the way

9    that Jason Galanis was holding himself out to the world.  So

10   the suggestion that he had no money and that, therefore, it

11   must have been stolen money that paid for those $15 million in

12   bonds is absurd.  But even so, Francisco Martin told you

13   explicitly with respect to that $15 million that he had no idea

14   that it was stolen bond money.

15        So the two guys, the two supposed conspirators, who

16   you heard from in this courtroom, who handled the $15 million

17   before it got to Rosemont Seneca Bohai, they both had no idea

18   where it was coming from or what it was used for.

19        Those two guys, those two guys who are knee deep in

20   different aspects of this fraud with Jason Galanis, those two

21   guys who are obstructing justice, who are making up documents,

22   who are lying to the F.B.I., and they're involved in all of

23   these side scams, they had no idea that $15 million was being

24   recycled from the first bond issuance and being used to buy the

25   second.  If they didn't know, Devon Schwartz didn't know.  You

1      certainly haven't seen any evidence that suggests otherwise.

2      That's the fourth reasonable doubt.  So, what's the fifth?

3              The fifth, you may have guessed, is the witnesses.

4      You heard from 16 government witnesses in this case.  Of them

5      only three of those witnesses ever interacted with Mr. Archer

6      in any way, shape or form, and only one of them, Mary Moynihan,

7      the very last fact witness the government called in its case

8      before the summary witness, ever met Devon.  She only met him

9      five times in her life.  That's shocking.

10             Let's just talk about those three witnesses, the only

11     ones who ever met Devon.  And, by the way, Mr. Touger was

12     correct yesterday.  You didn't hear Ms. Mermelstein talk a lot

13     about the witnesses in her summation.  She talked about

14     documents but not the witnesses, and that's because the

15     witnesses don't have a lot to say.  They certainly don't have a

16     lot to say about Mr. Archer.  But let's talk about the only

17     three who ever had any dealings with him.

18             Well, the first one we've already covered, and that

19     was Hugh Dunkerley.  He told you that the only time he ever

20     dealt directly with Devon Archer was on conference calls.  They

21     never had a one-on-one conversation, they never once spoke

22     about these bonds.  In a scheme where there is supposed

23     coconspirators to steal the proceeds of these bonds, they never

24     had a discussion about the bonds, let alone about stealing the

25     proceeds of the bonds.

1        So let's talk about Mary Moynihan.  That's the one

2   witness who ever actually met Devon.  She was the lawyer for

3   the independent trustees to the Burnham Investors Trust.

4        Now, first things first, that's really a total side

5   show.  Right?  The Burnham Investors Trust has nothing to do

6   with the bonds in this case.  She told you that clear as day.

7   The Burnham Investors Trust never invested in those WLCC bonds,

8   no one ever suggested that they would invest in them, they

9   didn't invest through Atlantic, they didn't invest through

10  Hughes, they were entirely separate mutual fund that were

11  managed through Burnham Asset Management.

12       In fact, Mary Moynihan didn't even hear about these

13  WLCC bonds until early 2016 when the SEC filed their civil

14  lawsuit against Atlantic Asset Management alleging those

15  conflicts of interest.  That's the first time she even hears

16  about those WLCC bonds.

17       So the BIT board, that evidence has nothing to do with

18  the WLCC bonds.  And it's important for you to understand that.

19  I'm going to go through this because Ms. Mermelstein said that

20  Devon lied to the BIT board.  And he didn't, and you need to

21  understand that.  But this evidence has nothing to do with

22  anything.

23       So, first of all, as I just said, the BIT board

24  discussions had nothing to do with the WLCC bonds, and in fact

25  they had nothing to do with any particular investment.  But the

I6Q7GAL2                    Summation - Mr. Schwartz

issue there was whether after Burnham Asset Management was

sold, the Burnham Investors Trust would continue to be a client

of Burnham Asset Management.  And I raise that now because

there is a technical point I want you to be attuned to.

Tomorrow, when Judge Abrams instructs you on the law,

she is going to give you what is called the elements, meaning

the various things that have to be proven beyond a reasonable

doubt in order to convict any of the defendants.  And one of

the elements of securities fraud is that whatever the scheme

was, whatever the lie was, it has to be in connection with the

purchase or sale of a security.

(Continued on next page)

1          That is the language I expect that Judge Abrams will

2     instruct you on tomorrow, and it has to be in connection with

3     the purchase or sale of a security.

4          Nothing that happened with the BIT Board was in

5     connection with the purchase or sale of a security.  It is a

6     very technical point, but the law is a technical thing, and you

7     have to be aware of those things.

8          In fact, the fact that it was a technical thing really

9     runs through Ms. Moynihan's evidence, right, because the way

10    that Ms. Mermelstein portrayed it yesterday, the way she argued

11    the evidence made it seem as if Jason Galanis' presence in the

12    deal was being hidden.  You recall she showed the letter that

13    referred to Thorsdale, and it said, tried to insinuate it was

14    somehow misleading because it didn't say right on there that

15    Thorsdale equals Jason Galanis.  No.

16         There is no secret that Jason Galanis was in this

17    deal.  Ms. Moynihan tells you that.  On Slide 71, the BIT Board

18    know that all the way going back to 2013.  Everyone knew he was

19    potentially involved in this deal, and the question was how was

20    he going to be involved in this deal, and what you see -- and I

21    am going to go through this -- what you see is that over the

22    course of really a year, lawyers for the BIT Board, lawyers for

23    the independent trustees, lawyers for COR Fund Advisors,

24    lawyers for Jon Burnham, they negotiated with one another, they

25    negotiate around a variety of things, right?

1          You remember there is negotiations about whether that

2     guy Dan McClory is allowed to keep his 2 percent interest

3     because he filed a bankruptcy 18 years ago.  They're

4     negotiating with that, every little thing, and that is fair.

5     That is what lawyers do.  Trust me, that is fair.  They have

6     those negotiations because they're representing their clients

7     and they have concerned.

8          One of the concerns that was articulated by the

9     independent trustees, by the BIT Board, was what role is Jason

10    Galanis going to have in this deal?  It wasn't a secret that he

11    was in the deal.  The question is what is his role going to be.

12         To fast forward to the end, the result was that Jason

13    Galanis gave up his ownership in COR Fund Advisors.  He got

14    taken out of COR Fund Advisors, and then he was never, ever

15    part of this new entity BAM Holdings which acquired Burnham

16    Asset Management, which was the only entity that mattered to

17    the BIT Board in the first place.

18         So at the end of the day -- and I will go through this

19    in a little bit more detail -- Devon and COR Fund Advisors did

20    exactly what they promised to do, which is to take Jason

21    Galanis out of the deal in the very, very specific way they

22    promised to do, okay?

23         What they never promised to do, never, ever, and you

24    will not see this in all of the exchange of lawyers' letters,

25    let alone in the final representations which are the only

1    representations the trustees relied upon to vote, there is

2    never a promise that Devon Archer is never going to have

3    anything to do with Jason Galanis, that Wealth Assurance is

4    never going to have anything to do with Jason Galanis.  The BIT

5    Board asked for that at one point as part of the negotiations,

6    and COR Fund Advisors said no.

7            I told you in my opening statement, and I mean it now

8    more than ever, that is something that Devon Archer will regret

9    until the end of his life because they were exactly right.  If

10   he had listened to them when they said stay away from Jason

11   Galanis, he wouldn't be sitting here today, but that's not what

12   happened, not because he was committing a massive fraud to

13   steal the proceeds of the WLCC bonds, but because he was trying

14   to close a business deal, and for right or for wrong -- as it

15   turns out, for wrong -- he didn't know it at the time, he

16   didn't want to cut out a person who had brought the deal to him

17   and was part of the deal from the beginning, but he never

18   promised to.

19           Let's look at exactly what was said.  On Slide 73 you

20   see -- by the way, what we're looking at here are the minutes

21   of meetings of the BIT Board, and you'll recall when Ms.

22   Moynihan testified, she really didn't have or she wasn't

23   comfortable testifying about her independent memory of what

24   happened at these meetings.  Every time I asked her, Ms.

25   Mermelstein asked what had happened at one of those meetings,

1    if you recall, she went back to the minutes and she read the

2    minutes.  That is fine, those minutes are in evidence and you

3    should look at them.

4           Those minutes, they're only summaries written by one

5    side of a hotly contested negotiation.  She told you that she

6    took notes, and an associate took notes, but that they were

7    destroyed, and that is their practice.  She told you there were

8    drafts of these minutes that were distributed to the members of

9    the board, and they were edited and finalized, and we haven't

10   seen those because those are attorney-client privilege.

11          So all we have is this final product, and you know

12   that this final product does not represent everything that was

13   said at that meeting.  It represents what Mary Moynihan wanted

14   it to depict what happened at the meeting.  In particular,

15   you'll recall there was one meeting, remember the email

16   Mr. Burnham was complaining, it lasted for six hours long, but

17   the minutes were less than a page long, right?

18          So those minutes are not word-for-word what happened.

19          I would ask you when you want to look at what was said

20   between COR Fund Advisors, BAM Holdings and the trustees, you

21   are much better off looking at the letters that were exchanged

22   which are the actual words of the parties than the minutes that

23   many Moynihan wrote.

24          But that said, here on Slide 73 we're looking at one

25   of those minutes, talking about concerns about the role of

I6QJGAL3                    Summation - Mr. Schwartz

1    Jason Galanis.  The minutes say that Mr. Archer responded that

2    he had been asked to remove Mr. Galanis from the deal and that

3    he had done so.  That is exactly right, right?

4           You saw Mr. Fliegler testify, go to the next page,

5    that over the course of August, September into October, COR

6    Fund Advisor -- excuse me -- Thorsdale, which is Jason Galanis,

7    was removed as a member of BOE Capital and then removed as a

8    member of COR Fund Advisors.  It was taken out of the deal,

9    right?  They obeyed the promise to take him out of the

10   ownership structure.

11          Now, Ms. Mermelstein talked about the $600,513.00 that

12   got paid to Thorsdale in connection with buying them out of the

13   deal.  You recall that?  She suggested this was a sham

14   transaction.  This was not a sham transaction.

15          First of all, regardless of the money, Thorsdale

16   actually got taken out of the ownership structure, which is

17   what they promised to do, right?  So when we're looking at

18   whether promises were kept, that's the important thing.  What

19   COR Fund and what Devon Archer promised to do was get Jason

20   Galanis, get Thorsdale out of the ownership structure of the

21   Burnham Financial Group, and that is exactly what happened.

22          Now, you saw evidence, absolutely you saw evidence,

23   our witness put it on, showing the $600,513.00 went from

24   Thorsdale to Rosemont Seneca Bohai, and then was used to buy

25   out Thorsdale's interest in CORFA.

1      There is a suggestion by the government -- no

2    evidence, none, just a suggestion, just arguments that that was

3    somehow legitimate.  There is absolutely, absolutely no

4    evidence about why the transaction was done that way.  They

5    imagine that that was done as a sham transaction in order to

6    fool someone, and I will explain to you in just two seconds why

7    that doesn't make any sense, why that was not the case.

8      Ms. Mermelstein is imagining that this was a sham

9    transaction, she is imagining conversations in which people

10   agreed to do the transaction this way for illicit purposes.  I

11   can imagine things, too, I can imagine legitimate reasons to do

12   it this way.  Maybe Jason Galanis and Thorsdale needed a tax

13   basis when they were doing a buy out of the CORFA securities

14   interest.  You have no evidence on this.  There are a million

15   different reasons why this transaction could have happened the

16   way it did, but the one thing we do know is that it didn't

17   happen for the reason that Ms. Mermelstein said, which was to

18   fool the BIT Board.

19      How do you know that it didn't happen for that reason?

20      Because if you flip the page, the BIT Board didn't

21   even know it.  The BIT Board didn't even know that Thorsdale

22   had been taken out of CORFA, let alone that the money had moved

23   that way.  The BIT Board, Mary Moynihan, they were simply

24   relying upon the representations that were made to them in

25   those letters.  At that point, they weren't checking.  She told

1    you that.  She had no idea that Thorsdale Fiduciary & Guaranty

2    Company was removed as a member of CORFA prior to the closing,

3    prior to the BIT Board approving the deal.  She didn't know

4    that.  So, obviously, it wasn't to fool them.  They didn't even

5    know, right?  So that wasn't the reason.  That is the one thing

6    we know for sure.

7         Then we know when the BIT Board required, to the

8    extent they're able to require, that Burnham Asset Management

9    be owned by a new entity separate from COR Fund Advisors and

10   separate from Burnham Securities.  That is exactly what Devon

11   did, and they created BAM Holdings, and Jason Galanis was never

12   a part of BAM Holdings.

13        At the end of the day, Burnham Asset Management, which

14   is where the Burnham Investors Trust money was managed, was

15   totally separated from CORFA, the entity that once upon a time

16   Jason Galanis was an investor in, okay?  But what CORFA did not

17   promise to do, what Devon Archer did not promise to do was get

18   rid of Jason Galanis from his life entirely, okay?

19        So what was Jason Galanis' real relationship?  He was

20   a consultant.  You saw that over and over and over again, and

21   the BIT Board knew that and they were reminded of that over and

22   over and over again.

23        You see Government Exhibit 757.  This is a letter

24   signed by Mr. Archer and Mr. Godfrey.  Jason Galanis consults

25   with CORFA.  You see Exhibit 4314 from Jon Burnham to the other

1    trustees.  Jason Galanis won't be associated with BAFG, but he

2    may have a consulting arrangement with Devon personally.

3    Exhibit 4354, these were minutes of a BIT Board that the

4    government didn't introduce.  We introduced it, and in those

5    minutes Mr. Burnham explained that Mr. Galanis operated as a

6    consultant, right?

7            You have other evidence.  Mr. Dunkerley, on Page 78,

8    Jason Galanis was the consultant, right?  Yes.  That's what his

9    role was, and that was not forbidden.

10           Let's just take a second to actually look at the

11   representations, starting on Page 80.  By the way, this is not

12   from Mr. Archer.  This is from Mr. Godfrey.  Mr. Archer is not

13   the only one who is making these reputations.  Mr. Godfrey made

14   them, Jon Burnham made them, the lawyer Steve Weiss made them.

15   They all said the same thing, right?  Those people are not

16   supposedly co-conspirators here.

17           This is Andrew Godfrey saying Jason Galanis has never

18   been and will not become an officer, employee, consultant,

19   director or member of the management of either Burnham

20   Financial Group (BAM) or Burnham Securities, right?

21           So here they have the word "consultant," but it is

22   only consultant to those specific entities, right?  I am going

23   to be very precise on this stuff, folks, I am going to be very,

24   very detail-oriented because this was done by lawyers and it is

25   very specific.  Ms. Moynihan told you you have to read it that

1  way, so when it says officer, employee, consultant, director of

2  Burnham Financial Group, BAM or Burnham Securities, those are

3  the only entities we should look at.  It says that he won't

4  source any type of transaction, and he didn't.  I will talk

5  about that in a little bit.

6          Now, the government agrees, by the way, that Jason

7  Galanis did not work at Burnham.  Remember that's what they say

8  John Galanis was lying about.  They say John Galanis was lying

9  when he told the WLCC that his son, Jason Galanis, worked at

10 Burnham Securities.  They say that's a lie and they say Mr.

11 Archer is lying when he says he doesn't work there.  They want

12 to have it both ways.

13         The truth is he didn't work there.  The truth is he

14 was never an employee, he was never an investment banker, he

15 was never anyone who had an official role or an unofficial role

16 at Burnham Securities, Inc. or Burnham Asset Management.  He

17 was throughout a consultant to COR Fund Advisors and COR Fund

18 Advisors managing members on the big transaction, okay?

19         Let's look at the final set of representations, and

20 this is very, very lawyerly.  For the avoidance of doubt, it is

21 our understanding that, dot, dot, dot, dot.  Kindly confirm

22 this understanding.  And the answer is, "confirmed."

23         Let's break it down.  Let's look at what this

24 understanding is.  Next slide.  There are three parts to this.

25 This is in Defense Exhibit 4389.

I6QJGAL3                    Summation - Mr. Schwartz

1              1.  Mr. Galanis, Jason Galanis, will have no interest
2      of any kind, direct or indirect, in any of the Burnham entities
3      or their successors.

4              True, 100 percent true, all right?  At that point,
5      remember this is going into the closing of the deal which is
6      finally approved on October 1st, 2014, Jason Galanis had been
7      removed as an investor, as a managing member from any role at
8      any of the Burnham entities, totally true, okay?

9              2.  He will not source deals to the Burnham entities.
10             Totally true again.  I think throughout this trial
11     you've only heard of two deals that Jason Galanis was involved
12     in at Burnham Securities.  One was the WLCC bonds.  Well, you
13     know those were around since early 2014.  The first tranche
14     closes back in the summer of 2014.  Those are all well under
15     way at the time that these representations are being made that
16     going forward he is not going to source deals.

17             The other one is Code Rebel, that IPO, right?
18             And there, too, the evidence is that that started way
19     early, and I won't bother showing you the exhibit, but you can
20     write it down if you want.  It is Defense Exhibit 2209.  That
21     shows that Jason Galanis informed Mr. Archer and others back in
22     early 2014 that that Code Rebel deal was something that was in
23     the works at Burnham.  Other than that, I don't think we have
24     heard about a single deal that for Burnham, that Mr. Galanis
25     ever sourced, totally true, all right?

1          3.  The Burnham entities will not invest with or in,

2     directly or indirectly, any business or enterprise in which

3     Mr. Galanis has any association, affiliation or investment.

4     100 percent true, right?

5          None of the Burnham entities, Burnham Financial Asset

6     Management, Burnham Securities, ever invested in a Jason

7     Galanis company.  There is zero evidence of that.  When you

8     actually look at what the promises were, you see that they were

9     exactly true.

10          Now, again it is unfortunate and in retrospect you

11     wish that it hadn't gotten to this point, which Mr. Archer had

12     decided long ago to cut Jason out of his life entirely, but

13     that is not what happened.  Making a mistake like that is not a

14     crime and it is certainly not proof, not proof beyond a

15     reasonable doubt, not proof of any kind that Devon Archer was

16     involved in a scheme to steal the proceeds of these bonds.

17          Everything, everything was true.  Turn to Page 84.

18     This is one Ms. Mermelstein didn't talk about it yesterday, but

19     she highlighted it with the witness.  Wealth Assurance may not

20     have any financial ties to BAM, BAM specifically.

21          Agreed and true.  It doesn't say Burnham Financial

22     Group.  It doesn't say Burnham Securities.  There were

23     continued ties between Wealth Assurance, this is the old Wealth

24     Assurance, Wealth Assurance AG.  There were continued ties

25     between Wealth Assurance AG and Burnham Securities.  No one

1    ever said otherwise.  The representation was it won't have

2    financial ties to BAM, none, and there weren't.

3          You may see -- don't let them do this in rebuttal,

4    there is a letter that says may not have any financial ties to

5    Burnham.  If they show you that one, write down what exhibit it

6    is, look to look at it in the back.  That is one of the ones

7    where Burnham is defined to mean Burnham Asset Management.  It

8    is defined to mean BAM, okay?

9          When I'm done, by the way, and when Ms. Notari is

10   done, the government will have an opportunity to come back up

11   and argue again, and I don't know who is going to speak to you.

12   They're all excellent lawyers.  Mr. Quigley hasn't gone yet.

13   Maybe it is him.  If it is him, he is an excellent lawyer and

14   he has a great voice.  Lawyers are trained to make arguments,

15   and he'll make an argument, or whoever does it will make an

16   argument and respond to what I say, what Mr. Touger said and

17   what Ms. Notari says later today or tomorrow.  He will have

18   responses to everything, but make sure, make sure you

19   scrutinize it.

20         The same thing I just asked you to do, go look at the

21   evidence, make sure that they're actually responding to

22   arguments.  If they show you that one, Wealth Assurance won't

23   have financial ties to Burnham, you ask to see it because

24   Burnham means BAM, Burnham Asset Management.

25         Finally on this point, Slide 86, it was clear as day,

1    it was clear as day that these were specific representations

2    and that Jason Galanis was not being totally severed.  You even

3    see this email up top, this is from the Lawyer Steve Weiss

4    proposing that they would set up a separate investment

5    committee to evaluate any proposals or investment opportunities

6    that had any connection whatsoever to Jason Galanis.

7              You see in Exhibit 2221 what Mr. Archer was thinking,

8    what he is saying to Jason Galanis.  I sent a letter back to

9    the BIT yesterday saying I can't deny doing business with you,

10   basically take it or leave it.  That's his state of mind.  That

11   is his thinking.

12             Now, the government yesterday tried to argue to you

13   that that was somehow a lie from Mr. Archer to Jason Galanis,

14   but what I've just walked you through is that is exactly true,

15   there was no representation ever, ever that Jason Galanis would

16   have nothing to do with COR Fund Advisors, nothing to do with

17   Devon Archer, right?  If they try to show you otherwise, I want

18   you to read that representation the way a lawyer would, read it

19   very carefully.

20             That is Mary Moynihan, the only other witness --

21   sorry, your Honor.

22             THE COURT:  Yes?

23             MR. SCHWARTZ:  When is your Honor intending to take an

24   afternoon break so I can plan?

25             THE COURT:  It is really up to you.  If anyone needs

1    to use the restroom, just raise your hand right and we can take

2    a short break.  It is up to you, Mr. Schwartz.  How much longer

3    do you think you have?

4               MR. SCHWARTZ:  A little bit.

5               THE COURT:  All right.

6               MR. SCHWARTZ:  Are you all okay?

7               JUROR:  I need a break.

8               THE COURT:  Why don't we take a short break now.

9               (Jury excused)

10              MR. SCHWARTZ:  I am more than halfway through.  I

11   don't know if I am an hour and 45 minutes more.

12              THE COURT:  Let's just keep this break short.

13              (Recess)

14              THE COURT:  Is everyone ready?

15              Ms. Notari, do you have a sense of timing how long

16   your summation is?

17              MS. NOTARI:  At least two hours.

18              THE COURT:  So it might well be we don't get to it

19   today.  We'll just see what time it is, but given the hour now,

20   it seems unlikely.

21              (Jury present)

22              THE COURT:  Everyone can be seated.  Thank you.

23              MR. SCHWARTZ:  Okay, good afternoon again, ladies and

24   gentlemen.  Now, we were talking about the only three witnesses

25   in this case who had any kind of reason -- (inaudible).  We

1    went through Ms. Moynihan, going through Mr. Dunkerley, and the

2    last one is Catharine Driever, and she was one of Devon's

3    bankers.  She told you that she never met Mr. Archer in person

4    and spoke to him only a handful of times.  Principally you

5    remember sometimes wire transfers were over a certain threshold

6    and they had to get voice confirmation.  Mostly she dealt with

7    Mr. Momtazi.

8           The government says that Devon lied to Morgan Stanley.

9    He also lied to Deutsche Bank in connection with their

10   custodying of the WLCC bonds.  I want to look at what actually

11   happened.

12          By the way, this testimony also, on that technical

13   legal point, was not in connection with the purchase or sale of

14   a security.  In fact, I asked Ms. Driever that exact question,

15   and she agreed it was not in connection with the purchase or

16   sale of a security.  It was in connection withholding a

17   security, custody of a security.  Just keep that technical

18   point in mind, but again I want to go through that, the big

19   point, which is the government says that Mr. Archer lied to

20   Morgan Stanley.

21          Let's look at what he actually said and what he didn't

22   say.  Go to Slide 88.  This is what he actually said.  The

23   question that was put to him was how was the $15 million

24   generated that was used to purchase the bonds?  And the answer

25   was $15 million was generated through sale of real estate.

1          The question on the first version of the client

2     representation letter, the version that Devon actually signed,

3     said method of acquisition, purchase.  Manner of payment, wire

4     transfer.  Well, on the form those statements are obviously

5     true.  It was, in fact, a purchase of a security and the manner

6     of payment was, in fact, a wire transfer.

7          The $15 million, of course, was not true, right?

8          We now know, because we have seen the movie, we now

9     know that that $15 million came from the first WLCC bond

10    issuance, and Jason Galanis and Hugh Dunkerley transferred it

11    from Wealth Assurance Private Clients to Thorsdale, and then he

12    had Francisco Martin transfer it from Thorsdale to Cliff Wolff.

13    Then he had Cliff Wolff transfer it from his own escrow account

14    to Devon.  That is what we know now.  That is not what Devon

15    knew then, and I will talk about that in a second.

16         First of all, I want to talk about what Devon didn't

17    say to Morgan Stanley because they're trying to put a lot of

18    weight on that, what he simply did not say.  By the way, Slide

19    89 says the exact same thing to Deutsche Bank.  There is no

20    question he said those things.  Those are emails that are from

21    his accountant.

22         While there is evidence, and we'll talk about it in

23    little bit, that said Momtazi, his assistant, used his email

24    account and sent emails from that email account, you saw his

25    wife said he signed that first version of the client

representation letter, and that email came from his account.
No mistake about that, right?

What the government is trying to tag him with is the
second version of the client representation letter.  You recall
that?  That's the one that Catharine Driever filled out in her
own handwriting and sent it to Seb Momtazi and got signed.
That is the one Ms. Mermelstein put up on the screen yesterday
and she said this alone convicts Devon Archer, this alone is
proof beyond a reasonable doubt.  That is nonsense, and I will
tell you why.

There is nothing that was a lie in that letter --
excuse me -- in the letter that Devon actually signed.  So
let's look at what he actually said.

Page 90, on October 7th, when Ms. Driever is asking
these questions, Devon's response at the bottom of the page,
$15 million was generated through the sale of real estate, and
she responds at 7:30 pm, just a few more follow-up questions,
all right?  So there is some follow-up questions from
compliance, the follow-up questions having nothing to do about
this, but she is asking follow-up questions.

That is at 7:30 pm.

Then at 7:56 pm, 26 minutes later, she writes an email
to one of her colleagues within Morgan Stanley, and it says
under Wakpamni, the funds used to purchase the bonds (15
million) were from real estate sales through his business,

I6QJGAL3                    Summation - Mr. Schwartz

Rosemont Seneca Bohai.

          Devon did not say that.  Devon said the money was
generated from real estate.  He did not say it came from
Rosemont Seneca Bohai.  Catharine Driever added that, right?
And Ms. Mermelstein yesterday, she tried to convince you she
only did that after speaking to Devon Archer on the phone and
getting that information from him in that 26 minute window
between 7:30 and 7:56 pm.

          I asked her question after question about this, right?

          It starts on Page 92.  She tried to say, as Ms.
Mermelstein said yesterday, that it was her practice to write
only what she was told, but when she was pressed, she couldn't
remember having any such conversation.  The next page.  And
even if she did have such a conversation, she couldn't tell us
that it was with Devon.

          The next page.  I went back to this again.  She can't
remember, but the things that she put down in her email and
ultimately that she wrote in her handwriting on the second
version of that form, they were not in the email that Devon
sent, and that is all that is in evidence.

          Look, this is not a vast Morgan Stanley conspiracy
against Devon Archer.  This is an honest mistake.  Look at the
next page.  Catharine Driever knew that Devon Archer runs a
real estate private equity group.  This is her in connection
with these bonds writing a request to her boss, actually for

1    her boss to sign to get an exception to their usually rule you

2    have to be a customer for a certain length of time to have

3    unregistered securities, and she says Devon Archer holds a

4    mortgage with the banking group, he runs a real estate private

5    equity group.

6           And so Catharine Driever did what normal people do

7    trying to be helpful, not trying to do anything wrong, and she

8    put two and two together and took the sort of sentence fragment

9    Devon had emailed over from real estate sales and she turns it

10   into what she thought was saying the exact same thing.  She

11   turns it into her own language, that the funds used to purchase

12   the bonds were from real estate sales through his business

13   Rosemont Seneca Bohai.

14          That is 3:45.  That is her email internally at Morgan

15   Stanley.  And then at 3:49 she uses the exact same language

16   word-for-word except she writes it in Devon's voice and she

17   puts it onto that client form.  Those are the words.  Those are

18   not Devon's words.

19          Then the signature on that one, Dr. Archer tells you

20   that Sebastian Momtazi is signing Devon's signature.  Again

21   there is nothing wrong with that.  We're not accusing Mr.

22   Momtazi of doing anything wrong.  He is a personal assistant.

23   His job is to facilitate things.  You saw in the emails, I

24   won't read them all to you, that Mr. Momtazi was actually in

25   close, close contact with Jason Galanis, organizing the

transfer of these bonds.  This was his project.  He was
spearheading the logistics of it, and I am sure he thought he
was being helpful here.  That is certainly fair for you to
conclude he was being helpful here.  The fact remains he signed
Devon's signature on the second version of the client
representation letter.  In everyday life, that is fine, right?
That is the bank is trying to be helpful.

          Mr. Momtazi is trying to be helpful.  If this were a
civil lawsuit, you might say the buck stops here, Mr. Archer,
he was the boss of Rosemont Seneca Bohai, he has to be held
responsible even though those were not his words.  That is not
what we're doing here, right?  The Judge is going to instruct
you tomorrow on the law, but you can only hold Mr. Archer
liable for the things that he did, or his own intentions.

          So what did Mr. Archer think?  Well, first things
first.  You don't have any evidence one way or the other, no
evidence that anyone spoke to Mr. Archer and told him this is
where the money came from.  There is not a single email that
says that, no witness testified to it.  There is a total
absence of evidence on that point.  I submit to you that is
reasonable doubt right there.

          There is certainly no communication in which anyone
says well, it is $15 million misappropriated from the first
bond issuance.  As we just went through, the other people that
were handling that $15 million, they had no idea that the money

1    was being transacted in that way.  They had no idea it was

2    stolen money going in a big, big circle, right?

3            What is the evidence that we do have?  Well, the

4    evidence that you do have is that Mr. Archer said twice, in

5    response to two questions in two different banks, where was

6    this money generated from?  And he said real estate sales.  So

7    what do we know about Jason Galanis, where the money came from

8    and his sources of wealth and what do we know about Rosemont

9    Seneca Bohai?

10           First of all, let's start with Rosemont Seneca Bohai,

11   Page 99.  Catharine Driever tells you Rosemont Seneca Bohai was

12   a capital management firm.  It was managing people's money, and

13   you saw that when you looked at some of the bank statements for

14   Rosemont Seneca Bohai, you saw there were all sorts of other

15   investments there, there were payments, a number of payments we

16   looked at to Mr. Biden who you heard was Mr. Archer's business

17   partner.

18           This is managing capital on behalf of other people, or

19   this is different from the other entities and accounts that Mr.

20   Archer holds that you heard about.  It is not the Archer

21   Diversified account, it is not his personal account, it is a

22   business account of Rosemont Seneca Bohai, a capital management

23   firm.

24           What else do you know?  You know that the lawyer,

25   Cliff Wolff, we looked at this before, but let's look at it

1  again, Slide 100, who handles the transaction that goes

2  directly to Rosemont Seneca Bohai, he's told that it is going

3  to be an investment.  Thank you for your assistance in helping

4  to settle this investment for your client.  This is $15 million

5  of Jason Galanis' money that is going to be invested in these

6  WLCC bonds.

7          Finally, you know that the evidence is overwhelming

8  that Jason Galanis had significant, significant real estate

9  investments, and Ms. Mermelstein tried to sort of make fun of

10  this yesterday.  She said oh, it is only two emails from a long

11  time ago.  Not so, not so.  Look through the record.  These are

12  some of them.  I will tell you about a few more, right?

13          Page 101, Francisco Martin handling real estate

14  investments on behalf of Jason Galanis.  You knew that Jason

15  Galanis had told the hotel, a real estate investment in Miami,

16  true?  Yes.

17          Page 102, Amman Resorts, a large hotel company,

18  between 500 million and $1 billion in assets, Jason Galanis

19  along with a man named Omar Amant was going to purchase Amman

20  Resorts, correct?  That was their plan.  Their plan was to

21  purchase it out of bankruptcy.

22          This is the thing Hugh Dunkerley plead guilty to

23  because he commits a bankruptcy fraud in connection with this

24  thing, but the real estate investment is real and that was a

25  real estate deal that Jason Galanis had arranged, true.

1          Yesterday you saw Mr. Galanis being presented and

2     forwarded to Devon substantial real estate investment

3     opportunities, right?  A great and immediate Maui hotel

4     investment opportunity.  And you see on the next page we read

5     to you this is an opportunity to buy in fee simple, meaning buy

6     the real estate of a Ritz Carlton Hotel in Maui, in Hawaii.

7          We read another one -- I won't show it to you --

8     yesterday in which Dr. Rory Knight had forwarded some

9     information about a real estate deal, and Jason Galanis replied

10    I'm all over the real estate.  Do you remember that one?  You

11    can ask for that.

12         Do you remember we also saw in the texts between Tim

13    Anderson and Yanni Galanis, Yanni was bragging about the family

14    real estate investments.  Do you remember that?  He even showed

15    a picture of one of those to Tim Anderson.

16         Jason Galanis was holding himself out once again as

17    being extraordinarily wealthy, and a good deal of that wealth

18    came from real estate investments.  So when Devon wrote the

19    money for the $15 million was generated from real estate, he

20    believed that was true.

21         Now, the government says no, no, no, no, we know what

22    that question is asking.  That question is not asking where was

23    that money generated from, even though that is literally the

24    question that Catharine Driever asked, it is really asking how

25    did you get the money.  The way he was supposed to answer that

I6QJGAL3                    Summation - Mr. Schwartz

1   was I got that money from Jason Galanis.  That is what the

2   government faults Devon for, that is what the government says

3   is proof beyond a reasonable doubt that he did not read that

4   question the way the government now years later and after doing

5   all this work to figure out this fraud, they say that's the way

6   that question is supposed to be read.  I submit to you that is

7   not right.

8           First of all, the question was asked how was the money

9   generated?  That means where did it come from originally, and

10   that's the question that Devon answered.

11          Maybe there is some different right answer, right?  I

12   am not sure if you have been here long enough to get jury

13   checks on your fees.  There is a fee, it is very, very small

14   from being a juror, something like $38 a day.  At the end of

15   the day when you get that check, if someone were to ask you

16   where did you get that money? How was it generated?  There are

17   like 10 different right answers to that question, right?  You

18   could say I got it because I sat as a juror in a federal trial

19   for a month when I would have rather been enjoining the

20   weather.

21          You could say I got it in a check.  You could say it's

22   taxpayer dollars.  You could say I got it from the U.S.

23   Treasury, who is going to be the payor of the check.  There are

24   10 other answers to the question where did that money come

25   from.  They're all accurate answers.

1            The answer that Devon gave on the form, the one he

2    actually filled out, that is an accurate answer.  The

3    government now says that is not the answer we want.  I

4    understand in hindsight they say that, but again put yourself

5    in a movie at the time, again it has nothing to do with buying

6    or selling these bonds, they're trying to help move at Morgan

7    Stanley.  Morgan Stanley says where did the money come from?

8    It is an investment on behalf of someone else, on behalf of

9    Thorsdale and Jason Galanis.  When they ask where is the money

10   from, this is where Jason Galanis got the money.

11           It turns out to be wrong, but being wrong is not the

12   same thing as lying.  Remember I talked to you little bit in my

13   opening statement about the difference between a mistake and a

14   lie, right?  The weatherman is not lying when he says it is

15   going to be sunny, and it rains.  It turns out we now know

16   after the government has done all this work that Devon was

17   wrong and that money was money that Jason Galanis had stolen,

18   but it wasn't a lie.

19           That is an important, important distinction for you to

20   understand.  You saw that, you saw that difference right here

21   in this courtroom.  There were some witnesses, I submit to you,

22   that were not credible like Mr. Martin.  I think he was -- I

23   think you know he was not honest with you about everything,

24   just as he was for years and years not honest with the FBI,

25   right?  There were other witnesses that were simply mistaken.

I6QJGAL3                    Summation - Mr. Schwartz

1          The best example of that is the government's own law

2     enforcement agent, Agent Kendall.  She was the last witness

3     that they called, and that was a scrupulously honest witness,

4     right?  You could see she was physically in pain at having to

5     admit that she had made all these mistakes.

6          She didn't want to do it, right?  And we pointed out

7     time after time after time that there were mistakes in the work

8     that she had done, and she looked at the evidence and she

9     looked at her work and she looked at the evidence, and she

10    admitted that there were mistakes.  Those were mistakes.  They

11    weren't lies.  She didn't lie.  She wasn't trying to trick you.

12         Now, some of the things that were on her charts, and

13    we'll talk about them in little bit later, were misleading.

14    Someone told her to do it that way.  Those people may have been

15    trying to trick you little bit, but Agent Kendall was entirely

16    honest in her testimony.  She was mistaken, but she didn't lie.

17    I submit to you that when Devon answered those questions twice

18    the same way, and he said real estate, he was mistaken, as it

19    turns out, but he didn't lie.

20         There is zero evidence to the contrary, zero evidence

21    that Devon knew that that $15 million came from stolen bond

22    proceeds, zero evidence that even the people that transacted or

23    handled that money before knew the full story.  The fact that

24    the government says that that alone supplies reasonable doubt

25    is remarkable to me.

1      By the way, ask yourself what does that evidence even

2   prove?  The government put on a witness, Francisco Martin, who

3   told you he lied to banks, right?  This is Slide 105.  He lied

4   to banks.  He said that he listed himself as the owner and a

5   managing director of Thorsdale on certain brokerage accounts

6   not because he was helping Jason Galanis steal the bond money.

7   He didn't know Jason Galanis was stealing the bond money.  It

8   is not because he was trying to steal money from Jason Galanis,

9   of course.  He is one of Jason Galanis' cronies, right?

10      So ask yourself what even does the government's

11   evidence prove?  The government says that this evidence, this

12   one form from Morgan Stanley by itself is proof beyond a

13   reasonable doubt.  I suggest to you that is ridiculous.

14      Tomorrow Judge Abrams is going to give you the

15   instructions on the law, and she is going to tell you that a

16   reasonable doubt is a doubt founded in reason and arising out

17   of the evidence in the case or the lack of evidence.

18      If you have a doubt, if it is founded in reason, if it

19   is based on evidence or the lack of evidence, it is your duty

20   to find Devon not guilty.  So what is a reasonable doubt?

21      I expect tomorrow Judge Abrams will tell you a

22   reasonable doubt is one that would cause you to hesitate before

23   acting in matters of importance to yourself.  Think about what

24   really means for a second, hesitate before acting in matters of

25   importance to yourself.

I6QJGAL3                    Summation - Mr. Schwartz

1          Would you bet your house that Francisco Martin was

2    telling the truth?

3          Would you give up something that was near and dear to

4    you on the basis of that one piece of paper, that Morgan

5    Stanley form when there is zero evidence that Devon knew that

6    that money came from the bonds?

7          That's what proof beyond a reasonable doubt is.  It is

8    an enormously high standard.  It is supposed to be an

9    enormously high standard, and the government has not come close

10   to meeting it.

11         What is the sixth reasonable doubt?  I'll do this one

12   quickly.  It is what happened after things started to fall

13   apart.  Jason Galanis gets arrested in late September 2015.  In

14   early October 2015, the SEC starts shooting out subpoenas.  The

15   businesses are in crisis and everything is falling apart.  Look

16   at what Devon Archer does and then look at what everyone else

17   does.

18         What do the real criminals do?  You heard it.  You

19   heard from one of them, Hugh Dunkerley.  Hugh Dunkerley told

20   you that he got together and he went to Jason Galanis' house

21   and they got together and they started plotting on these white

22   boards how they were going to get out of this mess.  They're

23   drawing plans on the white board about how they're going to

24   fool the SEC, going to fool the FBI, somehow they're going to

25   get themselves out of this mess.  That is what Hugh Dunkerley

1    and Jason Galanis do, and then they do it.  They make fake

2    documents, fake companies, fake account statements, all sorts

3    of stuff.

4            Hugh Dunkerley, the witness that they embrace, pled

5    guilty to obstruction of justice based on the creation and

6    submission of false documents by himself and Jason Galanis.

7    Gary Hirst helped.  Francisco Martin created Calvert.  Those

8    are the people who are creating false documents and trying to

9    fool the government when things start to come down.

10            What else do they do?  They're sending encrypted,

11   self-destructing messages on something called the WICKR to one

12   another.

13            Look, by the way, that is not illegal, right?  Privacy

14   is important, and you can send messages using secure apps and

15   self-destructing apps, and there is nothing wrong with that.

16   That is not what these guys were doing.  These guys were not

17   being protective of their privacy.  They were trying to evade

18   the FBI and the SEC and the government from doing what they

19   have done here, which is to get all of their criminal

20   communications with one another.

21            Again it is Martin, Dunkerley and Hirst all scheming

22   with one another.  We don't know exactly what they're saying

23   because those messages self-destructed, but you heard Hugh

24   Dunkerley testify about it, and even at the moment that

25   Francisco Martin goes into the Starbucks, you remember, for his

I6QJGAL3                    Summation - Mr. Schwartz

1    meeting with the FBI, he meets them alone without a lawyer at a

2    Starbucks in California.  He is WICKRing with Jason Galanis

3    right beforehand and he is reporting to him right afterwards.

4                   (Continued on next page)

1    It's part of their plot to cover up their crimes.  Devon was

2    not part of any of it; he wasn't there on the white board; he

3    wasn't on Wickr; he is not involved in any fake documents.

4          And we will talk about that for a second, because

5    Ms. Mermelstein made a truly impressive argument about that

6    yesterday.  So let's talk about Calvert.

7          Calvert is the company that is totally 100 percent

8    fake.  Right?  Francisco Martin creates it after this all

9    starts to happen in October 2015, and he and Jason Galanis

10   start backdating a bunch of stuff, and then they give all those

11   fake backdated agreements to the SEC and to the government to

12   cover their tracks.

13         There is nothing connecting Devon Archer to Calvert

14   except for this one e-mail.  Right?  There is one e-mail, I'm

15   going to show it to you, I'm going to be very upfront about it.

16   There is an e-mail from November 25, 2015, it's Government

17   Exhibit 2119, between Mr. Archer and Mr. Waddington -- who is

18   someone at Wealth Assurance, I believe -- and they are talking

19   about at this point what are we going to do with the WLCC bonds

20   that VL Assurance holds.  Remember, some of those bonds ended

21   up at something called VL Assurance.  And what Devon said is I

22   want to share some information -- which is information that had

23   been forwarded to him by other traders -- even though these are

24   going to be replaced/returned to Calvert.  OK?  And then later

25   on Mr. Waddington agrees with him, and Devon says again these

I6Q7GAL4                    Summation - Mr. Schwartz

1    bonds should go back to their beneficial owner.

2            That's it.  Right?  So we just went through the fact

3    that Rosemont Seneca Bohai was a capital management firm that

4    had made this investment on behalf of someone else.  Right?  So

5    they need to return these bonds now that the businesses are

6    being wound down, and someone tells Devon, well, they should go

7    to Calvert.  That's literally the only thing you can conclude

8    from this document.

9            Calvert -- as Mr. Dunkerley tells you on the next

10   slide -- its sole purpose was to deceive people.  And the only

11   people that he ever discussed that with were Gary Hirst and

12   Jason Galanis.  Not even Francisco Martin, who made up Calvert,

13   whose brother was the supposed operator of Calvert, knew that

14   was the purpose.

15           But the government wants you to conclude based on that

16   one e-mail that somehow Devon Archer was brought into the loop

17   and he knew that Calvert was the sinister thing, instead of he

18   was one of the many, many people that were deceived by the sole

19   purpose of Calvert.  Devon did not sign any Calvert documents;

20   he didn't rely on any Calvert documents.

21           And if you go to slide 113, the government makes a

22   truly breathtaking argument -- this is Ms. Mermelstein

23   yesterday -- "Devon Archer kept his hands a little cleaner.  He

24   didn't submit the fake Calvert documents himself.  Dunkerley

25   did it for him.  Look at Government Exhibit 1577."

1        So let's break this down for just a second.  What is

2   Ms. Mermelstein arguing?  We don't have any evidence connecting

3   Devon Archer to Calvert, so I'm going to spin that and say the

4   fact that we have no evidence is actually evidence itself that

5   he's guilty because he kept his fingerprints off of this, he

6   kept his hands a little bit cleaner.

7        What is the evidence of that?  What is the proof that

8   he kept his hands a little bit cleaner?  What is the evidence

9   that Dunkerley did it for him?  Dunkerley never discussed

10  Calvert with Devon Archer.  We just saw that testimony.

11  Dunkerley never talked to Archer about Calvert.

12       There is a reason why some of the Calvert documents

13  have all sorts of signatures on them, and the one that they

14  have to make up for Rosemont Seneca Bohai only has Dunkerley's

15  signature.

16       But you remember this one?  I'm not going to bother to

17  show it to you.  But you remember Dunkerley first is told by

18  Jason Galanis that Rosemont Seneca Bohai is this Chinese money,

19  and then later on they create this fake Calvert document that's

20  the exact opposite and says that Thorsdale and Calvert are

21  holding Chinese money that's being invested into Rosemont

22  Seneca Bohai?  It's the exact opposite of the original lie Hugh

23  Dunkerley tells.  Only Dunkerley signs that document, and he

24  testifies he never discussed Calvert and he never discussed

25  that document, he never discussed that document with Devon

I6Q7GAL4                    Summation - Mr. Schwartz

1    Archer.  OK?  It's on slide 114 as well.

2            What else happens after Jason is arrested, Jason

3    Galanis is arrested and things start to come down?  Well,

4    Ms. Mermelstein yesterday talked a little bit about Jason

5    Galanis' new fake e-mail address legal@colarisventures?  She

6    did it really quickly, but it was another just false argument.

7    She showed you a few Colaris e-mails, and she said this:  "You

8    can see a bit more of Archer and Cooney's involvement in the

9    cover-up when you take a look Colaris Ventures e-mails ... it

10   is not a good club."

11           Then she read three of the names on those e-mails but

12   not all of the names on those e-mails.  It's not a bad club.

13   Look at Government Exhibit 1453, October 2, 2015 from

14   legal@colarisventures to Rashaun Williams -- this is the

15   Goldman Sachs guy who worked at Bonwick -- Devin Wicker -- also

16   from Bonwick -- Jason Sugarman.  It's not a bad club to be in.

17           And, by the way, this is the only document -- the only

18   one -- Government Exhibit is 1453, that puts Devon Archer in

19   the so-called Colaris Ventures club.  This is an e-mail that

20   legal@colarisventures sends to Devon Archer and Andrew Godfrey.

21           He received an e-mail.  OK.  You can't stop people

22   from sending you e-mails.  You can't stop people from sending

23   you e-mails.  There is no response to this.  There is no Devon

24   Archer talking to whoever legal@colarisventures is.  There is

25   not even evidence that he had any idea this was from Jason

I6Q7GAL4                      Summation - Mr. Schwartz

1    Galanis as opposed to some spam from legal@colarisventures.

2              This is the evidence that they are relying upon --

3    that they want you to rely upon -- to say that Devon Archer was

4    part of a cover-up?  It's not responsible.

5              Look at what really happened, what Devon Archer really

6    did after Jason Galanis was arrested and after things start to

7    fall apart:  He met the BIT board again, and again, and again,

8    and he tried to answer all of their questions.

9              You see what he tells Jon Burnham on the day that the

10   arrest is announced:  "a surprise to both of us" -- meaning him

11   and Andrew Godfrey.  "We had no idea."  And that's a hundred

12   percent true.  The judge instructed you that's a hundred

13   percent true.  The judge instructed you that there is no

14   evidence that Devon Archer knew about the conduct underlying

15   that arrest or that the investigation existed.  That was true

16   what Mr. Archer said.  He said the same thing to the BIT board.

17   "He stated he had been shocked by the development"  A hundred

18   percent true.  It's not in dispute.  "And he thanked the

19   independent trustees"  He should have listened to them.  He

20   thanked them; they were right.  "And he said" -- and he was a

21   hundred percent true about this too" -- that he had been duped

22   in a sophisticated con"  And they kept asking him questions,

23   and he kept going back again and again and again to the BIT

24   board.  Now, remember, they have already approved the

25   transaction.  He is going in because he is trying to save the

I6Q7GAL4                    Summation - Mr. Schwartz

1    business that he's built.

2            Everyone else has run for the hills, right?  Galanis

3    and Dunkerley, they are doing code up on the white boards.

4    Francisco Martin is having frappuccino with the F.B.I. lying to

5    them, and Devon Archer is in a board meeting with the

6    independent trustees, answering all of their questions, and

7    honestly taking their frustration.

8            And you've seen that in your everyday life.  Right?

9    Sometimes you just kind of get angry at the person in front of

10   you even though they're not the ones to blame.  Have you ever

11   been at the airport and had your flight canceled, and there is

12   always someone who just kind of tees off at the person at the

13   ticket counter?  The person can't make that flight take off,

14   but they are the person that's in front of you.

15           Devon Archer showed up, and he went to those meetings,

16   and he took honestly the false accusations from the BIT board.

17   And you saw that.  At that first -- excuse me -- at that final

18   BIT board meeting, this is February 2016, this is after the SEC

19   has sued Atlantic Asset Management over the WLCC bonds.  The

20   BIT board is not saying get out of here; they're not saying

21   we're leaving Burnham Asset Management.  But they told you, Ms.

22   Moynihan has very clear they hadn't made that decision even in

23   February of 2016.  They're still willing to do business with

24   Devon Archer because they know that he had nothing to do with

25   that.  But Ms. Moynihan said, look, I read this complaint, and

1    it seems to me that you're one of these unnamed persons here.

2    And Mr. Archer said, no, I'm not.  And even the government

3    agrees.  That's a stipulation at the bottom.  "Devon Archer is

4    not one of the unnamed individuals discussed in that lawsuit."

5    That is undisputed.  That was just a false accusation by Ms.

6    Moynihan.

7           Mr. Archer showed up, he tried to repair these

8    businesses, he tried to answer the questions from frustrated

9    investors.  You saw he sent some lists and Andrew Godfrey sent

10   some lists of things they would have to deal with in the

11   aftermath of all of these problems; they were going to have to

12   find new funding.  And, lo and behold, page 115, Mr. Archer did

13   find new funding; he went out and he found new investors to

14   bring into Burnham Asset Management.  He is trying to save the

15   business.  He is not trying to cover up a crime.  He was always

16   in this to save the business, and that's what he was trying to

17   do right up until the last moments.  Right?  Right up until the

18   last moment.

19          Again here is Ms. Moynihan's testimony on slide 120.

20   Even in February of 2016 the independent trustees had not

21   decided to move their money.  They trusted Devon even after all

22   the facts had come out.

23          And the government said, well, he lied when he said he

24   had nothing to do with what was in that lawsuit.  First of all,

25   you don't have a copy of the lawsuit, but we have agreed -- and

it's in that same stipulation -- that it had to do with only

the first and the third bond issuances.  Well, we just went

through the fact that Devon Archer had nothing to do with the

first and the third bond issuances.  Yes, he knew they existed;

he was kept broadly in the loop -- we will talk about that a

little bit later.  That's not having anything to do with them.

          His answer was accurate, and his specific answer --

which is that he was not one of those unnamed people in that

complaint -- the government agrees is a hundred percent

accurate.  That's the sixth reasonable doubt.

          The seventh reasonable doubt is the government's own

investigation in this case.  Now, look, I have all the respect

in the world for these three lawyers and for the people that

work with them, but I think that you have seen that this

investigation has been sloppy.  It started late, and the

government has repeatedly put evidence before you in this case

that was false, and yesterday you heard arguments from the

government that asked you to draw totally false conclusions.

Right?

          This morning you heard the truth, which said the

government was trying to get Jason and John Galanis for a long

time.  That's how this case got started.  Devon Archer got

sucked up into it.  There are no witnesses against him.

          The witnesses that you did hear from -- this is slide

121 -- the government didn't even bother talking to them until

I6Q7GAL4                     Summation - Mr. Schwartz

1     long after they brought this case.  Ms. Moynihan -- the witness

2     we have been spending so much time with -- they didn't talk to

3     her until two months ago.  Ms. Driever -- the one they said

4     supplies all of the reasonable doubts -- they didn't talk to

5     her until just after Thanksgiving in 2017.  And that's true --

6     I won't go through them all -- that's true with so many of

7     their witnesses.  Tim Anderson, it was a year and a half after

8     they brought this case.  Even the victims, well into 2018.

9              The one guy that they did interview beforehand of

10    course was Francisco Martin, but he was lying, and he told you

11    that.  He told you although he met them earlier, he didn't

12    decide to tell the truth until 2018.  That's page 123.  And I

13    will leave it to you to decide whether even now he is telling

14    the truth.

15             Look at also the decisions that the government has

16    made in pursuing this investigation.  Look at who they have

17    made agreements with, who they've given immunity to.  They gave

18    a cooperation agreement to Hugh Dunkerley, Hugh Dunkerley who

19    pled guilty to three counts of securities fraud, not only

20    relating to the Wakpamni Lake Community Corporation bonds, but

21    also that separate Ballybunion fraud, that misappropriation of

22    funds from Wealth Assurance AG, also to a bankruptcy fraud and

23    also to obstruction of justice.  That's who they choose to make

24    the deal with.  And, by the way, he committed another fraud

25    that I will talk about in a second that they didn't make him

I6Q7GAL4                    Summation - Mr. Schwartz

1    plead guilty to.

2            And it's not just that he committed all of those

3    crimes but he obstructed justice; he produced faked documents

4    for the specific purpose of trying to con the government.  And

5    that's the witness the government embraces, as they say Mr.

6    Archer was somehow involved in the cover-up?  Based on what?

7    Based on an e-mail he receives but never replies to?  Based on

8    what?  A stray reference to Calvert, when he doesn't sign any

9    of the documents?

10           The reason why Dunkerley signs the Calvert documents,

11   while Devon Archer doesn't sign any of the documents, it's

12   because Devon Archer is not involved in the cover up.  The

13   people that were involved in the cover-up signed the documents.

14   Devon Archer never did.

15           How about Francisco Martin?  They gave him immunity.

16   He lied to them repeatedly, not just at the frappuccino

17   meeting, but over and over and over again he lied to them.  It

18   wasn't until 2018, when he is safe in Spain where they can't

19   get him, that he decides to tell the truth but only if they'll

20   give him immunity and an all expense paid trip to New York.

21   And that's the immunity pursuant to which he testified before

22   you.

23           But that's not the only evidence that the government

24   put before you here that is problematic.  The government put

25   evidence before you that was just plain misleading.  I'm not

1  going to dwell on this, because I talked about it already, but

2  look at slide 128.  Do you remember this chart of Agent

3  Kendall's?  This was just egregiously misleading.  The

4  government wanted you to believe that this $903,000 -- which

5  was the interest payments on the second bond -- went through

6  Rosemont Seneca Bohai on its way to Burnham Securities and to

7  VL Assurance.  That never happened.  That was a mistake that

8  Morgan Stanley made.  That money was adjusted in an internal

9  adjustment at Morgan Stanley.  Agent Kendall admitted this.

10 Right?

11         And finally we showed her on slide 130 the way the

12 money really moved, and she said, yes, this one was accurate.

13 This one that doesn't have Rosemont Seneca Bohai on it at all

14 is the accurate one.  That's not the one the government

15 offered.  And, in fact, that was their choice.

16         Look at Agent Kendall's testimony on the next page.

17 "Q. We know that you created a version of your chart that

18 accurately did not reflect payments going from RSB, Rosemont

19 Seneca Bohai, to Burnham Securities or VL Assurance, correct?

20 "A. Yes."

21         So, she had done it the right way, and the government

22 chose to show you the misleading way, because that was the one

23 that had Devon Archer and Rosemont Seneca Bohai on it.

24         That wasn't the only time they did it.  It wasn't just

25 Agent Kendall.  Do you remember very, very early on when Hugh

1    Dunkerley was on the stand?  The government showed him a chart.

2    This is slide 132.  This was the government's chart, 4001.  I

3    put up my own chart, Defense Exhibit 4063, and he said -- he

4    wasn't even answering my question by the way; he volunteered --

5    "My chart is a more accurate one than the government's chart."

6    That's on slide 133.

7           We shouldn't be up here correcting the government's

8    mistakes.  If they want you to convict Devon Archer, if they

9    want you to find guilt beyond a reasonable doubt, if they

10   expect you to draw conclusions where there is no evidence in

11   their favor, they have to put honest evidence in front of you.

12   And time, after time, after time, after time, that did not

13   happen in this case.  It just didn't.

14          I said it before, but what we are doing here, what you

15   all are doing is incredibly serious.  Guilty people should be

16   held responsible for their crimes, absolutely.  But there is a

17   reason that the Constitution requires guilt beyond a reasonable

18   doubt.  It is not enough that someone should have known better.

19   It's not enough that they were negligent.  It's not enough they

20   were foolish.  And the judge is going to tell you that

21   tomorrow, I expect.

22          And one thing that Ms. Mermelstein talked about was

23   this concept of conscious avoidance.  Don't let that be a

24   substitute for proof.  Constant avoidance -- and the Judge will

25   give you instructions on this -- is a very, very specific

I6Q7GAL4                      Summation - Mr. Schwartz

 1    doctrine, and it says you can't bury your head in the sand; you

 2    can't choose not to learn the facts and then say I didn't know

 3    it.

 4            That's not what happened here.  There is no fact that

 5    Devon Archer said, no, no, no, I don't need to see that I want

 6    to know what's going on there, you just do it, I'm sure it will

 7    work out fine.  That's not what happened.

 8            What happened was -- as we've shown you, and as I will

 9    continue to show you -- Jason Galanis took affirmative steps to

10    keep the truth from Devon Archer.  Being fooled is not

11    conscious avoidance.  Right?  And you should have known better

12    is not guilt.

13            Some other things that the government did that I think

14    are really problematic.  Well, you know, in Ms. Mermelstein's

15    closing yesterday one of the things she did was she just

16    flashed evidence before you and said with a lot of confidence,

17    look, this shows guilt.  Look at this one, slide 135.  "Weasels

18    win."  Ha, ha, ha, therefore it's a big fraud because they're

19    talking about themselves as fraudsters.

20            That's not what this is.  Look at what the underlying

21    is.  They're confirming that VL Assurance, the transaction is

22    closed.  I don't know why Jason Galanis writes "Weasels gettin

23    shit done."  I don't know who or what weasels is supposed to

24    be.  But the government wants you to draw the inference from

25    this e-mail that they are acknowledging the fact that they're

1    fraudsters?  That's ridiculous; that's fake evidence.  Show us

2    the evidence -- we haven't seen it yet -- that Devon Archer

3    knew that this money was being stolen as opposed to mirrored

4    some silly language that Jason Galanis used in an e-mail.

5          The government made a lot of arguments that are simply

6    not supported by the evidence.  Look at this chart.  This is

7    the purchase of 260 West Broadway.  That's the home that Jason

8    Galanis purchased in Manhattan.  By the way, that's the one

9    that was purchased in the name of Archer Diversified TCG.  The

10   government tried to make some hay with this, but they forgot

11   there is a stipulation Mr. Archer had nothing to do with Archer

12   Diversified TCG.  Totally separate company; he never did

13   anything with Archer Diversified TCG.  The only thing he ever

14   had to do with it was you saw one e-mail where Cliff Wolff sent

15   an e-mail to Seb Momtazi and said we're going to use Devon's

16   cache.

17         All right.  You know, fine, so Devon Archer might have

18   known -- if he paid attention to that e-mail -- that someone he

19   thought was a friend was going to use his name for something

20   that he thought was totally legitimate.  He didn't know the

21   money was being stolen out of Valorlife.  No one knew that

22   except for Jason Galanis and Hugh Dunkerley.  We do that all

23   the time in our everyday life, use my name to get a

24   reservation; use my name when you're trying to get into that

25   club or an appointment with that doctor.  That's all this is,

I6Q7GAL4                    Summation - Mr. Schwartz

this is helping a friend.  They're trying to turn that into

Devon Archer was therefore part of a conspiracy to steal

millions of dollars in bond proceeds.  Make them show you real

evidence.

Here is another fake argument.  Ms. Mermelstein said

on page 139 about this transaction:  "Jason Galanis bought a

$10 million apartment in Manhattan in Tribeca, and he did it

with proceeds from this scheme, and Devon Archer knew exactly

what he was doing and he helped him do it."

Well, that is quite a sentence.  If Ms. Mermelstein

meant helped him do it in the sense that he had this knowledge

through a cc that the company that was going to buy the

apartment was going to be called Archer Diversified TCG, then

OK.  But that's not what she wanted you to believe.  She wanted

you to believe when she made this argument to you yesterday

that Devon Archer knew exactly that this money came out of this

scheme.  And it didn't, by the way, it didn't come from this

scene.  When I referred a second ago to a totally separate

climb that Jason Galanis and Hugh Dunkerley committed, this is

that crime.

Look at slide 138.  These are e-mails between folks at

Valorlife, and they're talking about a transfer confirmation

dated August 12, 2014.  And if you look at the next page, it's

$3.2 million from Valorlife to the Cliff Wolff Law Firm --

because that's what Jason Galanis does, he puts Cliff Wolff Law

I6Q7GAL4                    Summation - Mr. Schwartz

1   Firm or some other law firm between his victim and Thorsdale,

2   just as he did with Devon -- and it says -- I'm sorry, I think

3   I said it was August before.  It's December.  This is the

4   European dating -- December 8, 2014 -- communications Valorlife

5   purchase of municipal bonds.  Wakpamni Lake Community

6   Corporation.

7           Valorlife was fooled into thinking on December 8, 2014

8   that they were buying $3.2 million of Wakpamni bonds.

9           Go back to slide 136, look at the bottom left hand:

10  $3.2 million December 8, 2014.  They never bought bonds.

11  That's another scheme that Jason Galanis and Hugh Dunkerley by

12  themselves used to loot Valorlife, the company that Devon was

13  trying to build, for their own benefit.  Devon didn't know

14  anything about that.  No one knew anything about that except

15  for Hugh Dunkerley and Jason Galanis.  Hugh Dunkerley didn't

16  even have to take responsibility for that.

17          One more, page 141.  The government showed you this

18  chart which showed $250,000 from Mr. Archer to Wealth

19  Assurance, Wealth Assurance Private Client, that we now know

20  was ultimately used for two purposes.  Some of it was used to

21  pay the coupon on the bond, and some of it -- in fact almost

22  precisely the amount that Mr. Archer put in -- was just

23  straight stolen by Jason Galanis.  And Ms. Mermelstein argued

24  to you:  "You know Archer understands exactly what that money

25  is for."  She says this is part of the cover-up, Devon Archer

I6Q7GAL4                         Summation - Mr. Schwartz

1   is covering this up by making interest payments on the bond.

2   That's Ms. Mermelstein's argument.

3            No evidence.  Not a shred of evidence.  There is

4   literally one document that's about that transaction, it's on

5   the next page, Government Exhibit 2121.  It's just wire

6   instructions.  And the government says because there are wire

7   instructions, therefore Archer understands exactly what that

8   money is for.

9            No evidence, just argument.  Right?  Argument is not

10  the same thing as evidence.  And when you go back into the jury

11  room it's the evidence that you have to focus on.  And time and

12  time again -- from the beginning of this case throughout the

13  presentation of the witnesses and the evidence, and through to

14  their arguments -- the government has presented to you false

15  evidence and evidence that was manipulated, to try to create

16  the impression that Mr. Archer was guilty and that he knew

17  things that there is no evidence to suggest that he did, and

18  that he touched transactions that there is no evidence to

19  suggest that he did.

20           I ask you, please, as I said at the very beginning,

21  keep your common sense about you and scrutinize the evidence.

22           What's the eighth reasonable doubt?  The eighth

23  reasonable doubt is that the real conspirators were using Devon

24  Archer.  The evidence is clear that Jason Galanis through his

25  friend Bevan Cooney brought Devon into this deal precisely to

1    exploit his connections and his money.  What Devon was

2    interested in was the roll-up plan, the big financial service

3    conglomerate.  All right?

4         We heard some testimony on slide 144 about Teneo, that

5    consulting company that was brought in precisely to advise on

6    the roll-up plan and bringing in a potential purchaser.  Devon

7    brought Teneo in, he paid Teneo out of his pocket, and the

8    original Teneo slide deck was designed to pitch the project

9    towards Devon's connections.

10        I want to show you just briefly a few of the pages of

11   that to remind you.  The deck, you should look at it, is 4733A.

12   This is an extensive footnoted appendixed slide presentation

13   put together by what everyone agrees are highly reputable

14   consultants.

15        If this business is a fraud, why would you do that?

16   Why would you subject yourself to that kind of scrutiny?  It

17   doesn't make any sense.  But Devon had no idea this was a

18   fraud.  He believed in this roll-up plan.  He believed that

19   they were creating this Guggenheim-like company that was going

20   to have all sorts of different businesses, insurance and asset

21   managers and broker dealers, and it was going to have billions

22   of dollars of assets under management.  And, remember, that's

23   what they are always in search of, assets under management,

24   because that's how you make money; you are able to invest those

25   assets on behalf of your clients, and that's where you get your

I6Q7GAL4                          Summation - Mr. Schwartz

1   fees.

2          So, whenever you see reference to assets under

3   management, that's the incentive here for Devon; that's how

4   they're going to make money.  Increase assets under management,

5   make it a more profitable overall company, and then sell it for

6   more than the sum of its parts.

7          And everyone knew that Devon was a valuable resource.

8   Morgan Stanley knew it.  You see that on slide 148.  They were

9   hoping that he would bring in new assets, and his friends and

10  his business partners.  The reason why Devon got brought into

11  this deal has nothing to do with fraud, has nothing to do with

12  Wakpamni bonds; it has to do with his connections to money and

13  to reputable people.

14         You see Exhibit 149 -- I'm sorry, page 149, Exhibit

15  4835 -- this is Jason Galanis -- Devon's not on this -- this is

16  Jason Galanis talking about the importance of a partnership

17  with Hunter Biden, Devon Archer and their partners at Harvest

18  Global.  All right, that's the purpose.  The purpose is to get

19  access to the billions or trillions of dollars in Chinese

20  money.

21         And you see that on the next page.  This is Devon was

22  stellar at a fund with $6 trillion of assets under management.

23         And constantly -- page 151 -- Jason Galanis -- who you

24  heard had somewhat of a checkered past; he had that civil SEC

25  settlement in his past -- he wanted to be able to put people

1    forward that were credible.  So here he is saying "I added

2    Devon prominently to this presentation."  And time and time

3    again he is providing information here to Francisco Martin

4    about Devon Archer and his connections.

5            Page 153 he is providing information to Dan McClory

6    and Hugh Dunkerley about Devon and his business partners Chris

7    Heinz and Hunter Biden.

8            Slide 154, Exhibit 800, providing that same

9    information to Michelle Morton and Richard Deary.

10           And Hugh Dunkerley told you that he wanted to take

11   advantage of Devon's connections.  And the very best evidence

12   that you heard of that was the recording that we played for you

13   earlier this week.  You heard Mr. Cooney saying -- Devon wasn't

14   there -- saying Devon Archer is the biggest whale of anyone.

15   And he is talking about all of his connections.  You know what

16   a whale it, right?  A whale is the high roller at the poker

17   table.  The whale is the one whose money and connections are

18   exploited.

19           You see on the next page layers of legitimacy.  That's

20   what Jason Galanis was searching for, layers of legitimacy.

21   And by bringing Devon Archer into the fold he was able to give

22   himself layers of legitimacy.

23           And you see him talking about that explicitly on slide

24   158.  You remember this one, Defense Exhibit 4708:  We have to

25   be careful with Devon.  Let's use his friendship with Bevan.

I6Q7GAL4                    Summation - Mr. Schwartz

Touch lightly.  "The alternative is to pimp Devon and see how

quickly he stops responding.  It will happen."  That's not

someone who is in on the scheme; that's not a coconspirator;

that's someone who is being exploited for their connections and

their money.

        Look, yesterday Ms. Mermelstein tried to tell you,

well, Devon Archer he would do some name dropping as well.

Look, first of all these are Mr. Archer's, his actual

relationships, but the only time you actually heard about him

invoking them in this entire trial is when he was asked about

them.

        Look at slide 158.  In every one of those minutes --

Mary Moynihan is the only one who tells you about this --

whenever Mr. Archer is talking about his relationship with

Hunter Biden and Chris Heinz it's always in response to

questions, in response to questions.  Mr. Archer responded to

further questions.  They wanted to know about this too, and one

of the reasons -- by the way, it was perfectly sensible -- was

because Hunter Biden was part of the Burnham team.  You

remember that.  You saw on that Teneo slide deck he was going

to be the vice chairman.  You heard testimony that he was in

the office.  Mary Moynihan from the BIT board told you they had

questions about his commissions and how much he was going to

bring in in terms of clients.  He was part of this deal.  It

was sensible to talk about him.  But for the conspirators, for

1   Jason Galanis, Devon and his connection to power and to money

2   was irresistible; and that's what they used him for.  It had

3   nothing to do with bonds.

4           If you go back, you'll see that Devon -- they were

5   talking about taking Devon's money and Devon's partners' money

6   long before there was an idea for bonds, back in 2013, 2014.

7           That's the eighth reasonable doubt:  Mr. Archer was

8   being used; Devon was being used by his coconspirators.

9           What's the ninth reasonable doubt?  This is an

10  important one.  Motive.

11          Now, look, there is no requirement that the government

12  prove motive.  I expect Judge Abrams will tell you that

13  tomorrow.  It's not an element of the crime.  But common sense

14  tells you people commit financial crimes to make money.  Right?

15  And the government over and over again has told you that the

16  motive in this crime was supposedly to make money.  The problem

17  is they have no coherent or common-sensical or reasonable

18  theory of motive for Devon Archer, and so they keep changing

19  their minds.  OK?

20          First, this is what Ms. Tekeei said in her opening

21  statements:  "Where did the money go, the bond money?  $15

22  million went to Devon Archer"  Well, you know that's not true.

23  Their own witnesses told you that's not true.  Their own

24  witnesses chart tells you he doesn't keep a penny of that

25  money; he doesn't benefit from those bonds being transferred.

1            Ms. Walch, the woman from FINRA, told you that when

2    those bonds were transferred Burnham was already at 1200

3    percent of its net capital.  Didn't benefit a whit from it.

4            So the government abandons that theory, and then they

5    say, well, maybe he didn't get the $15 million but he got cash.

6    Right?  So at the end of the case they throw up their charts,

7    and their chart says Devon Archer, RSB got $700,513.  How did

8    we choose what is depicted on here?  Of course the prosecutors

9    chose.  And we went through this in painstaking detail.  Devon

10   Archer, Rosemont Seneca Bohai, they didn't keep a penny of that

11   money.  The $100,000 was repayment of a loan.  And Agent

12   Kendall tells you it doesn't end up at Rosemont Seneca Bohai.

13           The $600,513, we talked about that before, that goes

14   to Thorsdale to buy it out of CORFA.  That doesn't end up at

15   Rosemont Seneca Bohai.  None of that money stays with Rosemont

16   Seneca Bohai.  And, in fact, you remember Agent Kendall has to

17   admit at the end of the day that she has double counted where

18   the money went, because this money that had returned from

19   Rosemont Seneca Bohai was counted elsewhere in her chart.  You

20   see that testimony on page 167.  This is another instance where

21   they presented false evidence to you.

22           So, we showed you slide 170.  Well, we talked about

23   that.  Slide 170, this was Mr. Fliegler's chart, that when you

24   look at the cash -- even, by the way, when we picked up a

25   $100,000 wire going from Thorsdale to Mr. Archer -- that the

1    government didn't pick up and that has nothing to do with the

2    bonds but we were trying to be conservative and give you a full

3    picture of the transactions between these entities -- Mr.

4    Archer suffered a net loss of $826,142.36, just like I told you

5    a month ago in opening statement.  He didn't get any $15

6    million; he lost almost a million dollars.  It's the net loss

7    in the transactions between these entities.

8            So, finally yesterday, on the last day of the case,

9    the government came up with a brand new theory of motive, and

10   they said, well, Mr. Fliegler, if some much this money went to

11   go invest in securities and those securities had value, those

12   aren't counted in your chart, right?  He said right.

13           First things first, none of this money went to

14   securities, none of it did, and they haven't shown you

15   otherwise.  They showed you some securities, but we know where

16   those came from.  None of this money went to securities.  On a

17   cash basis, looking at these entities, Mr. Archer experienced a

18   net loss of $826,142.36.  He was putting money into these

19   entities because he was trying to make his business a success.

20   OK?

21           So yesterday the government decided that the motive

22   was now to increase the value of Wealth Assurance Holdings

23   shares, and they show you that at some seemingly random period

24   in time Mr. Archer had 130,000 Wealth Assurance Holdings shares

25   that were worth $4.5 million, and that they say is the motive.

I6Q7GAL4                    Summation - Mr. Schwartz

1              Yes, they're right, that's the motive.  That was the

2      motive all along.  Mr. Archer's motive was to make Wealth

3      Assurance Holdings, Valor Group, this big financial

4      conglomerate, a huge success.  Who told you about these shares

5      very first?  I did on cross-examination of Hugh Dunkerley.  The

6      government didn't bring this out.  I brought this out.

7              It was Hugh Dunkerley who signed this and issues to

8      Mr. Archer 130,000 Class B nonvoting shares of Wealth Assurance

9      Holdings.  Right?

10             If you go back up to the previous slide, 171, and you

11     see under quantity 130,000 shares, those are the shares that

12     Mr. Archer is holding.  That was his motive; that's why he was

13     in this deal.

14             But slide 173, when did he get them?  April 2014,

15     before there were bonds.  That has nothing to do with the

16     bonds.  Right?  Hugh Dunkerley told you this was compensation

17     to Mr. Archer for agreeing to serve on the board of directors

18     of Wealth Assurance Holdings which became Valor Group; and he

19     told you that happens, and that done to align the incentives of

20     directors and shareholders, to make sure everyone has the same

21     goal, which is to make a company stronger.  And you heard that

22     not just from Mr. Dunkerley; you heard that from Commissioner

23     Atkins on page 176.  The point of this is so if the

24     shareholders feel the pain, the directors feel the pain too; it

25     aligns interests.

1          This plan, this roll-up plan, this Wealth Assurance

2     Holdings plan, this goes back to November 2013.  Go to slide

3     174, please.  This is what you see, a memorandum from Wealth

4     Assurance Holdings dated November 9, 2013, talking about Jason

5     Sugarman, Hugh Dunkerley, Devon Archer, David Ezekiel and Adam

6     Fisher being appointed to the board of directors.  There were

7     no bonds.  This was months and months before that meeting in

8     Las Vegas between Tim Anderson and John Galanis and Raycen

9     Raines and Steven Haynes.  This was long before any of that

10    stuff.  That's when Mr. Archer gets these shares.

11         And let's think about that for a second.  If Mr.

12    Archer's motive, according to the government, is now these

13    shares in Wealth Assurance Holdings, that's the long-term

14    investment.  That's investing in the health of this financial

15    services conglomerate.  Does it make any sense that he would

16    also participate in a fraud at the heart of it?  Does it make

17    any sense that he would participate in this bond fraud where he

18    doesn't get any of the money out of the bond fraud?  But does

19    it even make sense that he would participate and ruin the

20    company he is helping to create?

21         And it's not just this.  Remember Jason Galanis and

22    Hugh Dunkerley, the really bad guys in this story, they are

23    absolutely plundering these companies.  It's not just the bond

24    money, it's Ballybunion.  Remember that's money they just suck

25    out of Wealth Assurance.

1          And it is that money that goes to Jason Galanis'

2     apartment they suck out of Valor Life, totally separate crimes,

3     totally separate embezzlements.  Mr. Dunkerley had to plead

4     guilty to a separate crime, the one the government realized

5     about Valor Life.  It doesn't make any sense that Devon was a

6     co-conspirator if his motive was the long term health of this

7     company and everyone else is just pillaging.  That is like two

8     guys going to a bank and going to rob the bank vault.  One guy

9     takes all the cash and the other guy gets stock in the bank,

10    and the next day they rob it some more and still one guy takes

11    all the cash.  It doesn't make any sense, right?

12          Use your common sense.  That is what they ask you to

13    do.  Their theory of motive, the theory of why someone who had

14    everything to lose would participate in this fraud makes

15    absolutely, absolutely no sense.  That was the 9th reasonable

16    doubt, no motive.

17          What is the 10th and final reasonable doubt here?

18          The final reason that you know Devon is not guilty is

19    because there is no actual evidence that Devon knew that Jason

20    Galanis was stealing the money.  It couldn't get simpler than

21    that.

22          I am going to go through that in a second, but I do

23    want to talk -- I alluded to this before, but I am going to

24    talk about what is going to happen next.  I am going to sit

25    down in just a few minutes, and given the time, hopefully we'll

1    all go home and we'll start again in the morning.  Ms. Notari

2    will speak and the government will speak again.

3         When the government does that, as I said before,

4    they're going to make some excellent arguments, lots of

5    excellent arguments, but they're going to be arguments, right?

6    Whoever it is is going to go home tonight and they're going to

7    study this transcript that is being prepared, they're going to

8    study this transcript of everything that I have said and

9    they're going to try to poke holes in every single thing.

10        Look, we're lawyers, and we get paid to argue.  We're

11   all good lawyers, the government is excellent lawyers and

12   they're going to have responses.  I want have an opportunity,

13   and none of the defense lawyers will have an opportunity to

14   speak to you again.  It is the rule in federal criminal cases,

15   the government gets the last word.  That is how it should be.

16   They have an enormous burden, a burden of proof beyond a

17   reasonable doubt, so it is totally appropriate that they get

18   the last word.

19        I am going to ask you to continue to scrutinize

20   whoever it is that gives that argument and try to recognize the

21   difference between arguments and evidence because there is no

22   actual evidence that Devon Archer knew that Jason Galanis was

23   stealing the bond money.  There is argument, and you heard that

24   from Ms. Mermelstein yesterday.  She showed you a number of

25   emails, and they had some words in them like discretionary and

1    liquidity, and she put them up and said with a tremendous of

2    confidence that Devon Archer knew what this means, this shows

3    that he knew the money was being stolen, but that is simply not

4    so.

5            Let's look at some of those.  Slide 180.  You heard

6    over and over in this trial about the desire to get

7    discretionary liquidity, discretionary assets under management.

8    We talked about that concept.  They want you to believe that is

9    somehow code word for stealing the money.  Discretionary money,

10   discretionary investments, assets under management is not code

11   for stealing the money.

12           When you see that email from Jason Galanis that has an

13   opinion letter from Dilworth Paxson, Tim Anderson's law firm

14   attached to it that said the proceeds are $5 million to the

15   WLCC to build a winery and $15 million to us discretionary,

16   that doesn't mean discretionary, we can put it in our pockets.

17   That means it is discretionary assets under management.  This

18   is money that we can potentially use in order to make

19   investments and earn real fees.

20           You see some other emails, I won't show you all of

21   them, where Jason Galanis at one point says I don't want you to

22   bring me any more deals until we can pull the trigger

23   ourselves.  What is he saying?  He is saying we have to have

24   enough assets under management so we're not bringing in outside

25   investors and working for them for fees.  We're investing our

I6QJGAL5                    Summation - Mr. Schwartz

1   own, not our stolen, but our clients' assets under management.

2   That is what those communications mean.

3         They showed you a whole bunch of emails in this case,

4   and the only one who told you what they meant is the

5   government.  That is not evidence.  That is argument.  All of

6   those emails between Jason Galanis and Devon, you only have

7   what is written on the page, which I assure you does not make

8   any reference to stealing bond money.  I guarantee you if there

9   were any such an email, you would have seen it by now.  There

10  is no such thing.

11        There is references to discretionary, and you heard,

12  Slide 181, discretionary.  It means the investment manager has

13  discretion to invest within guidelines.  That's one of the

14  victims, Leo Griffin.  Their own expert, Professor Laby, talked

15  about discretion.  There are certain circumstances where a

16  client can hand over responsibility of what is called

17  discretion to an investment adviser.  That is what discretion

18  means in this context.

19        Slide 182, Exhibit 2120, this is the email I was

20  talking about a second ago.  This doesn't mean we get to steal

21  the $15 million.  It means it is discretionary assets.  We can

22  invest it.  We can earn a higher return on it.  This is how

23  we're going to make money, not I'm going to put it in my pocket

24  and not sharing it with you guys, which is how the government

25  wants you to read it.  That is what they have.

1          Yesterday the government showed you email after email

2     after email after email that had buzzwords in it, but none of

3     them were proof, and certainly no proof provided you any proof

4     whatsoever that Devon Archer knew that money was stolen.  All

5     they have are these words.  I just told you what I think the

6     words mean.  Ms. Mermelstein told you what she thinks the words

7     mean.  I don't think it is possible that you could not have a

8     reasonable doubt about what the words mean.

9          When the government in their rebuttal gets up and says

10    with absolute confidence that I'm wrong and they're right,

11    don't let their confidence be a substitute for proof.

12    Sometimes this happens to us, all of us in our everyday life.

13    We can be absolutely confident about something and still be

14    wrong.

15         When this trial started, there was this name going

16    around on the internet, I don't know if you all have seen it,

17    but it really speaks to this point.  Yanni versus Laurel.  Do

18    you know what goes on with this one?  Some of you do.  Can you

19    play that, Mr. --

20              MS. MERMELSTEIN:  Objection, your Honor.

21              THE COURT:  This is not really relevant.

22              MR. SCHWARTZ:  It absolutely is relevant.  It is a

23    demonstrative aid to the jury.

24              THE COURT:  I don't think so.

25              MR. SCHWARTZ:  For those of you who have seen it, what

1   the name was, was someone pronouncing that word, and half the

2   people who heard it with absolutely certain the word was

3   Laurel, and half the people who heard it were absolutely

4   certain that the word was Yanni, and absolutely certain and yet

5   filled with doubt.  That is what the evidence is in this case.

6   The evidence that the government has asked you to accept as

7   proof beyond a reasonable doubt in the best possible world, it

8   is totally ambiguous.  No one has told you what it meant.

9         Look, I have gone through today and I hope in the

10   course of walking through these 10 reasonable doubts, I have

11   not yet given you doubt, but I have given you certainty that

12   Devon Archer is not guilty, that he is innocent, but that is

13   not my burden.  That is why the government has the burden in

14   criminal cases of proof beyond a reasonable doubt, beyond each

15   and every reasonable doubt.

16         So I am going to sit down in just a moment, and before

17   I do, I want to make the same request I made before and I've

18   made a few times, which is that you exercise your own common

19   sense when you scrutinize the evidence closely just as you have

20   every single day while we have been here at trial.

21         I remember vividly that one of the very first

22   witnesses, it may have been Mr. Anderson, it may have been Ms.

23   Driever, I was asking a question, and I showed the witness a

24   document, and there was something kind of funny the way the

25   emails had been produced, and in some of the intermediate

I6QJGAL5                    Summation - Mr. Schwartz

emails the headers were not totally complete, and you all spoke
and you said hey, I think we're missing a page, I think we're
missing some information.

         I had to show you, I had to prove to you that it was
full, complete and accurate, a single email.  I had to show you
the production numbers.  I had to show you there were other
emails in the chain from the same person that had the same sort
of error.

         You required a month ago, you absolutely required that
precision, that attention to detail.  That wasn't our argument.
That was you requiring absolute accuracy, and I have asked
several witnesses in this trial, and the government keeps
objecting, but I keep getting the same answer.  Accuracy
matters.  What we're doing requires, if you're to convict
anyone in this case, a tremendous deal of accuracy, proof
beyond a reasonable doubt, proof beyond each and every doubt
that has a basis in reason or evidence or the lack of evidence.

         As you go back into the jury room to deliberate, think
back on the actual evidence, the witnesses and the documents
and the stipulations, none of which will show that Devon
understood that Jason Galanis was stealing millions upon
millions of dollars, and that's the only question that matters.

         If you focus on the evidence as it relates to that
question, did Devon know, not what do we know now, did Devon
know then, you will reach the right verdict, the verdict that

1   is consistent with the facts and the law, a verdict of not

2   guilty.

3           You all hold a man's life, family in your hands.  Next

4   week is July 4th.  It is Felix Archer's birthday.  The evidence

5   you have heard over the last month demonstrates that Devon

6   Archer is innocent.  The evidence overwhelmingly shows,

7   overwhelmingly shows that Devon Archer was misled and that he

8   had no clue that Jason Galanis was stealing money, that Jason

9   Galanis was trying to rip down the business, plunder it for his

10  own personal gain that Devon was trying to build up by putting

11  his own money into it.

12          So on behalf of Mr. Archer, I ask you to return the

13  right verdict, the verdict that is consistent with the facts

14  and the law.  I ask you to return a verdict of not guilty, and

15  I want to thank you very sincerely for your time and attention.

16          THE COURT:  Thank you, Mr. Schwartz.

17          Ladies and gentlemen, we are going to adjourn for the

18  night.  Please remember still don't discuss the case.  Don't

19  research anything.  I will see you tomorrow morning at 9:00,

20  and have a nice evening.

21          (Jury excused)

22          THE COURT:  Everyone can be seated.  I am going to

23  distribute a red-lined version of the charge tonight.  We can

24  talk about it tomorrow.  If the jury is here late, we'll talk

25  about it at 9:00.  If not, we'll talk about it between

I6QJGAL5                    Summation - Mr. Schwartz

1    Ms. Notari's summation and the government's rebuttal.

2              If there is anything else you want to be heard on, I

3    will hear you now.

4              MR. QUIGLEY:  Your Honor, we'll take a short break

5    after her speech?

6              THE COURT:  Yes, we'll take a short break after hers,

7    and you will go, and we'll take another break depending on what

8    time it is, we'll take a lunch break or short break, and I will

9    start the charge and see what time it is.  If there are any

10   other charge issues you want to raise with me?  I don't think

11   so.  Okay.

12             MR. QUIGLEY:  Not for the government, your Honor.

13             THE COURT:  Thanks, everyone.  Have a night nice

14   night.

15             (Court adjourned until Wednesday, June 27, 2018, at

16   9:00 o'clock am)

17

18

19

20

21

22

23

24

25

I6QJGAL5                    Summation - Mr. Schwartz

GOVERNMENT EXHIBITS

Exhibit No.                                      Received

4506     . . . . . . . . . . . . . . . . . .3829