I6R7GAL1

1    UNITED STATES OF AMERICA
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                         16 Cr. 371 (RA)

5    JOHN GALANIS, et al.,

6                   Defendants.

7    ------------------------------x

8                                        New York, N.Y.
                                         June 27, 2018
9                                        9:00 a.m.

10
     Before:
11
                       HON. RONNIE ABRAMS,
12
                                         District Judge
13

14                        APPEARANCES

15   ROBERT KHUZAMI,
          Acting United States Attorney for the
16        Southern District of New York
     BY:  BRENDAN F. QUIGLEY,
17        REBECCA G. MERMELSTEIN,
          NEGAR TEKEEI,
18             Assistant United States Attorneys

19   PELUSO & TOUGER
          Attorneys for Defendant John Galanis
20   BY:  DAVID TOUGER

21   BOIES, SCHILLER & FLEXNER LLP (NYC)
          Attorneys for Defendant Devon Archer
22   BY:  MATTHEW LANE SCHWARTZ
          LAURA HARRIS
23        CRAIG WENNER

24

25

I6R7GAL1

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
          Attorney for Defendant Bevan Cooney
4              - and -
     O'NEILL and HASSEN
5          Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ-HASSEN

6

7

8    Also present:  Kendall Jackson, Paralegal
                    Ellie Sheinwald, Paralegal
9                   Eric Wissman, Paralegal
                    Special Agent Shannon Bienick, FBI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6R7GAL1

1            (Trial resumed; jury not present)

2            THE COURT:  So, last night I circulated a red lined

3       version of the jury charge and the verdict form I intend to

4       use.  I think most of the changes are self explanatory.  There

5       are a few I'm going to note for you.

6            In both the substantive and conspiracy charges I added

7       abbreviated versions of the language Mr. Schwartz had requested

8       regarding defendant's association with individuals of position

9       in a corporate entity not being sufficient to establish

10      knowledge or intent.

11           Although none of the defense made this precise

12      argument, there has been kind of attack on the government's

13      investigation, so I left in the specific investigative

14      techniques charge.

15           I left in the conscious avoidance charge.  As I

16      previously noted, I think it is appropriate in response, just

17      as an example, to Mr. Touger's objection from yesterday.  I

18      want to note that it's also appropriate with respect to John

19      Galanis who received the $2.35 million for his role in the WLCC

20      bond offerings, which is not a payment authorized by any of the

21      governing documents, although he claims it was a finders fee.

22      At the very least, this is a red flag that should have alerted

23      him to the criminal nature of the scheme.

24           I added instruction on similar act evidence, as we

25      discussed yesterday.  If you have objections to the particular

I6R7GAL1

1  language, let me know.

2            As for the jury unanimity instruction, I took a closer

3  look at that, as I said I would yesterday.  I don't think it's

4  required in this case, where the government clearly alleges a

5  single scheme in the context of a substantive securities fraud

6  count.  This seems to be a situation in which at the very least

7  these factual allegations are interrelated.  So, see for

8  instance the Schiff case, 801 F.3d at 114 to 115 and Judge

9  Cote's opinion in the Gonzales case, 2002 WL 77082 at 3 to 4.

10  So, I think a general unanimity instruction is sufficient here.

11            Do we have all of the exhibits ready to go?

12            MS. NOTARI:  Almost.

13            MR. SCHWARTZ:  We will have ours this afternoon, which

14  is when I expect they will be relevant.  I forget, how many

15  copies did we agree upon?

16            THE COURT:  I think one copy of each.  And the idea I

17  thought was just to put it all in a trial cart and send them

18  all back at the same time.

19            MR. SCHWARTZ:  Yes.

20            THE COURT:  We don't have a lot of recordings in this

21  case.  We have some audio recordings.  We have, you know, the

22  promotional video of 1920 Bel Air.  But I don't know if you

23  need to send a computer back or some device to listen to the

24  recordings, or if that's not necessary unless they request it.

25            MR. SCHWARTZ:  I think you can just add to your

I6R7GAL1

1    instruction if they want to see any evidence that's not in hard

2    copy, they can ask for it, and we will display it in the

3    courtroom for them.

4              MS. MERMELSTEIN:  That's fine.  One note with respect

5    to exhibits.  We pulled ours together here so that the defense

6    can take a look at them if they want; they are all in this

7    cart.

8              With respect to things that were marked as a

9    Government exhibit and which then in offering -- because the

10   defense is offering they marked it as a joint exhibit, we don't

11   have copies of the "joint" exhibit.  We only have the

12   government exhibit.  We've included it as a Government exhibit

13   in the trial cart.  It seems fine to me.  The numbers are the

14   same, but I just wanted to make sure that's clear.

15             THE COURT:  That's fine.  Just make sure you have your

16   defense exhibit too if you want to have it presented as a

17   defense exhibit.

18             MR. SCHWARTZ:  Look, the truth is I called them joint

19   exhibits but they were defense exhibits; they were never moved

20   in by the government.  The reason that I called them joint

21   exhibits was because early on in the trial I didn't know what

22   the government was going to ultimately move in or not, and I

23   didn't want there to be confusion on the numbers.  So for

24   things that I was moving in on cross that had been designated

25   Government's exhibits, I called them joint exhibits so there

I6R7GAL1

1    wouldn't be confusion.  But I don't think there should be a

2    version of those documents that is called just a government

3    exhibit, because no such thing was every introduced.  We are

4    printing copies; they are designated as joint exhibits; the

5    government can look at them all.

6           THE COURT:  That's fine, as long as it has the

7    government sticker on it.  All I'm concerned about is if a

8    juror had taken down a note of what exhibit it was.  We want

9    them to be able to find it.

10          MS. MERMELSTEIN:  That's fine.

11          MR. SCHWARTZ:  That's fine.

12          MS. MERMELSTEIN:  The point wasn't to put in the

13   government one; it's that in making sure we were doing our

14   share of the exhibit printing we don't have those.

15          THE COURT:  That's fine.  So just take those out, show

16   them to Mr. Schwartz.

17          MS. MERMELSTEIN:  And we can swap in the joint ones.

18          THE COURT:  Exactly.  I just want to make sure we can

19   do this seamlessly after the charge.  I don't expect that I

20   will finish the charge or maybe even start it before lunch, so

21   you will have the lunch hour.  I may start it but I think we

22   will see how it goes.

23          MS. MERMELSTEIN:  That's fine, your Honor.

24          We have also prepared a sort of sanitized exhibit list

25   for the jury with respect to the government/joint exhibits.

I6R7GAL1

1    We're happy to combine it with a defense one, or put in two,

2    very neutral with respect to the descriptions, things like

3    to/from e-mail on date, no description.  I think it may be

4    helpful to them in finding things.

5              THE COURT:  OK.  If you can look at each others and

6    make sure that's OK as well.

7              MR. SCHWARTZ:  We have never discussed this before.  I

8    don't have a problem with it.  I wouldn't want there to be a

9    single list that reflected everything.  We can certainly do our

10   part, which is most of the defense exhibits, if the government

11   gives it to us now, by lunchtime, I would think.  Can you

12   e-mail it to us?

13             MS. MERMELSTEIN:  Sure.

14             THE COURT:  OK.  I mean I think if someone can work on

15   it during Ms. Notari's summation, that would be great.

16             MR. SCHWARTZ:  Exactly.

17             THE COURT:  Just to confirm -- because we have to make

18   copies of all of the charges, because my practice is to have

19   all the jurors have a copy of the charge -- do you have any

20   objections that you have not already lodged?

21             MR. SCHWARTZ:  I have you a few comments.  I'm not

22   going to reiterate what was in our original requests to charge

23   and what discussed the other day.  I presume those are all

24   preserved.

25             THE COURT:  They are preserved, yes.

I6R7GAL1

                MR. SCHWARTZ:  So, I just want to go over a few
things.

                One, I heard what your Honor said about unanimity.
I'm not going to reargue it.  But I do just want the record to
be clear.  Yesterday when we talked about this your Honor
handed out a proposed charge.  I believe that was a correct
proposed charge, and I just want to read it into the record so
that the record is complete.

                THE COURT:  Sure.

                MR. SCHWARTZ:  And the critical paragraph was this
one:  "One more point about the requirement that your verdict
must be unanimous.  Count Two of the indictment accuses the
defendants of committing substantive securities fraud in either
one of two different ways:  The first relates to misstatements
made to the WLCC; the second is the alleged material omissions
with respect to clients of Hughes and Atlantic.

                "The government does not have to prove both of these
for you to return a guilty verdict on this charge.  Proof
beyond a reasonable doubt of one or the other is enough, but in
order to return a guilty verdict, all 12 of you must agree that
the same one has been proved."

                And obviously it's our position that that is an
appropriate charge.

                THE COURT:  Understood.  As I said, just having taken
a closer look at the law, my view is that that is not necessary

I6R7GAL1

1    after all.  But you've preserved your record, so thank you.

2              MR. SCHWARTZ:  Thank you, your Honor.

3              Second, with respect to the conscious avoidance charge

4    that appears starting on page 50, we discussed this the other

5    day, and your Honor said you would think about it.  I just want

6    to make sure it didn't get lost.

7              We had discussed -- especially because of the

8    placement of the conscious avoidance charge, which comes at the

9    very end and is not with all the other sort of mental state

10   charges -- the idea that there should be some savings language

11   at the end, making clear to the jury that conscious avoidance

12   is not available as a substitute for intent, fraudulent intent

13   or willfulness.

14             Your Honor has put in the language that it's not a

15   substitute for active joint conspiracy -- which I think is

16   appropriate -- but I would also ask for a sentence or two

17   simply reminding the jury that on the substantive fraud count

18   they have to find knowledge, willfulness and intent, and

19   conscious avoidance only relates to knowledge.  They have to

20   separately find fraudulent intent and willfulness, not through

21   conscious avoidance.

22             MS. TEKEEI:  Your Honor, we think the Court's charge

23   here is the standard charge, and we think that this is

24   appropriate.  It covers all the circumstances that the court's

25   instructions as to knowledge earlier are sufficient to cover

I6R7GAL1

1      any questions on this issue.  We don't think that anything

2      needs to be added to this very standard conscious avoidance

3      charge.

4              MR. SCHWARTZ:  I don't think the government disagrees

5      that what I've just said is an accurate statement of the law,

6      and I think it would be much clearer to the jury, again,

7      especially given where this appears in the charge, at the end

8      and separated from all the other stuff about mental state.

9              THE COURT:  Two points.  I understand your point.  I

10     will take a closer look at this and see if there is language

11     that can be added that makes it clearer that it only goes to

12     the knowledge prong.  But do you think it should be somewhere

13     else in the charge?

14             MR. SCHWARTZ:  I mean particularly if you're not going

15     to give that instruction -- which I think you ought to -- I

16     think it would make more sense to put it at the beginning

17     before you get to the substantive counts, which I believe is

18     where it had been in the original request to charge, sort of

19     after you talk about the elements.

20             Mr. Touger disagrees.

21             MR. TOUGER:  I'm not disagreeing.

22             MR. SCHWARTZ:  You know, the other way to do it is to

23     sort of work it in.

24             THE COURT:  I'm sorry, I was just reading.  Just tell

25     me again what you said as to where it should be.

I6R7GAL1

1          MR. SCHWARTZ:  I'm just thinking out loud, but I think

2     it's prejudicial to have it be sort of the last thing the jury

3     hears on this topic, so I would either put it with the

4     discussion of the requisite mental states or when you're

5     talking about the evidence generally.

6          But either way, I do think that just as your Honor has

7     appropriately the second to last paragraph of the conscious

8     avoidance charge which is the way that conscious avoidance

9     interacts with the conspiracy charged in Count Two, I think

10    it's appropriate simply to put in a sentence or two talking

11    about the way that conscious avoidance interacts with Count

12    One, the substantive securities fraud charge.

13         THE COURT:  All right.  So I will take a look at that

14    now, and I will take a look at its placement.

15         Does the government have any objection to moving it to

16    the knowledge and intent section or right after knowledge and

17    intent?  So I think we're talking about page 32.

18         I think it's fair to add a line indicating that

19    conscious avoidance cannot be used as a substitute for finding

20    the defendant acted with the requisite intent, particularly if

21    it's specifically in a section on knowledge, intent and

22    willfulness; you want to make sure it's clear that they

23    understand it's going to knowledge and not intent.  But do you

24    have a problem moving it to the bottom of 32 before the third

25    element?

I6R7GAL1

1           MS. TEKEEI:  No, we don't have a problem with that.

2     And we will just note that in the conscious avoidance charge,

3     the substitution language, that conscious avoidance is not a

4     substitute of proof, it's in there twice.  It's in there first

5     just with respect to knowledge generally and then second again

6     towards the end of the charge with respect to whether a

7     defendant joined in the conspiracy.

8           So, it's in there two times in two different areas.  I

9     think that is more than sufficient.

10          THE COURT:  OK.  So I will take a look at that.  But

11    are we clear on where it should be, in your view?

12          MR. SCHWARTZ:  Look, I'm less bothered by its

13    placement if your Honor includes that language, which I think

14    is clarifying it.

15          The point Ms. Tekeei makes -- which is a good one --

16    your Honor says in two different places that in respect to

17    different things conscious avoidance is not a substitute, and

18    so the negative inference there is it may be a substitute for

19    knowledge and intent.

20          THE COURT:  I don't have a problem adding that

21    reference in.  If I do that, do you want me to move it or not?

22          MR. SCHWARTZ:  It's not necessary if you put that

23    language in.

24          THE COURT:  OK.

25          MR. SCHWARTZ:  The other stuff I had is in the nature

I6R7GAL1

1     of nits.

2              On page 19 I'd ask you to restore the word "good".

3              THE COURT:  I'm sorry.  I have that on 18.  I have

4     character testimony on 18.

5              MR. SCHWARTZ:  But we're looking at the same thing.

6              THE COURT:  I thought you said 19.  I mean I think

7     when you say you have a reputation for honesty and

8     trustworthiness it assumes it to be good.  I don't know what

9     bad honesty is.

10             MR. SCHWARTZ:  Dishonesty.

11             THE COURT:  No, I know, but that's the point, right,

12    dishonesty as opposed to honesty.

13             MR. SCHWARTZ:  But your reputation can be a good

14    reputation or bad reputation.  The testimony was that it was a

15    good reputation.  I don't think there is any harm in being

16    clear.

17             On the following page -- sorry, just a typo, but since

18    this is going to be handed out to the jury -- in the new

19    language on the third line from the bottom it should be "you

20    may not draw any conclusions".

21             THE COURT:  I'm sorry.  Tell me exactly where it is

22    again?

23             MR. SCHWARTZ:  This is the new paragraph on persons

24    not on trial.

25             THE COURT:  OK.

I6R7GAL1

1          MR. SCHWARTZ:  "As I instructed you with respect to

2    the testimony of the cooperating witness in this case, you may

3    not draw ..."

4          THE COURT:  Right.  Thank you.  And I just want to

5    make sure we have already talked at this point, yes, OK, about

6    cooperating witnesses.  I just wanted to make sure it was in

7    the right order.  Go on.

8          MR. SCHWARTZ:  Then on page 26 -- and this was

9    appropriate following the charge conference -- your Honor

10   struck the language about some of the evidence in this case was

11   limited to only one defendant.  Of course now we have heard

12   evidence that's limited to only one defendant, which is the

13   evidence of John Galanis' guilty plea.  That concept is

14   explicitly in the 404(b) charge, so I'm sort of agnostic to it,

15   but I want to make sure your Honor thought about it.

16         THE COURT:  Yes, I did.  I think it's covered by

17   404(b).

18         MR. SCHWARTZ:  I think that's fine.

19         THE COURT:  OK.

20         MR. SCHWARTZ:  And in the final point, we received the

21   verdict sheet.  Obviously your Honor has our proposed verdict

22   sheet and our objections, and you have made your choice, which

23   we object to but we understand.  I do want to renew my

24   request -- which I think is appropriate given the burden of

25   proof -- that the verdict sheet be listed not guilty/guilty,

I6R7GAL1

1    rather than guilty/not guilty.

2                THE COURT:  That's fine, I will do that.

3                MR. SCHWARTZ:  Thank you.

4                MS. TEKEEI:  Your Honor, we handed up multiple samples

5    of verdict sheets in our submission from I believe it was

6    Sunday evening.  They all -- the standard format is guilty and

7    then not guilty.  The defendants in Tussman raised this, and

8    Judge Gardephe said, no, I'm going to keep it like it is.  I

9    think that's the standard.

10               THE COURT:  I think judges can do either.  I don't

11   think there is a significant difference.  I'm just going to

12   change the order.  I don't think it matters either way.

13   Obviously, the jury is going to be focused on the substance and

14   not the presentation.

15               Does anyone else have any objections?

16               MS. TEKEEI:  We just had one objection, your Honor.

17   It's our page 33.  It appears in the knowledge, intent and

18   willfulness section.  I'm not sure what page it is in your

19   Honor's version.

20               Your Honor added a phrase to the end of sentence.  I

21   will just read the whole sentence.  "A person who acts on a

22   belief or opinion honestly held is not punishable under the

23   securities fraud statutes merely because his opinion or belief

24   turns out to be wrong."  And this is the portion that your

25   Honor added, which was "including that if that mistaken belief

I6R7GAL1

1    is the result of having been actively deceived by another

2    individual."

3            We understand that concept, but we think that

4    encompassed in the Court's general good faith instructions is

5    that concept that good faith means your honestly held beliefs.

6    We think that the addition of including that mistaken belief is

7    the result of having been actively deceived by another

8    individual endorses the defense's theory that they were all

9    actively deceived by one particular individual.

10           And the Court previously -- and we have all agreed

11   neither the indictment nor the defense theories are going back

12   to the jury.  I think this is a way of getting the defense

13   theory to the jury in a way when that concept is already

14   encompassed in the good faith instruction.

15           MR. SCHWARTZ:  I mean we talked about this explicitly

16   at the charge conference, and your Honor decided to include it,

17   I think appropriately so.  Elsewhere in the charge you have

18   examples such as negligence, foolishness, things like that.

19   And to round out the picture -- particularly in light of the

20   evidence that this jury has heard -- it's appropriate to

21   include this clause, which is an accurate statement of the law.

22           It's not an endorsement of a defense theory or even a

23   charge on a defense theory, any more than the entire charge is

24   a charge on the government's theory.  It is the law as it is

25   relevant to the case that these jurors have heard, and we think

I6R7GAL1                        Summation – Ms. Notari

1   it's appropriate.

2           THE COURT:  OK.  So I will think about that, and I'm

3   going to add a little bit of language into conscious avoidance,

4   and then I will make the little nit suggestions.

5           MS. NOTARI:  Can I go to the bathroom?

6           THE COURT:  Yes.  And I will check on the jury now.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6R7GAL1                    Summation - Ms. Notari

 1              (Jury present)

 2              THE COURT:  Good morning, everyone.  You may be

 3     seated.

 4              Ms. Notari.

 5              MS. NOTARI:  Good morning, everyone.  It's been

 6     probably the five longest weeks of my life.  I'm exhausted.  I

 7     lost five pounds, and I'm very excited and eager to talk to

 8     you.  I think when I first spoke with you I was probably more

 9     nervous, and I'm a little more comfortable now.  It had been a

10     long time since I had been in a jury trial, so...

11              But as a trial lawyer I was thinking last night and we

12     were talking about movie references, and I'm from Brooklyn and

13     people have told me throughout my life, because I grew up

14     around the same time as Marisa Tomei, my husband always makes

15     fun of My Cousin Vinny because it's one of his favorite movies

16     and he somehow sees a similarity between me and her.

17              But, anyway, in My Cousin Vinny, which is one of my

18     favorite movies, there is a scene where Marisa Tomei is Joe

19     Pesci's girlfriend, and she is brought in to testify, and she

20     is qualified as an expert mechanic because she comes from a

21     family of mechanics, and in this scene in the movie, it's the

22     pivotal scene where the defense introduces a photograph and

23     they realize that in this photograph you can see the tire

24     tracks from a different view, and it's a homicide case where

25     Joe Pesci's cousin is charged with murder in I think it's a

I6R7GAL1                    Summation - Ms. Notari

1    small town in the South, and it is through the testimony of

2    Marisa Tomei and this picture, this photograph, that she

3    changes the whole case and turns it upside down, and everything

4    is found in that photograph.

5            So, in thinking about this case, you know, we have

6    been here for five weeks, and you heard I think Mr. Schwartz

7    said 19 witnesses, and none of those witnesses -- I think 16 of

8    those witnesses had never met Mr. Cooney.  There were only

9    three witnesses that ever heard of the name Mr. Cooney, and two

10   of those witnesses were the government's chief cooperators in

11   this case, and both of them -- and we will get to that; I'll

12   review that -- but both of them had zero to say about

13   Mr. Cooney's knowledge of the fact that Jason Galanis

14   misappropriated the proceeds of the bonds.  Those witnesses

15   barely spoke to Mr. Cooney.

16           You know, this case, it's difficult because the

17   government, so much of their evidence is focused on friends,

18   friends, friends, and we see their emphasis on these e-mails --

19   which I will get to -- and, yes, there is no doubt about it,

20   they were friends, but there is simply no --

21           And if you recall in my opening statement I came out

22   and made a very broad statement.  I said to you -- and, you

23   know, when you're a defense lawyer, you have to be careful to

24   what you say to a jury in opening statements, because you can

25   be sure you are going to be held accountable for what you say

I6R7GAL1                    Summation - Ms. Notari

1  at the end, and the government is going to say Mrs. Notari said

2  in her opening statement.

3        Well, I said to you in opening statements that you're

4  not going to hear a shred of evidence in this case about the

5  WLCC bond and the fact that Mr. Cooney knew the proceeds of

6  that bond were misappropriated.  I said what you are going to

7  hear are distractions that have absolutely nothing to do with

8  the bond.

9        And I said that the government, if you recall, I said

10 they're going to throw a lot of mud, and they're going to ask

11 you to -- we're going to hold up a clear glass, and they're

12 going to hold up a dirty glass or a muddy glass, and they're

13 going to ask you to look at the evidence through the muddy

14 glass.

15       So my hope in my summation is to take you through the

16 evidence and to take you through the evidence in a way that you

17 can go back into the jury room and you can piece by piece look

18 at this evidence and you can realize that Mr. Cooney is telling

19 the truth.

20       We are not here to deceive you.  We are not here to

21 throw mud on the walls.  In this case it's actually the

22 government who is actually trying to deceive you and throw mud

23 on the walls, and I'm going to show you exactly how that has

24 happened.

25       Mr. Schwartz yesterday, I think he said that

1    Ms. Mermelstein told an excellent story but it wasn't based on

2    evidence it was based on argument.  And there is a difference

3    between evidence and argument.

4            So, when you look at the evidence and you think about

5    what Ms. Mermelstein argued, you have to say, well, is this

6    based on just your spin, or is this actually grounded in the

7    evidence in this case?  And I submit to you that I will show

8    you that her arguments are grounded in arguments, in prejudice,

9    in mud, and not in evidence, not on what happened, not on the

10   truth.  And I would hope that in our system of juris prudence

11   that jurors want to know the truth.

12           And I also told you in opening statements that we took

13   a lot of care and a lot of time in choosing smart jurors,

14   because in this case you have to be smart.  There is so much

15   complexity, but at the end of the day it's actually very

16   simple.  At the end of the day the question is did the

17   government prove beyond a reasonable doubt that Mr. Cooney knew

18   that Jason Galanis misappropriated the proceeds of the bond.

19   And I submit to you that there is no way he could have known

20   that.  I submit to you that he was a passive investor -- and we

21   will get to that -- that the two cooperators -- Hugh Dunkerley,

22   who was in charge of the annuity for Wealth Assurance, he

23   didn't even know what was going on; he didn't know that the

24   bond proceeds, that Jason Galanis recirculated the money that

25   went from WLCC to Wealth Assurance.  He had no idea.  So at

I6R7GAL1              Summation - Ms. Notari

1   some point he realized, but the fact that he didn't know, there

2   is no way that Mr. Cooney could have known.

3          And you have to think about how do we know what

4   Mr. Cooney knew?  How do you know what someone knows?  You

5   know, in mysteries, murder cases, investigators, what they do

6   is they profile people.  Right?  And people, you know, everyone

7   has a profile in a sense that if you come home and your husband

8   comes home, or your spouse, you know pretty much every day what

9   they're going to do.

10          I mean I'm sure you have that common experience where

11   my dad is obsessed with turning off the lights, and he drives

12   me crazy because every time he comes into my house he talks

13   about the lights and the doors, and it's a hundred percent

14   predictable.

15          And in the same way in this case Mr. Cooney does not

16   fit the profile of a person who commits fraud; he just doesn't.

17   You know, you can tell that he is an older man, he's

18   certainly -- there is no evidence that he has ever been in

19   trouble before.  And he surrounded himself with professionals.

20   He knew that -- the evidence -- and I told you about this in

21   the beginning -- that he was -- he was not an investor.  I mean

22   he was not an investment banker.  He was not a financial

23   analyst.  He was not an accountant.  He's not a lawyer, CEO,

24   decision maker, administrative leader; he never worked at a

25   finance firm.  He did not go to a fancy Ivy League institution.

I6R7GAL1                    Summation - Ms. Notari

1    And he was none of these things, but he made sure in his life

2    that he surrounded himself with business professionals,

3    business managers.  And you are going to hear -- and I'm going

4    to talk about it -- and you've heard in this case -- with

5    Fulton Management, Fulton & Meyer.  And he made sure for many,

6    many years before this bond -- because you learned that he was

7    an investor, and we learned that his background was that of a

8    person who owned the Viper Room -- which is a famous music

9    venue spot -- maybe some of you have heard about it -- but it's

10   on the Sunset Boulevard in Los Angeles.  It's a very famous

11   place, and he was once part owner of that, and a lot of his

12   contacts are in the music industry.  And he represented hip hop

13   artists, and you're going to hear in a minute, you're going to

14   see, I'm going to take you through a snippet of a text message

15   between Jason Galanis and Michelle Morton.

16            Now, Michelle Morton really has nothing to do with

17   Mr. Cooney.  All of the bond proceeds happened for the most

18   part in 2014, in October of 2014.  I think Mr. Schwartz said

19   yesterday by October 29 the first two tranches had been done.

20   And you're going to see in this text that Michelle Morton on

21   March 5, 2015 says who is Bevan Cooney.  She had no idea who he

22   was.  And in that text you will hear that Jason Galanis, you

23   know, his modus operandi, this guy -- and this is like very

24   troubling, because the government has completely ignored the

25   fact that Jason Galanis is an epic conman.

1            And you heard about the testimony where he is -- I

2     mean if you didn't really hear it, you almost wouldn't believe

3     it.  OK?  You wouldn't believe that a person like this who is

4     associating with the high level of sophisticated businessmen

5     and the top lawyers and, you know, I'm talking about Stamford

6     educated, Yale educated, you know, driving Bentleys, living in

7     a 1920 Bel Air mansion, you know, flying jets, you would never

8     believe that this man has two worlds.  He's got the world of

9     legitimacy -- and you heard about the two Jasons.  Hugh

10    Dunkerley testified that he did some Internet research on Jason

11    Galanis, and he found out before he started to work with him,

12    he found out that there were two Jasons.  There was the Jason

13    who some people said was a great business person, and then

14    there was the Jason that other people didn't like.  And he went

15    to work with him, and we realized, you know, what came later,

16    that she became part of his underworld with Gary Hirst and

17    Francisco Martin.

18            And this was a very closed world, and Jason Galanis

19    intentionally controlled them, and he didn't allow them to have

20    access to people, because he was afraid that if they had access

21    to people, that house of cards, that house of lies that his

22    castle was built on, would fall apart.  And it makes sense.

23            So, we have the two worlds of Jason Galanis.  And in

24    order to maintain that world, he had to keep the dark world.

25    And there is no secret, the people in that dark world knew who

they were dealing with.  Mr. Dunkerley and Francisco Martin
spoke to each other.  There was the evidence about the white
board room at 1920 Bel Air, the SEC had started an
investigation in late 2015, and they convened at Bel Air and
they started drawing up charts and manufacturing false
documents and backdating.

And this was -- you know, this was not -- this was in
response to a federal investigation.  This was in response to
knowing that these documents were going to be turned over to
the federal government and be investigated.  And that didn't
stop any of them.

And Dunkerley testified that he -- and Francisco
Martin -- that Galanis was the master, and they followed his
directions.  And they had a lot of similarities.  You know,
they were both down and out.  Francisco Martin hadn't worked in
three years, and they both were failing to pay their child
support, and they both -- there is this common theme of like
false identities and multiple e-mails.  And, you know, we're
going to get to more of this.  I'm just giving you kind of --
bringing you into the world of Mr. Cooney -- who knew nothing
about this, OK -- and I'm trying to contrast what their lives
were like with what Mr. Cooney's life was like.

Mr. Cooney is -- he is -- and what you heard me say in
my opening statement was he is from Montana, and he is a people
person.  He is the kind of guy that walks into a restaurant and

he makes friends and people love him, and he is very friendly.

And his job -- and again what I want you to realize is that

when you're telling the truth, when you're telling the truth

and you have nothing to hide, everything adds up.

And you know sometimes somebody lies to you and you're

like that just does not add up, I'm sorry, what you're telling

me belies common sense.  And we just know that.  We just know

that.  As jurors you can take your common sense into the jury

room.

And I want you to realize that I'm not asking you --

the government is asking you -- they're drawing these arguments

not based on the evidence.  I'm asking you to just do your due

diligence, and when you go back to the jury room to really

focus on the evidence and see how it just doesn't make sense.

First of all, their theories in this case have changed

from the beginning.  And I'm going to go through that with you.

In the beginning I think in opening statements they said that

Mr. Cooney -- this was a plan from the beginning, you know,

this conspiracy -- and they took millions of dollars from the

WLCC people, and now it becomes -- Tim Anderson testified --

and I'm going to go through this in a minute -- but Tim

Anderson testified -- this is the lawyer from Dilworth

Paxson -- and suddenly he didn't even know Mr. Cooney's name

until October 6, there was a backup plan, and the bonds fell

through, and Mr. Cooney was -- well, how could it have been a

1    plan from the beginning if Mr. Cooney wasn't even on the agenda

2    to be buying these bonds until well after this whole plan

3    started?

4        And Ms. Mermelstein said, you know, this financial

5    conglomeration was just a plan to -- they weren't interested in

6    getting immediate money from the bonds; they were looking at

7    the long run.

8        You have to understand how many resources, how much

9    money Mr. Schwartz talked about, the financial conglomeration

10   and the Teneo consulting report, and how much went into this.

11   This is not fly-by-night people; these are top, world class,

12   elite financial investors from Burnham -- from the top, Morgan

13   Stanley, Goldman Sachs.

14       I mean those of us who live in that world where we

15   have access to those kinds of people -- you know, my nephew is

16   in college right now.  What he would do to get his foot into

17   Goldman Sachs.  I mean these are the most highly vetted

18   financial institutions in the world, and this is the kind of

19   people that were involved in this financial roll-up, and it

20   just doesn't make sense.

21       Now, we have to -- I want you to think about

22   Mr. Cooney and how he became involved in Burnham.  And he was a

23   person who -- as I said, he invested in the Viper Room, and he

24   would basically put people together in deals.  We heard that

25   from Steve Shapiro, that he was the guy, he would bring people

I6R7GAL1                    Summation - Ms. Notari

1    and put people together in deals, and then he would get a
2    commission.  He was also involved in IPO companies, start-up
3    companies, like helping them go public and then very often what
4    happens in those situations is you get -- you get stock,
5    restricted stock, and then eventually you can sell that stock,
6    and while you don't get paid in a salary, you get paid in
7    stock, and that's another thing that he was involved in.
8           And so what that meant, I'm going to say this now,
9    although it's relevant for later -- of course of I have all
10   this script here and I'm not following any of it -- but what
11   that meant in his life was that, you know, he wasn't a wage
12   earner, he didn't get the salary like many of us get a
13   paycheck.  And sometimes -- sometimes, you know, he had --
14   there were periods of time where he didn't have a steady
15   income, so Steve Shapiro said he was a long-standing customer
16   at City National Bank, and he would get a loan.  And before
17   this whole situation with Jason Galanis -- and you can do the
18   timeline, his life was on the rise, and everything was
19   fantastic.  But things happened and everything sort of fell
20   apart, and we're going to get to that in a minute.
21          But getting back to how he became involved in Burnham,
22   he was given this fantastic opportunity.  He had made money in
23   2012, 2013, he had money to invest, and he had access to a lot
24   of people because of his contacts.  He was working with Jay Z.
25   He was part of Jay Z's Roc Nation.  He was working -- he had --

I6R7GAL1                          Summation - Ms. Notari

1  through the Viper Room and all of his LA contacts -- and you

2  heard Steve Shapiro say that City National Bank, he worked in

3  the entertainment division, and Fulton Meyer was an accounting

4  firm, very reputable accounting firm that had a lot of athletes

5  and celebrities, and Mr. Cooney was very much living in LA, and

6  he was very much a part of that world, and one can only imagine

7  when you're an owner of the Viper Room you probably meet a lot

8  of people who are very successful.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          And that was really what made him of interest to Jason

2     Galanis, because Jason Galanis, and you are going to see it in

3     a minute, but when someone is again a profile, a profile of an

4     epic fraudster, Bernie Madoff, those kinds of people, there is

5     actually like textbook characterizes of those kinds of people,

6     psychological profiles, and he is the chameleon.

7          When you hear him talk to Michelle Morton, you kind of

8     want to take a shower because it is so, it is so sleazy the way

9     he is talking to her and she is working him and he is working

10    her and he is just constantly working on promoting his lies.

11         This whole notion that Bevan Cooney was his childhood

12    best friend and best friends, best friends.  They were

13    definitely friends, but Mr. Cooney grew up in Montana, and I

14    can assure you Jason Galanis was not his childhood friend.  It

15    was just this constant working people and, you know, you heard

16    that from the cooperators who testified, they were just lied

17    to.  Sometimes it was hard to know when you were being told the

18    truth, and Dunkerley said some of them thought at first this

19    was all legitimate, and then they didn't, but, in any event,

20    Mr. Cooney's involvement in Burnham was a life-altering event.

21         This put him in a different, a different aspect of

22    his.  Before he was like, you know the investor in the bar and

23    now suddenly he is like a minority shareholder in Burnham

24    Financial Group, and he invested $400,000.  There is Mr.

25    Cooney.

I6RJGAL2                    Summation - Ms. Notari

1            We saw, and you are going to see -- go to the next

2       slide -- Saranya testified, my dear paralegal, and it was a

3       little mistake that the government found in the chart, but

4       you're going to see when you go back in the jury room, we tried

5       to make this as user friendly for you as possible, you can see

6       the very first entry is $400,000, and this actually -- one of

7       the beautiful things about Bevan Cooney and the way his life

8       was, everything he did was documented because of his business

9       managers.  They paid his bills, they paid -- they literally

10      paid his magazine subscriptions, paid his monthly bills, his

11      car payments.

12           Any time money came in, he would call up Alexis

13      Gluckman and you're going to see in a minute all the wire

14      transfers and all the things, and she would say a wire just

15      came in.  He would say put that as a loan.  Again, the

16      government will say oh, this is just a bunch of, you know, he

17      just was making all of this up.

18           But again you're going to be able to go back in the

19      jury room and you're going to be able to match up the bank

20      records.  There is a financial liabilities chart, Government

21      Exhibit 423.  You are going to be able to go and match

22      everything up.  You are going to see the math, it all adds up

23      perfectly because his business managers were top notch.

24           They made sure and he made sure, you know, he wanted

25      to be law-abiding.  He filed his taxes.  You haven't heard any

I6RJGAL2                    Summation - Ms. Notari

1   evidence of the fact that he was evading taxes or -- they talk

2   about this 1920 Bel Air.  There is no allegation of real estate

3   fraud.  It is just speculation, speculation, speculation, mud

4   on the walls, mud on the walls, and just be very, very clear

5   that it is a strategy.  It is a strategy.

6          Lawyers have strategies, and I am telling you there is

7   no strategy here.  We have nothing to hide.  We really just

8   want you to give Mr. Cooney his fair day and to really just

9   keep an open mind and to really just look at all this evidence

10  and to realize that it just doesn't make sense.

11         So he started investing in Burnham, and you heard --

12  you know, one of the great things about this case, not only do

13  you get to see his records, but you get to hear his voice, and

14  there is a recording which the government did not want you to

15  hear that came from the defense, and that recording, you're

16  going to get to listen to that recording.  You heard it once,

17  but that recording really goes into exactly what his state of

18  mind was.

19         I am not sure if this was -- okay.  You can see we

20  highlighted some excerpts here, but in that recording he is

21  talking to someone, this Billy Crafton in a bar and it is like

22  there is a lot of music playing in the background and John

23  Denver is playing and they're having drinks, which to me is

24  telling because alcohol is actually proven to be the truth

25  serum.

1          When you drink alcohol, it is known to be like you

2     tell the truth.  This is what he is telling Billy Crafton.

3     This is May of 2014, and he started his investments in Burnham

4     in April, and so he had been involved in this.  Again I want

5     you to pay attention to the dates because the dates are all

6     very important.  In this tape recording, which you can assume

7     he doesn't know this is a recording, and it is just all what

8     his state of mind is.

9          He is saying how, you know, you have these layers of

10    legitimacy with all the deals we are doing now and he is

11    excited he is part of this venture, this business with Devon

12    Archer and the excitement of his connections to Joe Biden and

13    Chris Heinz, and the government is like poo-pooing this, but

14    this is the reality of life.

15         Most people, maybe some are exceptions, but Tim

16    Anderson, he went into Burnham Financial and he saw Hunter

17    Biden and at that moment, you know, Joe Biden was the vice

18    president of the United States, and it made him feel good, it

19    made him feel like, wow, wow, I am doing business in a

20    reputable legitimate place.  That is a natural feeling if

21    you're doing business the Biden and the Kerris and the people

22    who go to Yale, you feel like there is this layer of

23    legitimacy.

24         He says, you know, the key to these deals and what I

25    am doing is aligning myself with people that are a lot smarter

I6RJGAL2                      Summation - Ms. Notari

1    than I am, which again is very important because in these

2    emails, in this case Mr. Cooney is not, he is not the guy that

3    they're going to for advice.  He is the guy who -- the passive

4    investor.  All of the meetings they talked about, the Teneos,

5    the report with all the executives, he is not part of that.

6          He is just relying on all those people, and in his

7    emails, and we are going to focus on that, they're all kind of

8    ridiculous.  They're all like cheerleading and excited and

9    there is never like -- you can play a game and go back to the

10   jury room and try to find a Cooney comment that is actually

11   very detailed or sophisticated or responsive.  There is nothing

12   like that.

13         He is just very excited.  This recording shows his

14   excitement, and I have included a chart, if we can go to the

15   next chart.  Now, these emails, I think there is so many emails

16   but these emails I hand selected because in my mind, they kind

17   of speak to his state of mind and where he was at this time.

18         You can see in February of 2015 he emails his mom.  He

19   says mom, this is why we bought Burnham, Drexel Burnham, just

20   an amazing history.  An article from the New York Times five

21   years after its collapse, we are going to have the exhibits in

22   the back, have defense exhibit binder and you can look at the

23   exhibits.

24         One thing I want you to really focus on is, you know,

25   there is defense exhibit stickers and government exhibit

1    stickers and to be honest, in this case we have nothing to

2    hide, so the government exhibit stickers don't, they don't,

3    they're just -- they're all very innocuous.  In my mind,

4    they're totally consistent with his innocence, but the

5    government is trying to spin them, and I will sort of focus on

6    some of those emails.

7            The government will take any one of these emails, I

8    promise you, and spin it in a negative way.  Try not to pay

9    attention to -- try to look at this objectively and blindly

10   because it just didn't make sense to copy exhibits twice, and

11   so we could have made double versions of everything, but

12   instead at least in my case we didn't do that.  We relied on

13   their exhibits.  So here you see like this is a state of mind

14   email I am relying upon as a government exhibit.

15           In this particular slide here, Bonwick Burnham term

16   sheet, he says this is solid.  He is emailing here is -- this

17   is Eric Fulton.  Now, Eric Fulton is the owner of Fulton &

18   Meyer, who is Fulton Management.  We are going to talk a lot

19   about that.  He is his primary.  He has hundreds and hundreds

20   of clients and he is Bevan's -- the primary contact for Mr.

21   Cooney was Eric Fulton because they had such a good,

22   long-standing relationship.

23           In these emails you can see Mr. Cooney's state of

24   mind.  I just want to focus also in the audio of Mr. Cooney,

25   his final words on that tape are if you believe in the deal and

1    the people who are on the deal, then you'll do the deal.  That

2    is again that was his state of mind.  He saw this, he saw his

3    investment in Burnham as an opportunity of a lifetime that

4    would take his career to the next level and that he was going

5    to be, have, you know, he was just going to be part of this

6    financial conglomeration, this financial roll-up which you

7    heard a lot of testimony about and reference to.

8         Let me just talk about that for a minute.  Now again

9    the government is saying that this financial roll-up was just a

10   scheme to make money and, you know, but, you know, the

11   financial roll-ups and Paul Atkins was an expert that

12   testified.  He said there are different ways that companies,

13   corporations grow, and some corporations grow organically and

14   some corporations grow by acquiring other companies, like the

15   reference he gave was Disney acquiring ABC, and we know from

16   recently Amazon purchased Whole Foods, and this is an entirely

17   legal and acceptable model of corporate growth.

18        There are repeated emails, and if we can go to the

19   next -- oh, no, that is not the one I want with the financial

20   roll-up.  Well, this actually is a good email for you to

21   reference because in this email it is called roadmap.  These

22   are government exhibits, right?

23        It is important for you to understand when you're

24   looking at these emails, they're almost always Jason Galanis,

25   his vision, and there is like marketing research and he is

I6RJGAL2                    Summation - Ms. Notari

1   always like putting everything together and he's -- in this

2   particular -- this is like the vision of what the roadmap is,

3   and it says investment -- can you go back to that for a

4   second -- so investment banking and Wealth Assurance, energy

5   resources, insurance, technology, special opportunity,

6   structured finance, so this was like the Guggenheim model, this

7   is what they were hoping to build.

8           This you see Mr. Cooney saying roadmap coming

9   together, love it, Greek.  Greek was like the nickname he

10  called Jason Galanis.  There is a lot of nicknames because, you

11  know, the government is trying to spin this in a way that these

12  emails are evidence of like some sinister motive, but you have

13  to remember, you heard from Tim Anderson that he looks forward

14  to levity in the day with like a fun email, and the same was

15  true for Steve Shapiro when I talked about his text messages,

16  his emails with Matthew Fullman, that business people are

17  human.

18          It is not uncommon when people are funny and doing

19  business together, they joke around.  When you look at this

20  email, you have to look at them from the perspective that

21  they're not trying -- this is just all very legitimate and

22  they're all just trying -- yes, at the end of the day they're

23  finance guys and they're trying to make money, and there is

24  nothing wrong with people trying to make money.

25          Can you go to the next slide.  So here we have what

1    you've seen many times before, and this was the Teneo

2    Consulting firm which a lot of money was spent on, and here you

3    see like the executive management team and you can read their

4    bios.  There is no, there is really no way that anyone would

5    see this and ever, ever believe that this was not 100 percent

6    legitimate.

7           You have to understand that, first of all, Mr. Cooney

8    is not featured anywhere there, okay?  Mr. Cooney did not have

9    the pedigree or the background that he could be -- he could

10   have an office at Burnham.  It is not to say he was, he was

11   just, these are very high profile people, and so Mr. Cooney

12   brought something different to Burnham in the sense that he

13   really had access to really high net worth people who -- one of

14   the things you're going to hear shortly his best friend Kevin

15   Washington was a billionaire, and he had, he just had a lot of

16   high net worth friends and he was a people person and he

17   brought people together.

18          He just was a minority shareholder, and all of this,

19   he invested $400,000 which for him was a lot of money because

20   if you look at the paperwork, you know, he is making maybe a

21   good year, I think it says 800,000, 850,000, but he is not, he

22   is not, you know, in the league of any of these super-wealthy

23   guys trying Bentleys.

24          He is still a pretty much regular person, but he is

25   not featured in any of these -- you are not going to hear or

I6RJGAL2                        Summation - Ms. Notari

1    see anything where there is an important business meeting.  He

2    didn't participate in any of these meetings.  There is no

3    evidence that Mr. Cooney participated in any Teneo meeting.  In

4    fact, Hugh Dunkerley said he wasn't even there.

5            Hugh Dunkerley testified he didn't have, he didn't

6    have an office, period, as far as he knew.  Perhaps the best,

7    again like in terms of his profile, he has a BT Cooney at Gmail

8    address.  That is the only email.  He doesn't each have a

9    computer.  You are going to see in the emails it is iPhone,

10   iPad.  He doesn't have a computer.  So any notion that he just

11   was a passive investor.

12           Can we go to the next slide.  Okay.  Right.  We can go

13   back to the other one.  So it is important to understand that

14   the WLCC bond and Mr. Schwartz has said this, and you have

15   heard this, was just one tiny aspect of everything that was

16   going on, and the WLCC bond was Mr. -- Mr. Cooney had nothing

17   to do with putting that bond together.  I just want to focus on

18   one more thing.

19           Can you go to the next slide.  No.  The Hugh Dunkerley

20   testimony about the financial roll-up.  I just want to -- this

21   is an example of the government ignoring evidence in this case.

22   So the government said to you in their summation that the

23   financial conglomeration was basically from the get-go a scam,

24   and this is Hugh Dunkerley, their chief cooperator, and the

25   question that was asked was all of these companies, Burnham

I6RJGAL2                    Summation - Ms. Notari

1    Securities, Burnham Asset Management, Hughes Capital

2    Management, Fundinvest Capital, they were actually acquired on

3    part of this roll-up strategy, right.  They collectively

4    managed many billions of dollars, correct?  Yes.  They were all

5    real and legitimate, true?  Absolutely.  It goes to the next

6    page.

7          And so I encourage you in this case, because there are

8    16, 19 witnesses, but really the only witnesses that really

9    matter in this case, because, because we're not contesting, at

10   least Mr. Cooney is not contesting that there was a fraud, that

11   the victims, WLCC and the pension fund, we're not disputing

12   that.  The only thing that is in issue in this case is whether

13   Jason Galanis -- whether Mr. Cooney knew that Jason Galanis was

14   misappropriating the funds, which there is no way he could have

15   known that.

16         So the only witnesses that you really, you know, need

17   to hear from are the cooperators regarding that, Hugh Dunkerley

18   and Francisco Martin who say absolutely nothing.  I will go

19   through that in a minute.

20         Anyway, the fact that this was not legitimate, and

21   even here it goes on to say in his testimony that the bonds is

22   just one aspect of Burnham.  So the government is not only

23   misleading you, but they're ignoring the testimony of their own

24   chief cooperator, and that is what this case is based on.

25         So I just want to talk to you a little bit about

I6RJGAL2                    Summation - Ms. Notari

1    trust.  You know, I think it is important for you when you

2    consider this case -- you know, everyone is a Monday morning

3    quarterback and everyone is ha, ha, ha, you how could they have

4    done that, but you have to again consider, to use Mr. Cooney,

5    the layers of legitimacy, and in this case, Mr. Cooney had no,

6    he was just a passive investor, but trust is so key because,

7    because we all, when we make our life decisions, we have to --

8    whether we're buying a car or whether we're getting surgery or

9    no matter what decision we make, it is all about trust.

10         Trust is something that comes from, it is just if

11   somebody has credentials, you know, it is going to make a

12   difference to you whether you trust them or not, you know?  If

13   you're looking for a surgeon and they have gone to -- they're

14   working at a top -- it is the first question people ask, what

15   hospital are you going to, what doctor?  People want to know

16   where the doctors are educated, where the lawyers were

17   educated, and these were the things that have an impact on

18   whether you trust.  You know what I mean?

19         A lot of people go to online dating, but it is

20   different if they're introduced to somebody.  It is a

21   difference if your friend who says hey, I have a friend who has

22   a car and that is much better to you than lists.  It is better

23   to you and crucial to you in our decision-making.

24         In this case, if you look at what made Mr. Cooney

25   trust first the Jason Galanis, and we talked about this a lot

1    during this trial, and you saw the Bel Air video, the $10

2    million house and he led the life, he walked the walk, he

3    talked the talk.  Hey, Hugh Dunkerley told us, gave us some

4    view of he jet-setted across the country and he flew first

5    class and had private planes and his wife, Monet Berger, they

6    had servants and they pampered their animals like babies, and

7    they're just life was consistent with somebody who is extremely

8    wealthy.

9           Their friend you heard ad nauseam, Peter Gruber, the

10   fact Pete Gruber was a billionaire and Jason Sugarman who was

11   Jason Galanis' business partner, his father-in-law owns, I am

12   terrible at sports teams, the Warriors or something like that,

13   and he was a movie producer.  He actually produced The Color

14   Purple, and he had 50 Academy Award nominated movies.  You're

15   talking about, you know, success.

16          This was the world that Jason Galanis lived in, and he

17   also, he -- Dr. Rory Knight who eventually became one of the

18   board of directors for Wealth Assurance, Dr. Rory Knight is the

19   dean of Oxford, okay, and he owned this company called Oxford

20   Metrica, and we are going to get to that.  This is the dean of

21   Oxford University in the U.K., and this is no joke.

22          Above and beyond that, you know, we've got the WLCC

23   bond, the two leading law firms in the country, Dillworth

24   Paxson and Greenberg Traurig are the leading law firms that

25   deal with Native American commercial litigation.  So every law

I6RJGAL2                        Summation - Ms. Notari

1     firm has a reputation.  Not every law firm does, you know --

2     for example, some law firms don't do commercial litigation, but

3     they had a niche of the kinds of work they did, and they both

4     specialized in this kind of work.

5             And Tim Anderson, you know, Tim Anderson testified

6     that he had done -- not only did he work for Greenberg Traurig

7     and he had done many of these tribal bonds before, four or

8     five, which is considerable -- the government, think about

9     their summation.  They did not talk about Tim Anderson, about

10    the fact that the bond was legal.

11            Again they're conveniently ignoring the testimony of

12    their first witness who testified over several days, and if you

13    recall his testimony, it is shocking.  He just went on and

14    repeatedly said that he put the bonds together and all the bond

15    work, you know, and you heard about the legal documents he

16    drafted, and repeatedly he said that there was nothing unusual,

17    he was not bothered by Jason Galanis' involvement, but again

18    this was all Mr. Cooney had nothing to do with putting this

19    bond together.

20            You know, this case is like, you know, we're all in

21    this courtroom together, but we're kind of -- there is

22    separation in the sense that we don't have anything to do with

23    putting this bond together.  There is not one email between Mr.

24    Cooney and the WLCC.  There is not one contact.  Raycen Raines

25    testified he never met my client.

1          All of those pension people that testified, you know,

2     my heart goes out to them because nobody wants, nobody wants

3     that to happen to your pension.  That is heartfelt, that is

4     tragic, but, but there is no way that, there is no way that Mr.

5     Cooney could have known that that was going on because they

6     were being lied to.

7          One of the things that became pretty apparent in

8     Mr. Tim Anderson, when the government stood up, if we can go

9     to, I am skipping ahead, I am sorry, Abraham, but -- yeah.  So

10    the government, this is an example of their deception.  So they

11    pointed out to you during their summation that this email is to

12    my client from Jason, and they said this is the email where Mr.

13    Cooney was sent all the victims that were defrauded, but again

14    you have to be a detective in this case, and I am going to help

15    you.

16         You have to piece together the testimony and the

17    documents and common sense because that is like the routine

18    theme that is going to put this altogether, but here I asked

19    Tim Anderson about this.  If you were able to read back all the

20    testimony, and now you're able to go back and listen to it all

21    over again, you are going to hear that Jason Galanis was

22    telling everybody that the bonds were a great success, and he

23    gave -- this actually was during the time that Tim Anderson got

24    the green light for the second tranche of bonds because Jason

25    said it was successful, there were all these institutional

I6RJGAL2                    Summation - Ms. Notari

buyers that wanted the bond, there was more buyers than demand
for the bond.

        This is the same thing that he was telling my client.
Again the dates, August 19th.  My client does not, he does not
purchase the bonds until October 6th, but this is what this is
about.  When I asked Tim Anderson about -- I am going to show
you the next email.  I want to go through this testimony.  Is
it fair to say you were repeatedly assured there were buyers
for the bond?  Yes.  At some point you were told there was
significant investor demand and therefore a need to invest in
more bonds?

        This is an error, but he says yes.  And it says there
was a BAM.  I am not sure what he meant by that.  Shortly after
the issuance of the first bond and it closed, you received what
was information from Jason Galanis, and it was called the green
light to go forward with the second issuance, correct?
Correct.

        Can we go to the next exhibit -- wait.  Stay here for
one second.  If you look at this exhibit, you'll see this was
the first tranche of bonds, Atlantic Asset, and they purchased
$27 million.

        If you go to the next exhibit, this was the exhibit
that was referenced in Tim Anderson's testimony, where he
was -- Tim attaches some custodian to U.S. Bank.  My
presumption is the balance of the wires will be reflected, but

1     again this was like, this was the green light, this was like

2     things are, there are buyers who want this bond, and if you

3     match up the two emails, you see that it is the same people, it

4     is the same institutional buyers.

5             We know that this is a private placement bond and that

6     these are the pension funds that are buying this bond.  So this

7     is just one example of how they spent it.  They just throw it

8     out there and say yes, Mr. Cooney, Jason Galanis was, you know,

9     sending him a list of the people that were defrauded.

10            You know, we live in a time where it is very hard, it

11    is very hard in any relationship these days, let alone to, you

12    know, the government, you saw Mr. Santos come, and he had the

13    phone, the text messages, you know, you can't -- everything

14    is -- people don't talk on the phone any more.  It is all

15    email.  These guys were jet-setting to all across the country.

16    One was in Iowa, one was in New York.

17            There is 3 million email, three million documents, I

18    think we heard something like that.  There is something like 3

19    million documents and there is not one shred of evidence that

20    shows that there was any knowledge of what is being charged

21    here.  That is what you're asked, what you're being asked to

22    Judge.  It is just kind of ridiculous, you know?

23            The only thing we have is these innocuous, very

24    cheerful, lighthearted, Mr. Cooney -- this is not proof beyond

25    a reasonable doubt.  It is really not.

I6RJGAL2                    Summation - Ms. Notari

1            So but getting back to Tim Anderson, Tim Anderson,

2    another way that -- so I talked a little bit about earlier on

3    about Mr. Cooney was the backup plan, and can we go to 1270 and

4    1272.  Now, the truth is that Jason Galanis was so controlling,

5    and when Mr. Cooney was -- there was testimony to mention about

6    the investors who purchased the bond, and at one point he said

7    that on September 23rd he got an email from Jason Galanis, and

8    that's Government Exhibit 12070, and there it was listed who --

9    there was the $20 million tranche of bonds was the second

10   issuance, and he learned who was going to be purchasing the $15

11   million tranche.

12           Then there is right at the end it says we will be

13   providing information about the other buyer for the tranche of

14   bonds the following day.  That never happened.  Then

15   Mr. Anderson, when I asked him about that, he said that he did

16   not learn the name Bevan Cooney until October 6th, 2014.

17           Then at the bottom of that email it says, you know, it

18   is probably helpful if you write down exhibit numbers if you

19   want to reference them later on.  Again they're all going to be

20   in a binder so you can read them.  The investor for the second

21   tranche of 5 million fell out last week.  We worked out

22   something with a backup.  He is prepared to proceed.  Any

23   notion that Mr. Cooney was like from the get-go that this was,

24   you know, this was the plan, is just not supported by the

25   evidence.

I6RJGAL2                    Summation - Ms. Notari

1          I am sure the government will come back and have an

2    explanation for that, and some of their explanations might be,

3    you know, might be okay, but where I am telling you that is not

4    the case, and some of their explanations, they have no

5    explanation for.  They just have no explanation for, and we'll

6    get to that.

7          But again Tim Anderson said he never met Mr. Cooney.

8    Now, this is important because Tim Anderson did everything

9    through Jason Galanis, and he did the due diligence, and it is

10   important because he is such a high profile lawyer and he has

11   not a shred of suspicion about Jason Galanis.  He doesn't -- he

12   thinks there is nothing awry.  He specifically does his due

13   diligence on the annuity.  He said it looked, everything looked

14   fine.  From the get-go he said everything looked fine, and it

15   might be worthwhile to ask for that read-back if you have any

16   issues with that.

17         I think we covered it pretty well and certainly I

18   don't know that the government, the government hasn't talked

19   about it because obviously it is not something they want to

20   talk about, the fact the bond was legal is something they're

21   trying to distance themselves from because it doesn't support

22   their argument in this case.  It doesn't support their proof

23   beyond a reasonable doubt because they want you to believe that

24   this was a scam, that the bond was not real, and that is just

25   not the evidence in this case.

I6RJGAL2                     Summation - Ms. Notari

1           But if we move forward, Mr. Cooney was the backup, and

2     again this is not something, this is not the biggest deal in

3     the world because we are not saying Mr. Cooney did not, you

4     know, was tricked into buying these bonds, but it was very

5     deceptive the way the government, when Tim Anderson testified,

6     they left you with, oh, and Mr. Cooney is a sophisticated

7     buyer, correct?  Sophisticated investor.  That was like the

8     testimony they elicited from Tim Anderson.

9           Well, a sophisticated investor is not -- if we look up

10    sophisticated investor in the Webster's dictionary, we think

11    that is a pretty strong term, right, that is a sophisticated

12    investor.  According to the Securities Act of 1933, a

13    sophisticated investor, and I established that, it is

14    cross-examination, he agreed with everything I said.  The

15    importance of that is that the security laws are very geared

16    toward making sure these private placement bonds which are not

17    registered, you know, that only certain people can be qualified

18    to buy these bonds because of the risks.

19          I will just say there is not anything wrong with them.

20    They're typically, Tim Anderson said it is typical these bonds

21    were unrated and there is nothing unusual about these bonds.

22    This is just the laws that require people to be qualified to

23    purchase them, that not anyone can go -- if I walked in and

24    said I want to purchase this bond, I would have to be

25    qualified.  There is different tests they apply, and you have

1    to look up the -- I don't want to bore you with that, but there

2    are requirements.

3            Tim Anderson was to taken by Jason Galanis that he

4    never even spoke to Mr. Cooney, you know, about all this

5    paperwork was done by email, that Jason Galanis, he emailed

6    Jason Galanis, the big boy letter and he had Mr. Cooney fill

7    out the big boy letter.  If you see the big boy letter, Mr.

8    Cooney puts his home address, and there was questions about was

9    there anything about like a natural person versus an

10   institutional buyer buying these bonds.  He said no, there was

11   nothing unusual about that.

12           He relied solely on Jason Galanis, and the government

13   brought out this testimony and they said oh, you know, he was a

14   sophisticated buyer because he had his money managed at City

15   National Bank, and City National Bank was an experienced

16   institution with the bond desk.

17           It is interesting that they focused on that and they

18   just rolled over it like no, no probing, no nothing.  Then

19   later on they bring in City National Bank, and there is no

20   evidence that City National Bank ever talked to Mr. Cooney

21   about this bond.

22           It is just like sloppy, like just put it out there.

23   It doesn't matter, you know, none of this matters.  These guys

24   are guilty, and Mr. Schwartz talked about the investigation,

25   how they were -- there was just judgment very early on and

1    there is something called confirmatory bias.  Confirmatory bias

2    is when you make a decision and then you filter the evidence

3    based on that decision and you don't change your mind in

4    accordance with the evidence that comes in.  We see that in

5    those cases, for example, some of the cases where people

6    prosecute people for crimes and then --

7              MS. MERMELSTEIN:  Objection, your Honor.

8              THE COURT:  I don't think this is --

9              MS. NOTARI:  Confirmatory bias?

10             MS. MERMELSTEIN:  Objection, your Honor.

11             THE COURT:  Let's just move on.

12             MS. NOTARI:  Okay.  In this case, the investigation

13   happened, Mr. Schwartz talked about that, and when your

14   cooperators come in and say I have nothing to say about this

15   person, I had no knowledge, I have no documents, which is what

16   Mr. Dunkerley said, at what point do you decide how far are you

17   going to stretch to grasp unrelated evidence to prove a person

18   where it just doesn't make sense.

19             We can only, you know, you can go back and think about

20   why those things happened, you know?  It is not really

21   appropriate for us to put that into your head, but I think Mr.

22   Schwartz talked about that yesterday, you know, and sometimes,

23   you know, prosecutors, there is other stuff out there that, you

24   know, that --

25             MS. MERMELSTEIN:  Objection, your Honor.

1          THE COURT:  Let's focus on this case.

2          MS. NOTARI:  Okay.  So Mr. Cooney, his basis for

3    qualifying him as a sophisticated investor was based solely on

4    his conversation with Jason Galanis, and basically

5    sophisticated investors, he agreed is someone that the

6    qualification is that they not only have to understand the risk

7    of the bond but has to fit within their investment profile.

8          In other words, like if you don't have an investment

9    profile to be able to buy this, then you wouldn't be qualified.

10   There was no due diligence on that issue for Mr. Tim Anderson.

11   I think that there was due diligence, but here he just was so

12   convinced by Jason Galanis, and it is a testament, it is

13   important because, for two reasons:  One, because the

14   government, they want you to believe Mr. Cooney was a

15   sophisticated investor when it is not true.

16         The second reason is that, as I said, that Tim

17   Anderson was believed.  Like this is what trust -- Mr. Cooney,

18   the fact that Mr. Cooney had no suspicion that he believed

19   everything was according to plan was based on the fact that

20   these law firms were completely doing their due diligence and

21   that this bond was, everything was fine and all the documents.

22         You look at the email, and it just was nobody could

23   have known that Jason Galanis, you know, he had access to this

24   money, that nobody could have known that.  The cooperators very

25   specifically said that they were controlled and they weren't

1    allowed to have access and they weren't allowed to talk to

2    people.  It just wouldn't make sense that this house of cards

3    would fall if he told people because these are not the kind of

4    people that would be involved in this.

5             They didn't have to be involved in this.  There was no

6    motive.  Mr. Cooney was, was successful, he had a perfect

7    credit rating.  You heard Steve Shapiro testify and he was a

8    long-standing customer of City National Bank.  His star was on

9    the rise, he was part of Burnham, and I think the financial

10   conglomeration, there is evidence that it would have been, you

11   know, I mean this was something that only fell apart because of

12   this case and Jason Galanis.

13            I think it is also important because it sort of starts

14   to, you know, in terms of Mr. Cooney, it sort of, you see how

15   Jason Galanis is like, you know, very controlling and he

16   controls Tim Anderson and he tries to control every aspect of

17   what is going on.  (Pause)  Just checking my notes.

18            So if we go to Government Exhibit 2027, you can see

19   that this is the distribution list, and you have heard about

20   this, you have seen it before during the trial.  This was just

21   a final draft of all the important players in this bond, and

22   you can clearly see that Mr. Cooney is not mentioned or

23   featured anywhere, but that he was not a part of putting this

24   bond together.

25            If we can go to the next -- no.  402.  I included

1    these exhibits, and again you can see in these exhibits they're

2    both government and defense exhibit stickers, and the

3    importance of these exhibits is that, you know, you can say

4    that there was testimony that but for the fact that Mr. Cooney

5    reached out to Tim Anderson, that he probably never would have

6    like had any correspondence with him because the only

7    correspondence he had with Mr. Cooney was about his purchase of

8    the bonds and about the follow-up on purchasing the bonds.

9            Mr. Cooney was an open, an open a book.  If you look

10   at these emails, there is so many people, there is this wire

11   called instructions to purchase the Wakpamni bonds and you can

12   see Matthew Fillman, Alexis Gluckman, Tim Anderson in

13   Government's 402.  These are the people, his business advisers

14   who are helping him purchase the bond, and they're included in

15   every aspect, every transaction.  He includes them, and he --

16   again Alexis planning on wiring funds on Monday and buying the

17   bonds.

18           The government has this theory they weren't

19   Mr. Cooney's bonds and he never owned the bonds.  You can see

20   in all these emails, you know, he always, always, there is no

21   evidence, you know, and we'll get to Steve Shapiro, but these

22   are his bonds.  He is always saying my bonds, and he is

23   clearly, you know, this notion that this is just, it is just

24   mud on the walls and it is a distraction.

25           I think it is important for you when you look at these

1    emails to really see how everything he did was completely, his

2    hands were held by his business managers and he reached out to

3    Tim Anderson for direction.  Again, you know, profile, like if

4    you're a fraudster, you're not reaching out to people like to

5    bring everyone into your business because if someone, it is

6    just common sense, like you don't do that.  That is not how

7    Hugh Dunkerley carried on, that is not how Francisco Martin,

8    that is not how people who are committing crimes lead their

9    lives.

10           Now we get to Hugh Dunkerley.  Now, Hugh Dunkerley, he

11   pled guilty and he received a cooperation agreement, and you

12   heard that he is facing a sentence, with a cumulative sentence,

13   he said, of approximately 70 years, and I think, you know, if

14   you're to ask for a read-back of evidence, I think that this is

15   a person who provides information, although he doesn't provide

16   any information about Mr. Cooney.

17           This is just when he testified, I did a recap of his

18   testimony, and I said the questions -- you testified that you

19   saw -- working for Jason Galanis for about two or three years,

20   I think he said.  You said in your life basically you've only

21   met Mr. Cooney on two or three times on social settings?

22   Correct.  You testified Mr. Cooney was a great guy?

23   Absolutely.  You never, you were never together at 1920 Bel

24   Air?  Correct.

25           He testified that it was not a common occurrence for

1    you to email Mr. Cooney, correct?  Correct.

2              In fact, you had difficulty remembering even one email

3    you had with him?  Yes.

4              You said you never spoke to Mr. Cooney about the WLCC

5    bonds?  Never.

6              And you testified that Jason Galanis lied to you,

7    correct?  Yes.

8              You testified that Jason Galanis lied to you, correct?

9    Yes.

10             And you knew for a fact he was consistent lying to

11   people?  Yes.

12             You knew for a fact fact that he was sending out

13   fraudulent comments?  Yes.  He ordered fake documents to be

14   sent to the government?  Yes.  There were times when he created

15   fake companies, Ballybunion and Las Vegas is not a real

16   company?  Correct.  On many occasions you had no idea what he

17   was telling other people?  Correct.

18             That is the government's chief cooperator, that there

19   is no evidence against Mr. Cooney, and he never spoke to Mr.

20   Cooney about the tribal bonds.  He said he had no documents

21   implicating Mr. Cooney about the tribal bond.

22             I say he is an important witness because it is through

23   him that we first see into the dark world of Jason Galanis.  I

24   talked about it earlier, there were two worlds.  There is the

25   underworld, the dark world where Francisco Martin and Dunkerley

1    and Hirst and strategizing and creating false documents and

2    false companies, and we heard testimony about the secret

3    communication.  Mr. Cooney is not part of any of that.  There

4    is no evidence that he was part of any of that.  There is no

5    WICKR, there is no white board sessions.  He was not part of

6    any of that.

7              He was strategically kept apart from these people, and

8    when I say strategically, the time that they were together were

9    always social settings where Jason Galanis was present.

10             You know, through his testimony -- again I reiterate

11   that -- Hugh Dunkerley, he testified not only to creating false

12   documents, backdating of documents and creating of false

13   companies, there was testimony that he did not -- this is very

14   important, and Mr. Schwartz went into this briefly yesterday,

15   but you need to hear it again, that he had no visibility into

16   what Jason Galanis was doing with the proceeds of the bonds and

17   what he planned on doing.

18             He said he thought the investors in the bond would be

19   paid back when Wealth Assurance became Valor, but that never

20   happened.  He had no idea the money from the first issuance of

21   the bond was recirculated to pay for the second and third

22   issuance of the bond.  He was part of that close world, and he

23   didn't know the money that Jason Galanis, that was

24   recirculated, and this is the government's like chart of this

25   money being recirculated, and he had no idea.  If he had no

1    idea, how would Mr. Cooney have an idea?  He didn't.

2            Again, there was -- now, Mr. Schwartz talked about the

3    bank statements, and we're going to talk about that a little

4    bit later.  This notion that Jason Galanis, you know, because

5    you have a bank statement, that it is somehow some indication

6    you have visibility into what is going on, and Mr. Cooney, and

7    there is evidence of this, that we put in the financial chart,

8    you know, and they had business dealings together.

9            There is no question about that, you know?

10           Mr. Cooney at one point, they rented a New York

11   corporate apartment, and Mr. Cooney had a perfect credit

12   rating, so he would -- it is not a crime.  He would have him

13   take charge of that, and there is no evidence that this was a

14   crime.  It is just mud on the walls.  They put in emails of

15   this corporate rental and they're trying to get you to focus

16   on, you know, anything they can get you to focus on to distract

17   you from the fact there is no evidence in this case.

18           So so we know that Hugh Dunkerley was, in the fall of

19   2015, there is the SEC investigation and they go into high gear

20   to start creating these false documents.  Again Mr. Cooney was

21   not part of that.  Creating false identities, false emails,

22   false business accounts, manufacturing false documents,

23   backdating them, notarizing them, this is just, you know,

24   whatever fraud that one can commit in terms of, you know, this

25   nature and Jason Galanis was a part of, and there is no

I6RJGAL2                    Summation - Ms. Notari

1    evidence that Mr. Cooney was a part of that.

2            Now, one of the things that is utterly shocking in

3    this case is the deception on the part of the government, and

4    you know, you heard, there has been testimony that Mr. Cooney

5    received $3.8 million, and the money, the government's chart

6    showed the money was wired to him and the money went to Camden

7    Escrow and the money went to the Wolff Law Firm.

8            The shocking part is that when Hugh Dunkerley

9    testified, he was asked by the government, there was an

10   electronic withdrawal wired to Bevan Cooney for $3.89 million.

11   At that time did you have any understanding when he made that

12   transfer, understanding why that money was going out?  No, I

13   did not.

14           So the government left you with the belief, there was

15   no follow-up on that, they left you with the belief that Hugh

16   Dunkerley had no idea why that money was wired to Mr. Cooney,

17   but then on cross-examination -- and if we can go to 3065 --

18   yeah, 3056, we start probing, and I say to Mr. Dunkerley, well,

19   isn't it true that, you know, have you reviewed this email --

20   isn't it true there was money wired, and you're on all these

21   email?

22           This is Maria Santana, and she works for Camden

23   Escrow, and on these email, you know, Hugh Dunkerley is on

24   these email and it is a very clear email thread where again Mr.

25   Dunkerley is there and talks about here on November 13th.

I6RJGAL2                    Summation – Ms. Notari

1              Now, if we look at the money chart, the wire came to

2     Mr. Cooney's account on November 10th, and there was $3.10

3     million, and a hundred thousand dollars and almost the next day

4     the wire was wired into Camden Escrow.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. NOTARI:  And so these documents are a summary of

2    what happened with this transaction.  But the government wants

3    you to believe -- first of all, they didn't want you to see

4    this e-mail, because they never asked Hugh Dunkerley about it.

5          And if you can just go to the next portion, later on

6    in cross-examination I said to him, I said,

7    "Q.  Defense Exhibit, you know, 3063, 3062, 3056A, these are

8    all e-mails between you and Maria Santana from Camden Realty,

9    correct?  These are e-mails that relate to real estate

10   transaction involving you as the managing member of 1920 Bel

11   Air and Maria Santana from Camden Escrow."

12         Now, if you remember his testimony, he was the

13   managing member.  Remember the visual.  At some point I gave

14   him like a lot of real estate documents and he went through

15   them, well, that was that moment in the trial.  And so he

16   testified over two days.

17   "Q.  And so in this case your e-mail that's reflected in these

18   documents are consistently hugh@dunkerleyus?

19   "A.  Yes.

20   "Q.  As far as this case, were all of your e-mail produced to

21   the government?

22   "A.  Yes.

23   "Q.  And at any time did the government during their 20

24   preparation session with you review these e-mails with you?

25   "A.  I believe so, yes.

I6R7GAL3                    Summation - Ms. Notari

1  "Q.  You believe that you discussed them?

2  "A.  I certainly looked at a variety of exhibits that were

3  going to come up in this case."

4          So, there are one of two options.  Either they didn't

5  review them.  They clearly had them because after they

6  testified they later moved them into evidence.  And.  You know,

7  so what are we trying -- what can we draw from that?

8          You know, they did not want you to know about this

9  e-mail.

10          Can you go back to the other exhibits, please.

11          They did not want you to know that this was a

12  legitimate real estate transaction.  And, you know, I want to

13  go through the evidence that this was legitimate.

14          You know, first of all, it never happened.  OK?  So

15  the transaction was eventually canceled.  And Government

16  Exhibit 3062 is "Please find for subject property cancellation

17  instructions."  So, the money that was wired to Camden Escrow

18  was eventually canceled, and Mr. Cooney did not keep that

19  money.

20          And actually Government Exhibit 3272 is an e-mail

21  where he is e-mailing Fulton Management and saying that

22  "Vanessa found this file for my taxes last year, Thorsdale

23  loaned me this property for a short period of time.  The money

24  went through my CNB account and to Camden Escrow in Beverly

25  Hills.  It was a failed real estate transaction."

1        OK?  But before we get to that point where it didn't

2   happen, a lot of stuff happened in between, and if you look at

3   these documents --

4        Can you go to the next.

5        Again you have to pay attention to the dates, because

6   what is happening -- what Hugh Dunkerley testified was that, if

7   you recall -- I asked him whether Jason Galanis was doing home

8   improvements, and we introduced into evidence -- you actually

9   saw yesterday Mr. Schwartz showed you the two photos of the

10  kitchen and the dining room, and I said, you know, were these

11  renovated, and Jason Galanis had a hard money loan, and he was

12  paying a high interest rate, and he was paying a lot of money

13  in monthly expenses, and, you know, Hugh Dunkerley was under

14  the belief that this was a refi, that Mr. Cooney was going to

15  help him refinance the property, but he absolutely -- you know,

16  there was not a shred of evidence from him that this was a

17  fraud.  You know, he absolutely backed up the fact that his

18  understanding from Jason Galanis was that this was a refi.

19       Now, again I specifically said:  Was your information

20  from Jason Galanis?  Yes.  Because he was -- you know, there

21  was not like a lot of communication allowed.  You know, the

22  e-mails went through Maria.

23       But separate and apart from that, all of the

24  surrounding, you know, evidence -- which you could look at --

25  is that Mr. Cooney was trying to get a loan for -- he was

I6R7GAL3                        Summation - Ms. Notari

1    trying to get a loan for the property.  That never happened; he

2    was not able to do so.  There is wires coming in and wires

3    coming out.  He is giving -- you know, the seminal date is

4    November 2014.  And you will see like a lot of -- this is

5    important.

6                Can you go back to the other exhibit.

7                Soo, if you look at -- you have to be a detective.

8    That's what I mean, I'm trying to give you the tools to go back

9    and be a detective.  But Mark Cohen, Cohen Financial Group --

10               THE COURT:  Ms. Notari, I think we may want to take

11   bathroom break.  About how much longer do you have?

12               MS. NOTARI:  Oh, a lot.

13               THE COURT:  OK.  So why don't we take a short break

14   now.  All right?  Thank you.

15               Just remember not to discuss the case.  Thank you.

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

I6R7GAL3                    Summation - Ms. Notari

1              (Jury not present)

2              THE COURT:  First of all, sorry to interrupt you.  One

3    of the jurors was indicating that she -- I'm just going --

4    everyone can be seated.  I'm just going to note a few things

5    about the charge, but I'm starting to print them.

6              I did take out the word "good" in referring to Mr.

7    Archer's reputation for honesty and trustworthiness, because I

8    think it's very clear that it was a positive reputation.

9              I did take out the language in the good faith section,

10   that the defendant is acting in good faith if he was actively

11   deceived by another individual.  I think it's abundantly clear

12   from the instruction that the doctrine would apply in such a

13   scenario; and I had previously decided not to instruct the jury

14   on the defense theory of the case.

15             With respect to conscious avoidance, I did add in a

16   line as requested.  I added in a line after the paragraph that

17   says "With respect to the conspiracy charged in Count One..." I

18   added a line that says, "Similarly with respect to the

19   substantive securities fraud charged in Count Two, conscious

20   avoidance can only go to knowledge and cannot be used as a

21   substitute for finding that the defendant you are considering

22   acted willfully or with an intent to defraud."

23             I added in your point about audio video recordings,

24   that they can be replayed in the courtroom, and then really

25   minor things that we discussed earlier, and then I found a typo

I6R7GAL3                       Summation - Ms. Notari

1    that said the wrong count.  But that's it, so I am starting to

2    print them now.

3              MR. TOUGER:  What's the schedule for the day?

4              THE COURT:  For the day?

5              How much longer do you have, Ms. Notari?

6              MS. NOTARI:  I can't believe it's been two --

7              THE COURT:  It's been almost two hours.

8              MS. NOTARI:  Well, I still have CNB.  I still have --

9    I'll try and move it along.  I think I have another hour.

10             THE COURT:  Another hour?  All right.  So, Ms. Notari

11   will finish.  Then we will take a short break, and the

12   government will do its rebuttal, and then we will take lunch,

13   and I will charge after lunch, OK, given the time.  Thank you.

14             (Recess)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Everyone can be seated.

3          MS. NOTARI:  Welcome back.  So I think when we last

4    left off I was talking about Hugh Dunkerley and the fact that

5    the government did not bring out the fact that he had been

6    involved in wiring $3.8 million, plus another $100,000 to

7    Mr. Cooney, and this went to Camden Escrow, and that it was

8    completely documented, and you will be able to see the exhibits

9    of this.  And the supporting evidence of this was a real estate

10   transaction was Dunkerley's testimony that Jason Galanis, who

11   was doing home improvements.  And again I said he testified

12   that his basis for him saying that he thought it was a refi and

13   not a sale was his conversations with Jason Galanis.  And we

14   understand that there was this control in who he was able to

15   speak to.

16         But certainly the e-mails -- and if we look at these

17   e-mails -- and around the time this is all happening, from the

18   time there was the wire until the escrow was canceled, there is

19   all this flurry of trying to get a loan.  Mr. Cooney was trying

20   to get a loan, and the intent was -- and again you see, you

21   know, that Mr. Cooney has good credit, and he was going to

22   purchase this in an LLC, but it never happened.

23         And there was a little bit of confusion about that

24   with Hugh Dunkerley, and I think a lot of it was just a

25   misunderstanding of when I said failed transaction, and he

I6R7GAL3                     Summation - Ms. Notari

1   said, yes and then no, but I think he thought that something

2   did happen.  Then when I confronted him with all the real

3   estate records -- and you are going to have those; you are

4   going to get to see that 1920 Bel Air is owned in an LLC, and

5   it's very complicated; there is a lot of complicated

6   transactions; but Mr. Cooney is not mentioned anywhere in those

7   documents; and he never purchased that property; and he never

8   kept a single cent of that money.

9           And the money, as the government indicates in their

10  summary charts -- if you want to go -- this was the

11  government's summary chart, and it shows the money went from

12  Bevan Cooney to Camden Escrow.

13          Now, these charts, I don't know when these charts were

14  made, but certainly it says Camden Escrow, but they never --

15  they never brought out testimony from Hugh Dunkerley, who

16  actually participated in the wiring of the money to Camden

17  Escrow as part of that deal.  And you would think he was a key

18  witness you would want to hear from, and you would want to hear

19  testimony about his involvement in that because he was -- he

20  was involved in it; I mean he was on all those e-mails.

21          So, the government is trying to be deceptive here.

22  OK?  They just wanted you to know that the money was going to

23  go wired into -- they just wanted it to be very, you know,

24  sketchy, but it's not.

25          In fact, if you go to the next exhibit, this is

I6R7GAL3                    Summation - Ms. Notari

1      actually what I was talking about earlier about state of mind.

2      And this is an e-mail from Jason Galanis to Bevan Cooney, and

3      it's August 13, 2013.  And again you're going to see on the

4      summary chart, you know -- they were -- they had -- before the

5      WLCC bond, they had deals together, and they were involved in

6      business deals.  And here it says "Coon, the wiring

7      instructions are on the second page.  Thank you so much for

8      handling this for us.  The real estate proceeds will pay it

9      off, but thank you for taking the shot again."

10             This is a very telling e-mail, because clearly it

11     says, you know, the real estate proceeds will pay it off, and

12     which was in Mr. Cooney's mind all along there was going to

13     be -- you know, they were making home improvements, and he was

14     going to buy this property.  He never could get the loan, and

15     it has nothing to do with the bond, and he had no way of

16     knowing, you know.

17             I cannot say here before you what Jason Galanis, but

18     Jason Galanis told Hugh Dunkerley that this was a real estate

19     transaction.  And certainly the government's chief cooperator

20     testified that this was a real estate transaction, and he never

21     said, you know -- so, again we're just -- we're just -- we're

22     just throwing mud on the walls.  OK?  This was my client,

23     absolutely what he believed.

24             And Oxford Metrica?  This is Oxford Metrica, and you

25     heard about Oxford Metrica; I told you about it earlier.  But

1    Dr. Rory Knight, the Dean of Oxford University in the UK, who

2    owned Oxford Metrica, my client was paying this bill.  OK?  He

3    was paying this bill for Dr. Rory Knight's expenses, because

4    this was part of, you know -- I'm not sure if he was the

5    director at this point of Wealth Assurance, the board of

6    directors, but in any event, it's important because it shows

7    Mr. Cooney, and he is actually sending Jason Galanis I think

8    this was $35,000.

9           This is not a man -- you know, this was -- he was --

10   he was -- you know, he was used and he was -- you know, the

11   government's theory -- and you're go to go see on their money

12   flow chart that they don't include -- they don't include any of

13   the money in their money chart that Mr. Cooney sent Jason

14   Galanis.  You know, it's a very, very narrow window of what

15   they think is relevant.  OK?

16          But this is -- this is -- they poo poo the fact

17   that -- and you're going to see in a few minutes that

18   Mr. Cooney, every transaction that happened -- and again this

19   is consistent with his credit, his wiring, his relationship

20   with his business managers, that everything was documented, and

21   any time he did anything, you know, there was a loan.

22          And if you look at -- if you look at his -- the

23   records from Fulton, and you match it up, it all matches up.

24   And so there was money going back and forth, OK, which is

25   consistent with a legitimate business relationship in his mind.

I6R7GAL3                        Summation - Ms. Notari

1    OK?  He had no reason to believe that what was going on --

2    which was really just the misappropriation of the money -- he

3    had no way to know that.  But again you should look back at

4    that, and you will see Oxford Metrica, and you will see a lot

5    more back in the jury room.  These are just highlights of some

6    of the evidence that you should be paying attention to.

7           So, again the government's -- any argument by them --

8           And again if you could just scroll ahead, Mr. Hassen.

9           OK.  This is another -- the government put this --

10   again, this is another example of how they're trying to spin

11   the evidence.  They put this -- they talked about this

12   yesterday, and they said my business partner Jason Galanis will

13   be coordinating all of that.

14          Look, this e-mail says, "Alexis, we are getting a

15   corporate apartment in New York.  Sent you the details.  I am

16   not handling any of the financial side of the lease.  My

17   business partner Jason Galanis will be coordinating all of

18   that.  All we need to do is get tax returns, bank statements

19   together.  Please e-mail Elaine at Marmot for a reference

20   letter as well.  Thanks."

21          So, this is just the nature of their relationship, and

22   Mr. Cooney -- there is nothing illegal about this.  I don't

23   know why this is government's -- I don't know why this is so

24   important, but apparently it's just part of the mud they are

25   trying to throw at Mr. Cooney, and it shouldn't stick.

1           If we can go to the next e-mail, the next exhibit.

2           Again this is more.  This is another Government

3   exhibit, and they're going to -- I am not sure what they're

4   going to argue here.  They're going to have another chance to

5   speak to you, but this is -- it was a corporate rental, and

6   there is references in the e-mails.  This was a corporate

7   rental.

8           And you can see that the intended -- you know, Jason

9   Galanis was living in California, and there were certain people

10  who were living in New York, and Burnham was in New York, and

11  so at some point they made the decision to rent an apartment.

12  You know, it was a corporate rental, and that was this, but

13  again it has nothing to do with the bond; it's just mud on the

14  walls.

15          Can you go to the next one.

16          OK.  The next big distraction in this case is City

17  National Bank.  OK?  Now, it's hard for me to even conjure up

18  exactly what the government's theory is on this, because I

19  think their theory is that Mr. Cooney obtained the WLCC -- he

20  purchased the bonds because he was trying to get real estate

21  loans.

22          I told you earlier that the nature of Mr. Cooney's

23  work is that he doesn't -- he is not a wage earner, and

24  sometimes there are periods of time where he doesn't get steady

25  pay and so he gets a loan.  And he had a very long-standing

I6R7GAL3                    Summation - Ms. Notari

1    relationship with City National Bank, and Fulton & Meyer, and

2    that was -- it was very clear when Steve Shapiro testified.

3    Steve Shapiro was the banker from City National Bank.  And what

4    is important is that, you know, the government -- so it's

5    important to understand the timeline.

6          Now, first this exhibit is important because it shows

7    that City National Bank was -- Matthew Fillman had a

8    long-standing relationship with City National Bank, and in

9    particular Steve Shapiro.  He testified they knew each other

10   for 16 years; they worked together; Matthew Fillman had

11   previously worked at City National Bank; and before that they

12   worked at Wells Fargo together.  And Steve Shapiro said they

13   were very good friends and they had worked together and they

14   had a very cordial relationship, and he talked about the

15   reputation of Fulton & Meyer.

16         So, if there is any belief out there that maybe this

17   is some fly-by-night accounting firm, business managers, that

18   was completely -- that was, you know, squashed by Steve Shapiro

19   who actually touted the credibility of Fulton, and Eric Fulton

20   who was the owner and he eventually became the sole owner,

21   became Fulton Management.  There were a lot of different names,

22   Matthew Fillman, Alexis Gluckman.

23         So here we have -- the evidence is very clear that

24   City National Bank was involved with Mr. Cooney's bonds, the

25   WLCC bonds, from the very beginning.  Well, we heard the

1  testimony from Tim Anderson that said he was qualified as a

2  sophisticated investor based on the fact that City National

3  Bank had a bond desk.  But separate and apart from that,

4  City -- when Mr. Cooney purchased his bond, it was physically

5  delivered to him.  Because you heard testimony in this trial

6  that in order for these bonds to be electronically purchased,

7  they have to be entered into this DTC system, and there was an

8  effort to do that but it never happened, and so the bonds were

9  physically delivered to Mr. Cooney.  And the first thing he

10 does when he gets these bonds is he contacts Tim Anderson, what

11 do I do with the bonds.  Again, consistent with an innocent

12 mind.  There is no, you know, trying to -- if he knew this was

13 a sham bond, maybe he would -- I mean, you know, it's just not

14 supported by the evidence.

15        So he e-mails -- here again we see how he brings

16 everyone -- Matthew, there are all of these different people on

17 this e-mail, and Steve Shapiro is actually on this e-mail.  And

18 this is when Mr. Cooney was trying to get City National Bank to

19 take custody of the bonds because he wanted to deposit the

20 bonds into City National Bank.

21        And to show Mr. Cooney's sophistication, he takes an

22 iPhone shot of the phone, sent from my iPhone.  You can see

23 that in almost -- you know, it's always --

24        Can you go to the next one.

25        So, now the government, they are focusing on this

I6R7GAL3                    Summation - Ms. Notari

1     financial statements that Mr. Cooney filled out.  Now, in

2     January of 2015 Mr. Cooney applied for a line of credit, and at

3     that point Fulton & Meyer and --

4               Can you go back for a minute.

5               Fulton & Meyer -- and the government establishes --

6     this is actually Ms. Mermelstein questioning Matthew -- I'm

7     sorry -- Steve Shapiro, and she specifically asks him:

8     "Q.  Who generally was your point of contact with respect to

9     the loan that Mr. Cooney sought?

10    "A.  Fulton Management was, and their representative Matthew

11    Fillman, Eric Fulton and others.

12    "Q.  And did Mr. Fillman act as Cooney's authorized agent in

13    the communications seeking the loan?

14    "A.  Yes, he did."

15              OK.  Can you go to the next slide.

16              So, in January of 2015 Matthew Fillman sends -- and

17    actually it was in February -- Matthew Fillman sends Steve

18    Shapiro a financial statement, and in that financial statement

19    it has -- and I think it's Government's Exhibits 406 -- and you

20    will be able to look at it.  It basically puts forward

21    Mr. Cooney's assets, and it attaches at that point a snapshot

22    of his Wakpamni bonds.  And I think according to that snapshot

23    at that point in February his bonds are worth about $5.5

24    million.  And it also includes a statement of the stock

25    Flikmedia that he owns which is worth about $2 million.

1          Now it's important for you to understand the course of

2     dealings between Steve Shapiro.  He testifies that he did not

3     really ever have a conversation with Mr. Cooney until January

4     of 2016.  And I will get to that.

5          The course of dealings with this first $100,000 line

6     of credit is completely with Matthew Fillman.  And there are

7     e-mails going back and forth, and Matthew Fillman is his

8     authorized agent, and he gives him -- you know, this

9     application is forwarded to City National Bank.

10         And it's fair to say that if you have an authorized

11    agent negotiating your loan, and they know every aspect of your

12    finances -- and certainly City National Bank has almost every

13    account that Mr. Cooney has.  This is not as if he walked into

14    a branch and said, hey, I need a loan.  These people know his

15    finances; they have been dealing with him for years and years

16    and years.  You're going to see the bank records that go back.

17    These are his personal bankers.

18         And so he gets the loan.  And it's very clear when I

19    asked Steve Shapiro, I said this is an unsecured loan -- which

20    means there is no collateral -- and Steve Shapiro says that the

21    bonds -- the bonds are not -- based on their credit rules, the

22    bonds would not qualify to be collateral on a loan like this.

23         And so -- and $100,000 line of credit, given

24    Mr. Cooney's earnings, it's not a big risk.  He had previously

25    obtained loans, and Mr. Shapiro said he previously obtained a

1    $250,000 loan I think in 2012.  There was never a problem with

2    any loan he had before; he was considered to be a long-standing

3    good client.

4           So if you go to 3755.  Now, this has a blue sticker

5    because the government never -- they didn't put this into

6    evidence.  They talked about it, but they never put this into

7    evidence.  Because again they're trying to confuse you.  You

8    know, this is a confusing transaction because there were

9    actually two loans in a six month period, and there was only

10   one financial statement.

11          So, there was one financial statement, and it was

12   given to City National Bank, and Matthew Fillman was the

13   authorized agent for that loan, and this was the actual

14   promissory note for the $100,000 line of credit.  And you can

15   see that it's a one year loan, and it commences on February 17,

16   2015; it expires February 17, 2016; and that went into place.

17          And this, the financial statement that is the focus

18   here, was filled out in connection with this loan, and there

19   was disclosure about the bonds.  And Ms. Mermelstein said, oh,

20   he never filled out that he had a loan on this financial

21   statement.  But again --

22          Can you go to Alexis, the loan.

23          OK, right in the beginning.  OK.  This is important

24   because you see that there is full disclosure.  This is October

25   8, 2014, this is when Mr. Cooney buys his bonds, huge wire,

1    book as loan.  And you are going to see later on there was a

2    loan agreement.

3          Fulton & Meyer knew everything that was going on with

4    Mr. Cooney.  OK?  And they filled out the paperwork.  And Steve

5    Shapiro -- again, the bond was never -- it was never -- it was

6    an unsecured loan, and, you know, they -- it was just -- this

7    financial statement was just -- everything was out in the open,

8    and it was never -- you know, it was just understood.  They

9    knew his finances.  They had him fill out -- and actually we

10   don't even know -- there is -- Steve Shapiro said that he

11   doesn't even know who filled it out.  And actually Fulton,

12   there is e-mails -- which you will see when you go back into

13   the jury room -- that Fulton & Meyer had a power of attorney,

14   and they just handled all of his work.

15         So, this notion that Mr. Cooney was trying to hide the

16   fact that he had a loan, he was hiding, you know, it's just a

17   lot of mud on the walls.

18         OK.  So what happens after that?  So what happens

19   after that is that Mr. Cooney, at some point he -- OK.  So at

20   some point there is evidence that you've heard about this

21   transfer of -- Mr. Cooney transferred his bonds to Bonwick

22   Capital.  And it's a little bit confusing because of the

23   timeline, but essentially -- and everyone is kind of

24   encouraging me to go faster so I'm going to try to go faster.

25         But essentially what happened was the evidence, the

I6R7GAL3                    Summation - Ms. Notari

1    e-mails -- and I'm going to go through this; I will show you

2    some exhibits -- that Mr. Cooney was trying to sell his bond.

3                Now, the government is trying to put forward this

4    theory that Mr. Cooney got these bonds, and he never -- he got

5    them for the purpose of getting loans, and they were never his

6    bonds, and he never intended --

7                You know, the theory is kind of all over the place,

8    but absolutely Mr. Cooney bought these bonds, and he bought

9    them with the loan -- and I'm going to talk about that toward

10   the end -- but his intention was always to sell the bonds, you

11   know, to an institutional buyer.  And he was trying to do that.

12   He was trying to sell the bonds to an institutional buyer.

13               And you will see in a few minutes that during this

14   time period he's going through like a bad money time, and

15   that's why he is trying to get these loans, and he is trying to

16   sell the bonds.

17               But he owns the bonds, and so he's clearly not trying

18   to hide the fact that he owns the bonds.  But at some point he

19   is trying to get an institutional buyer.  And there is talk at

20   Burnham -- you know, they're trying to get these bonds into a

21   DTC system which makes is easier to sell to an institutional

22   buyer, but at some point the bonds are transferred to Bonwick

23   Capital.  And this was not something -- this was part of a

24   decision that was made with Burnham and Andrew Godfrey and

25   Devin Wicker.  You heard evidence about Bonwick Capital that

I6R7GAL3                    Summation - Ms. Notari

1    Burnham acquired Bonwick Capital because Bonwick Capital was --
2    they were hoping to get into the business to further their
3    business in mutual bonds.  And Bonwick had an expertise in
4    this, and that was the reason for acquiring Bonwick Capital.
5    So Bonwick Capital --
6              This was not something that Mr. Cooney was involved
7    with.  You know, he had a lot of people on all sides advising
8    him.  And in order for him to transfer his bonds to Bonwick
9    Capital there is a requirement that you medallion golden --
10   medallion stamp your bonds, which is like a notary, and so what
11   happens is if we look at Government Exhibit 410, on April 24,
12   Alexis Gluckman --
13             Do we have a close up?  April 24.
14             So Alexis Gluckman, she contacts Steve Shapiro and she
15   says, Mr. Cooney, can you medallion transfer -- sign the
16   medallion transfer his bonds.  And there are all of these
17   e-mails, and he says, sure, have him come meet me, and I will
18   sign the medallion transfer which will allow him to transfer --
19   basically to transfer his bond power.  And so that happens on
20   April 24, 2015.
21             Can you go to the next one.
22             And you will see in the e-mail that what happens is
23   the paperwork is not filled out correctly.  And the paperwork
24   transfers the bond to Burnham, and so they have to do it again.
25             So what happens in Government Exhibit 412 is they

call -- they call up Steve Shapiro, and they say once again can

Mr. Cooney come back to your office.  Because he has to -- we

filled out the paperwork, and he has to transfer his Wakpamni

bonds to Bonwick Capital.  And so that happens on May 27.  And

if we could have Government Exhibit, I think it's 31 -- the

bond transfer.  OK.

So, 3162B -- now, the version that they put in front

of you with Mr. Shapiro, there was just a lot of confusion

about the fact that Steve Shapiro didn't know, you know, that

these were the bonds and Mr. Cooney was transferring the bonds.

And this happened in May of 2015.

So, again, January -- February he gets the $100,000

line of credit; then he transferred his bonds.  Then what

you're going to see next is that -- well, we will get into

that -- but here specifically it says -- at the top of this is:

The undersigned does hereby sell, transfer -- and this one is

to Burnham Financial, but there is another document which is to

Bonwick Capital, which looks just like this one, and it says $5

million.  And so that's what happened.  So he transfers his

bonds, and Steve Shapiro is involved in that.

Then subsequently, Mr. Cooney, his financial situation

changes, and he has a tech stock that is suddenly worth -- has

increased in value, and it's worth almost -- the book value is

like $12 million, but there is a six month restriction on this

stock.

I6R7GAL3                    Summation - Ms. Notari

1          Can you go to 414.  Actually, can we go to 411.

2          OK.  So, Mr. Cooney, there is a lot of going

3   back-and-forth, correspondence, and Matthew Fillman is

4   contacting him, and he says this is great news, there has been

5   a significant change in his portfolio, and he has this stock,

6   and we're trying to get him a $1.2 million loan to carry him.

7   And Steve Shapiro testified that this is going to help him pay

8   his taxes, and it's going to help him carry him through, and

9   based on all of their vetting and determination.  This is all

10  between Matthew Fillman and Fulton Management and City National

11  Bank, who they're close friends, they've got a long-standing

12  relationship, and they are the ones -- Mr. Cooney is fully

13  disclosing all of his financial -- they know everything.

14         And the reason why Mr. Cooney gets this loan is

15  because there is a change in his financial situation and his

16  stock is now worth a lot of money, and in six months the

17  restriction is going to be limited -- I mean lifted -- and so

18  he will be able to sell his stock.

19         So, what they do is they -- specifically he signs a

20  promissory note on June 24, 2015, and it's a six month loan,

21  matures January 1, 2016.  And the reason why it's a six month

22  loan is because it's all based on the stock that he is going to

23  sell.  It has nothing to do with the bonds, which City National

24  Bank absolutely knows that he transferred and is now no longer

25  available as an asset.

1          I mean any notion that Mr. Cooney was trying to hide
2     something is just -- is just ridiculous.
3          So now we see this loan, he signs it.  And, you know,
4     the government is trying to say that he didn't disclose -- he
5     didn't sign another financial statement to say that he
6     transferred the bond.  This is ridiculous, because everyone was
7     involved in this negotiation of this loan.
8          And, if anything, you know, it was upon them to have
9     him sign his authorized banker and his personal banker to say
10    well, you know what, now that you transferred the bond, maybe
11    you need another financial -- whatever it is.  It wasn't --
12    he -- he had professionals doing this for him.  And so if you
13    go back to -- I just want to make clear that the basis for this
14    six month loan, 411 --
15         OK, the basis, it says here -- this is the crappy
16    loans are us e-mail that you've heard about.  And there is
17    joking.  Which again it's important that you see this, because
18    in this case they're trying to make such a big deal about the
19    informality of the e-mail, you know, Mr. Cooney's e-mail, but
20    here we see there is a joke between Matthew Fillman and Steve
21    Shapiro:  Is this Steve Shapiro who works for crappy loans are
22    us?  Please call me back.  And then:  Totally slammed today.
23    What are the basics of said loan request?  And then the basics
24    of the loan are set forth:  Stocks secured, single stock,
25    NASDAQ traded, at least it's not a penny stock.  IPO is

I6R7GAL3                        Summation - Ms. Notari

1    yesterday.  He has 500 M shares.  It sets out everything.

2    There is no mention of the bond.  The bond was never a

3    consideration in any of this.

4             And so that's it.  And so he signs -- he gets the

5    loan, and then, you know, what happens is in January of 2016

6    now he services the loan -- which Steve Shapiro said -- and the

7    loan -- the restriction on the stock can't be lifted, and, you

8    know, Mr. Cooney's world starts to fall apart.  The stock can't

9    be restricted -- lifted -- and now there is a lot of back and

10   forth about, you know, what's happening and the fact that he

11   suddenly can't get the restriction lifted, and the loan is

12   going into delinquent status.

13            And, you know, and at this point it's very clear that

14   Mr. Cooney -- there is all kind of good faith dealing.  There

15   is testimony -- and you can ask for it to be read back -- but

16   there is a period of probably a month or two months where

17   they're going back and forth and they're trying to renegotiate

18   the repayments of this loan.  Mr. Cooney goes in with Eric

19   Fulton, they sit down, they try to -- it's a very cordial

20   meeting, and at that meeting Steve Shapiro and his

21   supervisor -- and you can imagine that that was probably very

22   stressful for Steve Shapiro.  You know, at this point he has

23   made a loan and, you know, things are not looking good for

24   Mr. Cooney that he is going to be able to repay that loan.

25            But Mr. Cooney was completely in good faith; he was

1    meeting with them; he was trying to renegotiate the loan.  His

2    credit was everything to him.

3             And, unfortunately, you know, this was something that

4    was not envisioned.  But to Mr. Cooney's credit -- which is

5    again inconsistent with any notion that this was preconceived.

6    Steve Shapiro, one is that he serviced the loan, and, two, even

7    after, you know, all of the settlement, trying to figure this

8    out, he paid down almost $100,000 more toward the loan, plus

9    you can imagine all the expenses of having to pay his business

10   managers.  And he paid $75,000, and then he makes two more loan

11   payments.

12            You know, so is this something a person who is

13   committing fraud, they would pay down another $100,000 toward

14   the loan?  I mean this is not how fraud people -- you know,

15   they drop things and run.  You know, this is not Mr. Cooney.

16            So, it's important for you to understand that any

17   statements, you know, by Steve Shapiro  -- and, you know, I

18   don't know what the government is going to argue, that

19   Mr. Cooney never owned his bonds and he didn't know that he --

20   he knew -- he was part of the --

21            You know, I tried to think of an analogy of this

22   situation, and I am spending a long time on this, because

23   basically this is like three trials in one.  You know, this is

24   what -- this is what the government is trying to prove their

25   case about whether he knew Jason Galanis misappropriated the

1    bond proceeds based on the CNB loan, which has nothing to do

2    with it.  But that's what they're trying to do, so we have to

3    have a trial within a trial about this utter nonsense, which is

4    completely supported.  Look at the timeline; look at the

5    documents.  OK?  Their arguments just make no sense.

6           Now, Government Exhibit 440, I thought this was very

7    important, because it speaks to Steve Shapiro's state of mind,

8    and he says that now that everything has hit the fan I need to

9    make sure this was not one of the biggest mistakes of my

10   career.

11          So, he is very upset, you know, that this has

12   happened, and he is just trying -- you know, he is just trying

13   to protect himself with his supervisors and saying that, you

14   know, Mr. Cooney didn't make disclosures.  But again this

15   was -- he had an authorized agent handling this loan.  There

16   was full disclosure, and it just makes no sense.

17          And what we know is that the stock, you know, they

18   couldn't lift the restriction, Mr. Cooney paid down $100,000,

19   and, you know, his finances went into disarray.

20          And if we look at the government's -- I just want to

21   read something to you.  Ms. Mermelstein in her summation said:

22   And you saw Government Exhibit 405.  This is the personal

23   financial statement that Cooney filled out.  Do you know what

24   he doesn't stay in that statement though?  It doesn't say he

25   got a $5 million loan.  He doesn't say that the $5 million he

I6R7GAL3                    Summation - Ms. Notari

1    got from Galanis wasn't really his.  Do you think that would

2    have mattered to the bank that he was already out $5 million?

3    He decides to leave that out, and you can see that in what he

4    lists as liabilities he lists --

5           I mean she -- it's just -- you know, she forgot that

6    she brought out in her direct that he had an authorized agent

7    negotiate this loan.  And that's what you're going to see.

8    That's what this case is about.  It's about mud and

9    distraction, and it's just not acceptable.  It's not proof

10   beyond a reasonable doubt.  And Mr. Cooney, the way he led his

11   life is evidenced in all of these documents.

12          I just want to go to the assets and liabilities.  Now,

13   I just focused on the government's argument that Mr. Cooney did

14   not disclose, you know, the loan, he did not -- and this is --

15   this is important because it's important for many reasons.  One

16   is that it's an asset and liability sheet which the government

17   put in evidence without objection from us.

18          And Steve Shapiro testified that this was sent to him

19   from Fulton & Meyer, and he understood that this was -- they're

20   an accounting firm -- and that this was a statement of

21   Mr. Cooney's assets and liabilities based on the records they

22   had.

23          And in this statement you can see -- and you will be

24   able to go and match up all the records.  You can see here the

25   investment in Burnham Financial, $400,000.  These are his

1   assets, but they're really his loans, his outstanding loans.

2   And you can see Wakpamni bonds $5 million.  And the

3   liabilities -- and if you go to our summary chart of what is

4   owed, the loans to and from Thorsdale, $5.4 million -- and we

5   will go into that in a minute -- but the loan is absolutely

6   disclosed.

7          And, you know, his accountants, they -- you know, it's

8   important that, you know, when you take things out of

9   context -- if the government -- if Mr. Cooney was on trial for

10   this, you know, then bring in accountants, bring in Fulton &

11   Meyer, put on your proof.

12          This is the United States government.  I mean they can

13   bring on whoever they want to bring on.  And, you know, it's

14   not -- we have put all of these documents into evidence, but,

15   you know, it's not the burden of proof of the defense to do

16   anything.  You know, it's like in the My Cousin Vinny snippet

17   Marisa Tomei puts in that picture which changes the case.  But

18   in reality you shouldn't have to put on any evidence.  You

19   know, it's their burden of proof.  You don't have to.

20          So if they're trying to say that this is something

21   other than what it is, then bring on your proof.  Bring it on.

22   OK?  No, they just want to throw mud on the walls and innuendo

23   and say, oh, that, and that, and that.  And that, you know, is

24   just not acceptable.

25          So again I encourage you to look through the records

I6R7GAL3                      Summation - Ms. Notari

1   and match up all of this, and you will find out that it all

2   makes perfect sense.

3           Now, I just want to talk about Francisco Martin.  I

4   really would rather not talk about Francisco Martin, because

5   again I think it's shocking that we wasted taxpayer money to

6   bring this man to the United States.  But just let me remind

7   you of this person who testified.

8           So, Francisco Martin testified that he met with the

9   government in February of 2016 at the Starbucks in West Hills,

10  California, or Los Angeles -- I'm not exactly sure, but it's

11  some neighborhood in the Los Angeles area -- and at that time

12  he met with them, and then subsequently he left the United

13  States and he only returned to talk to the government with the

14  understanding that he would have what is called a safe passage

15  letter, which meant that specifically during his meetings with

16  the government he was given safe passage and they couldn't

17  arrest him.

18          So, he would come back into the United States, or he

19  would have telephonic conferences abroad, and he was free to

20  live his life abroad and do whatever he wanted.  And then

21  eventually he said he would only come back, the testimony was,

22  if he was granted immunity.  And he eventually got his

23  immunity.  And he testified, you know, for it was one or two

24  days.  He lied to the government for probably the first two

25  years he was meeting with them.  And I said to him, well, when

1    did you startling the truth?  He couldn't remember.  And, you

2    know, if you go back, you can all take a bet how many "I don't

3    knows".  It was just non-stop.  Everything we asked him, we

4    refreshed him with statements he made in the past, and "I don't

5    know, I don't know, I don't know, I don't know.

6              I don't think the government mentioned him once in

7    their summation.  The only time they mentioned him -- and let

8    me just be clear.  So, he testified that he met Mr. Cooney two

9    times in social settings.  There are no e-mails between them.

10   And he agreed that the government reviewed many documents with

11   him.  He agreed that not one of those documents pertained to

12   Mr. Cooney.

13             And then there was testimony that he -- he went to a

14   celebratory lunch with Mr. Cooney and others to celebrate the

15   bond.  Again this is like -- this testimony was so compelling.

16   You know, there is no dispute that Mr. Cooney -- that these --

17   you know, that he knows these people, that he is friends with

18   them.

19             Again, Jason Galanis controls these guys.  You know,

20   Francisco Martin and Hugh Dunkerley, they weren't allowed to

21   freely -- they were only allowed to socialize like, you know,

22   in very controlled settings.  And so, you know, so Mr. Cooney

23   goes -- but the way it's presented, as if, you know, this

24   celebratory lunch is some type of guilt; it's like something

25   really bad, you know.  And then we get to the point, the

I6R7GAL3                         Summation - Ms. Notari

1    compelling point, the evidence against Mr. Cooney from

2    Francisco Martin is a phone call from Mr. Cooney to Francisco

3    Martin.  And we have no idea when he first told the government

4    about this phone call.

5         And let me tell you, this is the United States

6    government.  They brought in Mr. Santos to bring in the text

7    messages.  If this was really a phone call that they thought

8    was so important, and he told them early on, there would

9    definitely be like some kind of evidence, some witness to say,

10   oh, there was a phone call from Mr. Cooney.

11        So what the phone call -- if it ever happened -- was

12   was that Mr. Cooney called him to tell him that Jason Galanis

13   got arrested.  I mean that is their evidence.  That is why they

14   flew Francisco Martin into the United States.  Because they did

15   not mention him in their closing.  They did not mention him.  I

16   have to go back, but my recollection is that they never

17   mentioned him.

18        So what can we infer from that?  We can infer that as

19   this case got closer to trial, they were desperate because they

20   had no evidence against Mr. Cooney, and their case started to

21   fall apart.  And so, you know, Mr. Francisco Martin:  What else

22   do you remember about Mr. Cooney?  I don't know.  And so he

23   comes up with, you know, I don't know how it could have

24   happened or how the circumstances.  But it's just -- it's just

25   not acceptable.  It is not evidence.

I6R7GAL3                    Summation - Ms. Notari

1            And the reason why it's not acceptable is because you

2     were deceived in how this was presented to you.  OK?  You were

3     deceived and led to believe that this phone call was about the

4     bond.  You know?

5            But later on Mr. Schwartz, he asked him specifically,

6     and he said -- well, first he says how he basically, you know,

7     was part of this group that created false companies and created

8     fraudulent documents and, you know, committed all of these

9     crimes and got his letter of immunity.  And, you know, that all

10    came out very clear.  Although he didn't remember a lot.  But

11    then Mr. Schwartz says:

12    "Q.  Throughout the process the only person that you spoke to

13    was Jason Galanis about the bonds, true?

14    "A.  Jason Galanis, Gary Hirst and Hugh Dunkerley."

15           So after all is said and done, those are the people he

16    talked to the bonds about.  And we are just left about this

17    impression of the phone call as if it's something more.

18           And to me, you know, it's important because it colors

19    this case, and the deception, and what they're trying -- you

20    know, the levels that they're willing to go to.

21           And I just remind you, you know, Mr. Martin's -- his

22    admission that before he came to the United States to testify

23    he posted on his Instragram accounts "It's been a long journey.

24    No regrets."

25           And this is just really -- this is just -- based on

1    this evidence alone, you can totally dismiss his testimony, and

2    I submit you should do that, because it has no value in this

3    case.

4           And based on the fact that the two cooperators in this

5    case -- who are the only people who can talk about the bonds --

6    say nothing about Mr. Cooney, you as jurors can return a very

7    speedy not guilty verdict in this case, and you can say to the

8    government:  We expect more.  We don't expect -- we do not

9    expect our citizens to be brought to trial on such repugnant,

10   scant evidence.

11          Let's go to the next, Michelle Morton.  So there has

12   been testimony Michelle Morton pled guilty, and she failed to

13   disclose to the investors conflicts of interest.  And you heard

14   from Mr. Schwartz and from others about, you know, Atlantic

15   Asset Management, Hughes Capital Management.  And again

16   Mr. Cooney had no contact with any of those pension fund

17   victims or investors.  He had nothing to do with that; he was a

18   passive investor.

19          But again this evidence is important, because on March

20   5, 2015 -- which again I think the second tranche of bonds

21   ended -- I'm sorry -- on October 29, 2014 already two tranches

22   had been completed, and now we're in March 5, 2015, and she

23   says, who is Bevan again?  She doesn't even remember.  She

24   doesn't even know who he is.

25          So this is the version of this text message between

I6R7GAL3                    Summation - Ms. Notari

1    Michelle Morton and Jason Galanis that the government has

2    submitted in their case.  OK?  So you'll go back and you will

3    compare.  But they very intentionally wanted to highlight and

4    show to you this portion.  And again, you know, here Jason

5    Galanis is saying, you know, best friend of 23 years.

6              I just want to step back to Francisco Martin.

7    Francisco Martin testified again that Mr. Cooney and Jason

8    Galanis were childhood friends -- which is again ridiculous.

9              But Francisco Martin had known Jason Galanis for about

10   17 years, and his exwife and Jason Galanis' wife Monet Berger

11   were very close friends.  He went to his wedding, and they were

12   part of each other's social circle for many, many years; and he

13   began working for Jason Galanis in 2014.  And during the 17

14   years that he was friends with Jason Galanis, the first time he

15   meets Mr. Cooney twice is, you know, two years ago?  I mean it

16   just doesn't make sense.  You know, if Mr. Cooney and Jason

17   Galanis are these childhood friends, you know, it's just Jason

18   Galanis, that's his -- and we're going to see a little bit here

19   about how Michelle Morton, they're just con artists; they just

20   lie for sport.

21             So here we have this snippet.  Then let's go to what

22   is now marked as Defendant's Exhibit 3800.  She says:  "Do any

23   of your contacts have a relationship with Roc Sports Nation?

24   It's Jay Z's sports agency.  Would love to hook up with him

25   somehow.  Bevan is calling you about Jay Z -- this is Jason

1   Galanis -- 415 area code.

2           Are you um-hum?  That's better than a pony.  Josh and

3   Bevan are close, and knows Jay Z, or more.  Josh Takeman has

4   worked for Puffy for 18 years.  What does Josh do if I may ask?

5           Acts cool mostly.  Who is Bevan again?

6           Bevan Cooney.  Sorry?

7           We're missing a part.  Here, I can read it.

8           Who is Bevan again?

9           Best friend of 23 years, an equitu holder in all the

10  businesses.

11          Again this is what he does.  You know, he just puts

12  things out there because he is trying to -- constantly trying

13  to, you know, make himself feel more important, lie about, you

14  know, whatever he can lie about, and make himself again feel

15  important.  I thought Sugey was your best friend.  He's a

16  professional connector.  Cooney is from Missoula, grew up with

17  Kevin Washington.  Washingtons are home grown dollar zero

18  multi-billionaires, 9 billion.  Beverly Hillbillies.  Cooney?

19  Missoula?  Huh?  Montana style?  Bevan Cooney.

20          You know, one of my colleagues read that and said, you

21  no, do best friends talk about each other like that?  I mean

22  it's very clear what --

23          MS. MERMELSTEIN:  Objection.

24          THE COURT:  Let's just leave out what your colleagues

25  said.

1          MS. NOTARI:  Sorry.

2          Can we go to the next one.

3          So that was March 5, 2015.  Right?

4          Can you find the e-mail?  Oh, I'm sorry.

5          9 billion.  I understand.  I don't know why you waste

6    your time with me given the muckety mucks you know.  Ha.

7    Because it's not my 9 billion and you're more fun.  Good

8    answer.  Good answer.

9          Again, you should reread this and think about this in

10   context of all the evidence and what Jason Galanis was about

11   and what Mr. Cooney represented to him, that, you know,

12   Mr. Cooney was just -- he was just a person who used, and

13   conned, and deceived to get to other people.  And in this case,

14   we know, that from his audio recording, you know, you can put

15   it all together.  I mean it's just -- this is not -- this is

16   not very complicated, you know, as long as you're looking

17   through the clear glass and not the muddy glass.

18         So this is compelling, because this is March 6, 2015

19   this is the next day.  And so in that first message with Jason

20   Galanis she is trying to get some person who has an affiliation

21   with Roc Nation (sports agency) Jay-Z's nation  And now she

22   takes it to the level she wants to take it.  Good morning, I

23   have been given the opportunity to develop a proposal to form a

24   strategic alliance with a sports agency division of Roc Nation

25   to provide investment advisory services to their talent.  I am

1    working on this with one of my partners Bevan Cooney, who is

2    currently working with its founder on other projects.  If I am

3    successful, we will accelerate development of our advisory

4    division, which I believe will have a material impact on Dave

5    McMillan, Patty Denvir and Don.  I am sharing this information

6    with you to manage expectations regarding our activities during

7    the initial phase of this transaction.  If you wish to share

8    this --

9            So, you know, this is the day before she says Bevan

10   who, and now suddenly they're business partners.

11           Again, there is -- there is just -- you know, this is

12   not -- this is not charged in the conspiracy, and Mr. Cooney

13   doesn't even know -- doesn't even -- never even met her before.

14           Now, Mr. Cooney's e-mail.  The government has made a

15   big deal about Mr. Cooney's e-mail, and they love putting those

16   Bevan Cooney e-mails in front of you.  This is -- I think this

17   is all of Mr. Cooney's e-mail, his statements and all the -- I

18   think there is close to two dozen e-mails when he is saying

19   absolutely nothing.

20           You know, basically the format of these e-mails is

21   that Jason Galanis -- you see Jason Galanis launching an idea,

22   you see Jason Galanis supplying his investors with supportive

23   research or examples of other brilliant business deals.  You

24   see marketing literature.  You see lawyers from top law firms

25   involved, Dr. Rory Knight.  You see lawyers, bankers.  And the

1    importance of this is that, again, you keep in mind context,

2    and your own life experiences, how -- I don't want to say men,

3    because I think women do it too -- but how people act

4    informally.  And, you know, I remember that I worked for a

5    public defenders office, and every morning the guys in the

6    office would --

7              MS. MERMELSTEIN:  Objection.

8              THE COURT:  Yeah.

9              MS. NOTARI:  Well, it's just argument.

10             THE COURT:  Let's move on.

11             MS. NOTARI:  So, anyway, this is just your common

12   experience, how we've already seen the crappy loans are us.

13   This is how people act.  And there should be -- you can't --

14   these e-mail --

15             OK, this is Mr. Cooney's comments which are the

16   government is trying to say that they are indicative of some

17   type of guilt.  Another fantastic puzzle piece.  West Coast

18   offense charging down the field.  The Greek.  He includes a

19   picture of a jack.  This is pure genius.  Here Greek.  Greek

20   just running at a frenetic pace.  Love it.  Just a big time

21   hump day closing.  Road map coming together.  This is just so

22   solid.  A satellite toast is in order.  We gave Milky his shot.

23   He's Dungi.  Very promising Greco.

24             I mean just go through -- go through the e-mail, and

25   put your clean eyeglasses on, not the muddy ones, and there is

I6R7GAL3                    Summation - Ms. Notari

just nothing here.  You know, this is just casual banter, and
they're trying to say that they had this intent to do this
financial conglomeration, and it's just not acceptable.

          Can you go to the next one.

          I did want to, you know, point out that with the
e-mail, you know, you're not going to see -- you should -- you
should look, because you're not going to find it.  You're not
going to find an e-mail where Mr. Cooney is saying anything
remotely as if he is being asked to give advice or direction.
He was -- that was not his part in this.  He was -- he was the
passive investor; he was the guy who brought levity; he was guy
cheering them on because they were so -- because these were
elite, elite, elite investors, and nobody was ever going to
listen to or want to hear from him.

          And, you know, it reminds me that, you know, sometimes
when you're in a situation where you have nothing intelligent
to say because it's so complicated and it's so beyond you, you
kind of give something light and, you know, not very serious,
because that is what he brought to the table, that was who he
is.  And it's not to say it's a bad thing; it's not to say he
is not a bright person.  Of course he is.  It's just he was a
passive investor; he was not anything more.  And there is no
evidence of that.  He was not a part of the investment
committee.  He was not a marketing, he was not part of the
executive, he was not a director, he was none of this; he was

I6R7GAL3                        Summation - Ms. Notari

1    just a minority shareholder.

2            Now -- sorry.

3            The government, this is another e-mail that they

4    showed you during their summation, and they used this word

5    discretionary.  And Mr. Schwartz did a fabulous job of going

6    through and explaining the word discretionary.

7            I just want to point out that Mr. Cooney -- that they

8    put so much -- and the initial part of this chain, you know,

9    Jason Galanis says something about we get to -- we get 15

10   million for us and five to them, and my client's comment,

11   Mr. Cooney, says what do we get to do with the 15 million.  So

12   he just -- again, he just -- you know, they're trying to infer

13   guilt here from innocuous statements that are absolutely

14   consistent with innocence.

15           Can you go to 2253?  OK.

16           This is another e-mail that they showed you yesterday,

17   and it says:  Super stressful having no liquid honey.  Which

18   again taken out of context this statement just sounds, you

19   know, so, you know, so un-savory.  But when you think about the

20   context of what was going on in his life, you know, he was --

21   he was going through a period where he was not -- there was no

22   money coming in, and you could see down below, Government

23   Exhibit 3251 -- again this is an example -- these are all

24   Government's exhibits that I'm showing you, because they tell

25   the story of in context of what has happening in his life.

1            So, Government Exhibit 3251, we know this was just

2     about the time when he is applying for the loan from CNB, which

3     again is something that he had done in the past, and he had

4     always made good on his loans, and he had good credit.  And we

5     see that here the government's -- this e-mail down here is

6     March 25, that they're trying to get the bonds into the DTC

7     system.  And here if you go up to April 1, 2015, in

8     government's 3245, this is exactly consistent with the fact

9     that these were his bonds and he was trying to sell them.  Call

10    Richard Isaacs my broker if you have any questions.  We need to

11    make sure I sign anything we need before I leave Saturday.

12    This is a huge trade.  I have an institutional buyer lined up

13    to take me out of this bond position.  Super top priority.

14    Solves all my problems.

15            So in combination, you know, we can make sense of what

16    is going on in these e-mails, and he is trying to sell his

17    bonds -- and I want to get to that in a minute -- but this

18    is -- this is -- this is what is happening with super stressful

19    having no liquid honey.

20            And if we look at the loan chart, you know,

21    subsequently there is loans back and forth, but during this

22    time period Jason Galanis makes him several loans, and

23    eventually he pays back, you know, $150,000.  So there is

24    nothing sinister about this.  This is everyday business

25    America.

1          Now, I just want to focus on some e-mail that

2     they're -- they focused on.  And, you know, they're trying

3     to --

4          Can you take the yes, Eric classified.

5          So this is an e-mail they haven't mentioned yet, but I

6     think it's probably going to come later on today, because --

7     and we're not hiding from anything.  You know, we have nothing

8     to hide here.  This is a conversation between Mr. Cooney and

9     his accountants, and he says to date you have no income, so the

10    attached doesn't look so great.  This is he is trying to get a

11    loan, if you look at all the other e-mail.  However, I can

12    reclassify one or more of the transfers of money that came in

13    from Thorsdale and call it investment income, or something else

14    if you like to, generate some revenue/profit.

15         And he says, yes, Eric, reclassify $1.9 million of the

16    Thorsdale related transfers.

17         You know, this is again like your accountant calls you

18    and says, do you want to do this?  And you say, sure, let's do

19    that.  I mean it's -- it's -- there is -- there is just nothing

20    here.

21         You know, if you look at the money chart, there was no

22    $1.9 million.  It's not -- it's not even part of their theory

23    of the case.  So it's just here to make it seem like it's

24    something more.  And I just --

25         You know, conversations between your -- you put on

1    evidence that your accountant, Mr. Cooney's, at Fulton

2    Management are credible, reputable people, and then you try to

3    disparage your e-mails with him.  I mean pick a path.  Just

4    don't throw mud all over the place, which is what they're

5    doing.

6              Now, the government has spoken to you about the

7    Calvert documents, and they're making a big deal about the fact

8    that Mr. Cooney -- that Calvert was -- there was testimony that

9    Calvert was created in October of 2015, and this was one of

10   Jason Galanis' fake companies, and that somehow you should

11   attach significance to the fact that some of the documents that

12   Mr. Cooney obtained and gave to his accountants were Calvert

13   documents.

14             But again, you know, people do not create false

15   documents -- they create them with the intent to pass them to

16   others to deceive them.  This is the testimony of Hugh

17   Dunkerley:

18   "Q.  I want to talk to you now a little bit about Calvert

19   Capital.

20   "A.  Yes.

21   "Q.  You testified last week that one of the crimes that you

22   have plead guilty to was obstruction of justice, true?

23   "A.  True.

24   "Q.  And that included the falsification of documents, right?

25   "A.  True.

I6R7GAL3                    Summation - Ms. Notari

1    "Q.  And you were directly involved in creating or signing

2    those false documents, correct?

3    "A.  Yes.

4    "Q.  In fact, we don't need to look at it, but one of those

5    fake documents that was created was an agreement between

6    Thorsdale and Calvert, right?"

7             So we see there is a relationship between Thorsdale

8    and Calvert.

9    "Q.  And Calvert's sole purpose was to deceive people, correct?

10            "And again the only purpose that you ever discussed

11   Calvert and its illicit purpose with were Gary Hirst and Jason

12   Galanis, true?

13   "A.  True.

14            So there you have it.  There you have it.  Hugh

15   Dunkerley their cooperator, who knows nothing about Bevan

16   Cooney, testifies that the only people who knew these were

17   illicit documents were them.  And now the government is trying

18   to say that Mr. Cooney somehow knew that these Calvert

19   documents were false.  And the fact that, you know, he had

20   them, you know --

21            Can you go to the next exhibit?

22            This is one of the documents that they're focused on,

23   and this is sent to Mr. Cooney -- it's very clear.  And again

24   common sense, you know, it's the beginning of the year and

25   you're trying to get your taxes together.  Vanessa, I found the

I6R7GAL3                        Summation - Ms. Notari

1    file for my taxes for last year.  Thorsdale loaned me this

2    property for a short period of time.  The money went through my

3    CNB account into Camden Escrow in Beverly Hills.  It was a

4    failed real estate transaction.

5           So this document establishes that the Camden -- that

6    the transaction for 1920 Bel Air, the failed real estate

7    transaction, it actually confirms -- and if you read it it says

8    that, you know, the loan was funded, made to your family trust

9    on November 12, 2014.  This letter confirms that the loan of

10   $3.89 million was made for the purpose of a joint venture with

11   a residential real estate investment.  You funded escrow on

12   November 13 with the proceeds of the loan made to you.  The

13   transactions require the Bel Air property did not work out as

14   expected for reasons beyond your or our control.  You were

15   instructed by Thorsdale as the agent for the lender Calvert to

16   cancel escrow and wire the proceeds held in escrow to the

17   attorney/client trust account, of counsel to Thorsdale, which

18   you did prior to year end -- which is all in the government's

19   chart.

20           (Continued on the next page)

21

22

23

24

25

1    Accordingly, when you completed the wire, you loan was

2    paid off and the proposed venture terminated.  Let us know if

3    you require anything else, signed Jason Galanis.  So Mr. Cooney

4    handed this document to his accountant, and now it is the

5    evidence in this case.

6    So I just want you, when they talk about the Calvert

7    documents, that you should just keep in mind that these were

8    fake documents and they were intended to be fake and they were

9    passed to people, including the government, as part of the SEC

10   investigation.  They passed these false documents and that

11   there was testimony in this case that the only persons who knew

12   they were fake were Hugh Dunkerley, Jason Galanis and Gary

13   Hirst and possibly Francisco Martin.

14   If we can go to the next one.  So this is the money

15   chart that we put together and we put in evidence, and again

16   you recall Saranya testified and there was a slight error in

17   one of the numbers, the DX 3291, that is inaccurate, but GT

18   3209 is a compilation of all those documents, so you can see

19   the reference these documents by just going to 3209 and

20   everything else is accurate.

21   I just want to say the government, when we

22   established, we brought this chart in, the only thing they

23   questioned Ms. Saranya was on the fact there was an error.

24   They did not dispute a single financial transaction here.  This

25   is all documents, the financial records, and we didn't put this

1    on the chart because for issues that I can't, you know, that

2    basically it was at the time we prepared the chart, all this

3    wasn't just ready to go.

4              MS. MERMELSTEIN:  Objection.

5              MS. NOTARI:  You can reference all these emails, and

6    what you will find is that every single email perfectly

7    corresponds with incoming and outgoing wires.

8              These are all communications that Mr. Cooney had with

9    Fulton, his business managers, Matthew Fillman, Alexis Gluckman

10   and you can see this is like in DX 3141, it is a convertible

11   loan.  Alexis, please wire 400,000 to this account this

12   morning.  Sen me wiring information when available.  Alexis, it

13   is the detailed records of every transaction and Anslow &

14   Jaclin was a Jason holmby, at his request.  Jason Galanis here

15   asking Bevan Cooney please wire $35,000 to Oxford Metrica, to

16   Dr. Rory Knight.  This is a law firm.

17             Again it goes through all the different -- and what is

18   important is that we worked out, we sorted out we should let

19   you should do your own math.

20             MS. MERMELSTEIN:  Objection, your Honor.

21             THE COURT:  I will sustain that portion.  How much

22   time do you have left?

23             MS. NOTARI:  About 10 minutes.

24             THE COURT:  Okay.

25             MS. NOTARI:  So in this chart, if you add up, these

1    are all the wire transactions between Mr. Cooney and Jason

2    Galanis or Jason Galanis business deals, and what it shows is

3    that the loss is about $43,000 -- I mean Mr. Cooney was out

4    $43,000, so at the end of the day he made no money.

5          The government changed their position in the opening

6    statement.  This was all about the money that Mr. Cooney was

7    going to make, and now they've suddenly changed their position

8    that this is about, you know, the money he was going to make

9    for the financial conglomeration.

10          If we go to the government's chart, so this is the

11   government's chart, and so this chart shows that the money went

12   to Mr. Cooney and then he bought the $5 million bonds and then

13   it went to Bonwick Capital.

14          Go to the next chart.  Now, this chart, if you do the

15   math, this chart says that Mr. -- it totally, it completely

16   does not take into consideration the fact that Mr. Cooney did

17   not keep $5 million.  $5 million went to U.S. Bank for the

18   bonds.  That was a loan.  So that is not correct.

19          Then if you do the math, the government does not

20   include in their chart, if you go back to our chart, it does

21   not include any of the money that Mr. Cooney sent Jason

22   Galanis, after all this money in 2013, it doesn't reflect that,

23   and it doesn't reflect the money that Mr. Cooney wired to

24   Thorsdale on July 6th, 2015, he wired a hundred thousand

25   dollars.  On July 9th, 2015, he wired $50,000.  So they

I6RJGAL4                    Summation - Ms. Notari

1    selectively have chosen to mislead you with what they want to

2    mislead you and leave with this number of 5 million, all this

3    money that he received when it is just not true.

4            Now, I just want to explain, and I didn't get to this,

5    and I think it is very important why Mr. Cooney purchased the

6    bonds.  Mr. Cooney invested in Burnham, and Burnham was the

7    placement agent for the bonds, and Jason Galanis was, what he

8    was telling people, and this is like the common story he was

9    telling everyone, these bonds were in great demand, there were

10   institutional buyers.

11           At one point that was -- he told, and I don't really

12   want to credit Francisco Martin, but Francisco Martin bought

13   the bonds, but he bought them in a fake name.  Mr. Cooney,

14   these were his bonds.  He bought them in his own name with his

15   bankers and he bought them with a loan.  He had no idea that

16   the money that Jason Galanis gave him for this loan was money

17   that was from the first bond proceeds.

18           You have to understand Mr. Cooney, there is a lot

19   going on here.  He is a businessperson, and Jason Galanis is

20   telling him that this is good for Burnham, this is good for

21   movement of the bonds.  Mr. Archer had bought the first half of

22   the tranche of bonds, and we know from the audio recording that

23   Mr. Cooney thought Mr. Archer -- you can read that and listen

24   to that transcript and you'll see as far as his state of mind

25   and what, they were friends and he thought he was a brilliant

I6RJGAL4                    Summation - Ms. Notari

1   guy and he trusted him.

2             They're trying to just distract you and throw mud on

3   the walls.  Mr. Cooney knew that this was a conservative

4   investment.  It was a mutual bond, 6 percent interest, and he

5   was trying -- in February of 2009, there is attached to the

6   financial statement is a statement of what the bonds were

7   worth, and they were worth $5.5 million.

8             And so this is not, you know, nobody knew what Jason

9   Galanis knew.  You know, everyone thought this is part, a small

10  part of this financial conglomeration and that this was,

11  Burnham was moving in the direction of, you know, mutual bonds

12  and the Native American, all the things that Jason Galanis,

13  that puts in his emails, that Bonwick Capital was part of this.

14  There was no reason to believe, you know, what we now know.

15            There was no way he could have known, you know, that

16  he was stealing those proceeds.  His intent, and we can see in

17  the email I just showed you, he was going to sell the bonds,

18  and he tried to do that.  It was just a business deal and he

19  thought that, you know, he thought that he was helping Burnham

20  and Burnham was the placement agent, and you should consider

21  that Tim Anderson, the lawyer for Dillworth Paxson, again he

22  testified there was nothing wrong with the bonds, there was

23  nothing wrong with an individual like Mr. Cooney to purchase

24  the bonds, that Mr. Cooney told his -- he provided information

25  as soon as the wire came in to Fulton Management, but that he

I6RJGAL4                    Summation - Ms. Notari

1      purchased the bonds with a loan.

2              He provided the loan agreement to them.  This was,

3      yes, he absolutely believed in his investment in Burnham and he

4      believed, like all of them, that this was going to be the next

5      Guggenheim, and the government's case just doesn't make sense.

6              You know, when you consider -- first I want to talk a

7      minute about the court's instructions.  Mr. Schwartz has

8      already gone through and Mr. Touger has gone through the law,

9      and so I don't want to repeat what they say, but the court is

10     going to instruct you that there was clearly a fraud here.  We

11     are not trying to -- we have never, never, never said that

12     there were not victims, and there is no dispute the victims in

13     this case were the WLCC and also the people, the investors.

14             The allegation is has two pieces to it; the defendants

15     engaged in a scheme to misappropriate the proceeds of several

16     bond issuance by WLCC and also they caused investor funds to be

17     used to purchase the bonds, in violation of a fiduciary duties

18     with all those undisclosed conflicts of interest.

19             So what we want to, what I really want to leave you

20     with is that Mr. Cooney did not communicate in any way, shape

21     or form with any of the victims in this case, as we already

22     said, that he had no contact with the WLCC, that the only

23     witness you heard from was Raycen Raines from WLCC and they

24     never met Mr. Cooney.  All of the emails that were forwarded to

25     Mr. Cooney, you can look at those emails.  There is just no

1    proof or no evidence that he had any contact with the WLCC, he

2    had any contact with the victims.

3          There is no evidence of any misrepresentation.  There

4    is no evidence of that.  I am not sure if they're trying to say

5    they misrepresentations to the bank is somehow

6    misrepresentation.  Mr. Cooney, there is no lies here.  There

7    is no misrepresentations.

8          You know, the pension funds, you heard from

9    Mr. Griffin, he never met Mr. Cooney.  You heard from Mr. Smith

10   from Nebraska.  He never spoke to Mr. Cooney.  You heard from

11   Mr. Moore from the Goodyear Company.  He never interacted with

12   Mr. Cooney.  You heard from Mr. Turney, who worked at Atlantic,

13   the investment adviser.  He never had any interaction with Mr.

14   Cooney.  It is simply Mr. Cooney had no communications with any

15   of these people.

16         In order for you to establish a conspiracy, you know,

17   Jason Galanis lied to everyone.  There is no conspiracy between

18   Mr. Cooney and Jason Galanis.  Michelle Morton spoke to Mr.

19   Cooney the first time on March 5th of 2015.  There is no

20   evidence of any communication between Mr. Cooney and Michelle

21   Morton which establishes a conspiracy.

22         Francisco Martin, you know, only spoke to Dunkerley,

23   Hirst and Galanis about the bonds.  No conspiracy.

24         The only thing we have is that ridiculous phone call.

25   Mr. Cooney did not speak to Gary Hirst.  There is like a

1    limited communication between him but, of course, Gary Hirst

2    was very connected to Jason Galanis, so an email to Gary Hirst

3    doesn't mean anything.  There is one email in evidence between

4    Mr. Cooney and Gary Hirst.

5              The court is going to instruct you on the law, but

6    there are no misrepresentations, and as Mr. Cooney, Mr.

7    Schwartz said yesterday that the placement agreement very

8    specifically talks about disclosure, and Mr. Cooney had no

9    reason to know that what was being told to the clients that

10   Michelle Morton was dealing with, and she ultimately pled

11   guilty to her failure to disclose what she was supposed to

12   disclose.  Again there is just no evidence of that.

13             I am almost done.

14             (Off-the-record discussion)

15             MS. NOTARI:  Members of the jury, this moment is very

16   hard.  It is my time to sit down.  Throughout the five weeks I

17   have been with you, have been Mr. Cooney's voice in this

18   courtroom.  I told you early in this case I believe he is

19   innocent.

20             MS. MERMELSTEIN:  Objection, your Honor.

21             THE COURT:  Let's not give us your personal views.

22             MS. NOTARI:  I believe the evidence shows that

23   innocence is not a standard in this courtroom.  The standard is

24   proof beyond a reasonable doubt, and every piece of evidence

25   that we've analyzed today here is perhaps the government will

1    say it is consistent with guilt, but it is absolutely

2    consistent with innocence.  That should raise a hesitation in

3    your mind for all of the reasons I've outlined for you.

4            At the end of this case, your voice in this courtroom

5    sends a message as to the type of cases that, the type of proof

6    you as citizens taxpaying citizens expect our government to

7    bring, and this case is just not acceptable.

8            I ask you to return a verdict of not guilty.  This is

9    not a complicated case.  They have made it very complicated and

10   it distracted you, but it is not complicated case.  Thank you.

11           THE COURT:  Thank you.  So, ladies and gentlemen, we

12   are going to take a break now.  What I need to determine, and I

13   will speak to the lawyers about scheduling, whether you should

14   take your lunch break now or just a short break, have the

15   government rebuttal, and then I will charge you after the lunch

16   break.  Why don't you take a break and Ms. Cavale will come in

17   momentarily and let you know our schedule today.  Thank you.

18           (Jury excused)

19           THE COURT:  How long is your rebuttal?  Do you have a

20   sense of it?

21           MR. QUIGLEY:  It is not eight hours of defense

22   summations, but 45 to 50 minutes, maybe an hour.  I am happy to

23   go now.  I think the jury needs a break.

24           THE COURT:  I had planned for you to go before lunch,

25   but I think in light of the time, it is almost 1:00 o'clock, we

I6RJGAL4                        Summation - Ms. Notari

1     should take our lunch break now.

2                   (Off-the-record discussion)

3                   THE COURT:  I am happy to ask the jury.

4                   MS. MERMELSTEIN:  Some of the jurors, in response

5     to -- I will ask the lawyers clearly want to take the lunch

6     break now.  We are happy to do whatever your Honor wants.

7                   THE COURT:  I am going to say we ask the jury.

8                   MR. QUIGLEY:  We it might be an hour.  It won't be 20

9     minutes.

10                  (Pause)

11                  THE CLERK:  Lunch!

12                  THE COURT:  We're going to take lunch now.  So why

13    don't we come back, can we come back in a quarter to.  We'll

14    start promptly at 1:45.

15                  (Luncheon recess)

16                  (Continued on next page)

17

18

19

20

21

22

23

24

25

I6RJGAL4                    Summation - Ms. Notari

 1          AFTERNOON SESSION

 2          1:50 pm

 3          (Trial resumes)

 4          (In open court; jury not present)

 5          THE COURT:  You may be seated.  Thank you.  We are

 6     still waiting for one or two jurors, so you may set up.

 7          (Pause)

 8          THE COURT:  We are going to bring in the jury.  I will

 9     note for you that some jurors expressed -- I don't want to say

10     concern, but query about the fact that two of the jurors are

11     out all of next week, and as I have noted previously, they

12     indicated they can't sit on Friday and asked, you know, would

13     11 of us sit?

14          I want you to all think about who we should have start

15     deliberating, if we should include Juror No. 4 or 5 who is

16     going on vacation next week.  I know it is 13, right?

17          THE CLERK:  13 leaves on Friday.  She is an alternate.

18     Then number -- Mr. Sander, No. 5, is leaving on July 6.

19          THE COURT:  No. 5?  5 is leaving July 6, but there is

20     one who is out next week.  I will find my notes for you in

21     terms of who it is, but I want you to start thinking about if

22     we should start deliberating with the original twelve,

23     recognizing one of them is going to be out as of Friday.

24          MR. SCHWARTZ:  Putting the jury's schedule aside, what

25     would your Honor be intending to do if everyone were able to

1    sit every day?

2              THE COURT:  I am inclined to sit as much as we

3    possibly can.  If we can sit Friday, I would sit Friday.  I am

4    happy to sit all day Monday, Tuesday.  Obviously, we'll be out

5    on the 4th, and then back on the 5th and 6th.  That is my

6    intention.

7              I usually leave it to the jurors to set their schedule

8    in terms of when they come in and leave every day.  I would be

9    amenable also to leaving early on Tuesday because of the July

10   4th holiday, but I frankly would be inclined to leave it to the

11   jurors.  Think about that and we'll talk about it at the next

12   break.

13             MR. QUIGLEY:  We need two seconds for the power.

14             MR. SCHWARTZ:  Are you going to remind us who the

15   jurors are and what the schedules were?

16             THE COURT:  Let me find that for you.  Tell me when

17   you're ready, Mr. Quigley.

18             MR. QUIGLEY:  Will do, your Honor.

19             (Pause)

20             MS. MERMELSTEIN:  Your Honor, is it worth reconfirming

21   with them how flexible Friday is?  My sense is that we haven't

22   been sitting Fridays, and they were asked about Friday and they

23   said no.  Maybe that is not as hard --

24             THE COURT:  If someone like Juror No. 13 that we are

25   letting go, let's say we decide to do that, if she was the

1   issue on Friday, maybe we we could sit on Friday.

2           MS. MERMELSTEIN:  Exactly.

3           THE COURT:  I am trying to find the note where we had

4   everyone's schedule.

5           MR. QUIGLEY:  7 and 13 had an issue next week and the

6   court was the following week.

7           MR. SCHWARTZ:  If you remember, we had had that

8   conversation on the record.

9           THE COURT:  We can ask them again.

10          MR. SCHWARTZ:  Or we can ask again.

11          THE COURT:  How long are you going to be until you're

12  ready?

13          MR. QUIGLEY:  We are just pulling it up now.

14          THE COURT:  We can have Ms. Cavale go back and say in

15  light of what people just expressed, I want to go through with

16  each of you who has a scheduling issue when, including Friday.

17          MR. SCHWARTZ:  That makes sense.

18          THE COURT:  Do you want to do that?

19          (Off-the-record discussion)

20          THE COURT:  Mr. Miller, who is No. 7, is out all of

21  next week.  Mr. Miller, right?

22          THE CLERK:  And No. 13 leaves on Friday and is out all

23  next week, too.  Mr. Sanders, who I think is No. 5, is out on

24  July 6th and onwards.  A bunch of them are not available to sit

25  this Friday.

```
 1              THE COURT:  Did everyone hear that?

 2              MR. SCHWARTZ:  I did not.

 3              THE COURT:  No. 7 is out all of next week.  No. 13 is

 4    out Friday and all of next week.  Mr. Sanders, who is 5, is out

 5    on July 6th, and then a number of people are not available on

 6    Friday.  From my perspective, it sounds like we can't sit

 7    Friday.

 8              I think the question is do we substitute an alternate

 9    other than 13 for No. 7?  I don't think we should excuse

10    Mr. Sanders because he is free until July 6th.  I think the

11    issue is given that we may only have one full day of

12    deliberations, a little bit more, should we let 7 go and 11

13    go -- excuse me -- 7, 13?  I misspoke.  Why don't we hear the

14    government rebuttal and think about it and talk at the break

15    before the charge.  Sanders is No. 4.  You know who we mean, it

16    is the man sitting in the front.

17              THE CLERK:  Mr. Miller is 7.

18              MR. SCHWARTZ:  Who is seated in Seat No. 7?

19              THE CLERK:  Mr. Miller.

20              THE COURT:  And 13, who is in the back on the left is

21    the alternate not available Friday or next week.

22              THE CLERK:  Ms. Sanchez.

23              MR. SCHWARTZ:  The next alternate would be the

24    gentleman sitting next.

25              THE COURT:  In the glasses.  Let's bring them in.
```

I6RJGAL4                    Rebuttal - Mr. Quigley

1      Thank you.

2                (Jury present)

3                THE COURT:  Everyone can be seated.  Thank you.  Since

4      the government has the burden of proof in a criminal case, they

5      are entitled to a rebuttal summation.  Mr. Quigley.

6                MR. QUIGLEY:  Thank your Honor.  Good afternoon,

7      ladies and gentlemen.

8                A $60 million fraud, a fraud that everybody agrees

9      happened, a fraud where crimes were indisputably committed, a

10     fraud in which each of these defendants moved millions and in

11     some cases tens of millions of dollars, yet their argument is

12     they had no idea, they were in a den of thieves and they had no

13     idea.  That is what they want you to buy.

14               Let's make one thing clear before we get into this.

15               The government has the burden of proof in this case, a

16     burden to prove the defendants' guilt beyond a reasonable

17     doubt.  It is the same burden that has been applied in every

18     criminal trial in this country in the last 200 years.  It is a

19     burden we embrace and it is a burden we met.  When the

20     defendants make arguments like they just did, it is entirely

21     appropriate for you, as jurors, to scrutinize those arguments

22     and see how they match up to the evidence, to see if they hold

23     any water.

24               So I am going to spend the next little while

25     responding to some of those arguments.  I don't have eight and

I6RJGAL4                    Rebuttal - Mr. Quigley

a half hours like they did, so I am not going to respond to
every single one.  I will try to hit the major ones.

         This is a case about knowledge.  Did the defendants
know what they were doing or were they unwitting dupes?  The
evidence at this trial showed that they knew well what they
were doing.  Jason Galanis kept Devon Archer and Bevan Cooney
in the loop every step of the way about his need for money,
about his need for discretionary liquidity, about minute
details of the bond transactions like the CUSIP number for the
bonds, like when certain people signed bond documents, like
details about the closing of the Hughes and Atlantic.

         John Galanis was the person who approached the
Wakpamni, who drafted the early deal documents, who made
representation after representation that you know was false.
Who put $2.35 million into his own pocket.  Who told his
minion, Mark McMillan, where the money would go by using his
lawyer's email address and who, as you heard yesterday, pled
guilty to participating in a previous securities fraud with
Jason Galanis.

         If the defendants were innocent dupes, why the lies?
It is not just one lie, ladies and gentlemen.  It is a pattern,
lies to the Wakpamni, lies to the pension funds, lies to the
banks, lies to the BIT Board.  If the defendants were innocent
dupes, why the coverup?  Why the fake documents?  Why helping
to pay interest on the bonds?  The defendants are hoping you

I6RJGAL4                  Rebuttal - Mr. Quigley

1    lose the forest the trees.  Their actions over and over again

2    over many months demonstrate what your common sense tells you

3    they knew what was going on, they were in on it, they were

4    going to make it work, work for John Galanis, work for Hugh

5    Dunkerley, work for Michelle Morton and work for themselves.

6         Mr. Schwartz yesterday and Ms. Notari this morning

7    made a big deal how Mr. Archer and Mr. Cooney, they were never

8    in contact with the SEC or never spoke to any of the pension

9    funds.  Who know who never talked with WLCC, never talked to

10   any of the pension fund victims?  Jason Galanis.  Because that

11   is how big conspiracies, big schemes like this work.  Everyone

12   has a role to play, and the defendants played their role and

13   they played it well.

14        So let's walk through some of the arguments here.  You

15   heard a lot about legitimate business transactions and how all

16   these transactions were covered by lawyers and accountants, but

17   let's look at some of the actual transactions that showed the

18   defendants were part of this fraud.

19        Let's look at how Archer and Cooney bought the second

20   series of Wakpamni bonds.  Before we begin, make no mistake,

21   Archer and Cooney knew that the evidence, the money used to buy

22   these bonds came from the first issuance.  It was recycled in a

23   matter of weeks.

24        For one, as I mentioned before, and as Ms. Mermelstein

25   showed you on Monday, they were kept in the loop every step of

I6RJGAL4                    Rebuttal - Mr. Quigley

the way, and again Mr. Schwartz and Ms. Notari made a big

argument Mr. Archer didn't meet Michelle Morton until March

2015, Mr. Cooney didn't meet Michelle Morton around that time.

There is email after email where they're getting updates what

Michelle is doing from Jason Galanis.  Michelle Morton night

not have known them, but they certainly knew her and they knew

her from way back in the spring of 2014, early summer of 2014

before the Hughes transaction even happened.

        Do you remember that email that Jason Galanis sends to

Michelle Morton attaching the COR Capital summary and he sends

to Bevan Cooney, who no dout shamlessly, he responds how do you

do?  That is June 2014 before the first bond issuance, well

before the first bond issuance, okay?

        On this topic, Mr. Schwartz also made a big deal

yesterday about how Jason Galanis lied to Mr. Archer about the

bond issuance.  To be sure, Mr. Jason Galanis did lie to him.

That is why he was prosecuted in this case, that is why he was

arrested in the other case you heard about, okay?  The emails

Mr. Schwartz showed you yesterday about the barn and the

warehouse, those are accurate status reports on the status of

the Wakpamni construction.

        As he was cross-examined Mr. Raines about them, is

this not the Wakpamni Community?  He didn't do that because

they were accurate status reports.  They were kept in the loop

about the status of the transaction.

I6RJGAL4                        Rebuttal - Mr. Quigley

1            Here is what happens with Mr. Cooney's bonds.  You
2    heard about it already.  The money comes out of Wealth
3    Assurance on the first bond issuance, goes into Thorsdale, goes
4    to Cooney.  Cooney buys the second bond issuance and it goes
5    right back to Wealth Assurance.  Later on, in May of 2015, he
6    uses those bonds to help one of the defendant's companies,
7    Bonwick Capital, meet its net capital requirements.

8            As you heard from Ms. Walch from FINRA, it was a fancy
9    way of keeping in business because if you don't keep the net
10   capital requirements as a broker-dealer, you have to shut down.

11           Here is what happened with the bond Archer bought.
12   Very similar.  Mr. Schwartz showed you an email yesterday sent
13   by someone named Francisco Martin who you know to Clifford
14   tried to suggest that the Wolff Law Firm was somehow put in
15   this transaction to fool Devon Archer, but Devon Archer wasn't
16   fooled by this.  He knew on September 8th long before, two
17   weeks before the transaction closed that Cliff Wolff was
18   involved in this transaction.  Here is Government Exhibit 2228.

19           Jason Galanis is telling Devon Archer, telling him
20   about the bonds.  Have a word with Cliff, he says means have a
21   word with Cliff, and they continued, the three of them
22   continued corresponding with Cliff Wolff over the next two
23   weeks, 2228, 2300, where actually information about the bonds,
24   wire instructions for the bonds, there is an FYI, Galanis is
25   telling Archer and Wolff and Sebastian Momtazi the money is

1     coming out of his account in Thorsdale.  There is no hiding the

2     ball from Devon Archer here.

3           Now, as I said, to be perfectly clear, Archer and John

4     Galanis knew the money was coming from the first issue.  How do

5     they know that?  They know Jason Galanis didn't just have 15 or

6     $20 million to give him.  They knew all about the bond

7     issuance.  They knew it happened.  You saw the email this

8     morning, 2299, where Cooney gets the allocation that Hughes

9     bought with the first bond issue.  There is a ton of emails

10    kept up to date, 2217, and Galanis and Lonehill signed the bond

11    documents.  Again Galanis is accurately keeping them in the

12    loop on minute details of the bonds.

13          Ms. Notari and Mr. Schwartz talked a lot about how

14    Jason Galanis appeared very wealthy.  The reality is what he

15    was good at spending money, but he was not very wealthy by

16    2014.  The defendants knew that, okay?  You see other emails to

17    Archer and Cooney begging for discretionary, sick of begging

18    for discretionary liquidity.  2023, 2024, 2026, he talks about

19    the need, the need for dry powder in control soon.  That is

20    2025.  2021, all the governments exhibits where he says laser

21    focused summer cash hole.  A few months later there is Defense

22    Exhibit 4505 where Archer sends Galanis a short-term loan.

23          So Galanis is clearly in need of spending money.  He

24    doesn't have $20 million to give away.  That matches up with

25    the testimony of Francisco Martin.  You don't have to like

I6RJGAL4                    Rebuttal - Mr. Quigley

Francisco Martin, but think about his testimony and how it

matches with the other evidence in this case.

He said this is a later investment, but he said there

were no other income that was generated from Jason Galanis'

businesses other than the bond proceeds.  That is consistent

with what Galanis is saying in the emails to Archer and Cooney.

It is also consistent with what you see in the bank

records, okay?  Because you saw in Government Exhibit 4012, the

summary chart, right, for inflows and outflows out of Thorsdale

between August 14 and October 15.  Thorsdale got $43 million in

cash inflows during that time period.  38 million of that came

from Wealth Assurance Private Client, meaning 38 million of

that came from the bonds.  The bonds were Jason Galanis' main

source of income, and these defendants knew that.

So bottom line, having been kept in the loop every

step of the way, Archer and Cooney knew that Jason Galanis

didn't have $20 million to give them, much less $20 million to

give them for free, no questions asked, absent that $28 million

first Wakpamni issuance in August 2014.

Even setting that aside, let's not lose the forest for

the trees.  This deal makes no sense.  It is filled with red

flags from Archer and Cooney's perspective.  I expect Judge

Abrams will instruct you on something called conscious

avoidance, meaning you can't say you didn't know because you

stuck your head in the sand.

I6RJGAL4                        Rebuttal - Mr. Quigley

1              You have heard about a lot of numbers in this case,

2     okay?  Make no mistake, 15 or $20 million is a huge amount of

3     money.  For Devon Archer, 301 and 60, take a look at the impact

4     that $15 million impact on his account, it goes up and buys the

5     bonds and it goes right down, a tremendous amount of money.

6              If someone came up to you on the street and gave you

7     $20.00 and said hey, you go down the street and buy lunch for

8     me, I am going to stand behind this telephone poll while you do

9     that, that might strike you as a little strange.

10             If somebody came up to you with a bag of cash, okay,

11    with $20,000 in it and said please walk down the block to the

12    bank for me, I am going to sit in my car over here, and deposit

13    that cash for me, that would probably be a little weird, too.

14             What happened here is that Jason Galanis, who these

15    defendants knew certainly had a checkered past, came up and

16    said here is $20 million.  In other words, 1,000 of the $20,000

17    bags of cash I just talked about, and he said go buy these

18    bonds for me.  By the way, you don't have to give me anything.

19    That does not sound like a legitimate deal, and you know that.

20             Devon Archer knew that, Bevan Cooney knew that, and

21    that is why, as you will see in a few minutes, you know they

22    lied about it.  They held themselves out to the WLCC as

23    legitimate purchasers of the bonds, and they knew that Jason

24    Galanis was engaging, Jason Galanis was engaging in other

25    transactions during this time period that don't sound like

I6RJGAL4                    Rebuttal - Mr. Quigley

1    legitimate transactions at all.

2              I'll talk about 1920 Bel Air with Mr. Cooney in a few

3    minutes, but Jason Galanis buys an apartment with, in part with

4    bond proceeds using Mr. Archer's name.  This is from July 9th,

5    2014, Cliff Wolff, again Cliff Wolff ain't hiding anything from

6    Devon Archer here.  He says Jason Galanis is going to buy this

7    apartment using the Archer deals and Devon tells Sebastian

8    Momtazi hey, look out, you might get nailed for this entity at

9    your address, okay?

10             And then two days later, an email Mr. Schwartz did not

11   show you yesterday, Government Exhibit 2028, Devon Archer gets

12   the distribution list from Jason Galanis for the first tranche

13   of Wakpamni bonds, okay?

14             He tells him that the apartment close is July 31, and

15   Archer says from your lips to God's ears.  How does Galanis

16   respond?  So close.  Massively motivated.  Cliff, again Cliff

17   Wolff is running stall for me on the New York City magic.  I

18   want to be here and won't live in a 1750 foot square cage.

19   Massively motivated.

20             Does this sound like anything like an investment,

21   annuity or an investment to benefit Native Americans or pension

22   funds?  No.  This is clear evidence that Devon Archer was aware

23   that Jason Galanis intended to use that money, at least some of

24   that money, to buy an apartment.

25             You know what?  That is exactly what happened.  These

I6RJGAL4                    Rebuttal - Mr. Quigley

we can see.  Here is the contract of sale for 260 West
Broadway, $1 million down payment, Government Exhibit 225.  Who
is the seller, by the way?  The Wolff Law Firm again, and who
is the seller's attorney?  Katsky Korins, LLP.  Look at
Government Exhibit 512, look at the Dunkerley testimony.  What
is the very first wire out of the bonds when they come in, wire
out of Wealth Assurance Private Client?  Katsky Korins, right.
That is that down payment.

         Jason Galanis told Devon Archer he was going to do it,
and he did it.  He took a million dollars in the first bond
issuance and used it to buy, as a down payment on an apartment.

         Now, Mr. Schwartz also made a big deal yesterday in
saying certain things were argument, not evidence.  This is one
of the documents he talked about.  This is from a little later,
a year later.  Remember this is for the interest payments on
the first bonds.  Galanis tells Archer so you get this out
today, I am assured we can turn it today.  And the money goes
to Wealth Assurance Private Client, and then the next day, as
you have seen, it goes to pay interest on the first bonds.

         So Mr. Schwartz says even though Archer happened to
send Galanis $250,000 the day before the first interest
payments were due on the bonds, that there is not a shred of
evidence that Devon Archer is making an interest payment, knew
he was helping to make an interest payment on the bonds.

         There is a big difference between speculation and

I6RJGAL4                      Rebuttal - Mr. Quigley

1    drawing inferences from circumstantial evidence.  What we ask

2    you here to do is to do the latter, draw an inference from the

3    evidence in the case.

4           This is essentially, the whole thing is a crime of

5    secrecy.  Common sense tells you people don't sit around and

6    say at the table and say hey, let's commit a massive fraud

7    today.  Hugh Dunkerley wasn't told that.  Or put in an email,

8    hey, Archer, I need you to help me make interest payments on

9    the bond proceeds we misappropriated.  People don't say that.

10   These guys are not stupid.

11          As I said, this is a case primarily about what is in

12   the defendants' heads, what they knew and what they intended,

13   and I expect Judge Abrams will instruct you that many material

14   facts such as what a person was thinking or intending can

15   rarely be proved by direct evidence.

16          She will also tell you that circumstantial evidence is

17   as valuable as direct evidence, and the reasons for that are

18   really really clear.  You make all kinds of decisions every day

19   based on circumstantial evidence.  We don't see things

20   ourselves, but we draw inferences and the logical inferences

21   from the information around you.  I expect the Judge will give

22   you an example in a few minutes about a raincoat and umbrella,

23   okay?

24          You have to use circumstantial evidence regarding the

25   defendants' lies about the bonds and about each other and

I6RJGAL4                    Rebuttal - Mr. Quigley

1    they're involved in transactions that make no sense.  See how

2    it all fits together, and you come to the conclusion the

3    defendants knew they were part of a massive fraud, which nobody

4    disputes happened, and they tried to make it succeed.

5              Now, another way a piece of evidence in this case,

6    another way the defendants knew what was going on was their

7    lies.  Yesterday Mr. Schwartz and today Ms. Notari made a big

8    deal of trying to dissect each one of these lies, and as I

9    said, it is not the individual lies in isolation that matter.

10   Take a look at the pattern, a pattern of lies over a period of

11   months and, indeed, in some cases with the BIT Board over a

12   period of years about the bonds and about Jason Galanis.

13             That is critical evidence to the defendants' knowledge

14   and intent in this case, all right?  Mr. Schwartz knows that

15   because he told you that the BIT Board had nothing to do with

16   the WLCC bonds, but he spent a significant part of his closing

17   trying to get around this evidence because it is devastating

18   because what it says about Archer's relationship with Jason

19   Galanis, what Archer knew about Galanis' past are red flags

20   that had been raised about Galanis during the time period when

21   Archer was engaging in these bond transactions.

22             Now, Mr. Schwartz said yesterday that Archer told the

23   BIT Board that Galanis operated as a consultant.  Remember that

24   wasn't good enough for the BIT Board.  They wanted no

25   involvement, very broad, put in the broadest language possible.

I6RJGAL4                    Rebuttal - Mr. Quigley

1    It can't be with any affiliated persons.  Mary Moynihan told

2    you that.  The bottom line is in September and October of 2014,

3    the critical time period of this conspiracy, remember the first

4    bond issuance happens at the end of August, the second bond

5    issuance happens the beginning of October, Archer is talking

6    out of both of his sides of his mouth to the BIT Board about

7    Jason Galanis.

8           So here is an example, Government Exhibit 760.  This

9    is the September 5, 2014 letter.  He says Mr. Galanis will not

10   be associating in any type of transactions with the Burnham

11   Group or any member thereof.  There is three days later, the

12   placement agreement for the second bond issuance.  Devon Archer

13   is listed on that document as the buyer.  Who is listed as the

14   representative of the Burnham Group?  Look at the one in the

15   middle.  Jason Galanis, all right?

16          He is talking out of both sides of his mouth.  Here is

17   the September 26 letter to the BIT Board.  Now, Mr. Schwartz

18   focused on part of this letter yesterday.  He focused on the

19   part that said in the sentence beginning on the second page,

20   for avoidance of doubt, ellipses, ellipses.  Look at the first

21   part of the letter, the part he didn't address.  You provided

22   us with assurances regarding nonparticipation of Mr. Jason

23   Galanis.  We believe that you understand our views on the

24   subject.  That is, we wanted an ironclad assurance that going

25   forward, he will not be involved in any of the Burnham entities

1    and affiliated persons, not be involved, not -- can't just have

2    an ownership interest, not be involved.  That is what they

3    wanted.

4              How did he answer it?  Confirmed.

5              What is he doing at this exact same time?  Well after

6    he repeats this confirmation in person, five days later, on

7    October 1, 2014, what is he doing the same day, the same

8    morning?  He is buying Wakpamni bonds in a deal that Jason

9    Galanis put together, all right?  These are two emails with

10   Morgan Stanley, but this is the day he closed on the second

11   tranche of bonds.  He is talking out of both sides of his

12   mouth.

13             Mr. Schwartz yesterday tried to say he focused on the

14   language about sourcing deals and said okay, he didn't really

15   source any deals after that.  Guess what?  That is wrong, too,

16   okay, because he did source deals, Galanis did to Burnham.

17             One of the most obvious one is the final tranche of

18   Wakpamni bonds that happened six months after this, in April of

19   2015.  Remember they bought Atlantic Asset Management, Galanis,

20   there is an email where he tells Archer about buying Atlantic

21   Asset Management.  They buy it, and in two weeks Atlantic, lo

22   and behold, purchases $60 million in Wakpamni bonds that OSERS,

23   the Nebraska school teachers, Mike Smith didn't want it, didn't

24   know they wanted to buy it, don't want it in their account.

25             Burnham sourced that deal.  Jason Galanis sourced that

I6RJGAL4                     Rebuttal - Mr. Quigley

1    deal.  Mr. Schwartz said that he was well under way in October

2    of 2014.  It wasn't well under way.  They didn't own Atlantic

3    Asset Management.  How could it be well under way when he

4    didn't own the company that ended up buying the bonds?  It

5    wasn't well under way, a clear violation of the

6    representations.

7            This is the private placement memorandum.  As an

8    aside, the private placement memorandum for the third bond

9    issuance to -- Mr. Schwartz and Ms. Notari talked about this

10   document.  By the way, it is clear Burnham Securities is the

11   entity putting together this third bond issuance, right?  But

12   the defendants tried to say that hey, this shows we were okay

13   because there is some discussion here about conflicts of

14   interest and disclosures.  There are a couple of problems with

15   that argument.

16           For one, this document was only for the third and

17   final issuance, not put out for the first issuance.  Moreover,

18   there is no evidence that it got sent to investors.  Remember

19   there was testimony about Tim Anderson about this was in draft

20   form.  There is no evidence that Archer and Cooney ever saw

21   this document, so any disclosures that were in there, there was

22   no reason to be aware or have notice of, to think those things

23   were being disclosed.

24           Let's talk about how else Jason Galanis continued to

25   be involved with Burnham after October 1, 2014.  This is

I6RJGAL4                    Rebuttal - Mr. Quigley

1    defense exhibit, one of their favorites, it is the Teneo

2    presentation, okay?  This shows a couple of things, but one of

3    them, the second guy on the email, this is from July 18, 2015,

4    who is No. 2 on the email right after Devon Archer, Jason at

5    Burnham Equity Partners dot com.  That is Jason Galanis' email

6    address.  You see a ton of emails in this case where he uses

7    that address, where it is clearly him, Government Exhibit 2074,

8    2079, 2099, to name a few.

9             So nine months after the representations to the BIT

10   Board, Devon Archer is well aware Jason Galanis is still using

11   the Burnham email address and this presentation is about

12   Burnham.  It is all about Burnham.  So let's put the BIT Board

13   to the side for a second, and I want to talk about this

14   presentation.

15            Yesterday Mr. Schwartz made the point that no one --

16   this shows Devon Archer's good faith because no one in involved

17   in this, was submitted to this presentation, would have put

18   together this presentation, would have been involved in a

19   fraud.  That is just plain wrong because look who else is on

20   this email?  Jason Galanis, he is a fraudster.  Hugh Dunkerley,

21   no dispute he is a fraudster.

22            This was part of their plan.  This was how they were

23   going to get the payoff.  This was the whole point of the

24   Wakpamni bonds.  Use the bonds, and there is an email, this is

25   a very revealing email from a few months before this.  Galanis'

I6RJGAL4                    Rebuttal - Mr. Quigley

1    plan, the rest of the plan, with scale, scale, scale, at first

2    appearance of scale, and then actual scale deriving from that

3    send to his two partners, Archer and Cooney.

4           That is Government Exhibit 2069.  The Teneo

5    presentation is an example of an effort to create appearance of

6    scale.  Now, we'll provide -- they used the bonds to do that.

7    This is Page 4 of the Teneo presentation.  Remember I talked

8    about this with Mr. Dunkerley on his redirect, and the

9    important area of this presentation, right, is only from

10   Burnham down to Bonwick Capital because the stuff on the left,

11   right, the Burnham Legacy from Moellis down to Apollo, that is

12   all stuff Mr. Dunkerley testified from Drexel Burnham Lambert

13   in the 1980's that had nothing to do with the roll-up plan.

14          Everything from Gero Bank and to whatever, Apollo,

15   okay, those are planned acquisitions that never happened

16   because the whole thing fell apart.  The only entities that

17   matter are Burnham, Barrow Life, Atlantic Asset Management,

18   Fondinvest and Bonwick Capital.  You know all about how Burnham

19   was involved in the bonds.  They were the placement agent, and

20   Archer used his bonds to help Burnham meet their net capital

21   requirements.  You heard about that from the FINRA witness

22   again to try to help them stay in business.  FINRA eventually

23   said you can't count them.  They tried to count them and they

24   tried to count them for many months.

25          Valor Life was purchased with bond proceeds.  Remember

I6RJGAL4                       Rebuttal - Mr. Quigley

we saw the big payment used buy to Valor Life.  Atlantic Asset
Management I talked about used to buy without the knowledge of
Omaha school teachers, the entirety, $16 million of the final
tranche of the Wakpamni bonds.

        Fundinvest, 512, Dunkerley told you about it a week
after that $60 million comes in, $5 million or $66 million goes
out in the bonds provided to buy Fondinvest.  Fundinvest was
purchased with bond proceeds.

        Bonwick Capital, again Cooney's bonds were used to
keep Bonwick Capital in business to try to help it meet its
FINRA net capital requirements.  For the entities that actually
matter, the bonds play a critical part of the roll-up plan.

        The slide shows actually how integral, AAA, how
critical the bonds were to the roll-up plan.  It also shows
what Devon Archer hoped to get out of this.  This is his
motive, to roll up all these companies with the help the bonds
and to sell them and give a big payday, a big payday by
creating an appearance of scale in large measure through the
WLCC bonds.

        So let's shift back to the BIT Board for one second.
Now, you heard about Mr. Archer said after Jason Galanis'
arrest in September of 2015, Mr. Archer met with the BIT Board
again and again and again to try to make things right.  I guess
Mr. Schwartz would say that was literally true because you know
he met with them a total of three times.  There were a number

I6RJGAL4                    Rebuttal - Mr. Quigley

of toasts and misrepresentations in those meetings, and I won't

address them all now.

        Let's talk about one, the final meeting, February

2016.  Ms. Moynihan asked Mr. Archer if he had any involvement

with any of the events in SEC complaints against Atlantic.  How

did Archer respond?  No, no involvement whatsoever, no

involvement whatsoever.

        And we don't deny he wasn't one of the people named in

the complaint.  When he was asked point blank, no involvement

whatsoever.  That was a lie, okay?  Because you know that he

was involved in the first bond issuance.  Remember the Atlantic

complaint deal with the first bond issuance and third bond

issue?  Hugh Dunkerley testified that Archer was part of the

investment committee at Burnham that approved Burnham's

involvement in that issuance.

        This email, Government Exhibit 2218, supports that.

There is right before the bonds are issued, he is getting

forwarding information about the bonds, getting forwarded

information from the commitment committee memo and all kinds of

information in connection with the investment committee.

        The involvement in the third bond issuance, he was

involved in that one, too.  Government Exhibit 2078, right.

This is an email from, about -- this is August -- April 14th,

2015, the day before Atlantic put $60 million into the OSERS

account, the global yield opportunity fund.  What is this email

I6RJGAL4                    Rebuttal - Mr. Quigley

1    about?  The Atlantic Global Yield Opportunity Fund, okay?

2              And Devon Archer is asking how do we get ahead of

3    Jason Galanis in the email?  How do we get ahead of Don

4    Trotter?  There was testimony Don Trotter was an employee of

5    Atlantic.  He lives in Nebraska.  Daniel Turney talked about

6    that.  How do we get ahead?  We just was a head of this

7    company.  How do we get ahead of these new guys, and Galanis

8    responds, looks like the plan is winning hearts and minds, is

9    based in Connecticut.  Atlantic is based in Connecticut, yet he

10   is not sure what floats the boat of the Conecticut guys.

11             The next day, Atlantic purchases those bonds on behalf

12   of Galanis and behalf of Archer and are used in furtherance of

13   the roll-up plan.  No involvement whatsoever?  I don't think

14   so.

15             So let's talk about the lies to the banks.  Mr.

16   Schwartz made an argument yesterday that these lies cannot be

17   considered in connection with the purchase or sale of a

18   security.  I want to be clear about one thing regarding this

19   evidence.  The defendants are charged in Count 2 with, among

20   other things, participating in a scheme to defraud related to

21   the Wakpamni bonds.  I expect Judge Abrams will instruct you

22   the Wakpamni bonds are a security within the meaning of the

23   law.  The defendant's lies are smack dab in the middle of this

24   scheme about these bonds, provide powerful evidence of their

25   knowledge and intent.  Remember we are talking a October 2014,

I6RJGAL4                    Rebuttal - Mr. Quigley

1    snack dab in the middle of the scheme, and the first and second

2    bond issuance, before the third bond issuance.

3              So let's talk about the statements to Morgan Stanley

4    right here in Manhattan.  Now, Mr. Schwartz, Government Exhibit

5    2053, right?  This is the one where he is asked, Devon Archer

6    is asked who is to buy in more detail how -- (inaudible) --

7    this issuance an how is the 15 million, the 15 million in bonds

8    that Archer bought with money from Jason Galanis and ultimately

9    from the bond proceeds.  How is the 15 million generated that

10   was used to purchase the bonds?  He says it was generated

11   through the purchase of real estate.

12             Mr. Schwartz tried to twist and turn all around to try

13   to explain how this meant something other than what it means.

14   How is the money generated?  It means where did he get this

15   money.  There is no evidence that Archer had a reasonable

16   belief -- first of all, the fact the money came from real

17   estate is just a lie.  At best, it is incorrect.  There is no

18   evidence to support the argument that Jason Galanis -- Devon

19   Archer had any reasonable belief that this money actually came

20   from some real estate deal involving Jason Galanis.

21             Remember Jason Galanis did not have 15 or $20 million

22   worth of cash this time, and the best Mr. Schwartz can do is

23   point to some emails from 10 months, 11 months prior to this in

24   2013 and 2014 that simply referred to a real estate in general,

25   to a circular about a real estate investment, that is like

I6RJGAL4                         Rebuttal - Mr. Quigley

1    something you get as junk mail, and to some testimony that once

2    upon a time Galanis was involved with a hotel in Miami.

3             Ladies and gentlemen, the case has literally of

4    hundreds if not thousands of documents.  If there was some

5    evidence supporting the idea Jason Galanis was involved in a

6    legitimate trial estate transaction, or support Mr. Archer's

7    belief in that, do you think you would have seen it?

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6R7GAL5                         Rebuttal - Mr. Quigley

1

2          MR. QUIGLEY:  And another way you know this e-mail is

3     false is the answer to the first question.  Right?  It says who

4     is providing the detail into how you came to know of the

5     issues?  He says Burnham Financial packaged the deal of which I

6     am a shareholder.  Yeah, OK, right, Burnham was on the

7     placement documents, but Hugh Dunkerley testified he didn't

8     talk to Devon Archer about this deal.  He was, in theory, the

9     lead investment banker at Burnham.  This was Jason Galanis

10    calling Archer up.  Right?  This was not -- there was no formal

11    involvement at Burnham Financial in packaging the issuance;

12    this was Jason Galanis.  And Archer is hiding that here; that's

13    what he is doing in this e-mail.

14         And that's just -- that's just 2053.  Remember, there

15    is the other e-mail that's more detailed from Catharine

16    Driever, where it says Devon Archer a shareholder of Burnham

17    Financial, Burnham Financial packaged the issuance for the

18    Wakpamni bonds, some of the bankers at Burnham came to Devon

19    with the bonds and he agreed to purchase them.  The funds to

20    purchase the bonds were from real estate sales through his

21    business, Rosemont Seneca Bohai.

22         And that is completely false.  And their response to

23    that is, well, Catharine Driever doesn't remember a telephone

24    conversation she had four years ago.  And that's right, she

25    doesn't.  But she also testified that it was not her practice

to write things down unless a client actually told them to her.
She says in this e-mail just got the following from the client.
It's here that 344 in the upper left-hand corner is her prior
e-mail, and it's clear she got the issue information about
Flikmedia in the interim, so it's clear she talked to the
client between these two e-mails.

But there is something else, there is another e-mail
that Mr. Schwartz didn't show you yesterday, and that's
Government Exhibit 1226.  It's an e-mail from a couple days
later between Mr. Archer and a guy named John Tonzola at
Deutsche Bank.  And Mr. Tonzola asked a slightly different
question:  How did the entity come to own these bonds?  Again,
real estate sale.  No evidence that Mr. Archer was involved in
any real estate sale at this time.  The evidence is that the
bonds came from Jason Galanis.  This is also completely false.
He doubles down on the lie, that is critical evidence of his
intent.  Mr. Schwartz again completely ignored this e-mail.

So, why the lies about these bonds?  Why the lies by
Jason Galanis with the BIT board the same day he was buying the
bonds?  Because Devon Archer knew he was in the fraud, because
he knew real answers would not have allowed him to deposit
those bonds at Morgan Stanley or Deutsche Bank.  So, that's Mr.
Archer.

Now, Bevan Cooney lied too.  Ms. Notari talked a lot
about this this morning.  Again, I would argue that the reason

I6R7GAL5                         Rebuttal - Mr. Quigley

1    she spent so much time on it is because she knows it's pretty

2    bad evidence for her client in terms of his knowledge and

3    intent.

4            So, remember Cooney got a wire from Thorsdale --

5    sorry -- from Wealth Assurance for $3.8 million on November 12,

6    2014.  That's bond proceeds.  OK?  Then he sends it to Camden

7    Escrow.

8            So back up two slides.  And he gets asked:  What's

9    that wire for?  And he says:  It's to open an escrow for a real

10   estate purchase.  Remember, you saw the escrow documents, some

11   of the documents this morning from Ms. Notari.  He is

12   purporting to buy 1920 Bel Air, Jason Galanis' home.  He was

13   not buying a home that Jason Galanis lived in with money from

14   Jason Galanis.  That is not what happened.  And Ms. Notari this

15   morning said, oh, maybe it was a loan, maybe it was a refi.

16           Here is Mr. Cooney.  This is not Hugh Dunkerley.  It's

17   not Jason Galanis.  This is defendant Cooney; it's for a real

18   estate purchase.

19           And then later on what does he say about the same $3.8

20   million?  He said he asked his assistants please send me the

21   wire info on the $3.9 million that came into my account and

22   went out to Camden Escrow for the down payment on 1920 Bel Air.

23   Not for a loan, not for a refi.  This was a transaction

24   designed to conceal the fact that bond proceeds were being

25   used, were being misappropriated, were being recycled.  And

1    Bevan Cooney was in the middle of it and he lied about it.

2            And, you know, Ms. Notari put up this e-mail.  This is

3    one of the e-mails she put up this morning as evidence of

4    Cooney's supposed good faith with respect to this transaction.

5            So, this is from later on, and he says in February of

6    2016 -- almost a year and a half after the deal -- he says

7    Vanessa, I found this in my file for taxes for last year -- it

8    sound extremely plausible -- Thorsdale loaned me the money for

9    a short period of time.  It was a failed real estate

10   transaction.  That was the part Ms. Notari was really focused

11   on.  The attachment is a document dated January 2015 from

12   Calvert, purporting that Calvert was involved in this

13   transaction, Calvert was the lender.

14           You guys know full well by now Calvert is a fake

15   company that didn't exist until ten months after this January

16   17, 2015 letter was supposedly written.  And Ms. Notari tried

17   to say -- we will talk more about Calvert in a few minutes --

18   but Ms. Notari tried to say that Hugh Dunkerley testified that

19   the only people who knew about Calvert were him, Gary Hirst and

20   Jason Galanis.  And that's just wrong.  You just have to look

21   at the transcript to figure that out.  Because what Hugh

22   Dunkerley said he was the only person he spoke to -- he spoke

23   to -- about Calvert were Hirst and Galanis.

24           Francisco Martin knew Calvert was fake; he knew all

25   about it; he created it.  Hugh Dunkerley never spoke to him

I6R7GAL5                    Rebuttal - Mr. Quigley

1    about Calvert.  OK?  Just because Hugh Dunkerley only spoke to

2    Calvert -- about the certainty of Calvert -- doesn't mean --

3              MR. SCHWARTZ:  Objection.  Misstates the testimony.

4              THE COURT:  -- doesn't mean other people knew that

5    Calvert was fake.

6              MR. SCHWARTZ:  It misstates the testimony.

7              THE COURT:  Ladies and gentlemen, it's going to be up

8    to you to determine whether the lawyers' arguments are true to

9    the record.  And, again, you will be permitted to request any

10   testimony that you'd like read back.

11             So, I'm going to overrule the objection with that

12   instruction.

13             MR. SCHWARTZ:  Thank you.

14             MR. QUIGLEY:  Now he also lied to City National Bank.

15   Again, I'm not going to spend a lot of time on this.  But

16   remember he used the bonds to get a $1.2 million loan from City

17   National Bank; he used the bonds as capital.  All right?

18             Now, the idea here, the defense argument here is that,

19   well, City National really knew he didn't have the bonds

20   because sometime prior to that they put a medallion on his bond

21   certificate so he could transfer it to Bonwick -- which, as

22   we've said before was for net capital to keep Bonwick in

23   business.  All right?

24             Now, this was the testimony of Steve Shapiro, and he

25   says basically Mr. Cooney lied to my face, because the

I6R7GAL5                    Rebuttal - Mr. Quigley

1    medallion does not say or does not say the name of the bond; it

2    just has the CUSIP, the serial number.  And he meets with Steve

3    Shapiro -- Cooney meets with Steve Shapiro, and he says we're

4    looking to do a $1.2 million loan for you.  This is the same

5    day he's getting the bonds' medallion.  Cooney agreed.  I said

6    we're looking at using the Code Rebel stock as the primary

7    source of repayment.  OK.  Then he says: Is that OK?  Yes.

8    And I said:  If something goes wrong with that particular

9    stock, you're going to liquidate the $5 million muni bond, the

10   Wakpamni bond that you hold?  Is that correct as well?  And he

11   acknowledged in the affirmative as well.

12         So right at the same time that Cooney unbeknownst to

13   Steve Shapiro is getting Steve Shapiro to transfer his bond out

14   of City National he is telling him that, yeah, if this loan

15   goes south I will use the Wakpamni bond to repay it.  That's a

16   lie.

17         And again Ms. Notari said this morning that the loan,

18   the $1.2 million loan, was based only on Code Rebel?  That's

19   Shapiro's testimony.  The issuance of the loan was based -- the

20   loan was based both on the Code Rebel shares and the Wakpamni

21   bonds, that is correct.

22         All right.  Real quickly, it's clear that Steve

23   Shapiro understood that the Wakpamni bonds -- or believed

24   falsely, given Mr. Cooney's misstatements -- that the Wakpamni

25   bonds were still in his possession after this time.  All right?

1          Here is Government Exhibit 440; you can look at it in

2    the jury room.  He is asking about -- remember, they're trying

3    to repay the loan.  He says can we resell the muni bonds?  All

4    right?  He don't know that the muni bonds have long since

5    dissipated from Mr. Cooney's account.

6          And just to prove that Mr. Cooney was still pretending

7    to own the Wakpamni bonds, even though he had long since given

8    them up, this was an exhibit that was introduced this morning

9    of supposedly his good balance sheet.  All right?  Still

10   listing the Wakpamni bonds on his balance sheet as of February

11   2016.

12         So, let's talk about -- that's the lies to the banks.

13         By the way, Ms. Notari accused us of some bad faith

14   here, not putting documents in evidence.  All right?  She said

15   we hid the ball, we didn't put in Defense Exhibit 3735, which

16   she claimed somehow helped her client.  There is a signed

17   version of that in evidence as a Government exhibit.

18         MS. NOTARI:  Objection.  Misstates what I said.

19         MR. QUIGLEY:  It's a different document, your Honor.

20         THE COURT:  All right.  Overruled.  The same

21   instruction I gave you a few minutes ago.

22         MR. QUIGLEY:  Government Exhibit 414 at page 4,

23   already in evidence.  So that's wrong.

24         Let's talk about Calvert.  Now, again both defense

25   counsel -- and particularly Ms. Notari -- took the government

I6R7GAL5                         Rebuttal - Mr. Quigley

1    to task for this.  This is bad evidence for them.  She said

2    people do not create false documents; they create them with the

3    intent to pass them to other people.  Well, guess who defendant

4    Cooney passed false documents to.  He passed false documents in

5    this case to the Securities and Exchange Commission, the SEC,

6    and that fact is undisputed.  Right?

7            Here is Government Exhibit 1271.  This is a secured

8    loan agreement supposedly dated from the 2nd of October, 2014,

9    a year before Calvert even existed, and it's signed by Bevan

10   Cooney.  Signed by Bevan Cooney.

11           And there is a stipulation that this exhibit:

12   Government Exhibit 1271 are true and accurate copies of

13   documents produced by to the SEC by Bevan Cooney.

14           And Ms. Notari gets up here and criticizes Hugh

15   Dunkerley for his creating false documents?  But her client

16   submitted this false Calvert document to the SEC.  It's

17   powerful evidence that he knew -- and this relates to the

18   bonds -- powerful evidence that he knew that this bond

19   transaction, these bond proceeds, these bonds were a fraud,

20   because he needed to cover it up.

21           He also submitted Calvert documents to City National,

22   he submitted the same backdated Calvert document, dated again

23   October 2, 2014, a year before Calvert even existed, to City

24   National on February 28, 2016 as a secured loan agreement for

25   the bonds.  There is no way he signed this document in 2014.

1   Calvert didn't exist in 2014.

2          Now, Devon Archer was a little bit smarter with

3   respect to Calvert.  All right?  This is an e-mail that

4   Mr. Schwartz talked about yesterday.  But he says -- this is

5   November 2015 -- these bonds are to be replaced and returned to

6   Calvert; I wanted to share the below.  This is 2015.  He is

7   talking about the Wakpamni bonds that he bought a year earlier.

8   Calvert did not exist before October 2015.  Devon Archer bought

9   these bonds himself in October 2014.  He knows that.  You know

10  that.  And why is he talking about returning the bonds to

11  Calvert?  All right?  He says the lender and beneficial owner.

12  Right?  Calvert was not the lender and beneficial owner of the

13  bonds.  It didn't exist when he bought the bonds.  He knows

14  that.  And Mr. Schwartz' only response to this is to criticize

15  the government.  Yet he wasn't as brazen as Cooney about it,

16  but he tried to use Calvert too to get rid of the bonds and to

17  cover up.  Remember, this is during the time period when

18  subpoenas start flying.

19         Mr. Schwartz talked yesterday a lot about how, hey,

20  you know, the government didn't interview certain witnesses

21  until a few weeks before trial.  There is abundant evidence

22  that this investigation began in 2015 -- late 2015 -- when

23  people started getting subpoenas and people started covering

24  things up and started using entities like Calvert, and Archer

25  and Cooney were part of it.

I6R7GAL5                      Rebuttal - Mr. Quigley

1          Let's shift topics for a second and talk about Hugh

2     Dunkerley.  OK?  So there is a lot of testimony Hugh Dunkerley

3     didn't know this, Hugh Dunkerley didn't know that, and that's

4     right, but it doesn't help the defendants.  OK?  Because I

5     expect Judge Abrams will instruct you it is not necessary for

6     the government to show that a defendant was fully informed as

7     to all details of the conspiracy in order for you to infer

8     knowledge and intent on his part.  To have guilty knowledge, a

9     defendant need not have known the full extent of the

10    conspiracy, or all of the activities of all of the conspiracy's

11    participants.  And that's some more law.  The duration and

12    extent of a defendant's participation has no bearing on the

13    issue of that defendant's guilt.  Conspirators can perform

14    separate and distinct acts.

15         And Hugh Dunkerley got on the witness stand, and even

16    though he may not have understood everything, even though Jason

17    Galanis in August 2014, did he ever tell him, hey, we're

18    stealing the bond proceeds?  No, he never told him that because

19    that's not the way it works in the real world; people don't

20    tell each other explicitly they're committing a fraud.

21         Even though he might not have been fully informed

22    about every detail of the conspiracy and the scheme, he is

23    still guilty.  And this law applies to these defendants as

24    well.

25         I said earlier when I was talking about how Jason

I6R7GAL5                      Rebuttal - Mr. Quigley

1    Galanis never met the WLCC, never met the pension funds, in a

2    big conspiracy case like this one, different defendants play

3    different roles.

4              Let's also talk about Tim Anderson for a second.

5    There is a lot of talk about Tim Anderson about how his

6    involvement is evidence that shows the defendants' good faith.

7    OK?

8              To be sure, Tim Anderson was involved in this

9    transaction, right, and he was the lawyer, he was the lead

10   lawyer, and he didn't see anything wrong.  But there was a lot

11   he didn't know.  OK?  There is a lot he didn't know, that these

12   defendants -- and particularly Archer and Cooney knew -- john

13   Galanis knew also -- what if anything was your understanding of

14   Burnham Securities' relationship with Hughes Capital Management

15   at the time?  They had a working relationship.

16             You know that Jason Galanis was intimately involved in

17   both Burnham's placement of the bonds and he took over through

18   Michelle Morton Hughes Capital at this time.  They had a common

19   ownership.  OK?  Burnham didn't identify Hughes Capital

20   Management as an advisor who advises funds.  The same people

21   who were controlling Burnham from behind the scenes took over

22   Hughes Capital Management.

23             Now he also spoke to Yanni Galanis.

24   "Q.  Now, at this time in August of 2014, had you heard of an

25   entity called Sovereign Nations Development Corporation?"

1          Remember this was the entity that Yanni Galanis put

2     $2.3 million into, right?

3     "A.  Never heard of it.

4     "Q.  Did Yanni Galanis mention it to you at that time?

5     "A.  No.

6     "Q.  Or ever?

7     "A.  No.

8          Did he know about how Archer -- he knew Archer and

9     Cooney eventually bought the second issuance.  Did he know how

10    they got involved in it?  It was a Burnham client, he was

11    excited it occurred with the first bond issue, he wanted to be

12    supportive.

13         Did he know that money was coming from Jason Galanis,

14    the money he was using was coming from Jason Galanis?  Did he

15    know the money that they were using was coming from the

16    proceeds of the first issuance?  Of course not.

17    "Q.  At the time did you have any understanding of where Devon

18    Archer obtained the $15 million to obtain the second issuance

19    of the bonds?

20    "A.  No.

21         Third issuance:

22    "Q.  Did you have any understanding of who would be the

23    investor or investors in this series of bonds?

24    "A.  Atlantic Asset Management.

25    "Q.  At the time did you have any understanding of who owned

1    Atlantic Asset Management?

2    "A.   I did not."

3         But you do.  And these defendants do.  They knew that

4    two weeks before Atlantic purchased the third tranche of bonds

5    Jason Galanis, Devon Archer had bought them.  Right?  There is

6    an e-mail on April 2 where they congratulate each other about

7    buying Burnham.  Valor will formally provide the money, but

8    these defendants and their partners in crime were in control of

9    that company.  You saw that in the full preppy assault on the

10   Connecticut e-mail a few minutes ago.

11        So Tim Anderson, his view is of limited value because

12   he didn't know the key facts.  Nobody came to him and said,

13   hey, Tim, it's a massive fraud, so of course he thought it was

14   legal.

15        And the other thing is -- this is related -- garbage

16   in, garbage out.  Who is Tim Anderson getting his information

17   from?  He is getting it from John and Jason Galanis.  Do you

18   think they're telling him that they're going to steal the

19   proceeds?  That's ridiculous.  He said Jason and Yanni told him

20   at the end of July that the buyer wasn't quite there yet.  This

21   is for the first tranche.  Do you know what that means?  They

22   want bought Hughes yet; they were waiting to close the Hughes

23   transaction so they could shove all those $28 million of bonds

24   into Hughes.  He's being lied to.  Yanni told him WAPC was a

25   BVI subsidiary of Wealth Assurance.  That's false too.  Garbage

I6R7GAL5                    Rebuttal - Mr. Quigley

1    in, garbage out.

2            Now, shifting topics.  You heard a bunch of arguments

3    about how certain defendants have more involved than others,

4    and as we alluded to in our main summation it doesn't matter;

5    you should reject that argument.  But it does bring up the fact

6    that with respect to the substantive count, Count Two, a

7    defendant can be found guilty as a principal who committed the

8    crime of securities fraud, or alternatively can be found guilty

9    of something called aiding and abetting if they helped someone

10   else commit the crime or willfully caused the crime.

11           And I'm not going to go through the law here, because

12   you're hear it from Judge Abrams in a few minutes, but just I

13   alert you to that portion of the charge, that there are

14   multiple ways to be found guilty of Count Two.

15           Mr. Schwartz talked yesterday -- and Ms. Notari a

16   little bit this morning -- about discretionary and how it's

17   used by these defendants.  OK, said it meant assets under

18   management.  These defendants know in the context of this case

19   one thing it certainly meant was money they could use on

20   themselves and as their own interests.  And discretionary that

21   money was provided via the Wakpamni bonds.

22           The Government Exhibit 2021 is a perfect example,

23   Archer, Cooney and Galanis are talking about Fondinvest, which

24   they eventually bought using Wakpamni bonds, and Archer says we

25   have discretionary funds in our command soonest.

1        Galanis says I'm laser focused on summer cash hole and
2   discretionary.  I don't need anymore deals until we can pull
3   triggers ourselves.
4        And how did they get discretionary to buy Fondinvest?
5   Six months later, on April 2015, they issued the third tranche
6   of bonds and turned around and used that money to buy
7   Fondinvest.  Look at Exhibit 512, the WAPC bank records.  You
8   see the 16 million coming in, and you see it go right back out
9   around and out to a company called New Line Trading, which
10  Dunkerley testified was a special purpose vehicle used to buy
11  Fondinvest.
12       Now, Mr. Schwartz yesterday -- and Miss Notari this
13  morning -- and even Mr. Touger a little bit -- took a bunch of
14  potshots at the government's investigation.  I'm not going to
15  go tit for tat here.  We're not focused on hamburger patties,
16  or Marisa Tomei movies, or The Blair Witch Project.  We are
17  focused on the evidence in the case.  But I want to respond to
18  this just briefly.  All right?  And I already talked about the
19  documents, how this is a document case, and you know the
20  government's investigation was well under way even in late
21  2015.
22       Mr. Schwartz also continued to take some potshots
23  about Agent Kendall, particularly about the $903,000 transfer
24  credit for the second bond issuance interest payments on the
25  summary charts that goes in through Rosemont Seneca Bohai.  He

I6R7GAL5                        Rebuttal - Mr. Quigley

1  said, oh, that was horrible.

2          Guess what, the money went into Rosemont Seneca Bohai.

3  The transaction was reversed at Morgan Stanley.  Do you know

4  how you know that?  Mr. Schwartz's own witness, Mr. Fliegler,

5  the consultant from Duff & Meyers testified about that.  And

6  his chart shows that $903,000 going into Rosemont Seneca Bohai.

7  It was internally reversed at Morgan Stanley.  There is nothing

8  inappropriate about that.  It was there for 11 days, from

9  October 1st to October 12th.  There is nothing inappropriate in

10  a chart about showing where the money actually went and when it

11  went there.  That's a ridiculous and low thing for Mr. Schwartz

12  to do, particularly since it's consistent with what his own

13  witness said.

14          Now, another argument Mr. Schwartz made was that Mr.

15  Archer was used and didn't get anything out of this.  And

16  that's irrelevant and ridiculous for a couple of reasons.

17  Number one, Mr. Archer was well aware that Jason Galanis wanted

18  to use his profile to his advantage.

19          Here is Government Exhibit 2211.  With Archer's new

20  enterprise -- this is an e-mail that Mr. Archer was on --

21  having full control over this platform, will lead to us world

22  domination on p/e trades we are looking to do.  Aligns the

23  media and political stature Mr. Archer now enjoys with the

24  financial stature.  Add the golden smile, and we could be

25  massively effective.  Mr. Archer is well aware of what Jason

1    Galanis wants him for, and he continues to do business.  This

2    June 2014, this is early in their relationship; they continue

3    to do business for another 15 months until Jason Galanis'

4    arrest.  All right?

5         Another one.  We saw this one already.  But, hey,

6    we're going to use Devon's cache to buy an apartment.  Again,

7    Mr. Archer is cc'd on the e-mail.  No secret that Jason Galanis

8    is using his cache and frankly his office.  He says -- Cliff

9    Wolff says, look out, you might be getting some mail from this

10   company.

11        Here is another one.  Again this one is actually in

12   connection with the bonds.  June 2014.  Jason Galanis, Devon

13   Archer and Bevan Cooney.  Archer, the Indians signed ours our

14   engagement.  Here is our counsel from Greenberg.  May be good

15   for GT to know that you are associated with the insurance

16   company at the right moment.  Not necessary but it might be

17   icing on the cake.  Flash that golden smile.  That's what he's

18   saying, flash those credentials.  That is one thing Jason

19   Galanis saw in Devon Archer, but it's not a defense, because

20   Devon Archer was well aware of it; he knew this was how he

21   being used, and he hoped to make out with a big pay day

22   eventually.

23        And you know this is what he expected to get out of

24   the bonds, a huge pay off from the sale of Burnham.  He talked

25   about the presentation.  And he was making money already.  This

1      got conveniently got left off their chart from their summary

2      witness.  This is the last exhibit the government put in,

3      Wealth Assurance Holdings company -- which Jason Galanis was an

4      advisor -- a company in which all the key players in this case

5      were involved in -- Dunkerley, Galanis, Jason Sugarman -- he

6      gets put on the board of directors of that company and gets

7      $5.3 --

8              MR. TOUGER:  I'm going to object to what Galanis did

9      without designation.

10             MR. QUIGLEY:  Sorry, I will correct that.

11             Jason Galanis is an advisor, and the board of

12     directors is Devon Archer, Hugh Dunkerley and Jason Sugarman.

13     Dunkerley testified about that.

14             His stock is worth $5.3 million.  You're telling me he

15     didn't expect to get anything out of this?  He did it for free?

16     Yeah, it all came crumbling down, but he certainly expected to

17     make a lot of money out of the sale of these companies and out

18     of his involvement with these companies.

19             And, you know, Mr. Schwartz talked yesterday about how

20     it was implausible -- implausible -- that he would be involved

21     in a fraud because he wouldn't loot Wealth Assurance Holdings,

22     a company that he was a director of.

23             He has it backwards.  He wasn't looting Wealth

24     Assurance Holdings; he was involved in looting the pension

25     funds and the Wakpamni people to get money to build up Wealth

I6R7GAL5                         Rebuttal - Mr. Quigley

1    Assurance Holdings.  That was the purpose of the fraud, to

2    build up Burnham and Wealth Assurance Holdings.  That's what

3    they did, as you saw in the Teneo presentation.  So he wasn't

4    involved in looting the company he was the director of.  The

5    fraud here involved looting other people, the victims of the

6    scheme.

7             MR. SCHWARTZ:  Your Honor, that misstates my argument.

8    My argument was that the Ballybunion and Valorlife frauds

9    looted the company.

10            THE COURT:  The objection is noted.

11            MR. SCHWARTZ:  Thank you.

12            MR. QUIGLEY:  Mr. Schwartz also showed you yesterday a

13   couple of e-mails that he showed Jason Galanis controlling

14   access to Devon Archer.  One of them was Defense Exhibit 4179.

15            You have no idea what this e-mail is about.  There is

16   no context for this e-mail.  It's similar to the Cooney

17   recording you heard, two guys talking in a bar for three

18   minutes, you have no idea what they're talking about.  Even Ms.

19   Notari admitted this morning they were kicking back a few.

20            But what is interesting about this e-mail is a couple

21   things.  Number one, Mr. Schwartz made a point yesterday to say

22   that Gary Hirst and Devon Archer never communicated together,

23   but again although this is not a communication between them,

24   they are both on this communication.

25            And then Nordgren, Matt Nordgren is the guy that Devon

I6R7GAL5                        Rebuttal - Mr. Quigley

1   Archer has a conversation with two weeks later -- this is after

2   his representations to Burnham -- Government Exhibit 2066 --

3   over at Burnham we have some regulatory issues with JG -- Jason

4   Galanis -- so can't mention his name.  So he's clearly aware

5   that Jason Galanis had a lot of bad issues.  He continued to do

6   business with him; he continued to do highly suspicious

7   transactions with him; and he claims he was duped.  Don't buy

8   it.

9           Let's talk finally a little bit about John Galanis.

10          John Galanis -- you have seen a lot of these e-mails

11   already -- but was the driver of this deal.  OK?  He was sent

12   to Las Vegas.  He went to Las Vegas.  He met with the WLCC.  He

13   met with Tim Anderson.  He was the driver of this deal.  All

14   right?  He sends out -- this is April 2014 -- an e-mail about

15   tribal bonds, and he is listing --

16          MR. TOUGER:  Objection, your Honor.  There is no

17   testimony that he was sent to Las Vegas by anybody.

18          MR. QUIGLEY:  I said Yanni Galanis is sending out an

19   e-mail about tribal bonds on April 15, 2014.

20          THE COURT:  All right.  And again with respect to the

21   testimony, your recollection controls.

22          Proceed.

23          MR. QUIGLEY:  Again listing the directors of Wealth

24   Assurance Holdings is Devon Archer, Jason Sugarman, Hugh

25   Dunkerley.

1              Another e-mail.  And again this goes to awareness of

2     who is in the conspiracy.  None of these people knew who John

3     Galanis was?  Guess what, John Galanis certainly knew who they

4     were, because they were his coconspirators.

5              Hugh Dunkerley.  All right.  Burnham Securities,

6     deal's coming together.  And here, this idea that Mr. Touger

7     said something like on Monday that John Galanis just put two

8     people together and stepped back.  He's the driver of the deal.

9     Here are the documents -- some of the documents that he drafted

10    that you see him sending to Tim Anderson:  Source and use of

11    funds, term sheets, annuity contracts, Burnham municipal

12    capital final.  Those are all for the first bond issuance.

13    Wakpamni second tranche source and use of funds, proposal for

14    creating the Wakpamni Town Center, WLCC third tranche, soft

15    final.  A ton of documents; driver of the deal.

16             And obviously we know he got $2.3 million out of this.

17    OK?  And Mr. Touger on Monday said -- and he said it throughout

18    the trial -- this was a finders fee anticipated by the parties.

19    And what I say to that is this was just a secret payment

20    anticipated by no one.  OK?

21             If you look at Government Exhibit 514, this tells you

22    what was anticipated by the parties.  This is a closing

23    statement for the first bonds.  OK?  You see it's blown up

24    here.  All right?  There is going to be $24 million -- sorry --

25    $22 million is going to be used to purchase an annuity, and

1  then they are going to spend about $500,000 on closing costs.

2  $6,000 to U.S. National Bank, $75,000 to Greenberg Traurig,

3  $250,000 to Burnham.  You can read it in the jury room; I'm not

4  going to waste your time.  Bottom line there is no $2.3 million

5  fee to John Galanis anywhere on that document, which is what

6  the parties anticipated.

7          And John Galanis knew that well.  Do you know why?

8  Because he had come up with this funding scheme.

9          This is Government Exhibit 1304, and it's a document

10  John Galanis sends to Steven Haynes, Tim Anderson on June 16 of

11  2014, and this is source and use of funds version 15.  OK?  And

12  it lists -- it lists right on here that the closing costs are

13  going to be $500,000, which in fact they actually were.  He was

14  the driver of this deal.  OK?  $500,000.  Nowhere in here is

15  there any talk about a $2.3 million payment to John Galanis.

16  All right?

17          And you know that such a payment would make no sense,

18  OK, because, think about it, they issued roughly $24 or 28

19  million in bonds; they've got to pay back principal and

20  interest on those bonds over the life of the bonds over ten

21  years.  They're not going to go $2.3 million in the hole right

22  off the bat to one person.  They're not going to pay one person

23  ten times, five times what anyone else in the transaction was

24  getting.  Burnham was getting $250,000; that was the highest

25  fee.  They're not going to give John Galanis ten times that.

1    But the reason you know that it was not anticipated by the

2    parties is because no one knew about it.  No one knew about the

3    payment; no one knew about Sovereign Nations.  Mr. Raines:

4    "Q.  You weren't aware that John Galanis got $2.3 million of

5    the bond proceeds, were you?

6    "A.  No."

7            How did John Galanis get it?  Fake companies, fake

8    documents.  He created Sovereign Nations Development Corp. on

9    August 21, 2014.  It's not John Galanis creating that company.

10   It's his minnion, Mark McMillan, six days before the bond

11   issuance, right before he creates this company.

12           All right?  Back to Tim Anderson, you saw this before,

13   but he never heard of Sovereign Nations, never heard of Mark

14   McMillan.  So it's not a payment anticipated by the parties;

15   it's a secret payment that John Galanis stole.  All right?

16           Hugh Dunkerley.  Again don't need to know everything

17   about the conspiracy to be a coconspirator.  All right?

18   "Q.  Where was that money supposed to go?

19   "A.  "Sovereign Nations Development.

20   "Q.  Did you have any understanding of what that was?

21   "A.  Nope."

22           He actually thought it was associated with the tribe.

23   Right?  Further evidence of John Galanis' fraudulent intent

24   that he names a company that's designed to help himself to

25   sound like something that's associated with a Native American

1    tribe, Sovereign Nations Development Corp.

2            Raycen Raines never mentioned Sovereign Nations

3    Development Corp.  And you see what happens, money comes in

4    from the first bond issuance, goes right out to Sovereign

5    Nations.  And McMillan told you that; the charts told you that.

6            How does John Galanis spend that?  I mean Mr. Touger

7    made a big deal about private equity investments and all that.

8    John Galanis, whatever else you want to say, did not invest it

9    in private equity.  John Galanis is not an private equity

10   investment.  This is an investment in John Galanis by John

11   Galanis, stealing the bond proceeds.

12           Look at all the other steps he took.  He sent e-mails

13   to McMillan, to his minnion, using an attorney's e-mail

14   address.  McMillan testified about that.  Government Exhibit

15   3400, transcript 2845.  He uses Barry Feiner's e-mail address

16   to send e-mails.

17           Another thing Mr. Touger said was that no further

18   payments -- no further payments made to John Galanis after that

19   $2.3 million.

20           A couple problems with that argument.  Number one, you

21   can't unring a bell.  You can't steal money and then say it

22   wasn't me because I didn't get any more.  He got $2.3 million.

23   That's not how it works.  But moreover it's also wrong, because

24   you saw during the time period of the conspiracy John Galanis

25   got $235,000 --

I6R7GAL5                    Rebuttal - Mr. Quigley

1           MR. TOUGER:  There is nothing in the record about when

2      those payments were made, none whatsoever.  That's a totally

3      false statement.

4           THE COURT:  All right, objection is noted.  Please

5      proceed.

6           MR. QUIGLEY:  $235,000 from John Galanis and $237,000

7      to someone named Chandra Galanis.  Who is Chandra Galanis?

8      That's John Galanis' wife.  Raycen Raines testified about this.

9      So John Galanis got a further $500,000 from Thorsdale.

10          This also, by the way -- if the evidence that came in

11     yesterday about Jason Galanis and John Galanis being involved

12     in a prior securities fraud together, if that didn't totally

13     blow up this argument, the idea that this also undercuts any

14     argument that Jason Galanis and John Galanis kept their

15     dealings separate, because here is Thorsdale sending money to

16     John Galanis, Thorsdale.  Jason Galanis sending to John

17     Galanis.  All right?  It's more detail on the Sovereign Nations

18     proceeds.

19          Now one last argument that Mr. Touger addressed,

20     attempted to blame the victim.  Right?  And he had a number of

21     references in his closing on Monday to Raycen Raines, how

22     Raycen Raines supposedly got some big payment from Sovereign

23     Nations.  OK?  Mr. Raines got $5,000.  That's Government

24     Exhibit 1513.  Mr. Touger I think accused the government of

25     hiding this.  He got $5,000.  And you know that what happened

1    here is that members of the Wakpamni Lake Community got money

2    to attend a martial arts camp.  OK?  What does this show?

3    Nothing.  Except that John Galanis was happy to drop some

4    breadcrumbs to string his victims along.

5              This was like one quarter of one percent of the money

6    that John Galanis got from the WLCC bond proceeds.  And

7    Mr. Touger continued to blame the victims by saying that though

8    a $60 million fraud occurred, it's really not a big deal, the

9    tribe had sovereign immunity, the pension funds have a lot of

10   money anyway, no harm, no fall.

11             It doesn't work.  All right?  The government, as

12   Ms. Mermelstein said in her closing, the key here is intent to

13   deceive, intent to deceive.  It does not matter -- I expect

14   Judge Abrams will give you similar instructions to these in a

15   few minutes, but the government need not show that the

16   defendant acted with intent to cause harm.  And no amount of

17   honest belief that the scheme will actually make a profit will

18   excuse any actions or false representations.

19             And the bottom line is that the victims were harmed.

20   Again, this was in Ms. Mermelstein's closing -- I'm not going

21   to go through it in great detail -- but Raycen Raines testified

22   the prairie is overgrowing, these buildings have never been

23   completed, no realistic possibility that the warehouse could be

24   successful in the future to pay back the $65 million.  Broken

25   dreams, crushed hopes, that's how these defendants left the

I6R7GAL5                        Rebuttal - Mr. Quigley

1    Wakpamni.

2           Mr. Touger also tried on Monday through his

3    cross-examination of witnesses, pension funds make towns of

4    money, not a big deal.

5           This is Mike Smith's testimony.  Actually, let's stop.

6    I mean $16.2 million is a lot of money to anyone.  Whatever the

7    percentage of the overall assets of a pension fund, that's a

8    ton of money.  Think about that.  These are school teachers,

9    these are people who are counting on that pension for the rest

10   of their lives.  Think of how many school teachers' pensions

11   $16.2 million could pay, much less $60 million.  All right?

12          And he told you about how this was a very significant

13   loss.  All right?  $16.2 million for the bonds, they had to

14   unwind the GYOF in a rapid fashion.  It's not just stand alone

15   because you're investing so you a can accrue money over the

16   lifetime of the members.  So, over the lifetime of our members,

17   that $25 million would have grown to an excess of $100 million

18   to be able to pay the benefits to the members.  That money is

19   gone, and it's gone because of these defendants and their

20   partners in crime.

21          John Galanis drove this fraud.  He drafted many of the

22   key documents, documents that were the basis of the lies to the

23   WLCC, misrepresentations that made the fraud possible.  He then

24   lined his own pockets with $2.35 million the very day after the

25   first set of bonds were issued.

I6R7GAL5                    Rebuttal - Mr. Quigley

1          And despite making every attempt to hide his

2    involvement with these transactions, the documentary evidence

3    is perfectly clear and the testimonial evidence is very clear

4    from McMillan what John Galanis was doing here.

5          Ladies and gentlemen, back at the beginning of this

6    trial about five weeks ago Ms. Tekeei stood up here and said at

7    its core this case is simple:  It's about people, and trust,

8    and lies, and choices made by these defendants.  That's what

9    the last five weeks have been about.  It's been about people,

10   people like the Wakpamni, who are now $60 million in debt that

11   they will never be able to pay back, people like the pension

12   funds who are stuck with millions of dollars in bonds that they

13   will never be able to sell on their books.  And, most of all,

14   it's about these defendants and the choices they made, choices

15   that John Galanis made in his initial dealings with the

16   Wakpamni, lying to them about what would happen with the bonds

17   so he could line his own pockets with $2.3 million; choices

18   made by Devon Archer, Bevan Cooney, to cast their lot with

19   Jason Galanis -- who everyone knew had a checkered past.  I

20   mean you heard about what would come up on Google when you

21   checked on Jason Galanis.  People knew about his SEC bar.  They

22   chose to hold themselves out to the Wakpamni as legitimate

23   purchasers of the bonds, even though the money was using, there

24   was no way Jason Galanis could have provided that to them

25   absent the first bond issuance.  And they chose to lie, lie

I6R7GAL5                         Rebuttal – Mr. Quigley

1    repeatedly, lie in a pattern to banks about those bonds, and

2    about their friend and partner in crime Jason Galanis.

3           When you go back to the jury room, I ask you to follow

4    the oath that you swore at the beginning of this trial, to

5    decide this case without prejudice, or sympathy, without fear

6    or favor, based on the law and the evidence, and only on the

7    law and the evidence.  If you do that, there is only one

8    verdict that you can reach that is consistent with the

9    evidence, and that is that these defendants are guilty as

10   charged.  Thank you.

11          THE COURT:  Thank you.  So, ladies and gentlemen,

12   we're going to take a short break now, and I am going to

13   instruct you on the law, and that will take us to the end of

14   the day.  All right?  Thank you.

15

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

I6R7GAL5                    Rebuttal - Mr. Quigley

1              (Jury not present)

2              THE COURT:  Everyone can be seated.  Let me tell you,

3    I would recommend dismissing number 7 and 13 now, putting in

4    number 14 for number 7, and then we would have two alternates,

5    but I'm not going to do it unless you consent.

6              MR. SCHWARTZ:  Can we have a moment?

7              THE COURT:  Of course.  I'm not pressuring you.  It's

8    just to take the pressure off the jury in terms of deliberation

9    time.

10             MR. SCHWARTZ:  My suggestion, if we agree to that, is

11   that your Honor make those jurors alternates rather than

12   release them, just because next week is a complicated week, and

13   although it's unlikely they will have to be recalled, I am not

14   sure we want to lose them entirely.

15             MR. QUIGLEY:  We would be onboard with that.

16             MR. SCHWARTZ:  But let us talk first.  Also I do want

17   to object to one aspect of Mr. Quigley's rebuttal that I do

18   believe requires curative instruction.  I showed yesterday in

19   my summation a number of e-mails from Jason Galanis to Mr.

20   Archer and sometimes Mr. Sugarman updating them on the status

21   of the construction.  You will recall they were the pictures of

22   the bonded warehouse, and they start during the time the bonds

23   are issued, and they go forward in time all the way up until

24   August of 2015.

25             The only response that Mr. Quigley gave to that

I6R7GAL5                     Rebuttal - Mr. Quigley

1   argument was that I could have crossed Raycen Raines about that

2   and I did not.  I could not have crossed Raycen Raines on that.

3   The government from the very first witness in this case has

4   asked your Honor to impose a rule -- which your Honor has --

5   which is that I can only cross-examine a witness based on

6   e-mails that they were on.  And I objected to that at the time,

7   and I objected to that throughout the trial, and I said it was

8   appropriate as long as an e-mail was coming into evidence that

9   I could use it with any witness.

10          There was never an e-mail with Devon Archer and Raycen

11   Raines.  The government would not have permitted me -- your

12   Honor would not have permitted me -- to cross-examine Raycen

13   Raines on those e-mails.  So to suggest that I passed up an

14   opportunity -- and that's the only response they have to that

15   argument -- I think is a totally false argument by Mr. Quigley,

16   and it requires the instruction that I did not have the

17   opportunity to cross-examine Mr. Raines about those e-mails.

18          MS. MERMELSTEIN:  None of that is true.  There were a

19   wildly unreasonable number of speaking objections during the

20   rebuttal in an effort to give a surrebuttal that were totally

21   inappropriate, and no further instruction is necessary.

22          What Mr. Schwartz has just characterized about the way

23   this trial proceeded is false.  Those are, let's be clear, a

24   hundred percent real pictures of the Pine Ridge Reservation and

25   the buildings.  I have been there myself; that is what they

1    look like.  There is no dispute that they are real.  I imagine

2    you could find them on Google Maps.

3         No one would have objected if Mr. Schwartz wanted to

4    show a photo of a warehouse being built to Mr. Raines and say

5    is this the warehouse.  No one would have objected.  Of course

6    he could do that.  And the defendants -- notwithstanding the

7    government's repeated efforts to keep them from trying to

8    impede the government's case -- were free to ask any questions

9    and show any documents they wanted, and they were never stopped

10   from doing that in a manner that was appropriate and consistent

11   with the rules of evidence.

12        So, Mr. Schwartz could have asked that question, he

13   could have shown that to the witness.  There is no dispute that

14   factually those things are correct.  And he didn't do it.  And

15   there is no real reasonable dispute that in fact those are real

16   e-mails.

17        So the effort to get an instruction and an effort to

18   get the Court to suggest that there was something improper

19   about the government's rebuttal is not warranted, and it's

20   gamesmanship, and it should be rejected.

21        MR. SCHWARTZ:  I mean the last thing I will say on

22   this is literally from the very first witness, from Tim

23   Anderson, when under our agreed-upon protocol I provided notice

24   of the exhibits that I intended to use with Mr. Anderson, the

25   government put in a letter -- it's on the docket -- and they

said I should not be able to use e-mails that the witness was

not on because they're not a percipient witness.  They made the

argument repeatedly throughout the trial, your Honor sustained

those objections, and did not let me use e-mails that an

individual was not on.

So, the government can say that I could have done it,

but I couldn't have done it.  And they could say they wouldn't

have objected, but they would have objected.

And to say that I ought to have tried, you know, and

made this trial five weeks longer by putting in everything that

I wanted to cross someone on rather than respecting the rule

that your Honor had set down, I think that's wrong.  And I

think the argument by Mr. Quigley was false.  And the fact that

Ms. Mermelstein has been on the Pine Ridge Reservation and

knows those to be actual buildings is totally beside the point.

MS. MERMELSTEIN:  I'll just note, your Honor, that,

one, it's not beside the point, because what Mr. Schwartz is

suggesting is that I suggested to the jury that these might be

fake, and that is true they might be fake; and the answer is

it's not true; they are not fake; that's not a reasonable

argument.  But more than that, the government permitted the

defense counsel to show witnesses the attachments to e-mails

when they weren't on the e-mail, just not the cover e-mail.  He

could have shown the photos to the witness who said he lived on

the Pine Ridge Reservation and said "Is this what it looks

I6R7GAL5                    Rebuttal – Mr. Quigley

1   like?"  Of course he could have.  And he decided not to, in

2   order to make an argument to the jury that's factually frankly

3   not correct, and we responded, and that's the end of it.

4           THE COURT:  I am not going to instruct the jury on

5   this point.  The objection is noted for the record.

6           Why don't we take five minutes and then come back.

7   And do let me know, because I want to tell them -- I want to

8   keep those two after and speak to them right after the charge.

9   OK?

10          MS. MERMELSTEIN:  Yes.

11          MR. SCHWARTZ:  Yes.

12          (Recess)

13          THE COURT:  Do you have an objection to making

14  Mr. Miller and Ms. Sanchez alternates number 3 and 4?

15          MR. SCHWARTZ:  No, assuming those are the names of the

16  jurors that we've about discussing.

17          THE COURT:  Yes.  So Juror 7 and Juror 13 would become

18  alternates numbers 3 and 4.  And just to be clear, does

19  everyone consent to that?

20          MR. TOUGER:  And Juror 14 would become Juror 7.

21          THE COURT:  Correct.  So just to be clear, Mr.

22  Schwartz, do you consent to that?

23          MR. SCHWARTZ:  I consent.

24          THE COURT:  Ms. Notari?

25          MS. NOTARI:  Yes.

I6R7GAL5                    Charge

1          THE COURT:  Mr. Touger?

2          MR. TOUGER:  Yes.

3          THE COURT:  Does the government consent?

4          MR. QUIGLEY:  No objection, your Honor.  Yes.

5          THE COURT:  All right.  We will bring them in.  Thank

6     you.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4120

I6R7GAL5                        Charge

1           (Jury present)

2           THE COURT:  Members of the jury, you have now heard

3     all of the evidence in the case as well as the final arguments

4     of the parties.  You have paid careful attention to the

5     evidence, and I'm confident that you will act together with

6     fairness and impartiality to reach a just verdict.

7           Now it is time for me to instruct you as to the law

8     that governs this case.  There are three parts to these

9     instructions.  First, I'm going to give you some general

10    instructions about your role, and about how you are to decide

11    the facts of the case.  Most of these instructions would apply

12    to just about any trial.  Second, I'll give you some specific

13    instructions about the legal rules applicable to this

14    particular case.  Third, I will give you some final

15    instructions about procedures.

16          Listening to these instructions may not be easy.  I

17    will tell you know it will probably go to about 5:15 or so.

18    It's important, however, that you listen carefully and

19    concentrate.  You will notice that I am reading these

20    instructions from a prepared text.  It would be more lively, no

21    doubt, if I just improvised, but it's important that I do not

22    do that.  The law is made up of words, and those words are very

23    carefully chosen.  So when I tell you the law, it's critical

24    that I use exactly the right words.

25          (Continued on next page)

I6RJGAL6                      Charge

 1            You'll have copies of what I am reading in the jury

 2    room to consult, so don't worry if you miss a word or two, but

 3    for now listen carefully and try and concentrate on what I am

 4    saying.  Of course, you're free to read along as well.

 5            My duty at this point is to instruct you as to the

 6    law.  It is your duty to accept these instructions of law and

 7    to apply them to the facts as you determine them.  With respect

 8    to legal matters, you must take the law as I give it to you.

 9    If any attorney has stated a legal principle different from any

10    that I state to you in my instructions, it is my instructions

11    that you must follow.

12            You must not substitute your own notions or opinions

13    of what the law is or ought to be, but nothing I say is

14    evidence.  If I commented on the evidence at any time, do not

15    accept my statements in place of your recollection or your

16    interpretation.  It is your recollection and interpretation

17    that govern.  Also do not draw any inference from any of my

18    rulings.  The rulings I made during the trial are no indication

19    of any view on my part.  You should not seek to find from my

20    rulings any such view or opinion on my part, nor should you

21    otherwise speculate what I may thing.

22            At times I may have directed a witness to be

23    responsive to questions, to pause when an objection had been

24    made by counsel or to keep his or her voice up.  At times I

25    asked a question myself.  Any questions that I asked or

I6RJGAL6                    Charge

1    instructions that I gave were intended only to clarify the

2    presentation of evidence.

3         You should draw no inference or conclusion of any

4    kind, favorable or unfavorable, with respect to any witness or

5    any party in the case by reason of any comment, question or

6    instruction of mine, nor should you infer I might have any

7    views as to the credibility of any witness, as to the weight of

8    the evidence, or as to how you should decide any issue that is

9    before you.  It is entirely your role.

10        As members of the jury, you are the sole and exclusive

11   judges of the facts.  You pass upon the evidence.  You

12   determine the credibility of the witnesses.  You resolve such

13   conflicts as there may be in the testimony.  You draw whatever

14   reasonable inferences you decide to draw from the facts as you

15   have determined them.  You determine the weight of the

16   evidence.  This is your sworn duty as you have taken the oath

17   as jurors to determine the facts.

18        As I mentioned, any opinion I might have regarding the

19   facts is of absolutely no consequence.  It is the duty of the

20   attorneys to object when the other side offers testimony or

21   other evidence that the attorney believes is not properly

22   admissible.  It is my job to rule on those objections.

23        Therefore, why an objection was made or why I ruled on

24   it the way I did is not your concern.  You should draw no

25   inference or conclusion from the fact an attorney objects to

1    any evidence, nor should you draw any inference from the fact I

2    might have sustained or overruled an objection.

3              From time to time the lawyers and I had conferences

4    out of your hearing.  The conferences involved procedural and

5    other legal matters, and none of the events related to these

6    conferences should enter into your deliberations at all.

7              The personalities and conduct of counsel in the

8    courtroom are also not in any way at issue.

9              Now, I will instruct you on the presumption of

10   innocence and the government's burden of proof in this case.

11   The defendants have pleaded not guilty.  By doing so, each

12   defendant denies all of the charges in the indictment.  Thus,

13   the government has the burden of proving the charges against

14   each of them individually beyond a reasonable doubt.

15             A defendant does not have to prove his innocence.  On

16   the contrary, each defendant is presumed innocent of all the

17   charges contained in the indictment.  This presumption of

18   innocence was in the defendants' favor at the start of trial.

19   It continued in their favor throughout the entire trial.  It is

20   in their favor even as I instruct you now and it continues in

21   their favor during the course of your deliberations in the jury

22   room.

23             The presumption of innocence is removed if, and only

24   if, you, as members of the jury, are unanimously satisfied that

25   the government has sustained its burden of proving the guilt of

I6RJGAL6                      Charge

1    a particular defendant as to a particular count of the

2    indictment beyond a reasonable doubt.

3         The question that naturally comes up is what is a

4    reasonable doubt?  The words almost define themselves.  It is a

5    doubt founded in reason and arising out of the evidence in the

6    case or the lack of evidence.  It is doubt that a reasonable

7    person has after carefully weighing all the evidence.

8         Reasonable doubt is a doubt that appeals to your

9    reason, your judgment, your experience, your common sense.  If,

10   after a fair and impartial consideration of all the evidence,

11   you do not have an abiding conviction of a specific defendant's

12   guilt with respect to a particular count of the indictment --

13   in sum, if you have such a doubt as would cause you, as prudent

14   persons, to hesitate before acting in matters of importance to

15   yourselves, then you have a reasonable doubt, and in that

16   circumstance it is your duty to acquit that defendant of that

17   count.

18        On the other hand, if, after a fair and impartial

19   consideration of all the evidence, you do have an abiding

20   belief of a defendant's guilt as to a specific count of the

21   indictment, such a belief as you would be willing to act upon

22   without hesitation in important matters in the personal affairs

23   of your own life, then you have no reasonable doubt, and under

24   such circumstances it is your duty to convict that defendant of

25   that count.

I6RJGAL6                        Charge

1          One final word on this subject.  Reasonable doubt does

2     not mean beyond all possible doubt.  It is practically

3     impossible for a person to be absolutely and completely

4     convinced of any disputed fact which by its nature is not

5     susceptible to mathematical certainty.  It follows that the law

6     in a criminal case is that it is sufficient if the guilt of a

7     defendant is established beyond a reasonable doubt, not beyond

8     all possible doubt.

9          For those of you who have served as jurors in civil

10    cases, it is not a mere preponderance of the evidence standard.

11    The government's burden is heavier than that.  The government

12    is not required to prove the essential elements of the offense

13    by any particular number of witnesses.  The testimony of a

14    single witness may be sufficient to convince you beyond a

15    reasonable doubt of the existence of the essential elements of

16    the offense you're considering if you believe the witness has

17    truthfully and accurately related what he or she has told you.

18         Under your oath as jurors, you are not to be swayed by

19    sympathy or prejudice.  You are to be guided solely by the

20    evidence in this case, and the crucial, bottom-line question

21    that you must ask yourselves as you sift through the evidence

22    is has the government proven the guilt of any of the defendants

23    as to any of the counts beyond a reasonable doubt?

24         It is for you alone to decide whether the government

25    has proven the defendant, that a defendant is guilty solely on

I6RJGAL6                        Charge

1    the basis of the evidence or lack of evidence and subject to

2    the law as I explain it to you.  It must be clear to you that

3    once you let fear or prejudice or bias or sympathy interfere

4    with your thinking, there is a risk that you will not arrive at

5    a true and just verdict.

6            If you have a reasonable doubt as to a defendant's

7    guilt, you must not hesitate for any reason to find a verdict

8    of acquittal for that defendant.  But, on the other hand, if

9    you should find that the government has met its burden of

10   proving a defendant's guilt beyond a reasonable doubt, you

11   should not hesitate, because of sympathy or any other reason,

12   to render a verdict of guilty for that defendant.

13           The question of possible punishment of the defendants

14   is of no concern to the jury and should not enter into or

15   influence your deliberations.  The duty of imposing sentence

16   rests exclusively upon the Court.  Your function is to weigh

17   the evidence in the case and to determine whether or not any of

18   the defendants are guilty beyond a reasonable doubt solely upon

19   the basis of such received.  Under your oath as jurors, you

20   cannot allow a consideration of the punishment which may be

21   imposed upon a defendant if he is convicted to influence your

22   verdict in any way or in any sense to enter into your

23   deliberations.

24           Similarly, it would be improper for you to allow any

25   feelings you might have about the nature of the crimes charged

I6RJGAL6                    Charge

1    to interfere with your decision-making process.  Your verdict

2    must be based exclusively upon the evidence or lack of evidence

3    presented in this courtroom.

4         In reaching your verdict, you must remember that all

5    parties stand equal before a jury in the Courts of the United

6    States.  The fact that the government is a party and the

7    prosecution is brought in the name of the United States does

8    not entitle the government or its witnesses to any greater

9    consideration than that afforded to any other party.

10        By the same token, you must give the government no

11   less deference.  It would also be improper for you to consider,

12   in reaching your decision as to whether the government has

13   sustain its burden of proof, any personal feelings you may have

14   about the defendants' race, religion, national origin, gender,

15   sexual orientation or age.  All persons are entitled to the

16   same presumption of innocence and the government has the same

17   burden of proof with respect to all persons.  Your verdict must

18   be based solely on the evidence or the lack of evidence.

19        In determining the facts, you must rely upon your own

20   recollection of the evidence.  The evidence in this case is the

21   sworn testimony of the witnesses, the exhibits received in

22   evidence and the stipulations of the parties.  Testimony that I

23   have stricken or excluded, however, is not evidence and may not

24   be considered by you in rendering a verdict.  Also if certain

25   testimony was received for a limited purpose, you must follow

I6RJGAL6                         Charge

1    the limiting instruction I gave you and use the evidence only

2    for the purpose indicated.  The only exhibits that are evidence

3    in this case are those that were received in evidence.

4    Exhibits marked for identification, but not admitted, are not

5    evidence, nor are demonstrative aids or materials that were

6    used only to refresh a witness's recollection.

7            As I told you at the start of this case, statements

8    and arguments by lawyers are not evidence because the lawyers

9    are not witnesses.  What they have said to you in their opening

10   statements and in their summations is intended to help you

11   understand the evidence to reach your verdict.  However, if

12   your recollection of the facts differs from the lawyers'

13   statements, it is your recollection that controls.  For the

14   same reason, you are not to consider a lawyer's questions as

15   evidence.  It is the witness's answers that are evidence, not

16   the questions.

17           Finally on this point, as I have mentioned, any

18   statements that I may have made do not constitute evidence.  It

19   is for you alone to decide the weight, if any, to be given to

20   the testimony you have heard and the exhibits you have seen.

21           Generally there are two types of evidence that you may

22   consider in reaching your verdict.  One type of evidence is

23   direct evidence.  Direct evidence is testimony by a witness

24   that something he or she knows by virtue of his or her own

25   senses, something he or she has seen, felt, touched or heard.

I6RJGAL6                          Charge

1              For example, if a witness testified that when he or
2     she left the house this morning, it was raining, that would be
3     direct evidence about the weather.  Circumstantial evidence is
4     evidence from which you may infer the existence of certain
5     facts.
6              For example, assume when you arrived at the courthouse
7     this morning, the sun was shining and it was a nice day.
8     Assume that the courtroom blinds were drawn and you could not
9     look outside.  As you were sitting here, someone walked in with
10    an umbrella which was dripping wet.  Then a few minutes later
11    another person entered with a wet raincoat.
12             Now, because you cannot see outside of the courtroom,
13    you cannot tell whether or not it is raining, so you have no
14    direct evidence of that fact, but on the combination of facts
15    that I've asked you to assume, it would not be unreasonable for
16    you to conclude that it had been raining.  That is all there is
17    to circumstantial evidence.  You infer on the basis of reason
18    and experience and common sense from one established fact the
19    existence or nonexistence of some other fact.
20             As you can see, the matter of drawing inferences from
21    facts in evidence is not a matter of guesswork or speculation.
22    An inference is a logical, factual conclusion that you might
23    reasonably draw from other facts that have been proven.
24             Any material fact such as what a person was thinking
25    or intending can rarely be proved by direct evidence.

I6RJGAL6                        Charge

1   Circumstantial evidence is as valuable as direct evidence.  The

2   law makes no distinction between direct and circumstantial

3   evidence, but simply requires that before convicting a

4   defendant, the jury must be satisfied of the defendants' guilt

5   beyond a reasonable doubt based on all the evidence or lack of

6   evidence in the case, circumstantial or direct.

7         There are times when different inferences may be drawn

8   from the evidence.  The government asks you to draw one set of

9   inferences.  The defendant asked you to draw another.  It is

10  for you and you alone to decide what inferences you will draw.

11        You have had the opportunity to observe the witnesses.

12  It is now your job to decide how believable each witness was in

13  his or her testimony.  You are the sole judges of the

14  credibility of each witness and of the importance of his or her

15  testimony.  You should carefully scrutinize all of the

16  testimony of each witness, the circumstances under which each

17  witness testified, the impression the witness made when

18  testifying, the relationship of the witness to the controversy

19  and the parties, the witness's bias or impartiality, the

20  reasonableness of the witness's statement, the strength or

21  weakness of the witness's recollection viewed in the light of

22  all other testimony, and any other matter in evidence that may

23  help you decide the truth and the importance of each witness's

24  testimony.

25        In other words, what you must try to do in deciding

1    credibility is to size a witness up in light of his or her

2    demeanor, the explanation given and all the other evidence in

3    the case.  How did the witness appear?  Was the witness candid,

4    frank and forthright, or did the witness seem to be evasive or

5    suspect in some way?

6           How did the way the witness testified on direct

7    examination compare with how the witness testified on

8    cross-examination?

9           Was the witness consistent or contradictory?

10          Did the witness appear to know what he or she was

11   talking about?

12          Did the witness strike you as someone who was trying

13   to report his or her knowledge accurately?

14          These are examples of the kinds of common-sense

15   questions you should ask yourself in deciding whether a witness

16   was or was not truthful.  In passing upon the credibility of a

17   witness, you may also take into account any inconsistencies or

18   contradictions as to material matters in his or her testimony.

19   If you find that any witness has willfully testified falsely as

20   to any material fact, you have the right to reject the

21   testimony of that witness in its entirety.

22          On the other hand, even if you find that a witness has

23   testified falsely as to any material fact, you have the right

24   to reject as false that portion of his or her testimony and

25   accept as true any other portion of the testimony.  A witness

I6RJGAL6                        Charge

1    may be inaccurate, contradictory or even untruthful in some

2    aspects, and yet be truthful and entirely credible in other

3    aspects of his or her testimony.

4            The ultimate question for you to decide in passing

5    upon the credibility is did the witness tell the truth before

6    you?  It is for you to say whether his or her testimony at this

7    trial is truthful in whole or in part.

8            In evaluating the credibility of witnesses, you should

9    take into account any evidence that the witness who testified

10   may benefit in some way from the outcome in this case.  Such an

11   interest in the outcome creates a motive to testify falsely and

12   may sway the witness to testify in a way that advances his or

13   her own interests.  Therefore, if you find that any witness

14   whose testimony you are considering may have an interest in the

15   outcome of the trial, then you should bear that factor in mind

16   when evaluating the credibility of his or her testimony and

17   accept it with great care.

18           This is not to suggest that every witness who has an

19   interest in the outcome of the case will testify falsely.  It

20   is for you to decide to what extent, if at all, the witness's

21   interest has affected or colored his or her testimony.

22           You have heard testimony from a law enforcement

23   official and employees of the government.  The fact that a

24   witness may be employed by the federal government as a law

25   enforcement official or employee does not mean that his or her

1    testimony is necessarily deserving of more or less

2    consideration or greater or lesser weight than that of an

3    ordinary witness.  In this context, defense counsel may attack

4    the credibility of such a witness on the ground that his or her

5    testimony may be colored by a personal or professional interest

6    in the outcome of the case.  It is your decision, after

7    reviewing all of the evidence, whether to accept the testimony

8    of the law enforcement or government employee witness and to

9    give to that testimony the weight you find it deserves.

10           You have also heard from a witness who testified that

11   he was involved in criminal conduct and who subsequently pled

12   guilty to his criminal conduct pursuant to what is called a

13   cooperation agreement with the government.  This witness has

14   agreed to testify and to cooperate with the government in hope

15   of receiving a reduced sentence.  You are instructed that you

16   must not draw any conclusions or inferences of any kind,

17   favorable or unfavorable, about a defendant's guilt from the

18   fact that a prosecution witness pled guilty to similar charges.

19           The decision of the witness to plead guilty was a

20   personal decision about his own guilt.  Experience will tell

21   you that the government frequently must rely on the testimony

22   of cooperating witnesses and other witnesses who have admitted

23   to participating in crimes.  The government must take its

24   witnesses as it finds them and frequently must use such

25   testimony in criminal prosecutions because otherwise it would

1    be difficult or impossible to detect and prosecute wrongdoers.

2           For these very reasons, the law allows the use of

3    cooperating witness testimony.  Because of the possible

4    interest a cooperating witness may have, the cooperating

5    witness's testimony should be scrutinized with care and

6    caution.  The fact that a witness is a cooperating witness can

7    be considered by you as bearing upon his credibility.  It does

8    not follow, however, that simply because a person has admitted

9    to participating in one or more crimes, he is incapable of

10   giving truthful testimony.

11          Like the testimony of any other witness, cooperating

12   witness testimony should be given the weight it deserves in

13   light of the facts and circumstances before you, taking into

14   account the witness's demeanor, candor, the strength and

15   accuracy of the witness's recollection, his background and the

16   extent to which his testimony is or is not corroborated by

17   other evidence in the case.

18          In evaluating the testimony of a cooperating witness,

19   you should ask yourselves whether this cooperating witness

20   would benefit more by lying or by telling the truth.  Was his

21   testimony made up in any way because he believed or hoped he

22   would somehow receive favorable treatment by testifying

23   falsely, or did he believe his interests would be best served

24   by testifying truthfully?

25          If you believe the witness was motivated by hopes of

I6RJGAL6                        Charge

1    personal gain, was the motivation one that would cause him to

2    lie or was it one that would cause him to tell the truth?  Did

3    this motivation color his testimony?

4            If you find the testimony was false, you should reject

5    it.  If, however, after a cautious and careful examination of

6    the cooperating witness's testimony and demeanor upon the

7    witness stand, you're satisfied the witness told the truth, you

8    should accept it as credible and act upon it accordingly.

9            As with any witness, let me emphasize that the issue

10   of credibility need not be decided in an all-or-nothing

11   fashion.  Even if you find that a witness testified falsely in

12   one part, you still may accept his testimony in other parts or

13   may disregard all of it.  That is a determination entirely for

14   you, the jury.

15           You have heard the testimony of witnesses who have

16   testified under a grant of immunity from the Court.  What this

17   means is that the testimony of the witness may not be used

18   against him in any criminal case except a prosecution for

19   perjury, giving a false statement or otherwise failing to

20   comply with the immunity order of the Court.

21           You are instructed that the government is entitled to

22   call as a witness a person who has been granted immunity by

23   order of the Court.  The testimony of a witness who has been

24   granted immunity should be examined closely to determine

25   whether it is colored in a way as to further the witness's own

interests.  If you believe the witness's testimony to be true

and determine to accept the testimony, you may give it such

weight, if any, as you believe it deserves.

You have heard evidence that a witness may have made a

statement on an earlier occasion which counsel argues is

inconsistent with the witness's trial testimony.  Evidence of a

prior inconsistent statement is not to be considered by you as

affirmative evidence bearing on the defendants' guilt.

Evidence of the prior inconsistent statement was placed before

you for the more limited purpose of helping you decide whether

to believe the trial testimony of the witness who allegedly

contradicted himself or herself.  If you find that the witness

made an earlier statement that conflicts with his or her trial

testimony, you may consider that fact in deciding how much of

his or her trial testimony, if any, to believe.

In making this determination, you may consider whether

the witness purposefully made a false statement or whether it

was an innocent mistake, whether the inconsistency concerns an

important fact or whether it had to do with a small detail,

whether there is a motive to fabricate, whether the witness had

an explanation for the inconsistency and whether that

explanation appealed to your common sense.  It is exclusively

your duty, based upon all the evidence and your own good

judgment, to determine whether the prior statement was

inconsistent and, if so, how much, if any, weight to be given

I6RJGAL6                        Charge

1    to the inconsistent statement in determining whether to believe

2    all or part of the witness's testimony.

3             You have heard testimony from what we call expert

4    witnesses.  An expert is someone who, by education or

5    experience, has acquired learning or experience in a science or

6    a specialized area of knowledge.  Such a witness is permitted

7    to give his opinions as to relevant matters in which he

8    professes to be an expert and give his reasons for such

9    opinions.  Expert testimony is presented to you on the theory

10   that someone who is experienced in the field can assist you in

11   understanding the evidence or in reaching an independent

12   decision on the facts.

13            Your role in judging credibility applies to experts as

14   well as to other witnesses.  You should consider the expert

15   opinions that were received in evidence in this case and give

16   them as much or as little weight as you think they deserve.  If

17   you should decide that an opinion of an expert was not based on

18   sufficient evidence or experience or on sufficient data, or if

19   you should conclude the trustworthiness or credibility of an

20   expert was questionable for any reason, or if an opinion of an

21   expert was outweighed, in your judgment, by other evidence in

22   the case, you might disregard that opinion of that expert

23   entirely or in part.

24            On the other hand, if you find the expert opinion was

25   based on sufficient data, education and experience, and the

I6RJGAL6                        Charge

1    other evidence does not give you reason to doubt his

2    conclusions, you would be justified in placing great reliance

3    on his testimony.

4            Although the defendant is under no obligation to

5    present any testimony, you have heard testimony that Devon

6    Archer has a reputation for honesty and trustworthiness along

7    with all the other evidence you have heard.  You may take into

8    consideration what you believe about a defendant's reputation

9    for honesty and trustworthiness when you decide whether the

10   government has proven beyond a reasonable doubt that that

11   defendant committed the crime.

12           You have heard evidence during the trial some

13   witnesses have discussed the facts of the case and/or their

14   testimony with lawyers.  You may consider that fact when you

15   are evaluating a witness's credibility, but I should tell you

16   there is nothing unusual or improper about witnesses meeting

17   with lawyers before testifying so the witness can be aware of

18   subjects he will be questioned about and focus on those

19   subjects and have the opportunity to review relevant exhibits

20   before being questioned about them.  Such consultation helps

21   conserve your time and the Court's time.  In fact, it would be

22   unusual for a lawyer to call a witness without such

23   consultation.  The weight you give to the fact or the nature of

24   the witness's preparation for his testimony and what inferences

25   you draw from such preparation are matters completely within

I6RJGAL6                          Charge

1   your discretion.

2              There are people whose names you heard during the

3   course of this trial but who did not appear here to testify.  I

4   instruct you that all parties have an equal opportunity or lack

5   of opportunity to call any of these witnesses.  Therefore, you

6   should not draw any inferences or reach any conclusions as to

7   what they would have testified to had they been called.  Their

8   absence should not affect your judgment in any way.

9              You should remember my instruction, however, that the

10  law does not impose on a defendant in a criminal case the

11  burden or duty of calling any witnesses or producing any

12  evidence.  You may not draw any inference, favorable or

13  unfavorable, towards the government or any of the defendants

14  from the fact that any person in addition to the defendants is

15  not on trial here.  You also may not speculate in any way as to

16  the reason or reasons why other persons are not on trial.

17  Those matters are wholly outside your concern and have no

18  bearing open your function as jurors.

19             You have also heard about certain individuals who are

20  not on trial here but who have pled guilty to related offenses.

21  As I instructed you with respect to the testimony of the

22  cooperating witness in this case, you may not draw any

23  conclusions or inferences of any kind, favorable or

24  unfavorable, about a defendant's guilt from the fact that

25  another person has pled guilty to similar charges.

I6RJGAL6                         Charge

1          You have heard references to certain investigative

2     techniques that were used or not used by the law enforcement

3     authorities in this case.  You may consider these facts in

4     deciding whether the government has met its burden of proof

5     because, as I told you, you should look to all of the evidence

6     or lack of evidence in deciding whether any of the defendants

7     are guilty.  There is no legal requirement that the government

8     prove its case through any particular means.  While you are to

9     consider carefully the evidence presented by the government,

10    you need not speculate as to why certain techniques were used

11    or why others were not used.  Law enforcement techniques are

12    not your concern.

13         There have been a number summary charts and exhibits

14    that were shown to you but not admitted into evidence.  At the

15    time that they were shown to you, I had noted this fact to you.

16    For these charts and exhibits were not admitted into evidence,

17    they serve merely as summaries and analyses of testimony and

18    documents in the case and are here to act as visual aids for

19    you.  It is the underlying evidence and the weight which you

20    attribute to that which gives value and significance to these

21    charts.

22         To the extent that the charts conform to what you

23    determine the underlying facts to be, you should accept them.

24    To the extent the charts differ from what you determine the

25    underlying evidence to be, you may reject them.

I6RJGAL6                    Charge

1          Some of the exhibits that were admitted into evidence

2     were in the form of charts and summaries.  For these charts and

3     summaries that were admitted into evidence, you should consider

4     them as you would any other evidence.

5          In this case, you have also heard evidence in the form

6     of stipulations of fact.  A stipulation of fact is an agreement

7     among the parties that a certain fact is true.  You must regard

8     such agreed facts as true.  It is for you, however, to

9     determine the weight to be given to any stipulated fact.

10         During the course of the trial we have seen among the

11    exhibits received in evidence some documents that are redacted.

12    "Redacted" means that a portion of the document was taken out.

13    You are to concern yourself only with the part of the item that

14    has been admitted into evidence.  You should not speculate any

15    reason why the other part of it has been deleted.

16         Mr. Galanis, Mr. Archer and Mr. Cooney did not testify

17    in this case.  Under our Constitution, a defendant in a

18    criminal case never has any duty to testify or come forward

19    with any evidence.  This is because the burden of proof beyond

20    a reasonable doubt remains on the government at all times and

21    the defendant is presumed innocent.  A defendant is never

22    required to prove that he is innocent.  You may not speculate

23    as to why any defendant did not testify, nor attach any

24    significance to the fact the defendant did not testify.

25    Indeed, you may not draw any inference whatsoever from any

I6RJGAL6                          Charge

1    defendant's decision not to take the witness stand.

2           I will turn now to my instructions to you related to

3    the charges brought against the defendants in this case.  The

4    defendants in this case, John Galanis, Devon Archer and Bevan

5    Cooney, are formally charged in what is called an indictment.

6    As I instructed you at the outset of this case, the indictment

7    is merely a charge or accusation.  I is not evidence and it

8    cannot be used by you as proof of anything.

9           As a result, you are to give it no weight in deciding

10   the defendants' guilt or lack of guilt.  What matters is the

11   evidence that you heard at this trial.  Indeed, as I have

12   previously noted, each defendant is presumed innocent, and it

13   is the government's burden to prove each of the defendants'

14   guilt beyond a reasonable doubt.

15          Before you begin your deliberations, you will be

16   provided -- I am not going to provide you with a copy of the

17   indictment.  Instead, what I am going to do is I am going to

18   summarize the offenses charged in the indictment and then

19   explain in detail the elements of the charged offenses.

20          To find the defendants guilty, you must find that the

21   government has proven the specific charges in the indictment,

22   not some other crime, beyond a reasonable doubt.  If you do not

23   find the government has established beyond a reasonable doubt

24   the specific allegations set forth in the indictment, then you

25   must find the defendants not guilty.  All three defendants are

I6RJGAL6                        Charge

charged in both counts of the indictment.

Count 1 of the indictment charges that from at least on or about March 2014 through in or about April 2016, each of the defendants conspired or agreed with others to commit securities fraud.  As I will explain in more detail in a few moments, a conspiracy such as the one charged in Count 1 is a criminal agreement to violate the law.

Count 2 of the indictment charges that from at least in or about March 2014 through in or about April 2016, each of the defendants committed the substantive offense of securities fraud.  Later on I will explain to you the differences between a conspiracy count and a substantive count.  For now just keep in mind that a conspiracy count is different from a substantive count.

Count 1 charges each of the defendants with participating in a conspiracy to commit securities fraud.

Count 2 charges each of the defendants with a substantive securities fraud.

The indictment alleges that the securities fraud conspiracy charged in Count 1 and the substantive securities fraud offense charged in Count 2 relate to an alleged scheme by each of the defendants to defraud a Native American tribal entity, the Wakpamni Lake Community Corporation, which I will call the WLCC, to issue bonds, which I will call the Wakpamni bonds, based upon false and misleading representations and to

fraudulently cause clients of Atlantic and Hughes to buy

certain of those bonds, thereby defrauding those clients as

well.

        The indictment also alleges that the defendants failed

to invest the bond proceeds on the WLCC's behalf in the manner

agreed upon and instead misappropriated the bond proceeds for

their own use.  The defendants deny all of the allegations.

        In your role as jurors, you are not to be concerned

with the wisdom or policy of any laws the defendants are

alleged to have broken.  Your verdict must be based on the

evidence in this case.  Your verdict must not be based upon

your personal approval or disapproval of any particular law.

        The indictment names three defendants who are on trial

together.  In reaching a verdict, you must bear in mind that

guilt is individual.  Your verdict as to each defendant must be

determined separately with respect to him, solely on the

evidence or lack of evidence presented against him, without

with regard to the guilt or innocence of anyone else.

        As I just indicated, the indictment contains two

counts.  Each count charges a different crime.  You must

consider each count of the indictment separately and you must

return a separate verdict as to each defendant on each count.

The case on each count stands or falls upon the proof or lack

of proof for that count.

        I am now going to discuss the counts in the indictment

I6RJGAL6                         Charge

1    because some of the instructions as to the substance of the

2    charge in Count 2 will assist you in assessing the conspiracy

3    charge contained in Count 1.

4              I'll first instruct you on Count 2.  Count 2 charges

5    etch of the defendants, John Galanis, Devon Archer and Bevan

6    Cooney, with committing the substantive crime of securities

7    fraud.  Specifically Count 2 alleges as follows:

8              From at least in or about March 2014 through in or

9    about April 2016, in the Southern District of New York and

10   elsewhere, John Galanis, a/k/a Yanni, Bevan Cooney and Devon

11   Archer, the defendants, willfully and knowingly, directly and

12   indirectly, by use of the means and instrumentalities of

13   interstate commerce and of the mails, and of the facilities of

14   national securities exchanges, used and employed manipulative

15   and deceptive devices and contrivances in connection with the

16   purchase and sales of securities, in violation of Title 17,

17   Code of Federal Regulations, Section 240, 10b-5, by:

18             A.  Employing devices schemes and artifices to

19   defraud;

20             B.  Making untrue statements of material fact and

21   omitting to state material facts necessary in order to make the

22   statements made in the light of the circumstances under which

23   they were made not misleading; and

24             C.  Engaging in acts, practices and course of business

25   which operated and would operate as a fraud and deceit upon

I6RJGAL6                    Charge

persons, to wit:

          The defendants engaged in a scheme to misappropriate
the proceeds of several bond issuances by the WLCC and also
caused investor funds to be used to purchase the bonds for
which there was no secondary market, through which such bonds
could be redeemed without disclosure to those investors of
material facts, including the existence of multiple conflicts
of interest, and which investments in some cases were outside
the investment parameters of the accounts in which they were
placed.

          The relevant law here is Section 10-b of the
Securities Exchange Act of 1934, which is set forth in 15
United States Code Section 78jb.  Section 10-b provides in
pertinent part, it shall be unlawful for any person, directly
or indirectly, by the use of any means or instrumentality of
interstate commerce or of the mails, or of any facility, of any
national securities exchange, to use or employ in connection
with the purchase or sale of any security registered on a
national securities exchange, or any security not so
registered, any manipulative or deceptive device or
contrivance, in contravention of such rules and regulations as
the SEC may prescribe as necessary or appropriate in the public
interest or for the protection of the investors.

          The law also defines the term "security," which is set
forth in 15 United States Code Section 78 ca-10, includes any

I6RJGAL6                        Charge

1    bond.

2              Based on its authority under the statute, the SEC has

3    created a number of rules and regulations, one of which is

4    known as Rule 10b-5, is relevant here.  Rule 10b-5 reads as

5    follows:

6              Employment of manipulative and deceptive devices.  It

7    shall be unlawful for any person, directly or indirectly, by

8    the use of any means or instrumentalities of interstate

9    commerce or of the mails, or of any facility of any national

10   securities exchange:

11             A.  To employ any device, scheme or artifice to

12   defraud;

13             B.  To make any untrue statement of a material fact,

14   or to admit omit to state a material fact necessary in order to

15   make the statements made in light of the circumstances under

16   which they were made not misleading; or

17             C.  To engage in any act, practice or course of

18   business which operates or would operate as a fraud or deceit

19   upon any person in connection with the purchase or sale of any

20   security.

21             The 1934 Securities Exchange Act was the second of two

22   laws passed by Congress to protect the investing public in the

23   purchase and sale of securities that are publicly distributed.

24   To establish a violation of Section 10-b of the 1934 Securities

25   Exchange Act as charged in Count 2 of the indictment, the

I6RJGAL6                      Charge

government must prove each of the following elements beyond a

reasonable doubt:

First, in connection with the purchase or sale of

securities such as bonds, the defendant you are considering did

any one or more of the following:

One.  Employed a device, scheme or artifice to

defraud; or

Two.  Made an untrue statement of a material fact or

omitted to state a material fact which made what was said under

the circumstances misleading; or

Three.  Engage in act, practice or course of business

that operated or would operate as a fraud or deceit upon a

purchase or seller;

Second, that the defendant you are considering acted

knowingly, willfully and with the intent to defraud;

Third, that the defendant you are considering

knowingly used, or caused to be used, any means or

instrumentalities of transportation or communication in

interstate commerce or the use of the mails in furtherance of

the fraudulent conduct.

I will discuss each element with you in turn.  Does

anyone want to stand up and stretch?

(Pause)

The first element the government must prove beyond a

reasonable doubt is that in connection with the purchase or

I6RJGAL6                        Charge

sale of securities, the defendant you are considering did any
one of the following -- did I read this?  I don't think so.

            1.  Employed a device, scheme or artifice to defraud;
or

            2.  Made an untrue statement of a material fact or
omitted to state a material fact, which made what was said
under the circumstances misleading; or

            3.  Engaged in an act, practice or course of business
that operated or would operate as a fraud or deceit upon a
purchaser or seller.

            To prove this element, the government must prove at
least one of those three types of unlawful conduct was
committed by the defendant you are considering in connection
with the purchase or sale of securities, although it does not
need to prove all three of them.  You must be unanimous as to
which type of unlawful conduct, if any, the defendant you are
considering committed.  Let me now explain some of those terms.

            A device, scheme or artifice is merely a plan for the
accomplishment of an objective.  Fraud is a general term that
embraces all of the various means that individuals devise to
take advantage of others.  It includes all kinds of
manipulative and deceptive acts.  The fraud or deceit need not
relate to the investment value of the securities involved in
this case.

            Additionally, it is also not necessary that the

I6RJGAL6                          Charge

1    defendant you are considering made a profit or that anyone

2    actually suffered a loss for you to find that the government

3    has proven this element beyond a reasonable doubt.

4            An affirmative misrepresentation is one type of false

5    statement.  It is a statement of a fact which is objectively

6    false.  To put it in everyday language, an affirmative

7    misrepresentation is a lie.  A statement, representation, claim

8    or document is false if it is untrue when made and was then

9    known to be untrue by the person making it or causing it to be

10   made.  A representation or statement is fraudulent if it was

11   falsely made with the intention to deceive.

12           A statement may also be false if it contains

13   half-truths or it conceals material facts in a manner that

14   makes what is said or represented deliberately misleading.  The

15   deception need not be premised upon spoken or written words

16   alone.  The arrangement of the words or the circumstances in

17   which they are used may convey the false and deceptive

18   appearance.

19           If there is deception, the manner in which it is

20   accomplished does not matter.  You cannot find that the

21   government has proven the first element unless you find that

22   the defendant you are considering participated or agreed to

23   participate in fraudulent conduct that was in connection with a

24   purchase or sale of securities.  I instruct you that the

25   Wakpamni bonds are a security within the meaning of federal

I6RJGAL6                        Charge

law.

        The requirement that the fraudulent conduct be in
connection with the purchase or sale of securities is satisfied
so long as there was some nexus or relation between the
allegedly fraudulent conduct and the sale or purchase of
securities.  Fraudulent conduct may be in connection with the
purchase or sale of securities if you find that the alleged
fraudulent conduct touched upon a securities transaction.

        It is not necessary for you to find that if the
defendant you are considering was or would be the actual seller
of the securities, it is sufficient that the defendant
participated in the scheme or fraudulent conduct that involved
the purchase or sale of securities.

        By the same token, the government need not prove that
the defendant you are considering personally made the
misrepresentation or that he omitted the material fact.  It is
sufficient if the government establishes that the defendant
caused the statement to be made or the fact to be omitted.

        With regard to the alleged misrepresentations or
omissions, you must determine whether the statements were true
or false when made, and in the case of alleged omissions,
whether the omissions were misleading.  If you find that the
government established beyond a reasonable doubt that a
statement was false, or a statement was omitted, rendering the
statements that were made misleading, you must next determine

I6RJGAL6                       Charge

1        whether the statement or omission was material under the

2        circumstances.

3              The word "material" here refers to the nature of the

4        false or misleading statements.  We use the word "material" to

5        distinguish between the kinds of statements we care about and

6        those that are of no real importance.

7              A material fact is one that a reasonable investor

8        would consider important in making his or her investment

9        decision regarding the sale or purchase of securities.  That

10       means that if you find a particular statement of fact or

11       omission to have been untruthful or misleading, you must

12       consider whether the government has proven that the statement

13       is material.  In other words, you must consider whether the

14       government has proven that the statement or omission was one

15       that would have mattered to a reasonable investor in making

16       such investment decision.

17             In considering whether a statement or omission was

18       material, I remind you that the standard is what a reasonable

19       investor would have wanted to know in making an investment

20       decision.  It does not matter whether the actual investor who

21       purchased or issued the bonds at issue here is sophisticated or

22       inexperienced because the standard is whether an investor who

23       is reasonable would have wanted to know the statement or

24       omission, nor does it matter whether the alleged unlawful

25       conduct was or would have been successful or whether the

I6RJGAL6                    Charge

1    defendant you are considering profited or would have profited

2    as a result of the alleged crime.  Success is not an element or

3    violation of Section 78jb or Rule 10b-5.

4         If, however, you find that the defendant you are

5    considering expected to or did profit from the alleged scheme,

6    you may consider that in relation to the element of intent

7    which I will discuss in a moment.

8         The second element of Count 2 that the government must

9    establish is that the defendant you are considering acted

10   knowingly, willfully and with intent to defraud.  "Knowingly"

11   means to act voluntarily and deliberately rather than

12   mistakenly or inadvertently.  "Willfully" means to act

13   knowingly and purposefully, with an intent to do something the

14   law forbids; that is to say, with bad purpose, either to

15   disobey or to disregard the law.  "Intent to defraud" in the

16   context of the securities laws means to act knowingly and with

17   intent to deceive.

18        The question of whether a person acted knowingly,

19   willfully and with intent to defraud is a question of fact for

20   you to determine like any other fact question.  This question

21   involves one's state of mind.  Direct proof of knowledge and

22   fraudulent intent is often not available.  It would be a rare

23   case where it could be shown that a person wrote or stated that

24   as of a given time in the past, he committed an act with

25   fraudulent intent.  Such direct proof is not required.

I6RJGAL6                    Charge

1      The ultimate facts of knowledge and criminal intent,

2   though subjective, may be established by circumstantial

3   evidence based upon a person's outward manifestations, his

4   words, his conduct, his acts, and all the surrounding

5   circumstances disclosed by the evidence and the rational or

6   logical inferences that may be drawn therefrom.

7      Circumstantial evidence, if believed, is of no less

8   value than direct direct evidence.  In either case, the

9   essential elements of the crime charged must be established

10  beyond a reasonable doubt.  The government need only prove that

11  the defendant you are considering acted with an intent to

12  deceive, manipulate or defraud.  The government need not show

13  that the defendant acted with an intent to cause harm.

14      What is referred to as drawing inferences from

15  circumstantial evidence is no different from what people

16  normally mean when they say use your common sense.  Using your

17  common sense means that when you come to decide whether a

18  defendant possessed or lacked an intent to defraud, you do not

19  limit yourself to what the defendant said, but you also look at

20  what he did and what others did in relation to the defendant

21  and in general everything that occurred. .

22      On this subject, however, it is important for you to

23  know you may not infer knowledge or intent based solely on a

24  defendant's relationship or association with certain

25  individuals or his position in the corporate entity.

I6RJGAL6                         Charge

1          At this point, let me also advise you it since an

2    intention element of the crime charged is intent to defraud, it

3    follows as good faith, as I will define that term, on the part

4    of a defendant is a complete defense to a charge of securities

5    fraud.  A person who acts on a belief or opinion honestly held

6    is not punishable under the securities fraud statutes merely

7    because his opinion or belief turns out to be wrong.

8    Therefore, if you find that at all relevant times a defendant

9    acted in good faith, it is your duty to acquit him.

10         I want to caution you in this regard that the

11   defendant has no burden to establish a defense of good faith.

12   The burden is on the government to prove fraudulent intent

13   beyond a reasonable doubt.

14         In considering whether or not a defendant acted in

15   good faith, however, you are instructed that a belief by a

16   defendant, if such belief existed, that ultimately everything

17   will work out so that no investors would lose any money, or

18   that particular investments would ultimately be financially

19   advantageous for clients, does not necessarily constitute good

20   faith.  No amount of honest belief on the part of the defendant

21   that the scheme will ultimately make a profit for the investors

22   will excuse fraudulent actions or false representations or

23   omissions by him.

24         As a practical matter, then, to prove this charge

25   against a defendant, the government must establish beyond a

I6RJGAL6                        Charge

reasonable doubt the defendant knew that his conduct was

calculated to deceive and that he nevertheless associated

himself with the alleged fraudulent scheme.

The third and final element of Count 2, the

substantive securities fraud count, the government must prove

beyond a reasonable doubt that the defendant you are considered

knowingly used, or caused to be used, the mails or the

instrumentalities of interstate commerce in furtherance of the

scheme to defraud.

Let me first note that it is unnecessary for the

government to prove both the mails or an instrumentality of

interstate commerce was used in furtherance of the fraudulent

scheme.  Only one of the above, either the mails or an

instrumentality of interstate commerce, is enough, but you must

be unanimous as to at least one.

In considering this element, it is not necessary for

you to find that the defendant you are considering was or would

have been directly or personally involved in any mailing or the

use of an instrumentality of interstate commerce if the conduct

alleged would naturally and probably result in the use of the

mails or an instrumentality of interstate commerce, this

element would be satisfied.

Nor is it necessary that the items sent through the

mails or communicated through an instrumentality of interstate

commerce did or would contain the fraudulent material or

I6RJGAL6                        Charge

anything criminal or objectionable.  The matter mailed or
communicated may be entirely innocent so long as it is in
furtherance of the scheme to defraud or fraudulent conduct.

        The use of mails or instrumentality in interstate
commerce need not be central to the execution of the scheme and
may even be incidental to it.  All that is required is that the
use of the mails or an instrumentality of interstate commerce
bear in some relation to the object of the scheme or fraudulent
conduct.

        In fact, the actual purchase or sale of the security
need not be accompanied by the use of the mails or an
instrumentality of interstate commerce so long as the mails or
instrumentality of interstate commerce are used in furtherance
of the scheme and the defendant you are considering was still
engaged in actions that are part of a fraudulent scheme when
the mails or instrumentalities of interstate commerce were
used.

        The use of the term "mails" is self-explanatory and
includes the United States Mail and Federal Express and other
commercial mail couriers.  The term "instrumentality of
interstate commerce" includes any communications network that
involves one or more, more than one state, such as those used
to send emails and make phone calls.  The wire transferred of
money is also sufficient.

        The substantive securities fraud charge in Count 2

also charges the defendants with violating 18 United States

Code Section 2, the aiding and abetting statute.  That is each

of the defendants is charged not only as a principal who

committed the crime, but also as an aider and abettor in having

willfully caused the crime.

As a result, under 18 United States Code Section 2,

there are two additional ways the government may establish the

defendants' guilt on the substantive count charged in the

indictment.  One way is called aiding and abetting.  The other

is called willfully causing a crime, and let me explain each of

these.

Aiding and abetting is set forth in Section 2 (a) the

statute.  That section reads in part as follows:

Whoever commits an offense against the United States,

or aids or abets or counsels, commands or induces, procures its

commission or procures its commission, is punishable as a

principal.

Under the aiding and abetting statute, it is not

necessary for the government to show that the defendant himself

physically committed the crime with which he is charged in

order for you to find the defendant guilty.  Thus, even if you

do not find beyond a reasonable doubt the defendant himself

committed the crime charged, you may under certain

circumstances still find that defendant guilty of that crime as

an aider or abettor.

I6RJGAL6                      Charge

1          A person who aids or abets another to commit an

2     offense is just as guilty of that offense as if he committed it

3     himself.  Accordingly, you may find the defendant guilty of a

4     substantive crime if you find beyond a reasonable doubt that

5     the government has proved that another person actually

6     committed the crime and that the defendant aided and abetted

7     that person in the commission of the offense.

8          As you can see, the first requirement is that another

9     person has committed the crime charged.  Obviously, no one can

10    be convicted of aiding and abetting the criminal acts of

11    another if no crime was committed by the other person in the

12    first place.  If you do find that a crime was committed, then

13    you must consider whether the defendant willfully aided or

14    abetted the commission of the crime.

15         In order to aid or abet another to commit a crime, it

16    is necessary that you determine that he willfully, knowingly

17    associated himself in some way with the crime and that he

18    willfully and knowingly would seek by some act to help make the

19    crime succeed.  Participation in a crime is willful if action

20    is taken voluntarily or intentionally, or in the case of a

21    failure to act, with a specific intent to fail to do something

22    the law requires to be done; that is to say, with a bad

23    purpose, either to disobey or to disregard the law.

24         The mere presence of a defendant where a crime is

25    being committed even coupled with knowledge by the defendant

I6RJGAL6                    Charge

that a crime is being committed, or merely associating with

others who were committing a crime, is not sufficient to

establish aiding and abetting.  One who has no knowledge that a

crime is being committed or is about to be committed, but

inadvertently does something that aids in the commission of the

crime is not an aider or abettor.  An aider or abettor must

know that the crime is committed and act in a way which is

intended to bring about the success of the criminal venture.

In other words, the defendant must willfully

facilitate the crime.  It is not enough if a defendant's

actions may have been the effect of facilitating the crime.

There must be proof beyond a reasonable doubt that he

specifically intended to facilitate the crime in order for you

to find that the government has met this element.

Facilitation does not require extensive participation,

but the defendants' participation must occur before the

completion of the crime.  To determine whether the defendant

aided or abetted the commission of the crime with which he is

charged, ask yourself these questions:

First, did he participate in the crime charged as

something he wished to bring about;

Second, did he associate himself with the criminal

venture knowingly and willfully;

Finally, did he seek by his actions to make the

criminal venture succeed.

I6RJGAL6                          Charge

1           If the answer to all three of these questions is yes,

2      then the defendant is and aider and abettor.  If, on the other

3      hand, your answer to any of these questions is no, then the

4      defendant is not an aider or abettor.

5           The second way in which the government can establish

6      the defendants' guilt under 18 United States Code Section 2 is

7      by proving beyond a reasonable doubt that the defendant

8      willfully caused a crime.  Section 2 (b) of the aiding and

9      abetting statute which relates to willfully causing a crime

10     reads as follows:

11          Whoever willfully causes an act to be done which, if

12     directly performed by him or another would be an offense

13     against the United States, shall be guilty of a federal crime.

14          What does the term "willfully caused" mean?  It means

15     that the defendant himself need not have physically committed

16     the crime or supervised or participated in the actual criminal

17     conduct charged in the indictment.  It does not mean that the

18     defendant himself need have physically committed the crime or

19     supervised or participated in the actual criminal conduct

20     charged in the indictment.  The meaning of the term "willfully

21     caused" can be found in the answers to the following questions:

22          First, did the defendant you are considering take some

23     action without which the crime would not have occurred?

24          Second, did the defendant intend that the crime would

25     be actually committed by others?

I6RJGAL6                    Charge

1          If you're persuaded beyond a reasonable doubt that the

2     answer to both these questions is yes, then the defendant is

3     guilty of the crime charged just as if the defendant himself

4     had personally committed it.

5          If the answer to either is no, the defendant you are

6     considering cannot be found guilty of Count 2 under this theory

7     of liability.

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6R7GAL7                    Charge

1              Now I will instruct you as to Count One of the

2     indictment, in which each of the defendants -- John Galanis,

3     Devon Archer an Bevan Cooney -- is charged with violating Title

4     18 United States Code, Section 371.  That section provides as

5     follows:

6              If two or more persons conspire either to commit any

7     offense against the United States, or to defraud the United

8     States, or any agency thereof, in any manner for any purpose

9     and one or more of such persons do any act to effect the object

10    of the conspiracy, each [is guilty of a federal crime].

11             Each of the defendants is charged in Count One with

12    participating in a conspiracy to violate the federal statutes

13    that make it unlawful to commit securities fraud.

14    Specifically, Count One charges that each of the defendants

15    agreed to commit securities fraud in connection with the

16    Wakpamni bonds.

17             The indictment lists the overt acts that are alleged

18    to have been committed in furtherance of the conspiracy charged

19    in Count one.

20             As I have said, Count one of the indictment charges

21    each defendant with participating in a conspiracy.  As I will

22    explain, a conspiracy is kind of a criminal partnership -- an

23    agreement of two or more people to join together to accomplish

24    some unlawful purpose.  The essence of the crime of conspiracy

25    is an agreement or understanding to violate other law.  If a

I6R7GAL7                      Charge

conspiracy exists, even if it should fail in its purpose, it is
still punishable as a crime.

The crime of conspiracy -- or agreement -- to violate
a federal law, as charged in the indictment, is an independent
offense.  It is separate and distinct from the actual violation
of any specific federal law, such as that charged in Count Two
that I have just described for you, which the law refers to as
"substantive crime."

You may find a defendant guilty of a crime of
conspiracy -- in other words, agreeing to commit securities
fraud, even if you find that the substantive crime which was
the object of the conspiracy -- securities fraud -- was never
actually committed.  Congress has deemed it appropriate to make
conspiracy, standing alone, a separate crime, even if the
conspiracy is not successful and no substantive crime is
actually committed.

However, you must find that the defendant you are
considering not guilty of conspiracy unless the government
proves all of the elements of a conspiracy beyond a reasonable
doubt and you may consider whether the substantive crime that
is the object of the charged conspiracy was actually committed
in determining whether the government has met its burden.

To prove a defendant guilty of the conspiracy charged
in Count One, the government must prove beyond a reasonable
doubt each of the following three elements:

First, the government must prove the existence of the conspiracy charged in Count One of the indictment; that is, the existence of an agreement or understanding to commit the unlawful object of the charged conspiracy, which in this case is securities fraud.  The first element then is:  Did the conspiracy alleged in the indictment exist?  Was there such a conspiracy; and

Second, the government must prove that the defendant you are considering willfully and knowingly became a member of the conspiracy, with intent to further its illegal purposes -- that is, with the intent to commit the object of the charged conspiracy; and

Third, the Government must prove that any one of the conspirators -- not necessarily a defendant, but any one of the parties involved in the conspiracy -- knowingly committed at least one overt act in furtherance of the conspiracy during the life of the conspiracy, in the Southern District of New York.

So let us now separately consider each of these elements.

The first element that the prosecution must prove beyond a reasonable doubt to establish the offense of conspiracy is that two or more persons entered the unlawful agreement charged in the indictment.

The essence of the crime of conspiracy is an unlawful agreement between two or more people to violate the law.  The

I6R7GAL7                      Charge

first element of the crime of conspiracy thus has two parts:
An agreement and an illegal object of the conspiracy.  I am now
going to define both parts of this element to you

        To meet its burden of proof on this element, the
government must prove that there was an agreement between two
or more people.  The government is not required to show,
however, that two or more people sat down at a table and
entered into a solemn fact, orally or in writing, stating that
they have formed a conspiracy to violate the law and spelling
out all of the details of the plans and the means by which the
unlawful project was to be carried out, or that the part that
each of the persons who is a party to the conspiracy was going
to play.  Common sense will tell you that when people in fact
undertake to enter into a criminal conspiracy, much is left to
unexpressed understanding.  Conspirators do not usually reduce
their agreements to writing.  They do not typically broadcast
their plans publicly.  By its very nature, a conspiracy is
almost always secret in its origin and execution.  It is enough
if two or more people, in some way or manner, impliedly or
tacitly come to an understanding to violate the law.  Express
language or specific words are not required to indicate assent
or agreement to form the conspiracy.  You need only find that
two or more people entered into the unlawful agreement alleged
in the indictment in order to find that a conspiracy existed.
It is not enough, however, that the alleged conspirators simply

I6R7GAL7                          Charge

1    met, discussed matters of common interest, acted in similar

2    ways or perhaps helped one another out.

3           In determining whether there has been an unlawful

4    agreement as alleged in Count One, you may judge the proven

5    acts and conduct of the alleged conspirators that were taken to

6    carry out the apparent criminal purpose.  The old adage,

7    "actions speak louder than words," is applicable here.

8    Disconnected acts, when taken in connect with one another, can

9    show a conspiracy or an agreement to secure a particular result

10   just as satisfactorily and conclusively as more direct proof.

11          When people enter into a conspiracy to accomplish an

12   unlawful end, they become agents or partners of one another in

13   carrying out the conspiracy.  In determining the factual issues

14   before you, you may take into account any acts done or

15   statements made by any of the alleged coconspirators during the

16   course of the conspiracy, even though such facts or statements

17   may not have been made in the presence of the defendant or may

18   have been made without his knowledge.

19          Of course, proof concerning the accomplishment of the

20   object of a conspiracy may be the most persuasive evidence that

21   the conspiracy itself existed, but it is not necessary, as I

22   have said, that the conspiracy actually succeeded for you to

23   conclude that it existed.  In deciding whether the conspiracy

24   charged in Count One existed, you may consider all of the

25   evidence of the acts, conduct and statements of the alleged

1   conspirators and the reasonable inferences to be drawn from

2   that evidence.

3          It is sufficient to establish the existence of the

4   conspiracy if, after considering all of the relevant evidence,

5   you find beyond a reasonable doubt that the mind of at least

6   two alleged conspirators met in an understanding way, and that

7   they agreed, as I have explained, to work together to

8   accomplish the object or objective of the conspiracy charged in

9   Count One.

10          The second part of the first element relates to the

11   object of the conspiracy.  The object of a conspiracy is the

12   illegal goal the coconspirators agreed upon or hope to achieve.

13   As I have mentioned, the object of the conspiracy charged in

14   Count One of the indictment is securities fraud.  In order to

15   prove that a defendant is guilty of the conspiracy offense

16   charged in Count One, the government must establish beyond a

17   reasonable doubt that that defendant agreed with others to

18   commit securities fraud.

19          As I noted, the substantive offense alleged in Count

20   Two of the indictment is charged as the object of the

21   conspiracy.  This is permissible.  A crime may be punished for

22   its own sake, and it may also be an object of a conspiracy.

23   However, you must consider them separately.  A defendant may be

24   guilty of one and not the other, and you may consider whether

25   the defendant committed the substantive count when determining

I6R7GAL7                          Charge

whether the defendant committed the conspiracy.  I ask that you

apply the instructions I have already given regarding Count Two

in assessing whether the government has proven the object of

the conspiracy charged as Count One of the indictment.

          If you conclude that the government has proven beyond

a reasonable doubt that the conspiracy charged in Count One of

the indictment existed, and that the conspiracy had securities

fraud as its object, then you must next determine the second

question:  Whether the defendant you are considering

participated in the conspiracy with knowledge of its unlawful

purpose and in furtherance of its unlawful objective.

          In order to satisfy the second element of Count One,

the government must prove beyond a reasonable doubt that a

defendant knowingly and willfully entered into the conspiracy

with the intention of aiding the accomplishment of its unlawful

ends.

          An act is done "knowingly" and "willfully" if it is

done deliberately and purposely; that is, a defendant's acts

must have been the product of that defendant's conscious

objective, rather than the product of a mistake or accident, or

mere negligence, or some other innocent reason.

          To satisfy its burden of proof that a defendant

knowingly and willfully became a member of a conspiracy to

accomplish an unlawful purpose, the government must prove

beyond a reasonable doubt that the defendant knew that he was a

1    member of an operation or conspiracy to accomplish that

2    unlawful purpose, and that his action of joining such an

3    operation or conspiracy was not due to carelessness,

4    negligence, or mistake.

5            It is not necessary for the government to show that a

6    defendant was fully informed as to all of the details of the

7    conspiracy in order for you to infer knowledge and intent on

8    his part.  To have guilty knowledge, a defendant need not have

9    known the full extent of the conspiracy, or all of the

10   activities of all the conspiracy all of the conspiracy

11   participants.  Similarly, it is not necessary for a defendant

12   to have known every other member of the conspiracy.  In fact, a

13   defendant may know and have conspired with only one other

14   member of the conspiracy and may still be considered a

15   coconspirator.  Nor is it necessary for a defendant to have

16   received any monetary benefit from his participation in the

17   conspiracy, or to have a financial stake in the outcome of the

18   alleged joint venture.  It is enough if a defendant

19   participated in the conspiracy unlawfully, knowingly, and

20   willfully, as I have defined those terms.

21           The duration and extent of the defendant's

22   participation has no bearing on the issue of that defendant's

23   guilt.  A defendant need not have joined the conspiracy at the

24   outset.  A defendant may have joined the conspiracy at any time

25   in its progress, and a defendant will be held responsible for

1   all that was done before he joined and all that was done during

2   the conspiracy's existence while he was a member.  Each member

3   of a conspiracy may perform separate and distinct acts.  Some

4   conspirators may play major roles, while other play minor roles

5   in the scheme, and an equal role is not what the law requires.

6   In fact, even a single act may be sufficient to draw a

7   defendant within the scope of the conspiracy.

8           It is important for you to note that a defendant's

9   participation in the conspiracy must be established by

10   independent evidence of his own acts and statements and the

11   reasonable inferences that may be drawn from them.  I want to

12   caution you, however, that a person's mere association with or

13   relationship to a member of the conspiracy does not make that

14   person a member of the conspiracy, even when that association

15   is coupled with the knowledge that a conspiracy is taking

16   place.  The mere fact that a defendant may have met with or

17   knows others who engaged in criminal conduct does not prove

18   that defendant's participation in a conspiracy.  Similarly,

19   mere presence at the scene of a crime, even when coupled with

20   knowledge that a crime is taking place, is not sufficient to

21   support a conviction.  In other words, knowledge without

22   agreement and participation, is not sufficient.  In the context

23   of this case, as I instructed you concerning knowledge and

24   intent with respect to the substantive securities fraud, it is

25   important to remind you that you cannot infer guilt based

I6R7GAL7                        Charge

1    solely on the defendant's position in a corporate entity.

2              Similarly, the fact that a person, without knowledge

3    that a crime is being committed, merely happens to act in a way

4    that furthers either of the alleged purposes or objectives of

5    the conspiracy, does not make that person a conspirator.  What

6    is necessary is that the defendant joined in the conspiracy

7    with knowledge of its unlawful purposes and with an intent to

8    aid in the accomplishment of one or more of its unlawful

9    objectives.

10             In sum, the government must prove beyond a reasonable

11   doubt that the defendant you are considering, with an

12   understanding of the essential unlawful character of the

13   conspiracy, that is, to commit securities fraud, intentionally

14   engaged, advised or assisted in it for the purposes of

15   furthering that illegal undertaking.

16             Once a conspiracy is formed, it is presumed to

17   continue until either its objective is accomplished or there is

18   some affirmative act of termination by the members.  So too,

19   once a person is found to be a member of a conspiracy, he is

20   presumed to continue as a member in the conspiracy until a

21   conspiracy is terminated or achieves its objective, unless it

22   is shown by some affirmative proof that the person withdrew and

23   disassociated himself from it.

24             The third element --

25             Are you all OK?  It's late in the day, and it's a

I6R7GAL7                         Charge

1    little warm in here.  Does anybody want to stand and stretch or

2    keep going?

3          OK.  The third and final element of the conspiracy to

4    commit securities fraud charged in Count One of the indictment

5    is the requirement of an overt act.  To sustain its burden of

6    proof with respect to the conspiracy charged in the indictment,

7    the government must show beyond a reasonable doubt that at

8    least one overt act was committed in furtherance of that

9    conspiracy by at least one of the coconspirators -- not

10   necessarily a defendant -- in the Southern District of New

11   York.

12         The purpose of the overt act requirement is clear.

13   There must have been something more than mere agreement; some

14   overt step or action must have been taken by at least one of

15   the conspirators in furtherance of that conspiracy.

16         The overt acts are set forth in the indictment.  The

17   indictment alleges the following overt acts:

18         1.  In approximately March 2014, John Galanis, a/k/a

19   "Yanni," the defendant, met with employees of and advisors to

20   the WLCC at a Native American economic development conference

21   in Las Vegas, Nevada.

22         2.  On or about July 21, 2014, Michelle Morton sent a

23   text message to Jason Galanis stating, "should know how $ [sic]

24   we can proceed with bonds soon getting information.  Jason

25   Galanis responded, "I'm confident you will figure it out."

I6R7GAL7                          Charge

3.   On or about August 8, 2014, Hugh Dunkerley signed
an agreement pursuant to which he bound the broker dealer at
which he was employed to serve as the placement agent for the
issue witness of bonds by the WLCC.

4.   On or about August 22, 2014, Gary Hirst sent an
e-mail containing trade tickets signed by him authorizing the
purchase of certain bonds issued by the WLCC on behalf of
certain clients of Hughes.

5.   On or about October 1, 2014, Devon Archer, the
defendant, called the transfer of $15 million from a brokerage
account located in New York, New York for the purchase of $15
million of bonds issued by the WLCC, which bonds were also
held, for a period of time, in the brokerage account located in
New York, New York.

6.   On or about October 9, 2014, Bevan Cooney, the
defendant, caused the transfer of $5 million from an account in
his name for the purchase of $5 million bonds issued by the
WLCC

For the government to satisfy the overt act
requirement, it is not necessary for the government to prove
all of the overt acts alleged in the indictment.  And you may
find that overt acts were committed which were not alleged in
the indictment.  The only requirement is that one of the
members of the conspiracy -- not necessarily a defendant in
this case -- has taken some step or action in furtherance of

1    the conspiracy during the life of that conspiracy.

2              Let me put it colloquially.  The overt act element is

3    a requirement of the agreement went beyond the mere talking

4    stage, the mere agreement stage.  The requirement of an overt

5    act is a requirement that some action be taken during the life

6    of the conspiracy by one of the coconspirators to further that

7    conspiracy.

8              You are further instructed that the overt act need not

9    have been committed at precisely the time alleged in the

10   indictment.  It is sufficient if you are convinced beyond a

11   reasonable doubt that it occurred at or about the time and

12   place stated, as long as it occurred while the conspiracy was

13   still in existence.

14             You should bear in mind that the overt act, standing

15   alone, may be an innocent, lawful act.

16             But an apparently innocent act may shed its harmless

17   character if it is a step in carrying out, promoting, aiding or

18   assisting the conspiratorial scheme.  You are therefore

19   instructed that the overt act does not have to be an act which

20   in and of itself is criminal or constitutes an object of the

21   conspiracy.

22             Finally, you must find that an overt act was committed

23   in the Southern District of New York.  The Southern District of

24   New York encompasses the following counties:  New York County,

25   (i.e., Manhattan), the Bronx, Westchester, Rockland, Putnam,

I6R7GAL7                     Charge

1   Dutchess, Orange and Sullivan Counties.  Anything that occurs

2   in any of those places occurs in the Southern District of New

3   York.

4           You will recall that I have admitted into evidence

5   against the defendants the acts and statements of others

6   because these acts and statements were committed or made by

7   persons who, the government charges, were also coconspirators

8   of the defendants.

9           The reason for allowing this evidence to be received

10  against the defendants has to do in part with the nature of the

11  crime of conspiracy.  A conspiracy is often referred to as a

12  partnership in crime:  As in other types of partnerships, when

13  people enter into a conspiracy to accomplish an unlawful end,

14  each and every member becomes an agent for the other

15  conspirators in carrying out the conspiracy.

16          Therefore, the reasonably foreseeable acts or

17  statements of any member of the conspiracy, committed in

18  furtherance of the common purpose of the conspiracy, are

19  deemed, under the law, to be the acts or statements of all of

20  the members, and all of the members are responsible for each

21  acts or statements

22          If you find beyond a reasonable doubt that the

23  defendant was a member of the conspiracy charged in the

24  indictment, only reasonably foreseeable acts done, or

25  statements made, in furtherance of the conspiracy by a person

I6R7GAL7                    Charge

found by you to have been a member of the same conspiracy may

be considered against that defendant.  This is so even if such

acts were committed or such statements were made in that

defendant's absence, and without his knowledge.

       However, before you may consider the acts or

statements of a coconspirator in deciding the guilt of a

defendant, you must first determine that the acts were

committed or statements were made during the existence, and in

furtherance, of the unlawful scheme.  If the acts were done and

the statements were made by someone whom you do not find to

have been a member of the conspiracy, or if they were not made

in furtherance of the conspiracy, they may not be considered by

you in deciding whether a defendant is guilty or not guilty.

       I have instructed you that the defendants, in various

respects, must have acted knowingly in order to be convicted.

This is true with respect to the objects of the conspiracy

charged in Count One, as well as the substantive crime charged

in Count Two.  In determining whether a defendant acted

knowingly with respect to the objectives of the conspiracy or

the substantive crime, you may consider whether that defendant

deliberately closed his eyes to what otherwise would have been

obvious to him.

       This is what the phrase "conscious avoidance" refers

to.  As I told you before, acts done knowingly must be a

product of a person's conscious intention.  They cannot be the

result of carelessness, negligence or foolishness.  But a

person may not intentionally remain ignorant of a fact that is

material and important to his conduct in order to escape the

consequences of criminal law.  We refer to this notion of

intentionally blinding yourself to what is staring you in the

face as conscious avoidance.  An argument by the government of

conscious avoidance is not a substitute for proof of knowledge;

it is simply another factor that you, the jury, may consider in

deciding what a defendant knew.

Therefore, if you find beyond a reasonable doubt that

the defendant you are considering was aware that there was a

high probability that a material fact was so, but that the

defendant deliberately and consciously avoided confirming this

fact, such as by purposely closing his eyes to it, or

intentionally failing to investigate it, then you may treat

this deliberate avoidance of positive knowledge as the

equivalent of knowledge.  However, guilty knowledge may not be

established by demonstrating that the defendant was merely

negligent, foolish or mistaken.  Moreover, if you find that the

defendant actually believed that the material fact was true, he

may not be convicted.  It is entirely up to you whether you

find the defendant deliberately closed his eyes and any

inferences to be drawn from the evidence on this issue.

With respect to the conspiracy charged in Count One,

you must also keep in mind that there is an important

1    difference between intentionally participating in the

2    conspiracy, on the one hand, and knowing the specific object or

3    objects of the conspiracy, on the other.  You may consider

4    conscious avoidance in deciding whether a defendant knew the

5    objective or objectives of a conspiracy; that is, whether a

6    defendant reasonably believed that there was a high probability

7    that a goal of the conspiracy was to commit the crimes charged

8    as objects of that conspiracy and deliberately avoided

9    confirming that fact but participating in the conspiracy

10   anyway.  But conscious avoidance cannot be used as a substitute

11   for finding that the defendant intentionally joined the

12   conspiracy in the first place.  It is logically impossible for

13   a person to intend and agree to join a conspiracy if he does

14   not know actually know it exists, and that is the distinction I

15   am drawing.  Similarly, with respect to the substantive

16   securities fraud charged in Count Two, conscious avoidance can

17   go only to knowledge and cannot be used as a substitute for

18   finding that the defendant you are considering acted willfully

19   or with an intent to defraud.

20          In sum, if you find that the defendant you are

21   considering believed there was a high probability that a

22   material fact was so and that the defendant deliberately and

23   consciously avoided learning the truth of that material fact,

24   you may find that the defendant acted knowingly with respect to

25   that fact.  However, if you find that the defendant actually

believed the fact was not so, then you may not find that he

acted knowingly with respect to that fact.  You must judge from

all the circumstances and all the proof whether the government

did or did not satisfy its burden of proof beyond a reasonable

doubt.

          The government has offered evidence tending to show

that on another occasion, John Galanis engaged in conduct

similar to the charges in the indictment.

          In that connection, let me remind you that John

Galanis is not on trial for committing acts not alleged in the

indictment.  Accordingly, you may not consider this evidence of

similar acts as a substitute for proof that John Galanis

committed the crimes charged.  Nor may you consider this

evidence as proof that John Galanis has a criminal personality

or bad character.  The evidence of the other similar acts was

admitted for a much more limited purpose, and you may consider

it only for that limited purpose.

          If you determine that John Galanis committed the acts

charged in the indictment and the similar acts as well, then

you may, but you need not draw, an inference that in doing the

acts charged in the indictment, John Galanis acted knowingly

and intentionally and not because of some mistake, accident or

some other reasons.

          Evidence of similar acts may not be considered by you

for any other purpose.  Specifically, you may not use this

I6R7GAL7                              Charge

1    evidence to conclude that because John Galanis committed the

2    other act or acts he must also have committed the acts charged

3    in the indictment.  Nor may you consider this evidence in any

4    way against Mr. Archer or Mr. Cooney.

5              As we have proceeded through the indictment, you have

6    noticed that it refers to a range of dates.  I instruct you

7    that it does not matter if a specific event alleged to have

8    occurred on or about a certain date or month, but the testimony

9    indicates that in fact it was a different date or month.  The

10   law requires only a substantial similarity between the dates

11   and the months alleged in the indictment and the dates and

12   months established by the evidence.

13             Now, in addition to dealing with the claims of each of

14   the offenses, you must also consider the issue of venue as to

15   each offense, namely, whether any act in furtherance of the

16   unlawful activity occurred within the Southern District of New

17   York.  As I previously instructed you, the Southern District of

18   New York encompasses the following counties:  New York County,

19   (i.e. Manhattan), the Bronx, Westchester, Rockland, Putnam,

20   Dutchess, Orange and Sullivan Counties.  Anything that occurs

21   in any of those places occurs in the Southern District of New

22   York.

23             It is sufficient to satisfy the venue requirement if

24   any act by anyone in furtherance of the crime charged occurred

25   within the Southern District of New York.  To satisfy this

1    venue requirement only, the government need not meet the burden

2    of proof beyond a reasonable doubt.  It need not meet that

3    standard on the venue requirement and the venue requirement

4    only.  The government meets its burden of proof if it

5    establishes by a preponderance of the evidence -- simply tips

6    the scale in its favor -- that an act in furtherance of the

7    crime occurred within the Southern District of New York.  A

8    preponderance of the evidence means that something is more

9    likely than not.

10           So now I'm going to go through the last section of the

11   jury charge, and that deals with the deliberations of the jury.

12           So, ladies and gentlemen of the jury, that concludes

13   the substantive portion of my instructions to you.  You are

14   about to go into the jury room and begin your deliberations.

15   More than likely you will begin them tomorrow morning.  I will

16   back all of the exhibits to the jury room, but feel free to ask

17   for any items as well, including any exhibits you may have

18   trouble locating, and those that are not in hard copy, such as

19   audio or video recording, which we can replay for you in the

20   courtroom.  If you want any of the testimony read back, you may

21   also request that.  Please remember that it is not always easy

22   to locate what you might want, so be as specific as you

23   possibly can in requesting exhibits or portions of the

24   testimony.  If you want any further explanations of the law as

25   I have explained it to you, you may also request that.

I6R7GAL7                          Charge

1              Your requests for exhibits or testimony -- in fact any
2      communications with the Court -- should be made to me in
3      writing, signed, dated, and timed by a foreperson that you will
4      choose, and given to one of the court security officers.  I
5      will respond to any questions or requests you have as promptly
6      as possible, either in writing or by having you return to the
7      courtroom so I can speak to you in person.  In any
8      communication, please don't tell me or anyone else how the jury
9      stands on any issue until after a unanimous verdict is reached
10     and announced in open court by your foreperson.
11             If any of have you taken notes during the course of
12     this trial, I want to emphasize to you as you are about to
13     begin your deliberations that notes are simply an aid to your
14     memory.  Notes that any of you may have made may not be given
15     any greater weight or influence than the recollections or
16     impressions of other jurors, whether from notes or memory, with
17     respect to the evidence presented or what conclusions, if any,
18     should be drawn from such evidence.  All jurors' recollections
19     are equal.  If you can't agree on what you remember the
20     testimony was, you can ask to have the transcript read back.
21             Although during your deliberations you may discuss the
22     case with your fellow jurors, you must not communicate with or
23     provide any information to anyone else by any means.  You may
24     not thus use any electronic devices or media, such as
25     telephone, cell phone, smart phone, iPhone, BlackBerry, or

computer, the Internet, or any Internet service, or any text or
instant messaging service, or any Internet chat room, blog, or
website, such as Facebook, Snap Chat, YouTube or Twitter, to
communicate with anyone any information about this case or to
conduct any research about this case until I accept your
verdict.

Momentarily, you will retire to decide the case. Your
function is to weigh the evidence in this case and to determine
the guilt or lack of guilt of each defendant with respect to
each count charged in the indictment. You must base your
verdict solely on the evidence or lack of evidence and these
instructions as to the law, and you are obligated on your oath
as jurors to follow the law as I instruct you, whether you
agree or disagree with the particular law in question.

It is your duty as jurors to consult with one another
and to deliberate with a view toward reaching an agreement.
Each of you must decide the case for himself or herself, but
you should do so only after a consideration of the case with
your fellow jurors, and you should not hesitate to change an
opinion when convinced that it is erroneous. Discuss and weigh
your respective opinions dispassionately, without regard to
sympathy, and without regard to prejudice or favor for either
party, and adopt that conclusion which in your good conscience
appears to be in accordance with the truth. You are not to
discuss the case until all jurors are present. So if you get

1    there in the morning, you can't start talking about it until

2    everybody is there.  Nine or ten or even 11 jurors together is

3    only a gathering of individuals.  Only when all jurors are

4    present do you constitute a jury, and only then may you

5    deliberate.

6          The verdict must represent the considered judgment of

7    each juror.  In order to return a verdict, it is necessary that

8    each juror agree to the verdict.  Your verdict must be

9    unanimous.  However, you are not bound to surrender your honest

10   convictions concerning the effect or weight of the evidence for

11   the mere purpose of returning a verdict or solely because of

12   the opinion of other jurors.  Each of you must make your own

13   decision about the proper outcome of this case based on your

14   consideration of the evidence and your discussions with your

15   fellow jurors.  No juror should surrender his or her

16   conscientious beliefs solely for the purpose of returning a

17   unanimous verdict.

18         Remember at all times, you are not partisans.  You are

19   judges, judges of the facts.  Your sole interest is to seek the

20   truth from the evidence in the case.

21         If you are divided, do not report how the vote stands

22   and, if you have reached a verdict, do not report what it is

23   until you are asked in open court.

24         I referred a moment ago to a foreperson.  You should

25   by your own vote select one of you to sit as a foreperson.  The

I6R7GAL7                      Charge

1    foreperson doesn't have any more power or authority than any

2    other juror, and his or her vote doesn't count for any more

3    than any other juror's vote or opinion.  The foreperson is

4    merely your spokesperson to the court.  He or she will send out

5    any notes, and sign them and date them and time then.  And when

6    the jury has reached a verdict, he or she will notify the court

7    security officer or marshal that the jury has reached a

8    verdict, and you will come into open court and give the

9    verdict.

10           After you have reached a verdict, you will fill out a

11   form that will be given to you, a verdict form.  You will sign

12   it and date it, and advise the marshal or court security

13   officer outside your door that you are ready to return to the

14   courtroom.  The verdict form lists the questions that you must

15   resolve based on the evidence and the instructions that I have

16   given you.  When the form is complete, it will be marked as a

17   court exhibit.

18           I will stress that each of you must be in agreement

19   with the verdict which is announced in open court.  Once your

20   verdict is announced by your foreperson in open court and

21   officially recorded, it cannot ordinarily be revoked.

22           So, at this time, the first 12 jurors first thing in

23   the morning will begin their deliberations in the case.  In

24   light of the scheduling conflicts, however, Juror 7, that's

25   Mr. Miller, and alternate number 1, so it's Juror 13,

I6R7GAL7                    Charge

1    Ms. Sanchez, I understand that you are both going to be away

2    all of next week, and you are not available on Friday, so we're

3    actually going to make you alternates numbers 3 and 4.  And

4    Mr. Grippi, you are going to become Juror 7.  All right?  Is

5    that clear to everyone?

6          So for the alternates, you won't deliberate at this

7    time, but the alternates are not quite excused.  While the jury

8    conducts its deliberations, you don't have to come to court,

9    but you should give Ms. Cavale your phone numbers where you can

10   be reached, because it is possible and it sometimes happens

11   that one or more of you could be needed to deliberate if one of

12   the 12 jurors is unable to continue.  Ms. Cavale will call you

13   when deliberations are completed so that you know that you are

14   completely finished.

15         Between now and then, you must continue to observe all

16   the restrictions I have instructed you on throughout the trial.

17   That is, you must not discuss this case with anyone, including

18   your fellow alternate jurors, the other jurors, any other

19   people involved in the trial, members of your family, friends,

20   coworkers, anyone else.  And until a verdict is reached, as I

21   have already instructed, you may not communicate with anyone

22   about the case in any way.  If anyone approaches you and tried

23   to talk to you about the case, please report that to me through

24   Ms. Cavale immediately.

25         Do not listen to or watch or read any news reports

I6R7GAL7                         Charge

1    concerning this trial if there were to be any; don't do any

2    research on the Internet or otherwise; don't visit any of the

3    places mentioned during the trial or conduct any investigation

4    of your own, including on social media.  The reason for this of

5    course is that should you be asked to participate in reaching a

6    verdict in this case, the only information you will be allowed

7    to consider is what you learned in this courtroom during this

8    trial.

9              I'm sorry to the alternate jurors, you will likely

10   miss the experience of deliberating with the jury but the law

11   provides for a jury of 12 persons in this case.  So before the

12   rest of the jury retires to the jury room, if you have any

13   clothing or objects that you want to pick up, and you're going

14   to be asked to withdraw without discussing the case.  You can

15   say your goodbyes to your fellow jurors, and I'm going to come

16   thank you personally as well.

17             So, members of the jury, that concludes my

18   instructions to you.  Remember that your verdict must be

19   rendered without fear, without favor, and without prejudice or

20   sympathy.  I am sure that if you listen to the views of your

21   fellow jurors and apply your own common sense, you will reach a

22   fair verdict.

23             Right now I'm just going to ask you to stay seated or

24   stand and stretch for one minute while I speak to the lawyers.

25   And then we will swear in the marshal and excuse you for the

I6R7GAL7                        Charge

1    night.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6R7GAL7                    Charge

1              (At the side bar)

2              THE COURT:  Is there anything that needs to be

3    corrected, anything additional?

4              MR. QUIGLEY:  Just the language about the indictment

5    going back.

6              THE COURT:  But I think I corrected that on the fly,

7    so I don't think I need to fix that.  I don't think I need to

8    reprint everything, do you?

9              MR. SCHWARTZ:  No.

10             THE COURT:  All right.  So I'm going to send the jury

11   to deliberate.

12             MS. MERMELSTEIN:  How will we know what time they're

13   coming tomorrow?

14             THE COURT:  I'm going to ask them to send us a note

15   today and tell us what schedule they would like to set.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

I6R7GAL7                    Charge

1          (In open court)

2          THE COURT:  So, as I said, momentarily I'm going to

3   send you into the jury room to begin your deliberations.  And I

4   will send in the jury charge.  I will send in one copy of the

5   verdict form.  We will be sending all of the exhibits back, as

6   I mentioned.

7          I will note that Ms. Cavale has been dealing with you

8   during the course of the trial.  During your deliberations,

9   however, you will not have any contact with her.  Any contact

10  with the court must be made through the marshal or court

11  security officer by note, by written note.  So, we will now

12  swear in the marshal to protect you during the course of these

13  deliberations.

14          (Marshal sworn)

15          THE COURT:  I'm going to excuse you for the evening.

16  I'm going to just walk back and thank the alternate jurors --

17  to the extent I don't see you in the future -- thank you for

18  your time.

19          The one thing I'm going to ask you to do before you

20  leave tonight is just agree on a schedule going forward just

21  for purposes of today and tomorrow.  I assume you want to go

22  home now, but just let me know what time you plan to be here in

23  the morning so that we can be sure to be here as well.

24          And then I'm going to ask you to do the same thing

25  tomorrow if there is a particular time, if you want to sit

I6R7GAL7                          Charge

1    until five, or six, or earlier, just send us a note and let us

2    know so that we know what your schedule is going to be.  OK?

3    And with that, thank you for your patience, and you are

4    directed to begin your deliberations.

5                 (Jury retires for the evening)

6                 (Trial adjourned to June 28, 2018 at 9:00 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25