UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :

UNITED STATES OF AMERICA

                                                        :

        - v. -

                                                        :       S3 16 Cr. 371 (RA)

BEVAN COONEY,

                                                        :

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

 

                                                                                     AUDREY STRAUSS
                                                                                    Attorney for the United States,
                                                                                    Acting Under Authority Conferred by 28
                                                                                  U.S.C. § 515

Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys

       - Of Counsel -

**Table of Contents**

INTRODUCTION .................................................................................................................. 1
DISCUSSION ....................................................................................................................... 2
    I.    The Applicable Guidelines Range is 135 to 168 Months' Imprisonment .......................... 2
        A.    The Loss Amount is Between $25 and $65 Million ....................................... 3
        B.    The Enhancement for Ten or More Victims Applies ..................................... 6
        C.    An Enhancement for Obstruction of Justice is Warranted ........................... 6
        D.    A Minor Role Reduction is Not Appropriate ................................................. 8
    II.    A Sentence Within the Guidelines Range is Appropriate ................................................ 9
        A.    A Guidelines Sentence Would Recognize the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Ensure Adequate General Deterrence .. 9
        B.    A Guidelines Sentence Would Also Be Appropriate in Light of the History and Characteristics of the Defendant ................................................................. 10
        C.    A Guidelines Sentence Would Not Cause an Unwarranted Sentencing Disparity ..... 12
    III.    Restitution and Forfeiture............................................................................................. 13
CONCLUSION ................................................................................................................... 14

The Government respectfully submits this memorandum in connection with the sentencing of defendant Bevan Cooney, which is scheduled for July 31, 2019, at 11:00 a.m.  For the reasons that follow, the Government submits that a sentence within the 135 to 168 months Guidelines range is sufficient, but not greater than necessary, to effectuate the purposes of sentencing.

## INTRODUCTION

Because the Court is amply familiar with the facts of this matter, given that it presided over Cooney's lengthy trial and the extensive post-trial litigation that followed, the Government will not reiterate the ample evidence of Cooney's extensive participation in the Wakpamni fraud. Nor given the jury's swift conviction of Cooney and Court's proper rejection of Cooney's Rule 29 and 33 motions will the Government engage with Cooney's efforts to relitigate his guilt as part of sentencing.  As was clearly established at trial, Cooney was aware of and involved in numerous aspects of the Wakpamni fraud – including the purchase of Hughes and Atlantic, the placement of the bonds with victim pension funds, the "purchase" of a tranche of bonds on behalf of Jason Galanis, and the extensive efforts to cover up the fraud through the creation of false documents.  Along the way, Cooney proved himself wholly willing to lie – to the Wakpamni Lake Community, to his own bank, even to the SEC – to perpetrate this massive fraud.  And years after the fact, and even in the face of a jury verdict, Cooney has wholly failed to accept responsibility for his criminal conduct.  In light of the seriousness of the offense, the need to promote respect for the law, and the requirement of just punishment, the Government respectfully submits that a sentence within the 135 to 168 months Guidelines range is appropriate.

**DISCUSSION**

I. **The Applicable Guidelines Range is 135 to 168 Months' Imprisonment**

The Government and the Probation Department agree that the Guidelines range is 135 to 168 months' imprisonment, calculated as follows:

- The base offense level is seven, pursuant to U.S.S.G. § 2B1.1(a)(1), because the offense of conviction has a statutory maximum sentence of more than 20 years.

- Because the loss was greater than $25,000,000 but less than $65,000,000, 22 levels are added pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

- Because the offense involved ten or more victims, two levels are added pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).

- Because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction, two levels are added pursuant to U.S.S.G. § 3C1.1.

- The defendant is not entitled to any reduction for acceptance of responsibility as he was convicted following a jury trial and has continued to disavow responsibility for his crimes.

Accordingly, the total offense level is 33.  Cooney has no criminal history points and is thus in Criminal History Category I.  Accordingly, the Guidelines range is 135 to 168 months imprisonment.

Cooney challenges virtually every aspect of this Guidelines calculation,[1] claiming, amazingly, that he faces a Guidelines range of zero to 6 months' imprisonment.  As set forth in

---

[1] Cooney appears to argue that the Court must utilize a "reasonable certainty" standard, rather than a preponderance of the evidence standard, in determining the applicability of any enhancements because the applicable Guideline is U.S.S.G. § 2X1.1, rather than §2B1.1.  (Br. at 47).  But because Cooney was convicted of both substantive and conspiracy offenses, there can be no question that the appropriate Guideline provision is §2B1.1 and that the Court must find any enhancements under the well-established preponderance standard.

2

further detail below, Cooney is wrong.

## A. The Loss Amount is Between $25 and $65 Million

As a preliminary matter, Cooney does not, and could not, contest that the actual losses to the victims of the charged crimes exceeded $25 million. And as this Court has already repeatedly found there can be "no dispute that th[e] total investment loss [to the Atlantic/Hughes clients] is between 25 million and 65 million." (Dkt. 740, John Galanis Sentencing Tr. at 10; Dkt. 230, Jason Galanis Sentencing Tr. at 31; Dkt. 635, Gary Hirst Sentencing Tr. at 8). Instead, Cooney argues that there "was not sufficient evidence [that] Cooney knowingly and willingly participated in the charged fraud scheme" and there was no "causal link" between "the transaction involving 1920 Bel Air," his "purported fraudulent actions with CNB," or his "purported submission of false Calvert Documents to the SEC and the ultimate loss to the institutional investors." (Br. at 53).[2]

The Court should reject this argument. Under the Guidelines, Cooney is responsible for the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 app note. 3(A)(i). Further, in addition to his own conduct, Cooney is also responsible for "all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal

---

[2] Perplexingly, Cooney also argues that such losses are not attributable to him because he was convicted "only" of the securities fraud counts "which do not require any intended or actual deprivation of property as an element of the offense," (Br. at 50) but not of the investment adviser fraud counts. Cooney cites not a single case in support of this proposition. And indeed, there is no support for such an argument. Indeed, this Court has already found the same loss amount attributable to defendant John Galanis, who was also not charged with any investment adviser counts.

3

activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity[.]" U.S.S.G. §1B1.3(a)(1)(B).

As this Court has already found, there was "ample evidence demonstrating that . . . Cooney [was a] willful participant" in the Wakpamni bond fraud.  (Op. and Order at 1).  Even if Cooney was not directly involved in the first bond issuance, he was fully aware beforehand that it was going to happen.  *See, e.g.*, GX 2217 (Galanis email to Cooney to say that members of the Wakpamni community have fully executed bond documents).  Moreover, Cooney was fully aware that $28 million of the bonds had been placed with Hughes clients, just a week after Cooney's co-conspirators had acquired Hughes.  GX 2034 (Galanis 8/11/14 email to Cooney stating "WAAG wire $2.76 million today to close Hughes"); GX 2299 (Galanis 8/19/14 email to Cooney with bond allocation among Hughes' clients).

As such, the loss from the first issuance, $28 million, was clearly foreseeable to Cooney, and as Jason Galanis took steps to put that $28 million to work for him and his co-conspirators (and not into an annuity for the benefit of the Wakpamni), Cooney's involvement in the fraud only deepened.  In October 2014, Cooney "bought" $5 million worth of the second tranche of bonds, using money misappropriated from the first bond issuance and which Cooney had received just days earlier from Jason Galanis.  In connection with the bond purchase, Cooney sent the WLCC a purported representation letter, indicating that he was buying the bonds for his "own account for investment only" and making no mention of the fact that, at best, he was acting essentially as a straw purchaser for Galanis.  (*See, e.g.*, GX 254, 2232, 2233).  Cooney also knew another co-conspirator had purchased $15 million of the second tranche.  *See, e.g.*, GX 1236 (Archer and Cooney back and forth comparing Cooney's lack of issues depositing bonds at

4

City National with Archer's issues at Morgan Stanley).   In addition, in November 2014, shortly after the completion of the first two rounds of bonds, Cooney received a wire for $3.895 million from the account used by the "annuity provider" and then used this money purportedly to purchase Galanis's house.[3]

Further, Cooney was (i) aware of the purchase of Atlantic just before the final bond transaction, *see, e.g.*, GX 1229, whose clients received the entirety of the third tranche, and (ii) on April 28, 2015, shortly after the final bond transaction, Cooney received a $75,000 wire from the "annuity provider."

In short, Cooney was unquestionably a willing participant in the scheme, and the scope of the loss was clearly reasonable foreseeable to him given his awareness of all three bond transactions, which totaled almost $60 million.

Cooney's suggestion that he cannot be held "liable for loss to CNB bank" simply misses the mark.   (Br. at 51).   Neither the Government nor the Court has ever suggested that the loss amount here includes CNB's losses as a result of Cooney's default on his fraudulently obtained loan.   Nor has the Government suggested that Cooney's submission of fraudulent documents to the SEC long after the issuance of the bonds was the *cause of* the investors' losses.   Rather, as detailed in the Court's decision denying Cooney's post-trial motions, Cooney's lies about the source of the money used to buy the bonds and even whether he owned the bonds, as well as his efforts to cover up the scheme by submitting false documents to the SEC, all reveal his knowing

---

[3] Cooney makes much of the purported legitimate use to which he intended to put the $3.895 million – namely, to purchase Jason Galanis's Bel Air Mansion.   But as the Court has already noted, "Cooney's intent as to the use of the money is of no moment . . . the critical point is that Cooney personally received nearly $4 million in funds directly from the annuity provider for the WLCC," from which the "natural inference" "is that Cooney knew this money constituted misappropriated bond proceeds." (Op. and Order at 48).

5

participation in the scheme.

### B. The Enhancement for Ten or More Victims Applies

The ten or more victims enhancement is also appropriate.   Cooney argues that his crimes of conviction do not include the pension fund investors, and that because he was not responsible for losses to the investors, nor was it reasonably foreseeable to him that losses to investors would result from his participation in the fraud, he cannot be held accountable for the number of investors defrauded.

The Court should reject Cooney's argument.   As described above, all three issuances were reasonably foreseeable to Cooney, as were the purchases of those tranches by the clients at the two captured asset management firms that Cooney knew had been purchased by co-conspirators.   On this basis alone, there is ample basis to impose a two-level increase on the basis of the ten or more victims, given the involvement of ten pension funds and the WLCC.

As such, all 11 victims of the scheme were reasonably foreseeable to Cooney

### C. An Enhancement for Obstruction of Justice is Warranted

The two-point enhancement for obstruction of justice pursuant to U.S.S.G. §3C1.1 also applies.   Cooney concedes that Calvert was a fake entity created for the explicit purpose of covering up the Wakpamni fraud and that he produced purported (but fake) Calvert documents to the SEC, but unbelievably argues that "[t]here was no evidence that [he] had any idea that Calvert was a fake company created by Galanis and others." (Br. at 58).

Trial evidence indisputably established that Calvert Capital was first created in October 2015.  (GX 1609).   The evidence was also clear that Cooney provided his financial managers with an October 2014 secured loan agreement between himself and Calvert in which Calvert

6

purportedly loaned him $5 million to purchase the Wakpamni bonds. (GX 2298).   Similarly, Cooney provided his tax preparer with a letter purportedly documenting a $4,895,000 loan made to him by Calvert in connection with his purported purchase of Jason Galanis's home, telling his tax preparer that he had "found this in his file for my taxes for last year." (GX 3273).

Since Calvert was not created until October 2015, Cooney could not, of course, have believed that Calvert had loaned him money in 2014 to fund the purchase of the Wakpamni bonds or of 1920 Bel Air.   And Cooney's own emails and documents make clear that he knew the money had not come from Calvert. (*See, e.g.*, GX 3236 (Email in which Cooney acknowledges that the money wired to him for the "purchase" of Jason Galanis's home came from Wealth Assurance Holdings); GX 432 (Cooney's bank records demonstrating that $5 million used to buy bonds was wired to Cooney by Thorsdale)).   There was thus overwhelming evidence that Cooney knew that Calvert was a fake company and knew the purported loan agreements he provided first to his financial managers and tax preparer, and later to the SEC were fabricated.   Cooney's conduct thus fits squarely within the kinds of actions contemplated by § 3C1.1.  (*See*, Application Note 4(C) providing examples of covered conduct and including "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding.").

Cooney further argues, however, that the Calvert documents were simply "produced to the SEC as part of a mass production," and without the specific intent to defraud the SEC.   (Br. 58).   But in light of the fact that Cooney indisputably knew that the Calvert documents were fake, the fact that he first produced them to his financial advisers and tax preparers, or that he produced them together with many other documents, does nothing to excuse his obstructive

7

conduct. Indeed, that he produced them to entities other than the SEC demonstrates only how far the efforts to cover up the fraud extended.

### D. A Minor Role Reduction is Not Appropriate

Finally, the Court should reject Cooney's argument that a minor-role reduction is warranted.

#### 1. Applicable Law

A mitigating role adjustment under Section 3B1.2 is appropriate only when a defendant is "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2, app. note 3(A). In considering the applicability of a mitigating role adjustment, the Sentencing Commission has instructed courts to "consider the following non-exhaustive list of factors:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;

(ii) the degree to which the defendant participated in planning or organizing the criminal activity;

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity."

U.S.S.G. § 3B1.2, app. note 3(C).

#### 2. Discussion

Cooney is not entitled to a minor-role adjustment because he is not "substantially less culpable than the average participant in the criminal activity," *i.e.*, the Wakpamni bond fraud.

8

Cooney clearly understood the "scope and structure of the criminal activity," having stayed apprised of the creation of the bonds, personally participated in misappropriating the proceeds from the first and the third bond issuances, and personally purchasing $5 million of the second bond issuance – a decision which was his alone to make.  While it is true that Cooney generally acted at the direction of Jason Galanis and his personal financial gain was significantly less than Jason Galanis's, the same could be said for most of his co-conspirators.  Thus, these factors do not make him "substantially less culpable than the average participant in the criminal activity."  As such, a minor-role reduction is not appropriate.

***

Accordingly, the applicable Guidelines range is 135 to 168 months' imprisonment.

## II. A Sentence Within the Guidelines Range is Appropriate

A sentence within the 135 to 168 months' Guidelines range is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

### A. A Guidelines Sentence Would Recognize the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Ensure Adequate General Deterrence

A Guidelines sentence would be appropriate "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), and to provide general deterrence, 18 U.S.C. § 3553(a)(2)(B).

#### 1. Cooney Ranks Among the Most Culpable of Fraud Defendants

Simply put, this was a massive fraud.  To start with, the loss amount of $43 million plainly puts Cooney and his co-conspirators among the most culpable of fraud defendants nationwide.  Sentencing Commission statistics for 2018 show that less than 1 percent of defendants sentenced last year pursuant to U.S.S.G. § 2B1.1 had a loss figure of greater than

9

$25,000,000.  *See* U.S. Sentencing Comm., *Use of Guidelines and Specific Offense Characteristics, Offender Based, Fiscal Year 2018*, at 11, *available at Use of Guidelines and Specific Offense Characteristics, Offender Based, Fiscal Year 2017*.

Further, the Wakpamni scheme was designed to be highly complex in an effort to fool investors and law enforcement.   In both the late summer of 2014 and the spring of 2015, the conspirators nearly simultaneously (i) executed the purchase of an investment adviser firm (Hughes in 2014 and Atlantic in 2015) and (ii) executed a bond issuance, the entirety of which they placed with clients of that newly acquired investment adviser.  *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").

Cooney played a key role in this scheme.   He knew about the acquisition of Hughes and Atlantic, personally purchased $5 million of the Wakpamni bonds using misappropriated bond proceeds, kept himself apprised of every step of the fraud, and worked to cover up the fraudulent nature of the scheme by distributing fraudulent Calvert contracts purporting to justify the fraudulent bond transactions, including to the SEC.   The amount of the loss, the scope of the fraud, and Cooney's involvement in numerous aspects of the fraud show that a Guidelines sentence is necessary to reflect the seriousness of the offense, promote respect for the law, and deter others from engaging in similar conduct in the future.

### B.  A Guidelines Sentence Would Also Be Appropriate in Light of the History and Characteristics of the Defendant

A Guidelines sentence is also appropriate in light of the history and characteristics of the

defendant.

### 1. There is a Serious Need for Specific Deterrence in This Case

Cooney argues that the need for specific deterrence does not require an incarceratory sentence because he has "already received this message," by virtue of having been civilly charged and sued. (Br. at 65). The opposite is true. Specific deterrence is a serious concern in the present case. Even in the face of a jury verdict, Cooney has utterly failed to take responsibility for his criminal activities. Instead, he continues to disavow responsibility for his own actions and those of his coconspirators, instead claiming to have been an unsophisticated passive investor duped by Jason Galanis.[4] There is thus little reason to believe that he has learned his lesson or that he would not engage in similar criminal conduct in the future.

This is all the more so in light of the evidence of Cooney's involvement in other criminal conduct. First, as described above, there is no question that Cooney made material misrepresentations to CNB in order to obtain a more than million dollar loan which he has not repaid. Thus, in addition to the present matter, he is also responsible for a more than million dollar bank fraud. Second, as revealed in portions of the Crafton recording not placed into evidence at trial, the Wakpamni fraud was not Cooney's first participation in a securities fraud. In that recording, Cooney told Crafton about his involvement with prior Jason Galanis deals in

---

[4] Cooney's repeated reliance on his purported "utter lack of sophistication, education, and experience" (Br. at 26) is also at odds with his own representations about his prior financial dealings. For example, Cooney has represented to Probation that he has been involved with three businesses as an investor or owner/operator, including Clover Hill Capitol, a "boutique investment banking firm." PSR ¶ 126. Cooney also represents that he has been involved in numerous other business deals, including an oil and gas deal with Recovery Energy, as part of a successful effort to raise more than $100 million for a natural resources deal. PSR ¶ 127. His complaint that the present conviction will prevent him from being able to "work in the world of finance," (Br. at 65), is also in tension with his claim to lack the qualifications to do so.

which efforts to manipulate the price failed because they did not control all of the outstanding stock. Cooney and Crafton also discussed an upcoming deal and the possibility that – in return for a fee – Crafton (an investment adviser) could place blocks of stock with his clients and guarantee that the clients would not sell the stock for an agreed upon period of time. In other words, Cooney's admissions on the recording make clear that he had repeated involvement in efforts to engage in market manipulation prior to his participation in the present offense.

### 2. Cooney's Friendships and Family Ties Do Not Merit a Variance

Cooney argues that his "exceptional" good works and his care for his aging father merit a significant variance from the Guidelines. (Br. at 63). And Cooney's support for his friends and family are admirable. But nothing about his support for his friends – checking in frequently with a friend whose family was facing serious illness or loss (Ltr. from Al Dunlap; Ltr. from John Sherron; Ltr. from Peter Gardiner; Ltr. from Beth Noah) or driving a friend to a rehabilitation facility (Ltr. from James Brennan) – constitutes truly exceptional good works. And nothing about his role as a supportive friend could come close to supporting the non-incarceratory sentence he seeks.

### C. A Guidelines Sentence Would Not Cause an Unwarranted Sentencing Disparity

A sentence within the 135 to 168 month Guidelines' range would not cause a disparity "among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Cooney does not suggest that such a sentence would create unwarranted disparities with respect to the other defendants already sentenced in this case. Rather, Cooney alleges that such a sentence would create unwarranted disparities vis-à-vis "cases where the fraud was even larger, the conduct more egregious and where the defendant was required to pay

12

restitution because the fraud victims lost money." (Br. at 68). But as discussed above, the fraud here is among the largest prosecuted frauds in the last year. It is difficult to imagine more egregious conduct. The fraud victims in this case also lost substantial sums of money, and Cooney must be required to pay restitution. Indeed, the restitution amount in the present case is vastly higher than the restitution amounts in any of the cases Cooney cites. (Br. at 69) (comparing this case to cases involving restitution amounts of $1 million to $15 million).

Thus, a Guidelines sentence would not cause an unwarranted sentencing disparity

***

Accordingly, a Guidelines sentence is appropriate.

### III. Restitution and Forfeiture

Consistent with the restitution orders entered against co-defendants Jason Galanis, John Galanis and Gary Hirst, the Court should order restitution in the amount of $43,785,175. A proposed order of restitution (with a schedule of victims filed under seal) is attached. In addition, and consistent with the recommendation of Probation, the Court should enter an order of forfeiture in the amount of $9,527,000, representing the proceeds from the Wakpamni fraud that Cooney directly received, (PSR ¶ 153) and the Government will provide a proposed preliminary order of forfeiture prior to sentencing.

## **CONCLUSION**

For the foregoing reasons, the Government requests that the Court impose a sentence within the 135 to 168 month Guidelines range.

                     Respectfully submitted,

                     AUDREY STRAUSS
                     Attorney for the United States,
                     Acting Under Authority Conferred by 28
                     U.S.C. § 515

By:    _/s Rebecca Mermelstein_____
         Rebecca Mermelstein/Brendan F. Quigley/
         Negar Tekeei
         Assistant United States Attorneys
         (212) 637-2360/2190/2444

Dated:  July 22, 2019
          New York, New York