**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY <br><br> Defendants. | No. 16 Cr. 371 (RA) |

**SENTENCING MEMORANDUM**
**ON BEHALF OF DEVON ARCHER**

BOIES SCHILLER FLEXNER LLP

Matthew L. Schwartz
Craig Wenner
55 Hudson Yards
New York, New York 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Devon Archer*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 3

MR. ARCHER'S PERSONAL HISTORY AND CHARACTERISTICS ..................... 7

    A.    Early Life and Education ....................................................... 7

    B.    Family ................................................................................... 8

    C.    Career ................................................................................. 10

    D.    Current Employment........................................................... 15

    E.    Civic and Charitable Work ................................................. 16

    F.    Community Reputation........................................................ 17

OFFENSE LEVEL COMPUTATION ...................................................................... 22

    A.    Mr. Archer's Base Offense Level is 7 ................................. 22

    B.    The Loss Amount Reasonably Foreseeable to Mr. Archer Was $0, and the Number of Victims Is One..................................... 22

    C.    Mr. Archer's Minimal Participation Warrants a Downward Adjustment of 4 Levels............................................................ 25

    D.    The Appropriate Advisory Guidelines Range Is 0–6 Months ............................ 28

A NON-CUSTODIAL SENTENCE IS APPROPRIATE IN THIS CASE.................... 28

I.    The Nature and Circumstances of the Offense ................................ 28

II.    Mr. Archer's Personal History and Characteristics ......................... 33

III.    The Need for the Sentence Imposed ................................................. 34

    A.    Mr. Archer Has Already Been Punished Severely............... 34

    B.    The Purposes of Deterrence Have Been Served ................. 36

    C.    There Is No Need to Protect the Public from Mr. Archer, Who Has Deep Respect For the Law ............................................ 36

      D.       Mr. Archer Does Not Need Treatment ................................................................. 38

IV.    The Kinds of Sentences Available ....................................................................... 39

V.     The Need to Avoid Unwarranted Sentencing Disparities .................................... 40

VI.    Application of the Section 3553(a) Factors Counsels Strongly in Favor of a Non-
       Custodial Sentence ............................................................................................. 41

VII.   The Need to Provide Restitution .......................................................................... 42

CONCLUSION ................................................................................................................. 44

INDEX OF EXHIBITS ..................................................................................................... 45

Devon Archer respectfully submits this memorandum of law and accompanying letters to assist the Court in determining the appropriate sentence to impose at the February 28, 2022 sentencing hearing.  For the reasons that follow, we respectfully submit that a non-custodial sentence is both consistent with the applicable sentencing guidelines and, regardless, sufficient but not greater than necessary to serve the purposes of sentencing.[1]

## PRELIMINARY STATEMENT

Devon Archer is a good and trustworthy man. He is a loving husband and devoted father of three. For those with the good fortune of becoming close to Mr. Archer, he is a lifelong friend who is always ready to help. As demonstrated by the outpouring of support from his family and people from every corner of his civic and professional community, Mr. Archer is "a family first man of dignity," "unfailingly warm and generous, and kind," "fair minded," "a person of very good moral character," "a great friend and a family man," someone who "operates with integrity," and is "ethical," "honest, loyal, thoughtful of others, and very supportive." "Devon is simply amazing, outstanding, terrific." "He has, is, and always will be a good man." His siblings, the children he coaches and mentors, his friends and members of his community, and the business partners from both before and after the indictment all attest to the powerful contributions Mr. Archer has made in their lives.

Mr. Archer is also a deeply empathetic and trusting person. Almost to a fault, he sees the good in people, including those who later abused that trust. Mr. Archer sincerely believed in Jason Galanis and Jason Sugarman's broader business strategy to grow the Burnham Financial

---

[1]     As the Court well knows, Mr. Archer pleaded not guilty to the charges against him and went to trial.  For purposes of sentencing, we acknowledge that Mr. Archer has been convicted of Counts I and II of the Indictment, but nothing in this memorandum should be understood as an acknowledgement that Mr. Archer is, in fact, guilty.

Group into a full-services firm through acquisitions – a belief that led Mr. Archer to take actions

that he now deeply regrets. At the time, however, Mr. Archer thought he was building a business,

not helping to further Galanis's criminal scheme. Mr. Archer does not shy away from the

mistakes he made, and he understands that his actions allowed Galanis to enrich himself and

others to the detriment of pension funds and the Wakpamni Lake Community Corporation, not to

mention the numerous long-time employees of the Burnham companies who lost their jobs. But

as Mr. Archer has maintained from the very beginning of the case, he did not knowingly join a

criminal conspiracy. Mr. Archer understands that the Court of Appeals for the Second Circuit

held that the jury was entitled to infer Mr. Archer's criminal state of mind, but the reality is that

his intent was only ever to build a business. He never profited from the criminal scheme, and it is

undisputed that he lost approximately $800,000 of his own money. As evidenced by the 44

letters of support submitted in connection with his sentencing, Mr. Archer's experience in this

case is a complete aberration and inconsistent with the integrity with which he has conducted

himself in a lifetime of other professional, personal, and charitable pursuits.

      Mr. Archer has been totally compliant with the Court throughout this case, showing an

impeccable Pre-Trial Services record. He has consistently demonstrated that he will faithfully

abide by any directive of the Court. When he first learned he would be charged, Mr. Archer

returned home from an overseas trip early and waited on his front steps outside his home before

dawn to minimize the impact of the arrest on both his children and the government. He has

appeared at every conference and has participated directly in his defense at trial. He traveled

internationally without incident during the pendency of this case dozens of times. His

compliance is not surprising, given that Mr. Archer's legal life history before this case has been

spotless. The offenses of conviction are utterly inconsistent with his character and personality, as

attested to by numerous friends, family, and business partners. And despite the criminal trial and conviction, Mr. Archer has continued to do the best he can by both his family and his community.

No matter how this case ultimately turns out, Mr. Archer has already suffered a great deal. He has lived with the crushing burden that his involvement, albeit unknowing, in Jason Galanis's fraud caused harm to so many people – not only the direct victims of the crime, but also for example the numerous Burnham employees who lost their jobs as a result. He has lived with the impact on his family, including his three young children who have been traumatized by their father's prosecution and conviction, which have become matters of national headlines and presidential politics by virtue of Mr. Archer's association with people of prominence. And, relatedly, Mr. Archer has watched the reputation and career he built over decades fall apart around him as he has faced a near constant onslaught of vitriolic media attention.

Under these circumstances, we respectfully submit that a non-custodial sentence will serve as sufficient punishment and satisfy the other objectives of the Sentencing Guidelines and section 3553. As explained below, such a sentence is within the appropriate guidelines range, but even if this Court were to calculate the guidelines differently, the result should be the same. Mr. Archer simply does not belong in jail.

## BACKGROUND

On June 28, 2018, following a six-week trial, Mr. Archer was convicted of securities fraud and conspiracy. From the beginning of the case, Mr. Archer maintained his innocence, and on August 17, 2018, Mr. Archer moved for acquittal and a new trial due to the insufficiency of the evidence. On November 15, 2018, this Court found that under the then-prevailing Rule 33 standard, Mr. Archer was entitled to a new trial. After evaluating the entire trial record and

applying what the parties agreed was the correct standard, the Court was "left with an unwavering concern that Archer is innocent of the crimes charged." *United States v. Galanis*, 366 F. Supp. 3d 477, 494 (S.D.N.Y. 2018).

After the government appealed, the Court of Appeals for the Second Circuit reversed. In its October 7, 2020 opinion, the Second Circuit observed that "the district court relied on this Court's prior case law on the proper standard" but held that this case law was in need of "clarifying," because "we have not always been clear about" when a district court has discretion to grant a new trial based on the weight of the evidence. *United States v. Archer*, 977 F.3d 181, 188, 190 (2d Cir. 2020); *but compare id.* at 187 n.3 ("we hold that the district court applied the incorrect standard").

In "clarifying" the Rule 33 standard, *id.* at 190, the court "stress[ed] that" under Rule 33, a district court may not reweigh the evidence "absent a situation in which the evidence was patently incredible or defied physical realities, or where an evidentiary or instructional error compromised the reliability of the verdict," *id.* at 188. Because no procedural or instructional error marred the verdict, and because the evidence relied on by the jury was not insufficient as a matter of law, the Second Circuit held that "the jury was entitled to conclude" that Mr. Archer was guilty and that the district court "must defer to the jury's resolution of conflicting evidence." *Id.* at 187 n.3, 188.

On November 20, 2020, Mr. Archer petitioned the Second Circuit for rehearing or rehearing *en banc*. After submitting the petition to the active members of the Court for a vote, the Second Circuit denied the petition. *See* Order, *United States v. Devon Archer*, Case No. 18-3727 (2d Cir. Dec. 23, 2020). Mr. Archer then filed a petition for a writ of certiorari with the United States Supreme Court, which that Court denied on November 1, 2021.

Mr. Archer's rehearing and certiorari petitions were based on the *Archer* panel decision adopting a standard that would make Rule 33 weight-of-the-evidence review essentially impossible, limiting it to situations in which the evidence "was patently incredible or defied physical realities."  (In such a situation, the evidence would also be insufficient as a matter of law under Rule 29.)  Just four days after the Supreme Court denied certiorari in this case, the Second Circuit decided the long-pending *United States v. Landesman*, which essentially walked back the *Archer* panel decision in exactly the way Mr. Archer's petitions requested.  *Landesman* inserted the words "for example" in the passage in *Archer* quoted above:  "'absent a situation in which,' ***for example***, 'the evidence was patently incredible or defied physical realities,' 'where an evidentiary or instructional error compromised the reliability of the verdict,' or where the government's case depends upon strained inferences drawn from uncorroborated testimony, 'a district court must defer to the jury's resolution of conflicting evidence.'"  *United States v. Landesman*, 17 F.4th 298, 331 (2d Cir. 2021) (quoting *Archer*, 977 F.3d at 188) (other internal citations and alterations omitted).  The *Landesman* court continued:  "Of course, in *Archer* we provided the clearest examples of when it would be appropriate to grant a Rule 33 motion, but they were merely examples, and not an exhaustive list."  *Id.*

This holding, which purported to be consistent with the *Archer* panel decision, was directly contrary to the government's own construction of *Archer* as put forward to the *Landesman* panel itself.  *See* Government's Notice of Supplemental Authority, *United States v. Nordlicht*, No. 19-3209-cr (2d Cir. filed Oct. 26, 2020), ECF 104 at 1 (explaining that under *Archer*, "a district court has discretion to grant a new trial ***only*** where 'the evidence was patently incredible or defied physical realities, or where an evidentiary or instructional error

compromised the reliability of the verdict,'");[2] *accord* Response and Reply Brief by the United States at 33-34, *United States v. Hoskins*, No. 20-842-cr (2d Cir. Jan. 12, 2021), ECF 110 (*Archer* "forbid" district courts from "re-weigh[ing] the evidence" under Rule 33).

The Second Circuit therefore seems to have recognized that it went too far in the *Archer* decision for exactly the reasons identified by Mr. Archer in his petitions, but it did so in a way that provides no relief to Mr. Archer.  It did so even though under *Landesman*'s clarification that Rule 33 allows a new trial "where the government's case depends upon strained inferences drawn from uncorroborated testimony," this Court's Rule 33 decision should have withstood appellate review.  17 F.4th at 331.  (Mr. Archer fully intends to take this issue up on direct review of the inevitable judgment against him, particularly since the government argued that his certiorari petition was premature because of its interlocutory posture.)

In any event, after the jury verdict, the Probation Office prepared a Presentence Investigation Report, which was subsequently revised, most recently on January 21, 2022. [ECF No. 996.] The PSR calculates a total offense level of 31, resulting in a guidelines imprisonment range of 108 months to 135 months. The Probation Office recommended a sentence of a total of 84 months. *Id.* at 61. Mr. Archer objected to the PSR, including the guidelines range.[3] Mr. Archer's objections are quoted in part in the PSR, which Mr. Archer reiterates here and discusses

---

[2]     *Nordlicht* and *Landesman* were consolidated appeals arising from the same prosecution, and which resulted in the single *Landesman* opinion from the Second Circuit.

[3]     Mr. Archer previously objected to portions of the original PSR, a copy of which is attached. In the final PSR, the Probation Office left many critical issues unresolved. As explained more fully below, the Court has already examined these factual questions in connection with its Rule 33 decision.

Because the PSR remained unchanged without addressing many objections, the government's preferred framing remains in the report. Mr. Archer therefore respectfully requests that the Court make specific findings as to these paragraphs and not adopt the government's position, about which the Probation Office expresses no view.

more fully below.[4] In its recommendation, the Probation Office notes that a non-guidelines sentence may be appropriate based on Mr. Archer's "employment history, his lack of a criminal history record, his community ties, his charitable service/good works, and his family ties and responsibilities." PSR ¶ 170. The Probation Office also acknowledges the Court may also consider "the effect the case has already had on Archer's life and reputation, the unlikelihood he would commit other crimes, and Archer's minor role in the instant offense," though the Probation Office does not base its recommendation on those additional factors or give Mr. Archer a minor role adjustment under the guidelines. PSR ¶ 171.

For the reasons below, a non-custodial sentence – which is consistent with the correct applicable Guidelines range, to the extent relevant – would be appropriate and no greater than necessary to serve the purposes of sentencing.

### MR. ARCHER'S PERSONAL HISTORY AND CHARACTERISTICS

A.      **Early Life and Education**

Mr. Archer was born on May 31, 1974, in Glen Cove, New York. PSR ¶ 99.  He is the oldest of four children and maintains a very close relationship with each of his siblings. *Id.* ¶ 100. Although Mr. Archer grew up in a middle-class household with loving parents, he overcame his fair share of challenges growing up.



---

[4]      Mr. Archer's objections are attached as Exhibit F.



Mr. Archer attended public school in Glen Head. *Id.* ¶ 122.  Mr. Archer excelled at school and sports, though not without considerable hard work.  After graduating from high school in 1992, Mr. Archer was set to go to Yale, where he was to play football and lacrosse.  Just a week after high school graduation, however, Mr. Archer got into a mountain biking accident and broke his neck and beck.  He laid on the ground, broken, for several hours before his brother found him and literally dragged him home and called an ambulance.  He spent weeks in the hospital, his C4 and T7 vertebrae broken.  "According to his doctors, he had a 1% chance of not being paralyzed."  PSR ¶ 103.  But – with a lot of luck – Mr. Archer persevered, dedicated himself to intense physical therapy, and was able to start at Yale in the fall.  At Yale, Mr. Archer was a standout lacrosse player and graduated with a degree in American Studies, though his football career was not to be.  *Id.*

**B.     Family**

Mr. Archer is completely devoted to his family. Mr. Archer literally married his childhood sweetheart. Mr. Archer and Dr. Krista Archer grew up on the same street and dated

before college, eventually marrying in 2003. PSR ¶ 106. Dr. Archer is a foot and ankle surgeon, *id.*, but she has scaled back her practice in recent years to care for their children. Dr. Archer has supported Mr. Archer and their family throughout the case. She attended the trial virtually every day and testified to his character.

Mr. Archer and Dr. Archer have three children, ages 14, 8, and 7. PSR ¶ 107. One common theme throughout the letters in support is that Mr. Archer depends on his children, and they on him, for their emotional foundation. The Archers' two youngest children literally cannot remember a time before this case, during which Mr. Archer has taken on added childcare responsibilities and deepened his already strong emotional bond with all three children.

Dr. Archer describes in her letter of support how Mr. Archer's children are everything to him and explains the devastating impact a term of incarceration will have on their young children who depend on him. Mr. Archer dedicates an enormous amount of time to his children, time that no one else could provide. For example, ████████████████████████████████ ████████████████████████████████████████████████. PSR ¶ 107. Mr. Archer is responsible for managing the additional burden of transporting her to the school, which does not provide bussing, and working with her outside of school to make sure she meets developmental goals. For his oldest child, Mr. Archer spends every weekend traveling with him across the state and country so that he can continue competing in Lacrosse at a national level. *Id.*

Mr. Archer's entire family notes the impact this case has had on Mr. Archer's children. Their youngest child has lived almost his entire life under the shadow of this case. The children experience the fallout from the near-constant media attention on Mr. Archer. Mr. Archer's mother noted in her interview with the Probation Office that Mr. Archer's oldest son, then 11, "is

9

at a fragile age and has been effected tremendously by the case." PSR ¶ 105. In one illustrative

example, █████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

PSR ¶ 107. The probation report notes that when discussing his children, Mr. Archer became

"visibly upset." *Id.* Dr. Archer explained that the pendency of this case and the attendant media

and public attention has been "awful for the entire family."  "She explained that she has seen her

husband age significantly and they've had to deal with her older son being bullied in school."

PSR ¶ 109. Mr. Archer has been proactive in trying to address the psychological and emotional

impact his trial and sentencing have on his oldest son, attending therapy together and separately.

PSR ¶¶ 107. As the letters in support attest, Mr. Archer's children are the single most important

thing to him in this world. The idea that he has hurt them by his behavior is unbearable.

Mr. Archer is and always was a key figure in his siblings' lives, as well. His sister Kier

describes Devon as not only a brother, but her "lifelong friend and mentor." As the oldest child

in a family with a loving father who was nonetheless somewhat compromised by the effects of

his military service in Vietnam, Devon has always been mindful of his siblings' needs. When

Kier came out as gay 20 years ago, it was "Devon's complete acceptance of [her that] set the

tone for the rest of [their] family. For that [Ms. Archer] is forever grateful for him." According to

Mr. Archer's youngest brother, Breck, Devon "has always looked out for the best interest of

[him] and [his] family. Devon has always been [his] role model, not because of his academic or

professional success, but because of his integrity and honesty."

### C.   Career

Mr. Archer's livelihood is building businesses, and his career has been defined by hard

work and unique opportunities. After college and following a short stint working for NBC during

the Atlanta Summer Olympics in 1996, Mr. Archer's first job was with Citibank in Asia. PSR

¶ 140. He worked for two years in Citibank's Ho Chi Minh City office before quitting to work on a charitable project involving U.S. and Vietnamese veterans of the Vietnam War, motivated by his father's experience and the life-long mark it had on Mr. Archer. PSR ¶ 139.

Back in 1997, Mr. Archer met Stephen Whisnant, who was the executive director of an international sports charity.  As he explained in his letter to the Court, Mr. Archer "became an integral part of [their] planning, and ultimately the execution of" a bicycle tour that united disabled veterans from both Vietnam and the United States. Mr. Archer "served as an on the ground Ambassador and spokesperson and he participated in this thirteen day journey." Mr. Archer "made an indelible mark on the project." Following the tour, Mr. Archer "was instrumental in helping to create a powerful and award-winning documentary film, working tirelessly to help find the resources to make it, and to then help distribute it around the world. He did this as a way to make certain the goodness of the project, what it did and what it stood for could be shared around the globe, and most certainly in the veterans community." The documentary aired on NBC in December 1998 and received the Emmy Award for Outstanding Program Achievement in 1999. PSR ¶ 124. The film, titled "Vietnam – Long Time Coming," raised millions of dollars for disabled athletes and funded the construction of a new hospital in Vietnam. *Id.*[6] Mr. Archer made such an impression on Mr. Whisnant, that they continued to work on charity events in subsequent years, and Mr. Whisnant named Mr. Archer his son's godfather.

Mr. Archer next worked for several years for Metlife and was involved in some of Metlife's major corporate initiatives, such as the acquisition of New England Financial and

---

[6]    Mr. Archer also appears in the documentary because he participated in the bike tour. Excerpts of the movie are freely-available online.  *E.g.*, https://tinyurl.com/ym8ey3ep

Metlife's initial public offering. PSR ¶ 137. Mr. Archer declined to stay on at MetLife following the IPO and instead started building businesses from the ground up.

Mr. Archer's first private equity initiative was as Co-Founder and President of Sitaro Group Ltd. PSR ¶ 136. Sitaro is a technology company focused on "digital asset management" whose clients include IBM, Cisco, Adobe, Y&R, Ogilvy & Mather and the Ad Council. *Id.* Mr. Archer sold his stake in Sitaro in 2004 after he joined Senator John Kerry's presidential campaign. *Id.* Consistent with Mr. Archer's charisma and talents, he served as the co-chair for Senator Kerry's national finance committee from 2003 to 2004. *Id.*

Having sold his interest in Sitaro, and Senator Kerry having lost the election, Mr. Archer started over again. In 2005, Mr. Archer co-founded Rosemont Capital LLC and was the company's managing partner. PSR ¶ 132. Mr. Archer "built the firm into a multi-asset class boutique private equity manager with at least seven 'vehicles' that they created for which they acted as General Partner." *Id.* He also co-founded and was the General Partner of Rosemont Realty LLC. PSR ¶ 135. Mr. Archer was responsible for "corporate strategy and equity capital for development for the organization." *Id.* Under Mr. Archer's leadership, Rosemont and its affiliates "successfully raised over $1 billion in equity and debt deployed over 10 portfolios and properties." *Id.* Rosemont Realty "managed over 29 million square feet of commercial multi-tenant property valued at over $2 billion at its peak." *Id.* In 2015, Rosemont Realty's shareholders sold a majority stake in the company to a Chinese real estate company, and most of Mr. Archer's equity interest in Rosemont Realty was rolled over into a newly formed entity now controlled by the Chinese acquirer. *Id.* Also among the Rosemont businesses that Mr. Archer built was Rosemont Seneca Technology Partners, LLC, which continues to do business today as Pilot Growth Equity Partners. PSR ¶ 133. Also during this period, Mr. Archer served as a trustee

of the Heinz Family Office, where he was responsible for reviewing and approving Trust-related materials and investment opportunities. PSR ¶ 134.

Some of the investors in Mr. Archer's Rosemont companies have written letters of support. Paul Sohn, for example, met Mr. Archer at college. Because Mr. Sohn sat on the board of his family's timber management company, and because he "100% believe[d] in Devon, his judgment and his ethics," Mr. Sohn recommended Mr. Archer's Rosemont Realty investment opportunity to his family's business. That began what Mr. Sohn describes as "the most successful and by an order of magnitude largest investment [his family's company] had made to date outside of timber." Mr. Sohn put his own "reputation and family relationships on the line," and throughout the five-year life of the deal, "Devon acted as a 100% ethical steward of our capital and a powerful advocate" for their company, ultimately returning a significant profit. Mr. Sohn "entered this transaction without hesitation because of the confidence [he] had in Devon as a businessman, investor, and person." He "would not hesitate to go into business with Devon again should the opportunity arise." Brad Cohen also invested in Rosemont. Mr. Cohen and Mr. Archer's relationship began when they worked together to "bring in critically important security equipment for the Indian Government." Mr. Cohen later invested $150,000 of his own money in Rosemont. Even today, after everything that has gone on, Mr. Cohen continues to do business with Mr. Archer as Mr. Cohen's company "relied heavily on Devon to help us expand and explore new opportunities." In their time working together, Mr. Cohen's impression of Mr. Archer is that he is "honest, hard-working, and ethical" and acts selflessly to "put other people first over his own interest."

Eventually Mr. Archer and his Rosemont business partners decided to go their separate ways. As they sold off pieces of their companies, such as the sale of Rosemont Realty, Mr.

Archer began new ventures with new business partners. For example, Jonathan Li explains that he has known Mr. Archer since 2009, when Mr. Li was CEO of China's first RMB-denominated private equity fund. Mr. Li is an experienced financier and lawyer by training. When Mr. Li started a new venture in 2013, a fund management firm focusing on China's outbound mergers and acquisitions, Mr. Li "immediately thought about Devon and invited him to become [Mr. Li's] business partner." In their numerous meetings and transactions together, Mr. Li "always found him to be honest, open and fair in all of the dealings [Mr. Li] observed." Mr. Archer "was courteous and respectful of everyone and made an effort to understand the positions of all sides. Sometimes [Mr. Li] even thought he was too accommodating and too quick to trust."

Mr. Archer also became a member of Norvik Bank's Governor Counsel in London, United Kingdom, and Riga, Latvia. PSR ¶ 134. In 2014, as has been reportedly endlessly, he joined the board of directors of Burisma Holdings in Kiev, Ukraine.  What the news reports fail to mention is that Mr. Archer provided real value to Burisma, and he was responsible for helping to found and develop the Burisma Holdings subsidiaries Burisma Kazakhstan and Burisma Geothermal. Mr. Archer was also involved in general corporate governance and strategy at the parent company. PSR ¶ 134.

In 2014, as Mr. Archer was completing his work at Rosemont Realty and getting involved in the various foreign business opportunities just described – and as the Archer family was growing with two new children – Mr. Archer was recruited to the boards of Burnham Financial Group and Valor Group.  As he explained in his own letter to the Court, Mr. Archer's goal was to build a business based on the storied Burnham brand.  The Court is familiar with what happened next.

### D.    Current Employment

Since the charges in this case and the collapse of Burnham, Mr. Archer has tried mightily to continue working to support his family.  Mr. Archer even managed to develop an entirely new business relationship during the pendency of this case, notwithstanding the enormous, negative media attention swirling around him. Since 2017, Mr. Archer has been employed by a company where he is responsible for international development and has worked full time for the company, which is headquartered in Illinois. *Id.* ¶ 131.  As the Court is aware, many of Mr. Archer's international travel requests during this case have been to create and expand opportunities for this company.

Mr. Archer's colleagues have described working with him over the last several years. Enrique Gonzalez sits on the board of the company and has had a close working relationship with Mr. Archer for the last five years. Mr. Gonzalez has extensive experience in business and is "proud to say that through direct efforts of Devon and [himself]," they achieved several significant milestones for their company. "In all of [Mr. Gonzalez's] dealings and work with Devon, he has exhibited discipline, hard work, commitment to the success of whichever project [they] were handling at that time, and integrity." "As a serial entrepreneur and venture capital investor, [Mr. Gonzalez is] trained to assess people and make a judgment call on their character." Mr. Gonzalez has "no doubt on Devon's character and integrity," and Mr. Gonzalez hopes Mr. Archer will be able to continue his work, which Mr. Gonzalez believes "will no doubt lead to valuable contributions for society."

Other colleagues provide similar accolades. Scott Wanamaker serves as the Chief Legal Officer and has known Mr. Archer for four years. Mr. Wanamaker describes Mr. Archer as "a person of high moral and ethical character." James Mrowka met Mr. Archer over five years ago, when they both started working for Mr. Archer's current employer. Mr. Mrowka has observed

Mr. Archer in board meetings, pitches to prospective clients, or internal meetings, and Mr.

Archer "consistently act[s] with great integrity, diligence, unselfishness and loyalty." Mr. Archer

"is a highly empathetic person and thinks first about how he can make the other person feel

better, not about what that person can do for him." Mr. Mrowka believes "it was Devon's

optimistic, kind and non-cynical nature that led him to trusting the individuals that caused this

case in the first place."  Callie de Quevedo served as Chief Marketing Officer and worked

closely with Mr. Archer for two years after this case started. In Mr. Archer's role at the

company, he "has built a supportive community and culture within [their] organization that is

based on clear vision, open communication, close collaboration, and mutual respect." He

"epitomizes the word 'leadership,' and he does so masterfully, honorably, and with integrity."

Mr. Archer committed himself to keeping the full team employed despite tough times during the

pandemic. Mr. Archer is "unfailingly warm and generous, and kind," and he exhibits "a deep

care and concern for others."

### E.    Civic and Charitable Work

One of Mr. Archer's most demanding commitments—and one of his most rewarding and,

he would say, important—is coaching the Brooklyn Crescents Lacrosse Club. PSR ¶ 128. The

Brooklyn Crescents is a volunteer-run non-profit organization that teaches children and teenagers

"the fundamental/advanced skills and values of lacrosse (e.g., commitment, teamwork, integrity,

passion, community pride)." *Id.* The program has over 500 participants, and Mr. Archer is

responsible for the under 11/12 boys program, which is comprised of two teams with over 50

players. This is not an insignificant time commitment. Mr. Archer spends multiple hours three to

four days per week throughout the entire spring and fall administering and coaching for the club.

Separate from sports, Mr. Archer has served in volunteer roles in public interest

organizations domestically and abroad. He currently serves as a director on the board of the

Astana International Financial Center (AIFC), which is a global center for business and finance in Kazakhstan. PSR ¶ 130. Nurlan Kussainov explains in a letter of support how he worked closely with Mr. Archer on the AIFC. Mr. Kussainov is the Chairman of the Board of the Astana International Exchange ("AIX"), the securities exchange located within the AIFC, and met Mr. Archer in Kazakhstan in 2010. Working together through the AIFC, Mr. Kussainov and Mr. Archer managed to create AIX from "scratch." Today, AIX is "a very dynamic capital market platform" with many significant multi-national shareholders.  Mr. Kussainov views Mr. Archer as a "transparent, ethical, dedicated, professional and very trustworthy friend." Mr. Archer also previously served on as a director and a member of the Investment Committee of Kazakhstan's Sovereign Wealth Fund, which is a division of the Kazakhstan Central Bank. *Id.*

Mr. Archer has a long history of helping charities raise money, putting to civic use the skills he developed professionally. Recently, Mr. Archer has helped raise several millions of dollars for a non-profit organization that helps children in poverty or who were child soldiers or sex trafficked. The charity provides substantial assistance to these children, many of whom have gone on to great success, including enrollment in Ivy League schools.

Mr. Archer has also continued his commitment to veterans' causes, which is near and dear to him because of his own father's experience in Vietnam.  Mr. Archer is currently spearheading a $1,000,000 campaign for a veterans charity ███████████████ that provides support to veterans re-acclimating to civilian life, to match a $1,000,000 pledge by the end of the first quarter of 2022. PSR ¶ 128.

### F.    Community Reputation

What is clear from the few letters quoted above, and the many others attached, is that wherever Mr. Archer goes, he develops close and lasting bonds with people. People from all walks of his life—from his childhood through to his coworkers who have known him only after

this case started—share the same impression of Mr. Archer: Mr. Archer exhibits a deep sense of empathy and integrity.

The letters of support are full of colorful examples of the positive impact Mr. Archer has had on peoples' lives. For example, Dr. Daniel Blatz, who has known Mr. Archer since they were six years old, explains that their friendship "has consistently pushed [Dr. Blatz] to be better; . . . to be the vest version of [himself]." Dr. Blatz describes Mr. Archer as "an incredibly compassionate, loyal, and humble man, who has always supported his friend and family in every situation." Mr. Archer became a friend to Dr. Blatz's sister, who has Down Syndrome, and "has brought nothing but laughter and smiles to my sister's face." Dr. Blatz is "honored to call him our friend."

As an accomplished student and athlete, Mr. Archer chose to use his influence to help others rather than simply elevate himself. Patrick Wallace and Paul Sohn played lacrosse with Mr. Archer in college. Mr. Wallace recounts how Mr. Archer became "a mentor to the younger players on the team." Mr. Sohn can attest to that, as he joined the lacrosse team as a freshman when Mr. Archer was a senior. Mr. Archer "went out of his way to make [Mr. Sohn] feel like part of the group." He would drive Mr. Sohn to practice, and protected him from bullying by others. Mr. Sohn credits his later tremendous success on the team to Mr. Archer.

From his time in Vietnam, Julie Larochelle describes how Mr. Archer helped her care for her youngest sister at a difficult time in Ms. Larochelle's life. Mr. Archer "gave us so much of his time, Mr. Archer has a natural generosity." To this day, "Devon is [her] brother in heart, a dear friend, one of the best friends of my husband and my kid's Uncle."

Constantine Morris is Mr. Archer's brother-in-law and has known Mr. Archer for 20 years. Mr. Morris recounts how Mr. Archer "went beyond the boundaries of family obligations

to try to improve the quality of life for [Mr. Morris's] youngest son," who is diagnosed with Autism Spectrum Disorder. Because of Mr. Archer's hard work in finding the best treatment for Mr. Morris's son, and by expending Mr. Archer's own time and money to fly Mr. Morris's family repeatedly to California for treatment, Mr. Morris's son "began showing huge signs of verbal progression and a new fondness for trying different foods," fundamentally changing the entire family's quality of life.

Scott Sergeant and Khari Freeman know Mr. Archer from the Brooklyn Crescents Lacrosse team. Mr. Archer coaches Mr. Sergeant's son. Mr. Sergeant describes how Mr. Archer treated "all of the boys equally as if they were his own son." Mr. Archer "went out of his way to work with [Mr. Sergeant's son] and build the confidence" that "carried over to his school work and friendships." Mr. Archer "will always be remembered as one of the most pivotal adults outside of family" in his son's life. Mr. Freeman has served with Mr. Archer as "volunteer coaches for the Brooklyn Crescents Lacrosse Club since the 2015 season." Despite their very different backgrounds, Mr. Freeman and Mr. Archer formed a close bond, and Mr. Archer even "served as a mentor to [him] as a lacrosse coach." Mr. Freeman "was also inspired by his compassion for all the young men on the team," and "how willing he was to come early, stay late and work with everyone not just [Devon's] son." To Mr. Freeman, Mr. Archer is "a man of integrity." Mr. Freeman recounts an experience where Mr. Archer could have given the game ball to Mr. Archer's own son, who was a leading scorer, but instead gave the ball to Mr. Freeman's son in what Mr. Freeman "consider[s] a very noble and selfless act."

At the time of his letter,[7] John Cooper was a freshman at Columbia University. Mr. Cooper has known Mr. Archer since he was 13 years old, when Mr. Cooper's father and Mr. Archer began working together. Mr. Archer has taken Mr. Cooper under his wing, and they have "formed an incredible bond and friendship." Mr. Cooper knows that he "can always count on Devon if [he] ever need[s] anything," and Mr. Cooper "would not be in the position [he] is in today had it not been for the help, advice, and support that Devon has provided [him]."

The letters continue like this. Parvin Daphne Moyne spent nearly a decade as an AUSA in this District and is now a partner at a major international law firm. Ms. Moyne has known Mr. Archer since they were children, and her "own countless experiences demonstrate" that "Devon is a generous and loyal friend." He is also "utterly devoted to his family" and "extremely hard working."

Kristopher Lakin describes Mr. Archer as the sort of person who, in "no exaggeration," "will give you the shirt off his back." The example Mr. Lakin provides is from early in the pandemic, when "Devon became aware that inmates and guards at NYC-DOC's Rikers Island facility were in dire need of personal protective equipment, specifically masks." Mr. Archer spent "what seemed like hundreds of hours on the phone" and "found a supplier with 20,000 surgical masks." "Without hesitation, Devon borrowed a neighbor's cargo van and drove hours to the warehouse, loaded the van and personally delivered the masks – enough to protect nearly all of the inmates and guards – to Rikers Island; never mentioning that he'd personally covered the costs."

---

[7]     Certain of the letters attached to this submission were obtained in late 2018, in connection with Mr. Archer's original sentencing date.  Except where important, we have not asked these people to update or provide new letters so as not to impose on them further.  If the Court has questions about any of the support reflected in this submission, we would be happy to provide updated information.

Mr. Archer's reputation carries through his business dealings as well. Norman Hotz has had a fifty-year career in the data analytics business during which time he has "directly engaged with hundreds of business and government leaders." For several years, Mr. Hotz worked with Mr. Archer "on the multinational financing and other aspects" of an acquisitions and mergers project to develop "a new worldwide company" based on certain technology patents. During this period, Mr. Hotz "associated with many people from several countries that had worked with [Mr. Archer] over many years. Without exception, Mr. Archer was highly respected and universally admired for his character and integrity."

Antonio Morales is the Chairman of ABS Partners Ltd. Based on a five-year working relationship, including working closely together on developing business opportunities in China, Mr. Morales characterized Mr. Archer as "simply amazing, outstanding, terrific. He is honest, loyal, thoughtful of others, and very supportive. He always tries to see and understand things from the other person's perspective." Mr. Archer supported Mr. Morales through a difficult personal problem, writing, "Devon was so very supportive that it is simply too difficult to describe in words his dedication and concern to my problem." Mr. Archer "is a man that comes up with very thoughtful solutions to any problems or situations that may arise." Mr. Morales is "very proud to call him [his] trusted friend."

Arthur Maxwell founded "one of the largest commercial furniture manufacturers in the United States." Mr. Maxwell has known Mr. Archer personally and through business for more than 7 years. Mr. Maxwell's own impression of Mr. Archer, and the impression of others in business whom Mr. Maxwell knows, is that Mr. Archer is "generous, intelligent, kind and of high integrity." Mr. Archer is also "a family first man of dignity." Mr. Maxwell has watched as Mr. Archer's career crumbled because of this case and his character came "under constant

attack," and so Mr. Maxwell asked if he could write this letter "in an attempt to help a man who is energetic and inspiring."

Athanasios Christ has worked closely with Mr. Archer since May 2017. Mr. Christ's software engineering firm provides consulting services to Mr. Archer's employer, and Mr. Christ has worked alongside Mr. Archer "and often third-party investors and operators with whom he has engaged. [Mr. Christ] can therefore say, unequivocally, that with respect to his professional conduct, Devon has always acted ethically and honorably, taking a fair-minded approach with the aim of benefitting both my client and the many companies with which my client sought to transact."

In sum, Mr. Archer has left a legacy of goodwill behind him and has made a real and deeply important impact on peoples' lives.

## OFFENSE LEVEL COMPUTATION

### A.    Mr. Archer's Base Offense Level is 7

Section 2B1.1 of the Sentencing Guidelines applies to securities fraud. Pursuant to that section, Mr. Archer's offense level is 7. PSR ¶ 81.[8]

### B.    The Loss Amount Reasonably Foreseeable to Mr. Archer Was $0, and the Number of Victims Is One

The Court should not attribute any actual or intended loss to Mr. Archer on either count, an issue that the PSR left "unresolved," crediting for the time being the government's assertion that "it was wholly foreseeable to Archer both that more than 10 victims would be defrauded and that the pension fund clients would lose the entirety of their investments." *See* PSR at p. 52–53.

---

[8]    The PSR erroneously states that Section 2B1.1 is also the appropriate guidelines for the conspiracy count.  As set forth in Mr. Archer's objections, however, the appropriate guideline for conspiracy is contained in Section 2X1.1.

The government argues, in effect, that the full sweep of Jason Galanis's fraud was foreseeable to Mr. Archer, and that Mr. Archer should therefore be responsible for all of it.  *See* PSR ¶ 75.

The loss amount urged by the government alone corresponds to a 22-level sentencing enhancement under the Guidelines.  The $43 million loss amount attributable to Galanis's fraud constitutes the funds invested by the pension fund customers of Atlantic and Hughes in the first and third bond offerings. But in selecting that number, over $43 million, the government admits that no losses can be attributed to the second bond offering—the only offering in which Mr. Archer had any direct involvement. *See* Ex. F, Mr. Archer's Objections to ¶ 68. This is entirely sensible, as the trial evidence showed that Jason Galanis used the proceeds of the first bond offering to fund the second offering, unbeknownst to Mr. Archer. The loss from the first bond offering would therefore be counted twice if any loss was attributed to the second bond offering. Double counting in that manner to increase offense levels would be grossly unjust.

The government failed to show that Mr. Archer purposefully intended to inflict loss on any victim as required by the Sentencing Guidelines and Second Circuit precedent. *See, e.g.*, *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) (holding that the district court must determine a defendant's subjective intent to cause loss). Under the Guidelines, loss should be calculated based on the "reasonably foreseeable pecuniary harm that resulted from the offense"; to be reasonably foreseeable, the harm must be one that the defendant knew, or reasonably should have known, would result from his conduct. U.S.S.G. § 2B1.1, App. Note 3(A)(i), (iv). In other words, to support its theory of loss, the government would have needed to prove that Mr. Archer knew or should have known that the clients of Atlantic and Hughes were defrauded and that Jason Galanis was stealing the bond proceeds. That is simply not the case.

As the Court noted in its decision granting Mr. Archer's Rule 33 motion, the "primary aspect of the government's case against Archer was his purchase of WLCC bonds [in the second issuance] using proceeds from the first issuance." *Galanis*, 366 F. Supp. 3d at 493. But "the government presented ***no evidence*** that Archer knew that these funds came from WAPC," which was Galanis's fake annuity that received the bond proceeds from the investment advisor clients. In other words, Mr. Archer did not know that the investment advisor clients were defrauded or that the proceeds of the bond offerings were not in fact invested in an annuity. The Court described in detail why the evidence did not support an inference that Mr. Archer knew the second bond offering was funded with the proceeds of the first offering, a fact that Jason Galanis carefully hid from Mr. Archer (and everyone else, for that matter).[9]

To be clear, while Mr. Archer maintains his innocence, we are not relitigating that question here. Rather, viewing the record as a whole, the jury may have, as the Second Circuit held, inferred Mr. Archer's intent without separately determining the fact questions left to the Court now for sentencing, such as the reasonably foreseeable loss amount to Mr. Archer. It is entirely consistent for the Second Circuit to have held that the "evidence at trial did not preponderate heavily against the jury's verdict," *Archer*, 977 F.3d at 189, and for this Court to

---

[9]      In connection with John Galanis's sentencing, his son, Jason Galanis, submitted a letter in support of his father. The letter is attached as Exhibit G, which Jason Galanis requested be filed under seal. That letter is noteworthy in several respects. Galanis's description of how he structured the fraud—whereby he "deliberately separated third parties from one another in an effort to control information"—is entirely consistent with the evidence and with Mr. Archer's ignorance of the criminal aspects of the scheme. Also entirely consistent with the evidence at trial is that Archer "did not make a penny in the fraud." Similarly, Jason Galanis describes how he purposefully "published misleading information about purported 'affiliated companies,'" including "with Wealth Assurance" companies. And again, it was not Mr. Archer who received the benefit of the misappropriated bond proceeds through the fake WAPCC company that Galanis secretly controlled. Notably absent from Galanis's exonerations is any mention of Bevan Cooney, who, from the evidence at trial, clearly did receive money in the scheme and whom Galanis let see behind the curtain.

previously have denied Rule 29 relief, while at the same time determining that Mr. Archer did

not know the source of the funds for the second bond offering.  Thus, this Court could conclude

for sentencing purposes – as it presumably did in connection with denying Rule 29 relief – that

the evidence was sufficient to show that Mr. Archer participated in a scheme to defraud when he,

for example, made statements to his bank or to the so-called BIT Board.  In such a scenario,

which seems to be precisely what the Court contemplated, the evidence would be sufficient to

uphold the jury's verdict but insufficient to show that Mr. Archer could reasonably foresee any

loss to the investment advisory clients of Atlantic and Hughes who purchased the first and third

bond offerings.  If that is so, the loss amount appropriately attributed to Mr. Archer should be

zero, and the number of victims should be one.

### C.    Mr. Archer's Minimal Participation Warrants a Downward Adjustment of 4 Levels

Mr. Archer should also receive the benefit of a 4-level, or at least a 2-level, downward

adjustment for his role in the scheme.  The PSR left "unresolved" Mr. Archer's suggestion that

he is entitled to such an adjustment, PSR at 53-54.

Mr. Archer should receive a downward role adjustment because Mr. Archer is

substantially less culpable than any of the other defendants or other members of the conspiracy.

*See* U.S.S.G. § 3B1.2 (Mitigating Role). The Court has already recognized Jason Galanis's

leadership role. *See* Galanis Sentencing Hearing Tr. 32:6-8 (August 11, 2017) (ECF No. 230);

*see also* PSR ¶ 57 (Galanis "served as an organizer of the criminal activity," "obstructed the

administration of justice," and "created and provided fraudulent documents to the Government").

Hugh Dunkerley, the government's cooperating witness, was effectively Galanis's lieutenant in

various frauds, and executed numerous fraudulent transactions on Galanis's behalf. Dunkerley

also plotted with Galanis to obstruct the investigation into their crimes by falsifying documents

and providing them to the SEC. *See Galanis*, 366 F. Supp. 3d at 494 (Dunkerley "was privy to more aspects of Jason Galanis' various criminal acts than virtually anyone else—including frauds in which Archer is not alleged to have played any role[.]"). Francisco Martin and Mark McMillan, two other witnesses called by the government pursuant to immunity agreements, were also active participants in the fraud and long-time Galanis family confederates.

The government recognized that Gary Hirst – a lawyer – "created WAPCC, executed the purchases of the first set of bonds while working at Hughes, and set up Thunder Valley and Seymour Capital, entities used to misappropriate the final set of bond issuances and then used to pay interest on the first set of bonds." Government Sentencing Memorandum for Gary Hirst at 9–10 (ECF No. 615). Michelle Morton and Hirst helped organize the acquisitions and control over the investment advisors — something Mr. Archer had no involvement in.

Co-defendant John Galanis directly interfaced with the WLCC, inducing them to invest in the bonds to begin with. Mr. Archer never communicated with the WLCC. Unlike Mr. Archer, there "was ample evidence presented at trial of John Galanis' central role in the criminal enterprise," and it "is undisputed that he received $2.35 million" from the bond proceeds. *Galanis*, 366 F. Supp. 3d at 489.

Even as compared to Bevan Cooney, Mr. Archer is significantly less culpable. Cooney, for example, signed the fraudulent Calvert loan document in an attempt to deceive a financial institution, and he then produced the fraudulent document to the Securities and Exchange Commission. *See* GX 2298; GX 1271; *see also Galanis*, 366 F. Supp. 3d at 504 ("Galanis, Dunkerley, and Cooney all participated in backdating Calvert forms related to certain of the bond transactions"). When Jason Galanis was arrested in September 2015, Cooney called co-conspirator Francisco Martin and told Martin "that Jason Galanis was arrested but not to worry,

it didn't have anything to do with the bond issue." Trial Tr. 2176:21-2177:6. Cooney also personally profited from the scheme while Mr. Archer lost hundreds of thousands of dollars. Indeed, Galanis instructed Cooney to try to convince Mr. Archer of the legitimacy of their investment or, alternatively, to "pimp" Mr. Archer.

Mr. Archer's conduct—purchasing the bonds in the second offering at Galanis's instruction with money provided by Galanis—was not the result of his own planning or the exercise of his own discretion in how to execute the scheme to misappropriate bond proceeds. The Sentencing Guidelines provide an example of similar conduct where an adjustment is appropriate: "For example, a defendant in a health care fraud scheme, whose participation in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, may receive an adjustment under this guideline." *See* U.S.G. § 3B1.2, app. note 3(A). *Cf.* Transcript of Sentencing Hearing at 32:2-3, *United States v. Atilla*, No. 15-cr-867 RMB (S.D.N.Y. May 18, 2018) (granting minor role reduction where defendant was "neither a chief architect nor a beneficiary of the various schemes").

The government's response to Mr. Archer's objection in the PSR relies heavily on the fact that Mr. Archer was committed to seeing the roll-up succeed. In that role, Mr. Archer did touch many pieces of Jason Galanis's conspiracy, but in that way so did other senior members of the various companies' management and oversight teams. The government cites Mr. Archer's communications with the BIT Board, for example, but as the Court already noted, this evidence "did not concern the WLCC bond deal." *Galanis*, 366 F. Supp. 3d at 502.

In sum, viewing Mr. Archer's role relative to the other conspirators, the Court should grant a downward adjustment of 4 levels or, in the alternative, 2 levels.

### D.    The Appropriate Advisory Guidelines Range Is 0–6 Months

As discussed above, Mr. Archer's base offense level is 7. No loss is attributable to Mr. Archer, and there is only one victim. Finally, a minus-four level adjustment for a minimal role is appropriate here. Based on this calculation, the total offense level is 3. Mr. Archer has absolutely no criminal history, putting him in Criminal History Category of I.  *See* PSR ¶¶ 91-97.  The appropriate advisory Guidelines range is thus 0–6 months.[10]

### <u>A NON-CUSTODIAL SENTENCE IS APPROPRIATE IN THIS CASE</u>

As the Court is well aware, a criminal sentence must be "sufficient, but not greater than necessary" to meet the objectives of sentencing. 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 111 (2007). In crafting a sentence, "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 477 (2011).

Applying these standards – and regardless of the applicable Guidelines range – anything other than a non-custodial sentence would be "greater than necessary" to achieve the objectives of sentencing.

### I.    The Nature and Circumstances of the Offense

The Court is very familiar with the facts of this case, having sat through a lengthy trial in an "indisputably complex case." *Galanis*, 366 F. Supp. 3d at 492. With respect to the nature and circumstances of the offense as it relates to Mr. Archer, the Court concluded that the evidence as a whole revealed that "Galanis viewed Archer as a pawn," whom he sought to keep [] in the dark" "such that [Archer] knew only that which was essential" to his "narrowly defined role." *Id.*

---

[10]      Further, given Mr. Archer's limited role in the conspiracy (if any) and his otherwise spotless lifetime record, a downward departure is warranted under U.S.S.G. § 5K2.20 (aberrant behavior).

at 492, 505.[11] That role was very limited, and Mr. Archer did not benefit from the scheme. The thrust of the government's case was that Jason Galanis, "the admitted mastermind of the conspiracy and a serial fraudster," *Archer*, 977 F.3d at 480, effectively took control of a series of financial institutions and used that control to issue bonds on behalf of a Native American tribal corporation, which he caused clients of one of the financial institutions to purchase without their knowledge or consent. Galanis then misappropriated the proceeds of the bonds for his own purposes, including to buy a luxury home. *Galanis*, 366 F. Supp. 3d at 485.

To be sure, the Court concluded – and we accept for these purposes – that "[Mr.] Archer's behavior was troubling in some respects," such as with regard to "his statements made to Morgan Stanley and the BIT Board." *Id.* at 507. Mr. Archer was also too careless and unquestioning when accommodating requests from Jason Galanis—a mistake that he will regret for the rest of his life. While in "hindsight, it now appears obvious that it was Jason Galanis' intent to misappropriate the bond proceeds from the inception of his plan to sell Native American bonds," *id.*, it required a multi-week trial to unpack that scheme that included many witnesses who never even knew or spoke with Mr. Archer.

The PSR leaves many of Mr. Archer's objections to key fact questions for sentencing unresolved. We respectfully submit that the Court has already resolved these issues based on its careful review of the factual record when it granted Mr. Archer's Rule 33 motion.[12] Adherence to those findings is appropriate given the Court's careful prior analysis of the record, and doing so will not conflict with the Second Circuit's holding that the evidence did not preponderate

---

[11]     As mentioned above, Jason Galanis described exactly this method of separating people to compartmentalize their knowledge in his letter of support for his father, John Galanis. Exhibit G.

[12]     Mr. Archer explicitly renews all of his objections to the PSR. Those objections that the Probation Office specifically left unresolved are paragraphs 43, 48, 50, 52, 54, 56, 59, 62, 64, 65, 66, 67, the loss amount and number of victims, the minor role enhancement, and forfeiture.

heavily against the verdict.  Put differently, there is no inconsistency with the Second Circuit's decision that evidence of innocence did not "preponderate heavily," on the one hand, and that some of the same evidence – especially as to which of Galanis's conduct was reasonably foreseeable to Mr. Archer – does not establish Mr. Archer's culpability for sentencing enhancements by a preponderance of the evidence.  *See United States v. McCray*, 7 F.4th 40, 49 (2d Cir. 2021) ("the standard of proof for the district court's factual findings at sentencing . . . is a preponderance of the evidence.").

For example, Paragraph 43 of the PSR states that Mr. Archer controlled an entity that Galanis caused to provide financing for Michelle Morton to purchase the investment advisors, Atlantic and Hughes. The PSR goes on to state that Mr. Archer was well aware of Galanis's efforts to gain control of the investment advisors and insinuates that Mr. Archer had knowledge that client funds were used for the purchase of the bonds in a manner that was contrary to any investment parameters or without the investors consent. PSR ¶ 43. This is flatly incorrect. As Mr. Archer explained in his objection to the PSR, the funding for the acquisitions of Atlantic and Hughes came from entities that were not controlled by Mr. Archer. He did not sit on their boards or have any knowledge of how the acquisition was funded. And the Court, having examined the relevant communications, already concluded that the emails involving Mr. Archer revealed that "there existed a hope that clients of Hughes and Atlantic would purchase WLCC bonds, but no intent to unilaterally foist the bonds upon them." *Galanis*, 366 F. Supp. 3d at 499.

The PSR also continues to suggest that Mr. Archer knew that Jason Galanis caused bond proceeds to be transferred, indirectly, to an account controlled by Mr. Archer. PSR ¶ 48. This contention is based principally on inferences the government draws from information selectively revealed to Mr. Archer by Jason Galanis. After the Court reviewed the evidence and carefully

weighed the inferences pressed by the government, the Court found them seriously lacking. The government's case relied on drawing strained inferences from common business "terms such as 'liquidity' and 'discretionary' as if they are necessarily evidence of criminal intent." *Id.* at 495. The government treated these as synonymous with misappropriation, but the Court looked at all of the evidence "cumulatively" and found that "when these individuals used the word discretionary in this context they were referencing the ability of an asset manager to exercise discretion in selecting investments for a client." *Id.* at 497. Because "[d]iscretionary liquidity is frequently referenced in the course of discussing perfectly legitimate transactions and entities, including the sorts at issue in the case at hand," *id.*, the Court concluded that this "language in the emails is facially innocuous or, at best, most naturally subject to innocent interpretations," *id.* at 495. (No witness who was involved in the relevant emails testified to their meaning. *Id.*)

Similarly, the government put "much weight" on a line in an email from one of Mr. Archer's co-defendants—"$20mm bond approved. Proceeds are 15mm to us and 5mm to them." *Id.* at 496. The government argued that the phrase "15mm to us" put Mr. Archer on notice of his co-defendants' intent to misappropriate funds. *Id.* The Court, however, correctly weighed the email in the context of the whole record, including a legal opinion letter attached to the email itself that set out how certain proceeds would be distributed to the debtor "while the remaining $15 million was to be invested on its behalf." *Id.* Because the "to us" language simply reiterated what was in the legal opinion, the Court drew the "more natural inference" that a reader of this email would "not understand [the author] to mean that they would steal the money." *Id.* Upon reviewing these and many other documents, the Court found that the government had advanced a "misleading impression" of the evidence, which required "simply too large an inferential leap." *Id.* at 482, 499.

31

The Court likewise found the government's other circumstantial evidence to be wanting in light of the full record. For example, the government emphasized an instance in which Mr. Archer sent $250,000 to one of the Galanis-controlled financial institutions—one in a series of investments and working capital loans that Mr. Archer made to that company—at or about the same time that Galanis made fraudulent interest payments on the bonds from the same entity. *Id.* at 503. But the Court found that Galanis stole $240,000 of the $250,000 for himself, "further undercut[ting] the notion that Archer was aware that the money he supplied was being used for illicit purposes." *Id.* at 503 n.22.

Ultimately, the record showed that there was extensive evidence that Galanis actively concealed his scheme from Mr. Archer, *id.* at 493–45, and that "unlike his co-defendants at trial, [Mr. Archer] never received misappropriated proceeds directly," and instead lost the substantial amounts that he had invested in the transactions at issue. *Id.* at 507; *see id.* at 492. Mr. Archer, on the other hand, was there to build a business. He brought his usual enthusiasm and energy to the process, and through that, he made it easier for Jason Galanis to perpetrate his fraud. If Mr. Archer could do it over again, and knew then what he knows now, he would have stopped the fraud in its tracks.

Thus, when viewed in the light of the entire record, even assuming that Mr. Archer was guilty of the charged crimes, his role was akin to a nominee whose name, reputation, and bank account was used by others in furtherance of a criminal scheme, the details and scope of which he was totally unaware. While such conduct, if accompanied by the requisite intent, is certainly blameworthy and carries consequences, it is totally different in kind than the intentional

misappropriation of tens of millions of dollars that the other conspirators in this case were responsible for.[13]

## II.     Mr. Archer's Personal History and Characteristics

The second mandate of 18 U.S.C. § 3553(a)(1)—which requires courts to consider "the history and characteristics of the defendant"—weighs particularly heavy among the sentencing factors. As noted by Judge Rakoff,

> surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant.

*Adelson*, 441 F. Supp. 2d at 513–14. We respectfully submit that the good from Mr. Archer's life dramatically outweighs the bad and justifies a probationary sentence.

As the discussion above makes clear, Mr. Archer is an honest and hard-working man who has always carried himself with great integrity.  He is a source of strength for his family, his

---

[13]     To the extent the Court disagrees and believes Mr. Archer is responsible for the $43 million loss figure urged by the government, that would still substantially overstate his role in the offense.  We do not reiterate here the many criticisms of the fraud guidelines' over-reliance on loss amount, which are well-known to the Court.  Further, such loss amount is specifically overstated in this case, where there is no dispute that Mr. Archer did not profit at all from Galanis's scheme, and in fact lost money.

Thus, even if the Court believes a higher loss amount might apply, it should depart downward to zero.  *See* U.S.S.G. § 2B1.1, cmt., Application Note 21(C) ("There may be cases in which the offense level determined under this guideline substantially overstate the seriousness of the offense. In such cases, a downward departure may be warranted.").  Alternatively, the Court should consider a downward variance in light of the injustice in charging Mr. Archer with $43 million in losses under the fraud guidelines.  *See, e.g., United States v. Adelson,* 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008)

community, his business associates, and the charitable endeavors that he has dedicated himself to.  If one thing stands out from the picture painted by the dozens of letters submitted in Mr. Archer's support, it is that the conduct alleged in this case is inconsistent with Mr. Archer's history and characteristics.  Mr. Archer deserves credit for having built a lifetime of goodwill with people from all over the world.  A non-custodial sentence will ensure that he can continue to contribute to the world, rather than be taken from it.

## III.   The Need for the Sentence Imposed

### A.   Mr. Archer Has Already Been Punished Severely

Mr. Archer has brought shame and embarrassment not only on himself, but on his family. Mr. Archer's historical relationships have caused him and this case to play out on an international stage, thrust him into presidential politics, and turned him literally (after the then-President tweeted a photo of him) into a joke on late-night TV.  This has had a devastating impact on Mr. Archer's psyche, his family's psyche, his business prospects, and his wife's business.

Mr. Archer has sought counseling and therapy, both individually and with his family. PSR ¶¶ 115–17. He "has had thoughts of suicide since his arrest" and has watched his "life 'chopped' away from him." *Id.* ¶ 117. His children have suffered. His oldest son suffered a panic attack and has been bullied at school, in no small part to the unrelenting and deeply hurtful media coverage of Mr. Archer.

Mr. Archer has watched his reputation and career systematically crumble around him. In 2016, he left Rosemont Capital, which he founded in 2005, due to his arrest. PSR ¶ 132. He stepped down as managing partner of Pilot Growth Equity Partners. PSR ¶ 133. He resigned as a trustee of the Heinz Family Office. PSR ¶ 134. He stepped down as Vice Chairman of BHR

Partners in China. PSR ¶ 134. He resigned from Norvik Bank's Governor Counsel, and he resigned from the board of directors of Burisma Holdings in Ukraine. *Id.*

In his volunteer work, Mr. Archer has also been marginalized and cut out. He resigned from the Investment Committee of Kazakhstan's Sovereign Wealth Fund. PSR ¶ 130. He has taken a less active role in Planned Parenthood, East Harlem Charter School, Navy Seal Foundation, Atlantic Council, Seed Global Health, Brooklyn Botanical Garden, Berkeley Carroll School, and Kane Street Synagogue School. PSR ¶ 129.  Mr. Archer withdrew his nomination to the board of the Brooklyn Botanical Garden. One after another, he has resigned from prior business positions in the interests of the companies to which he once devoted himself.

Mr. Archer and his family have also been affected financially, and are currently severely cash flow negative.  As the Court is aware, Mr. Archer lost more than $800,000 he invested in Burnham Financial.  According to the PSR, as of May 2019 when the interest rate on the Archers's home adjusted, the family's annual net income was approximately *negative* $492,000. PSR ¶ 141 & n. 6.  Next year, factoring in school costs for the Archers's youngest child, it will be negative $528,000.  *Id.* n.9.

The sentence this Court imposes will pile on to an already long list of terrible consequences that have flowed from Mr. Archer's fateful decision to go into business with Jason Galanis. Mr. Archer is still actively litigating multiple civil lawsuits, including by the SEC. His future dreams of working in politics or public service for the government are over. His arrest, the attendant publicity, and the loss of his credibility and reputation have made abundantly clear to Mr. Archer the seriousness of his conduct. The harsh consequences that have already befallen Mr. Archer have served as real punishment and affected the necessary deterrence.

B.      **The Purposes of Deterrence Have Been Served**

A custodial sentence is not necessary to afford adequate deterrence. As mentioned above, the suffering that Mr. Archer and his family have already experienced because of his conduct, coupled with the onslaught of public scrutiny, provide adequate specific and general deterrence. There is no need for incarceration to assure that Mr. Archer is deterred from future crimes.

And while general deterrence is a somewhat different consideration, we respectfully submit that the goal of general deterrence is not served in this case by incarcerating Mr. Archer. While the fraud at the center of this case was unquestionably widespread, Mr. Archer's role was minimal compared to the other defendants and alleged participants.  As we discuss below, the Court has already served the goals of general deterrence by sentencing the people most centrally responsible for the fraud in this case to substantial prison sentences.  It is not "necessary" to send Mr. Archer to prison, therefore, to communicate the severity of the crimes to the general public. 18 U.S.C. § 3553(a).

C.      **There Is No Need to Protect the Public from Mr. Archer, Who Has Deep Respect For the Law**

Mr. Archer poses no risk of recidivism. The suffering and embarrassment his arrest and conviction have caused not only to him, but to his family and friends, will ensure that he does not re-offend.

Despite those consequences, as the attached letters demonstrate, Mr. Archer is surrounded by family—particularly his children—and friends who provide him enormous support and motivation to avoid ever finding himself on the wrong side of the law again. This is not a situation in which a sentence of imprisonment is necessary to protect the public from Mr. Archer. In fact, as the letters and his good works demonstrate, sentencing Mr. Archer to a term of imprisonment will make the public worse off, not better.

A custodial sentence is not necessary to protect the public from Mr. Archer, as well, because he has deep respect for the law. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████

        ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████    ████████████

---

█    ███████████████████████████████████████████████

██████████████████████    .

███████████████████████████████

███

Mr. Archer loves this country, and is committed to its laws. He is no threat to the public.

### D.    Mr. Archer Does Not Need Treatment

Pursuant to section 3553(a)(2)(D), the Court must also consider the need for any sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." This does not apply to Mr. Archer, who is physically and mentally healthy (although benefiting from mental health counseling). And as the numerous letters from Mr. Archer's colleagues, business partners, and community members demonstrate, Mr. Archer is a highly active and productive member of his communities.

In any event, Mr. Archer does not require vocational training, and the services available to him through incarceration would not serve to rehabilitate him. Instead, being able to continue the care for his children—including his daughter who was recently diagnosed with dyslexia and requires transportation to and from a specialized school and extensive hands-on parental time— and the many professional and charitable works with which he is already engaged will have the greatest rehabilitative force, whereas a term of imprisonment would "wreak extraordinary destruction" on Mr. Archer's family. *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992). *See also United States v. Huerta*, 371 F.3d 88 (2d Cir. 2004) (finding extraordinary family circumstances where defendant was sole caregiver to child); *United States v. Kon*, 05 Cr. 271 (RWS), 2006 WL 3208555 (S.D.N.Y. Nov. 2, 2006) (imposing sentence of time served (one day) to drug offender with Guidelines of 30-37 months in light of defendant's parental responsibilities); *United States v. Roberts*, 01 Cr. 410 (RWS), 2005 WL 1153757 (S.D.N.Y. May 16, 2005) (imposing sentence of time served (one day) to drug offender with Guidelines of 10-16 months in light of defendant's responsibilities to care for his life partner).

## IV.     The Kinds of Sentences Available

The Court must also consider the "kinds of sentences available." 18 U.S.C. § 3553(a)(3). In this case, we respectfully submit that alternatives to incarceration—such as probation, home confinement, community service, and the like—would best serve the purposes of section 3553 and the interests of justice. U.S.S.G. §§ 5F1.2, 5F1.3.  The Sentencing Commission has recognized that probation can satisfy the purposes of sentencing, including providing just punishment for the offense. U.S.S.G. Manual, Chapter 5, Part B, Introductory Cmt.

In this case, probation, coupled with community service, is an adequate sentence. Mr. Archer's trust in Galanis was foolish, and his mistakes helped Galanis defraud the victims in this case, but this experience is a complete aberration in Mr. Archer's life. There is no chance of recidivism. He was, in his words, heartbroken to "learn of pensioners losing their hard-earned retirement savings and the Wakpamni Tribe having their name dragged through the mud irreparably." Mr. Archer is "sorry for all the Burnham Financial employees that lost their jobs and for the charitable endeavors [he has] not been in a position to support." Mr. Archer cannot describe the pain he feels for having caused his children and family to share in the terrible consequences of his actions.

We respectfully submit that sending Mr. Archer to prison, and requiring his wife and three children lose his support, would impose a punishment that would serve no rehabilitative or other legitimate purpose as to Mr. Archer.

If the Court determines that probation and community service is not sufficient on its own, the Court should consider home confinement. This would be a meaningful punishment because it would severely restrict the activities that Mr. Archer enjoys on a daily basis and would further punish him by limiting his current business and charitable endeavors, but would still allow him to remain with his family and provide additional support to his daughter who needs his attention

to meet her developmental goals—a responsibility that currently falls solely upon Mr. Archer as his wife is the primary source of income and runs her own medical practice. It has already taken years for Dr. Archer to rebuild her practice and business in the wake of Mr. Archer's reputational and professional collapse. *See* PSR ¶ 144. Sending Mr. Archer to prison would require Dr. Archer to scale back what she has painstakingly rebuilt, which would be unfair to her and disproportionately impact Mr. Archer's family.

## V.      The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) requires the Court to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records" who have been found guilty "of similar conduct." This factor weighs heavily in favor of a non-guidelines sentence.

The loss amount in this case is the primary driver of the guidelines range urged by the government and has very little connection to Mr. Archer's actual role in the scheme. Mr. Archer had no contact with the victims and the losses were not reasonably foreseeable to him. As such, comparisons to the sentences imposed on other defendants in this case are less helpful, as they either had superior knowledge of the conspiracy to Mr. Archer and directly profited from it, such as Jason Galanis, John Galanis, and Bevan Cooney,[15] or they were involved in investment advisor fraud and directly misappropriated client funds, such as Michelle Morton and Gary Hirst.

That said, the sentences imposed by the Court on the other defendants in this case also point to a non-custodian sentence. Bevan Cooney was sentenced to 30 months' imprisonment, notwithstanding what the Court held was his clear knowledge of the fraud and active obstruction of the investigation into it. Michelle Morton was sentenced to 15 months' imprisonment, though she worked actively with Jason Galanis to foist the bonds on the clients of Hughes and Atlantic

---

[15]      Hugh Dunkerley has not yet been sentenced.

without their knowledge and in violation of their investment parameters.  By any account, Mr. Archer was substantially less culpable than each of them.  A non-custodial sentence therefore would not create any sentencing disparity at all, let alone an "unwarranted" one.

## VI.   Application of the Section 3553(a) Factors Counsels Strongly in Favor of a Non-Custodial Sentence

Taken together, the Section 3553(a) factors strongly favor a non-custodial sentence. Section 3553(a) calls for the Court to weigh the purposes of sentencing, including the need for the sentence to (a) reflect the seriousness of the crime, promote respect for the law, and provide just punishment; (b) afford adequate deterrence; (c) protect the public from the defendant's further crimes; and (d) provide the defendant with needed training, medical care, or other correctional services in the most effective manner.

We respectfully submit that consideration of all of these factors compels the conclusion that a non-custodial sentence consisting of probation and community service is sufficient, but not greater than necessary, to serve the interests of sentencing.  Mr. Archer was (if anything) a minor player in a fraud masterminded by Jason Galanis who took steps to, at the very least, compartmentalize Mr. Archer's exposure to what he was doing.  Mr. Archer has already suffered incredibly from his involvement with Galanis, and has done so in a uniquely public way that have exacerbated the consequences to not only him, but his family as well.  There is no threat that Mr. Archer will commit other crimes in the future, and he has deep respect for the laws. There is likewise no need to send him to jail to accomplish the purposes of general deterrence when the main culprits in this case have been appropriately and harshly punished, sending the appropriate message to the public.  Sending a bit player like Mr. Archer to jail would add nothing, and risks undermining confidence in the fairness of the criminal justice system.

## VII.    The Need to Provide Restitution

Finally, section 3553(a)(7) directs the Court to consider "the need to provide restitution to any victims of the offense." For the same reasons mentioned above concerning the loss amount attributable to Mr. Archer, the correct restitution amount as to Mr. Archer is $0.

The Court also should not order any forfeiture amount.  The purpose of forfeiture is to disgorge ill-gotten gains from a criminal.  As the trial record demonstrated conclusively, Mr. Archer received no ill-gotten gains; he possesses no property that constitutes or is derived from proceeds traceable to the conspiracy. Because Mr. Archer lost money in his investments into the Valor Group and Burnham Financial Group, and because Mr. Archer never profited from the criminal conspiracy, he has no gains from which criminal forfeiture can be ordered. *See* Objection to PSR ¶ 160.

The government agrees that Mr. Archer has no property traceable to the fraud but argues that "the entirety of the fraud proceeds that passed through Archer's hands are forfeitable." PSR at p. 57. The government is wrong on the law. In *United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012), the case cited by the government in its response to Mr. Archer's objection, PSR at p. 57, the Second Circuit held that the defendant could not be ordered to forfeit profits that he never received or possessed. 692 F.2d at 145. "Forfeiture" connotes a person's losing an entitlement as a penalty for proscribed conduct. *Id*. Contorinis, therefore, could not be ordered to forfeit the profits that the Government sought because such profits were in the possession of the beneficiary fund over which Contorinis entirely lacked control. *Id*. Mr. Archer similarly never was the beneficiary of the fraud or the transactions in which Galanis used him as an intermediary. *See* Objection to PSR ¶ 160. And while the Second Circuit in *Contorinis* acknowledged that forfeiture of "proceeds received by others who participated jointly in the crime" may be appropriate in some cases, it is only permissible where "the actions generating those proceeds were reasonably foreseeable to the defendant." *Id*. at 147. As explained above, that was not the

42

case with Mr. Archer, where it was not reasonably foreseeable to Mr. Archer that Galanis was providing him proceeds of the bond scheme. Further, the government's argument that he should be required to forfeit proceeds received by Galanis and others relies entirely on cases that predate the Supreme Court's decision in *Honeycutt v. United States*, 137 S.Ct. 1626 (2017), which held unambiguously that a criminal defendant cannot be ordered to forfeit "property that his co-conspirator derived from the crime but that the defendant himself did not acquire." *Id.* at 1630.

Finally, at guidelines level 3, the appropriate fine guidelines is $200 to $9,500. *See* U.S.S.G. § 5E1.2. Even so, a fine would not be appropriate in this case in light of Mr. Archer's ability to pay. *See* PSR ¶¶ 141-149.

## **CONCLUSION**

For the reasons set forth above, we respectfully request that the Court impose a non-custodial sentence of probation and community service.

Dated:     February 14, 2022
           New York, New York

                                          Respectfully,

                                           /s/ Matthew L. Schwartz
                                          Matthew L. Schwartz
                                          Craig Wenner

                                          BOIES SCHILLER FLEXNER LLP
                                          55 Hudson Yards
                                          New York, New York 10001
                                          Tel.: (212) 446-2300
                                          Fax: (212) 446-2350
                                          mlschwartz@bsfllp.com
                                          cwenner@bsfllp.com

                                          *Attorneys for Devon Archer*

44

## <u>INDEX OF EXHIBITS</u>

A.      Letter to the Court by Devon Archer

B.      Letter to the Court by Dr. Krista Archer, Mr. Archer's wife

C.      Letters to the Court from other members of Mr. Archer's family

D.      Letters to the Court from Mr. Archer's friends

E.      Letters to the Court from Mr. Archer's business partners and associates

F.      September 14, 2018 Objections to the Presentence Report

G.      Letter to the Court from Jason Galanis in connection with his father's sentencing