

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 21, 2022

**By ECF**

The Honorable Ronnie Abrams
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re:   **United States v. Devon Archer**, 16 Cr. 371 (RA)

Dear Judge Abrams:

The Government respectfully submits this memorandum in connection with the sentencing of defendant Devon Archer, which is scheduled for February 28, 2022, at 12:00 p.m.  For the reasons that follow, the Government submits that a sentence of 30 months' imprisonment – the same sentence imposed by this Court on co-defendant Bevan Cooney – is sufficient, but not greater than necessary, to effectuate the purposes of sentencing.

**OFFENSE CONDUCT**

The Court is amply familiar with the facts of this matter and its procedural history, and the Government provides only a brief overview below.[1]

As the jury found after a lengthy trial and beyond a reasonable doubt, delivering a verdict that was affirmed by the Second Circuit, Archer knowingly participated in numerous aspects of a scheme to defraud the Wakpamni Lake Community Corporation of the Oglala Sioux Tribe (the "WLCC"), into issuing more than $60 million in bonds, the proceeds of which the defendants used not for a promised annuity, but instead for their own personal use and to help build a financial services mega-company they would control.  The WLCC was not the only victim of the scheme.  Also harmed were the clients of Hughes Asset Management ("Hughes") and Atlantic Asset Management ("Atlantic"), upon whom the defendants foisted the bonds to generate cash, without first disclosing the numerous attendant conflicts of interest.  When he became involved in this scheme, Archer knew about Jason Galanis's regulatory bar from serving as an officer or director of a public company, and knew about Galanis's checkered past.  Nonetheless, Archer became a

---

[1] The Government incorporates the evidence admitted at trial, including as summarized in the Government's briefing before the Second Circuit in *United States v. Archer*, No. 18-3727, Dkt. No. 29 at 2-21, Dkt. No. 72 at 3-23.

key player in the scheme, anticipating that, when the scheme succeeded, he would helm the resulting conglomerate and, ultimately, reap massive profits from its sale.

Archer knowingly participated in the scheme in multiple ways, including the following:

- First, as a member of Burnham Securities' investment committee, Archer caused Burnham Securities to become the "placement agent" for three separate issuances of the WLCC bonds.

- Second, another company with which Archer was affiliated – Wealth Assurance-AG – financed the purchase of Hughes, just in time to dump the first issuance of unsaleable WLCC bonds onto the firm's unwitting clients (negating the need for a true placement agent).

- Third, using proceeds misappropriated from the first bond issuance, and sent to him by Galanis through intermediaries, Archer purchased $15 million of the second issuance of WLCC bonds, and used the bonds he purchased to prop up the placement agent's net capital.  In trying to deposit the bonds, Archer falsely represented to two different banks that he had purchased the bonds with "real estate" proceeds.

- Fourth, with respect to the third issuance of WLCC bonds, Archer caused yet another one of his companies to help secure control of Atlantic, which then dumped the entirety of the third issuance – $16 million worth – onto one of its institutional clients without that client's prior knowledge or approval.

- Fifth, to secure support for his and his partners' efforts to consolidate control over the Burnham family of entities, Archer lied, repeatedly, to the board of the Burnham Investors Trust (the "BIT Board") about Galanis's involvement with Burnham-related business.  Archer did this because he needed the BIT Board to approve an acquisition of a Burnham subsidiary to further the roll-up plan that was being fueled by the WLCC bonds.

- Finally, in the fall of 2015, as the scheme was unraveling and the annual interest payment on the first tranche of bonds became overdue, Archer paid part of that annual interest payment himself in order to stave off detection of the scheme.  In addition, Archer perpetuated the fiction that a company named Calvert Capital (which was fake) had loaned him funds to purchase $15 million worth of WLCC bonds in the second issuance.

On June 28, 2018, after a six-week trial, a jury found beyond a reasonable doubt that Archer conspired to commit securities fraud and committed securities fraud by knowingly and intentionally participating in the scheme.  Archer moved for acquittal under Federal Rule of Criminal Procedure 29 and, in the alternative, for a new trial under Rule 33.  On November 15, 2018, the Court denied Archer's motion for acquittal, and granted Archer's motion for a new trial. On October 7, 2020, the Second Circuit reversed and remanded for sentencing.  Archer filed a

petition for rehearing, which was denied on December 23, 2020, and a petition for a writ of certiorari, which was denied on November 1, 2021.

## DISCUSSION

### I. The Applicable Guidelines Range is 108 to 135 Months' Imprisonment

The Government and the Probation Department agree that the Guidelines range is 108 to 135 months' imprisonment, calculated as follows:

- The base offense level is seven, pursuant to U.S.S.G. § 2B1.1(a)(1), because the offense of conviction has a statutory maximum sentence of more than 20 years.

- Because the loss was greater than $25,000,000 but less than $65,000,000, 22 levels are added pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

- Because the offense involved ten or more victims, two levels are added pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).

- The defendant is not entitled to any reduction for acceptance of responsibility as he was convicted following a jury trial and has continued to disavow responsibility for his crimes.

Accordingly, the total offense level is 31. Archer has no criminal history points and is thus in Criminal History Category I. Accordingly, the Guidelines range is 108 to 135 months imprisonment.

Archer urges the Court to find – in contravention of the jury's verdict and the Second Circuit's direction – that the Government has failed to prove that "Archer knew or should have known that the clients of Atlantic and Hughes were defrauded and that Jason Galanis was stealing the bond proceeds." (Def. Mem. at 23). Archer is wrong. By virtue of having been convicted, Archer was necessarily aware of the objects of the conspiracy in which he participated and at least some of the losses must have been reasonably foreseeable to him. As explained below, the Government has amply established by a preponderance of the evidence that the full amount of the loss and the full number of victims was reasonably foreseeable to him.

### A. The Loss Amount is Between $25 and $65 Million

As a preliminary matter, Archer does not, and could not, contest that the actual losses to the victims of the charged crimes exceeded $25 million. And as this Court has already repeatedly found there can be "no dispute that th[e] total investment loss [to the Atlantic/Hughes clients] is between 25 million and 65 million." (Dkt. 740, John Galanis Sentencing Tr. at 10; Dkt. 230, Jason Galanis Sentencing Tr. at 31; Dkt. 635, Gary Hirst Sentencing Tr. at 8; Dkt. 801, Bevan Cooney Sentencing Tr. at 29). Instead, Archer attempts to carefully thread the needle, arguing that he is not "relitigating" "his innocence," but arguing only that the Government has failed to "prove that

Mr. Archer knew or should have known that the clients of Atlantic and Hughes were defrauded and that Jason Galanis was stealing the bond proceeds." (Def. Mem. at 23-24). Archer suggests that it is possible for the jury to have "inferred [his] intent" without "separately determining the fact questions left to the Court now for sentencing." (Def. Mem at 24). And in an effort to find a loss-free fraud, Archer suggests that the Court could "conclude that Archer participated in a scheme to defraud when he . . . made [false] statements to [Morgan Stanley] or to the [] BIT Board." (Def. Mem. at 25). But that argument is nonsensical.

There can be no question that the charged scheme was a scheme to fraudulently induce the WLCC to issue bonds, to induce the Atlantic and Hughes clients to purchase the bonds, and to misappropriate the proceeds. That is clear from the operative indictment itself. (Dkt. 367, Third Superseding Indictment). And it is clear from the very way in which this Court defined the scheme for the jury's consideration:

> The indictment alleges that the securities fraud conspiracy charged in Count 1 and the substantive securities fraud offense charged in Count 2 relate to an alleged scheme by each of the defendants to defraud [] the WLCC, to issue bonds . . . based upon false and misleading representations and to fraudulently cause clients of Atlantic and Hughes to buy certain of those bonds, thereby defrauding those clients as well. The indictment also alleges that the defendants failed to invest the bond proceeds on the WLCC's behalf in the manner agreed upon and instead misappropriated the bond proceeds for their own use.

(Trial Tr. 4143-44).

The Second Circuit similarly endorsed that understanding of the charged fraud, explaining that:

> Count One alleged that the Defendants conspired to defraud the Wakpamni by inducing them to issue bonds on the false promise that the proceeds would be invested into an annuity, which the Defendants instead misappropriated for their own use. It also charged the Defendants with conspiring to defraud Hughes's and Atlantic's clients by gaining ownership and control of those investment advisers "and causing client funds to be invested in the Wakpamni bonds, without disclosing the material facts to these clients, including that the bonds did not fit within the investment parameters of certain clients' investment advisory contracts and that certain substantial conflicts of interest existed. Count Two accused the Defendants of substantive securities fraud for making false statements and omitting material facts while engaging in a scheme to misappropriate the proceeds of several bond issuances by the Wakpamni and in causing investor funds of Hughes's and Atlantic's

clients to be used to purchase the bonds.

*United States v. Archer*, 977 F.3d 181, 185-86 (2d Cir. 2020) (internal quotations and citations omitted).

Archer himself endorsed this understanding of the fraud, arguing to the jury that the fraud had two components: "that the defendants engaged in a scheme to misappropriate the proceeds of several bond issuances by the WLCC, and also that they caused investor funds to be used to purchase the bonds in violation of fiduciary duties with all those undisclosed conflicts of interest." (Trial Tr. at 3846-47). And Archer argued repeatedly to the jury that he could not be found guilty because he did not know either that the bond proceeds were being misappropriated or that the Atlantic/Hughes clients were being defrauded. (*See, e.g.,* Trial Tr. 3851) (arguing that Archer had "no contact with the WLCC victims and no idea of what misrepresentations are being told to them; and there is no contact with the pension fund victims, no idea of what is being told to them, and every reason to believe that those transactions are arms length and legitimate"); (Trial Tr. 3921) (arguing that there was no evidence that "Devon Archer knew that this money was being stolen"); (Trial Tr. 3934) ("The final reason that you know Devon is not guilty is because there is no actual evidence that Devon knew that Jason Galanis was stealing the money.").

Archer's suggestion that his conviction might have been based solely on his participation in an undefined scheme to defraud based on his lies to the BIT Board and to Morgan Stanley simply makes no sense. Archer was not charged with defrauding Morgan Stanley or the BIT Board. Those lies were a part of the charged scheme both because they were told to further the scheme, for example, to enable the depositing of the bonds, and because they evinced Archer's knowledge of the misappropriation of the bond proceeds. The lies did not – as Archer himself argued – constitute a stand-alone crime of which he could be convicted. (*See, e.g.,* Dkt. 355 at 16, 28 (Archer 404(b) Opp.) (arguing that misstatements to BIT Board could not "constitute statements or omissions in connection with the purchase or sale of any security" and that lies to Morgan Stanley and Deutsche Bank were "not part of the charged scheme, as neither bank engaged in a purchase or sale of securities on behalf of Mr. Archer"); (Trial Tr. at 3878) (arguing that "nothing that happened with the BIT Board was in connection with the purchase or sale of a security"); (Trial Tr. At 3893) (same point with respect to lies to the banks)).

Archer was correct in the first instance. He could not have been convicted at trial based on some independent crime of lying to the BIT Board or the banks. The jury could not have convicted him if it found that he knew neither that the bond proceeds were being misappropriated nor that the investor funds were being fraudulently used to purchase them. But a jury found Archer guilty of participating in the *charged* scheme. The Second Circuit found that the evidence provided "strong support" that "Archer knew the bond proceeds were being misappropriated" and "that Archer intended to help the coconspirators defraud Hughes' and Atlantic's clients by purchasing the bonds without informing them of the conflicts of interest that riddled the transactions." *United States v. Archer*, 977 F.3d 181, 191 (2d Cir. 2020). And because Archer did know the objects of the scheme, there can be no reasonable debate that there were losses reasonably foreseeable to Archer. The Court must find – at a minimum – that it was reasonably foreseeable to Archer that the bond proceeds would be misappropriated, and the clients of Hughes and Atlantic would be

defrauded, with respect to at least one of the bond issuances.  Given that Archer was a knowing participant in the fraud, the only question is whether he was a knowing participant from the jump, such that the entirety of the fraud was foreseeable to him from the outset, or whether he somehow learned of the fraudulent nature of the transactions at some point along the way.

Under the Guidelines, Archer is responsible for the "reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1 app note. 3(A)(i).  Further, in addition to his own conduct, Archer is also responsible for "all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity[.]" U.S.S.G. §1B1.3(a)(1)(B).

There is no dispute that Archer was aware of all three tranches of bonds. *See, e.g.*, GX 2217 (Galanis telling Archer and Cooney that the WLCC have signed the bond agreements); GX 2030 (Galanis sends Archer the term sheet for the Hughes acquisition and says he "believes they will take $28 million" of the Wakpamni bonds); GX 1236 (Cooney emailing Archer referencing Cooney's deposit of $5 million of the bonds he purchased and referencing Archer's difficulties depositing the ones Archer had purchased); GX 2062 (Galanis forwarding Archer and Cooney a Morton email in which she says Atlantic will "begin the process of going through the client information to determine where [the third tranche of Wakpamni bonds] can be placed). There is also no dispute that Archer was aware of the acquisition of Atlantic and Hughes and the intention to place the bonds with Atlantic and Hughes' clients, which purchases took place. *See, e.g.*, GX 2018 (Galanis apprises Archer and Cooney of the possible "useful" acquisition of Hughes); GX 2018 (Galanis sending Archer and Cooney Hughes acquisition term sheet); GX 2014 (Galanis informing Archer and Cooney that the money to close the Hughes deal has been wired out); GX 2303 (Galanis sending Archer and Cooney info on Atlantic); GX 2061 (Galanis forwarding Archer and Cooney an email from Morton saying they are "90%" there on the Atlantic transaction). Nor is there any dispute that Archer was aware that the first and third bond issuances had in fact been placed with clients of Atlantic and Hughes.

As the Second Circuit recognized, "the very nature of the transactions was surely suspect," as Archer "had worked to acquire [Hughes and Atlantic] specifically to offload the Wakpamni bonds." *United States v. Archer*, 977 F.3d 181, 192 (2d Cir. 2020).  In particular, in light of Archer's undisputed awareness of Galanis's "questionable reputation," (*id.*), there is more than sufficient evidence to establish by a preponderance that Archer understood that conflicts of interest would not be disclosed, and that the full loss amounts were therefore reasonably foreseeable to him.

Even if the Court found that Archer was unaware of the nature of the fraud during the first bond issuance, there can be no question that Archer understood the fraudulent nature of the scheme when he personally purchased $15 million of the second bond issuance. As a preliminary matter, Archer was a sophisticated investor and the transaction simply makes no sense as a legitimate transaction.  There is no dispute that: (i) Archer understood the $15 million was given to him by Galanis; (ii) Archer knew the money had not been provided directly to him, but instead funneled through Galanis's attorney, (iii) Archer purchased the bonds after falsely representing to the

WLCC that he was purchasing them "for [his] own account and for investment only"; and (iv) Archer did not keep the bonds, but quickly transferred them to another entity for net capital purposes. Archer therefore knew he was serving as a front man. He neither paid for, nor kept the bonds. If Archer actually thought that Galanis had a spare $15 million to purchase his own bonds, only to park them with another entity they controlled for net capital purposes, and that such a transaction was proper, why the need for Archer's involvement at all?

Nor was the facially suspicious nature of the transaction the only evidence of Archer's knowledge. As the Circuit recognized, "[t]he sudden appearance of $15 million – just weeks after Galanis had repeatedly told Archer that he needed 'discretionary liquidity,' and money to buy his 'nyc mansion,' supported a finding that the $15 million came from the first bond offering." *United States v. Archer*, 977 F.3d 181, 193 (2d Cir. 2020). That is all the more true given that Archer knew the money had been funneled through the very "same attorney who was handling Galanis's condo purchase." (*Id.* at 194).

Archer's lies to Morgan Stanley/Deutsche Bank and the BIT Board – "[p]erhaps the strongest evidence of Archer's guilty knowledge" – further reinforce that he possessed the requisite knowledge at least as of the second bond issuance. *United States v. Archer*, 977 F.3d 181, 194 (2d Cir. 2020). There is no dispute that Archer's statements to the banks that the $15 million was from real estate proceeds was false. And as the Second Circuit recognized, Archer's claim that he was repeating a lie told to him by Galanis, was "not supported by the record," and Archer's speculation that a Morgan Stanley employee simply assumed the money came from Archer's own real estate investments was "at odds with the employee's testimony that she would not have written such information down unless it came from the client." (*Id.* at 195). There is only one supportable inference – that Archer lied about the source of the money because he knew it was stolen bond proceeds.

That conclusion is reinforced by the fact that Galanis provided virtually identical updates on all aspects of the transactions to Archer and Cooney, and both Archer and Cooney took virtually identical actions in using misappropriated proceeds from the first bond issuance to purchase the second bond issuance. As this Court has already found with respect to Cooney, even if he "was unfamiliar with the criminal object of the WLCC deal at its inception," "he at least obtained the requisite knowledge during the course of the fraud," and certainly "knew the objectives of the criminal conspiracy at the time he acquired the second tranche of bonds," and further "would have been aware at that point" that "the $20 million used to purchase the bonds had been misappropriated from Hughes' investors." (Dkt. 801, Bevan Cooney Sentencing Tr. at 29). As such, the Court found that "it would have been reasonably foreseeable to Mr. Cooney that the victims in this case would sustain a combined loss of between $25 million and $65 million." (*Id.*). So too for Archer. It would make no sense for Galanis to have provided identical information to two co-conspirators and to have asked them to take identical actions, but to have apprised only one of the true purpose of the scheme. Archer, like Cooney, clearly understood the nature of the fraud

*at least* as of the second bond transaction, and the Court should find – as it did for Cooney – that the entire loss was foreseeable to him.

Finally, Archer's use of the Calvert cover-up also demonstrates his knowledge of the fraudulent nature of the second bond issuance. "[O]n November 25, 2015, Archer sent an email to an employee at a roll-up company that had taken possession of some of the bonds from the second offering, stating that the bonds needed 'to be replaced/returned to Calvert' as 'the lender and beneficial owner' of the bonds." *United States v. Archer*, 977 F.3d 181, 196 (2d Cir. 2020). As this Court is aware, Calvert was a fictitious entity created as a cover story for various of the transactions involved in the bond issuances. While the Court found that this single instance was insufficient to establish Archer's knowing participation, Archer's adoption of the cover story concocted by his co-conspirators was highly significant. As the Second Circuit recognized, Archer clearly knew that Calvert was not the beneficial owner of the bonds," and his "explicit lie to a third party made during the course of and in furtherance of the cover-up" should not be "downplayed." *Id.* at 196.

Thus, even if the Court finds only that Archer became aware of the fraudulent nature of the scheme during the second bond issuance, the loss amount reasonably foreseeable to him still exceeds $25 million, because he is responsible for the $20 million in the second bond issuance and the more than $16 million in the third issuance.[2]

In short, because Archer has been found guilty of the charged crimes, at least some portion of the $43 million in losses was necessarily foreseeable to him. There is more than sufficient evidence to establish by a preponderance that the full amount was reasonably foreseeable to him. But even if it was not, there can be question that amounts involved in the second and third issuances were reasonably foreseeable to him, such that the applicable loss amount for Guidelines purposes is still more than $25 million.

### B. The Enhancement for Ten or More Victims Applies

The ten or more victims enhancement is also appropriate. Archer does not directly address this enhancement, except to argue generally that he did not know that the clients of Atlantic or Hughes would be defrauded. (Def. Mem. at 23). But for the same reasons as the Court should find the relevant loss amount was in excess of $25 million, it must also find that there were ten or more victims. As described above, all three issuances were reasonably foreseeable to Archer, as were the purchases of the first and third issuances by the clients at the two captured asset management firms that Archer knew had been purchased by co-conspirators. On this basis alone, there is ample basis to impose a two-level increase on the basis of the ten or more victims, given the involvement of ten pension funds and the WLCC.

---

[2] In addition, even if Archer was unaware of the fraudulent nature of the scheme during the first bond issuance, he later participated in and furthered that part of the scheme by transferring $250,000 to WAPC – an entity with which he had no affiliation – in order to make the interest payment on the first series of bonds, thereby delaying disclosure of the fraud.

As such, all 11 victims of the scheme were reasonably foreseeable to Archer

### C.  The Government Does Not Oppose a Two-Point Minor Role Adjustment

As the Court is aware, the Government does not believe that a minor role adjustment is warranted for any defendant in this case and there is absolutely no basis for Archer to receive the four-level reduction reserved for defendants who played only a minimal role. However, because the Court gave a two-point role reduction to Cooney – whose core participation in the offense was virtually identical to Archer's – the Government does not object to a two-level reduction for Archer as well.

A mitigating role adjustment under Section 3B1.2 is appropriate only when a defendant is "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2, app. note 3(A). In considering the applicability of a mitigating role adjustment, the Sentencing Commission has instructed courts to "consider the following non-exhaustive list of factors:

> (i)  the degree to which the defendant understood the scope and structure of the criminal activity;

> (ii)  the degree to which the defendant participated in planning or organizing the criminal activity;

> (iii)  the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

> (iv)  the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

> (v)  the degree to which the defendant stood to benefit from the criminal activity."

U.S.S.G. § 3B1.2, app. note 3(C).

As the Government argued in connection with Cooney's sentencing, the Government does not believe any role adjustment is warranted because Archer clearly understood the "scope and structure of the criminal activity," having stayed apprised of the creation of the bonds, personally participated in misappropriating the proceeds from the first and the third bond issuances, assisting to make an interest payment on the first bond issuance in order to delay discovery of the fraud, and personally purchasing $15 million of the second bond issuance – a decision which was his alone to make. While it is true that Archer generally acted at the direction of Jason Galanis and his personal financial gain – in the form of his interest in the roll-up – was significantly less than Jason Galanis's, the same could be said for most of his co-conspirators.

Indeed, the Court itself found the role adjustment at Cooney's sentencing a "close question," but ultimately gave a two-level minor role adjustment to Cooney, finding that he was "substantially less culpable than the average participant in the Wakpamni bond fraud." (Dkt. 801,

Bevan Cooney Sentencing Tr. at 30). In so finding, the Court explained that while there was "no doubt that [Cooney] played an important role in the fraudulent scheme having purchased the second tranche of WLCC bonds through recycled proceeds," his role was not as pivotal as that of Jason Galanis, John Galanis, Gary Hirst or Hugh Dunkerley. (*Id.* at 31-32). Archer argues that he is even less culpable than Cooney because Cooney produced a fraudulent Calvert document to the SEC, informed Francisco Martin of Galanis's arrest in an unrelated matter, and personally profited from the scheme. (Def. Mem at 26-27). But Archer was equally if not more culpable that Cooney. He purchased three times as many Wakpamni bonds, lied repeatedly to Morgan Stanley and to Deutsche Bank about the source of the money used to purchase the bonds, lied to the BIT Board on Galanis's behalf, utilized the same Calvert lie to cover up the fraud (albeit not to a regulator), and stood to gain far more from the success of the roll-up plan. Both Archer and Cooney's most prominent role in the scheme however was the same – they each used misappropriated bond proceeds to purchase the entirety of the second tranche of bonds, misrepresented the purpose of their purchase to the WLCC, and then transferred the bonds to other entities involved in the roll up for net capital purposes. In that vein, although Archer purchased three times as many bonds as Cooney, the two are similarly situated and Archer should receive the same – but no greater – role reduction as Cooney.

\*\*\*

Accordingly, the applicable Guidelines range is 108 to 135 months' imprisonment.

## II.     A 30 Month Sentence Would Recognize the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Ensure Adequate General Deterrence

A sentence of 30 months' imprisonment, the same sentence imposed on co-defendant Bevan Cooney, is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

An incarceratory sentence equal to that imposed on co-defendant Bevan Cooney is essential "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), and to provide general deterrence, 18 U.S.C. § 3553(a)(2)(B).

To begin, this was a massive fraud. The loss amount of $43 million plainly puts Archer and his co-conspirators among the most culpable of fraud defendants nationwide. Sentencing Commission statistics for 2020 show that less than 1 percent of defendants sentenced last year pursuant to U.S.S.G. § 2B1.1 had a loss figure of greater than $25,000,000. *See* U.S. Sentencing Comm., *Use of Guidelines and Specific Offense Characteristics, Offender Based, Fiscal Year 2020*, at 9, *available at Use of Guidelines and Specific Offense Characteristics, Offender Based, Fiscal Year 2020.*

Further, the Wakpamni scheme was designed to be highly complex in an effort to fool investors and law enforcement. In both the late summer of 2014 and the spring of 2015, the conspirators nearly simultaneously (i) executed the purchase of an investment adviser firm

(Hughes in 2014 and Atlantic in 2015) and (ii) executed a bond issuance, the entirety of which they placed with clients of that newly acquired investment adviser. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").

Archer played a key role in this scheme. He knew about the acquisition of Hughes and Atlantic, personally purchased $15 million of the Wakpamni bonds using misappropriated bond proceeds, kept himself apprised of every step of the fraud, lied to effectuate the bond transaction and assist Jason Galanis, and worked to cover up the fraudulent nature of the scheme by fronting money for the initial interest payment and utilizing the fraudulent Calvert story to cover up the nature of the scheme. The amount of the loss, the scope of the fraud, and Archer's involvement in numerous aspects of the fraud show that a significant incarceratory sentence is necessary to reflect seriousness of the offense, promote respect for the law, and deter others from engaging in similar conduct in the future.

The need to avoid unwanted sentencing disparities also mandates a sentence of 30 months. As described in greater detail above, Archer and Cooney played virtually identical roles in the charged scheme. This Court has already indicated its view of Cooney's culpability relative to his co-conspirators. He was less culpable than Jason Galanis, the "mastermind behind and orchestrator of the fraud," than John Galanis, who "induced the Wakpamni tribe to issue its bonds in the first place . . . but which Mr. Cooney took no part in," than Hugh Dunkerley, who "served as the placement agent for the tribal bond issuances and is the sole managing member of the WAPC, roles which were pivotal in misappropriating the bond proceeds, and again . .  which did not involve Mr. Cooney," and Gary Hirst, who also "played a more significant role than Mr. Cooney" by "set[ting] up the annuity provider that was supposed to invest the bond proceeds on behalf of the WLPC, as well as the bank account into which the bond proceeds were deposited." (Dkt. 801, Bevan Cooney Sentencing Tr. at 31-32). On the other hand, Cooney was more culpable than Morton, given that he was "aware of [the] broader fraud," where Morton was aware only of the fraud on the Atlantic/Hughes clients but not the misappropriation of the bond proceeds. (Dkt. 946, Michelle  Morton Sent. Tr. at 19). And Cooney's sentence of 30 months' – significantly below the sentences imposed on John Galanis, Jason Galanis, and Gary Hirst – fully takes into account his role in the offense. That same assessment applies with equal force to Archer whose conduct was indistinguishable in any meaningful way. The non-incarcertory sentence Archer requests would therefore result in a significant and unwarranted sentencing disparity.

Archer's friendships, family ties, and community engagement do not alter that assessment. Archer argues that he is an "honest and hard-working man who has always carried himself with great integrity" and that a non-incarceratory sentence is warranted because he is a "source of strength for his family, his community, his business associates, and the charitable endeavors that he has dedicated himself to." (Def. Mem at 33-34). The first claim is somewhat undermined by his conduct in this case. As to the second, Archer's support for his friends, family and community is commendable and to his credit. But his good works in one area of his life cannot wipe out his

criminal conduct in another. And while the Court can and should consider Archer's positive attributes, these simply cannot justify the enormous sentencing benefit he seeks.

Archer also argues that no further punishment is necessary or warranted because of the devastating impact the instant prosecution has had on his psyche, his family, his business prospects and his finances. There is no doubt that criminal prosecutions have a collateral effect on innocent family members, and especially on children, who have done nothing to deserve it. And the Government in no way diminishes the difficulties Archer's criminal conduct has wrought for his children. But that is equally true with respect to virtually every defendant who is also a parent. Archer's children, who have the benefit of a present mother, a close extended family, an extraordinary education, ███████████████, are surely better off than the vast majority of defendants' children. To permit Archer to avoid incarceration in order to meet the needs of his children would create gross disparities with the multitude of defendants who are afforded no such benefit and would send a dangerous and wrong message that the children of privileged defendants are more important than the children of defendants who are not.

Archer also argues that no further punishment is warranted because he has already "watched his reputation and career systemically crumble" and because he "and his family have [] been affected financially, and are currently severely cash negative." (Def. Mem. at 34-35). But if the professional consequences of a white-collar defendant's fraud were themselves sufficient punishment, there would be no occasion to ever sentence such defendants. Indeed, this Court has already rejected that argument in connection with the sentencing of co-defendant Michelle Morton. Morton too argued for a non-incarceratory sentence, claiming that no further punishment was necessary because "this case has wreaked . . . destruction on [Morton's] life" destroying "[h]er once flourishing career in the financial industry," causing her to lose her "friends, her colleagues, [and] her personal and professional support system," and leaving her "so destitute she [could not] even afford the medical care she so desperately needs." (Dkt. 946, Michelle Morton Sent. Tr. 29-30). But despite Morton's less culpable role, and the far graver price she had already paid for her participation in the scheme, this Court recognized that just punishment required some term of incarceration and sentenced her to 15 months' imprisonment.

And the professional and personal consequences to Archer are indisputably less severe. While Archer claims his career has crumbled, Archer is employed, and indeed has submitted letters from numerous of his current and former colleagues. (See, Def. Mem. at 15-16). Indeed, the Court has authorized dozens of international business trips for Mr. Archer since the inception of this case.[3] Archer also complains that he is "severely cash negative." (Def. Mem. at 35). But Archer is living in a multi-million dollar Brooklyn townhouse, and owns a second residence in the Hamptons, both of which have significant equity.[4] He and his wife own investment assets worth

---

[3] During the pendency of this case, Archer and his family have also travelled internationally on vacation on multiple occasions, including to Jamaica, Turks and Caicos, Mexico, the United Arab Emirates, and the French Antilles. See Archer July 9, 2020 Ltr.

[4] Archer claims that his primary residence is currently valued at $3.5 million, which is inconsistent with his representation at the time of his arrest that it was worth $5.5 million. (PSR ¶141, n. 1).

more than several million dollars. (PSR ¶ 141). And while the PSR lists Archer's wife's tax liabilities, it does not include any indication of her income. In short, while Archer may well be living beyond his current means, he is nonetheless living an indisputably privileged lifestyle and nothing about his finances warrants a reduction in sentence.



\*\*\*

For all the reasons set forth above, a sentence of 30 months is warranted.

## III. Restitution and Forfeiture

Consistent with the restitution orders entered against co-defendants Jason Galanis, John Galanis and Gary Hirst, the Court should order Archer to pay restitution to Wakpamni and to the Atlantic and Hughes clients in the amount of $43,427,436. A proposed order of restitution (with a schedule of victims filed under seal) is attached.

In addition, and consistent with the recommendation of Probation, the Court should enter an order of forfeiture in the amount of $15,700,513, representing the proceeds from the Wakpamni fraud that Archer directly received, calculated as follows: (1) $15,000,000 of bond proceeds received by Archer through his entity, Rosemont Seneca Bohai, that he used to purchase additional Wakpamni bonds; (2) $600,513 received by Archer via Rosemont Seneca Bohai, and which Archer used to make it appear as though he had purchased Jason Galanis's share in CORFA; and (3) an additional $100,000 received by Archer via Rosemont Seneca Bohai, which had been transferred by Thorsdale.[5] (PSR ¶ 165). In arguing that Archer has no forfeiture obligation, Archer ignores controlling Second Circuit precedent post-dating the Supreme Court's decision in *Honeycutt v. United States*, 137 S.Ct. 1626 (2017), and holding that under 18 U.S.C. § 981(a)(1)(C), "acquired"

---

[5] The PSR also identifies $178,000 of funds from Code Rebel that Archer received as partial repayment for making interest payments on the first round of fraudulently induced Wakpamni bonds as subject to forfeiture. The Government is not seeking forfeiture of these funds.

property "need not be personally or directly in the possession of the defendant" as long as "at some point, [it had] been under the defendant's control." *United States v. Bergstein*, 788 F. App'x 742, 748 (2d Cir. 2019) (citing *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012) (internal quotation marks omitted)). In *Bergstein*, the defendant was found to "effectively control[]" proceeds of the fraud that he transferred to shell companies and then used. Like the defendant in *Bergstein*, Archer's reliance on *Honeycutt* is misplaced. In *Honeycutt*, "the Supreme Court held that forfeiture under 21 U.S.C. § 853(a)(1), could not be imposed upon a defendant, jointly and severally with his coconspirator, for proceeds he never acquired or controlled." *Bergstein*, 788 F. App'x at 748. Here, like in *Bergstein*, the evidence established that Archer controlled the funds in question. *See id.* at 748.

The Government will provide a proposed preliminary order of forfeiture prior to sentencing.

<div style="margin-left: 40%;">

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  /s/ Rebecca Mermelstein
    Rebecca Mermelstein
    Negar Tekeei
    Assistant United States Attorneys
    (212) 637-2360/2482

</div>

cc:    Matthew Schwartz, Esq. (via ECF)