

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

February 23, 2022

**BY ECF**

Hon. Ronnie Abrams
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

     Re:    *United States v. Devon Archer*, S3 16 Cr. 371 (RA)

Dear Judge Abrams:

     I represent Devon Archer and write in response to the Government's sentencing memorandum dated February 21, 2022. [ECF No. 1003 ("Gov. Ltr.").] Simply put, even assuming for sentencing purposes Mr. Archer's guilt,[1] he was plainly kept in the dark about Jason Galanis's larger fraud, lost a substantial amount of his own money and received nothing, and was by far the least culpable defendant or alleged co-conspirator. Further, Mr. Archer has been subject to pretrial supervision for nearly seven years during which he has a spotless record of compliance, has lived an otherwise exemplary life, and has already suffered greatly due to the collateral consequences of his arrest, trial, and conviction. As discussed below and in our opening submission, we respectfully submit that a non-custodial sentence is both consistent with the applicable sentencing guidelines and, regardless, sufficient but not greater than necessary to serve the purposes of sentencing.

## OFFENSE CONDUCT

     The government's overview of Mr. Archer's purported participation in the scheme mischaracterizes the record and hews closely to the narrative that this Court has already rejected. We emphasize again that nothing about the Second Circuit's decision reinstating the jury verdict and finding that the jury was "entitled" to convict is inconsistent with this Court's ability to find sentencing facts by a preponderance of the evidence consistent with its November 2018 decision. *See also* Archer Mem. at 24-25. The government's submission does not grapple with this reality, and instead asserts that a preponderance of the evidence supports its narrative. It does not.

     To begin, the government's very first example of why it believes Mr. Archer was a "key player in the scheme" is unsupported by the evidence. The government contends that, "as a member of Burnham Securities' investment committee, Archer caused Burnham Securities to become the 'placement agent' for three separate issuances of the WLCC bonds." Gov. Ltr. at 2.

---

[1] Again, Mr. Archer pleaded not guilty to the charges against him and went to trial. For purposes of sentencing, we acknowledge that Mr. Archer has been convicted of Counts I and II of the Indictment, but nothing in this submission should be understood as an acknowledgement that Mr. Archer is, in fact, guilty.



While it is true that Mr. Archer was a member of the investment committee for Burnham Securities, the trial record does not establish that there was a committee meeting concerning the WLCC bonds or, if there was one, that Mr. Archer participated in it. Hugh Dunkerley could not recall whether Mr. Archer was at such a meeting where the WLCC bonds were discussed. *See* Trial Tr. 1410:20-1411:3 (Dunkerley: "I would need to refresh my memory on that" and "I don't specifically recall it"). No minutes of such a committee meeting were introduced, and the single email referencing the meeting that was used at trial—though not admitted over the Government's objection—suggested there was no such meeting. *See id.* at 1419:14-1424:9.

The "Second" way in which the government contends that Mr. Archer participated in the scheme is equally unsupported. It argues that "another company with which Archer was affiliated – Wealth Assurance-AG – financed the purchase of Hughes," which Jason Galanis used to purchase the bonds. Gov. Ltr. at 2. But Mr. Archer did not sit on the board of Wealth Assurance AG, and the acquisition of Hughes was orchestrated by Jason Galanis and Dunkerley entirely without the involvement of Mr. Archer. Trial Tr. 1386:14-1394:2, 1409:13-17.

The "Third" way in which the government contends Mr. Archer was involved in the scheme is through his purchase of $15 million of the bonds from the second bond offering. Notwithstanding the extensive briefing and findings of the Court concerning this event, the government continues to overreach. It argues that Mr. Archer "used the bonds he purchased to prop up the placement agent's net capital." Gov. Ltr. at 2. But again, this contention is not supported by the record – the evidence did not show that Mr. Archer was involved in Burnham Securities' decision to use the bonds for net capital, or that he even knew about it. Mr. Archer's entity, RSB LLC, transferred the bonds to VL Assurance (Bermuda) Ltd. GX 301 at 135. Everything that happened after that transfer happened without any involvement or awareness of Mr. Archer. *See, e.g.*, Tr. 2100:17-24 (Walch: testifying that she never met with or spoke to Mr. Archer and that her discussion of Burnham Securities' statements and actions were not references to Mr. Archer's statements or actions). In any event, as the Court previously found, "[t]here is no evidence, however, that anything was amiss with this aspect of the transactions. The entities seemed to have engaged with FINRA in good faith and ceased using the bonds to satisfy net capital requirements upon receipt of the agency's final decision." *United States v. Galanis*, 366 F. Supp. 3d 477, 485 (S.D.N.Y. 2018).[2]

The government contends that the "Fourth" way in which Mr. Archer participated in the scheme was to "cause[] yet another one of his companies to help secure control of Atlantic," which Galanis then used to purchase the third bond issuance. Gov. Ltr. at 2. While the Court previously found that Mr. Archer was aware of the purchase of Atlantic and the possibility that

---

[2] What Mr. Archer did and did not represent to the banks concerning the source of funds for the bond purchase has been heavily litigated. As the Second Circuit noted, multiple different inferences could be drawn from this evidence. *Archer*, 977 F.3d at 194-95. But this Court already determined that the evidence did not establish that Mr. Archer misled any bank "because he knew that Jason Galanis was stealing the bond proceeds." *Galanis*, 366 F. Supp. 3d at 501. As discussed more fully below, the specific findings that this Court must make for purposes of sentencing are distinct from a review of the record as a whole when determining whether the



the transaction would facilitate the sale of WLCC bonds, there was "no indication, however, that the individuals in control of the investment advisers, Morton and Hirst, would fail to disclose the conflicts of interest or violate the terms of the clients' investor agreements." *Galanis*, 366 F. Supp. 3d at 499.

The government's "Fifth" way in which Mr. Archer participated in the scheme – his statements to the BIT Board – in fact had nothing to do with the bond scheme at all. While the government contends that Mr. Archer misled the BIT Board "to further the roll-up plan that was being fueled by the WLCC bonds," Gov. Ltr. at 2, there was no evidence at trial that Mr. Archer "was misleading because he knew Galanis was stealing the bond proceeds." *Galanis*, 366 F. Supp. 3d at 500. This is not to say that Mr. Archer's conduct before the BIT Board was without fault, but it is not evidence of his participation in the charged conspiracy and certainly is not evidence that he understood that Galanis was misappropriating the bond proceeds. *See United States v. Archer*, 977 F.3d 181, 195 (2d Cir. 2020) (". . .Archer did not make this warranty in the context of the Wakpamni scheme directly. . .").

"Finally," the government contends that Mr. Archer paid an interest payment on the bonds "in order to stave off detection of the scheme" and "perpetuated the fiction that a company named Calvert Capital (which was fake) had loaned him the funds to purchase" the bonds. Gov. Ltr. at 2. Neither is true. As noted in Mr. Archer's objection to paragraph 56 of the PSR, nothing adduced at trial supports a charge that Mr. Archer knew the purpose of the payment he made, which was likely for some other purpose or based on a misrepresentation made to him by Galanis. *See Galanis*, 366 F. Supp. 3d at 503 ("It is thus just as consistent with Archer's transfer of money that he was intending to assist what he believed to be a legitimate transaction by providing liquidity needed in the short-term.").

The evidence concerning what Mr. Archer may have understood about Calvert is similarly absent from the record. Mr. Archer did not say, as the government contends, that Calvert "had loaned him funds." Rather, Mr. Archer referenced Calvert as the holder of the bonds. The record is simply silent on what Mr. Archer was told by Galanis or otherwise knew about Calvert, such as when Calvert acquired the bonds. As noted in Mr. Archer's objection to paragraph 23 of the PSR, unlike with Bevan Cooney and others who directly and clearly participated in a cover-up, there is nothing to suggest Mr. Archer knew that Calvert was meant to deceive anyone. *See Galanis*, 366 F. Supp. 3d at 504 ("Indeed, the weight of the evidence undercuts the notion that Archer was aware of the Calvert cover-up.").

Finally, a brief response to the February 18, 2022 letter from the Board of Trustees of the RMB Investors Trust – the successor to the "BIT Board" (the "BIT Board Ltr.") – is necessary. At the outset, Mr. Archer has acknowledged that his decision to continue to do business with Jason Galanis was a horrible mistake, and that he should have heeded the warnings that the BIT Board provided both explicitly and through its questions. But the BIT Board's letter should otherwise have little bearing on Mr. Archer's sentencing in this case. As both this Court and the Second Circuit have recognized, Mr. Archer "did not make this warranty in the context of the Wakpamni scheme directly." *Archer*, 977 F.3d at 195. Neither the government nor the Court has adopted the view that the BIT Board is a victim. And the BIT Board's opinion as to what Mr. Archer's subjective state of mind was at the time of the negotiations is irrelevant and contrary to



the evidence and this Court's findings. *See* BIT Board Ltr. at 1 ("Mr. Archer did not have in mind a legitimate business roll-up.").

As to the claim that Mr. Archer "lied to [the BIT Board] repeatedly," the BIT Board again relies on its own opinion and speculation without the benefit of a factual record. The BIT Board claims that Mr. Archer did not invest his own money in Burnham but was instead investing money that "came directly from the bond scheme." As Mr. Archer proved at trial, he invested at least $599,000 of his own money in Burnham Financial Group, in addition to regularly providing liquidity infusions. *See* DX 9003 at 5. Presumably the BIT Board is referring to the government's misleading summary chart that suggested Mr. Archer moved funds from WLCC back to Burnham Securities, which the evidence proved was simply an internal error at the bank that did not involve Mr. Archer at all. *See* DX 8011. With regard to the BIT Board's claim that he "assured us he would have no further associations with Jason Galanis," BIT Board Ltr at 2, this was decidedly not Mr. Archer's representation. As the Court noted previously, Mr. Archer explained that, with the advice of counsel, he agreed to comply with limitations on the involvement of Galanis, though Mr. Archer acknowledges the Court's prior finding that "he misled these entities and violated the spirit of his representations." *Galanis*, 366 F. Supp. 3d at 501. The BIT Board's other contentions, such as its incorrect claim that Mr. Archer had any knowledge or involvement in the use of the bonds for net capital purposes, have been addressed above.

## DISCUSSION

### I.     The Appropriate Loss Amount is $0 and the Number of Victims One

The government argues that by virtue of the conviction, Mr. Archer "was necessarily aware of the objects of the conspiracy" as charged. Gov. Ltr. at 3. This is wrong on the law and the evidence.

The jury convicted Mr. Archer of securities fraud and conspiracy to commit securities fraud. But the conspiracy as alleged in the indictment was sweeping, covering conduct by co-conspirators who were purposefully siloed from one another by Jason Galanis, including the management of the investment advisors – something Mr. Archer was not involved in at all. It does not follow, contrary to the government's argument, that the knowledge and conduct of the co-conspirators was reasonably foreseeable to Mr. Archer.

> It is important to note that the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy. As we noted in *United States v. Lanza,* 790 F.2d 1015, 1023 (2d Cir. 1986), *cert. denied,* 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986) to obtain a conviction for conspiracy, the government must demonstrate that the accused had some knowledge of the unlawful aims of the conspiracy, but it is not necessary to demonstrate that the accused knew *all* of the unlawful aims of the scheme charged. Under the guidelines, however, a defendant convicted of conspiracy can only be held accountable for what he could reasonably have foreseen.


*United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir.), *decision clarified on reh'g,* 949 F.2d 36 (2d Cir. 1991). "This is because 'the emphasis in substantive conspiracy liability is the scope of the *entire conspiracy*,' while 'the emphasis under [the Guidelines] is the scope of the *individual defendant's* undertaking.'" *United States v. Rigo*, No. 13 CR. 897 (RWS), 2017 WL 213064, at *3 (S.D.N.Y. Jan. 17, 2017) (quoting *United States v. Spotted Elk*, 548 F.3d 641, 673-74 (8th Cir. 2008) (emphases in original)); *see also* U.S.S.G. 1B1.3(a)(1)(B).

The Second Circuit has recognized that to hold a defendant accountable for jointly undertaken criminal activity, the district court must make two findings: "1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the defendant." *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995).[3] "When applying these requirements, district courts look to (1) whether the participants pooled their profits and resources, or whether they worked independently; (2) whether the defendant assisted in designing and executing the illegal scheme; and (3) what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct." *United States v. Willis*, 14 F.4th 170, 188 (2d Cir. 2021) (cleaned up). Importantly, "a defendant's knowledge of another participant's criminal acts is not enough to hold the defendant responsible for those acts." *Studley*, 47 F.3d at 575.

The Sentencing Guidelines specifically anticipate a situation like this one. "Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." U.S.S.G. 1B1.3, App. Note 3(B). Here, the government alleged in the Indictment a broad conspiracy (or conspiracies[4]) that shared a common nexus around Jason Galanis but otherwise involved different people working in different roles and different aspects of the fraud.

Mr. Archer agreed to purchase bonds for Jason Galanis in the second bond offering, which served to further Galanis's scheme and arguably implicate Mr. Archer in fraud and conspiracy. But, as the Court has already determined on the specific facts of this case and as explained in Mr. Archer's opening sentencing memorandum, he did so without knowledge of every aspect of the broader conspiracy. The government's sentencing submission seeks to relitigate these issues that the Court has already carefully reviewed in connection with its decision on the post-trial motions. *Compare* Gov. Ltr. at 5-9, *with Galanis*, 366 F. Supp. 3d at 492-507 (analyzing the record concerning each issue raised by the government in its sentencing submission).

---

[3] *Studley* itself concerned jointly undertaken criminal activity in furtherance of a substantive fraud charge, but both the language of the Guidelines (U.S.S.G. § 1B1.3(a)(1)) and subsequent Second Circuit authority (*e.g., United States v. Johnson*, 378 F.3d 230, 238 (2d Cir. 2004)) make clear that its test applies equally to jointly undertaken criminal activity as part of a conspiracy charge.

[4] Mr. Archer argued previously that the indictment actually charges multiple conspiracies.



We respectfully submit that the Court should adopt its findings from its earlier decision and determine that the appropriate loss amount for Mr. Archer is $0 and the number of victims one.[5] This reflects the fact that Mr. Archer invested money he received from Galanis and never received any funds from either WAPC or the bond proceeds, unlike other co-conspirators such as Cooney – meaning, there were no reasonably foreseeable victims to Mr. Archer other than arguably the WLCC, which issued the bonds.

## II.   A Four-Point Reduction for Mr. Archer's Minimal Role Is Appropriate

The government does not object to a two-point role reduction for Mr. Archer because the Court granted Cooney a two-point role reduction. However, the government opposes a four-point role reduction because it contends that Cooney's "core participation in the offense was virtually identical to Archer's." This is obviously untrue. Cooney personally profited from the scheme and received stolen bond proceeds directly from WAPC. Cooney was also within Jason Galanis's inner circle, as evidenced by, among other things, his personally signing fraudulent Calvert loan documents and producing them to the SEC. The Court already determined that Cooney was "substantially less culpable than the average participant in the Wakpamni bond fraud." [ECF No. 801, Cooney Sentencing Tr. at 30.] Consistent with its prior findings, the Court should determine that Mr. Archer was even less culpable than Cooney and grant a four-point role reduction. *See Galanis*, 366 F. Supp. 3d at 507 (identifying "circumstantial evidence unique to [Cooney], primarily regarding his receipt of money from the WAPC account, his participation in the Calvert cover-up, and purported lies he told various entities about subjects that were indisputably within his realm of knowledge").[6]

## III.   A Non-Custodial Sentence Would Not Create a Sentencing Disparity

The government's sentencing argument has virtually nothing to do with the specific facts and circumstances of Mr. Archer's case.  Instead, relying heavily on the fact that Bevan Cooney was sentenced to 30 months, the government contends that sentencing Archer any lower would result in a sentencing disparity and frustrate the purposes of general deterrence. Gov. Ltr. at 10-13.

---

[5]  The government contends that even ignoring the first bond offering, the reasonably foreseeable losses in connection with the second and third bond offerings still exceeded $25 million and somehow involved more than 10 victims. Gov. Ltr. at 8. But the government admits that there were no losses associated with the second bond offering by excluding that amount from its restitution request, and the third bond offering was less than $25 million and involved only one pension fund victim. So even under the government's view, the Guidelines calculation should be four levels lower (two levels lower because of the lower loss amount and two levels lower because there were fewer than 10 victims).

[6]  As Mr. Archer argued in his opening submission, the correct Guidelines range is 0 to 6 months. But even if the Court were to attribute the losses from the third bond offering to Mr. Archer – which it should not do for the reasons already explained – the Guidelines level would be 23 (a base level of 7, plus 20 levels for a loss less than $25 million, minus 4 levels for his



But any fact-based comparison to Cooney strongly suggests that Mr. Archer should not receive a sentence anywhere close to 30 months. As quoted above, the Court already noted the differences between Mr. Archer's and Cooney's conduct in and knowledge of the broader scheme. At sentencing, the Court gave Cooney an obstruction of justice enhancement, and determined that Cooney "played a comparatively smaller role in this scheme as compared to his co-conspirators, as noted earlier, and did not retain close to the amount of criminal proceeds that various other individuals in the conspiracy did." [ECF No. 801, Tr. 44:11-15.] As the Court knows, Mr. Archer did not retain any criminal proceeds and in fact lost a substantial amount.

Notably, the government does not even try to argue that a term of imprisonment is necessary for specific deterrence.[7] Instead, the government compares Mr. Archer's situation to that of Michelle Morton, arguing that he deserves to be punished more severely than the 15-month sentence the Court imposed on her. But at Morton's sentencing, the government asked for a Guidelines sentence of 10 years and noted that Cooney did not have any fiduciary duty to the people whose money he stole. [ECF No. 946, Morton Sentencing Tr. at 18:23-19:12; *see also id.* at 15:20-16:3 (noting that Morton completely abdicated that responsibility and on *two* separate occasions put millions of dollars of bonds into the client accounts).] Mr. Archer did not owe a fiduciary duty to Galanis, from whom he received money to purchase bonds. And like Morton, there is "no direct evidence that [Mr. Archer] knew that the WLCC had been fraudulently induced to issue the bonds or that the bond proceeds were stolen." *Id.* at 33:2-7. Accordingly, the guideline range driven by the loss amount is "significantly less useful here" in light of the fact that Mr. Archer "disclaimed any knowledge" of the broader fraud or Galanis's theft of bond proceeds. *Id.* at 33:7-12. Morton, like Mr. Archer, did not receive any of the bond proceeds herself. *Id.* at 33:13-16.

Coupled with his less culpable role than both Morton and Cooney, and the fact that he has already suffered substantial collateral consequences from the case and the media, and the fact that he has spent a life building goodwill in his community, Mr. Archer sentence should be no greater than necessary, which here is a non-custodial sentence.

---

7 



### IV. Restitution and Forfeiture

With respect to restitution, Mr. Archer rests on his prior submission and the argument above concerning the loss amount that can be appropriately attributed to Mr. Archer, which is $0.

The government's requested order of forfeiture in the amount $15,700,513 is unjust. Forfeiture is not a strict liability punishment. Simply because certain funds at one point moved through Mr. Archer's or his company's account – funds that Mr. Archer never used or profited from personally, and which he never understood were his – should not subject him to millions of dollars in forfeiture. As the Court recognized at Cooney's sentencing:

> the Second Circuit has made clear that forfeiture in criminal proceedings under 18 U.S.C. Section 981 includes illicit proceeds that have, at some point, been under the defendant's control or the control of his co-conspirators *so long as the actions generating those proceeds were reasonably foreseeable to the defendant*.

[ECF No. 801, Cooney Sentencing Tr. at 50:16-21 (emphasis added) (citing *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012).] The full amount of requested forfeiture was appropriate for Cooney because, as the Court found, Cooney received millions of dollars directly from WAPC in addition to funds for his own personal benefit. The money that RSB LLC received, in contrast, was sent from an attorney on behalf of a Galanis entity and remitted back to accounts that Galanis controlled. Mr. Archer at no point exercised any discretion in what he or his company did with the funds. For that reason, the government's attempts to distinguish *Honeycutt* are unavailing and forfeiture inappropriate. *Cf. United States v. Bergstein*, 788 Fed. App'x 742, 748 (2d Cir. 2019) (affirming the district court's finding that the defendant had "acquired" the relevant property where he "was able to transfer the funds to shell companies and use the funds for personal expenses").[8]

\* \* \*

---

[8] If the Court is inclined to agree with the government on the calculation of the amount, Mr. Archer respectfully submits that imposing a punitive forfeiture amount of $15,700,513 on Mr. Archer would violate the Eighth Amendment's protection against excessive fines. *United States v. Bajakajian*, 524 U.S. 321, 324, 334-36 (1998); *see also United States v. Viloski*, 814 F.3d at 104, 109-10 (2d Cir. 2016) (listing factors that may be relevant in assessing proportionality). The Government's requested forfeiture amount is "grossly disproportional to the gravity of [Mr. Archer's] offense." *Bajakajian*, 524 U.S. at 334; *see also United States v. Akhavan*, No. 20-CR-188 (JSR), 2021 WL 3862123, at *7 (S.D.N.Y. Aug. 30, 2021) (finding that a $17 million forfeiture amount was unconstitutionally excessive and imposing instead



Page 9

For the reasons stated above and in Mr. Archer's opening submission, we respectfully request a non-custodial sentence.

Respectfully,

/s/ Matthew L. Schwartz
Matthew L. Schwartz
Craig Wenner