M2SKARCS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              16 CR 371 (RA)

5   DEVON ARCHER,

6                  Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         February 28, 2022
9                                        12:00 p.m.
    Before:
10
                        HON. RONNIE ABRAMS,
11
                                         District Judge
12
                              APPEARANCES
13

14  DAMIAN WILLIAMS
         United States Attorney for the
15       Southern District of New York
    REBECCA MERMELSTEIN
16  NEGAR TEKEEI
         Assistant United States Attorneys
17
    JEFFREY T. SCHWARTZ
18  CRAIG A. WENNER
         Attorneys for Defendant
19

20  ALSO PRESENT:  NICHOLAS KROLL, FBI

21

22

23

24

25

M2SKARCS

1        (Case called)

2            MS. MERMELSTEIN:  Good morning, your Honor.  Rebecca

3    Mermelstein, for the government.  With me is Negar Tekeei and

4    Special Agent Nicholas Kroll.

5            THE COURT:  Good morning to all of you.

6            MR. SCHWARTZ:  Good morning.  Matthew Schwartz and

7    Greg Wenner, for the defendant, Mr. Archer.

8            THE COURT:  Good afternoon to both of you as well.

9            You are all familiar with the procedural history of

10   this case.  After Mr. Archer was convicted of conspiracy to

11   commit securities fraud and securities fraud, I denied his

12   motion for acquittal, but granted his Rule 33 motion for a new

13   trial due to a concern that he did not have the requisite

14   intent to commit the crimes charged.

15           On appeal, the Court of Appeals for the Second Circuit

16   clarified the standard on a Rule 33 motion, reversed my grant

17   of a new trial, reinstated the conviction, and remanded to me

18   for sentencing.

19           Under the law, "a guilty verdict, not set aside, binds

20   the sentencing court to accept the facts necessarily implicit

21   in the verdict."  That's a quote from the *Hourihan* case, 960

22   F.2d at 218.  I must thus accept for purposes of this

23   sentencing that Mr. Archer did indeed have the requisite intent

24   to commit the crimes for which he was convicted.

25           In connection with today's proceeding, I have reviewed

M2SKARCS

1    the following submissions:  The presentence investigation

2    report, revised as of January 21st of this year, including a

3    recommendation that I vary downward from the sentencing

4    guidelines; Mr. Archer's sentencing memorandum, dated

5    February 14, with 44 letters of support; the government's

6    sentencing memorandum, dated February 21st, 2022; a letter from

7    the independent trustees of the Burnham Investors Trust, now

8    RMB Investors Trust, dated February 18th; a letter from the

9    Omaha School Employees' Retirement System, dated November 30,

10   2021; Mr. Archer's response to the government's sentencing

11   submission, dated February 23rd.

12        Have you each received all of these submissions?  And

13   am I missing anything?

14        MS. MERMELSTEIN:  We have, your Honor, and you're not

15   missing anything.

16        MR. SCHWARTZ:  We have received all of those things.

17        Your Honor didn't say it, but there were additional

18   materials provided with our original sentencing submission,

19   including a letter from Mr. Archer himself and our objections

20   to the PSR.

21        THE COURT:  Yes.  And I have reviewed all of those as

22   well.  Thank you.

23        Let's begin by discussing the presentence report,

24   which, as you all know, is prepared by the United States

25   Probation Office.

M2SKARCS

1          Mr. Schwartz, have you reviewed the presentence report

2     and discussed it with your client?

3          MR. SCHWARTZ:  Yes.

4          THE COURT:  Mr. Archer, have you had enough time and

5     opportunity to review the presentence report with your counsel?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Mr. Schwartz, I know you have a host of

8     objections to the presentence report, and we can go through

9     them now, but, just to clarify, are you renewing all of the

10    ones you made, just the 12 in your footnote 12 of your

11    submission, or a subset?

12         MR. SCHWARTZ:  I'm renewing them all except for a

13    handful of matters that were corrected or updated by the

14    probation office in the preparation of the final PSR.  I have a

15    suggestion for how we could go through them efficiently, if

16    your Honor wants to hear it.

17         THE COURT:  Sure.

18         MR. SCHWARTZ:  Because I think the majority of the

19    objections fall into one of two categories, and they're

20    obviously related — one is the description of the offense

21    conduct and the other is the application of the guidelines.

22         We can certainly go paragraph by paragraph through the

23    existent PSR and try to conform what is in there to the

24    evidence and then apply that to the sentencing guidelines.  I

25    would suggest, as we did in our submission, instead, that your

M2SKARCS

1   Honor should simply reject the characterization of the offense

2   conduct as it's set forth in the PSR and, instead, adopt the

3   characterization that was in your Honor's November 2018

4   opinion, which, as we point out, you can do consistent with

5   your observation at the beginning of this proceeding, that you

6   have to accept, for purposes of these proceedings, Mr. Archer's

7   guilt and the facts that are necessarily found by a jury in

8   convicting Mr. Archer.  Nonetheless, your opinion speaks in the

9   language of the weight of the evidence and the preponderance of

10  the evidence, which are the relevant standards for sentencing.

11  I suspect if your Honor had known it was going to be the

12  standard, you would have spoken in the language of whether the

13  evidence preponderated heavily at the time, but that's a

14  discussion for a different day.  But we can go through, and I

15  can point to the language of that opinion where your Honor

16  makes findings about the weight of the evidence or the

17  preponderance of the evidence, and I would suggest that simply

18  adopting those findings for purposes of the PSR is the most

19  efficient way to proceed and is obviously consistent with the

20  work that you've already done.

21          THE COURT:  I don't think I can do that.  I don't

22  think I can adopt the characterization that was in my Rule 33

23  opinion and be faithful to the jury's verdict.

24          There are some tweaks, I think, that could be made to

25  some of the paragraphs in the PSR if you thought it was

M2SKARCS

```
1    important.  I know, also, separately, at some point, you had

2    requested noting some procedural history regarding my opinion

3    and the circuit's opinion that Mr. Archer maintains his

4    innocence and objects to the characterization in the PSR, and

5    I'm happy to put language to that effect in, and I'm happy to

6    tweak a few of the paragraphs, but, beyond that, I don't think

7    I can do that consistent with the facts implicit in the jury's

8    verdict in light of the Second Circuit's opinion.

9              MR. SCHWARTZ:  Well, let me question that concept a

10   little bit.

11             I don't think that there was anything that was

12   necessarily found by the jury convicting that spoke to

13   Mr. Archer's specific intent with respect to, in particular,

14   the first and third bond issuances and the existence and role

15   of the clients of Atlantic and Hughes, who were victims of the

16   larger fraud, but were not reasonably foreseeable victims to

17   Mr. Archer.  Again, your Honor reviewed that evidence and found

18   that the preponderance of the evidence demonstrated that

19   Mr. Archer didn't know about that --

20             There were plenty of ways, in a hypothetical world,

21   that the jury could have convicted Mr. Archer that are not

22   consistent with the government's overarching narrative that he

23   knew absolutely everything that Jason Galanis was doing, and

24   that is largely the narrative that's adopted by the PSR.

25             For example, it would be entirely consistent with the
```

M2SKARCS

1    jury's verdict to find that Mr. Archer was less than honest

2    when he spoke to Morgan Stanley and that had the effect of

3    allowing the bonds to flow through the Rosemont Seneca Bohai

4    account, which, on the government's view, was used for

5    regulatory capital for some of the entities at issue here and

6    that facilitated the fraud.  That would make him guilty of both

7    substantive and conspiracy to commit securities fraud and would

8    be, therefore, entirely consistent with the jury's verdict, but

9    would not be consistent with the overall theory of the

10   government or the specific facts set out in the PSR.

11        So I don't think that you are bound to accept the

12   overarching theory that's put forward by the government and

13   adopted by probation in the PSR.

14        I think the other way to do it is, since there's never

15   been that much disagreement about what the core fraud here was,

16   your Honor could remove references to Mr. Archer's intent and

17   make specific findings about his intent or what was reasonably

18   foreseeable to him.  But I don't think it would be -- it is

19   certainly not necessary.  Unless your Honor has had a change in

20   heart about your view of the evidence, I don't think it would

21   be consistent with the evidence to adopt anything like the

22   statement of facts set forth in the PSR right now.

23        THE COURT:  I don't think that's right.

24        I don't think I need to accept every fact argued by

25   the government at summation, but I do think I have to accept

M2SKARCS

1    the facts that are implicit in a finding of guilt with respect

2    to these crimes.  In other words, the jury found Mr. Archer

3    guilty of the charged crimes as alleged in the indictment, and

4    the government cited to the trial transcript, as I instructed

5    the jury, and I'm happy to read that out loud, but I have to

6    accept that he had the requisite intent to commit those crimes,

7    and, in doing so, I must accept that he knew that the

8    investment advisor clients were being defrauded and that the

9    tribal bond proceeds were being misappropriated.

10           As the government notes in its letter, the way this

11   Court defined the scheme for the jury's consideration, just

12   simply and referencing the indictment — and I'm reading from

13   the trial transcript at page 4143 to 4144 — the indictment

14   alleges that the securities fraud conspiracy charged in Count

15   One and the substantive securities fraud offense charged in

16   Count Two relate to an alleged scheme by each of the defendants

17   to defraud the WLCC to issue bonds based upon false and

18   misleading representations and to fraudulently cause clients of

19   Atlantic and Hughes to buy certain of those bonds, thereby

20   defrauding those clients as well.  The indictment also alleges

21   that the defendants failed to invest the bond proceeds on the

22   WLCC's behalf in a manner agreed upon and, instead,

23   misappropriated the bond proceeds for their own use.

24           So I just disagree with you.  I'm happy, again, as I

25   said, to go through them.  There are certain paragraphs that we

M2SKARCS

1    could make particular tweaks to, if you thought it was

2    important to do so, and I'll, of course, talk about the loss

3    amount and the various enhancements that you're objecting to,

4    and I'm happy to hear you out further if you'd like to be

5    heard.

6              MR. SCHWARTZ:  Sure.

7              I can see your Honor has expressed a view, but just to

8    say the last word on this subject:  I think the government, as

9    we know, must charge the offense conduct in the indictment in

10   the conjunctive with "ands," and the jury is entitled to

11   convict in the disjunctive, "ors," so it does not follow that

12   just because all of that language was in the indictment or was

13   described by you as the scheme, that the jury necessarily found

14   Mr. Archer guilty of every aspect of the scheme.  And I think

15   when you've looked at the sentencing of some of the other

16   defendants, your Honor has accepted that they weren't

17   necessarily involved in every aspect of the scheme.  I'm

18   thinking about Michelle Morton, for example.

19             THE COURT:  And I don't think I necessarily need to

20   find that he was involved in every aspect of the scheme, but I

21   do think that I need to find that he had the requisite intent

22   to engage in these particular crimes.

23             MR. SCHWARTZ:  Well, if your Honor feels that way, my

24   request would be that you make clear that you are finding that,

25   assuming this is true, because you are bound to do so in light

M2SKARCS

1    of the Second Circuit's ruling, and your independent view of

2    the evidence continues to be as it was in your prior opinion,

3    and as I alluded to before, I think it would be useful, if it

4    is something your Honor has thought about, to indicate that,

5    now understanding the Second Circuit's standard, that the

6    evidence not only preponderated in favor of a new trial and

7    against Mr. Archer's specific intent with respect to those

8    items, but preponderated heavily, nonetheless, you are bound.

9            THE COURT:  Does the government want to be heard?

10           MS. MERMELSTEIN:  Sure, your Honor.

11           I think for the reasons your Honor has said, I don't

12   think that the decision granting the Rule 33 can replace the

13   factual findings of the PSR.  And while I agree that your Honor

14   need not accept everything that the Second Circuit found the

15   jury could have accepted, there is some daylight there, I

16   think, I think we're also not drawing on a blank slate here.

17   And I think, first, with respect to what Mr. Schwartz just

18   said, the Second Circuit has already found that using the

19   clarified standard, the evidence here did not preponderate

20   heavily against the verdict.

21           THE COURT:  That, I think, is clearly done.  I think

22   the lapping was there's only one clear result or something to

23   that effect, but please proceed.

24           MS. MERMELSTEIN:  I think that's right.

25           I also think that the Court now, in making factual

M2SKARCS

findings, cannot, in addition to that overarching starting

point -- there are certain things the Second Circuit has said

that I think are now functionally decided, and so if you look

at the language of the Second Circuit's decision closely, in

some cases, the circuit said something was not supported by the

record or was not a reasonable inference with respect to the

Rule 33 decision.  In other cases, it was, I think, more

agnostic on what the jury might have -- on what its view of the

right view was, but said sort of the jury was entitled to go

this way even if it also could have been entitled to go another

way, and there, there may be some daylight, but there's a fair

amount of language where the Second Circuit says, for example,

taken as a whole, the emails provided strong support for the

jury to find that Archer knew the bond proceeds were being

misappropriated or the evidence strongly supported an inference

that he intended to help the conspirators fraud Hughes' and

Atlantic's clients by purchasing the bonds without informing

them of conflicts of interest that riddled the transactions.

       There was persuasive evidence that Archer, when he

made the first interest payment, or assisted in doing so,

intended to delay discovery of the scheme or that his

perpetuation of the Calvert story was evidence that he was

lying about it because he understood the nature of the fraud.

       That language, that there's a strong inference that

there's persuasive evidence, I think, is functionally a finding

M2SKARCS

1   that there was a preponderance of evidence in favor of those

2   findings.  It's hard to -- if a preponderance is 51 percent,

3   then these things seem to be a determination that at least as

4   to these facts, there was a preponderance of the evidence.  And

5   so for purposes of sentencing where that's the standard, I

6   think those issues really can't be relitigated.

7           I think, to be clear, I don't think your Honor has to

8   adopt the entire Second Circuit's decision as the facts here.

9   I think there's room to say there's a difference of opinion,

10  but I think those core facts really can't be disputed at this

11  stage of the litigation.

12          THE COURT:  All right.

13          Mr. Schwartz?

14          MR. SCHWARTZ:  So I think that there are two issues

15  here.

16          One is what role, if any, the Second Circuit's

17  decision has in your fact-finding; the other is the jury

18  verdict.

19          I think with respect to what the government just

20  talked about and, quote-unquote, fact-finding in the Second

21  Circuit's decision, I think that has nothing to do with what

22  we're doing here today.  It is very clear that the Second

23  Circuit was looking at the trial record through a particular

24  lens, and it was the lens of the standard that they clarified

25  for Rule 33 relief and whether the evidence preponderates

M2SKARCS

1  heavily in favor of innocence such that whatever it was that

2  they articulated the standard was at the time.  Any discussion

3  of the facts that they engaged in in that context have to be

4  viewed against that standard of review and can't be viewed as

5  fact-finding or determinative of fact-finding for sentencing,

6  and I think it would be grossly unfair to Mr. Archer to assume

7  that you are bound by any of the, quote-unquote, fact-finding

8  by the Second Circuit, because they were applying a much more

9  stringent standard of review than the preponderance of the

10  evidence fact-finding that we're doing at sentencing here.

11      Now, the effect, however, of the Second Circuit's

12  decision was to reinstate the jury verdict.  And, of course,

13  you're correct that the jury verdict carries certain

14  implications for sentencing — you know, first and foremost,

15  that we're having one — but it has never been the law that a

16  jury's conviction on a substantive scheme or conspiracy count

17  sweeps up, for sentencing purposes, all of, for example, the

18  aims of the conspiracy as your Honor instructed to the jury.

19      I just cite to you again what we pointed to in our

20  submission — this is at page 4 of our reply — noting that to

21  obtain a conviction for conspiracy, the government must

22  demonstrate that the accused had some knowledge of the unlawful

23  aims of the conspiracy, but it is not necessary to demonstrate

24  that the accused knew and therefore reasonably anticipated all

25  of the unlawful aims of the scheme charged.  That's from *United*

M2SKARCS

*States v. Perrone*, 936 F.2d 1403 at 1416.

So, again, I think for sentencing purposes, the only thing that you are bound by is the jury's verdict that there was sufficient evidence to convict on the elements of the crime.  And the relevant element of conspiracy is willfully joining the conspiracy with knowledge of some of its aims, and with respect to fraud, the specific intent to defraud.  But that doesn't entail any particular way in which the jury found facts in reaching its verdict.  It doesn't entail that all of, for example, the pension funds were victims, as opposed to the WLCC being the only victim of the crime.  It doesn't entail understanding that Jason Galanis was misappropriating or stealing the proceeds of the bonds as opposed to exposing the issuer to the risk of loss because there were misstatements about the bonds.  Any of those are things that the government argued to the jury actually happened, and that all the defendants, but this defendant, in particular, were actually responsible for and made them guilty of the crime.  And if the jury was unanimous on, for example, the regulatory capital theory that I gave you before, they could have convicted, and that would have been sufficient for those purposes and would not have entailed any of the other fact-finding that you're talking about.

So I feel very strongly that if we are looking at the jury's verdict, the only thing that you are bound by is the

M2SKARCS

1    jury's finding with respect to the elements of the crime, and,

2    given the way the evidence came in, there were ample ways in

3    which the jury could have convicted that don't entail

4    Mr. Archer's specific intent as to the larger scheme that Jason

5    Galanis was perpetrating, or even that aspects of it were

6    reasonably foreseeable to him, in particular, the fraud on the

7    clients of Atlantic and Hughes and the loss of tens of millions

8    of dollars to those pension funds.

9            MS. MERMELSTEIN:  I'll say one other thing, your

10   Honor.

11           I don't disagree with Mr. Schwartz that in the

12   abstract, following the jury verdict, the Court can fact-find

13   and is limited only by the nature of the elements.  I think

14   we're not there here, both for the reasons I've said with

15   respect to the Second Circuit's decision, but even leaving

16   aside the extent to which the language in that decision saying

17   that things were well-established is controlling, I think

18   Mr. Schwartz's idea that there is some other fraud on the BIT

19   Board or on Morgan Stanley is clearly not the charged crime,

20   and so when you think about -- when you work backwards from the

21   first principle here, which is that Mr. Archer stands convicted

22   of the charged crime with its two prongs — the investment

23   advisor piece and the misappropriation piece — and you then

24   view the evidence in light of the fact that he is, in fact,

25   guilty and had the requisite intent, the inferences from all of

1   that evidence — the participation, the facially bizarre nature

2   of the $15 million transaction, the updates from Jason Galanis

3   to Mr. Archer all throughout, and the fact that those are

4   identical virtually to the updates to Mr. Cooney, who also

5   stands convicted — in the lens of guilt, the meaning of those

6   facts take on a more clear direction.

7           So even in the absence of the Second Circuit's

8   language — and I think we need not decide the extent to which

9   that limits the discretion — when you look back at the evidence

10  through the lens of guilt, I think it is clear that Mr. Archer

11  knew, and it was reasonably foreseeable to him, both prongs of

12  the fraud, and that the findings then need to proceed from

13  there, in which case, I think the PSR functionally stands as

14  is, and if there are particular tweaks, we're happy to talk

15  about them.

16          MR. SCHWARTZ:  So I actually think now we're in

17  agreement that your Honor is free to engage in fact-finding on

18  sentencing, and the government is simply arguing what facts

19  that you should find.  I'm happy to argue the other set of

20  facts, but, again, I think your Honor has already gone through

21  that process, looked at all the facts, and made findings by a

22  preponderance of the evidence in your 2018 opinion, and I go

23  back to where I started, which is:  Consistent with guilt — and

24  the government seems to agree --

25          THE COURT:  What I state in my opinion was not

M2SKARCS

1    consistent with guilt, and I would be unfaithful to the jury's

2    verdict.  I agree with you that I don't have to assume, and

3    will not assume, that he knew of everything that the government

4    alleged or everything that the circuit said, but I do have to

5    conclude that he had the requisite intent to commit this

6    conspiracy and this securities fraud, as it was defined to the

7    jury, including in the indictment.

8          So I am happy to talk about the presentence report,

9    but I think we need to start with that general premise,

10   because, otherwise, I don't think I'd be living up to my oath,

11   and I think I would be unfaithful to the jury verdict.

12         MR. SCHWARTZ:  Well, I suppose the reason why I'm

13   hanging onto your opinion is, your Honor held that there was

14   sufficient evidence to convict under Rule 29, and it's not

15   clear from the decision exactly what evidence you're referring

16   to, and I, frankly, read the opinion the way you just

17   articulated it, which is that it was not consistent with guilt

18   at all, but somewhere your Honor --

19         THE COURT:  When I say it was not consistent with

20   guilt, I stand by what I said in my opinion in terms of, I

21   couldn't say that a reasonable jury couldn't conclude what it

22   did, but I had the reservations that I expressed.  The circuit

23   has since clarified the standard under Rule 33.  I need to make

24   factual findings today by a preponderance of the evidence, but

25   they need to be consistent with the facts implicit in the

M2SKARCS

1    jury's verdict.  And I don't think the theory you've proposed

2    to me is consistent with the jury's verdict.  The theory of

3    guilt that you have proposed, I don't believe is consistent

4    with the jury's verdict.

5              MR. SCHWARTZ:  Can I ask why not?

6              THE COURT:  For the reason that I just said a moment

7    ago — about how the fraud was framed and articulated to the

8    jury at every stage of the case, including in the indictment

9    that was read to them.

10              MR. SCHWARTZ:  That puts us in an interesting

11   position, right, because the jury convicted, and that

12   conviction is valid for today's purposes.  There were aspects

13   of the scheme, as was charged, that your Honor held not only

14   that there was insufficient evidence, but that there was no

15   evidence.

16              For example, the government argued that Mr. Archer

17   understood that the $15 million that was received into the RSB

18   account to purchase the second tranche of bonds was recycled

19   proceeds from the first charge.  Your Honor held, at page 24,

20   that there was no evidence that Archer was aware that that

21   money was —— that the money provided by Jason Galanis

22   constituted proceeds.

23              So I take the point about needing to be faithful to

24   your oath, but you also need to be faithful to the evidence.

25   And if there is a world in which the jury could have convicted

M2SKARCS

1    Mr. Archer that is also consistent with your fact-finding in

2    that decision, I think that's where both your fact-finding and

3    your oath ought to lead us.  And while the theory that I

4    articulated certainly was not the central thesis of the

5    government, these were arguments that the government made --

6    particularly with respect to Morgan Stanley, they were

7    arguments that the government made to the jury that they said

8    were sufficient to convict him of conspiracy and securities

9    fraud, and I think we ought to take the government at its word

10   when it made those arguments.  It is not necessary to embrace

11   every aspect of the way the government charged the case, and

12   some of it is simply not supported by the evidence at all, as

13   your Honor has already found.

14        So I think we have to respect the jury's verdict for

15   today's proceedings, but we don't have to guess at what the

16   jury found or probably found.  Under the law, as you explained

17   it at the top, we have to accept, for today's purposes, the

18   facts that the jury necessarily found.  And the only thing that

19   they necessarily found was that Mr. Archer joined a conspiracy

20   and that he engaged in a substantive fraud, not that he did it

21   in any particular way and, certainly, not that he did it in the

22   very specific way argued by the government and laid out in the

23   PSR.

24        THE COURT:  I think I have already responded to your

25   point.  I understand them.  I have no doubt the circuit will be

M2SKARCS

1    in a position to hear this again.

2            I'm not going to -- if that's your approach to the

3    PSR, we don't need to wordsmith particular paragraphs unless

4    you wanted to.  I will add in, as I said, the language about

5    him maintaining his innocence, some procedural history.  If

6    anyone wants to talk about the exact language, we can, but if

7    you trust me to do that, I'll add that in.

8            MR. SCHWARTZ:  I think that's fine.

9            I would ask, again, that your Honor basically

10   incorporate your part of this discussion into the PSR, which is

11   to say, you are adopting those portions because you feel

12   constrained to, but that your review of the evidence is still

13   consistent with what you wrote in November 2018.  That, at

14   least, preserves these issues for us.

15           THE COURT:  I think the theory of the case as

16   presented in the PSR is what is consistent with the jury's

17   verdict, and that for the same reason that I denied the Rule 29

18   motion, there was ample evidence to allow a jury to find as it

19   did.

20           So I am adopting the PSR.  Again, there are one or two

21   places that I think we can wordsmith, but I'm adopting the

22   characterization of the fraud as presented in the PSR.  I think

23   there is sufficient evidence in the record accepting the facts

24   implicit in the jury's verdict for me to find, by a

25   preponderance of the evidence, that that is how I determine

M2SKARCS

1  loss amount and the number of victims, and I'm happy to walk

2  through it a little bit more now.

3  Again, unless you want to go through one or two

4  particular sentences, I'm going to adopt the findings in the

5  presentence report.  I'll just tell you what I was going to

6  change, but it was not the bulk of it in the way that you're

7  requesting.

8  As I said already, after paragraph 7 on page 5, I was

9  going to add in some procedural history and indicate that the

10  Court denied Mr. Archer's motion for a judgment of acquittal,

11  but granted his Rule 33 motion.  I was going to indicate what

12  the circuit did in response.  I was going to have a footnote,

13  as I believe you had requested, after paragraph 33, indicating

14  that Mr. Archer has maintained his innocence throughout and

15  disputes that he was a knowing participant in the conspiracy

16  and contests many of the facts contained herein.

17  In paragraph 43, about the control of Atlantic and

18  Hughes, I was going to change the second sentence slightly to

19  read:  Jason Galanis did so together with Archer, Dunkerley,

20  Cooney, among others, by providing Morton with financing to

21  purchase the investment advisors.

22  I was going to make a minor alteration to

23  paragraph 54, in the second line, and say:  For example, Archer

24  provided $2.6 million of bonds to another entity, which then

25  transferred them to the placement agent.

M2SKARCS

1          And there is one sentence I was going to take out at

2     paragraph 65 about Jason's Galanis informing Archer that

3     Galanis intended to use the bond proceeds to purchase his

4     TriBeCa mansion, which Galanis subsequently did.

5          But I was going to overrule, and I am overruling, your

6     other objections.

7          So the presentence report will be made part of the

8     record in this matter and placed under seal.  If an appeal is

9     taken, counsel on appeal may have access to the sealed report

10    without further application to the Court.

11         We've been talking, in part, about how these facts

12    affect the guidelines.  As you all know, the sentencing

13    guidelines are a set of rules published by the United States

14    Sentencing Commission.  They're designed to guide judges when

15    they impose sentence.  Although at one time they were

16    mandatory, meaning judges were required to follow them, they're

17    no longer binding, but judges must nonetheless consider them in

18    determining an appropriate sentence and must, thus, ensure that

19    they have properly computed the guideline range.

20         Are you still pursuing your objection to the use of

21    2B1.1 with respect to the conspiracy?

22         MR. SCHWARTZ:  I don't think it makes a practical

23    difference.  It is not correct, but 2B1.1 will be the correct

24    guideline for the substantive securities fraud, and they will

25    be grouped.

M2SKARCS

1          THE COURT:  I just want to note that the 2X1.1 only

2     applies when one has been convicted of a conspiracy and his or

3     her specific offense is not covered by another guideline

4     section.  So, in this case, Mr. Archer was both convicted of

5     conspiracy and the specific substance offense of securities

6     fraud, for which the applicable guidelines is 2B1.1.

7          Does the government disagree with that?

8          MS. MERMELSTEIN:  No.  I think it's academic here.

9          THE COURT:  Okay.

10          I'm going to, therefore, evaluate the enhancements to

11     Mr. Archer's sentence under the typical preponderance of the

12     evidence standard.

13          As to loss amount, there's no dispute that the actual

14     losses to the victims exceeded $25 million.

15          Under the guidelines, Mr. Archer is responsible for

16     pecuniary harm that he knew or, under the circumstances,

17     reasonably should have known was a potential result of the

18     offense.

19          In addition to his own conduct, he's also responsible

20     for all acts and omissions of others that were (1) within the

21     scope of the jointly undertaken criminal activity; (2) in

22     furtherance of that criminal activity; and (3) reasonably

23     foreseeable in connection with that criminal activity.

24          Mr. Archer argues that no loss amount was reasonably

25     foreseeable to him.  He further contends that the Court could

M2SKARCS

conclude for sentencing purposes that the evidence was

sufficient to show that he participated in a scheme to defraud,

but insufficient to show that he could reasonably foresee any

loss to any victims.

I disagree.  As I said earlier, the jury convicted

Mr. Archer not just of any scheme to defraud, but the

particular scheme to defraud alleged here; in other words,

given that the jury found him guilty of these charged crimes,

as alleged in the indictment, I have to accept that he had the

requisite intent to commit those crimes, and in doing so, I

believe I must also accept that he knew that the investment

advisor clients were being defrauded and that the tribal bond

proceeds were being misappropriated.  And I do so by a

preponderance of the evidence, which leads me to believe that

the entire $43 million in losses was reasonably foreseeable to

him.

I'm going to quote a little bit from the circuit's

opinion, but I agree — and I think we all agree — that I'm not

bound by the facts as the circuit characterized them, but they

referred to "a wealth of emails in which Archer, Cooney, and

Galanis discussed the progression of the Wakpamni scheme," and

what I'll say — I'm no longer quoting — is that those emails go

back to early 2014 in the communications, and I'm quoting again

now from the circuit, "Galanis ensured that Archer stayed up to

date on the deal with the Wakpamni, including by informing

M2SKARCS

Archer that the proceeds from the sale of the bonds were

supposed to be placed into an annuity."

        Other emails sent to Archer did keep him informed

about the progress of the Hughes and Atlantic acquisitions and

specifically referenced the possibility of placing the Wakpamni

bonds with them.  For example, in one email, Galanis told

Archer that he believed Hughes would take 28 million of the

bonds, which is what transpired after the first bond issuance.

        There was also evidence introduced at trial to the

effect that Mr. Archer personally purchased $15 million worth

of bonds in the second issuance using money given to him by

Jason Galanis, made representations to the WLCC that he was

purchasing the bonds "for his own account and for investment

only," transferred them to another entity controlled by his

codefendants, made false statements about the source of the

money to Morgan Stanley and Deutsche Bank, and stated that

Calvert was the "lender and beneficial owner" of the bonds from

the second offering.  Later on, he also misled the BIT Board as

to Galanis's involvement with the Burnham companies.

        Thus, accepting the factual findings I believe were

implicit in the jury's verdict, there is sufficient evidence to

establish by a preponderance of the evidence that Mr. Archer

got involved with the WLCC scheme from the start and either did

foresee, or reasonably should have foreseen, the entire amount

of the losses from the scheme, thus, I find that a 22-level

M2SKARCS

enhancement is appropriate.

I also find that the ten or more victims enhancement is appropriate. Mr. Archer urges me to find that he was unaware that the clients of Atlantic and Hughes would be defrauded, but, again, I must assume his knowledge of the objects of the conspiracy in order to be faithful to the jury verdict. Given the involvement of ten pension funds and the WLCC, a two-level increase is appropriate.

The parties agree that a two-level minor-role reduction is warranted, and I do as well. Even assuming that Mr. Archer played an important role in the fraudulent scheme, as made clear by Amendment 794 to the sentencing guidelines, "relatively culpability" is now to be assessed "only by reference to one's co-participants in the case at hand" and not as the Second Circuit had previously held, "as compared to the average participant in such a crime." Here, I believe that Mr. Archer is substantially less culpable than the average participant in the criminal activity at issue, and there's no doubt that the loss amount greatly exceeded his personal gain.

As I said at Bevan Cooney's sentencing, it's undisputed that Jason Galanis was the mastermind behind and orchestrator of the fraud. As for John Galanis, he induced the Wakpamni tribe to issue its bonds in the first place, something which was undoubtedly at the heart of the fraudulent scheme. Hugh Dunkerley served as the placement agent for the tribal

M2SKARCS

bond issuances and as the sole managing member of the WAPC,

roles which were pivotal in misappropriating the bond proceeds.

And Michelle Morton and Gary Hirst, as investment advisors,

caused client funds to be invested in the WLCC bonds without

disclosing conflicts of interest.

I thus find that a two-level minor-role reduction is

warranted here.  Again, the government doesn't disagree.

I don't agree with Mr. Archer that a four-level

minimal role reduction is applicable.  A minimal role

participant is defined as a defendant whose lack of knowledge

or understanding of the scope and structure of the enterprise

and of the activities of others is indicative of a role as a

minor participant, but this enhancement is inapplicable, in my

view, for the reasons I already stated regarding the proof of

Mr. Archer's knowledge.

Accordingly, I find that his offense level is 31, his

criminal history category is I, and his recommended guideline

sentence is 108 to 135 months in prison.

As I said earlier, that range is only advisory.

Courts may impose a sentence outside of that range based on one

of two legal concepts — a departure or a variance.

A departure allows for a sentence outside the advisory

range based on some provision of the guidelines themselves.  I

understand that Mr. Archer is making motions for departures

based on aberrant behavior and the offense level overstating

M2SKARCS

1   the seriousness of the offense.

2           Is that right, Mr. Schwartz?

3           MR. SCHWARTZ:  That's correct.

4           THE COURT:  Okay.

5       I'm going to deny those motions, although I'm going to

6   consider the substance of the arguments when evaluating the

7   3553(a) factors.

8           With respect to aberrant behavior, a court may depart

9   downward for aberrant behavior only if a defendant committed a

10  single criminal occurrence or a single criminal transaction

11  that (1) was committed without significant planning; (2) was of

12  limited duration; and (3) represents a marked deviation by the

13  defendant from an otherwise law-abiding life.

14          Application Note 2 to 5K2.20 notes that a departure

15  for aberrant behavior in a fraud case is generally not

16  available because such a scheme usually involves repetitive

17  acts rather than a single occurrence or a single criminal

18  transaction and significant planning.  In the *Barber* case, 132

19  F. App'x at 895, the Second Circuit held that an aberrant

20  behavior departure was unwarranted where the defendants' fraud

21  offenses "required sophisticated financial forethought, were

22  not of limited duration and involved significant planning."  I

23  find here, similarly, that a departure from aberrant behavior

24  is not warranted.  This was a complex scheme that was carried

25  out over at least two years, and Mr. Archer's actions,

M2SKARCS

accepting the facts implicit in the jury's verdict, required

significant financial forethought and planning.

I also find that a downward departure is not warranted

on the basis that the offense level substantially overstates

the seriousness of the offense per Application Note 21(C) to

2B1.1.  This is not the kind of exceptional securities fraud

case contemplated by the guidelines in which a fraud produces

an aggregate loss amount that is substantial but diffuse, with

relatively small loss amounts suffered by a relatively large

number of victims.  As I said, I will, though, consider this

argument in assessing the 3553(a) factors.

In short, I've considered whether there is an

appropriate basis for departure from the advisory range within

the guideline system and conclude that no grounds exist, but I

also, of course, can impose a nonguideline sentence based on

what we call a variance, which is what I've been talking about

pursuant to 18, United States Code, Section 3553(a).

Would the government like to be heard with respect to

sentencing?

MS. MERMELSTEIN:  Yes, your Honor.

There's really no question here that this was a

serious and large-scale offense.  And I think that in thinking

about what the right sentence is for this defendant, the two

most serious considerations are really just punishment and

respect for the law.

M2SKARCS

1          With respect to just punishment:  A very heavy

2     consideration is the need to avoid unwarranted sentencing

3     disparities as we've said in our submission.  Archer played

4     virtually an identical role to Mr. Cooney.  There are, of

5     course, small ways in which they can be distinguished —

6     Mr. Archer bought three times as many bonds, for example — but

7     in almost every respect, they functioned in parallel, they did

8     the same things, they were apprised of the same things, they

9     acted in the same way, and Mr. Cooney received a sentence of

10    30 months.

11          I think it would be manifestly unjust for Mr. Archer

12    to receive a nonincarceratory sentence after the sentence

13    imposed on Mr. Cooney.  I understand the arguments Mr. Archer

14    has made about his personal life and circumstances, and those

15    are, of course, things that the Court can consider, but

16    Mr. Cooney had similar arguments that he made, and even

17    assuming the Court found some daylight there, it cannot justify

18    the enormous swing between two defendants who did functionally

19    the same thing.

20          I think that it's worth noting here that Mr. Archer is

21    not a person, as we sometimes see in financial cases, who acted

22    out of some desperate need for money.  He obviously is a person

23    who has lived, in almost every way, a privileged life.  So

24    there's no justification for the conduct in that respect, and I

25    think it would send a very dangerous and damaging message with

1      respect to general deterrence and respect for the law to treat

2      someone differently, to allow someone not to face consequences

3      solely on those bases.  It would send the message that someone

4      who is privileged or connected is facing a different system of

5      justice, and that would be wrong.

6               Given the nature of the scheme here, I understand the

7      complexity of your Honor's differing view on this, but given

8      the conviction and the jury's verdict and the Second Circuit's

9      decision and the sentences imposed on the other defendants in

10     the case, I think an incarceratory sentence is warranted and

11     necessary.  So for the reasons we've set forth in our

12     submission, we think that sentence is appropriately 30 months.

13               THE COURT:  Thank you.

14               Mr. Schwartz, would you like to be heard?

15               MR. SCHWARTZ:  Yes.  Thank you.

16               This is certainly an unusual situation.  We're here

17     for the sentencing of a defendant whom the jury convicted, whom

18     your Honor had serious, and I presume still has serious,

19     questions about whether he was factually innocent, and whom the

20     Second Circuit reversed and sent us back here, and those

21     findings and the jury's verdict have taken on what appears to

22     be an outsized role as compared to an ordinary sentencing,

23     where I think that we would look at the sentencing facts

24     afresh.  We're not here.  That's fine --

25               THE COURT:  But I always have to consider the nature

M2SKARCS

1    and circumstances of the offense.  It's always core to

2    sentencing.

3            MR. SCHWARTZ:  For sure, for sure.

4            But you would look at the offense as charged, as

5    convicted, and then you would look at your Honor's independent

6    view of the evidence as to what, particularly in a scheme or

7    conspiracy case, an individual defendant was personally

8    responsible for.

9            Here, everything that your Honor just held was

10   prefaced with the words -- some version of the words "assuming

11   the facts necessarily found by the jury," and we have a

12   difference as to what that is, and that makes this strange, is

13   all I am saying.

14           But the government has not pointed to anything that

15   Mr. Archer has done that makes him worthy of the sort of

16   punishment that it's seeking.  Instead, it's trying to compare

17   him to other people, and I think, putting aside those other

18   things, it's very clear that Mr. Archer played a fundamentally

19   different role — we would say he was used — he played a

20   fundamentally different role in this scheme than even

21   Mr. Cooney, who they want to compare him to.  Mr. Cooney was

22   sentenced to 30 months in prison, and they say that's an

23   appropriate benchmark, but let's just look at some of the

24   critical differences between them.

25           Just to point to three what I think are enormous

M2SKARCS

factual differences between them as to even crediting

everything we're saying was implicit in the jury's verdict are

plainly different:

Number one, Mr. Cooney profited from the scheme and

received money directly from the fake Wakpamni account.

Mr. Archer did not.  He lost money in the account.

Number two, Mr. Cooney falsified documents relating to

Calvert as part of the coverup and then submitted those

documents to the SEC to obstruct its investigation, which led,

I believe, your Honor to give him an obstruction enhancement at

sentencing.  Mr. Archer didn't do any of that.  There is one --

actually two emails where he used the word "Calvert."  There's

no indication that he understood what it was or that he was

trying to cover anything up as opposed to just repeating a word

that Jason Galanis had said to him.  The government has not

asked for an obstruction enhancement, nor would one possibly be

appropriate.  That alone is a basis to distinguish them for

respect for the law and general deterrence purposes.

And number three is, just between those two men, look

at the way that they interacted with and dealt with one

another.  Your Honor will recall the recording that was put

into evidence of Bevan Cooney talking about Mr. Archer, talking

about how he was going to be used, his communications with

Jason Galanis where Jason Galanis told Bevan Cooney to take it

slow with Mr. Archer or else he would just have to pimp him

M2SKARCS

out.  They were, even in a world in which Mr. Archer knew what
was going on, plainly using him.  They were using him for his
connections, they were using him for his reputation, they were
using him for his name, they were using him for his good
credit.

Mr. Archer played a fundamentally different role in
this scheme, even crediting everything that we're talking
about, than Mr. Cooney did, and it would actually offend the
notion of just punishment and trying to avoid sentencing
disparities to sentence them anywhere close to one another
because they are not, even in this view, close to equally
responsible for the fraud.

Now, all that being said, the purpose of sentencing is
not just to look at the offense, but also to look at the entire
person.  And Mr. Cooney and Mr. Archer are also totally
different people, and I'm not going to speak to him as a
person, but I will speak to Mr. Archer.

Mr. Archer is someone who spent the early years of his
life working incredibly hard to build businesses, successfully
to build businesses, and that all came crashing down when this
case was charged, and he bears some responsibility for that,
for sure.  In the almost six years since that has happened, he
has put his head down, and he has dedicated himself equally to
his friends, family, and community, and you see that in the
outpouring of support that you get from his immediate family,

M2SKARCS

from his extended family, from the people he works with, from

the members of his community, from the parents of the kids that

he coaches in the community lacrosse league, from all of the

people that he has selflessly helped over the years, whether

with his time or with his money or with anything else.

Mr. Archer has lived under this court's supervision

for almost six years.  He has a spotless record.  He is a

person who is loved and supported by his family and community,

as you see by the folks not only who submitted letters, but who

have taken the time to come here today.

All of those things must be balanced against the

offense that, for today's purposes, we assume that he

committed.  And whether that technically qualifies for an

aberrant behavior departure, it is plain that the offense

conduct was aberrant, that it is not like anything he's ever

done or been accused of doing any other time in his life, and

it's very clear why it happened.  It happened, whether

knowingly or not, because he came under the influence of a

person that he trusted far too much and didn't ask nearly

enough questions of.

He has and his family has and his friends have

suffered incredibly already as a result of that association.

While no one would say that being on pretrial

supervision for six years is the same as being sentenced to

jail, it is a material impact on a person's liberty, on their

M2SKARCS

ability to live their lives, on their ability to earn a living and provide for their family, and Mr. Archer has been doing that for the last six years, he's been doing it without complaint.

I respectfully submit — and I, of course, want you to hear from Mr. Archer himself — I respectfully submit that no purpose — no purpose articulated by the government and no other purpose — would possibly be served by taking this man out of the community, by taking him away from his three children, the oldest of whom is 14, by taking him away from his wife, who has had to become the primary bread earner for the family, by taking him away from the many children that he coaches in his community, by taking him away from the family that he supports, again, not only through his work, but through his time.  The daughter that he drives to and from school every day and spends countless hours with because of her needs, the other children that he devotes so much time to, no purpose, no legitimate purpose of sentencing would be served by taking him away from those people.

If anything, the way to serve the purposes of sentencing are to require him to do more, to sentence him to probation, and to require him to give more to his community. Those things would both allow him to be a productive member of his community, as he has been, not inflict more collateral horrific consequences on his family and his community, and

M2SKARCS

1  demonstrate the appropriate level of punishment for his conduct

2  and himself as a person in comparison to both the other

3  individuals involved in this case and on its own terms.

4      Thank you.

5      THE COURT:  Thank you.

6      Mr. Archer, I read your letter, but would you like to

7  be heard today?

8      THE DEFENDANT:  Yes, your Honor.

9      THE COURT:  Just bring the microphone a little closer,

10  please.

11     THE DEFENDANT:  I'm reading my words.

12     The position I found myself in here is nothing less

13  than surreal.  I've been sentenced for a crime I was not

14  knowingly a part of, but I now understand was used by Jason

15  Galanis and others to help commit the fraud.  And I have deep

16  remorse for the victims of the crime, the pension funds, the

17  Wakpamni tribe, as well as other people who were injured by

18  Jason Galanis's scheme, not to mention the numerous Burnham

19  employees that needlessly lost their jobs.

20     Of course, I'm most sorry for my family, for what I

21  put them through, and the dreams we haven't realized.  I want

22  you to understand even though I did not commit this crime, I've

23  learned many lessons through the experience.  I was doing too

24  many things at once, probably not paying enough attention to

25  any one of them.

M2SKARCS

1     All the business deals I was involved with, I probably
2  concentrated too much due diligence on the overseas activities
3  and trusted the people involved in this deal too much because
4  of their pedigree and reputation.

5     I have learned a lesson in the hardest way possible
6  that you cannot outsource any critical decision-making and that
7  people are not always what they seem.

8     I've also learned an important lesson about the people
9  in my life.  Regardless of what your Honor decides today, I
10  have a more loving family than most and equally supportive
11  friends, which I attribute to be very exceptionally blessed and
12  very lucky.  Those people have stood with me throughout this
13  process, and I'm sustained by their love.  Corrupt actors in
14  our business world and politics, coupled with vicious media,
15  have no chance against the kind of love and support I have, and
16  they will not shape my narrative.

17     I do not think there is much more to say here that I
18  haven't already told you in my very personal letter.  I just
19  hope that these words fall on receptive ears and a
20  compassionate heart.

21     I just ask you that you do not separate me from my
22  young family and allow me to continue to try to do good with my
23  children and my community.

24     THE COURT:  Thank you.

25     Is there any reason why sentence cannot be imposed at

M2SKARCS

1    this time?

2          MS. MERMELSTEIN:  No, your Honor.

3          MR. SCHWARTZ:  No, your Honor.

4          THE COURT:  I'm required to consider the advisory

5    guidelines range as well as the factors outlined in the

6    provision of the federal law I've mentioned a couple times, 18,

7    United States Code, Section 3553(a), and I have done so.

8          There's no dispute about the harm this fraud caused to

9    real people.  One of the poorest Native American tribes in the

10   country, as well as the clients of Hughes and Atlantic pension

11   funds held for the benefit of transit workers, longshoremen,

12   housing authority workers, and city employees, among others.  A

13   substantial sentence must, thus, be imposed to reflect the

14   seriousness of the offense, promote respect for the law,

15   provide just punishment, and afford adequate deterrence to

16   others who may seek to engage in similar criminal conduct.

17         Many judges have noted the inordinate emphasis that

18   the sentencing guidelines place in fraud cases on the amount of

19   actual or intended financial loss, and that's a quote from the

20   Adelson case, 441 F. Supp. at 509, which can oftentimes lead to

21   unreasonable and unfair sentences.  In such cases, judges have

22   varied downward pursuant to the rule 3553(a) factors to arrive

23   at a more just and reasonable sentence.  See, e.g. Johnson,

24   2018 WL 1997975, at *4.  Such an approach is warranted here.

25         I have also considered the need, as the government, I

M2SKARCS

think, rightly notes, to avoid unwarranted sentencing

disparities.  I want to make clear, though, that the three

defendants who received the longest sentences in this case

received thousands or even millions of dollars in criminal

proceeds and were convicted of another separate fraud together

prior to this one.  Mr. Archer, by contrast, lost money from

this scheme and has no criminal history.

The government argues that Mr. Archer's most akin in

terms of culpability to Bevan Cooney, whom I sentenced to

30 months in prison.  Accepting that Archer had the requisite

intent, I generally agree.  Like Mr. Archer, Mr. Cooney played

a relatively smaller role in the scheme compared to his

coconspirators, but, in some respects, as Mr. Archer notes, he

is distinguishable from Mr. Cooney as well.

Cooney received thousands of dollars in criminal

proceeds, less, for sure, than the millions others received in

this case, but Archer received none at all.  Indeed, Archer

lost hundreds of thousands of dollars of his own money.  And

while Mr. Cooney had a criminal history, Archer has none, and

Cooney, as noted, got an enhancement for obstruction of

justice, which the government isn't even seeking here.

Finally, I want to note that Mr. Cooney was sentenced

prior to the pandemic.  Countless judges, including myself,

have given significantly reduced sentences since the pandemic

began, and have recognized that, as Judge Oetken put it in the

M2SKARCS

*Gonzalez* case, prison time is much more punitive given

conditions that have been extraordinarily harsh.  In his

estimate, incarceration now is essentially the equivalent of

either time and a half or two times that would ordinarily be

served.  In *United States v. Saez*, Judge Engelmayer rightly

noted that beyond the risks to health, the pandemic has also

subjected all inmates to far more restrictive conditions of

confinement and has prompted limits on access to visitors,

including family, far beyond what would normally be the case.

Whether or not we can quantify how much harder it is

between the risks of COVID, the lockdowns, and the limitations

on healthcare, movement, and visitation, this is an important

factor to consider at sentencing, particularly for someone like

Mr. Archer, who does not present a danger to the community and

is unlikely to recidivate.

While it's true that the pandemic is starting to wane,

the conditions inside our prisons remain extraordinarily

difficult.  In fact, the only defendant I have sentenced in

this case since the pandemic began is Michelle Morton, who

received a 15-month sentence, and she was not only convicted of

conspiracy to commit securities fraud, but investment advisor

fraud.  In addition, Morton faced a higher guidelines range and

did not receive a minor-role reduction.

I have also considered, pursuant to 3553(a),

Mr. Archer's personal history and characteristics because each

M2SKARCS

defendant must be considered individually as a person at

sentencing.  As noted by the probation office in the

presentence report, he's led an otherwise law-abiding life for

the last 47 years, has been an active member of his community,

both in terms of volunteering his time and money, and has been

consistently employed throughout his adult life, and is, by all

accounts, a loving and devoted father to young children.

I've reviewed all 44 letters submitted on Mr. Archer's

behalf, which speak to what he's like as a person, parent,

friend, and community member.  While letters from family

members and friends can be expected, I'll note that the sheer

number of letters from all aspects of life is somewhat unusual.

Among other things, they address his charitable endeavors,

including his work advocating and fundraising for veterans

struggling to reacclimate to civilian life, children in

poverty, victims of sex trafficking, and inner-city youth.

So I've considered all of that as well as the other

arguments the parties have made.

Ultimately, while I think the guidelines range is

simply too high, as is the government's recommendation, being

faithful to the jury's verdict, as I must, the crimes are just

too serious and the harm done too great to sanction a

nonincarceratory sentence here.  In other words, a sentence

without any prison time is simply insufficient for someone who

knowingly committed this crime, which the jury concluded

M2SKARCS

1    Mr. Archer did.

2           So, Mr. Archer, please rise for the imposition of

3    sentence.

4           It's the judgment of this Court that you be committed

5    to the custody of the Bureau of Prisons for a term of one year

6    and one day, to be followed by a term of supervised release of

7    one year on all counts to run concurrently.

8           I believe that this sentence is sufficient, but not

9    greater than necessary, to comply with the purposes of

10   sentencing set forth in the law.

11          You may be seated.

12          I'll also note that this is consistent with sentences

13   imposed by other judges from this district in financial fraud

14   cases with either similar guidelines range, roles, and/or loss

15   amount, including *U.S. v. Casper*, 19 CR 337; *U.S. v. Cervino*,

16   15 CR 171, and *U.S. v. Antoine*, 16 CR 763.

17          Now I'm going to impose financial penalties and inform

18   you of the conditions of your supervised release.

19          With respect to supervised release, it's going to be

20   for one year instead of three because you have been on release

21   for six years already.

22          All the standard conditions of supervised release

23   shall apply.

24          Mr. Schwartz, do you waive the public reading of the

25   standard mandatory conditions, or would you like me to read

M2SKARCS

1    them out loud?

2              MR. SCHWARTZ:  Not necessary, your Honor.  We waive.

3              THE COURT:  Okay.

4              So I'm going to impose mandatory special conditions of

5    supervised release.  I am imposing the standard conditions

6    recommended by the probation department, as well given the

7    nature of the crime and the financial penalties that will

8    follow.

9              You must report to the probation office in the federal

10   judicial district where you're authorized to reside within 72

11   hours of release from imprisonment unless the probation office

12   instructs you to report to a different probation office.

13   Sorry, that was a standard condition.

14             You must provide the probation officer with access to

15   any requested financial information.  You must not incur new

16   credit card charges or open additional lines of credit without

17   the approval of the probation office unless you're in

18   compliance with the installment payment schedule.

19             And you will be supervised in the district of your

20   residence.

21             Now we've got to talk about the financial penalties.

22             I am imposing the mandatory special assessment of

23   $200, which must be paid immediately.

24             Mr. Schwartz, do you want to be heard with respect to

25   restitution and forfeiture?  I mean, I'll tell you I was

M2SKARCS

1    inclined to give the amount requested by the government for the

2    very reason we talked about earlier with respect to reasonable

3    foreseeability.

4            MR. SCHWARTZ:  Well, I was going to say, I'll note my

5    objection, but I do understand that that reasoning essentially

6    compels the result that your Honor just discussed.

7            The proposed orders, we only received this morning.  I

8    would like some time to look at them, particularly with respect

9    to the joint and several calculation of the forfeiture order,

10   which I understand the government has no objection to.

11           MS. MERMELSTEIN:  That's fine, your Honor.  I think

12   you have to impose the number, but we can sign the order with

13   the numbers later.

14           THE COURT:  That's fine.

15           With no objection to restitution, other than the

16   objections that are implicit in the objection to this based on

17   the earlier arguments, restitution is ordered in the amount of

18   $43,427,436.  As noted, liability for restitution shall be

19   joint and several with that of all other defendants ordered to

20   make restitution for the offenses in this matter.  The names,

21   addresses, and specific amounts owed each victim are outlined

22   on a schedule of victims page which will be filed under seal.

23           With respect to forfeiture, I am ordering forfeiture

24   in the amount of $15,700,513 in funds.

25           Do you want me to rule on your objection with respect

M2SKARCS

1    to forfeiture?  I can read my ruling.  I know you had made

2    objections and cited particular cases, and I'm happy to express

3    my rationale right now.

4              MR. SCHWARTZ:  Yes.  There was -- it becomes a little

5    academic in light of the restitution order, but there was a

6    separate objection to the forfeiture order with respect to the

7    bulk of funds that Mr. Archer never had control over.

8              THE COURT:  I am imposing forfeiture in the amount I

9    just noted.  I understand Mr. Archer's argument that no

10   forfeiture obligation is appropriate because while that 15-plus

11   million in funds passed through his accounts at some point, he

12   lacked control over them and does not possess them now.  He

13   cites *Contorinis*, the *Contorinis* case, 692 F.3d at 147, in

14   which the Second Circuit held that insider trading proceeds

15   that were never possessed by the defendant which went directly

16   to an innocent third-party investment fund where the defendant

17   was a mere employee and small equity owner could not be subject

18   to forfeiture.  He also cites the *Honeycutt* case, 137 S. Ct. at

19   1635, in which the Supreme Court held that a defendant who had

20   no ownership interest in the entity that received the money and

21   did not personally benefit could not be subject to forfeiture.

22             I agree with the government that these citations are

23   misplaced because, here, the funds went directly into the

24   Rosemont Seneca Bohai account, not a third-party entity, but an

25   entity which Archer controlled.  In any event, *Contorinis* makes

M2SKARCS

1    clear, and I believe Mr. Archer acknowledges, that a court may

2    order a defendant to forfeit proceeds received by others who

3    participated jointly in the crime provided the actions

4    generating those proceeds were reasonably foreseeable to the

5    defendant.  Mr. Archer argues that it was not reasonably

6    foreseeable to him that Galanis was providing him proceeds of

7    the bond scheme, but, again, implicit in the jury's verdict was

8    the finding that Mr. Archer knew the proceeds of the bond

9    scheme were illicitly obtained.

10            Even if he didn't have control over those funds,

11   Galanis indisputably did.  That Archer does not possess any

12   fraudulently proceeds now is also not relevant or determinative

13   here.  A defendant may be ordered to forfeit "any property...

14   which constitutes or is derived from proceeds traceable to the

15   offense, whether kept by the defendant or shared with others,"

16   and that's a quote from the *United States v. Ohle* case, 441 F.

17   App'x 803.

18            I thus find that the funds in question were acquired

19   by Mr. Archer because they were controlled by him or his

20   coconspirators and find that an order of forfeiture in the

21   amount of $15,700,513 is appropriate here.

22            In light of the very significant forfeiture and

23   restitution amounts, I decline to impose a fine.

24            I've already noted the special assessment.

25            So those are my rulings.

M2SKARCS

1          Does either counsel know of any legal reason why this

2     sentence cannot be imposed other than the arguments already

3     made?

4          MS. MERMELSTEIN:  No, your Honor.

5          MR. SCHWARTZ:  No, your Honor, although I would ask,

6     for the record, whether your Honor has considered the

7     possibility, consistent with this sentence, of ordering

8     Mr. Archer to serve through intermittent incarceration so as to

9     minimally disruptive to his small children?

10          THE COURT:  And what would you propose specifically?

11          MR. SCHWARTZ:  So, in my experience, the Bureau of

12     Prisons typically administers that program, and it requires

13     some combination of nights and weekends in a facility.

14          THE COURT:  But that's ultimately up to the Bureau of

15     Prisons?

16          MR. SCHWARTZ:  No.  Your Honor would have to -- if we

17     take a break, I'll point you to the provisions, but your Honor

18     would have to order the sentence to be served through

19     intermittent incarceration, and then they would administer it.

20          THE COURT:  I don't think that's appropriate here.

21     I'm happy to make other recommendations, as I often do, but I

22     think that there are many defendants in criminal cases that

23     have familial obligations, and often it's the family members of

24     a criminal defendant who are hurt the most.

25          MR. SCHWARTZ:  I do understand that.  Just to be

M2SKARCS

1   clear, I don't think a recommendation -- I don't think the

2   Bureau of Prisons could do anything with a recommendation.  I

3   think it would have to be part of the sentence.

4              THE COURT:  Okay.

5              MR. SCHWARTZ:  But if your Honor is declining to do

6   that, obviously, that is within your --

7              THE COURT:  Are there any other recommendations that

8   you're asking I make in terms of location or anything else?

9              MR. SCHWARTZ:  We would ask that Mr. Archer be

10  designated to a facility close to his home.

11             THE COURT:  Yes.  And that recommendation will be

12  made.

13             So, before I read Mr. Archer his appellate rights, I'd

14  like to discuss a surrender date within approximately 60 days.

15             Mr. Schwartz, do you want to talk to Mr. Archer about

16  dates?

17             MR. SCHWARTZ:  Yes, although I do have an application,

18  your Honor.

19             I would ask for you to consider staying imposition of

20  the sentence pending appeal.  Given the material appellate

21  issues, including with respect to the sentencing issue that

22  we've been discussing and the nature of the sentence, it's

23  highly likely that if Mr. Archer is required to report within

24  approximately 60 days, that he will serve on most or all of

25  that sentence before an appeal is adjudicated.  I think in

M2SKARCS

1   similar circumstances, district courts or the Court of Appeals

2   have stayed the imposition of sentence pending appeal.  I think

3   that would be appropriate here.

4           THE COURT:  Why don't you do this:  Why don't you

5   write me a letter setting forth the basis of the appeal — I'm,

6   obviously, familiar with the arguments you've made today — and

7   I will let the government respond.  So I won't set a surrender

8   date today, but I'll consider your arguments with respect to

9   the stay for purposes simply of appeal.

10          Okay?

11          MR. SCHWARTZ:  Yes.  I'm sorry, I missed a word.  You

12   will or you won't set a surrender date today?

13          THE COURT:  I'm not going to set a surrender date

14   today.  I'll get your letter within a week, I'll get the

15   government's response within a week, and I will rule promptly

16   on the appropriateness of that.

17          MR. SCHWARTZ:  Thank you.

18          THE COURT:  And it would be helpful if you can cite to

19   other cases in which a stay of that sort was or was not

20   granted.

21          MR. SCHWARTZ:  Absolutely.

22          THE COURT:  Thank you.

23          So that's the sentence of this Court.

24          Mr. Archer, you have a right to appeal your conviction

25   and sentence.  If you so choose to appeal, the notice of appeal

M2SKARCS

1    must be filed within 14 days of the judgment of conviction.  If

2    you're not able to pay for the costs of an appeal, you may

3    apply for leave to appeal in forma pauperis, which simply means

4    that court costs, such as filing fees, will be waived.

5           If you request, the Clerk of Court will prepare and

6    file a notice of appeal on your behalf.

7           At sentencing, I often say this because I firmly

8    believe it to be true, I don't think people need to be defined

9    by the worst mistakes they ever make, and while I know you

10   maintain your innocence, you also acknowledge making serious

11   mistakes, and you talked about this a little bit in what you

12   said today.  I'll say to you what I say to others often at

13   sentencing:  I don't think you need to be defined by this case,

14   even though I know it's hard to believe that right now.  As you

15   noted, you are so lucky to have so many supportive family

16   members and friends and ability to help others through

17   volunteering, working with youth and charity, and nothing is

18   going to take any of that away from you.

19          Are there any other applications at this time?

20          MR. SCHWARTZ:  No, your Honor.

21          MS. MERMELSTEIN:  No, your Honor, except to say that

22   we move to dismiss the underlying counts.  The trial was a

23   superseding indictment, so there are underlying indictments.

24          THE COURT:  The underlying indictment will be

25   dismissed.

M2SKARCS

1          All right.  Thank you.  We are adjourned.

2          (Pause)

3          THE COURT:  My deputy just raised an issue about

4     timing.  You can't file your notice of appeal, as you know,

5     until the judgment is issued, and the judgment won't be issued

6     until we have a surrender date in it.

7          Do you think that's right?  Do you think -- just give

8     me one second.

9          (Pause)

10          THE COURT:  I think it's fine.  I think it's fine.

11     I'll issue the judgment.  I won't mention a surrender date.

12     I'll get your letters in a week and a response within a week of

13     that.  I'll rule promptly on the motion for the stay.  If I

14     deny the stay, I'll promptly set a surrender date, but I think

15     I can move forward on the judgment.

16          Okay?

17          Thank you.

18                              *  *  *

19

20

21

22

23

24

25