MANDATE

22-539
*United States v. Archer*

1:16-cr-00371-RA-6

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jul 25 2023

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 7th day of June, two thousand twenty-three.

PRESENT:

> RICHARD J. SULLIVAN,
> WILLIAM J. NARDINI,
> MYRNA PÉREZ,
> *Circuit Judges.*

———————————————————

UNITED STATES OF AMERICA,

> *Appellee*,

v.  No. 22-539

DEVON ARCHER,

> *Defendant-Appellant*.*

———————————————————

\* The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

MANDATE ISSUED ON 07/25/2023

| | |
|---|---|
| **For Defendant-Appellant:** | MATTHEW L. SCHWARTZ (Craig A. Wenner, *on the brief*), Boies Schiller Flexner LLP, New York, NY. |
| **For Appellee:** | SAMUEL P. ROTHSCHILD (Negar Tekeei, Hagan Scotten, *on the brief*), Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY. |

Appeal from a judgment of the United States District Court for the Southern District of New York (Ronnie Abrams, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Devon Archer appeals from a judgment of conviction following a jury trial in which he was found guilty of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5, stemming from his involvement in a scheme to defraud the Wakpamni Lake Community Corporation of the Oglala Sioux Tribe (the "Wakpamni") of the proceeds of a series of bond offerings worth approximately $60 million. For his role in the scheme, Archer was sentenced to one year and one day in prison to be followed by one year of supervised release. On appeal, Archer

2

raises several challenges to his conviction and sentence, each of which we address in turn. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

## I. The Law-of-the-Case Doctrine

Archer argues that "the law of this Circuit has changed so substantially" since we reversed the district court's grant of his motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure, see *United States v. Archer (Archer I)*, 977 F.3d 181 (2d Cir. 2020), that we must reinstate the district court's decision or remand to the district court for reconsideration of the motion. Archer Br. at 30. As a general principle, the law-of-the-case doctrine requires us to "adhere to [our] own decision at an earlier stage of the litigation." *United States v. Plugh*, 648 F.3d 118, 123 (2d Cir. 2011) (internal quotation marks omitted). But we need not adhere to the law of the case in the face of an intervening change in controlling law, new evidence, or the need to prevent a clear error or a manifest injustice. *See Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983). In asserting that the law of the Circuit has changed since our prior opinion, Archer relies on *United States v. Landesman*, 17 F.4th 298 (2d Cir. 2021). That reliance is misplaced.

3

In *Archer I*, we clarified that a district court may not grant a motion for a new trial "based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *Archer I*, 977 F.3d at 187–88 (internal quotation marks omitted). To illustrate when it would be appropriate to grant a motion for a new trial under this standard, we provided two examples of when a district court need not "defer to the jury's resolution of conflicting evidence" – namely, (1) where the evidence was "patently incredible or defied physical realities," or (2) where an "evidentiary or instructional error compromised the reliability of the verdict." *Id.* at 188–89 (internal quotation marks and alterations omitted). Because *Archer I* is a published opinion, it binds all future panels of this Court "unless and until it is overruled by the Court *en banc* or by the Supreme Court." *Deem v. DiMella-Deem*, 941 F.3d 618, 623 (2d Cir. 2019). The *Landesman* panel thus had no authority to overrule our holding in *Archer I*.

Archer nevertheless argues that *Landesman* "retreated" from *Archer I*'s supposed position that there are only two situations where a district court may disregard a jury's resolution of conflicting evidence. Archer Br. at 29. But this is wrong for two reasons. First, *Archer I* never said that the two examples it

4

provided formed an exhaustive list. Second, *Landesman* never purported to walk back the holding in *Archer I*. For these reasons, Archer's contention that *Landesman sub silentio* reversed *Archer I*'s holding as applied to him defies logic and the clear law of this Circuit. We therefore decline to reinstate the district court's decision or remand to the district court for reconsideration of Archer's motion for a new trial.

## II. Archer's Motion to Suppress

Archer next challenges the sufficiency of two nearly identically worded warrants used to seize records associated with two of his email accounts. Specifically, he contends that the warrants flunk the Fourth Amendment's particularity requirement because they included three catch-all phrases – "among other statutes," "evidence of crime," and "communications constituting crime" – that allowed law enforcement officers to search for evidence of *any* crime rather than evidence of the Wakpamni scheme alone. Archer Br. at 34–35 (quoting App'x at 211, 218) (emphasis omitted). We disagree.

"In an appeal from a district court's ruling on a motion to suppress, we review legal conclusions de novo and findings of fact for clear error." *United States v. Freeman*, 735 F.3d 92, 95 (2d Cir. 2013). The Fourth Amendment provides

5

that "no Warrants shall issue, but upon probable cause, . . . and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To satisfy the particularity requirement, a warrant must (1) "identify the specific offense for which the police have established probable cause"; (2) "describe the place to be searched"; and (3) "specify the items to be seized by their relation to designated crimes." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (internal quotation marks omitted). But the Fourth Amendment does not demand "a perfect description of the data to be searched and seized." *Id.* at 100. Rather, "some ambiguity" is permitted "so long as law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant." *Id*. (internal quotation marks omitted).

Here, both warrants specified the offenses for which the officers had established probable cause, *see* App'x at 211, 218 (listing 18 U.S.C. § 1348; 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. 240.10b-5; 18 U.S.C. § 371; and 15 U.S.C. §§ 80b-6 and 80b-17), identified the email accounts to be searched, *see id.* at 205, 216 (naming the accounts), and specifically described the material to be seized from those accounts,

6

*see id.* at 205–13, 216–19 (authorizing the collection of email content, address book content, and transactional information, among other data).

Archer nevertheless contends that the warrants' inclusion of the phrase "among other statutes," *id.* at 211, 218, at the end of the list of specified crimes for which there was probable cause authorized an unlawful general search, untethered to the Wakpamni scheme. But read in context, the warrants make clear that they were sufficiently tailored to permit "the rational exercise of judgment by the executing officers in selecting what items to seize." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (internal quotation marks and alterations omitted).

Archer makes similar arguments with respect to the warrants' use of the phrases "evidence of crime" and "communications constituting crime." App'x at 212, 219. But once again, Archer's interpretation rests on his attempt to isolate those phrases from the rest of the warrant to suggest that law enforcement officers were authorized to collect evidence of *any crime whatsoever* without limitation. Considered in context, the warrants do no such thing; they authorized a search for evidence related to only one conspiracy. *See id.* at 211, 218 (authorizing the seizure of "evidence of the agreement to engage in a fraudulent scheme involving

7

the issuance of bonds on behalf of the Wakpamni . . . and the misappropriation of the proceeds of those bonds"); *see also Andresen v. Maryland*, 427 U.S. 463, 479–82 (1976) (concluding that the term "crime" had to be read in the context of the warrant, and that when so read, it clearly referred to the scheme at issue); *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990) (upholding "broadly worded categories of items" in light of the warrant's "illustrative list" of items that could be seized). We therefore cannot say that the district court erred in concluding that the warrants were sufficiently particularized.

### III. Archer's Severance Motion

Archer also argues that his joint trial with John Galanis subjected him to a substantial risk of "spillover prejudice." Archer Br. at 51. Again, we disagree. In federal courts, there is a preference for defendants who are indicted together to be tried together. *See Zafiro v. United States*, 506 U.S. 534, 537 (1993). Accordingly, severance is required "only if there is a serious risk that a joint trial would compromise a specific trial right" of a defendant or "prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. We review a district court's denial of a motion to sever for abuse of discretion. *See United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994).

8

Archer first contends that he was prejudiced because the evidence at trial "overwhelmingly" established Galanis's guilt, while the evidence against Archer was "entirely documentary and inferential." Archer Br. at 56 (internal quotation marks omitted). Perhaps. But we have "repeatedly recognized that joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." *See United States v. Locascio*, 6 F.3d 924, 947 (2d Cir. 1993) (collecting cases). And so, while the quantum of evidence presented against Archer and Galanis may not have been equal, we see nothing in the record to suggest that the jury was unable to compartmentalize the evidence against each defendant.

Archer next asserts that the introduction of evidence of Galanis's prior conviction specifically subjected Archer to spillover prejudice. But the mere "fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." *United States v. Spinelli*, 352 F.3d 48, 56 (2d Cir. 2003) (internal quotation marks omitted). Indeed, we have held that introducing evidence of one defendant's prior bad acts does not necessarily prejudice other defendants at trial, *see United States v. Cacace*, 796 F.3d 176, 192 (2d Cir. 2015), and we see no reason to take a different approach here. Moreover, the district court's

9

charge – which expressly instructed the jury not to consider the evidence of Galanis's prior conviction against Archer – cured any risk of prejudice. *See Spinelli*, 352 F.3d at 55 (reasoning that any risk of prejudice in joint trial may be remedied where, as here, "the district court explicitly instructed the jury to consider the defendants individually").

## IV. The District Court's Jury Instructions

Archer challenges the district court's jury instructions in two respects. First, he argues that the district court erred by failing to instruct the jury regarding multiple conspiracies. Second, he contends that the district court erred by advising the jury that it could infer Archer's knowledge of the scheme based on a theory of conscious avoidance. Archer is wrong on both counts.

### A. Multiple-Conspiracies Charge

As a general matter, "a criminal defendant is entitled to instructions relating to his theory of defense, for which there is some foundation in the proof." *United States v. Dove*, 916 F.2d 41, 47 (2d Cir. 1990). Nevertheless, we will vacate a conviction for failure to give a requested instruction only when the defendant's proposed instruction "is legally correct, represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively

10

presented elsewhere in the charge." *United States v. Doyle*, 130 F.3d 523, 540 (2d Cir. 1997) (internal quotation marks omitted). Here, Archer requested an instruction that the Wakpamni scheme consisted of two conspiracies – one to misappropriate the proceeds of the Wakpamni bonds, and another one to defraud the investors who purchased the bonds by failing to disclose material conflicts of interest.

A defendant is "not entitled to a multiple conspiracy charge" when "only one conspiracy has been alleged and proved." *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990) (internal quotation marks omitted). To prove a single conspiracy, the government must show only that "each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004) (internal quotation marks omitted). A cognizable single conspiracy thus does not transform into multiple conspiracies "merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance" among the conspirators. *United States v. Berger*, 224 F.3d 107, 114–15 (2d Cir. 2000) (internal quotation marks omitted).

11

Here, the record demonstrates that there was only one conspiracy – to defraud the Wakpamni into issuing more than $60 million in debt and to misappropriate the bond proceeds for personal use. To be sure, the conspiracy involved two types of misrepresentations and two sets of victims. With respect to the first victim – the Wakpamni – one group of coconspirators lied to the tribe about how the bond proceeds would be invested. As for the other victims – the pension funds – a different set of coconspirators lied to them about the nature of their investment in the bonds. But the two purported conspiracies involved the same goal (to divert bond proceeds for personal use) and were hatched by the same individual (Jason Galanis). *See id.* at 115 (considering overriding goal, overlap of leadership, and common participants as evidence that several schemes fell within same conspiracy). We thus agree with the district court's conclusion that there was no factual basis for a multiple-conspiracies charge.

**B. Conscious-Avoidance Charge**

Archer also challenges the district court's conscious-avoidance instruction. A conscious-avoidance instruction is appropriate when (1) "a defendant asserts the lack of some specific aspect of knowledge required for conviction," and (2) "the

12

appropriate factual predicate for the charge exists." *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003). Both requirements are met here.

As to the first prong, Archer clearly disputed his knowledge of the object of the alleged conspiracy. While Archer did not testify, his knowledge of the goals of the conspiracy was plainly in dispute at trial, *see, e.g.*, App'x at 894 ("The money did move that way, it moved in a big circle, but *Devon didn't know it*." (emphasis added)), and in fact, remains disputed on appeal, *see, e.g.*, Archer Br. at 45 (arguing that Archer "had no idea" that the source of the funds used to purchase the second bond issuance came from the first bond issuance).

With respect to the second prong, there was a sufficient factual predicate for a conscious-avoidance instruction on the facts before the jury. In *Archer I*, we catalogued many of the red flags Archer received during the course of the scheme, including the "Ponzi-like" funding of the second bond purchase using the proceeds of the first and the circuitous routing of $15 million to make that purchase. 977 F.3d at 192–93. On this record, we see no reason to second-guess the district court's conscious-avoidance instruction. *See United States v. Eltayib*, 88 F.3d 157, 170 (2d Cir. 1996) (explaining that "if the defendant's participation in the

13

conspiracy has been established, conscious avoidance may support a finding with respect to the defendant's knowledge of the objectives or goals of the conspiracy").

Archer counters that the charge was improper because the government affirmatively argued that Archer had "'*devised* a scheme, a scheme to use tribal bonds to fuel' his 'business empire.'" Archer Br. at 44 (quoting App'x at 248). But a conscious-avoidance instruction is appropriate even where the government's primary theory is that the defendant had actual knowledge. *See United States v. Hopkins*, 53 F.3d 533, 542 (2d Cir. 1995) (holding that a conscious-avoidance instruction is proper even when "the government has primarily attempted to prove that the defendant had actual knowledge, while urging in the alternative that if the defendant lacked such knowledge it was only because he had studiously sought to avoid knowing what was plain").[1]

---

[1] Archer also argues that the government improperly urged the jury to infer his "intent to participate in the alleged *conspiracy*" based on a theory of conscious avoidance. Archer Br. at 46 (emphasis added). As this argument does not relate to the district court's jury instructions, Archer must show that the government's arguments "resulted in substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Aquart*, 912 F.3d 1, 27 (2d Cir. 2018) (internal quotation marks omitted). Contrary to Archer's assertion, the government argued only that the jury could infer Archer's *knowledge of the object of the conspiracy* based on conscious avoidance. *See, e.g.*, App'x at 792 (arguing that "you can't put your head in the sand; you can't see all these red flags, all these things about these transactions that don't make any sense and not want to know," as "[t]hat is the same thing as acting knowingly"); *id.* at 1096 (arguing that the deal "is filled with red flags from Archer['s] . . . perspective" and that "you can't say you didn't know because you stuck your head in the sand"). It never argued that Archer's participation in the conspiracy itself was a product of his willful

14

## V. Sentencing Challenge

Archer also argues that the district court committed reversible error by refusing to engage in the requisite fact-finding at sentencing pursuant to the applicable preponderance-of-the-evidence standard. Specifically, he contends that this error infected the court's calculation of his offense level because the court added a twenty-two level enhancement for loss amount and a two-level enhancement for ten or more victims based on a "guess" as to what "facts a jury might have found." Archer Br. at 18.

While Archer may disagree with the district court's factual findings, there can be no doubt that the court properly understood its role in assessing Archer's offense conduct under the Sentencing Guidelines. Before calculating Archer's offense level, the district court stated that it would "evaluate the enhancements to Mr. Archer's sentence under the typical preponderance[-]of[-]the[-]evidence standard." App'x at 2130. The district court then reviewed the evidence showing Archer's knowledge of the full scope of the Wakpamni scheme. The

---

blindness. *Compare United States v. Scotti*, 47 F.3d 1237, 1243 (2d Cir. 1995) (holding that a conscious-avoidance charge may not be used on the issue of "membership in a conspiracy"), *with United States v. Tropeano*, 252 F.3d 653, 660 (2d Cir. 2001) (holding that a conscious-avoidance charge may "support a finding that a defendant knew of the objects of the conspiracy"). We thus discern no error on this score, plain or otherwise.

15

court observed, for example, that Archer "personally purchased $15 million worth of bonds in the second issuance using money given to him by Jason Galanis, made representations to the [Wakpamni] that he was purchasing the bonds 'for his own account and for investment only,' transferred them to another entity controlled by his codefendants, [and] made false statements about the source of the money to Morgan Stanley and Deutsche Bank." *Id.* at 2132. The district court also highlighted evidence showing that Archer was "informed about the progress of the [investment advisers'] acquisitions" and that he was aware of the "possibility of placing the Wakpamni bonds with them." *Id.* Based on this evidence, the court found "by a preponderance of the evidence" that Archer was aware of the full loss amount and number of victims. *Id.* at 2132–33.

Against this clear record, Archer cherry-picks a handful of sentence fragments from the sentencing hearing transcript to argue that the district court shirked its fact-finding responsibilities and assumed "that it was required to defer to factual findings that it believed were 'implicit in the jury's verdict,' but which [actually] went far beyond the elements of the charged crimes." Archer Br. at 12 (quoting App'x at 2154). But the full transcript reveals that the district court did no such thing. *See, e.g.*, App'x at 2114 ("I don't think I need to accept every fact

16

argued by the government at summation."); *id.* at 2116 ("I don't think I necessarily need to find that he was involved in every aspect of the scheme."). At bottom, the district court correctly exercised its discretion and engaged in its own independent fact-finding to support its calculation of Archer's offense level under the Sentencing Guidelines.[2]

\* \* \*

We have considered Archer's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court



A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[2] At oral argument, counsel for Archer argued for the first time that the district court miscalculated Archer's Sentencing Guidelines range. While counsel initially represented that this issue was "less developed in the briefing," he ultimately conceded that it was, in fact, not developed at all. Oral Argument at 5:22–7:40. Because Archer failed to raise this argument in his opening brief or his reply brief, he has forfeited it. *See United States v. Cedeno*, 644 F.3d 79, 83 n.3 (2d Cir. 2011).